**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, ) ) ) ) | Case No. 22-cv-06124 (JMF) |
| Plaintiff, ) ) | |
| v. ) ) | |
| ARM OR ALLY, LLC; BLACKHAWK MANUFACTURING GROUP, INC., A/K/A 80 PERCENT ARMS, INC. OR 80 PERCENT ARMS; SALVO TECHNOLOGIES, INC., A/K/A 80P BUILDER OR 80P FREEDOM CO.; BROWNELLS, INC., A/K/A BROWNELLS OR BOB BROWNELL'S; GS PERFORMANCE, LLC, A/K/A GLOCKSTORE OR GSPC; INDIE GUNS, LLC; KM TACTICAL; PRIMARY ARMS, LLC; RAINIER ARMS, LLC; AND ROCK SLIDE USA, LLC, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

## RULE 5.1 NOTICE OF CONSTITUTIONAL CHALLENGE OF A FEDERAL STATUTE

Pursuant to Rule 5.1(a) of the Federal Rules of Civil Procedure, Defendants Salvo Technologies, Inc., a/k/a 80P Builder or 80P Freedom Co.; Brownells, Inc., a/k/a Brownells or Bob Brownell's; Primary Arms, LLC; and Rock Slide USA, LLC (collectively, "Defendants"), respectfully file this Rule 5.1 Notice of Constitutional Challenge of a Federal Statute with the Court. In Brownells' Motion to Dismiss Plaintiff's Amended Complaint filed with this Court on January 16, 2023 (ECF Nos. 89, 91), and as incorporated and fully adopted by Salvo, Primary Arms, and Rock Slide in their respective Motions to Dismiss (ECF Nos. 93–98), Defendants

challenge the constitutionality of the federal statutory definition of "firearm," arguing that interpreting "firearm" as Plaintiff urges would render the relevant federal statute unconstitutionally vague in violation of the Fifth Amendment and violate the Second Amendment (*see* ECF No. 91 at 41–44, 50–54).

In compliance with Rule 5.1(a)(2) of the Federal Rules of Civil Procedure, Defendants will serve the United States Attorney General with a copy of this Notice and the pleading questioning the federal statute's constitutionality via certified mail. A true and accurate copy of that notice is attached hereto as Exhibit A.

Dated: January 18, 2023        Respectfully Submitted,
New York, New York

/s/ David H. Thompson
**COOPER & KIRK PLLC**
David H. Thompson*
Brian W. Barnes*
1523 New Hampshire Ave., NW
Washington, DC 20036
Phone: (202) 220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
* Admitted *pro hac vice*

*Attorneys for Defendant Salvo Technologies, Inc.,
a/k/a 80P Builder or 80P Freedom Co., Brownells,
Inc., a/k/a Brownells or Bob Brownell's, Primary
Arms, LLC and Rock Slide USA, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that the foregoing was served upon all counsel of record using the CM/ECF system.

I further certify that the foregoing was served upon the United States Attorney General by mailing a copy thereof via Certified Mail to the United States Attorney General at the following address:

> The Honorable Merrick B. Garland
> United States Attorney General
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

/s/ David H. Thompson
David H. Thompson*

* Admitted *pro hac vice*

*Attorney for Defendant Salvo Technologies, Inc., a/k/a 80P Builder or 80P Freedom Co., Brownells, Inc., a/k/a Brownells or Bob Brownell's, Primary Arms, LLC and Rock Slide USA, LLC*

# EXHIBIT A

# Cooper & Kirk

Lawyers

A Professional Limited Liability Company

David H. Thompson
(202) 220-9659
dthompson@cooperkirk.com

1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036

(202) 220-9600
Fax (202) 220-9601

January 18, 2023

**<u>Via Certified Mail, Return Receipt Requested</u>**

The Honorable Merrick B. Garland
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Re:    *The People of the State of New York v. Arm or Ally, LLC, et al.*, No. 1:22-cv-6124 (JMF) (S.D.N.Y.)

## NOTICE OF CONSTITUTIONAL CHALLENGE OF A
## FEDERAL STATUTE UNDER FED. R. CIV. P. 5.1

Dear General Garland:

Pursuant to Rule 5.1(a)(2) of the Federal Rules of Civil Procedure, I am writing to notify you that Salvo Technologies, Inc., a/k/a 80P Builder or 80P Freedom Co.; Brownells, Inc., a/k/a Brownells or Bob Brownell's; Primary Arms, LLC; and Rock Slide USA, LLC (collectively, "Defendants"), Defendants in the above-captioned matter, have filed Motions to Dismiss (ECF Nos. 89, 91, 93–98) seeking to dismiss Plaintiff's Amended Complaint (ECF No. 72). In their Motions to Dismiss, Defendants challenge the constitutionality of the federal statutory definition of "firearm," arguing that interpreting "firearm" as Plaintiff urges would render the relevant federal statute unconstitutionally vague in violation of the Fifth Amendment and violate the Second Amendment (*see* ECF No. 91 at 41–44, 50–54).

Enclosed are copies of the following:

1. Plaintiff's Amended Complaint (ECF No. 72).
2. Memorandum of Law in Support of Defendant Brownells, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 91).
3. Defendants' Rule 5.1 Notice of Constitutional Challenge of a Federal Statute

Sincerely,

David H. Thompson
dthompson@cooperkirk.com

Enclosures

cc:    All Counsel of Record (via email)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,

                    Plaintiff,

          -against-                                    Case No. 22-cv-06124 (JMF)

ARM OR ALLY, LLC; BLACKHAWK
MANUFACTURING GROUP, INC., A/K/A 80
PERCENT ARMS, INC. OR 80 PERCENT ARMS;
SALVO TECHNOLOGIES, INC., A/K/A 80P
BUILDER OR 80P FREEDOM CO.; BROWNELLS,
INC., A/K/A BROWNELLS OR BOB BROWNELL'S;
GS PERFORMANCE, LLC, A/K/A GLOCKSTORE OR
GSPC; INDIE GUNS, LLC; KM TACTICAL;
PRIMARY ARMS, LLC; RAINIER ARMS, LLC; AND
ROCK SLIDE USA, LLC,

                    Defendants.

-------------------------------------------------------------------X

## **AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 4

PARTIES ............................................................................................................................. 5

FACTUAL ALLEGATIONS ............................................................................................. 7

    I.    Hidden By Design:  Defendants' Firearm Products Are Manufactured to be Easily Converted Into Working Untraceable Firearms and Are Sold Without Background Checks or Other Public Safety Protections. ........................................................................ 7

        A.    Defendants Actively Subvert Federal Firearms Laws that Protect the Public. ............... 9

        B.    There Are Trivial Differences Between Defendants' Unfinished Frames and the Finished Frames Subject to Federal Protections. ........................................................... 12

        C.    From Unfinished Frame to Ghost Gun, In Less Than An Hour ................................... 15

    II.    The Safeguards: Ghost Guns Are Illegal Under State, Local, and Federal Law ............. 19

    III.    Cashing In:  Defendants Have Profited From Repeated and Persistent Illegal Sales of Frames and Receivers into New York. ............................................................................. 23

        A.    Arm or Ally ................................................................................................................. 27

        B.    80 Percent Arms .......................................................................................................... 32

        C.    80P Builder ................................................................................................................. 39

        D.    Brownells .................................................................................................................... 41

        E.    Glockstore/GS Performance ....................................................................................... 52

        F.    Indie Guns .................................................................................................................. 60

        G.    KM Tactical ................................................................................................................ 62

        H.    Primary Arms .............................................................................................................. 65

        I.    Rainier Arms ............................................................................................................... 68

        J.    Rock Slide USA .......................................................................................................... 72

    IV.    The Price Paid by the People:  Defendants' Ghost Guns Have Harmed New York and Will Continue To Do So If Unabated. ............................................................................. 73

        A.    The Rise of Ghost Guns and the Damage Done .......................................................... 74

        B.    Defendants' Conduct Is Dangerous and Directly Harms New York ........................... 76

        C.    We Need to Fix This Avoidable Crisis. ....................................................................... 80

CLAIMS FOR RELIEF ............................................................................................. 83

    AS AND FOR A FIRST CAUSE OF ACTION REPEATED AND PERSISTENT FRAUD
        OR ILLEGALITY IN BUSINESS IN VIOLATION OF EXECUTIVE LAW § 63(12). 83

    AS AND FOR A SECOND CAUSE OF ACTION REPEATED AND PERSISTENT FRAUD
        OR ILLEGALITY IN BUSINESS IN VIOLATION OF EXECUTIVE LAW § 63(12). 84

    AS AND FOR A THIRD CAUSE OF ACTION REPEATED AND PERSISTENT FRAUD
        OR ILLEGALITY IN BUSINESS IN VIOLATION OF EXECUTIVE LAW § 63(12). 85

    AS AND FOR A FOURTH CAUSE OF ACTION CREATION OF A PUBLIC NUISANCE
        BY A GUN INDUSTRY MEMBER ............................................................... 87

    AS AND FOR A FIFTH CAUSE OF ACTION FAILURE TO ESTABLISH REASONABLE
        CONTROLS BY A ...................................................................................... 88

    GUN INDUSTRY MEMBER ........................................................................... 88

    AS AND FOR A SIXTH CAUSE OF ACTION REPEATED AND PERSISTENT
        FRAUDULENT CONDUCT PURSUANT TO EXECUTIVE LAW 63(12).................. 88

    AS AND FOR A SEVENTH CAUSE OF ACTION  REPEATED AND PERSISTENT
        ILLEGAL CONDUCT  PURSUANT TO EXECUTIVE LAW 63(12)........................... 89

    AS AND FOR AN EIGHTH CAUSE OF ACTION  REPEATED AND PERSISTENT
        ILLEGAL CONDUCT  PURSUANT TO EXECUTIVE LAW 63(12)........................... 90

    AS AND FOR A NINTH CAUSE OF ACTION  DECEPTIVE BUSINESS PRACTICE ..... 91

    AS AND FOR A TENTH CAUSE OF ACTION  FALSE ADVERTISING DECEPTIVE
        BUSINESS PRACTICE .................................................................................. 92

    AS AND FOR AN ELEVENTH CAUSE OF ACTION REPEATED AND PERSISTENT
        FRAUD OR ILLEGALITY IN BUSINESS IN VIOLATION OF EXECUTIVE LAW §
        63(12).................................................................................................. 93

PRAYER FOR RELIEF ............................................................................................ 95

ii

Plaintiff, The People of the State of New York ("New York" or "the People"), through their attorney Letitia James, Attorney General of the State of New York, allege the following, with personal knowledge of the actions of the Office of the Attorney General ("OAG") and upon information and belief as to the actions of others:

## PRELIMINARY STATEMENT

1.      New York State is grappling with a public health and safety crisis caused by gun violence.  A significant part of that crisis is attributable to an influx of homemade, unserialized guns, commonly known as "ghost guns."  These weapons are just as lethal as any other handgun or rifle, but Defendants sell them directly to consumers untraceably, without a background check, and without any federally-required record of their sale.  In many cases, Defendants sell to consumers who otherwise could not legally purchase firearms from a licensed retailer.

2.      Defendants make these sales based on the pretense that they are not selling actual firearms, but rather "unfinished" frames or receivers.  Federal law defines a frame or receiver as a firearm, subject to the same licensing and public safety requirements as a completed weapon, but the products Defendants sell are marketed as incomplete, even though the differences between an "unfinished" frame and a firearm are trivial: a tiny amount of plastic to shave down at the top of the frame and three tiny holes to be drilled on the side.  These adjustments require no guesswork.  With the aid of a simple jig that precisely guides the tool work, usually sold together with the unfinished part as a kit, an individual can produce a working firearm in under an hour without any special skill or aptitude.

3.      Although these nominally unfinished frames and receivers are sold for the sole

1

purpose of being converted into a working firearm, Defendants do not follow the fundamental

federal law requirements enacted by Congress to curtail gun crime.  They market and sell these

products without the serial numbers required to be engraved on all firearms sold in the United

States, meaning that the ghost guns made from them are untraceable when recovered by law

enforcement in connection with a crime.  Defendants do not conduct a federally required

background check to ensure they are not selling to improper persons, including felons, unlicensed

persons, fugitives from justice, persons with dangerous mental illness, or those with a history of

domestic violence.  And Defendants do not record their sales of unfinished frames or receivers in

the manner laid out in 26 U.S.C. § 5843, meaning that there is no record of the sale in law

enforcement databases.

4.      These products are unquestionably illegal.  Under New York State law, possession

or sale of an unfinished frame or receiver is a felony.  *See* Penal Law §§ 265.60-265.61.  So too is

the possession or sale of a ghost gun made from one.  *See* Penal Law §§ 265.63-265.64.  Unfinished

frames and receivers are also illegal to sell or possess under the law of New York City.  *See* N.Y.

City Admin. Code § 10-314.  The sale of these products without following statutory serialization

and background check requirements also violates federal law.

5.      In Defendants' own words, the products they sell are "ridiculously easy" to convert

into fully operable and completely untraceable firearms.  Nevertheless, despite their illegality,

Defendants continue to sell these products into New York State.  Defendants persist in endangering

the health and safety of the public by delivering to private individuals everything they need to

make a deadly firearm at home.  Customers can thus assemble a ghost gun using Defendants'

products and methods in 30 minutes and sell the weapon for as much as $2,000 on the street. As Defendant Brownells' marketing materials rhetorically ask—"Wait, it can't be that simple? Yes, it is."

6.      Defendants' ghost gun business has already resulted in death. For example, in May 2020, Defendant Brownells sold and shipped ghost gun products to a man with a "lengthy rap sheet," who was a repeat customer (and also a customer of Defendants GS Performance and Primary Arms) but legally ineligible to own or operate a firearm. That same month, that customer allegedly used a ghost gun in a triple shooting that killed one person and injured two others in the Bronx. The customer could never have passed a background check and should have never been able to purchase a gun, but Defendants' illegal market and business practices permitted the killer to acquire a working firearm without any of what they refer to as "RED TAPE."

7.      State law requires Defendants and all other firearms industry members selling into the New York market to "establish and utilize reasonable controls and procedures" to prevent such tragedies, General Business Law § 898-b(2), but Defendants have no such controls or procedures in place. In fact, upon information and belief, Defendants are enjoying the spoils of a massive spike in sales of their illegal products since the start of the COVID-19 pandemic in March 2020.

8.      Defendants have betrayed their obligations under New York law through a persistent course of misconduct, all while failing to take the necessary steps—or any steps at all— to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms. Indeed, there are numerous common-sense, scientifically grounded policies and practices that, if implemented, would reduce the risk of Defendants' guns being used in murder,

3

suicide, or violent crime.  Not only have Defendants failed to implement any such reasonable policies and practices, the very nature of their business model subverts and undermines the laws designed to protect New Yorkers' right to public safety.

9.      Defendants also engage in fraudulent conduct, deception, and false advertising in violation of New York law.  Through their marketing and customer communications, Defendants mislead customers directly and indirectly about the legality of possessing the unfinished frames sold by Defendants as well as the completed "ghost guns" derived from them.

10.      On behalf of the People, the New York State Attorney General brings this lawsuit to stop Defendants' illegal business practices, abate the dangers posed by the public nuisance for which they are responsible, and hold them accountable in law and equity for the crisis they have inflicted on the State and its residents.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction pursuant to New York Constitution, Article VI, § 7(a), and Judiciary Law § 140-b.  No claim or substantial question of federal law is alleged.

12.      Jurisdiction is proper under CPLR 302(a)(1) because each Defendant transacts substantial business within the State by supplying goods into New York State.

13.      Jurisdiction is also proper under CPLR 302(a)(3) because each Defendant commits tortious acts outside New York State that cause injury to persons or property within New York State, and because each Defendant (1) regularly solicits business in New York State, (2) engages in persistent conduct towards New York State consumers, (3) derives substantial revenue from goods used or consumed in New York State, and (4) expects or should reasonably expect its sale

4

of its unfinished frames and receivers to have consequences in New York State and derives substantial revenue from interstate commerce.

14.     Venue in New York County is proper under CPLR 505(a) because this action is brought by a public authority with primary offices located in New York County, which is involved in the action.

15.     Venue in New York County is proper under CPLR 503(a) because Defendants' tortious conduct, including shipments of unfinished frames and receivers, occurred within New York County and is a substantial part of the events giving rise to the claim.

16.     Venue in New York County is further proper under CPLR 503(a) and 509 because it is the county designated by the Plaintiff.

17.     Adjudication in the Commercial Division is proper under Uniform Civil Rule 202.70 because this action alleges statutory violations arising out of Defendants' business dealings – in this case, their sale of ghost gun products into New York State – and because the damages caused by their conduct exceed $500,000.  *See* Uniform Civil Rule 202.70 (a) & (b)(1).

## PARTIES

18.     Plaintiff, the People of the State of New York via New York State Attorney General Letitia James, brings this action in a sovereign capacity to protect the interests of the State and its citizens.  This action is brought pursuant to the Attorney General's common-law and statutory authority including, *inter alia*, Executive Law § 63 and General Business Law § 898-d.

19.     Defendant Arm or Ally, LLC ("Arm or Ally") is a North Carolina limited liability corporation with its principal place of business in Indian Trail, NC.  It has a subsidiary named Arm

5

or Ally S LLC.

20.     Defendant Blackhawk Manufacturing Group, Inc., also known as 80 Percent Arms, Inc. ("80 Percent Arms"), is a California corporation with its principal place of business in Garden Grove, CA.

21.     Defendant Salvo Technologies, Inc., also known as 80P Builder or 80P Freedom Co. ("80P Builder"), is a Florida corporation headquartered in Clearwater, Florida, and does business as 80P Builder, which is based in Largo, Florida.

22.     Defendant Brownells, Inc. ("Brownells"), also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinell, IA.  Its subsidiaries include Brownells International, Inc.; Brownells Manufacturing Co.; Brownells Manufacturing, Inc.; Brownell's Project Management Services, Inc.; and Brownells Properties Inc.

23.     Defendant GS Performance, L.L.C., also known as Glockstore, GSPC, and Double Diamond ("Glockstore"), is a Tennessee limited liability corporation with offices in Nashville, TN and San Diego, CA.  It is the successor of a California limited liability corporation also named GS Performance, L.L.C., headquartered in San Diego.

24.     Defendant Indie Guns LLC ("Indie Guns") is a Florida limited liability corporation with its headquarters in Orlando, FL.

25.     Defendant KM Tactical, LLC is a Missouri limited liability corporation with its registered office in Independence, MO.

26.     Defendant Primary Arms, L.L.C. ("Primary Arms") is a Texas limited liability corporation with its headquarters in Houston, TX.  Its subsidiaries include Primary Arms Optics,

Primary Arms Wholesale, Primary Arms Online and Primary Arms Government.

27.     Defendant Rainier Arms, LLC ("Rainier Arms") is a Washington State limited liability corporation with its principal place of business in Auburn, WA.  It has subsidiaries including Rainier Arms Holdings LLC, Rainier Arms International, Inc., and Rainier Arms Manufacturing LLC.

28.     Defendant Rock Slide USA, LLC is a North Carolina limited liability company with its principal place of business in Broadway, NC.

## FACTUAL ALLEGATIONS

I.      **HIDDEN BY DESIGN:  DEFENDANTS' FIREARM PRODUCTS ARE MANUFACTURED TO BE EASILY CONVERTED INTO WORKING UNTRACEABLE FIREARMS AND ARE SOLD WITHOUT BACKGROUND CHECKS OR OTHER PUBLIC SAFETY PROTECTIONS.**

29.     The unfinished frames and receivers marketed by Defendants and sold into New York State are designed to subvert the federal and state statutes that aim to prevent guns from falling into the hands of people who cannot and should not possess them.

30.     As discussed further below, an "unfinished frame or receiver," also known as an "80% lower" or a "receiver blank," is the core part of a handgun, rifle, or shotgun, but missing a few drill holes and containing a small amount of extra plastic, easily convertible into the finished product, a deadly weapon.

31.     The term "frame" generally refers to the core part of a pistol or handgun, while the term "receiver" generally refers to the core part of a rifle, shotgun, or other long gun.  Current federal regulations define "firearm frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded

7

at its forward portion to receive the barrel." 27 C.F.R. § 478.11. It is this definition that Defendants' unfinished frames try to avoid simply by leaving a few key holes undrilled or plastic unfiled.

32.     Because these unfinished frames or receivers purportedly fall outside the federal definition of a "firearm" under 18 U.S.C. § 921, Defendants sell them directly to consumers without following any of the federal laws and regulations that apply to the sale of guns, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source when used in a crime.

33.     The finished weapons made from these unfinished frames or receivers are commonly known as "ghost guns," so-named because they are untraceable and there is no record of their sale, or even their existence.[1]  *Cf.* N.Y. Penal Law § 265.00(32) (defining "ghost gun" as a firearm that fails to comply with tracing and serialization requirements in Penal Law § 265.07).

34.     Because of these characteristics, unfinished frames and receivers, and the ghost guns made from them are particularly popular among (and naturally marketed to) persons who would not be able to purchase guns legally, or who want a gun that cannot be traced back to them.

35.     But although Defendants sell unfinished frames and receivers as part of this scheme to evade federal and state laws, there is little practical difference between their "unfinished"

---

[1] The term "ghost gun" is also sometimes used to refer to firearms made with a 3D printer, which are similarly unserialized and impossible to trace.  Although these 3D-printed firearms generally also meet New York's statutory definition of a ghost gun, *see* N.Y. Penal Law §§ 265.00(32); 265.07, the term as used in this Complaint refers to guns made from commercially-purchased unfinished frames and receivers, such as those sold by Defendants.  The ghost guns created out of Defendants' products, which are the subject of this action, create a much higher quality firearm and are far more prevalent.

receivers and a "finished" receiver meeting the federal definition of a firearm in 18 U.S.C. § 921(a)(3).

36.     Finishing a frame or receiver is, in the words of Defendant 80 Percent Arms, "ridiculously easy," and can be carried out by an amateur in under an hour with basic hand tools.

37.     These unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose.

38.     The result is that Defendants sell these almost-but-not-quite guns online and ship them to New York consumers, in the full knowledge that many of these consumers cannot and should not have a deadly weapon, without applying any internal controls to verify the identity of their customer and the appropriateness of their sale.

A.     **Defendants Actively Subvert Federal Firearms Laws that Protect the Public.**

39.     Federal law operates to protect the public's right to safety from gun violence through a series of provisions aimed at ensuring that deadly weapons are only sold by responsible sellers to responsible buyers.

40.     For instance, any firearm must be sold through a Federal Firearms Licensee ("FFL"), a person or business that has gone through an extensive investigation, review, and licensing process overseen by the Department of Justice.  *See generally* 18 U.S.C. § 923.  FFLs must adhere to specific ethical and recordkeeping obligations in connection with any and all sales.

41.     Federal law attempts to keep guns out of the hands of dangerous persons by requiring that FFLs subject each customer to a background check.  The dealer will query the National Instant Criminal Background Check System, which contains records of persons who fall

9

into one or more prohibited categories, such as convicted felons, fugitives from justice, persons who have been committed to a mental institution, or persons subject to protective orders relating to domestic violence.  *See generally* 18 U.S.C. § 922(d,t).

42.     Federal law helps to mitigate or solve crimes committed with firearms by requiring that firearm manufacturers stamp each firearm with "a serial number which may not be readily removed, obliterated, or altered." 26 U.S.C. § 5842(a), 18 U.S.C. § 923(i).  Federal law also requires FFLs to keep records of the serial number of every weapon sold.  *See* 26 U.S.C. § 5843. This process ensures that when a gun is recovered in connection with a crime, law enforcement officers can query an ATF database to quickly access critical information about the gun's origin and first owner.

43.     Defendants sell unfinished receivers and other ghost gun products, which is a business that is specifically designed to circumvent these federal laws.  They do so by purporting to skirt the federal definition of a "firearm" subject to these protections.

44.     That definition is a broad one, covering "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  18 U.S.C. § 921(a)(3).  It also explicitly covers "the frame or receiver of any such weapon."  *Id.*

45.     Defendants attempt to get around this straightforward definition by marketing their frames and receivers as unfinished, and then selling to consumers directly without taking any of the precautionary steps described above.

46.     Defendants specifically market the unfinished frames and receivers as designed to evade federal gun laws.

10

47.     For instance, Defendant Rainier Arms markets the Freedom Wolf 80% Pistol Frame by telling consumers that it "is not at the stage of manufacturing to meet the ATF definition on a firearm frame.  This means that this item can ship straight to your door, with no Federal Firearms License Required.  Simply follow the instructions provided, and 48 hours later, you will be ready to assemble and shoot your home built Freedom Wolf!"[2]

48.     Defendant 80 Percent Arms similarly emphasizes that "When buying a completed AR-15 from your local gun shop, you must purchase from an authorized dealer with an FFL, undergo a thorough background check, fill out various forms and paperwork, endure a waiting period, then pay.  With an 80% lower, you add the piece to your cart when ordering online, then checkout.  It's shipped directly to your doorstep.  Simple, right?!"[3]

49.     And the "Q&A" Section of Brownells' webpage for a Polymer80 Frame Kit includes an exchange where a customer asks, "Is this unit serialized (does it have a [*sic*] engraved serial number on it)?  I want it and will buy it if it DOES NOT.  I have asked this question before but never got an answer!"  Brownells' staff expert answered: "Not serialized it's a 80% receiver."[4]

50.     The same Q&A page includes a Brownells customer care "staff expert" assuring the customer that although the ATF was issuing a new regulation (clarifying that unfinished frames and receivers are firearms, as discussed below), 80% frames "are still legal" and "will still be legal after the change but there will be new restrictions and hoops to jump through."  *Id.*

---

[2] *See* https://www.rainierarms.com/rifle-parts/receiver-parts/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame/ (last visited June 16, 2022).
[3] *See* https://www.80percentarms.com/blog/what-is-an-80-lower/ (last visited June 17, 2022).
[4] *See* https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-textured-for-glock-19-23-32-prod97837.aspx (last visited June 28, 2022).

11

51. Similarly, in touting the Polymer80 frame kits it sells, Defendant KM Tactical points to the "blank serialization plate" as a significant feature.[5]

52. Defendants know, or should know, that they are selling their ghost gun products to buyers who are trying to evade federal and state gun laws.

**B.** **There Are Trivial Differences Between Defendants' Unfinished Frames and the Finished Frames Subject to Federal Protections.**

53. The difference between an unfinished frame and a frame is negligible, as is the effort required to convert the former into the latter.

54. Compare, for instance, the following two pictures. On the left is a photograph of an "unfinished" Polymer80 Glock-compatible pistol frame recently sold and shipped into New York by Defendant Indie Guns. On the right is a photograph of a "finished" Polymer80 Glock-compatible pistol frame taken from the website of Defendant Primary Arms, where the frame is sold as a finished firearm, complete with serialization and a background check:



---

[5] *See* https://kmtactical.net/product/polymer-80-standard-pistol-frame-kit-pf940v2-black/ (last visited June 17, 2022).

55.     The two weapons – one an "unfinished frame" that Defendants sell over the internet and ship into New York without serializing or conducting a background check, the other a "finished" frame that meets the definition of "firearm" under 18 U.S.C. § 921(a)(3) and is subject to these requirements – are virtually identical to the naked eye.  That's because there is virtually no difference between them.

56.     The differences amount to drilling three small holes and milling down a small amount of plastic at the top of the frame.  A "finished" frame sold by Defendant Primary Arms is illustrated as follows:



13

57.     The differences are just as minuscule in the context of an unfinished lower receiver

for a rifle.  As Defendant 80 Percent Arms assures customers about building the receiver for an

AR-15: "[W]hat is complete is far more than what is left for you to do, hence the term 80 percent

lower."  This seller spells out the differences in detail:

> So, what are the differences between an 80 percent lower and a stripped
> lower? Let's take a look!
>
> To complete an 80% lower, you must:
>
> - Drill a hammer pinhole
> - Drill a trigger pinhole
> - Drill safety selector lever holes
> - Machine the fire control group cavity
>
> Here's what is already prepped for you out of the box:
>
> - Bolt catch
> - Pistol grip hole
> - Magazine well
> - Magazine release
> - Buffer detent hole
> - Trigger guard pinholes
> - Upper receiver rear lug pocket
> - Front and rear takedown holes
> - Buffer tube threads and housing

https://www.80percentarms.com/blog/what-is-an-80-lower/ (Last visited June 17, 2022).

58.     In the case of both unfinished frames (for handguns) and unfinished receivers (for

rifles and shotguns), Defendants' business model is simple: sell the core of a working firearm that

requires just a bit of unsophisticated finishing work. Based on the need for that tiny bit of finishing

by the consumer, Defendants pretend that they are selling something that falls short of the legal

definition of a "firearm," and justify selling their product to anyone over the internet, without any

14

controls or procedures to protect the public's safety.

**C.**  **From Unfinished Frame to Ghost Gun, In Less Than An Hour**

59.     With such a small difference between an unfinished frame and a finished frame, it takes very little time, effort, or skill to convert an unfinished framer or receiver into a working ghost gun.

60.     Defendants make this ease of conversion a key part of their marketing.

61.     For instance, Defendant 80 Percent Arms explains that its jigs "make it ***ridiculously easy*** for a non-machinist to finish their 80% lower in under 1 hour with no drill press required." *See* https://www.80percentarms.com/80-lowers/ (last visited June 28, 2022) (emphasis added).[6]

62.     Defendants' customers agree.  For instance, one of the reviews on the webpage for Brownells' exclusive Polymer80 Glock-compatible pistol frame is entitled "EASY AS CAN BE," and begins, "So I bought roughly three frames from Brownells and not one of them came to me in bad condition.  I was able to mill, drill and assemble them all myself without any prior gunsmithing knowledge other then what I saw on YouTube.  And guess what they all go bang when I pull their trigger."[7]

63.     Defendants take further steps to eliminate the need for any technical skill on their customer's part by shipping the products in a "jig," a plastic setting for the frame or receiver that

---

[6] Defendant Brownells similarly says that unfinished frames (and specifically the kind marketed by Polymer80, Inc.) "ha[ve] revolutionized the custom gun world.  If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame."  *See* https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 17, 2022).

[7] *See* https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-aggressive-texture-for-glock-19-23-32-prod105856.aspx (last visited June 28, 2022).

makes it easy for even an amateur to see and follow the steps necessary to convert the unfinished frame into finished form.

64.    Here is a picture of an unfinished Glock-compatible handgun frame purchased from Defendant Indie Guns by investigators from the Office of the Attorney General, as it was packaged inside the box it came in:



65.    The unfinished handgun frame is shipped already inside the jig, and the jig itself is clearly labeled with the simple steps the consumer needs to take to "finish" the frame.  The notches on the top are clearly labelled "REMOVE" – the small pieces of plastic sticking up above them

are the "rails" that the consumer is to mill off, along with another small piece of plastic inside the frame where the recoil spring will go.

66. The jig makes sure that an untrained consumer will easily be able to remove the small plastic rails – and only the small plastic rails. As Defendant Brownells explains in its how-to video, "this is pretty simple to do because, once you put this in the included jig . . . only the portions that stick up here are what you remove."

67. Once that's done, all that's left to do is to drill the three simple holes, which are helpfully labeled as "M2" or "M3" on the jig. These correspond to two drill bits that are included in the same box:



17

68. All the consumer needs to do is drill the three holes using a hand drill or a drill press, following the instructions on the jig.

69. The result is a "finished" frame that would have required serialization and a background check if the Defendants had sold it to a consumer. The finished frame can accept a few commercially-available parts (sometimes sold as a kit along with the unfinished frame) in order to become a working ghost gun.

70. Defendant Brownells goes a step further, providing an online page with step-by-step video instructions on how to convert a nominally unfinished Polymer80 frame into a finished frame. In the key section, entitled "How to Mill a Polymer80 Frame," Brownells writes that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last '20%' of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video." *Id.*

71. The viewer can watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a "finished" version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete." If the viewer has questions or would like assistance finishing the frame, Brownells offers a telephone "tech line" where "we'll be glad to help you out."

72. Each Defendant knows that the only purpose of the "unfinished" frames and receivers they sell is to become a "finished" frame or receiver that would have required

18

serialization or a background check, and then to be further converted into a working ghost gun. Each Defendant knows that these products are in demand from consumers who could not legally purchase firearms. If any Defendant claims ignorance of these facts, they are being willfully blind to the illicit nature of their business.

## II. THE SAFEGUARDS: GHOST GUNS ARE ILLEGAL UNDER STATE, LOCAL, AND FEDERAL LAW

73. Defendants' conduct in selling unfinished frames and receivers into New York is unquestionably illegal.

74. Sections 265.63 and 265.64 of the New York Penal Law establish criminal liability for anyone who knowingly sells an unfinished frame or receiver in New York State, subject to certain exceptions not at issue here.

75. Under the Penal Law, an "unfinished frame or receiver" is defined as "any unserialized material that does not constitute the frame or receiver of a firearm, rifle or shotgun but that has been shaped or formed in any way for the purpose of becoming the frame or receiver of a firearm rifle or shotgun, and which may readily be made into a functional frame or receiver through milling, drilling, or other means," and has not been promptly registered and serialized by a New York-licensed gunsmith. *See* N.Y. Penal Law §§ 265.00(32); 265.07.

76. Selling one unfinished frame or receiver is a Class E felony punishable by up to four years in prison. N.Y. Penal Law §§ 265.63; 70.00(2)(e). Selling ten or more unfinished frames or receivers is a Class D felony punishable by up to seven years in prison. N.Y. Penal Law §§ 265.64; 70.00(2)(d).

77. The ghost guns that are made from the unfinished frames and receivers that

19

Defendants sell are also illegal.  Sections 265.60 and 265.61 of the New York Penal Law establish criminal liability for anyone who knowingly "sells, exchanges, gives, or disposes of a ghost gun to another person."

78.    The punishments for trafficking in ghost guns are the same as trafficking in unfinished frames or receivers: selling one is a Class E felony, N.Y. Penal Law § 265.60, and selling ten or more is a Class D felony.  N.Y. Penal Law § 265.61.

79.    To the extent that one or more of the Defendants have sold or shipped unfinished frames or receivers into the five boroughs of New York City, the conduct is also criminal under local law.  Section 10-314 of the New York City Administrative Code states that "no person shall dispose of or possess an unfinished frame or receiver,"[8] and establishes that a person commits a Class A misdemeanor for each such prohibited item.

80.    The sale of Defendants' almost-but-not-quite guns is also illegal under federal law. The definition of a "firearm" in the United States Code is not limited to completed guns, but also encompasses "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon."  18 U.S.C. § 921(a)(3).

81.    Federal courts have repeatedly found that items short of a completed gun qualify as a "firearm" if they can easily be made into a functional weapon.  *See, e.g.*, *United States v. Morales*,

---

[8] City law defines "unfinished frame or receiver" as "[a] piece of any material that does not constitute the frame or receiver of a firearm, rifle, shotgun or assault weapon but that has been shaped or formed in any way for the purpose of becoming the frame or receiver of a firearm, rifle, shotgun or assault weapon with modification by the user and that is not engraved with a serial number" pursuant to federal standards.  N.Y. City Admin. Code § 10-301(22).

280 F. Supp. 2d 262, 272-73 (S.D.N.Y. 2003) (partially-disassembled pistol was a "firearm" because "[w]hether in pieces or whole, it is clear to this Court that the item . . . was clearly 'designed to,' and could 'readily be converted to' expel a projectile"); *U.S. v. 16,179 Molso Italian .22 Caliber Winler Derringer Starter Guns*, 443 F.2d 463, 465 (2d Cir.1971) (a weapon "which can be converted by a relatively simple operation taking only a few minutes is a 'firearm' and subject to federal controls."); *U.S. v. Mullins*, 446 F.3d 750, 756 (8th Cir. 2006) (starter gun that "could be converted to expel a projectile, without any specialized knowledge, in less than an hour, and in minutes by an expert" met the definition of a firearm).

82.     This holding includes items sold to consumers that would allow them to easily construct their own working guns.  *See United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017) (upholding denial of motion to acquit on conviction of manufacturing and selling unlicensed firearms where the evidence demonstrated that defendant "was selling complete Uzi parts kits that could 'readily be converted to expel a projectile by the action of an explosive,' thus meeting [18 U.S.C. § 921(a)(3)(A)'s] definition of a firearm").

83.     A weapon meets the definition of "firearm" even if additional parts or work is required to make it shoot.  *See, e.g.*, *United States v. John*, No. 20 Cr. 341, 2022 WL 1062998, at *1, 4-5 (E.D.N.Y. Apr. 8, 2022) (weapon was a firearm where ATF agent was only able to make it fire "by placing duct tape around the cartridge case and removing approximately half of the gun powder" and using a different caliber of bullet, a process that took "twenty to thirty minutes"); *see also Morales*, 280 F. Supp. 2d at 272-73 (collecting cases where inoperable weapons needing replacement parts were nonetheless held to be "firearms").

21

84.     Even if unfinished frames and receivers were not so easy to convert to working ghost guns, they would nonetheless meet the statutory definition.  Under federal law, a weapon meets the definition of "firearm" if it is "designed" to fire a projectile, even if it cannot be readily converted to do so.  *See U.S. v. Rivera*, 415 F.3d 284, 287 (2d Cir. 2005) ("The statute was clearly written in the disjunctive.  The government need only show that the weapons were either 'designed to' or 'may readily be converted.'  It need not demonstrate both." (citation omitted)).  As pled above, every unfinished frame or receiver is designed for the sole purpose of being converted into a working weapon; it serves no other function.

85.     The Bureau of Alcohol, Tobacco, Firearms, and Explosives has issued a new regulation clarifying that the terms "frame" and "receiver" as used above include "shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver."  87 Fed. Reg. 24739.  The definition was broadened specifically to combat the spread of illicit ghost guns, such as the ones made from the products Defendants have sold into New York.  *See* 87 Fed. Reg. 24655-60 (discussing "the substantial increase in the number of [ghost guns] recovered from crime scenes throughout the country in recent years;" the ways in which ghost guns frustrate efforts to trace weapons used in crimes; the efforts made by federal, state, and local law enforcement to combat their proliferation; and the conclusion that "wide availability of ghost guns" is "a homeland security threat").  ATF's new regulation will go into effect on August 24, 2022.  *See* 87 Fed. Reg. 24652.

86.     Ultimately, the ATF's interpretation of the statute is irrelevant, since Defendants'

22

unfinished frames and receivers are "designed to" and also "may readily be converted to expel a projectile by the action of an explosive," meeting the statutory definition of a "firearm" in 18 U.S.C. § 921(a)(3)(A). "In interpreting any statute, we start with the plain meaning of the text, and absent any ambiguity, we end there too." *Ziparo v. CSX Transportation, Inc.*, 15 F.4th 153, 158 (2d Cir. 2021).

87.     Defendants have been aware that their products and the sale of those products violate New York State and local law, as well as federal law, or were willfully blind to that conclusion.

III.    **CASHING IN:  DEFENDANTS HAVE PROFITED FROM REPEATED AND PERSISTENT ILLEGAL SALES OF FRAMES AND RECEIVERS INTO NEW YORK.**

88.     Despite the illegality of their conduct, Defendants have intentionally and repeatedly sold and shipped unfinished frames and receivers into New York.

89.     Several of Defendants shipped unfinished frames or receivers directly to undercover investigators from the Office of the Attorney General or the New York City Sheriff's Office, demonstrating that their products are available for purchase in New York without Defendants making any effort to implement controls or verify the identity of their customers.

90.     Meanwhile, publicly available material from prosecutors, law enforcement, and media reports demonstrates that many of the perpetrators of the most serious ghost gun-related crimes were the same people who had ordered products from Defendants.

91.     For instance, in April 2022, the NYPD executed a search warrant on the Manhattan home of a man named Rene Loyola, recovering over $20,000 in ghost guns and parts, including more than 30 frames and receivers.

23

92.     And in October 2021, police officers searched the home and car of a Queens resident, named Jonathan Santos, recovering approximately 30 working firearms, many of them ghost guns, along with over 130 high-capacity magazines, approximately 150,00 rounds of ammunition, and various parts and tools used to convert ghost guns into working weapons.

93.     Loyola received at least ten different packages from Defendant Brownells, while Santos received shipments from Defendants Arm or Ally, Brownells, and KM Tactical.

94.     In each of the incidents enumerated below, Defendants sold and shipped their unfinished frames or receivers to individuals located in New York State who went on to commit crimes.

95.     In many cases, Defendants sold directly to persons with criminal records or other disqualifications who could not legally possess a firearm.

96.     On information and belief, the incidents enumerated below represent only a small fraction of Defendants' illicit shipments into New York.  The true number of unfinished frames and receivers sold by Defendants can only be established when their sales records are obtained in discovery.

97.     Although the Defendant companies ship products including unfinished frames and receivers directly to consumers, their dangerous and untraceable products also enter New York in other, less direct ways.

98.     For instance, on or around November 20, 2021 law enforcement officers observed a man named Robert Alcantara purchase approximately 45 sets of unfinished upper and lower receivers at a gun show in Morgantown, Pennsylvania.  Later that day, he drove the guns into New

24

York, where he was apprehended in Bronx County.

99.    Alcantara told law enforcement officers that he and a conspirator had purchased the ghost guns for approximately $360 per pair ($16,200 in total), and that he was going to turn them into completed firearms, though he denied that he was going to sell them.

100.    Alcantara's phone included pictures of a workbench in his home in Rhode Island with various ghost guns and parts, and a set of what appear to be completed firearms on top of an advertisement from Defendant Glockstore.[9]  According to the complaint sworn to by an ATF special agent, the Glockstore advertisement included "instructions as to how to machine ghost guns."

101.    An ATF Agent averred that "I know from my training and experience that the photographs [] show that ROBERT ALCANTARA, . . . has been machining substantial numbers of 'ghost guns.'"  Another photo on Alcantara's phone show completed guns "that appear packaged for shipment or for sale."

102.    According to ATF, Alcantara purchased 68 additional ghost gun kits just between February and August 2021, in addition to the ones bought at the Pennsylvania gun show.  These purchases totaled $32,105.

103.    The Alcantara case provides an example of the tremendous amount of money to be made by purchasing unfinished frames or receivers, converting them into working ghost guns, and selling them on the black market – as well as the significant revenues derived by "legitimate"

---

[9] The federal complaint against Alcantara identifies Glockstore only as "Ghost Gun Retailer-1."  However, the Glockstore name is completely visible on one of the pictures in the complaint taken from Alcantara's phone.

retailers, such as Defendants who provide that market with the foundational product.

104.    The scale of Defendants' activities directed toward the New York market is staggering, as is the number of unfinished frames and receivers they have directed into New York State.

105.    A preliminary analysis of shipping records obtained by the Office of the Attorney General demonstrates that in the past few years Defendants have made approximately 100,000 shipments to New York addresses that are not FFLs – i.e., shipments directly to consumers.

106.    The actual number of direct shipments to New York consumers will be significantly higher – well into the six-figure range – once complete records from every shipper become available.

107.    On information and belief, a significant portion of these shipments contained unfinished frames and receivers.

108.    The shipping records compiled to date show approximately 29,655 packages that roughly match the weight and/or dimensions of the unfinished handgun frames sent by certain of Defendants in fulfillment of OAG's undercover purchases.  Many of these shipments into New York are likely to be unfinished frames, which are illegal.

109.    The actual number of illegal shipments is likely to be significantly higher, for several reasons.  First, the shipping data obtained by OAG is incomplete to date.  Second, these shipments are only those matching the weight of an unfinished frame kit in its packaging alone. If a consumer bought more than one unfinished frame, or an unfinished frame and other parts (for instance, the parts necessary to convert the unfinished frame into a working ghost gun), the weight

26

of the shipment would be different.  And third, these are only shipments that match the weight of an unfinished frame used to make a handgun; shipments of the unfinished receivers used to make ghost gun rifles or shotguns will have different weights and dimensions.

110.    The true number of unfinished frames and receivers shipped by Defendants into New York State can best be ascertained by each Defendant's sales records, but the figure can reasonably be expected to number many thousands.

111.    On information and belief, none of these unfinished frames and receivers were serialized according to federal and state requirements, and none of Defendants conducted a federal background check prior to sending them.

112.    Each of the Defendants played a role in this massive influx of unfinished frames and receivers, and in the ghost guns that were inevitably and foreseeably made from them.

### A.    **<u>Arm or Ally</u>**

113.    Arm or Ally is a distributor of firearms and firearms parts located in Indian Trail, NC.

114.    Its business focuses on parts for AR-10 and AR-15-style rifles, including unfinished receivers that can be used to build ghost gun versions of those rifles.  It also sells unfinished handgun frames, including into New York.

115.    Its webpages selling AR-15-compatible receiver kits proclaim, in large bold green letters, "No FFL Required!"  *See* https://www.armorally.com/shop/polymer80-ar15-80-lower-receiver-kit-rl556v3/ (last visited June 23, 2022).

116.    Meanwhile in tiny, mostly-illegible text, Arm or Ally attempts to divest itself of

27

any responsibility for whether its sales are legal, throwing it onto the consumer instead. Its boilerplate text reads, "It is your responsibility to know and understand your state and local laws regarding the ownership and possession of this product. We do not provide legal advice; if you are uncertain, consult with an attorney prior to purchasing." *Id.*

117.    Although its AR-15-compatible unfinished lower receiver page says in similarly tiny text that "[w]e do not provide advice or assistance with the manufacturing process," the page in fact links to a set of "milling instructions," providing a step-by-step guide to convert the "unfinished" receiver into the core of an AR-15 rifle. *Id.*

118.    Arm or Ally's sales pages discuss "State Restrictions" in New Jersey, Connecticut, Washington State, and Washington, DC, but not New York.

119.    In fact, Arm or Ally has sold and continues to illegally sell unfinished frames and receivers directly to consumers in New York State.

120.    On or around April 28, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Glock-compatible Polymer80 PF940C unfinished frame kit from Arm or Ally. Arm or Ally's website acknowledged that the company was shipping directly to consumers, and in fact stated that the order of an unfinished frame was "required to ship to your credit card's billing address." Arm or Ally accepted the order and shipped the frame into New York County.

121.    On or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of parts sufficient to convert the unfinished frame into a ghost gun, including a G19-compatible slide parts kit, a G19-compatible threaded barrel, and a

28

G19-compatible slide, all manufactured by Arm or Ally.  The City also purchased a Polymer80 9mm frame parts kit.  Arm or Ally accepted the order and shipped the parts into New York County.

122.    The webpage viewed by the investigator demonstrated that the company understood that its products would be converted into working weapons, stating that "[i]n the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools."

123.    Arm or Ally accepted the order and shipped the parts into New York County.

124.    On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940C Glock-compatible unfinished frame from Arm or Ally's website, as part of a pistol frame kit.

125.    The Arm or Ally website said of the product that "[t]his system is a complete kit. There are no additional jigs and parts to purchase.  Polymer80 Spectre system is a complete, all-inclusive package including the jig and drill bits required to finish your Glock project."  *See* https://www.armorally.com/shop/polymer80-pf940c-pistol-frame-kit/ (last visited June 6, 2022).

126.    Although the Arm or Ally website said that "NY residents must send copy of valid state-issued Driver's License," *see* https://www.armorally.com/shop/polymer80-pf9ss-g43-pistol-frame-kit/ (last visited June 28, 2022), they did not actually require investigators to do so.

127.    Arm or Ally accepted the order and shipped the frame into Kings County.

128.    Arm or Ally's illegal sales of unfinished frames and receivers have led to a number of instances where its products have been used in crimes or by persons who cannot legally possess a gun.

29

129.     On or around July 8, 2021 Arm or Ally sent a package to Rene Loyola at an address on East 6th Street in Manhattan.

130.     On information and belief, the package from Arm or Ally contained unfinished frames or receivers and/or the parts to make them into ghost guns.

131.     As discussed further below, the NYPD later executed warrants on Loyola's home and storage locker, discovering an arsenal of unfinished frames and receivers and material used to convert them into working ghost guns.

132.     Loyola was indicted on approximately 289 separate violations of New York's firearms laws.

133.     Between approximately April 25, 2021 and June 7, 2021, Arm or Ally sent seven packages to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY.

134.     On information and belief, the packages Arm or Ally sent to Santos contained unfinished frames or receivers and/or the parts to make them into ghost guns.

135.     On October 18, 2021, police officers observed Santos loading guns into the trunk of his car.   See   https://queensda.org/queens-man-charged-with-possessing-arsenal-of-illegal-ghost-guns/.

136.     After pulling Santos over, they discovered nine ghost guns, including two assault rifles, one other assault rifle, 25 high-capacity magazines, and 500 rounds of ammunition.

137.     When NYPD officers executed a search warrant on Santos' home on 102nd Street, they recovered 21 working firearms, many made from unfinished frames or receivers, two rapid-

30

fire modification devices, 110 high-capacity magazines, three silencers, approximately 15,000 rounds of ammunition, and various parts and tools commonly used to convert unfinished frames or receivers into working weapons.

138. Santos did not have a license to possess or own firearms.

139. A portion of the weapons recovered from Santos is pictured below:



140. Santos was charged with 252 separate violations of New York's firearms laws.

141. On or around October 7, 2021, Arm or Ally sent a package to David Goldberg at an address on Bullet Hole Road in Mahopac, NY.

142. On information and belief, the package Arm or Ally sent to Goldberg contained unfinished frames or receivers and/or the parts to make them into ghost guns.

143. The Putnam County Sheriff's Department, as part of a multi-agency investigation into ghost guns and other illegal weapons that led to more than 100 weapons seized, arrested Goldberg in late-January 2022 on four felony charges, including first-degree criminal possession

of a weapon (10 or more).  <u>See</u> <u>https://www.westchestergov.com/home/all-press-releases/9204-more-than-100-firearms-seized-following-lengthy-investigation-into-ghost-guns-and-other-illegal-weapons-in-westchester-and-putnam-counties</u>.

144.    On or around August 18, 2021, Arm or Ally sent a package to Andrew Lopez at an address on Fair Street in Carmel, NY.

145.    On information and belief, the package Arm or Ally sent to Lopez contained unfinished frames or receivers and/or the parts to make them into ghost guns.

146.    The Putnam County Sheriff's Department, as part of a multi-agency investigation into ghost guns and other illegal weapons that led to more than 100 weapons seized, arrested Lopez in late-January 2022 for second-degree criminal possession of a weapon.  *Id.*

**B.**    <u>**80 Percent Arms**</u>

147.    Blackhawk Manufacturing Group, Inc., also known as 80 Percent Arms, Inc. or 80 Percent Arms, is a California entity with its principal office in Garden Grove, CA.

148.    As indicated by its name, 80 Percent Arms' business is focused on selling unfinished frames and receivers, and the company explicitly sells its products as a means to get around federal registration and background check requirements.

149.    Its page on 80% lowers emphasizes that "an unfinished receiver is not subject to the same regulations as any other complete firearm.  This means no RED TAPE including: NO Registering an 80% Lower, NO Transfer fees like a typical firearm, NO FFL Required, Ships right to your door."  *See* <u>https://www.80percentarms.com/80-lowers/</u> (last visited June 6, 2022)

150.    Clicking on "No FFL Required" takes a consumer to a webpage explaining how

the company's unfinished frames and receivers are exceptions to the Gun Control Act of 1968 and the Brady Handgun Act of 1993. The page also explains that "80% lowers are popular for numerous reasons. For one, with an 80% lower there is no background check or registration involved; saving you time and headaches. Also, when using an FFL to transfer firearms, there is generally a fee involved. Since you obviously don't need an FFL for an 80% lower- congratulations you just saved yourself money! (a valuable selling point when telling the wife you bought more gun parts.) And again, 80% lowers are shipped right to your door, which is convenience that can't be beat." *See* https://www.80percentarms.com/blog/buying-guns-online-without-an-ffl/ (last visited June 6, 2022).

151.    Meanwhile, the header of 80 Percent Arms' webpage emphasizes that converting its unfinished frames and receivers into a working firearm is "ridiculously easy," explaining that its jigs "make it ridiculously easy for a non-machinist to finish their 80% lower in under 1 hour with no drill press required." *See* https://www.80percentarms.com/80-lowers/ (last visited June 6, 2022)

152.    80 Percent Arms' website falsely tells consumers that its unfinished frames and receivers are legal to purchase in New York.

153.    Its page on "80 Lower Laws" includes a map of the United States with New York State colored yellow. When a consumer puts his or her mouse pointer over New York, it displays text reading, "New York's attorney general sent cease and desist letters to 80% manufacturers to stop the sale and shipment of AR lowers however, 80% pistols can still be purchased. Do your own research before purchasing to ensure compliance." *See*

33

https://www.80percentarms.com/pages/california-laws-80-lower (last visited June 6, 2022).

154.    Shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, 80 Percent Arms sent approximately 155 packages to non-FFL addresses in New York State each month, with approximately 106 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

155.    On or around March 3, 2022 80 Percent Arms sent a package to Rene Loyola at an address on Hart Street in Brooklyn.

156.    On information and belief, the package from 80 Percent Arms contained unfinished frames, unfinished receivers, and/or the tools to convert them into working ghost guns.

157.    As discussed, the NYPD later executed warrants on Loyola's home and storage locker, discovering an arsenal of ghost guns, unfinished frames and receivers, and tools used to convert them into working weapons.

158.    Loyola was indicted on approximately 289 separate violations of New York's firearms laws.

159.    On or around August 27, 2020 and January 4, 2021, 80 Percent Arms sent packages to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY.

160.    On information and belief, the packages 80 Percent Arms sent to Santos contained unfinished frames, unfinished receivers, and/or the tools to convert them into working ghost guns.

161.    As discussed, when NYPD officers searched Santos' home and car, they found dozens of working ghost guns, along with parts, ammunition, and tools used to convert unfinished frames and receivers into working weapons.

34

162.   Santos was charged with 252 separate violations of New York's firearms laws.

163.   On or around October 2, 2020 and October 30, 2020, 80 Percent Arms sent packages to a man named Kurt Therkelsen at an address on Ward Road in Salt Point, NY.

164.   Therkelsen was a supporter of the "Boogaloo Boys," a far-right militia-style organization with a well-documented history of political violence. *See* https://nypost.com/2022/02/01/boogaloo-boys-supporter-kurt-therkelsen-gets-4-years-in-nyc-ghost-guns-case/.

165.   On information and belief, the packages 80 Percent Arms sent to Therkelsen contained unfinished frames, unfinished receivers, and/or the tools to convert them into working ghost guns.

166.   On December 15, 2020, the Joint Terrorism task force and the NYPD raided an AirBNB on First Avenue in Manhattan, where Therkelsen was staying.

167.   The NYPD recovered two unserialized Polymer80 ghost guns, 11 high-capacity magazines, four additional unfinished frames and receivers, as well as various parts, gunmaking tools, and other paraphernalia.

168.   Investigators also recovered Kevlar body armor and a shirt that said, "Kill Cops."

169.   Therkelsen pled guilty to firearms charges in December 2021 and was sentenced to four years in prison.

170.   On or around August 24, 2021, and September 27, 2021, 80 Percent Arms sent packages to Dexter Taylor at an address on Eldert Street in Brooklyn, NY.

171.   On information and belief, the packages 80 Percent Arms sent to Taylor contained

35

unfinished frames, unfinished receivers, and/or the tools to convert them into working ghost guns.

172. When NYPD officers raided the Eldert Street location, they recovered four completed ghost gun assault weapons, five completed ghost gun handguns, four completed ghost gun rifles, eight unfinished receivers, five unfinished frames, eleven magazines, and various parts and tools used to convert unfinished frames and receivers into working firearms. See http://www.brooklynda.org/2022/04/22/bushwick-man-indicted-for-illegal-possession-of-ghost-guns/.

173. Taylor was indicted on 37 counts of violations of New York's firearms laws.

174. On or around July 12, 2021 and October 26, 2021, 80 Percent Arms sent packages to Chaz McMillan at an address on 162nd Street in the Flushing Area of Queens, NY.

175. On information and belief, the packages 80 Percent Arms sent to McMillan contained unfinished frames, unfinished receivers, and/or the tools to convert them into working ghost guns.

176. On December 8, 2021, investigators executed a search warrant on McMillan's 162nd Street address.

177. They found 25 working ghost guns, including 19 semiautomatic pistols, 5 assault weapons, and 1 semiautomatic shotgun. They also found four additional unfinished frames or receivers that had not yet been constructed into working weapons. See https://queensda.org/queens-man-charged-with-possessing-arsenal-of-illegal-ghost-guns-2/.

178. McMillan also had 31 large-capacity magazines, 670 rounds of ammunition, and various parts and tools used to convert unfinished frames and receivers into working ghost guns.

36

179.    McMillan did not have a license to possess or own firearms.

180.    McMillan was charged with 125 counts of criminal violations of New York's firearms laws.

181.    On or around August 24, 2020, 80 Percent Arms sent a package to Domingo Valle at an address on East Tremont Avenue in the Bronx, NY.

182.    On information and belief, the package 80 Percent Arms sent to Valle contained unfinished frames, unfinished receivers, and/or the tools to convert them into working ghost guns.

183.    As discussed below, Valle was a convicted felon who could not legally purchase a firearm and would have failed a background check if he had tried to do so.  When law enforcement agents later searched Valle's address, they found several ghost guns concealed throughout his apartment.

184.    On or around August 20, 2020, and January 14, 2021, 80 Percent Arms sent packages to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway section of Queens, NY.

185.    On information and belief, the packages sent to the residence contained unfinished frames or receivers and/or the parts to make them into ghost guns.

186.    As discussed below, on February 19, 2022, Thomas Saxton, from the same address, was arrested after threatening to shoot his wife while she held her child.  When police stopped Saxton, he was carrying two ghost guns, as well as additional ammunition and a plastic bag of cocaine.

187.    On or around October 21, 2020, 80 Percent Arms sent a package to Kai Zhao at an

37

address on 167th Street in the Flushing area of Queens, NY.

188.     Between approximately July 20, 2021 and September 22, 2021, 80 Percent Arms sent five packages to Seongwoo Chung at an address on Crocheron Avenue in the Flushing area of Queens, NY.

189.     On information and belief, the packages 80 Percent Arms sent to Zhao and Chung contained unfinished frames or receivers and/or the parts to make them into ghost guns.

190.     On or around March 1, 2022, Zhao, Chung, and two codefendants were arrested as part of an NYPD investigation into firearms trafficking.  *See* https://queensda.org/four-queens-residents-charged-with-possessing-arsenals-of-illegal-ghost-guns-in-bayside-and-flushing-homes-photos/.

191.     Search warrants executed on Zhao, Chung, and their alleged accomplices resulted in the seizure of 27 ghost guns, including 22 semiautomatic pistols, 4 assault weapons, and 1 assault shotgun.

192.     The search warrants also resulted in the NYPD seizing 16 unfinished receivers, 78 large capacity magazines, approximately 10,000 rounds of ammunition, silencers, sites, components and tools to assemble unfinished frames and receivers into working firearms, and more than $50,000 in cash.

193.     Zhao, Chung, and their codefendants did not have a license to own or possess firearms.

194.     Zhao was charged with approximately eight counts of violations of New York's firearms laws.  Chung was charged with approximately eight counts of violations of New York's

firearms laws.

195.    Between approximately December 12, 2021 and January 13, 2022, 80 Percent Arms sent three packages to Gregory Lopez at an address on Rosman Road in Thiells, NY.

196.    On information and belief, the packages 80 Percent Arms sent to Lopez contained unfinished frames or receivers and/or the parts to make them into ghost guns.

197.    On or around April 27, 2022, police executed a search warrant on Lopez' Rosman Road address.   They discovered two loaded, unserialized AR-15-style ghost gun rifles, ammunition, magazines, and multiple unfinished frames and receivers.   See https://hudsonvalleypost.com/historic-hudson-valley-man-arrested-under-new-yorks-new-gun-law/.

198.    A Rockland County grand jury indicted Lopez on twelve counts of violating New York's firearms laws.

**C.    80P Builder**

199.    80P Builder, a division of Salvo Technologies, Inc. also known as 80P Freedom Co., is a Florida corporation that claims to "specialize in aftermarket parts while also offering Polymer80 frames."  See https://80pbuilder.com/ (last visited June 23, 2022).

200.    Despite the fact that selling unfinished frames and receivers is a core part of its business model, its website touts a claim that "**80P Freedom Co. does NOT sell firearms**" in bold, oversize letters.  Id.

201.    80P Builder sells unfinished receivers in tandem with the "lower parts kit" containing the parts necessary to make it the fully-functional lower part of a handgun.  See, e.g.,

39

https://80pbuilder.com/pf940sc-frame (last visited June 23, 2022). Its webpage touts the "Blank Serialization Plate" as one of the key features of the product, as well as the fact that a "Complete Finishing Jig and Drill bits [are] Included." *Id.*

202.    80P Builder knows that these products are illegal, and in fact it informs consumers that it will not ship to New Jersey. As to other states, it simply says, "[a]t 80P Builder, we by no means provide legal advice or legal counsel. Every builder needs to research their respective State laws and Federal laws."

203.    Despite New York State law, 80P Builder has shipped, and continues to ship unfinished frames and receivers into New York State.

204.    Although the Office of the Attorney General has not yet obtained records of the shipments sent by 80P Builder, its sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

205.    On or around May 11, 2022, an employee of the New York City Sheriff's office conducted an undercover purchase of a Polymer80 PF940v2 unfinished frame from 80pbuilder.com, along with a lower parts kit; a Glock-17-compatible slide, barrel, and guide rod, an upper parts kit, and a set of high-definition sights.

206.    80P Builder accepted the order and shipped the ghost gun into New York County.

207.    On information and belief, this undercover purchase was just one of many instances when 80P Builder sent prohibited unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning

40

its products into working ghost guns.

### D. Brownells

208. Brownells, Inc., also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinell, IA.

209. Although Brownells sells a wide variety of different firearms, parts, and paraphernalia, it has taken to selling unfinished frames and receivers with particular gusto, marketing them based in large part on the lack of compliance with federal firearms law and the ease with which they can be converted into working ghost guns.

210. For instance, in an October 2017 press release announcing that the company would market a set of exclusive Polymer80 unfinished frames unique to Brownells, the company said that the unfinished frames could be used "to make instant custom handguns at home," and that "[w]ith a drill press or similar tool, an 80% frame can be finished into a firearm in just minutes." Press Release, "Brownells Announces Exclusive Polymer80 Frames," (Oct 11, 2017), available at https://www.theoutdoorwire.com/story/1507676814jseq2774930.

211. The same press release also advertised the legal conclusion that "[b]ecause they are not complete firearms, [unfinished frames] can be shipped straight to a customer's home without an FFL." *Id.*

212. As discussed above, Brownells' online materials go to great lengths to promote unfinished frames to consumers, saying that they "ha[ve] revolutionized the custom gun world. If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame." *See*

41

https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 28, 2022).

213.   Brownells provides an online page with step-by-step video instructions on how to convert a nominally unfinished Polymer80 frame into a finished frame.  In the key section, entitled "How to Mill a Polymer80 Frame," Brownells writes that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last "20%" of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video." *Id.*

214.   The viewer can watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a "finished" version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete."  If the viewer has questions or would like assistance finishing the frame, Brownells offers a telephone "tech line" where "we'll be glad to help you out."

215.   Brownells has sold and continues to illegally sell unfinished frames and receivers directly to consumers in New York State.

216.   Shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Brownells sent approximately 1,300 packages to non-FFL addresses in New York State each month, with approximately 328 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

217.    Brownells' sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York State investigators in response to an undercover purchase.

218.    On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940Cv1 unfinished frame kit from Brownells' website.

219.    Brownells accepted the order and shipped the unfinished frame kit into Kings County.

220.    Brownells has sold a massive number of unfinished frames and receivers into New York State, many of which have been converted into ghost guns used in crimes or by persons who could not and should not legally possess a firearm.

221.    Between October 2016 and May 2020, Brownells sent approximately 17 shipments to Jason Ramirez in New York County.

222.    On or around September 18, 2017, Brownells sold Ramirez a Polymer80 PF940CV1-OD Glock-compatible pistol frame and shipped it to his home in New York. Brownell's gave Ramirez a $10 promotional discount on the sale.

223.    On or around February 20, 2018, Brownells sold Ramirez another Polymer80 PF940CV1 Glock-compatible pistol frame, along with a part to build the gun, and shipped it to his home in New York. Brownells again gave Ramirez a discount on the sale.

224.    On or around December 27, 2018, Brownells sold Ramirez a Polymer80 PF940SC Glock-compatible pistol frame and shipped it to his home in New York. Brownells again gave

43

Ramirez a discount on the sale.

225.    Ramirez also purchased several sets of tools from Brownells to make unfinished frames into working ghost guns, along with accessories for the completed weapons.

226.    Brownells' records indicate that the company knew that Ramirez was not a Federal Firearm Licensee.

227.    Ramirez was indicted and pled guilty to violations of New York's firearms laws.

228.    On or around December 5, 2017, Brownells sent a shipment to Brandon Glaski in East Nassau, NY.

229.    Approximately six months later, law enforcement officers from the ATF and the New York State Police executed a search warrant on Glaski's residence.  In addition to dozens of other weapons, the officers found seventeen unfinished frames and receivers, all without serial numbers, including two that had been converted into working rifles.

230.    Glaski had a prior felony conviction and would not have been eligible to purchase a gun legitimately.

231.    Glaski pled guilty to federal gun charges in the Northern District of New York, and was sentenced to 30 months in prison.[10]

232.    On information and belief, the shipment sent from Brownells to Glaski contained unfinished frames or receivers and/or the parts to make them into ghost guns.

233.    Between approximately November 16, 2020, and October 26, 2021, Brownells sent

---

[10] *See* https://www.justice.gov/usao-ndny/pr/rensselaer-county-felon-sentenced-30-months-firearms-convictions (last visited June 28, 2022).

at least ten shipments to Rene Loyola at an address on East 6th Street in Manhattan.

234.    On information and belief, the shipments sent from Brownells to Loyola included unfinished frames or receivers and/or the parts to make them into ghost guns.

235.    On or around April 20, 2022, the New York Police Department executed search warrants on Loyola's residence in Brooklyn and his storage unit in Manhattan.

236.    The police discovered approximately $20,000 worth of ghost guns and ghost gun parts, including more than 30 frames and receivers, nearly 300 high-capacity magazines, and other tools used to manufacture and modify ghost guns, including tools to convert them to fire automatically.

237.    A portion of the ghost guns and paraphernalia recovered from the search warrants on Loyola are pictured below:



238.    On or around May 6, 2022, Loyola was indicted in New York County on approximately 264 different counts of violations of state firearms laws.

239.    On or around May 12, 2022, Loyola was indicted in Kings County on an additional 25 criminal violations.

240.    On or around December 11, 2020, Brownells sent a package to Kurt Therkelsen at an address on Bergen Street in Brooklyn.

241.    As discussed, Therkelsen was a supporter of the "Boogaloo Boys," a far-right militia-style organization.  When the NYPD raided his apartment, they recovered a host of weapons, including ghost guns, high-capacity magazines, and unfinished frames and receivers, as well as various parts, gunmaking tools, and other paraphernalia.  Therkelsen pled guilty to firearms charges in December 2021 and was sentenced to four years in prison.

242.    Between approximately August 5, 2021, and March 16, 2022, Brownells sent at least 28 packages to Dexter Taylor at an address on Eldert Street in Brooklyn, NY.

243.    Brownells' shipments to Taylor only stopped after the NYPD executed a search warrant on his apartment on April 6, 2022.[11]

244.    On information and belief, the packages Brownells sent to Taylor contained unfinished frames or receivers and/or the parts to make them into ghost guns.

245.    Officers recovered ghost guns including four completed assault weapons, five completed handguns, and four completed rifles, as well as eight unfinished receivers, five

---

[11] *See* http://www.brooklynda.org/2022/04/22/bushwick-man-indicted-for-illegal-possession-of-ghost-guns/ (last visited June 28, 2022).

46

unfinished frames, eleven magazines, and various parts and tools used to convert unfinished frames and receivers into working firearms.

246.    Taylor was indicted on 37 counts of violations of New York's firearms laws.

247.    Between approximately November 17, 2020, and May 28, 2021, Brownells sent four packages to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY.

248.    On information and belief, the packages Brownells sent to Santos contained unfinished frames or receivers and/or the parts to make them into ghost guns.

249.    As discussed, when NYPD officers searched Santos' home and car, they found dozens of working ghost guns, along with parts, ammunition, and tools used to convert unfinished frames and receivers into working weapons.  Santos was charged with 252 separate violations of New York's firearms laws.

250.    On or around August 4, 2021, Brownells sent a package to Chaz McMillan at an address on 162nd Street in the Fresh Meadows area of Queens, NY.

251.    On information and belief, the package Brownells sent to McMillan contained unfinished frames or receivers and/or the parts to make them into ghost guns.

252.    As discussed, on December 8, 2021, investigators executed a search warrant on McMillan's 162nd Street address.  They found 25 working ghost guns, including 19 semiautomatic pistols, 5 assault weapons, and 1 semiautomatic shotgun.  They also found four additional unfinished frames and receivers.  McMillan also had 31 large-capacity magazines, 670 rounds of ammunition, and various parts and tools used to convert unfinished frames and receivers into

working weapons.

253.     McMillan did not have a license to possess or own firearms.

254.     McMillan was charged with 125 criminal violations of New York's firearms laws.

255.     On or around December 28, 2020, Brownells sent a package to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.

256.     As discussed further below, police executed a search warrant on the Hook Creek Boulevard location and found an arsenal of ghost guns and the parts and tools to make them.  Kiem and his partner were charged with 39 criminal counts, including violations of the firearms laws and endangering the welfare of a child.

257.     Between approximately August 22, 2018, and May 11, 2020, Brownells sent at least five packages to Matthew Gerwitz at addresses in Tonawanda, NY.

258.     On information and belief, the packages Brownells sent to Gerwitz contained unfinished frames or receivers and/or the parts to make them into ghost guns.

259.     According to the Erie County District Attorney's Office, on or around May 26, 2020, Gerwitz carried out a drive-by shooting near his home, wounding a man in the stomach.[12]

260.     When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective multiple times.

261.     The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and

---

[12] *See* https://buffalonews.com/news/local/da-suspect-in-police-shooting-accused-of-using-homemade-guns-in-attacks/article_0ccc4699-a340-53b9-a87e-26a278dd7fc8.html (last visited June 28, 2022).

did not have a permit.

262.     Police found three more ghost guns when searching Gerwitz' home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

263.     On or around May 5, 2020, Brownells sent a package to Craig Bubak at an address on Riggs Street in Franklinville, NY.

264.     On information and belief, the package Brownells sent to Bubak contained unfinished frames or receivers and/or the parts to make them into ghost guns.

265.     On May 13, 2022, New York State Troopers responded to a report of shots fired in Franklinville.  Officers located Bubak, who was holding a "9mm polymer-based style pistol," which the Troopers described as a "ghost gun," without a serial number.  Further investigation revealed that Bubak had threatened multiple people in that area and fired at a victim but missed.

266.     Troopers arrested Bubak for attempted murder and other charges.

267.      Between approximately June 24, 2020, and May 4, 2022, Brownells sent at least seven packages to Edison Cruz at an address on Andrews Avenue in the Bronx, NY.

268.     On information and belief, the packages Brownells sent to Cruz included unfinished frames or receivers and/or the parts to make them into ghost guns.

269.     Edison Cruz was not legally permitted to possess a firearm.  According to a report from NBC 4 New York, he had "a lengthy rap sheet, and was previously arrested in June 2020 after allegedly walking down the street with a flamethrower and wearing a ballistic vest, a senior law enforcement official said. Later that year, he was arrested again after throwing something at his mother's head, and police found he had an ax, a loaded ghost gun, multiple gun parts and

49

another ballistics vest."[13]

270.   In May 2022, Cruz was arrested for a triple shooting that left one person dead and two others hospitalized.

271.   The *New York Post* reported that Cruz was "a nut for illegal 'ghost guns'" and that he "used one of the untraceable weapons in the shooting."

272.   Between approximately May 29, 2019, and December 7, 2020, Brownells sent at least seven packages to Theodore Brois at an address on Tallwoods Road in Armonk, NY.

273.   On information and belief, the packages from Brownells contained unfinished frames or receivers and/or the parts to make them into ghost guns.

274.   The North Castle Police Department arrested Brois in late-January 2022 for first-degree criminal possession of a weapon (10 or more weapons).  The Somers Daily Voice reported that about 60 guns, gun parts, and a "large amount" of ammunition were seized from Brois's home. North Castle Police Chief Peter Simonsen said the various gun parts could have been used to build additional firearms and that he was "quite surprised with the number of guns and ammunition found in the quiet neighborhood."

275.   On or around March 20, 2021, Brownells sent a package to Steven Salerna-Sanchez at an address on Claudette Court in Cheektowaga, NY.

276.   On information and belief, the package from Brownells contained unfinished frames or receivers and/or the parts to make them into ghost guns.

---

[13] *See* https://www.nbcnewyork.com/news/local/crime-and-courts/25-year-old-man-in-custody-after-bronx-shooting-leaves-1-dead-2-hurt/3672700/ (last visited June 28, 2022).

277.    On June 13, 2022, police arrested Salerna-Sanchez, also known as "Gunsmith," on felony weapons charges following a search of the apartment on Claudette Court that netted guns, including an AR-15, along with thousands of rounds of ammunition and kits to make untraceable guns, the Buffalo News reported.[14]

278.    Police Commissioner Joseph Gramaglia described Salerna-Sanchez as a high-level gun dealer who has been implicated in selling dozens of guns on the streets of Buffalo and, possibly, surrounding communities, the Buffalo News reported.  Gramaglia told the newspaper it takes about 30 minutes to assemble the kits into an operational firearm that can be sold for as much as $2,000 on the street.

279.    "This is what feeds the everyday gun violence that we see in our community and in communities across America – not just in Buffalo," Gramiglia said.

280.    On or around April 14, 2022, Brownells sent a package to Joshua Gotthart at an address on Wright Avenue in Buffalo, NY.

281.    On information and belief, the package Brownells sent to Gotthart contained unfinished frames or receivers and/or the parts to make them into ghost guns.

282.    On April 28, 2022, police pulled over Gotthart as he drove from his house on Wright Avenue.

283.    He had a loaded ghost gun in a holster strapped to his right hip and was wearing a bulletproof vest, according to the Erie County District Attorney's Office.

---

[14] *See* https://buffalonews.com/news/local/crime-and-courts/police-raid-nets-weapons-and-ghost-gun-kits-this-is-what-feeds-everyday-gun-violence/article_afc1a5da-eb52-11ec-97a7-1bb3d1b8c1dd.html (last visited June 28, 2022).

284.     Around the same time, Buffalo Police SWAT, joined by officers from multiple agencies, raided Gotthart's house, the Buffalo News reported. Using a search warrant, they said they found three unregistered handguns in a bedroom and what the DA's office described as an "arsenal" of rifles, shotguns, and magazines. They also found tools used to assemble ghost guns and a large amount of ammunition in the house, the DA's office said in a statement.[15]

285.     Gotthart was arraigned on one count of Criminal Possession of a Weapon in the Second Degree (Class "C" violent felony), three counts of Criminal Possession of a Firearm (Class "E" felonies), and one count of Unlawful Wearing of a Body Vest (Class "E" felony).

**E.     Glockstore/GS Performance**

286.     GS Performance, LLC, also known as Glockstore and GSPC, is a Tennessee entity with offices in Nashville, TN and San Diego CA.  It is the successor or affiliate of a California entity also named GS Performance, LLC.

287.     To look at Glockstore's website and marketing materials now, one would think the company has nothing to do with selling unfinished frames or receivers.  Its website no longer offers the products, and a consumer visiting today will find no mention of unfinished frames, 80% lowers, or Polymer80's main product line.

288.     But in fact, unfinished frames and receivers were central to Glockstore's business model for many years, and the company was one of the most significant manufacturers and distributors of these deadly products.

---

[15] *See* https://buffalonews.com/news/local/crime-and-courts/gunning-for-the-guns-police-cracking-down-in-buffalo-to-reduce-shootings/article_376afcfe-cc7a-11ec-ae52-efb7dcf5267c.html (last visited June 28, 2022).

289.     Glockstore was less than fully thorough in erasing the evidence of its prior business model.  For instance, one still-online blog post talks about how a new model of unfinished pistol frame is "one of the most talked about firearm products ever!"  Glockstore goes on to explain that the product "is specifically designed to straddle the line between an ATF firearm classification and a DIY project that's easily accomplished by anyone even moderately handy."[16]

290.     The same blog post explains that one of the main reasons a consumer might like to buy an unfinished frame is "the fact that you can build a completely legal handgun without any 'government oversight,' aka interference."   Further down, Glockstore sums up its value proposition: "[n]o fuss, no muss, no registration, no records… what's not to like?"  *Id.*

291.     The blog post appears to have embedded a video of Glockstore owner Lenny Magill walking the consumer through how to "transform this 'not a firearm' into a fully functioning 9mm handgun."[17]  The video itself has been removed for violating YouTube's terms of service.  *Id.*

292.     Another blog post Glockstore missed in its whitewashing attempt is still available at the URL http://community.glockstore.com/no-need-to-register-your-handgun-with-the-spectre-polymer80/ (last visited June 28, 2022).   The post is entitled "[100% Legal] Build a Non-Registered Handgun With a Spectre Polymer80."

293.     The post describes the unfinished frame in question as "[o]ne of the most exciting and fastest selling items at the GlockStore." The blog focuses both on the frame's usefulness for

---

[16] *See* http://community.glockstore.com/i-can-build-my-own-gun-with-this/ (last visited June 28, 2022).
[17] *See also* http://community.glockstore.com/lenny-magill-completes-the-new-polymer-80-full-size-v2-80-lower-using-glock-factory-parts/ (another blog post describing the contents of Mr. Magill's video) (last visited June 28, 2022).

evading registration requirements and on the ease of converting it into a working ghost gun, explaining that "[o]ne can simply purchase them as a 'non-firearm' part and then 'finish' the frame into a functioning lower. You then assemble then with readily available parts and legally own a firearm that does not have to be 'registered.'" *Id.* (quotation marks in the original).

294.   According to Glockstore, "[t]his is completely legal and acceptable based on Federal laws that have been on the record for many years that state an individual can actually make a firearm for personal use." *Id.* The blog post does not acknowledge the existence of state laws, licensing requirements, or longstanding prohibitions against firearm possession by felons or other dangerous persons.

295.   Glockstore's illicit sales of unfinished frames and receivers stopped only after the State of California filed suit against it based on several consumer protection statutes. *See* Amended Complaint, *People of the State of California v. Blackhawk Mfg. Grp., et al.*, Case No. CGC-21-594577 (Cal. Super. Ct.).

296.   California's pleading details several undercover purchases from Glockstore, as well as how Glockstore's marketing falsely "leads consumers to believe that ATF has approved the sale" of its products and falsely projects "the conclusion the [unfinished frame] is unregulated." *See id.* ¶¶ 106-112, 133-36.

297.   California specifically cited Glockstore's failure to inform consumers of the unfinished frame's illegality under California law, and of the legal requirements for the gun to be serialized and for the consumer to pass a background check. *Id.* ¶¶ 138-40.

298.   Glockstore shipped large numbers of its illegal products into New York as well,

again based on a manifest disregard for state law.

299.    Between November 13, 2017, and July 2, 2020, Defendant Glockstore shipped at least five packages to Domingo Valle in Bronx County.

300.    On information and belief, the packages from Defendant Glockstore to Valle contained unfinished frames or receivers and/or the parts to make them into ghost guns.

301.    Valle had been previously convicted of a gun crime and served time in jail for it. He could not legally purchase a firearm and would have failed a background check if he had tried to do so.  See https://www.justice.gov/usao-sdny/pr/bronx-man-who-possessed-five-ghost-guns-charged-possessing-firearm-and-ammunition.

302.    When law enforcement agents executed a search warrant on Valle's address in the Bronx, on or around October 4, 2021, they found two "ghost gun" pistols and an AR-style "ghost gun" rifle inside a concealed shelf in the living room, as well as another AR-style "ghost gun" rifle in the master bedroom.

303.    On information and belief, these weapons were assembled from the shipments sent by Defendant Glockstore.

304.    Valle was charged with being a felon in possession of a firearm and ammunition in the U.S.  District Court for the Southern District of New York.

305.    On or around December 14, 2021, GS Performance sent a package to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway area of Queens, NY.

306.    On information and belief, the package sent to the residence contained unfinished frames or receivers and/or the parts to make them into ghost guns.

55

307.     On February 19, 2022, Thomas Saxton, from the same address, was arrested after threatening to shoot his wife while she held her child.  When police stopped Saxton, he was carrying two ghost guns that had been converted to working firearms, as well as additional ammunition and a plastic bag of cocaine.  *See* https://www.liherald.com/stories/east-rockaway-man-indicted-for-possession-of-ghost-guns,141297,

308.     Between approximately August 21, 2020, and March 19, 2021, GS Performance sent at least five packages to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.

309.     On October 12, 2021, police executed a search warrant on the Hook Creek Boulevard location that Kiem shared with his partner and their ten-year-old daughter.

310.     Police found six fully assembled ghost gun pistols, three additional unfinished frames and the parts necessary to convert them into working pistols, two unfinished receivers capable of conversion to an AR-15 style rifle, an additional unfinished receiver, four large capacity magazines, approximately 650 rounds of ammunition, 23 additional pistol magazines, and various other components and parts used to convert unfinished frames and receivers into working weapons.

311.     Some of the firearms were found in the dresser drawer of the child's bedroom.

312.     Kiem did not have a license to possess or own firearms.

56

313. A portion of the firearms recovered from Kiem and his partner are pictured below:



314. Kiem and his partner were charged with 39 criminal counts, including violations of the firearms laws and endangering the welfare of a child.

315. On or around August 7, 2020, and October 29, 2020, GS Performance sent packages to Kai Zhao at an address on 167th Street in the Flushing area of Queens, NY.

316. On information and belief, the packages GS Performance sent to Zhao contained unfinished frames or receivers and/or the parts to make them into ghost guns.

317. On or around August 17, 2020, GS Performance sent a package to Seongwoo Chung at an address on Crocheron Avenue in the Flushing area of Queens, NY.

318. On information and belief, the package GS Performance sent to Chung contained

57

unfinished frames or receivers and/or the parts to make them into ghost guns.

319.     On or around March 1, 2022, Zhao, Chung, and two codefendants were arrested as part of an NYPD investigation into firearms trafficking.

320.     As discussed above, search warrants executed on Zhao, Chung, and their alleged accomplices resulted in the seizure of 27 ghost guns, including 22 semiautomatic pistols, 4 assault weapons, and 1 assault shotgun.  The search warrants also resulted in the NYPD seizing 16 unfinished receivers, 78 large capacity magazines, approximately 10,000 rounds of ammunition, silencers, sites, components and tools to assemble unfinished frames and receivers into working firearms, and more than $50,000 in cash.  Zhao, Chung, and their codefendants did not have a license to own or possess firearms.

321.     Between approximately November 26, 2018, and December 6, 2019, GS Performance sent at least four packages to Matthew Gerwitz at an address on Morgan Street in Tonawanda, NY.

322.     On information and belief, the packages GS Performance sent to Gerwitz contained unfinished frames or receivers and/or the parts to make them into ghost guns.

323.     As discussed above, Gerwitz conducted a drive-by shooting and shot a police officer multiple times, using weapons the Erie County District Attorney described as "homemade" and "off-the-internet."

324.     On or around January 12, 2022, and February 7, 2022, GS Performance sent packages to Gregory Lopez at an address on Rosman Road in Thiells, NY.

325.     On information and belief, the packages GS Performance sent to Lopez contained

58

unfinished frames or receivers and/or the parts to make them into ghost guns.

326.    On or around April 27, 2022, police executed a search warrant on Lopez' Rosman Road address.   They discovered two loaded, unserialized AR-15-style ghost gun rifles, ammunition, magazines, and multiple ghost gun parts.

327.    A Rockland County grand jury indicted Lopez on twelve counts of violating New York's firearms laws.

328.    On or around July 10, 2020 and March 8, 2021, GS Performance sent packages to Edison Cruz at an address on Anderson Avenue in the Bronx, NY.

329.    On information and belief, the shipments from GS Performance to Cruz contained unfinished frames or receivers and/or the parts to make them into ghost guns.

330.    As discussed, Edison Cruz was man with a "lengthy rap sheet" who was not legally permitted to buy or possess a firearm.  In May 2022, Cruz committed a triple shooting that left one person dead and two others hospitalized.  The New York Post reported that Cruz was "a nut for illegal 'ghost guns'" and that he "used one of the untraceable weapons in the shooting."

331.    On or around August 18, 2021, GS Performance sent a package to David Goldberg at an address on Bullet Hole Road in Mahopac, NY.

332.    On information and belief, the package GS Performance sent to Goldberg contained unfinished frames or receivers and/or the parts to make them into ghost guns.

333.    The Putnam County Sheriff's Department arrested Goldberg in late-January 2022 on four felony charges, including first-degree criminal possession of a weapon (10 or more), as part of a multi-agency investigation into ghost guns and other illegal weapons.

334.     On or around November 4, 2021, GS Performance sent a package to Andrew Lopez at an address on Fair Street in Carmel, NY.

335.     On information and belief, the package GS Performance sent to Lopez contained unfinished frames or receivers and/or the parts to make them into ghost guns.

336.     The Putnam County Sheriff's Department, arrested Lopez in late-January 2022 for second-degree criminal possession of a weapon as part of a multi-agency investigation into ghost guns and other illegal weapons.

### F.     Indie Guns

337.     Indie Guns LLC is a Florida limited liability company with its principal place of business in Orlando, Florida.  It appears to be affiliated with another Florida limited liability company named Indie Group LLC, also with its principal place of business in Orlando.

338.     Indie Guns' business focuses on ghost guns and the parts for them, particularly unfinished frames and receivers.  It touts itself as the "[p]remiere distributor of high quality USA made polymer gun frames, 80% lowers, and build kits."

339.     Its website advertises a wide variety of unfinished frames, frame kits and full build kits.

340.     The company touts a "blank serialization plate" as one of the key features of the unfinished frames it sells.

341.     Indie Guns also sells unfinished frames as part of "LSB Kits" (the acronym standing for "lock, stock, and barrel"), which the company describes as "everything needed to build a complete pistol in a discounted bundle package."  *See* https://indieguns.com/kangal-17-urban-

60

camo-lsb-kit-lock-stock-barrel-for-g17-gen3/ (last visited June 28, 2022).

342.    The company ships these LSB kits directly to the consumer, without going through an FFL that would follow federal serialization, background check, and recordkeeping requirements.  The company knows and intends that these consumers will convert the LSB kits into working firearms – as Indie Guns itself explains, "When done with your build, just grab a box of rounds and you're good to go…"  *Id.*

343.    Indie Guns has sold and continues to sell and ship illegal unfinished frames and receivers into New York State.

344.    Although the Office of the Attorney General has not yet obtained records of the shipments sent by Indie Guns, its sale of unfinished frames into the New York market is evidenced by the fact that it sent unfinished frames to New York State and City investigators in response to undercover purchases.

345.    On or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns, as part of a complete frame assembly kit including a trigger assembly, a magazine, and a complete slide with barrel.  Indie Guns accepted the order and shipped the product into New York County.

346.    On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns' website, as part of a complete frame assembly kit.

347.    The Indie Guns website said that "Indie Guns is pleased to present the CFA-17

61

(COMPLETE FRAME ASSEMBLY-17)  The CFA-17 contains all necessary parts, as detailed below, to build a complete G17 Gen3 lower."  Indie Guns also touted the frame's "blank serialization plate."[18]

348.    Indie Guns accepted the order and shipped the unfinished frame into Kings County.

349.    On information and belief, these undercover purchases were just two of many instances when Indie Guns sent prohibited unfinished frames and receivers into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

**G.    KM Tactical**

350.    KM Tactical is a Missouri-based online retailer of gun parts and paraphernalia, focusing on AR-15, AR-10, and Glock components.

351.    Categorized under the "Goodies" section of the site, KM Tactical offers an extensive selection of unfinished frames and receivers divided between AR and Glock platforms.[19]

352.    According to KM Tactical owner Kyle Murphy in an October 2020 interview, "[n]othing we sell does damage, we don't sell serialized parts."[20]

353.    Mr. Murphy is correct that the unfinished frames and receivers his business sells into New York are unserialized, but the damage has been extensive.

---

[18]  *See*  https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35/  (last visited June 6, 2022).
[19]     *See*     https://kmtactical.net/product-category/default-category/accessories/80-lowers/ar-platform/     and https://kmtactical.net/product-category/default-category/accessories/80-lowers/glock-platform/ (last visited June 28, 2022).
[20] https://www.leessummit.org/husband-wife-duo-move-business-home-to-lees-summit/

354.     Shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, KM Tactical sent approximately 246 packages to non-FFL addresses in New York State each month, with approximately 222 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

355.     On or around July 29, 2021, KM Tactical sent a package to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY.

356.     On or around September 22, 2021, KM Tactical sent a package to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY.

357.     On information and belief, the packages KM Tactical sent to Santos contained unfinished frames or receivers and/or the parts to make them into ghost guns.

358.     As discussed above, when NYPD officers searched Santos' home and car, they found dozens of working ghost guns, along with parts, ammunition, and tools used to convert unfinished frames and receivers into working weapons.

359.     Santos was charged with 252 separate violations of New York's firearms laws.

360.     On or about April 10, 2020, KM Tactical sent a package to Craig Bubak at an address on Riggs Street in Franklinville, NY.

361.     On information and belief, the package KM Tactical sent to Bubak contained unfinished frames or receivers and/or the parts to make them into ghost guns.

362.     On May 13, 2022, New York State Troopers responded to a report of shots fired in Franklinville. Officers located Bubak, who was holding a "9mm polymer-based style pistol," which the Troopers described as a "ghost gun," without a serial number.  Further investigation

63

revealed that Bubak had threatened multiple people in that area and fired at a victim but missed.

363.    Troopers arrested Bubak for attempted murder and other charges.

364.    Between approximately October 28, 2019, and May 22, 2020, KM Tactical sent 11 packages to Matthew Gerwitz at addresses on Morgan Street and Grove Street in Tonawanda, NY.

365.    On information and belief, the packages KM Tactical sent to Gerwitz contained unfinished frames or receivers and/or the parts to make them into ghost guns.

366.    According to the Erie County District Attorney's Office, on or around May 26, 2020, Gerwitz carried out a drive-by shooting near his home, wounding a man in the stomach. When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective between multiple times.[21]

367.    The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and because Gerwitz did not have a permit.

368.    Police found three more ghost guns when searching Gerwitz' home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

369.    Between approximately April 23, 2020 and April 30, 2020, KM Tactical sent two packages to Brandon Glaski at an address on Adams Crossing Road in East Nassau, NY.

370.    On information and belief, the packages sent from KM Tactical to Glaski contained unfinished frames or receivers and/or the parts to make them into ghost guns.

---

[21] *See* https://buffalonews.com/news/local/tonawanda-man-indicted-in-drive-by-slaying-attempted-murder-of-cop/article_fff58d82-e7b7-11ea-a7fe-7f8ba091a3f4.html (last visited June 28, 2022).

371.     On June 12, 2018, law enforcement officers from the ATF and the New York State Police executed a search warrant on Glaski's residence.  In addition to dozens of other weapons, the officers found seventeen unfinished frames and receivers, all without serial numbers, including two that had been converted into working rifles.

372.     Glaski had a prior felony conviction and would not have been eligible to purchase a gun legitimately.

373.     Glaski pled guilty to federal gun charges in the Northern District of New York, and was sentenced to 30 months in prison.[22]

374.     Between approximately September 24, 2020, and September 29, 2020, KM Tactical sent two packages to David Goldberg at an address on Bullet Hole Road in Mahopac, NY.

375.     On information and belief, the packages KM Tactical sent to Goldberg contained unfinished frames or receivers and/or the parts to make them into ghost guns.

376.     As discussed above, Goldberg was later arrested by the Putnam County Sheriff's Department as part of an ongoing investigation into illegal ghost guns.

**H.**     **Primary Arms**

377.     Defendant Primary Arms is a Houston-based online retailer of firearms, parts, and paraphernalia.

378.     Although Primary Arms now appears to sell their unfinished frames and receivers serialized and through a FFL, for many years the company shipped unfinished frames and receivers

---

[22] *See* https://www.justice.gov/usao-ndny/pr/rensselaer-county-felon-sentenced-30-months-firearms-convictions (last visited June 28, 2022).

directly to New York consumers, with no serialization and no background check.

379. Shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Primary Arms sent approximately 790 packages to non-FFL addresses in New York State each month, with approximately 332 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

380. On or around November 27, 2021, Primary Arms sent a package to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway area of Queens, NY.

381. On information and belief, the package sent to the Residence contained unfinished frames or receivers and/or the parts to make them into ghost guns.

382. As discussed above, on February 19, 2022, Thomas Saxton, from the same address, was arrested after threatening to shoot his wife while she held her child. When police stopped Saxton, he was carrying two ghost guns that had been converted to working firearms, as well as additional ammunition and a plastic bag of cocaine.

383. Between approximately March 17, 2021, and September 13, 2021, Primary Arms sent at least four packages to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.

384. As discussed above, police executed a search warrant on the Hook Creek Boulevard location and found an arsenal of ghost guns and the parts and tools to make them. Kiem and his partner were charged with 39 criminal counts, including violations of the firearms laws and endangering the welfare of a child.

385. On or around August 22, 2021, and December 28, 2021, Primary Arms sent

66

packages to Edison Cruz at an address on Anderson Avenue in the Bronx, NY.

386.    As discussed above, Cruz had "a lengthy rap sheet" and was not legally permitted to own or operate a firearm.  In May 2022, Cruz committed a triple shooting that left one person dead and two others hospitalized.  The New York Post reported that Cruz was "a nut for illegal 'ghost guns'" and that he "used one of the untraceable weapons in the shooting."

387.    On or around December 17, 2021, Primary Arms sent a package to Theodore Brois at an address on Tallwoods Road in Armonk, NY.

388.    On information and belief, the package Primary Arms sent to the Brois residence contained unfinished frames or receivers and/or the parts to make them into ghost guns.

389.    As described above, police in Westchester County seized about 60 ghost guns, gun parts, and a "large amount" of ammunition from Brois's home. North Castle Police Chief Peter Simonsen said the various gun parts could have been used to build additional firearms and was "quite surprised with the number of guns and ammunition found in the quiet neighborhood."

390.    On or around May 26, 2021, Primary Arms sent a package to Adam DiMaggio at an address on Lincoln Drive in Carmel, NY.

391.    On information and belief, the package Primary Arms sent to DiMaggio contained unfinished frames or receivers and/or the parts to make them into ghost guns.

392.    The FBI Safe Streets Task Force and Putnam County Sheriff's Office, arrested DiMaggio in late-January 2022 for unlawful possession or receipt of a firearm or ammunition by a prohibited person.

## I.    **Rainier Arms**

393.    Rainier Arms is a Washington State-based online retailer that describes itself as "the ultimate stop for AR-15 rifles and AR-15 parts."

394.    When Rainier Arms markets its unfinished frames or receivers, the company portrays them as exempt from public safety laws.  For instance, Rainier Arms explains that "80% receivers are almost-completed pieces of machined metal or plastics that are not classified as firearms by the ATF.  As such, they can be bought, sold, and transported without restriction, as the government jut considers them pieces of metal and/or plastic and not guns."[23]

395.    Rainier Arms also sells unfinished handgun frames, including the Glock-compatible Lone Wolf Arms Freedom Wolf 80% Pistol Frame.  Rainier Arms' product description for the unfinished frame claims the product "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License required."[24]

396.    Rainier Arms is aware of state-law restrictions on the sale of unfinished frames or receivers to consumers, declaring that it will not ship them to New Jersey or sell them in-store within Washington State.  However, the company acknowledges no restrictions on shipping to New York consumers.

---

[23]    https://www.rainierarms.com/manufacturers/polymer80/ (last visited June 28, 2022).  *See also* https://www.rainierarms.com/lower/filter/category2:stripped-lower-receivers/ (representing that "80% Lower Receivers are components that require the completion of the last 20% of milling. Due to this fact, 80% Lowers are not treated as firearms") (last visited June 28, 2022).
[24]    https://www.rainierarms.com/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame/ (last visited June 28, 2022).

397.    Rainier Arms has sold and continues to sell unfinished frames and receivers into New York State.

398.    Rainier Arms' sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

399.    On or around April 27, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940SC Glock-compatible unfinished pistol frame from Ranier Arms.

400.    Ranier Arms accepted the order and shipped the frame into New York County.

401.    On or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a 24-round magazine[25] and two parts kits for the Polymer80 ghost gun.

402.    Rainier Arms accepted the order and shipped the parts into New York County.

403.    On or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940v2 Glock-compatible unfinished pistol frame from Ranier Arms, along with a Glock 17-compatible slide and barrel.

404.    Ranier Arms accepted the order and shipped the frame and parts into New York County.

405.    Shipping data obtained by the Office of the Attorney General indicates that from

---

[25] The large-capacity magazine Rainier Arms sold was separately illegal under New York State law.  *See* Penal Law § 265.00(23).

March 2020 to the present, Rainier Arms sent approximately 131 packages to non-FFL addresses in New York State each month, with approximately 106 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

406.    Between approximately July 2, 2021, and September 1, 2021, Rainier Arms sent at least seven packages to Chaz McMillan at an address on 162nd Street in Queens, NY.

407.    On information and belief, the packages Rainier Arms sent to McMillan contained unfinished frames, unfinished receivers, and/or the parts to convert them into ghost guns.

408.    As discussed above, when law enforcement searched McMillan's house, they found 25 working ghost guns, including 19 semiautomatic pistols, 5 assault weapons, and 1 semiautomatic shotgun.  They also found four additional unfinished frames and receivers that had not yet been constructed into working weapons.  McMillan did not have a license to possess or own firearms.

409.    On or around March 12, 2018, Rainier Arms sent a shipment to Brandon Glaski in East Nassau, NY.

410.    On information and belief, the package Ranier Arms sent to Glaski contained unfinished frames or receivers and/or the parts to make them into ghost guns.

411.    As discussed above, Glaski had a felony conviction and could not purchase a gun legally.  When law enforcement officers from the ATF and the New York State Police executed a search warrant on Glaski's residence, they found seventeen unfinished frames and receivers, all without serial numbers, including two that had been converted into working rifles.

412.    Between approximately April 1, 2021, and May 22, 2021, Rainier Arms sent at

least three packages to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.

413.    On information and belief, the packages Ranier Arms sent to Kiem contained unfinished frames or receivers and/or the parts to make them into ghost guns.

414.    As discussed above, police executed a search warrant on the Hook Creek Boulevard location and found an arsenal of ghost guns and the parts and tools to make them.  Kiem and his partner were charged with 39 criminal counts, including violations of the firearms laws and endangering the welfare of a child.

415.    On or around February 1, 2022, Rainier Arms sent a package to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway area of Queens, NY.

416.    On information and belief, the package sent to the residence contained unfinished frames or receivers and/or the parts to make them into ghost guns.

417.    As discussed above, on February 19, 2022, Thomas Saxton, from the same address, was arrested after threatening to shoot his wife while she held her child.  When police stopped Saxton, he was carrying two ghost guns, as well as additional ammunition and a plastic bag of cocaine.

418.    On or around July 20, 2021, Rainier Arms sent a package to Adam DiMaggio at an address on Lincoln Drive in Carmel, NY.

419.    On information and belief, the package Rainier Arms sent to DiMaggio contained unfinished frames or receivers and/or the parts to make them into ghost guns.

420.    The FBI Safe Streets Task Force and Putnam County Sheriff's Office arrested

DiMaggio in late-January 2022 for unlawful possession or receipt of a firearm or ammunition by a prohibited person.

**J.** **Rock Slide USA**

421. Defendant Rock Slide USA, LLC is a North Carolina limited liability company with its principal place of business in Broadway, NC.

422. Rock Slide USA specializes in manufacturing "uppers," the part of the gun that fits on top of the "lower" part containing the frame. Rock Slide USA also sells Polymer80 brand Glock-compatible unfinished frames, and touts their compatibility with its own "upper" products.

423. Rock Slide USA describes the unfinished frames they sell as "com[ing] with everything needed to make your own custom, Glock compatible pistol at home. Various colors available. No license required."[26]

424. Although the Office of the Attorney General has not yet obtained records of the shipments sent by Rock Slide USA, its sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

425. On or around May 11, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940C Glock-compatible unfinished frame from Rock Slide USA, along with Rock Slide-brand upper and the remaining parts necessary to convert the unfinished frame into a working ghost gun.

426. The checkout page included the words "No license required. Ships anywhere in

---

[26] *See* https://rockslideusa.com/shop/ (last visited June 28, 2022).

the USA."

427.     Rock Slide USA accepted the order and shipped the frame into New York County.

428.     On information and belief, this undercover purchase was just one of many instances when Rock Slide USA sent prohibited unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

## IV.     THE PRICE PAID BY THE PEOPLE:  DEFENDANTS' GHOST GUNS HAVE HARMED NEW YORK AND WILL CONTINUE TO DO SO IF UNABATED.

429.     The influx of ghost guns into New York is a significant threat to public health and safety.  New York's legislature has passed laws to serve this purpose, but by the conduct described in detail above, Defendants not only undermine those laws, they affirmatively harm New Yorkers by (i) increasing the number of firearms likely to be used in the commission of a crime, (ii) diminishing or unwinding the effect of on-point legal protections, including those relating to intimate partner violence, (iii) increasing the number of murders and suicides, and (iv) creating a new primary and secondary market for illicit guns in New York.

430.     As a result, to date, New York has had to (i) invest in ghost gun-specific law enforcement initiatives, technology, and resources, (ii) expend increasing amounts of resources on law enforcement investigative efforts to solve specific crimes involving assembled ghost guns, and (iii) research and implement other measures to quell the crisis, including expanding relevant community support and services and equipping more public hospitals with resources to treat gun-related injuries.

A.  **The Rise of Ghost Guns and the Damage Done**

431.  The available data shows that ghost guns are proliferating – and are being used in crimes – at an exponential pace.  According to the Bureau of Alcohol, Tobacco, Firearms and Explosives, the number of ghost guns recovered at crime scenes nationwide has increased more than elevenfold in just six years, from 1,758 in 2016 to 19,344 in 2021.[27]  Notably, according to the ATF, "[t]hese numbers are likely far lower than the actual number of [ghost guns] recovered from crime scenes" because some law enforcement agencies trace ghost guns incorrectly, while others do not attempt to trace guns that have no serial numbers or identifiable markings.[28]

432.  The number of ghost guns recovered at crime scenes in New York likely follows this disturbing upward national trend.

433.  Specifically, New York law enforcement is recovering an increasing number of crime guns each year.  In 2018, law enforcement made 6,559 crime gun recoveries, but in 2021, that number rose to 10,132 crime guns—an increase of 54.5%.[29]

434.  Ghost guns are an increasingly disturbing part of this growing pool.  Throughout New York State, including New York City's five boroughs, the number of assembled ghost guns

---

[27] *See* 87 Fed. Reg. 24656 (citing internal figures from the ATF Office of Strategic intelligence and Information).

[28] *See id.* at n. 18.  Law enforcement officers often confuse ghost guns with "defaced" firearms.  The latter is a term of art that relates only to serialized firearms which had the serial number scraped, covered, or otherwise impeded from view.  Law enforcement agencies, including NYPD, have laboratory capabilities and processes to recover serial numbers on defaced firearms, and in some instances, a recovering officer may designate a recovered ghost gun as "defaced" so that the agency can take a closer look and determine whether a serial number may be recovered.  After subsequent review, a ghost gun initially misidentified as a defaced firearm will not be re-identified by law enforcement.  This accounts for a potentially significant undercount of recovered ghost guns.

[29] These figures include all firearms identified as "defaced," whether they are in fact defaced with potentially recoverable serial numbers or in actuality ghost guns with no serial number at all

law enforcement recovered (and properly identified as such) increased from just 44 in 2018 to 641 in 2021—a 1,357% increase.  Moreover, as of June 17, 2022, there have been 373 recoveries of assembled ghost guns, putting New York on pace to recover over 800 ghost guns over the full year.[30]

435.    When considering the rate of ghost guns in the context of all gun recoveries across the State, the trend is deeply disturbing.  In 2018, assembled ghost guns constituted only 0.67% of all guns recovered by law enforcement.  That rate increased to 1.5% in 2019, then 3.6% in 2020, then further to 6.32% in 2021.  Upon information and belief, from January 1 through June 20, 2022, law enforcement has recovered an assembled ghost gun 8.7% of the time they made a gun recovery.  Senior law enforcement officials expect the prevalence of ghost guns to continue to increase unless steps are taken to restrain illicit trafficking.

436.    The number of assembled ghost guns in New York —including those created from Defendants' illegal products—has reached crisis levels and continues to climb.

437.    The pandemic has exasperated the issue.  Gun manufacturers have generally reported massive sales of ghost gun kits since March 2020.  Upon information and belief, Defendants' sales of unfinished frames and receivers have likewise increased exponentially over that same time period, with a significant number of those products being shipped directly into New York State or easily finding their way into New York State—leading to significant profits for

---

[30] Notably, these numbers do not count recovered unfinished frames and receivers, nor do they count completed "major components" of a firearm, which are also illegal and harmful to New Yorkers.  For example, these numbers do not account for the NYPD's recovery of 50 unfinished frames or receivers incident to arrests in 2020, 125 in 2021, and 100 for this calendar year through May 31st.

Defendants from this illicit market.

438. Upon information and belief, that increase in sales has coincided with a massive uptick in gun murders, as approximately 79% of U.S. murders committed in 2020 involved a firearm, which represents a 34% increase from 2019, a 49% increase from 2015, and a 75% increase from 2010.[31]

439. Defendants' business practices, which at bottom increase the number of illegal operable firearms in New York, are also related to an increase in suicide deaths, as approximately half of all suicide deaths involve a firearm. Like gun murders, gun-related suicides in the U.S. increased 10% between 2015 and 2020, and 25% when measured against 2010.[32]

440. While New York was among the states with the lowest rates of gun fatalities in 2020, Defendants' products and practices are changing the tide. Indeed, Defendants' business practices and conduct are significant contributors to New York's increasing rates of gun-related fatalities.

**B.** **Defendants' Conduct Is Dangerous and Directly Harms New York**

441. The evidence that Defendants have caused and continue to cause great harm to New York's public health and safety by their conduct and business practices is not anecdotal or limited to instances of sales where their products were ultimately used in crimes or found in the possession of convicted felons.

442. Rather, guns recovered at crime scenes are statistically related to gun manufacturer

---

[31] https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/

[32] *Id.*

practices in the aggregate. Available public health research indicates that manufacturers can lessen the use of their guns in crime by implementing certain reasonable policies and practices. For example, a manufacturer may have an authorized dealer program, maintain records of sales to individual dealers or visit dealers frequently, maintain distributor agreements, or impose location-related controls over where their advertising appeared. The more of these practices that a manufacturer has followed, the less frequently their products were recovered from crime scenes. By these practices, a manufacturer aligns its business practices with its responsibilities under the law and incentivizes its dealer or distributor customers to do the same.

443.    Defendants' conduct, as described in more detail above, is entirely at odds with such reasonable policies and practices. Defendants here do nothing to geographically restrain the marketing of their prohibited products, and they employ policies and practices that result in sales of these illegal products directly to unknown and unchecked individuals in New York.

444.    Moreover, Defendants are aware that criminals are an important segment of the gun industry market. To that end, a significant percentage of handguns that have been used in crimes in New York have historically originated in states that have weaker gun laws. Indeed, according to the ATF, 74% of firearms used by individuals in the commission of a crime in New York were purchased outside of New York. By the conduct described above, Defendants exacerbate the challenges New York has in preventing illegal firearms from entering our communities by providing criminals and other individuals who either know or suspect they are ineligible to legally purchase a firearm with a direct avenue to illicitly purchase one that is virtually untraceable. Thus, Defendants' conduct and business practices have created a new and more easily accessible market

for illegal operable firearms in New York. (*See also, e.g.*, *supra* ¶¶ 97-103).

445. Moreover, ATF trace data has also long-established certain dealer characteristics that indicate serious problems. For example, guns purchased by individuals who bypassed a geographically closer dealer constitute the vast majority of traced firearms. That risky characteristic is exponentially amplified by individuals who can not only bypass geographically closer dealers but can bypass any and all dealers entirely.

446. In the context of domestic violence, an intimate partner is 5 times more likely to be murdered when the violent partner has access to a firearm.[33] New York law addresses this very real and substantial risk by, among other ways, suspending a violent partner's firearms license, rendering the individual ineligible for such a license, and requiring the immediate surrender of any firearms he or she possesses or owns when certain conditions are present. *See* N.Y. Fam. Ct. Act § 842-a (McKinney). These laws are effective. Limitations, like those imposed by N.Y. Fam. Ct. Act § 842-a, have been studied and are linked to significant reductions in intimate partner homicide rates. Defendants' sale of ghost gun products and their refusal to conduct background checks undermine these important protections, *increasing* the already-significant risk that a protected person or persons will be murdered.

447. Defendants' sale of unfinished frames and receivers directly to consumers also undermines New York's licensing laws, which play a major role in protecting the public. Research indicates that comprehensive background checks are most effective in lowering firearm homicide

---

[33] Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and Their Associations With Intimate Partner Homicide. Am J Epidemiol. 2018 Nov 1;187(11):2365-2371. Doi: 10.1093/aje/kwy174. PubMed PMID: 30383263.

and suicide rates when they are implemented in conjunction with handgun purchaser licensing laws.[34]  Notably, when Missouri repealed its handgun purchaser licensing law, there was an "estimated [] 47.3% overall increase in firearm homicides and a 23.5% increase in firearm suicides."[35]  Consistent with that result, permit to purchase laws like New York's have been studied and demonstrated to meaningfully decrease firearm homicides.[36]

448.   But by their conduct, Defendants are nullifying those benefits.  Defendants are stripping New York's effective licensing and permit laws of their impact, and consequently the number and rate of homicides and suicides will continue to rise.

449.   Accordingly, given the nature of Defendants' business practices and products, together with the known nature of the gun industry market and the statistical relationship between a gun manufacturer's conduct and crime gun outcomes, Defendants are knowingly and/or recklessly causing harm to New York's public health and safety.

450.   With every sale Defendants have made and continue to make, they circumvent and undermine New York's firearms public safety measures for their own profit.

---

[34] McCourt AD, Crifasi CK, Stuart EA, Vernick JS, Kagawa RMC, Wintemute GJ, Webster DW. Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States, 1985-2017. Am J Public Health. 2020 Oct;110(10):1546-1552. Doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20. PubMed PMID: 32816544; PubMed Central PMCID: PMC7483089.

[35] *Id.*

[36] Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Association between Firearm Laws and Homicide in Urban Counties. J Urban Health. 2018 Jun;95(3):383-390. Doi: 10.1007/s11524-018-0273-3. PubMed PMID: 29785569; PubMed Central PMCID: PMC5993701; Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Correction to: Association between Firearm Laws and Homicide in Urban Counties. J Urban Health. 2018 Oct;95(5):773-776. Doi: 10.1007/s11524-018-0306-y. PubMed PMID: 30117057; PubMed Central PMCID: PMC6181823.

## C.    **We Need to Fix This Avoidable Crisis.**

451.    The rise of gun violence in New York is a public health crisis, as declared both by the 2021-2022 legislative session and by the Governor's recent Executive Order. *See* N.Y. Executive Order 3.9 (declaring a disaster emergency across the State due to gun violence).

452.    As described further here, Defendants have created, maintained, or contributed to a substantial interference with the public's right to health and safety, exacerbating the ongoing public health crisis.

453.    New York's Penal Law establishes that the unlawful possession, sale, or use of an unfinished frame or receiver constitutes a nuisance. N.Y. Penal Law §§ 265.07, 400.05.

454.    New York law permits civil enforcement actions based on such a nuisance. Specifically, in New York, and as described in more detail above, "given the specific harm illegal firearm violence causes certain New Yorkers, those responsible for the sale, manufacture, importing, or marketing of firearms should be held liable for the public nuisance caused by such activities." New York Sponsors Memorandum, 2021 S.B. 7196; *see also* N.Y. Gen. Bus. Law § 898-d.

455.    Further, "[n]o gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

456.    Moreover, "[a]ll gun industry members who manufacture, market, import or offer

80

for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." *Id.* § 898-b(2). A "qualified product" is a firearm or a component part of a firearm that has been shipped in interstate commerce. *See id.* § 898-a(6) (incorporating the federal definition from 15 U.S.C. § 7903(4)).

457.    Here, and as described more fully above, each Defendant has engaged in conduct prohibited by General Business Law § 898-b.

458.    For example, as detailed above, several Defendants sent several shipments to individual consumers in a short period of time, making no effort to determine whether those consumers were engaged in firearms trafficking, shipped unfinished frames and receivers to individuals who were not eligible to legally own a firearm, and for those Defendants who sold unfinished frames or receivers to undercover employees of New York City or the Office of the Attorney General, they made no attempt to conduct a background check or otherwise verify that the purchaser was legally permitted to purchase a gun in this State. (*See supra* at ¶¶ 113-428) Upon information and belief, each and every sale of Defendants' prohibited ghost gun products to a New York customer or to a customer who could foreseeably bring that product into New York likewise lacked any background check or meaningful verification process.

459.    Each Defendant's misconduct is ongoing and continuous.

460.    Each Defendant's misconduct has resulted in significant ongoing harm and costs to the People. For example, in February 2020, New York City established an NYPD team dedicated exclusively to stopping the flow of ghost guns before they reach city streets. At New York City's

81

expense, that team, among other things, works with federal, state, and local law enforcement and prosecutors on in-depth ghost gun investigations, search warrant executions, and arrests, and conducts ghost gun-related trainings for police officers and prosecutors. Other jurisdictions across the State have similarly had to redirect law enforcement resources to confront the growing threat posed by the proliferation of products like those sold by the Defendants.

461. The People believe that abating the public health and safety crisis caused by Defendants' products will require extensive additional resources, including those necessary to (i) develop and execute policies and procedures to locate, recover, and destroy unfinished frames and receivers and/or the ghost guns made from them, (ii) research and implement processes sufficient to identify, trace, and link unserialized firearms used in the commission of multiple crimes, and (iii) support communities hard hit by gun violence and crimes.

462. Some of this work has already begun. In January 2022, Governor Kathy Hochul announced that New York must, among other things:

a. Triple the New York State Police's gun violence intelligence resources by adding a team of analysts who process gun tracing data to the New York State Intelligence Center;

b. Increase the State Police's ability to partner with local law enforcement to combat community-specific crime problems;

c. Increase funding for the Gun Involved Violence Elimination (GIVE) program, which uses evidence-based strategies to reduce gun crimes in the State's 17 counties that account for more than 80 percent of the violent crime that occurs in the State outside of New York City;

d. Increase investments in New York's Crime Analysis Centers, which collect and share criminal intelligence and data with local law enforcement;

e. Establish Crime Gun Intelligence Centers in every region of the State;

82

f.      Create the Interstate Gun Tracing Consortium, which facilitates the exchange of intelligence between localities and neighboring states; and

g.      Triple the State's investment in community-based prevention and response efforts that have been proven to alleviate gun violence, including expanding hospital-based gun violence specialists to all 22 of the State's trauma centers and launch a the nation's first program to recruit and retain outreach workers.[37]

463.      These expenditures are necessary due in no small part to the dangerous conditions caused by Defendants' self-serving and illegal business practices.

464.      Despite enacting evidence-based gun control laws and effective enforcement strategies, New York finds itself in a gun violence crisis. Defendants caused, maintained, and/or contributed to this crisis for their own profit, and must be held accountable.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
### REPEATED AND PERSISTENT FRAUD OR ILLEGALITY IN BUSINESS IN
### VIOLATION OF EXECUTIVE LAW § 63(12)
Selling and Shipping Unfinished Frames and Receivers

465.      The People reallege each and every allegation in the paragraphs above as though fully set forth herein.

466.      Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent illegal conduct in the carrying on, conducting, or transaction of business.

467.      Selling or shipping unfinished frames or receivers into New York State is illegal under New York State law. *See* New York Penal Law §§ 265.60, 265.61. Those shipments sent

---

[37] https://www.governor.ny.gov/news/governor-hochul-announces-three-part-agenda-prevent-and-reduce-gun-violence-and-violent-crime

into New York City are also illegal under City Law. *See* N.Y. City Admin. Code § 10-314. And because unfinished frames and receivers are "designed to" and "may readily be converted" into working firearms, 18 U.S.C. § 921(a)(3); *see also id.* (including "the frame or receiver of any such weapon" in the definition), it is illegal to sell them under federal law unless they are serialized, subject to a background check, and sold through a federal firearms licensee.

468. As set forth above, each Defendant has repeatedly sold unfinished frames or receivers and shipped them directly to New York consumers, in violation of these laws.

469. By reason of the foregoing, each Defendant has engaged in repeated or persistent illegal conduct in violation of Executive Law § 63(12).

470. As discussed above, Defendants' illegal business conduct has done significant damage to New York in the form of increased crime, undermined public safety protections, and increased expenditures on public health and law enforcement.

### AS AND FOR A SECOND CAUSE OF ACTION
### REPEATED AND PERSISTENT FRAUD OR ILLEGALITY IN BUSINESS IN VIOLATION OF EXECUTIVE LAW § 63(12)
Aiding and Abetting the Possession of Firearms By Convicted Persons

471. The People reallege each and every allegation in the paragraphs above as though fully set forth herein.

472. Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent illegal conduct in the carrying on, conducting, or transaction of business.

473. Federal law prohibits possession of a firearm by anyone who has been convicted of a felony. *See* 18 U.S.C. § 922(g)(1).

474.    New York State similarly prohibits the possession of a firearm by anyone who has been convicted of a crime.  *See* Penal Law § 265.02; *see also People v. Hughes*, 83 A.D.3d 960, 961 (2d Dep't 2011) (prohibition applies to those convicted of "a misdemeanor or a felony").

475.    As discussed above, each Defendant sold unfinished frames or receivers into New York State knowing, intending, or being willfully blind to the fact that these products would be converted into working firearms.

476.    As discussed above, each Defendant knew, intended, or was willingly blind to the fact that that by selling their unfinished frames and receivers without following federal serialization, background check, and recordkeeping requirements, they would be purchased by convicted persons and others who could not buy a firearm through legitimate channels.

477.    By reason of the foregoing, each Defendant aided and abetted convicted persons in possessing a prohibited firearm.

478.    By reason of the foregoing, each Defendant has engaged in repeated or persistent illegal conduct in violation of Executive Law § 63(12).

479.    Defendants' illegal business conduct has done significant damage to New York in the form of increased crime, undermined public safety protections, and increased expenditures on public health and law enforcement.

**AS AND FOR A THIRD CAUSE OF ACTION**
**REPEATED AND PERSISTENT FRAUD OR ILLEGALITY IN BUSINESS IN**
**VIOLATION OF EXECUTIVE LAW § 63(12)**
Aiding and Abetting the Possession of Firearms By Unlicensed Persons

480.    The People reallege each and every allegation in the paragraphs above as though

85

fully set forth herein.

481.    Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent illegal conduct in the carrying on, conducting, or transaction of business.

482.    New York State law prohibits the possession of a firearm without a valid license. *See* Penal Law §§ 265.01(1), 265.20(3).

483.    As discussed above, each Defendant sold unfinished frames or receivers into New York State knowing, intending, or being willfully blind to the fact that these products would be converted into working firearms.

484.    As discussed above, each Defendant knew, intended, or was willfully blind to the fact that that by selling their unfinished frames and receivers without performing a background check or otherwise confirming that the buyer had a valid license, they would be purchased by unlicensed persons, including persons who could not legitimately obtain a license.

485.    By reason of the foregoing, each Defendant aided and abetted unlicensed persons in possessing a prohibited firearm.

486.    By reason of the foregoing, each Defendant has engaged in repeated or persistent illegal conduct in violation of Executive Law § 63(12).

487.    Defendants' illegal business conduct has done significant damage to New York in the form of increased crime, undermined public safety protections, and increased expenditures on public health and law enforcement.

## AS AND FOR A FOURTH CAUSE OF ACTION
## CREATION OF A PUBLIC NUISANCE BY A GUN INDUSTRY MEMBER
New York General Business Law § 898-b(1)

488.    The People reallege each and every allegation in the paragraphs above as though fully set forth herein.

489.    The Attorney General acts within her authority to bring an action in this Court to enjoin and restrain each Defendant from its ongoing violations and to obtain restitution and damages, pursuant to N.Y. Gen. Bus. Law § 898-d.

490.    Each Defendant constitutes a "gun industry member," subject to N.Y. Gen. Bus. Law § 898-b.

491.    Each Defendant has sold and continues to sell; has manufactured and continues to manufacture; has marketed and continues to market "qualified product[s]," as defined in N.Y. Gen. Bus. Law § 898-a.

492.    By the conduct described above, each Defendant has acted unlawfully by advertising, manufacturing, selling, and shipping unfinished frames and receivers directly into New York State.

493.    By the conduct described above, each Defendant has acted unlawfully by advertising, manufacturing, selling, and shipping unfinished frames and receivers that may foreseeably make their way into New York State.

494.    These actions have created, maintained, or contributed to a condition in New York State that endangers the safety and health of the public.

495.    Under state law, Defendants' activities constitute a public nuisance.  *See* General

87

Business Law § 898-c(1).

### AS AND FOR A FIFTH CAUSE OF ACTION
### FAILURE TO ESTABLISH REASONABLE CONTROLS BY A
### GUN INDUSTRY MEMBER
New York General Business Law § 898-b(2)

496.    The People reallege each and every allegation in the paragraphs above as though fully set forth herein.

497.    Each Defendant constitutes a "gun industry member," that is required to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed, or sold unlawfully."  General Business Law § 898-b(2).

498.    These required procedures include, but are not limited to "instituting screening, security, inventory and other business practices to prevent . . . sales of qualified products to . . . traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others."  General Business Law § 898-a(2).

499.    Each defendant fails to have any policy or procedure that constitutes adequate measures to screen security or inventory, or otherwise prevent its prohibited products from being possessed, used, marketed, or sold unlawfully in New York.

500.    Each Defendant's failure to have reasonable controls and procedures has resulted and continues to result in ongoing harm to the public and constitutes a public nuisance.  *See* General Business Law § 898-c(1).

### AS AND FOR A SIXTH CAUSE OF ACTION
### REPEATED AND PERSISTENT FRAUDULENT CONDUCT PURSUANT TO
### EXECUTIVE LAW 63(12)

501.    The People reallege each and every allegation in the paragraphs above as though

fully set forth herein.

502.     Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent fraudulent conduct.

503.     Executive Law § 63(12) defines "fraud" or "fraudulent" to "include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

504.     Defendants have engaged in repeated and persistent fraudulent conduct by engaging in acts and practices, including but not limited to:

      a.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York;

      b.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

      c.    Misrepresenting, directly or by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods and that the guns sold need not be serialized or recorded.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### REPEATED AND PERSISTENT ILLEGAL CONDUCT
### PURSUANT TO EXECUTIVE LAW 63(12)
Deceptive Business Practices in Violation of GBL 349

505.     The People reallege each and every allegation in the paragraphs above as though fully set forth herein.

506.     Executive Law § 63(12) authorizes the Attorney General to seek injunctive and

other relief when any person engages in repeated or persistent illegal conduct.

507.    GBL Article 22-A, § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the State of New York.

508.    As set forth above, Defendants have repeatedly violated GBL § 349 by engaging in acts and practices including but not limited to:

> a.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York;
>
> b.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;
>
> c.    Misrepresenting, directly or by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods and that the guns sold need not be serialized or recorded.

509.    By reason of the foregoing, Defendants have engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### REPEATED AND PERSISTENT ILLEGAL CONDUCT
### PURSUANT TO EXECUTIVE LAW 63(12)
### False Advertising in Violation of GBL 350

510.    The People reallege each and every allegation in the paragraphs above as though fully set forth herein.

511.    Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent illegal conduct.

90

512. GBL Article 22-A, § 350 prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

513. As set forth above, Defendants have repeatedly violated GBL § 350 by engaging in acts and practices including but not limited to: (i) making misrepresentations either expressly or by implication, including:

514. Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

515. Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to to sell or possess ghost guns in the State of New York and/or the City of New York;

516. Misrepresenting, directly or by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

517. By reason of the foregoing, Defendants have engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

### AS AND FOR A NINTH CAUSE OF ACTION
### DECEPTIVE BUSINESS PRACTICE
General Business Law 349

518. The People reallege each and every allegation in the paragraphs above as though fully set forth herein.

519. GBL Article 22-A, § 349 prohibits deceptive acts and practices in the conduct of

91

any business, trade, or commerce in the State of New York.

520.    As set forth above, Defendants have violated GBL § 349 by engaging in acts and practices including but not limited to:

521.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York.

522.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

523.    Misrepresenting, directly or by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods and that the guns sold need not be serialized or recorded.

## AS AND FOR A TENTH CAUSE OF ACTION
## FALSE ADVERTISING DECEPTIVE BUSINESS PRACTICE
### General Business Law 350

524.    The People reallege each and every allegation in the paragraphs above as though fully set forth herein.

525.    GBL Article 22-A, § 350 prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

526.    As set forth above, Defendants have violated GBL § 350 by engaging in acts and practices including but not limited to:

92

a.   Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York;

b.   Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

c.   Misrepresenting, directly or by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods and that the guns sold need not be serialized or recorded.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
### REPEATED AND PERSISTENT FRAUD OR ILLEGALITY IN BUSINESS IN VIOLATION OF EXECUTIVE LAW § 63(12)
Aiding and Abetting the Possession of Unserialized Firearms

527.   The People reallege each and every allegation in the paragraphs above as though fully set forth herein.

528.   Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent illegal conduct in the carrying on, conducting, or transaction of business.

529.   Federal law requires that "[a]ny person who possesses a firearm . . . which does not bear the serial number and other information required by [federal law] shall identify the firearm with a serial number."  26 U.S.C. § 5842(b); see also 26 U.S.C. § 5861(c) (making it unlawful for anyone to "possess a firearm made in violation of the provisions of this chapter.").

530.   Federal law similarly makes it illegal "for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."

93

26 U.S.C. § 5861(d).

531.    Under these provisions, the "ghost guns" made from the Defendants' unfinished frames and receivers are required to be serialized and recorded, just like any other firearm.

532.    New York similarly requires all firearms and all frames and receivers, finished or unfinished, to be serialized according to the standards in federal law.  See Penal Law § 265.07.

533.    As discussed above, each Defendant sold unfinished frames or receivers into New York State knowing, intending, or being willfully blind to the fact that these products would be converted into working, unserialized firearms.

534.    As discussed above, the Defendants marketed their products as a way around serialization requirements, deriding them as "RED TAPE" or touting their products' "blank serialization plate[s]."  In many cases they portrayed serialization as optional, unnecessary, or undesirable.  Even after the filing of this lawsuit, several Defendants have continued to promote their unfinished frames and receivers as a way around serialization requirements.[38]

535.    As discussed above, each Defendant knew, intended, or was willfully blind to the fact that that by selling their unfinished frames and receivers unserialized, marketing them based on their lack of serialization, and/or failing to inform their customers about the serialization requirement, their actions would result in their customers possessing unserialized firearms in violation of federal and New York law.

536.    By reason of the foregoing, each Defendant aided and abetted the possession of

---

[38] See, e.g., https://indieguns.com/pf45-fde-flat-dark-earth-frame-kit-for-g20-g21/ (features of unfinished frame include "blank serialization plate"); https://kmtactical.net/product/polymer80-pf9ss-80-single-stack-pistol-frame-kit-g43/ (unfinished frame "comes with a metal pate for those that wish to serialize their completed pistols.").

unserialized firearms.

537.    By reason of the foregoing, each Defendant has engaged in repeated or persistent illegal conduct in violation of Executive Law § 63(12).

538.    Defendants' illegal business conduct has done significant damage to New York in the form of increased crime, undermined public safety protections, and increased expenditures on public health and law enforcement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the People of the State of New York, respectfully requests that the Court enter an order and judgment that:

1.    Enjoins each Defendant, pursuant to Executive Law § 63(12):

   a.    From selling, shipping, distributing, or otherwise supplying unfinished frames or receivers to any person or entity with a current New York State address;

   b.    From selling, shipping, distributing, or otherwise supplying unfinished frames or receivers to any person whom the Defendant knows or should know intends to bring, ship, sell, or otherwise transport, carry, or transfer any such unfinished frame or receiver, or an operable, unserialized firearm assembled therefrom, to New York State or to any person or entity with a current New York State address;

   c.    From manufacturing, distributing, selling, or marketing unserialized firearms or products that are used to form or create operable, unserialized firearms within the State unless such conduct complies with heightened, independently-monitored safeguards against the recurrence of the Defendant's fraudulent, illegal, and/or unlawful practices, which are to be set forth in a compliance plan reviewed and approved by Plaintiff and the Court; and

   d.    To issue public corrective statements regarding their false and misleading public statements and omissions;

2.    Directs each Defendant, pursuant to Executive Law § 63(12), to:

   a.    Pay restitution and damages for its fraudulent and/or illegal practices that violated

that statute and caused compensable injuries to Plaintiff or any other person; and

b. Disgorge all revenues it wrongfully obtained as a result of its fraudulent and/or illegal practices in violation of that statute;

3. Directs Defendants, jointly and severally, to endow an abatement fund with sufficient capital to eliminate the public nuisance they are responsible for creating, exacerbating, and/or perpetuating, pursuant to New York General Business Law § 898-b;

4. Grants civil penalties pursuant to General Business Law § 350-d, which provides for a penalty of up to $5,000 for each violation of General Business Law §§ 349 or 350. Because civil penalties are paid to the State, their purpose is to deter future violations and to punish illegal conduct, not to compensate the injured party. *See Meyers Bros. Parking Sys. v. Sherman*, 87 A.D.2d 562, 563 (1st Dep't 1982), *aff'd*, 57 N.Y.2d 653 (1982).

5. Awards Plaintiff its costs and grants statutory costs pursuant to CPLR § 8303(a)(6); and

6. Grants such other and further relief as the Court deems just and proper.

Dated: New York, New York
       December 22, 2022

LETITIA JAMES
Attorney General of the State of New York


By: _____
     James M. Thompson
     Monica Hanna
     Special Counsel
     Abigail Katowitz
     Assistant Attorney General
     28 Liberty Street
     New York, New York 10005
     (212) 416-6556
     (212) 416-8227
     (212) 416-8922
     james.thompson@ag.ny.gov
     monica.hanna@ag.ny.gov
     abigail.katowitz@ag.ny.gov

97

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Case No. 22-cv-06124 (JMF) |
| Plaintiff, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| ARM OR ALLY, LLC; BLACKHAWK MANUFACTURING GROUP, INC., A/K/A 80 PERCENT ARMS, INC. OR 80 PERCENT ARMS; SALVO TECHNOLOGIES, INC., A/K/A 80P BUILDER OR 80P FREEDOM CO.; BROWNELLS, INC., A/K/A BROWNELLS OR BOB BROWNELL'S; GS PERFORMANCE, LLC, A/K/A GLOCKSTORE OR GSPC; INDIE GUNS, LLC; KM TACTICAL; PRIMARY ARMS, LLC; RAINIER ARMS, LLC; AND ROCK SLIDE USA, LLC, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BROWNELLS, INC.'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

David H. Thompson*
Brian W. Barnes*
**COOPER & KIRK PLLC**
1523 New Hampshire Ave., NW
Washington, DC 20036
Phone: (202) 220-9600
* Admitted *pro hac vice*

*Attorneys for Defendant Brownells, Inc., a/k/a Brownells or Bob Brownell's*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

   *Brownells* ........................................................................................................ 2

   *The State's Lawsuit* ......................................................................................... 3

      *1.*    *Illegal Act Claims* ............................................................................. 4

      *2.*    *Nuisance Claims* ............................................................................... 4

      *3.*    *Fraud Claims* .................................................................................... 5

ARGUMENT ..................................................................................................... 7

I.    The State's Allegations that Defendants Violated Federal Law Fail Because the Products at Issue Are Not "Firearms" Under 18 U.S.C. § 921. .......................... 7

    A.    The Unfinished Frames and Receivers that the State Alleges Defendants Sold Are Not "Firearms" Under the Plain Meaning of 18 U.S.C. § 921(a)(3). ....... 7

    B.    The State's Litigating Position on the Meaning of "Firearm" is Contrary to Longstanding ATF Guidance and Repeated Assurances by New York State Officials. .............................................................................................. 12

    C.    Unfinished Frame or Receiver "Parts Kits" Are Not "Firearms" Under Federal Law. ......................................................................................... 18

    D.    Because the Unfinished Frames and Receivers at Issue in this Case Are Not "Component Parts" of Firearms, It Must Dismiss Counts Four and Five. ........... 20

II.    The State's Claims are Barred by the Federal Protection of Lawful Commerce in Arms Act. ..................................................................................................... 22

    A.    The Language, Purpose, and Structure of the PLCAA Prohibits Lawsuits Such as This One. ................................................................................. 22

    B.    Case Law Interpreting the PLCAA Confirms that It Bars the State's Claims. .................................................................................................. 24

C.    The State's Claims Are Prohibited Qualifying Civil Liability Actions. ............... 27

D.    The State Cannot Proceed Under the PLCAA's Predicate Exception. ................. 28

        1.    The Amended Complaint Fails To Allege a Violation of Any Predicate Statute. ......................................................................... 28

                a.    The State's Illegal Conduct and Misrepresentation Claims Are Based Upon Statutes of General Applicability. ...................... 28

                b.    The State's Nuisance Claims Are Unmoored Common Law Claims that the PLCAA was Enacted to Prohibit. ......................... 33

        2.    The Amended Complaint Fails to Allege "Knowing" Violations of Predicate Statutes. ....................................................................... 34

        3.    The Amended Complaint Fails to Satisfy the Predicate Exception's Proximate Causation Requirement. ........................................... 37

III.    The State's Claims Must Be Dismissed Under the Federal Constitution. ......................... 41

A.    The State's Interpretation of the Federal Definition of "Firearm" and New York General Business Law § 898-b Would Render Both Statutes Void for Vagueness. ............................................................................................. 41

B.    The State's Misrepresentation and False Advertising Claims Seek to Hold Defendants Liable for Expressions of Legal Opinion that Are Protected by the First Amendment. ................................................................................ 46

C.    All the State's Claims Must be Dismissed Under the Second Amendment. ......... 50

IV.    The Amended Complaint Fails To Adequately Allege a Basis for the Imposition of Joint and Several Liability. ................................................................................... 55

V.    The First Amended Complaint Suffers from Additional Pleading Deficiencies That Require Dismissal. .............................................................................................. 59

A.    The State Fails to Allege the Specific Conduct That Purports to Support Its Misrepresentation Claims Against Brownells. ...................................... 59

B.    The State's Claims Raised on "Information and Belief" Fail to Allege or Cite Sufficient Facts to Make Them Plausible. .......................................... 61

C.    The State Fails to Adequately Allege That Brownells Aided and Abetted Violations of State or Federal Law. .................................................. 62

D.    The State Fails to Allege Persistent Conduct in Its Executive Law § 63(12) Claims. .................................................................................. 64

CONCLUSION ................................................................................................................65

# TABLE OF AUTHORITIES

**Cases**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Page**

*600 W. 115th St. Corp. v. 600 W. 115th St. Condo.*,
　180 A.D.2d 598 (N.Y. App. Div. 1st Dep't 1992)....................................47

*Alix v. McKinsey & Co.*, 23 F.4th 196 (2d Cir. 2022) ...................................38

*Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008)..............................11

*Am. Sugar-Ref. Co. v. United States*, 99 F. 716 (2d Cir. 1900) ...................................45

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)..........................................38

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).........................................................45

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ..........................................42, 43

*Cargill v. Garland*, 2023 WL 119435 (5th Cir. Jan. 6, 2023) ...................................14

*Cayuga Indian Nation of N.Y. v. Pataki*, 79 F. Supp. 2d 66
　(N.D.N.Y. 1999) ...........................................................56, 57, 58, 59

*Chipman v. Palmer*, 77 N.Y. 51 (1879).....................................................58, 59

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ..............................................44

*City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384
　(2d Cir. 2008).............................................24, 25, 26, 28, 29, 31, 32

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725
　(9th Cir. 1999)........................................................................47, 48, 49

*Cucchiaro v. Cucchiaro*, 627 N.Y.S.2d 224
　(N.Y. Sup. Ct. Orange Cnty. 1995) ...........................................................49

*Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484 (D.C. Cir. 1996).......................48, 49, 50

*Diamond v. Oreamuno*, 24 N.Y.2d 494 (1969) ...............................................40

*District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163 (D.C. 2008) .......................26, 38, 40

*District of Columbia v. Heller*, 554 U.S. 570 (2008).......................................51, 52

*Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132 (2d Cir. 2018) .....................37

*Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*,
　2022 WL 4597526 (D. Mass. Sept. 30, 2022) ...............................................37, 38

*Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996) ....................................45

*Flores-Figueroa v. United States*, 556 U.S. 646 (2009).....................................35

*Freeman v. Quicken Loans, Inc.*, 566 U.S. 624 (2012) .......................................8

*Gamble v. United States*, 139 S. Ct. 1960 (2019).........................................53

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2019 WL 1768965
　(S.D.N.Y. Apr. 4, 2019).................................................................47

*Goetz v. Greater Ga. Life Ins. Co.*, 649 F. Supp. 2d 802 (E.D. Tenn. 2009) ...............................45

*Goldych v. Eli Lilly & Co.*, 2006 WL 2038436 (N.D.N.Y. Jul. 19, 2006) .....................................5

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..................................................................43

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ..............................................................21

*Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222 (2001) ...........................................................46

*Hecht v. City of New York*, 60 N.Y.2d 57 (1983) ..............................................................55, 56

*Hill v. Colorado*, 530 U.S. 703 (2000) ...........................................................................42, 43

*Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197 (1991). ..............................................................14

*Hubbard v. United States*, 514 U.S. 695 (1995) .......................................................................40

*Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009)...............................................23, 25, 26, 33, 34

*Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274 (C.D. Cal. 2006)........................................................24

*Ill. Ass'n of Firearm Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) .........................................................................51, 52

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*,
    447 F. Supp. 2d 289 (S.D.N.Y. 2006).............................................................55, 56, 57, 58, 59

*Irvine v. Wood*, 51 N.Y. 224 (1872) ...................................................................................57

*Jefferies v. District of Columbia*, 916 F. Supp. 2d 42 (D.D.C. 2013)................................................26

*Johnson v. United States*, 576 U.S. 591 (2015) ..............................................41, 42, 43, 44, 45, 46

*Kolender v. Lawson*, 461 U.S. 352 (1983)...............................................................................44

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) ..................................................................51

*Leocal v. Ashcroft*, 543 U.S. 1 (2004).................................................................................41

*Li v. Yellow Cab Co. of Cal.*, 532 P.2d 1226 (Cal. 1975).............................................................25

*Liparota v. United States*, 471 U.S. 419 (1985)....................................................................35, 36

*Luis v. United States*, 578 U.S. 5 (2016)...........................................................................51, 52

*Lynch v. Donnelly*, 465 U.S. 668 (1984)................................................................................53

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)......................................................................52

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ...................................................................47

*Morehouse Enters., LLC v. ATF*, 2022 WL 3597299
    (D.N.D. Aug. 23, 2022) .........................................................................................12

*N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435 (E.D.N.Y. 2003)..............................................56, 58, 59

*Nastasi & Associates, Inc. v. Bloomberg, L.P.*,
    2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022)........................................................................37

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)...........................................................................2, 50, 51, 52, 53, 54

*Nat'l Conversion Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621 (1969)..........................................49

*Nat'l Shooting Sports Found., Inc. v. James*,
    2022 WL 1659192 (N.D.N.Y. May 25, 2022)........................................................26

*Nat'l Shooting Sports Found., Inc. v. James*, No. 22-1374 (2d Cir. June 24, 2022) ...................26

*Nelson v. Lilley*, 2022 WL 2872648 (W.D.N.Y. July 21, 2022) ..................................................63

*New York v. United Parcel Serv., Inc.*, 942 F.3d 554 (2d Cir. 2019) ..........................................40

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015).....................................................................................48, 49, 50

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013)..................................47

*People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 761 N.Y.S.2d 192
    (App. Div. 1st Dep't 2003) .........................................................................58, 59

*People v. Carpenter*, 30 N.Y.S.3d 299 (App. Div. 2d Dep't 2016)..............................................63

*People v. Ernst & Young, LLP*, 980 N.Y.S.2d 456 (App. Div. 1st Dep't 2014) ..........................40

*People v. Gen. Elec. Co.*, 756 N.Y.S.2d 520 (App. Div. 1st Dep't 2003)....................................54

*Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216 (D. Colo. 2015).........................................40

*Podpeskar v. Dannon Co., Inc.*, 2017 WL 6001845 (S.D.N.Y. Dec. 3, 2017)...........................38

*Prescott v. Slide Fire Sols., LP*, 341 F. Supp. 3d 1175 (D. Nev. 2018).................................21, 37

*Prunier v. City of Watertown*, 936 F.2d 677 (2d Cir. 1991)........................................................45

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)..................................8

*Ravo ex rel. Ravo v. Rogatnick*, 70 N.Y.2d 305 (1987).....................................................55, 56, 57

*Rehaif v. United States*, 139 S. Ct. 2191 (2019) ...............................................................35, 36

*Rigby v. Jennings*, 2022 WL 4448220 (D. Del. Sept. 23, 2022)...................................................51

*Ruan v. United States*, 142 S. Ct. 2370 (2022) .................................................................35, 36

*Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007) ...........................................................................36

*Sambrano v. Savage Arms, Inc.*, 338 P.3d 103 (N.M. App. 2014) ..............................................21

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990).....................48, 49

*Sash v. Zenk*, 439 F.3d 61 (2d Cir. 2006) .................................................................................14

*Schwebel v. Crandall*, 967 F.3d 96 (2d Cir. 2020) ...................................................................16

*Simmons v. Everson*, 124 N.Y. 319 (1891).............................................................................57

*Slater v. Mersereau*, 64 N.Y. 138 (1876)................................................................................57

*Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262 (Conn. 2019)........................................33

*State ex rel. Grupp v. DHL Exp. (USA), Inc.*, 19 N.Y.3d 278 (2012).........................................40

*State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir. 1985)............................................57

*State v. City of Yonkers*, 836 N.Y.S.2d 495 (N.Y. Sup. Ct. Westchester Cnty. 2004) ................57

*State v. Schenectady Chems., Inc.*, 479 N.Y.S.2d 1010 (App. Div. 3d Dep't 1984) ....................57

*Suria v. Shiffman*, 67 N.Y.2d 87 (1986) ................................................................55

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609 (9th Cir. 2016)...................48

*Trs. of Amherst Coll. v. Ritch*, 151 N.Y. 282 (1897) .....................................................49

*U.S. Dept. of Treasury v. Fabe*, 508 U.S. 491 (1993) ....................................................29

*United States v. Harris*, 838 F.3d 98 (2d Cir. 2016) ......................................................8

*United States v. Imperial Irrigation Dist.*, 799 F. Supp. 1052 (S.D. Cal. 1992) .........................58

*United States v. Lanier*, 520 U.S. 259 (1997) ..........................................................42

*United States v. Morales*, 280 F. Supp. 2d 262 (S.D.N.Y. 2003) ...................................10

*United States v. Pipola*, 83 F.3d 556 (2d Cir. 1996)................................................62, 63

*United States v. Price*, 2022 WL 6968457 (S.D. W. Va. Oct. 12, 2022) .............................54

*United States v. Reese*, 92 U.S. 214 (1876) ...........................................................44

*United States v. Ryles*, 988 F.2d 13 (5th Cir. 1993)...................................................10

*United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992)...............................12

*VanDerStok v. Garland*, 2022 WL 4009048
   (N.D. Tex. Sept. 2, 2022)...............................................12, 17, 18, 19, 20, 48

*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010) ..............................41, 42, 43

*Virginia v. Moore*, 553 U.S. 164 (2008) ..............................................................53

## **Constitutions and Statutes**

U.S. Const. amend. II ...............................................................................50, 51

U.S. Const. amend. V ...................................................................................41

15 U.S.C.

   § 7901(a)(3) ................................................................22, 35, 37, 39
   § 7901(a)(4) ........................................................................35, 36
   § 7901(a)(6) ...............................................................................39
   § 7901(a)(7) ................................................................29, 31, 35, 36
   § 7901(a)(8) ..............................................22, 27, 28, 29, 31
   § 7901(b)(1) ...............................................................................22
   § 7901(b)(4) ...............................................................................22
   § 7901(b)(5) ...............................................................................22
   § 7902(a) .............................................................................22, 23
   § 7903(4) ............................................................20, 21, 23
   § 7903(5)(A) .......................................................23, 27, 37
   § 7903(5)(A)(i)–(vi) .......................................................................23
   § 7903(5)(A)(ii) ......................................................................23, 34

§ 7903(5)(A)(iii) ................................................23, 24 28, 31, 32, 37, 39
§ 7903(5)(A)(iv) .............................................................................23

18 U.S.C.

§ 2 ..................................................................................................63
§ 921(a)(3) ............................................................6, 7, 8, 21, 30
§ 921(a)(3)(A) ...............................................................................11
§ 921(a)(3)(B) .......................................................7, 10, 11, 19, 20
§ 922(g)(1) .........................................................................6, 30

26 U.S.C.

§ 5842(b) ..........................................................................6, 30
§ 5845(a) .....................................................................................12
§ 5845(e) .....................................................................................12
§ 5861(c) .....................................................................................30
§ 5861(d) .........................................................................6, 30

N.Y. Gen. Bus. Law

§ 349 ........................................................................................6, 31
§ 349(a) ........................................................................................5
§ 350 ..............................................................................5, 6, 32
§ 898-a(6) ....................................................................................20
§ 898-b .............................................................4, 5, 6, 44
§ 898-b(1) .....................................................2, 34, 41, 44
§ 898-d ........................................................................................39

N.Y. Penal Law

§ 20.00 .........................................................................................63
§ 265.01(1) .........................................................................6, 30
§ 265.02 ..............................................................................6, 30
§ 265.20 .......................................................................................30
§ 265.20(3) ....................................................................................6
§ 265.60 ...........................................................................6, 30, 64
§ 265.61 ...........................................................................6, 30, 64

N.Y. City Admin. Code § 10-314 ..................................................6, 30

N.Y. Exec. Law § 63(12) ..................................4, 5, 6, 29, 64

**Rules, Regulations, and Congressional Materials**

Protection of Lawful Commerce in Arms Act, Pub. L. No. 109-92, 119 Stat. 2095,
2095 (2005) ..............................................................................22

87 Fed. Reg. 24652 (Apr. 26, 2022) ...........................................42

Fed. R. Civ. P. 8(d)(3) ...............................................................21

27 C.F.R. § 478.11 ........................................................................17

27 C.F.R. § 478.12(c) .......................................................17, 19, 20

151 Cong. Rec. S9087–01, S9374–01 ...........................................................24

**Other Authorities**

*About Brownells*, BROWNELLS, https://bit.ly/3ZBWmQ3 (last visited Jan. 16, 2023) ..................2

ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL
    TEXTS (2012) ...........................................................................................11

*Are "80%" or "unfinished" receivers illegal?*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS
    & EXPLOSIVES (Apr. 6, 2020), https://bit.ly/2nlfssN (last visited Jan. 16, 2023) ..................13

ATF Ruling 2015-1, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES
    (Jan. 2, 2015), https://bit.ly/3PheBo4 ...........................................................12, 13

*Attorney General James Stops Sales of "Ghost Guns" Into New York*, N.Y. ATT'Y GEN.
    (July 15, 2020), https://on.ny.gov/3e0pehk (last visited Jan. 16, 2023) ..........................15, 16

*Brownells Announces Exclusive Polymer80 Frames*, THE OUTDOOR WIRE (Oct. 11, 2017),
    https://bit.ly/3W9xr3g...........................................................................60, 61

Br. & Suppl. App. for Appellee, *Nat'l Shooting Sports Found., Inc. v. James*,
    No. 22-1374 (2d Cir. Jan. 6, 2023) ...............................................................39

*Component*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1944)..............................21

*Constituent*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1944)..............................21

*Governor Hochul Signs Legislation Package to Fight Gun Violence Epidemic*,
    NEW YORK STATE (Oct. 28, 2021), https://on.ny.gov/3R41SWF
    (last visited Jan. 16, 2023) .......................................................................16

Int. No. 1553-A § 3, N.Y. CITY COUNCIL, https://on.nyc.gov/3yDBhIc
    (last visited Jan. 16, 2023) .......................................................................7

James B. Whisker, THE GUNSMITH'S TRADE (1992) ................................................53

Jose Webster Untraceable Firearms Act § 8, S.B. S14A, 2021 Reg. Sess. (N.Y. 2021)................7

Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*,
    54 ST. MARY'S L. J., at *16 (Apr. 11, 2022), https://bit.ly/3APYZSx .............................53, 54

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical
    Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791,
    and not 1868 (working draft)*, (Oct. 1, 2022), *available at* https://bit.ly/3CMSKjw..............52

Mem. of Law in Supp. of Defs.' Mot. for Summ. J. & in Opp'n to Pls.' Mot. for
    Summ. J., *Syracuse* (S.D.N.Y. Jan. 29, 2021), ECF No. 98 ..................................11, 12, 13, 14

*Part*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1944) ..............................21

*Readily*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1944).........................10

*Regular Session – February 10, 2021 Transcript*, N.Y. STATE SENATE,
    https://bit.ly/3TAlaF8 (last visited Jan. 16, 2023)
    (statement of sponsor Sen. Hoylman)...........................................................16

*Regular Session – June 8, 2021 Transcript*, N.Y. STATE ASSEMBLY,
    https://bit.ly/3KAtG2A (last visited Jan. 16, 2023)
    (statement of sponsor Rep. Rosenthal) ..................................................................16

Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J.,
    *City of Syracuse v. ATF*, No. 20-cv-6885 (S.D.N.Y. Mar. 19, 2021),
    ECF No. 114. ATF..................................................................................................11

RESTATEMENT (SECOND) OF TORTS

    § 433A, cmt. c................................................................................................................58
    § 840E, cmt. b..........................................................................................................57, 58
    § 840E, cmt. e................................................................................................................58

Senate Bill S14A, N.Y. STATE SENATE, https://bit.ly/3zdHcW2
    (last visited Jan. 16, 2023) ...........................................................................................7

Stop Gun Violence: Ghost Guns, Hearing before the Subcomm. on the Constitution, Comm.
    on the Judiciary ("Stop Gun Violence"), 117th Cong. 4 (2021) (statement of Ashley
    Hlebinsky, Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum,
    President, The Gun Code, LLC), https://bit.ly/3cS6LDp (last visited Jan. 16, 2023) .............54

*Weapon*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1944).......................................9

## INTRODUCTION

The fulcrum on which most of this lawsuit turns is the State's contention that Defendants sold "firearms" in violation of federal law that were later misused by third parties. But the products at issue in this case are not "firearms" under the plain text of the relevant federal statute and longstanding ATF guidance. Before this lawsuit, numerous New York state officials, including the Attorney General's Office, agreed. Yet now, in an extraordinary bait-and-switch, the State claims that the actions of Defendants were *always* unlawful and seeks to impose retroactive liability for conduct Defendants took in strict compliance with then-authoritative guidance from ATF. The fact that the State, as a matter of policy, would prefer that the law had been different in the past is not a basis for changing it after the fact.

To the extent this Court nevertheless holds (or assumes) that Defendants' products are "firearms," this case is a textbook illustration of why Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA"). Before that statute was passed in 2005, the gun industry faced a tidal wave of public nuisance lawsuits in which plaintiffs asked the courts to use their common lawmaking power to regulate the industry. Although those suits had gained traction in some jurisdictions, Congress considered them manifestly unfair because they threatened to impose massive retroactive liability on the industry under adventuresome legal theories that the industry could not have foreseen at the time of the challenged conduct. Congress's solution was to confer immunity for all suits against the industry for the criminal or unlawful misuse of its products, with a handful of narrowly drawn exceptions. None of the exceptions apply, so this suit must be dismissed in its entirety.

The State's claims also run afoul of multiple federal constitutional doctrines. Retroactively holding Defendants liable for sales that ATF long said were lawful would render the federal

definition of firearms void for vagueness as applied in this case. The void for vagueness doctrine also requires dismissal of Count Four of the complaint, which seeks to hold Defendants liable under New York's hopelessly amorphous prohibition on "contribut[ing] to a condition . . . that endangers the safety or health of the public." N.Y. GEN. BUS. LAW § 898-b(1). The State's misrepresentation claims (Counts Six through Ten) all seek to hold Defendants liable for expressing opinions about a contested legal issue—speech that falls within the heartland of the First Amendment. In addition, all the State's claims depend on firearms regulations that can no longer survive Second Amendment scrutiny after the Supreme Court's decision last term in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

Finally, the State's allegations about Brownells, Inc., a/k/a Brownells or Bob Brownell's ("Brownells"), also fail to comport with the minimum pleading requirements to support many of its claims. Accordingly, the Court should dismiss the Amended Complaint.

## **BACKGROUND**

### *Brownells*

Brownells is an Iowa corporation that sells a variety of firearms, parts, and paraphernalia. Am. Compl. ¶¶ 208–209 (Dec. 22, 2022), ECF No. 72. The company was founded in 1939 by a devoted outdoorsman and shooter, Bob Brownells, who enjoyed repairing and customizing firearms. *See About Brownells*, BROWNELLS, https://bit.ly/3ZBWmQ3 (last visited Jan. 16, 2023). For over 80 years, Brownells has diligently followed the law through numerous developments and has continued to provide quality gunsmithing tools and parts to the firearms industry. Today, the company sells over 90,000 gun parts, tools, and supplies.

*The State's Lawsuit*

The State asserts eleven claims against all ten Defendants, and those claims fall into three groups. The complaint repeatedly lumps all Defendants together and makes general allegations about them collectively in an attempt to attribute the actions of one Defendant against each Defendant—though, it does not allege any connection between the Defendants. This makes it difficult to discern what allegations are intended to support which claims and which actions should be attributed to which Defendants.

The State's factual allegations against Brownells consist of allegations about marketing and allegations about sales. The marketing materials the State cites consist of portions of Brownells' website and a press release. The State alleges that in the Q&A portion of Brownells' website, Brownells' staff experts stated that a Polymer80 Frame Kit was "[n]ot serialized" and was an "80% receiver," and that 80% frames "are still legal" and "will still be legal after the [new ATF regulation] but there will be new restrictions and hoops to jump through." Am. Compl. ¶¶ 49–50. The State further alleges that the Brownells website provides general information on how to build a custom pistol using a Polymer80 frame. *Id.* ¶¶ 66, 70–71, 210–214. Additionally, the State cites to customer reviews on the Brownells webpage which indicate that finishing the 80% receiver is easy. *Id.* ¶ 62. The State also cites a press release published on a third-party website with Brownells' announcement about selling unfinished frames. *Id.* ¶ 210.

In terms of sales, the State alleges that Brownells sold unfinished frames and receivers to consumers in New York State based on shipping data, which allegedly indicates that about 25% of Brownells' shipments into New York have similar weights and dimensions to a package received in one undercover purchase made by the Attorney General's Office. *Id.* ¶¶ 215–218. The State alleges that between October 2016 and May 2022, Brownells sent packages to 15 individuals

with New York addresses that "on information and belief" contained unfinished frames. *Id.*
¶¶ 217–285. Of the 13 individuals to whom Brownells is accused of sending shipments, the State
only alleges with specificity the contents of shipments to two recipients. First, investigators from
the Office of the Attorney General made an undercover purchase of a "Polymer80 PF940Cv1
unfinished frame kit" from Brownells' website on or around May 27, 2022. *Id.* ¶ 218. And second,
Brownells sent shipments to Jason Ramirez on or around September 18, 2017, February 20, 2018,
and December 27, 2018, which allegedly contained Glock-compatible pistol frames and one
unspecified part. *Id.* ¶¶ 222–224.

1.     *Illegal Act Claims*

The State asserts four claims under New York Executive Law § 63(12) based on allegedly
illegal actions by the Defendants. Executive Law § 63(12) provides a vehicle for the Attorney
General to assert claims against an individual engaging in repeated, persistent fraud or illegal
conduct. The statute provides, in relevant part:

> Whenever ***any person*** shall engage in repeated fraudulent or illegal acts or
> otherwise demonstrate persistent fraud or illegality in the carrying on, conducting
> or transaction of business, the attorney general may apply . . . for an order enjoining
> the continuance of such business activity or of any fraudulent or illegal acts, [and]
> directing restitution and damages . . . .

N.Y. EXEC. LAW § 63(12) (emphasis added). By its own terms, this is a statute of general
applicability, providing the New York Attorney General a cause of action against "***any*** person"
for ***any*** "fraudulent or illegal acts" of any kind. *Id*. (emphases added). In this group of claims, the
State seeks civil recovery for alleged violations of federal and state criminal laws.

2.     *Nuisance Claims*

Counts Four and Five are brought under New York's new nuisance statute, General
Business Law § 898-b, which went into effect on July 6, 2021. Section 898-b provides:

1. No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product.

2. All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state.

N.Y. GEN. BUS. LAW § 898-b. New York alleges in these two claims that Defendants created a public nuisance by selling unfinished frames and receivers.

3. *Fraud Claims*

The State asserts five claims based on alleged fraud under New York General Business Law § 349 and § 350 and New York Executive Law § 63(12). The State's general illegality statute claims in Counts Seven and Eight cite General Business Law § 349 and § 350. Counts Nine and Ten are merely duplicative generalized claims under those same statutes. Sections 349 and 350 both "prohibit deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." *Goldych v. Eli Lilly & Co.*, 2006 WL 2038436, at *6 (N.D.N.Y. Jul. 19, 2006) (internal quotation marks omitted).  Section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state," N.Y. GEN. BUS. LAW § 349(a), and § 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful," *id.* § 350. These provisions, like those of Executive Law § 63(12), apply to anyone in the state. In sum, these claims all essentially allege that Defendants committed fraud by misrepresenting the legality of the unfinished frames and receivers they sold.

| Illegal Acts Claims – Executive Law § 63(12) | |
|---|---|
| First Cause of Action (Am. Compl. ¶¶ 465–470) | Selling and shipping unfinished frames and receivers, in violation of N.Y. Penal Law §§ 265.60, 265.61; N.Y. City Admin. Code § 10-314; and 18 U.S.C. § 921(a)(3). |
| Second Cause of Action (Am. Compl. ¶¶ 471–479) | Aiding and abetting the possession of firearms by convicted persons, in violation of 18 U.S.C. § 922(g)(1) and N.Y. Penal Law § 265.02. |
| Third Cause of Action (Am. Compl. ¶¶ 480–487) | Aiding and abetting the possession of firearms without a valid license, in violation of N.Y. Penal Law §§ 265.01(1), 265.20(3). |
| Eleventh Cause of Action (Am. Compl. ¶¶ 527–538) | Aiding and abetting the possession of unserialized firearms, in violation of 26 U.S.C. § 5842(b) ("[a]ny person who possesses a firearm . . . which does not bear the serial number and other information required by [federal law] shall identify the firearm with a serial number") and 26 U.S.C. § 5861(d) (making it illegal "for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record"). |
| Nuisance Claims – General Business Law § 898-b | |
| Fourth Cause of Action (Am. Compl. ¶¶ 488–495) | Advertising, selling, and shipping unfinished frames and receivers that may foreseeably make their way into New York. |
| Fifth Cause of Action (Am. Compl. ¶¶ 496–500) | Failure to establish and utilize reasonable controls and procedures to prevent qualified products from being possessed, used, marketed, or sold unlawfully. |
| Misrepresentation Claims – General Business Law § 349, § 350; Executive Law § 63(12) | |
| Sixth Cause of Action (Am. Compl. ¶¶ 501–504) | Repeated and persistent fraudulent conduct in advertisements by misrepresenting the legality of products, in violation of Exec. Law § 63(12). |
| Seventh Cause of Action (Am. Compl. ¶ 505–509) | Deceptive business practices in advertisements by misrepresenting the legality of their products, in violation of Gen. Bus. Law § 349 & Exec. Law § 63(12). |
| Eighth Cause of Action (Am. Compl. ¶¶ 510–517) | False advertisement by misrepresenting the legality of their products, in violation of Gen. Bus. Law § 350 & Exec. Law § 63(12). |
| Ninth Cause of Action (Am. Compl. ¶¶ 518–523) | Deceptive business practices in advertisements by misrepresenting the legality of their products, in violation of Gen. Bus. Law § 349. |
| Tenth Cause of Action (Am. Compl. ¶¶ 524–526) | False advertisement by misrepresenting the legality of their products, in violation of Gen. Bus. Law § 350. |

## ARGUMENT

**I.    The State's Allegations that Defendants Violated Federal Law Fail Because the Products at Issue Are Not "Firearms" Under 18 U.S.C. § 921.**

The Amended Complaint is replete with allegations that Defendants violated federal law by selling unfinished frames and receivers into New York State. Importantly, those allegations are not merely redundant with the State's claims that Defendants also violated New York State and City laws that purport to regulate unfinished frames and receivers. New York State's statutory prohibition on sales of these items only went into effect on April 26, 2022,[1] and the effective date of the relevant New York City ordinance was February 23, 2020.[2] For alleged transactions that occurred prior to those dates, the State's main hook for claiming that Defendants violated the law is its theory that the unfinished frames and receivers that Defendants sold are "firearms" under 18 U.S.C. § 921(a)(3)(B). That novel theory is irreconcilable with the plain meaning of the relevant statutory text, contradicts the longstanding position of ATF, and is contrary to many recent public statements by New York State officials—including the Attorney General's Office. Accordingly, the Court should dismiss the State's claims to the extent that they are predicated on alleged violations of federal law.

**A.    The Unfinished Frames and Receivers that the State Alleges Defendants Sold Are Not "Firearms" Under the Plain Meaning of 18 U.S.C. § 921(a)(3).**

Under 18 U.S.C. § 921(a)(3), a "firearm" is: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an

---

[1] *See* Jose Webster Untraceable Firearms Act § 8, S.B. S14A, 2021 Reg. Sess. (N.Y. 2021) ("This Act shall take effect on the one hundred eightieth day after it shall have become a law."); Senate Bill S14A, N.Y. STATE SENATE, https://bit.ly/3zdHcW2 (last visited Jan. 16, 2023) (bill signed by Governor on October 28, 2021).

[2] *See* Int. No. 1553-A § 3, N.Y. CITY COUNCIL, https://on.nyc.gov/3yDBhIc (last visited Jan. 16, 2023) ("This local law takes effect 120 days after it becomes law . . . ."); *id.* (stating that the local law's enactment date was October 26, 2019).

explosive" or "(B) the frame or receiver of any such weapon." Unfinished frames and receivers do not fit into either subpart of that definition.

1. The text of Section 921(a)(3)(A) says that a "firearm" includes three types of "weapons": (1) a weapon that "will . . . expel a projectile by the action of an explosive"; (2) a weapon that is "designed to . . . expel a projectile by the action of an explosive"; and (3) a weapon that "may readily be converted to expel a projectile by the action of an explosive." This portion of the statutory definition of "firearm" does not apply to the unfinished frames and receivers identified in the Amended Complaint for numerous reasons.

First, the Court should reject any argument that would categorize a frame or receiver of a weapon as a firearm under subsection (A) because such an interpretation would make subsection (B) wholly superfluous. *See United States v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016) ("[C]ourts must give effect to all of a statute's provisions so that no part will be inoperative or superfluous, void or insignificant." (cleaned up)). Where parties offer two competing interpretations of a statute, the rule against superfluities "favors that interpretation which avoids surplusage" and redundancies. *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (emphasis omitted). Interpreting subsection (A) to encompass frames and receivers as well as their precursors would make the items covered by subsection (B) a mere subset of items already included in subsection (A). The Court should reject any interpretation of this statute that would make subsection (B) meaningless surplusage.

Second, interpreting subsection (A) to apply to unfinished frames and receivers would violate the "commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). In subsection (B) of the definition, Congress specifically spoke to the status of a "frame or receiver," and in resolving this

dispute the Court must therefore be guided by subsection (B) rather than the more general language of subsection (A).

Third, subsection (A) does not apply to the unfinished frames identified in the Amended Complaint because those unfinished frames are not themselves "weapon[s]." A "weapon" is "[a]n instrument of offensive or defensive combat" or "anything used, or designed to be used, in destroying, defeating, or injuring, an enemy, as a gun, a sword, a shield, etc." *Weapon*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1944) [hereinafter WEBSTER'S SECOND]. An unfinished frame—essentially a hunk of plastic or metal—does not satisfy this definition. It is neither an instrument of offensive combat nor something used or designed to be used in injuring an enemy. And while it eventually can become *part* of a weapon once it *is* finished, it is clear from context that subsection (A) does not sweep so broadly, particularly given the *separate* identification of frames and receivers as "firearms" in subsection (B).

Fourth, even if the Court disagrees with these initial points, the unfinished frames the State identifies in the Amended Complaint still do not qualify as "firearm[s]" under subsection (A) because they "will" not, are not "designed to," and may not "readily be converted to expel a projectile by the action of an explosive." Unfinished frames are not in a state of completion that would allow the firing of a projectile, so it plainly cannot be said that they "will" expel projectiles. Nor are unfinished frames "designed to" expel projectiles because the purpose of an unfinished frame is not to expel a projectile. Instead, its purpose is to be incorporated into *something else* that is designed to expel a projectile. The object that is designed to expel a projectile is the completed firearm—not its trigger, its hammer, the grip, the front sight, or the frame. It is the combination of these objects into one that results in an item that is "designed to" expel a projectile. Interpreting the statute otherwise would have no limiting principle and would mean that *every part* of a gun—

including the various screws and springs—is "designed" to expel a projectile and, therefore, would be deemed a "firearm" under subsection (A)—an absurd conclusion that cannot possibly be correct.

The State's own allegations demonstrate that the unfinished frames identified in the Amended Complaint cannot be "readily converted to expel a projectile." "Readily" means "[w]ith promptness; quickly; at once; easily." *Readily*, WEBSTER'S SECOND. As the complaint itself acknowledges, converting an unfinished frame into something that will expel a projectile requires additional parts, specialized tools to drill holes and mill parts, the knowledge of how to perform those precise actions, and time to complete the necessary steps. *See* Am. Compl. ¶¶ 63–69. This process is much more involved and fundamentally different from situations in which courts have determined that a firearm in a disassembled condition nevertheless remains a firearm under § 921(a)(3)(A) because the component parts could quickly and easily be put together into a complete firearm. *See, e.g.*, *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993) (determining that shotgun with the barrel removed from the stock that could have been assembled in thirty seconds or less was "readily converted" to an operable firearm and therefore was a firearm); *United States v. Morales*, 280 F. Supp. 2d 262, 272 (S.D.N.Y. 2003) (concluding that handgun parts that could be assembled into a working gun "in about five seconds" satisfied statutory definition of "firearm").

2. The unfinished frames at issue also do not qualify as "firearms" under 18 U.S.C. § 921(a)(3)(B), which covers "the frame or receiver of any such weapon." Unfinished frames do not fit this definition because they are not frames or receivers. As the Amended Complaint acknowledges, there are additional steps that need to be performed to convert an unfinished frame into a frame capable of being added into something that will expel a projectile by the action of an

explosive. *See* Am. Compl. ¶¶ 63–69.

Nor can an unfinished frame satisfy Section 921(a)(3)(B) on the theory that it "may readily be converted" into "the frame or receiver of any such weapon." The phrase "may readily be converted" in Section 921(a)(3)(A) cannot be imported into subsection (B), where it does not appear. Congress had the power to insert the "readily converted" language into subsection (B) but chose not to do so. Accordingly, reading this language in one subpart of the definition into another would violate the principle that "[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008); *see also* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 112 (2012).

Indeed, this is the interpretation that ATF historically has adopted; it has asserted that the "readily be converted" language in subsection (A) has no application to subsection (B). ATF recently said in federal court filings that "ATF's position is that the 'readily be converted' language modifies only 'weapon' in Section 921(a)(3)(A) and not 'frame or receiver' in Section 921(a)(3)(B)." Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. at 6–7 & n.3, *City of Syracuse v. ATF*, No. 20-cv-6885 (S.D.N.Y. Mar. 19, 2021), ECF No. 114. ATF has also recognized that "the 'designed to' and 'readily be converted' language are only present in the *first clause* of the statutory definition [of firearm in Section 921(a)(3)]." Mem. of Law in Supp. of Defs.' Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. at 14, *Syracuse* (S.D.N.Y. Jan. 29, 2021), ECF No. 98 (emphasis added) ("ATF *Syracuse* Br.").

A district court in the Northern District of Texas recently agreed with many of these arguments in determining, in preliminarily enjoining ATF from enforcing its new rule against a

plaintiff in that case, that the newly promulgated definition of "frame or receiver" conflicts with 18 U.S.C. § 921(a)(3)'s plain meaning. *See VanDerStok v. Garland*, 2022 WL 4009048, at *4 (N.D. Tex. Sept. 2, 2022), *appeal docketed*, No. 22-11071 (5th Cir. Nov. 3, 2022).[3] The court reasoned that "[t]hat which *may become* a receiver is not itself a receiver" and explained that "Congress could have included firearm parts that 'may readily be converted' to frames or receivers, as it did with 'weapons' that 'may readily be converted' to fire a projectile," but it did not. *Id.* "[I]t omitted that language when talking about frames and receivers." *Id.* The court thus concluded that Congress made the deliberate choice *not* to cover "parts that are 'designed' to be frames or receivers—that is, incomplete, nonfunctional frames or receivers." *Id.* This Court should conclude the same on the statutory interpretation question.[4]

### B. The State's Litigating Position on the Meaning of "Firearm" is Contrary to Longstanding ATF Guidance and Repeated Assurances by New York State Officials.

1. Defendants' interpretation of the word "firearm" in § 921(a)(3) is consistent with the longstanding position of ATF. "[O]ver the past several decades ATF has consistently focused on the degree of machining a device has undergone . . . in order to determine whether the device is a firearm," ATF *Syracuse* Br. at 7, *not* whether the object may be "readily converted" into a firearm. ATF has recognized that certain "castings or machined/molded or other manufactured bodies . . .

---

[3] *But see Morehouse Enters., LLC v. ATF*, 2022 WL 3597299, at *5–9 (D.N.D. Aug. 23, 2022), *appeal docketed*, No. 22-2854 (8th Cir. Aug. 31, 2022) (preliminarily concluding that ATF's new rule is not inconsistent with the statutory language of the Gun Control Act).

[4] While most of the State's claims allege violations of federal law that depend on the definition of "firearm" that appears in 18 U.S.C. § 921, Count Eleven alleges that Defendants aided and abetted violations of the National Firearms Act ("NFA"). *See* Am. Compl. ¶¶ 528, 530. The NFA uses a different and much narrower definition of "firearm" that does not include ordinary semiautomatic handguns and rifles. *See* 26 U.S.C. § 5845(a), (e); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 507 (1992) (plurality). Because there is no allegation that Defendants sold "firearms" within the meaning of the NFA, Count Eleven must be dismissed.

have not yet reached a stage of manufacture in which they are classified as 'firearm frames or receivers' under the Gun Control Act of 1968 (GCA) and implementing regulations." ATF Ruling 2015-1, at 1, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Jan. 2, 2015), https://bit.ly/3PheBo4. Even if a product required only "minor drilling and machining activities" to convert it into a frame or receiver, it nevertheless could still be categorized as an unfinished frame or receiver. *Id.*

In accordance with this approach, for unfinished receivers, ATF long held that "items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the [Gun Control Act]." *See Are "80%" or "unfinished" receivers illegal?*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Apr. 6, 2020), https://bit.ly/2nlfssN (last visited Jan. 16, 2023). This approach was reiterated by ATF in a 2013 Technical Bulletin that stated "[i]n order to preclude classification as a firearm, this area of the receiver, in addition to being solid, must not contain any holes or dimples for the trigger, hammer, and selector," an approach that is consistent with the focus on "the degree of machining to the frame or receiver." ATF *Syracuse* Br. at 32.

Of particular relevance to this case, ATF previously determined that Polymer80 PF940 unfinished frames are "<u>not</u> sufficiently complete to be classified as the frame or receiver of a firearm and thus . . . not . . . 'firearm[s]' as defined in the GCA." *See* Letter from Michael R. Curtis, Chief, Firearms Technology Industry Services Branch, ATF, to Jason David, The Law Offices of Davis & Associates, at 4 (Jan. 18, 2017) (attached as Exhibit A). The *only* unfinished frames or receivers that the Amended Complaint specifically alleges Brownells sold are Polymer80 PF940 unfinished frames. *See* Am. Compl. ¶¶ 218, 222–224. At the time of the alleged sales, operative

ATF guidance said that this specific product is not a "firearm" under federal law.

In sum, ATF's longstanding position was that "an unfinished frame or receiver is not a firearm until it has been sufficiently machined such that it has reached a critical stage of manufacture, and that line-drawing exercise is necessarily carried out on a device-by-device basis." ATF *Syracuse* Br. at 9. And "unfinished frames or receivers that have not yet reached a critical stage of manufacturing—devices that are not designed to expel a projectile and still require many steps, tools, and expertise to be converted into such a device—are *not firearms* within the meaning of the GCA." *Id.* at 11 (emphasis added). ATF applied that framework and determined that Polymer80 PF940 unfinished frames—the specific product the State accuses Brownells of selling—are **not** firearms. *See* Ex. A at 4.

The Court should give great weight to ATF's longstanding refusal to interpret the statute in the manner the State advocates in view of the significant reliance interests that built up around ATF's interpretation. *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202 (1991). Brownells and the gun industry more generally have spent years assiduously following ATF's guidance on this issue, with industry members posing questions to the agency and following its directives in cases of doubt. Gun industry members should be encouraged to comply with ATF's guidance, not retroactively punished for doing so. ATF's longstanding interpretation also deserves additional weight because the federal statute at issue here can trigger not only civil but also criminal liability. *Cf. Sash v. Zenk*, 439 F.3d 61, 67 (2d Cir. 2006) (Sotomayor, J.) (recognizing that Supreme Court precedent leaves open the possibility "that some regulatory interpretations of criminal statutes" could trigger the rule of lenity because they are "inadequate for purposes of fair warning"); *Cargill v. Garland*, 2023 WL 119435, at \*18 (5th Cir. Jan. 6, 2023) (en banc) (applying the rule of lenity to federal definition of "machinegun").

Defendants' adherence to ATF's guidance regarding unfinished frames and receivers should be lauded, not derided through misleading comparisons between finished and unfinished frames and receivers. In its Amended Complaint, the State juxtaposes an unfinished pistol frame with a finished pistol frame and comments that "there is virtually no difference between them." *See* Am. Compl. ¶¶ 54–56. On the contrary, the drilled holes and removed plastic are not a mere technicality but are essential to ATF's prior focus on the degree of machining a device has undergone to determine if the device is a firearm. The differences between the two objects in the State's picture reflect the balance that ATF struck between enforcing the federal regulatory regime applicable to firearms and preserving the ability of hobbyists to construct their own firearms. Indeed, in a January 18, 2017 classification determination letter, in which ATF concluded that Polymer80 PF940 unfinished frames are "<u>not</u> sufficiently complete to be classified as the frame or receiver of a firearm and thus . . . not a 'firearm' as defined in the GCA," the agency included a picture of the unfinished frame that is virtually indistinguishable from the unfinished frame picture the State uses in its Amended Complaint. *See* Ex. A at 4–5. The State's comparison at most evinces that the gun industry has been attentive to complying with the directives of ATF and meeting the law's requirements with exacting precision.

2. Until recently, New York State officials, including the Attorney General, agreed with Defendants and ATF that the meaning of "firearm" under federal law does not reach unfinished frames or receivers like the ones at issue in this case. In a July 15, 2020 press release about cease-and-desist letters that the Attorney General sent to websites selling unfinished lower receivers, the Office wrote that "[a]side from a fully assembled firearm, the lower receiver is the only piece that is independently considered a firearm and is thus subject to federal regulation. However, an incomplete lower receiver—lacking certain holes, slots, or cavities—is not considered a firearm."

*Attorney General James Stops Sales of "Ghost Guns" Into New York*, N.Y. ATT'Y GEN. (July 15, 2020), https://on.ny.gov/3e0pehk (last visited Jan. 16, 2023).[5] In debating the Jose Webster Untraceable Firearms Act and the Scott J. Beigel Unfinished Receiver Act, legislators stated that unfinished frames and receivers "aren't considered to be firearms," *Regular Session – February 10, 2021 Transcript* at 673, N.Y. STATE SENATE, https://bit.ly/3TAlaF8 (last visited Jan. 16, 2023) (statement of sponsor Sen. Hoylman), and that one can "legally have a ghost gun in New York State under current law," *Regular Session – June 8, 2021 Transcript* at 126, N.Y. STATE ASSEMBLY, https://bit.ly/3KAtG2A (last visited Jan. 16, 2023) (statement of sponsor Rep. Rosenthal); *see also id.* at 164–65 (sponsor Rep. Lavine stating that the ATF "does not view these . . . ghost gun kits as being illegal, and they're not illegal in New York State"). During the signing ceremony for the Jose Webster Untraceable Firearms Act and the Scott J. Beigel Unfinished Receiver Act, Governor Hochul asserted that the bills she was signing "make it a crime to sell the unfinished frames or receivers" and that "[r]ight now, that has not been illegal." *Governor Hochul Signs Legislation Package to Fight Gun Violence Epidemic*, NEW YORK STATE (Oct. 28, 2021), https://on.ny.gov/3R41SWF (last visited Jan. 16, 2023).

Accordingly, it appears to have been the view of the very New York officials who are bringing this case that until certain laws were passed in New York in late 2021, Defendants' products *were not* illegal.

3. ATF recently promulgated a new rule addressing unfinished frames and receivers that in some respects differs from the agency's heretofore longstanding position. Under the new

---

[5] The Court should equitably estop the State from arguing that Defendants' products are "firearms" under federal law based on this statement. *See Schwebel v. Crandall*, 967 F.3d 96 (2d Cir. 2020). The Attorney General—the State's chief legal officer—publicly stated that unfinished receivers are not firearms under federal law. New York cannot now change its view and retroactively punish Brownells for its past conduct.

regulations, the terms "frame" and "receiver" include "a partially complete . . . or nonfunctional frame or receiver . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). The provision exempts from regulation "a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.* As an illustrative example, the regulation explains that a "blank of a frame or receiver that is sold . . . with a compatible jig or template is a frame or receiver" subject to the full panoply of federal regulations of firearms. *Id.*

ATF's new rule does not undermine the argument that Defendants' products are not firearms for three reasons. First, even under the new rule's definitions, Defendants' products are not "readily . . . converted to function as a frame or receiver." *Id.* The regulations define "readily" as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state," and lists eight factors "relevant in making this determination," including how long it takes to finish the process, how difficult it is to do so, what knowledge and skills are required, what tools are required, whether additional parts are required, and how easily those parts can be obtained. *Id.* § 478.11. As even the Amended Complaint acknowledges, however, converting an unfinished frame into something that will expel a projectile requires additional parts, specialized tools to drill holes and mill parts, the knowledge of how to perform those precise actions, and time to complete the necessary steps. Am. Compl. ¶¶ 59–69. Defendants' products are thus not "readily . . . converted" under ATF's definition. Second, as explained above, a district court recently preliminarily concluded that ATF's new definition of "frame or receiver" conflicts with 18 U.S.C. § 921(a)(3)'s

plain meaning. *See VanDerStok*, 2022 WL 4009048, at \*4. This Court should reject ATF's rule for similar reasons. Third, even if this Court disagrees, all of the conduct that the State alleges Defendants engaged in occurred prior to the August 24, 2022 effective date of ATF's new rule. Defendants cannot be held liable under regulatory definitions that were not in effect at the time.

### C. Unfinished Frame or Receiver "Parts Kits" Are Not "Firearms" Under Federal Law.

1. The Amended Complaint is nebulous in alleging what products aside from unfinished frames or receivers Brownells purportedly sold into New York. The State does allege that Brownells sold and shipped a "Polymer80 PF940CV1 Glock-compatible pistol frame, along with a part to build the gun." Am. Compl. ¶ 223. The State does not explain in detail, however, precisely what items were included with these products. But as described in the Amended Complaint, an unfinished frame parts kit seems to include an unfinished frame or receiver, some "part" that would be required to convert that unfinished frame or receiver into a frame, and perhaps a "lower parts kit," imprecisely defined as "containing the parts necessary to make [an unfinished frame] the fully-functional lower part of a handgun." *Id.* ¶ 201. Such an unfinished frame parts kit is not a "firearm" under federal law.[6]

First, an unfinished frame parts kit is not "any weapon . . . designed to or [that] may readily be converted to expel a projectile by the action of an explosive" because such a kit is not itself a weapon. *See VanDerStok*, 2022 WL 4009048, at \*6 ("Congress's definition [in Section 921(a)(3)(A)] does not cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile."). Section

---

[6] To the extent the State alleges that other Defendants sold unfinished frame parts kits as well, none of those "parts kits" are firearms under federal law either, for the same reasons as explained herein.

921(a)(3)(A) is clear: it is a *weapon* that can be readily converted to expel a projectile by the action of an explosive that is a firearm, not the objects that can eventually be assembled into a weapon that can readily be converted to expel a projectile. Indeed, if the unassembled parts of a "weapon" were treated as a firearm under Section 921(a)(3)(A), then there would have been no need for the statute separately to include "the frame or receiver" of a weapon within the definition of a firearm under Section 921(a)(3)(B). "The statutory context repeatedly confirms that Congress intentionally chose not to regulate 'weapon' parts generally." *Id.*

Second, an unfinished frame parts kit is not a weapon that may "readily be converted to expel a projectile by the action of an explosive." None of the "kits" that New York describes include all the parts necessary to manufacture an operable firearm. At most—and as Brownells has explained above, this would be an improper way to categorize unfinished frames or receivers— the "kit" might readily be converted into a frame, but that is *not* the same as readily being converted into a weapon that will expel a projectile by the action of an explosive, *i.e.*, an operable firearm.

Third, an unfinished frame parts kit is not "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3)(B). As explained above, the unfinished frames at issue in this case—and, logically, the parts kits that include them—do *not* fit this definition because they are not frames or receivers. There are additional steps that need to be performed to convert the unfinished frame contained in the parts kit into a frame capable of being added into something that will expel a projectile by the action of an explosive. And the Court should reject any argument that attempts to import the "may readily be converted" language from Section 921(a)(3)(A) into (B) because, as also explained above, it would defy bedrock canons of statutory interpretation.

2. To be sure, ATF's recently promulgated rule adopts a different view of unfinished frame parts kits. Under 27 C.F.R. § 478.12(c), the terms "frame" and "receiver" include "a frame or

receiver parts kit . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." As a consequence, because Section 921(a)(3)(B) defines a firearm as "the frame or receiver of any such weapon," an unfinished frame parts kit *is itself* a firearm according to the new regulation.

Nevertheless, the plain meaning of Section 921(a)(3) mandates a different interpretation, and this Court should therefore reject ATF's newly adopted position to the contrary. There are strong reasons why ATF's rule is invalid as a matter of law, and indeed, in recently preliminarily enjoining ATF from enforcing certain provisions of 27 C.F.R. §§ 478.11 and 478.12 against a plaintiff, another district court concluded that the plaintiff was likely to succeed on the merits of its claims that including "weapon parts kits" in its definition of "firearm" exceeded ATF's authority. *See VanDerStok*, 2022 WL 4009048, at *6–7. But even if this Court disagrees, again, all the conduct that the State alleges Defendants engaged in occurred prior to the effective date of ATF's new rule. Defendants cannot be held liable pursuant to a regulatory interpretation that was not in place at the time.

### D. Because the Unfinished Frames and Receivers at Issue in this Case Are Not "Component Parts" of Firearms, It Must Dismiss Counts Four and Five.

Counts Four and Five of the Amended Complaint both allege that Defendants violated New York General Business Law § 898-b through sales of "[q]ualified product[s]"—a term that has "the same meaning as defined in 15 U.S.C. section 7903(4)." N.Y. GEN. BUS. LAW § 898-a(6). The cross-referenced federal statute, in turn, defines "qualified product" as "a firearm" under 18 U.S.C. § 921(a)(3) or "a component part of a firearm or ammunition." 15 U.S.C. § 7903(4). As the discussion above demonstrates, unfinished frames are not "firearms" under federal law. To the extent the Court concludes that unfinished frames are also not "component part[s]" of a firearm, the Court must therefore dismiss Counts Four and Five of the Amended Complaint.

The Court should hold that the unfinished frames and receivers at issue in this case are not "component part[s]" under 15 U.S.C. § 7903(4).[7] The statute does not define "component part," so the Court "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76 (2009). And according to that ordinary meaning, because unfinished frames and receivers do not serve to "form, compose, or make up" firearms, nor are they "one of the portions" into which firearms may be divided, they are not "component parts" of firearms. *See Component*, Webster's Second; *Constituent*, Webster's Second; *Part*, Webster's Second.

This argument from plain meaning finds support in the overarching statutory structure. The federal definition of "firearm" includes "the frame or receiver of any" "weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). If, as ATF long maintained, the products at issue in this case are not far enough along in the manufacturing process to qualify as "frame[s] or receiver[s]" under that definition, it is difficult to see how these same products could qualify as "component part[s]" of "firearm[s]." 15 U.S.C. § 7903(4).

Case law also supports this interpretation. When determining whether other products qualify as "component part[s]" of firearms covered by 15 U.S.C. § 7903(4), courts have asked whether the item in question is necessary for a firearm to function. *Prescott v. Slide Fire Sols., LP*, 341 F. Supp. 3d 1175, 1188–89 (D. Nev. 2018); *Sambrano v. Savage Arms, Inc.*, 338 P.3d 103, 105 (N.M. Ct. App. 2014). Every firearm requires a *finished* frame or receiver to fire; firearms

___

[7] As permitted by Federal Rule of Civil Procedure 8(d)(3), this argument is presented in the alternative to the PLCAA defense presented later in this brief.

cannot function using unfinished frames.

## II. The State's Claims are Barred by the Federal Protection of Lawful Commerce in Arms Act.

To the extent the Court concludes that unfinished frames and receivers are "firearms" or "component part[s]" of firearms, all the State's claims must be dismissed under the PLCAA. 15 U.S.C. § 7902(a). In 2005, Congress enacted the PLCAA for the express purpose of prohibiting the precise claims that the State now wrongfully attempts to pursue in this case. The State's suit is predicated on alleged criminal, unlawful misuse or possession of products covered by the PLCAA. *See, e.g.*, Am. Compl. ¶¶ 230, 269. The PLCAA's purpose was to prevent plaintiffs from bringing such lawsuits.

### A. The Language, Purpose, and Structure of the PLCAA Prohibits Lawsuits Such as This One.

The PLCAA was enacted to "prohibit civil liability actions from being brought or continued against manufacturers, distributors, dealers, or importers of firearms or ammunition for damages, injunctive or other relief resulting from the misuse of their products by others." *See* Protection of Lawful Commerce in Arms Act, Pub. L. No. 109-92, 119 Stat. 2095, 2095 (2005). Congress found that such lawsuits are improper because they

> attempt to use the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce through judgments and judicial decrees thereby threatening the Separation of Powers doctrine and weakening and undermining important principles of federalism, State sovereignty and comity between the sister States.

15 U.S.C. § 7901(a)(8). In response to the phenomenon of these improper lawsuits, Congress took corrective action with the PLCAA. The stated purpose of the PLCAA was to *prohibit* such lawsuits and to protect the constitutional rights of distributors and dealers of firearms or ammunition products. *Id.* §§ 7901(b)(1), (4), (5). This ensures that liability for any wrongdoing lies with the "third parties, including criminals," who engage in the underlying conduct. *Id.* § 7901(a)(3).

The PLCAA's principal substantive provision states, "A qualified civil liability action *may not be brought in any Federal or State court*." *Id.* § 7902(a) (emphasis added). A "qualified civil liability action" is further defined as any "civil action . . . brought by any person against a manufacturer or seller of a qualified product[8] . . . for damages . . . or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." *Id.* § 7903(5)(A).

The PLCAA provides a few limited exceptions from its express prohibition on qualified civil liability actions. *See* 15 U.S.C. §§ 7903(5)(A)(i)–(vi). There are only six excepted cases in which a qualified civil liability action can proceed; *e.g.*, actions for "negligent entrustment or negligence per se," *id.* § 7903(5)(A)(ii); actions for "breach of contract or warranty," *id.* § 7903(5)(A)(iv); and actions in which the defendant "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought," *id.* § 7903(5)(A)(iii). These exceptions are narrowly drawn and demonstrate that "Congress clearly intended to preempt common-law claims, such as general tort theories of liability." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135 (9th Cir. 2009).

In particular, the exception found in § 7903(5)(A)(ii) illuminates Congress's intent to prohibit general negligence claims. The *only* permissible claims predicated on negligence are for "negligent entrustment or negligence per se." 15 U.S.C. § 7903(5)(A)(ii). Congress's express inclusion of this exception reveals that it directly considered whether tort and negligence claims should survive enactment of the PLCAA and concluded that only these two named forms of negligence can proceed. This is confirmed by the Act's legislative history, which reveals that

---

[8] A "qualified product" is defined as a "firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of Title 18), . . . or ammunition . . . or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce." *Id.* § 7903(4).

Congress expressly rejected calls to add an exception in the PLCAA for "gross negligence or recklessness" because doing so would have "effectively 'gut[ted]' the Act." *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403–04 (2d Cir. 2008) (citing *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274, 1294 (C.D. Cal. 2006)); *see also* 151 Cong. Rec. S9087–01, S9374–01.

### B.    Case Law Interpreting the PLCAA Confirms that It Bars the State's Claims.

Two federal Courts of Appeals—notably including the Second Circuit—have substantively applied the PLCAA to claims against manufacturers and sellers. In both cases, the Act was deemed constitutional, and the claims were dismissed.

First, in 2008, the Second Circuit decided *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008). In that case, as in this one, a New York government entity sued companies that sold firearms or related products in its jurisdiction and sought "injunctive relief and abatement of [an] alleged public nuisance." *See id.* at 389–91; *compare id.*, *with* Am. Compl. at 95–96. And in that case, as in this one, the plaintiff claimed it was entitled to relief because defendants' "marketing and distribution practices" did not prevent purchasers from illegally possessing, transferring, or using the purchased products. *See Beretta*, 524 F.3d at 391.

The Second Circuit held that the PLCAA "bar[red] the commencement or the prosecution" of the lawsuit because it was a "qualified civil liability action" under the statute and ordered the case be dismissed. *Id.* at 398, 404. The Court ruled that the plaintiff could only pursue its claims if they fit within the PLCAA's listed exceptions. *See id.* at 398–99. The only possibly relevant exception was the third, which permits "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* (citing 15 U.S.C. § 7903(5)(A)(iii)). This exception to PLCAA immunity was named the "predicate exception," because such cases are brought under an underlying "predicate statute." *Id.* at 389–90.

The Court focused primarily on the predicate exception's requirement that the predicate statute invoked be "applicable to the sale or marketing of" firearms. *Id.* at 399. The Court held that the predicate exception applies *only* to state or federal statutes (1) that "expressly regulate firearms"; (2) that "courts have applied to the sale and marketing of firearms"; or (3) that "clearly can be said to implicate the purchase and sale of firearms." *Id.* at 404. Put another way, "a statute of general applicability that does not encompass the conduct of firearms manufacturers" is ***not*** a predicate statute. *Id.* at 400. It is not enough that a statute is so general that it could be read to encompass firearms manufacturers or sellers *along with the general public*; a predicate statute must be legislatively directed toward the purchase and sale of firearms. *See id.* at 400–04.

Second, in 2009, the Ninth Circuit decided *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009). In that case, shooting victims sued gun manufacturers for their injuries from a shooting incident perpetrated by a criminal who was not a party to the action. *Id.* at 1130. The plaintiffs' claims were based on "common law tort statutes for foreseeably and proximately causing injury, emotional distress, and death through knowing, intentional, reckless, and negligent conduct." *Id.*

The Ninth Circuit, like the Second Circuit in *Beretta*, held that the PLCAA barred the claims and ordered the action dismissed. *Id.* at 1146. The *Ileto* court held that the PLCAA clearly reflected that "Congress intended to preempt general tort law . . . even though California has codified those claims in its civil code." *Id.* at 1138. The court ruled that a suit brought under a statute that merely codifies a tort claim cannot be a predicate statute under the PLCAA. *Id.* at 1136–38. This is because such a statute merely "announce[s] and formulate[s] existing common law principles." *Id.* at 1136 (quoting *Li v. Yellow Cab Co. of Cal.*, 532 P.2d 1226, 1233 (Cal. 1975)). As such, those statutes remain subject to standard "further judicial development" in the common law. *Id.* (quoting *Li*, 532 P.2d at 1233). The court held that codified torts that remain

subject to "the same 'judicial evolution' as ordinary common-law claims" were "precisely the target of the PLCAA," are prohibited, and must be dismissed. *Id.* at 1136–38.

These precedents make clear that courts must give effect to Congress's intent to foreclose precisely these types of actions. Indeed, in 2013, the U.S. District Court for the District of Columbia ruled that claims explicitly barred by the PLCAA should be dismissed with prejudice— even *sua sponte*—to effectuate Congress's purpose. *See Jefferies v. District of Columbia*, 916 F. Supp. 2d 42, 46–47 (D.D.C. 2013). This is so even if a non-federal statute expressly authorizes tort liability against the manufacturer or seller. *Id.* at 44–45 (citing *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 170–71 (D.C. 2008)).

Lastly, currently pending before the Second Circuit is a case concerning whether the PLCAA bars New York General Business Law §§ 898a–e. *See Nat'l Shooting Sports Found., Inc. v. James*, No. 22-1374 (2d Cir. June 24, 2022). That appeal follows a district court ruling that those statutes fall within the predicate exception. *Nat'l Shooting Sports Found., Inc. v. James*, 2022 WL 1659192, at *4 (N.D.N.Y. May 25, 2022). But even in that case, the district court acknowledged under controlling Second Circuit precedent laws of general applicability in New York are outside the scope of the PLCAA's predicate exception. *Id.* (citing *Beretta*, 524 F.3d at 403).

Taken together, the existing case law on the PLCAA demonstrates several controlling principles:

- Statutes of general applicability cannot constitute predicate statutes for the PLCAA's predicate exception absent case law applying those statutes to firearms manufacturers or distributors.

- Statutes codifying common law tort claims do not constitute predicate statutes.

*See Ileto*, 565 F.3d at 1130–46; *Beretta*, 524 F.3d at 400–04; *Jefferies*, 916 F. Supp. 2d at 46–47.

### C.  The State's Claims Are Prohibited Qualifying Civil Liability Actions.

It is evident from the face of the Amended Complaint that the State's claims are prohibited "qualified civil liability action[s]" under the PLCAA. *See* 15 U.S.C. § 7903(5)(A). First, the State itself claims that the products sold that are at issue in this case are "qualified product[s]" under the PLCAA. *See* Mem. of Law in Supp. of the N.Y. State Att'y Gen.'s Mot. for Remand at 2, 13–14 (Aug. 17, 2022), ECF No. 43 ("Remand Mot."). Second, the State's claims are predicated upon the underlying alleged wrongdoing of the *purchasers* of the products—*i.e.*, by impermissible possession or use of the products. Indeed, the complaint expressly recounts in detail facts concerning the individual purchasers, including facts about the purchasers who were "indicted and pled guilty" to crimes. *See* Am. Compl. ¶¶ 227, 231, 235–239, 241, 245–246, 249, 252–254, 256, 259–262, 265, 269–270, 274, 277–278, 282–285. Accordingly, the complaint seeks damages from Defendants "resulting from the criminal or unlawful misuse" of their products. *See* 15 U.S.C. § 7903(5)(A).

In addition to the bare nature of the allegations and claims in this case, the State is not at all shy in the complaint to broadcast its intent to use this lawsuit to achieve impermissible legislative goals, which is precisely the very end-run around separation-of-powers principles that the PLCAA was intended to prevent. The Amended Complaint asserts that the underlying animating goal of this lawsuit is that "*we* need to fix this avoidable crisis." *See* Am. Compl. at 80 (emphasis added); *see also id.* ¶¶ 451, 461–463. This verbiage makes plain that the lawsuit is little more than an invitation by the State asking this Court to assist the State in achieving the Attorney General's political and public policy aims—improperly encroaching on the province of the state and federal legislatures in the process. Congress foresaw this precise maneuver and declared expressly that the PLCAA was intended to prevent litigants from "circumvent[ing] the Legislative

branch of government" and "undermining important principles of federalism." 15 U.S.C. § 7901(a)(8).

### D. The State Cannot Proceed Under the PLCAA's Predicate Exception.

The PLCAA provides six exceptions to the broad immunity it confers on the gun industry, and none could plausibly be argued to apply except the predicate exception. The predicate exception only exempts from PLCAA immunity "an action in which a . . . seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* § 7903(5)(A)(iii); *see Beretta*, 524 F.3d at 390. The text of the predicate exception thus establishes three requirements before it can exempt a claim: (1) there must be an alleged violation of a predicate State or Federal statute applicable to the sale or marketing of a qualified product, (2) the Defendants must have "knowingly violated" that statute, and (3) that violation must be a "proximate cause of the harm for which relief is sought." None of those three requirements is satisfied, so all the State's claims must be dismissed under the PLCAA.

#### 1. The Amended Complaint Fails To Allege a Violation of Any Predicate Statute.

The State's claims fail to meet the predicate exception's first requirement because the State's illegal acts claims and misrepresentation claims are based on statutes of general applicability and its nuisance claims are the exact kind of unmoored common-law claim the PLCAA was enacted to prohibit.

##### a. The State's Illegal Conduct and Misrepresentation Claims Are Based Upon Statutes of General Applicability.

Start with the State's illegal acts claims and fraud claims. In *Beretta*, the Second Circuit made clear that the PLCAA prohibits claims based on statutes of general applicability. *See Beretta*, 524 F.3d at 400–04. Counts One, Two, Three, Six, Seven, Eight, and Eleven are all brought under

New York Executive Law § 63(12), which provides the exclusive basis and vehicle for the State's requested relief on those counts. *See* Am. Compl. ¶¶ 466, 469, 472, 478, 481, 486, 506, 509, 511, 517, 528, 537 & Prayer for Relief at 95–96, ¶¶ 1–2. Executive Law § 63(12) provides, "Whenever ***any person*** shall engage in repeated ***fraudulent or illegal acts*** or otherwise demonstrate persistent fraud or illegality . . . the attorney general may apply . . . for an order enjoining the continuance of such . . . fraudulent or illegal acts [and] directing restitution and damages." N.Y. EXEC. LAW § 63(12) (emphases added). The express application to "any person" categorically renders this statute one of "general applicability," not one directed toward firearms manufacturers or sellers.

The State's citation to underlying state and federal statutes that inform its Executive Law claims do not rescue these claims from PLCAA immunity because they are not the source of the cause of action or the State's demanded relief. As discussed, when enacting the PLCAA, Congress found that this statute was necessary, in part, because "liability actions commenced or contemplated by . . . States" were an "attempt to use the judicial branch to circumvent the Legislative branch of government" and to "expand civil liability in a manner never contemplated . . . by the legislatures of the several States." 15 U.S.C. § 7901(a)(7), (8). Consistent with Congress's findings, the predicate exception, which must be read "narrowly," does not permit the State to pursue causes of action *unless* the state legislature has expressly permitted such a cause of action through "statutes that actually regulate the firearms industry." *Beretta*, 524 F.3d at 403–04. In this way, the predicate exception is akin to a "clear-statement rule," only lifting the bar on causes of action when the State legislature has actually sought to regulate the firearms industry and expressly permitted particular causes of action to proceed. *Cf. U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993) (describing McCarran-Ferguson Act's preemption provision as a "clear-statement rule"). But here, the New York State Legislature has not done so. Instead, the State is

attempting to shoehorn its claims under a statute of general applicability, Executive Law § 63(12), in an end-run around the PLCAA.

Count One cites federal, state, and municipal laws that purportedly prohibit selling or shipping unfinished frames or receivers into New York State, including 18 U.S.C. § 921(a)(3), New York Penal Law §§ 265.60, 265.61, and New York City Administrative Code § 10-314. *See* Am. Compl. ¶¶ 465–470. However, the State does not (and cannot) bring any charge or cause of action under, or seek any relief provided by, these provisions. It only seeks relief under Executive Law § 63(12). *See id.* ¶ 466.

Likewise, Count Two alleges that Defendants aided and abetted some third parties' presumed criminal violations of 18 U.S.C. § 922(g)(1) and New York Penal Law § 265.02, which may prohibit third parties from possessing a firearm if they have been previously convicted of certain crimes. *See* Am. Compl. ¶¶ 473–474. Again, however, these statutes are not the basis for the claim against Defendants in Count Two; indeed, the State does not allege that Defendants themselves violated that provision, much less that the State is entitled to direct relief therefor. It only claims relief under the generally applicable Executive Law § 63(12).

The same is true for Count Three, which only alleges that Defendants aided and abetted some third parties' presumed violations of possessory crimes under New York Penal Law §§ 265.01 and 265.20, which prohibit possession of firearms by unlicensed individuals. Am. Compl. ¶ 482. And likewise for Count Eleven, which only alleges that Defendants aided and abetted some third parties' presumed violations of 26 U.S.C. §§ 5842(b) and 5861(c)–(d) prohibiting possession of unserialized or unregistered firearms. Am. Compl. ¶¶ 529–530.

None of these Counts seeks relief under those underlying statutes; the exclusively cited source for the causes of action is Executive Law § 63(12), and the exclusive relief sought is

provided only by that section. Therefore, each represents a claim under a statute of general applicability that is not a predicate statute exempted from PLCAA immunity. To hold otherwise would be to allow the State to skirt the strictures of the PLCAA, which Congress designed explicitly to ensure courts were not used to "circumvent the Legislative branch" or impose liability in a manner not expressly set out by the "legislatures of the several States." 15 U.S.C. § 7901(a)(7)–(8). That the New York State Legislature has not expressly granted the Attorney General authority to pursue such causes of action requires dismissal of Counts One, Two, Three, and Eleven.

Count Six does not even cite an underlying statutory violation. Instead, that count is brought by reference *exclusively* to the generally applicable Executive Law § 63(12) for generalized "fraudulent conduct." Am. Compl. ¶¶ 502–504. Under the Second Circuit's controlling *Beretta* decision, Count Six is facially deficient and must be dismissed because it does not even purport to relate to any underlying regulation of manufacturers or distributors of qualifying products.

The analysis is no different for Counts Seven, Eight, Nine and Ten, which are brought by reference to New York General Business Law §§ 349 and 350. As to § 349, that provision is a law of general applicability, which provides that *any* "[d]eceptive acts or practices in the conduct of *any* business, trade or commerce . . . are hereby declared unlawful." N.Y. GEN. BUS. LAW § 349 (emphasis added). Count Nine claims that Defendants violated this provision through misrepresentations in "advertising and elsewhere." Am. Compl. ¶¶ 520–523. However, by the plain terms of this statutory provision, it is generally applicable to all actors, not "applicable to the sale or marketing" of qualified products as contemplated in the PLCAA as interpreted by the Second Circuit in *Beretta*. *See* 15 U.S.C. § 7903(5)(A)(iii); *Beretta*, 524 F.3d at 400–04. Count

Seven, meanwhile, states yet another a claim under Executive Law § 63(12) for Defendants' alleged violations of General Business Law § 349. *See* Am. Compl. ¶¶ 508–509. In other words, Count Seven is an impermissible general-applicability claim *nested inside another* impermissible general-applicability claim. The predicate exception does not provide a basis upon which these claims can proceed.

Likewise, General Business Law § 350 provides that *any* "[f]alse advertising in the conduct of *any* business, trade or commerce . . . is hereby declared unlawful." N.Y. GEN. BUS. LAW § 350 (emphasis added). Count Ten claims that Defendants violated this provision directly based on identical allegations to those in Count Nine. *See* Am. Compl. ¶ 526. As with General Business Law § 349, this provision uses substantively identical language and is generally applicable to all actors; it cannot be relied on as a predicate statute under the PLCAA. *See* 15 U.S.C. § 7903(5)(A)(iii); *Beretta*, 524 F.3d at 400–04. Count Eight, much like Count Seven, purports to state a claim under Executive Law § 63(12) for Defendants' alleged violations of General Business Law § 350. *See* Am. Compl. ¶¶ 513–517. Once again, the State's nested general-applicability claim is flatly impermissible under the PLCAA.

\*     \*     \*

Under Second Circuit precedent, Executive Law § 63(12) and General Business Law §§ 349 and 350 are statutes of general applicability. *See Beretta*, 524 F.3d at 404. In the absence of any caselaw from before the enactment of the PLCAA applying those statutes to the manufacture or sale of firearms, *Beretta* requires that all claims based on these statutes be dismissed because they cannot satisfy the predicate exception to the PLCAA. *Id.* For that reason,

Counts One, Two, Three, Six, Seven, Eight, Nine, Ten, and Eleven must be dismissed.[9]

> **b.** **The State's Nuisance Claims Are Unmoored Common Law Claims that the PLCAA was Enacted to Prohibit.**

The State's Nuisance Claims also fail to satisfy the predicate exception. Those claims allege that the Defendants' activities "constitute public nuisances." *See* Am. Compl. ¶¶ 495, 500. They are brought under New York General Business Law § 898-b. But these counts too are prohibited by the PLCAA because, to the extent Defendants are given any fair notice of the standard of liability in these counts, they are premised on "general tort theories of liability that traditionally have been embodied in the common law." *Ileto*, 565 F.3d at 1135.

The *Ileto* court rightly determined that "Congress clearly intended to preempt common-law claims, such as general tort theories of liability" in enacting the PLCAA. *Id.* The court's reasoning was three-fold. First, though California had codified its common law of nuisance into its statute—just as New York did with section 898-b—those codified statutes remained subject to "judicial evolution," *i.e.*, future development under common law principles as with standard tort claims. *Id.* at 1136. This is antithetical to Congress's intent. *Id.* Second, on review of 15 U.S.C.

---

[9] The Connecticut Supreme Court erred in its interpretation of the predicate exception in *Soto v. Bushmaster Firearms International, LLC*, 202 A.3d 262 (Conn. 2019). But, in any event, *Soto* provides no support for the State here. In that decision, the Connecticut Supreme Court allowed what it described as a "narrow legal theory" to proceed, *id.* at 272, but emphasized this would not lead to "crippling [the] PLCAA," *id.* at 312. The court made two points relevant here. First, the court agreed that, "as a general matter, the predicate exception cannot be so expansive as to fully encompass laws such as public nuisance statutes insofar as those laws reasonably might be implicated in any civil action arising from gun violence." *Id.* at 311. The court added that a general claim that "any sale of assault weapons to the civilian market constitutes an unfair trade practice," for example, "would falter on this shoal." *Id.* at 312. In this case, the State's claims founder on PLCAA's shoals. Second, the *Soto* court's merits discussion expressly distinguished that case (brought by direct victims of gun violence) from a case brought by municipal plaintiffs seeking to "recoup various municipal costs associated with gun violence." *Id.* at 97–98. Those harms "were too indirect, remote and derivative with respect to the defendants' conduct." *Id.* at 97 (cleaned up). So too here, *see infra*, where the State similarly fails to adequately allege proximate causation.

§ 7901(a)(4), the court concluded that Congress intended the predicate exception to cover "statutes that regulate manufacturing, importing, selling, marketing, and using firearms or that regulate the firearms industry—rather than general tort theories that happened to have been codified by a given jurisdiction." *Id.* Third, it would create incongruity between the states if those with a codified common law of torts fell within the PLCAA's predicate exception while those with the same common law torts that were not codified did not. *Id.* For those reasons, the *Ileto* court ruled that a nuisance statute is barred by the PLCAA.

The statute at issue in this case—§ 898-b—calls for the same analysis and conclusion. That provision states that "[n]o gun industry member, by conduct either unlawful in itself or **unreasonable** under all the circumstances shall knowingly or ***recklessly*** create, maintain or contribute to a condition in New York state that ***endangers the safety or health of the public*** through the sale, manufacturing, importing or marketing of a qualified product." N.Y. GEN. BUS. LAW § 898-b(1) (emphases added). The emphasized language reveals that the statute has merely codified New York's tort law of nuisance, precisely as did California's legislature as discussed in *Ileto*. This is particularly clear from § 898-b's apparent invocation of the common law's reasonableness and recklessness standards, which are constructions of tort law and subject to judicial development; by contrast, the *only* tort concepts accounted for in the PLCAA are negligent entrustment and negligence *per se*. 15 U.S.C. § 7903(5)(A)(ii). Therefore, Counts Four and Five, which are expressly pleaded as nuisance claims, are barred by the PLCAA. *Ileto*, 565 F.3d at 1135.

## 2. The Amended Complaint Fails to Allege "Knowing" Violations of Predicate Statutes.

Independent of whether any of the counts are based on a violation of an "applicable" statute, the State's claims still must be dismissed because the State has failed to allege "knowing" violations of these statutes. When enacting the PLCAA, Congress was concerned about

"[l]awsuits" against defendants when the "firearms . . . operate as designed and intended," especially in light of the fact that "[t]he manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are *heavily* regulated." 15 U.S.C. § 7901(a)(3), (4) (emphasis added). This was particularly so because these lawsuits were "expand[ing] civil liability in a manner never contemplated by . . . the Constitution, by Congress, or by the legislatures of the several States." *Id.* § 7901(a)(7). Thus, Congress was driven to bar efforts to use litigation to expand liability for non-defective firearms produced under the watchful eye of heavy regulation. The predicate exception confirms that one way in which Congress accomplished this was to limit it to actions where a defendant "knowingly violated a State or Federal statute." By its very terms, this requires allegations that the Defendants knew they were violating the law.

The Supreme Court has recently explained how to interpret "knowingly." The analysis looks at the words "knowingly" modifies, and here "knowingly . . . modifies the verb 'violate[d]' and its direct object, which in this case is" the applicable underlying statute. *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019). When a statute uses "knowingly" in this manner, the Supreme Court has held it requires knowledge of the law. *Id.* at 2198. The reason being that knowledge of the relevant law "separate[s] wrongful from innocent acts," *id.* at 2197, or, to put it another way, required knowledge of the *unlawfulness* of an action separates what Congress sought to proscribe from a "broad range" of conduct that it did not, *Liparota v. United States*, 471 U.S. 419, 426 (1985); *see also Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022). This is particularly so when such a reading complies with "ordinary English grammar." *Rehaif*, 139 S. Ct. at 2196 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009)). Accordingly, the Supreme Court has interpreted "knowingly" to require knowledge by a person who acquires or possesses food stamps that, as a matter of law, "his conduct [was] unauthorized by statute or regulations." *Liparota*, 471

U.S. at 425. "Knowingly" requires knowledge by a possessor of a firearm that he is, as a matter of law, in the United States illegally. *Rehaif*, 139 S. Ct. at 2198. And, "knowingly" requires that a doctor's dispensation of drugs not merely be unauthorized as a matter of "fact," but also that the doctor "knew or intended" that his dispensation was not authorized by statute or regulation. *Ruan*, 142 S. Ct. at 2382.

The State has failed to allege any knowledge of the unlawfulness of Defendants' conduct. In particular, the State has failed to allege that Defendants *knew* their products were "firearms" (they are not, see *supra*), and thus the State has failed to allege Defendants *knew* their sales violated applicate law. And the State cannot do so. Defendants cannot have knowingly violated applicable definitions of "firearm" when they acted consistent with an objectively reasonable interpretation of the federal definition of "firearm" and authoritative guidance from ATF. As explained above, the products at issue in this case are not "firearms" under the governing federal statutes and ATF guidance in force at the time of the sales at issue. But at an absolute minimum, it was objectively reasonable for Defendants not to treat these products as "firearms" when ATF said they were not firearms. "Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a *knowing* or reckless violator. Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts, whatever their subjective intent may have been." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 70 n.20 (2007) (emphasis added).

As Congress found, the firearms industry is "heavily regulated," and liability actions must be limited to those "contemplated" by Congress or the particular state legislature. 15 U.S.C. § 7901(a)(4), (7). In providing a narrow exception to the bar on liability, Congress required

allegations of a "knowing[ ]" violation of the applicable law. *Id.* § 7903(5)(A)(iii). In this instance, such a "knowing[ ]" violation cannot be found when the "heavy" regulators themselves—ATF and the State—contemporaneously advanced the very same interpretation that the State now asserts Defendants *knew* was wrong.

### 3. The Amended Complaint Fails to Satisfy the Predicate Exception's Proximate Causation Requirement.

Congress was explicit that "an action" under the predicate exception must be based on a violation that "was a *proximate cause* of the harm for which relief is sought." *Id.* (emphasis added). This clause of the predicate exception compels dismissal of both the State's claims and many of the forms of relief it seeks.

1. In enacting the PLCAA, Congress was particularly concerned about firearms manufacturers having to litigate claims where the "the harm caused" was "the misuse of firearms by third parties, including criminals." *Id*. § 7901(a)(3). That is why it defined "qualified civil liability action," in part, by reference to an action where there has been "criminal or unlawful misuse of a qualified product by the person [bringing the suit] or a third party." *Id*. § 7903(5)(A). In light of this context, the predicate exception's specific "proximate cause" requirement has real teeth. *Prescott*, 341 F. Supp. 3d at 1191 (dismissing case because plaintiffs "cannot show that Slide Fire's misrepresentation proximately caused the injuries that are the subject of this case").

At a minimum, "proximate cause" requires that the claimed-of harm have "some direct relation between the injury asserted and the injurious conduct alleged." *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018) (cleaned up). "Put differently, 'a link that is too remote, purely contingent, or indirect is insufficient.'" *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2022 WL 4448621, at *13 (S.D.N.Y. Sept. 23, 2022) (quoting *Empire Merchs., LLC*, 902 F.3d at 141)); *see also Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 2022

WL 4597526, at *15 n.9 & *20 (D. Mass. Sept. 30, 2022), *appeal docketed*, No. 22-1823 (1st Cir. Dec. 5, 2022) (noting government plaintiff's harm was too causally remote for statutory standing, thus it was "doubtful" PLCAA "proximate-cause requirement could be satisfied"). In the proximate cause analysis—as is made clear by the PLCAA's repeated references to barring liability claims based on the actions of third parties—a central consideration must be whether "potential intervening events . . . broke the chain of causation between" the claimed violation and the State's "alleged injury." *Alix v. McKinsey & Co..*, 23 F.4th 196, 205 (2d Cir. 2022); *cf. Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). Under the PLCAA, Congress highlighted the most likely intervening actions that would break the causal chain and would bar a liability action—namely, third parties and the criminal or unlawful misuse of qualified products. *See Beretta*, 940 A.2d at 171 (noting the government needed "proof" of "proximate cause" "*despite* the misuse of the firearm by a third person"; it is "implausible" Congress would permit an action based on a mere "causal link" (emphasis added)).

The State has made no effort to allege proximate causation on *any* count. In fact, the Amended Complaint uses the word "cause" twenty-four times, twenty-two of those to label its "cause[s] of action." And the Amended Complaint *repeatedly* highlights the alleged criminal misconduct of third parties. *See, e.g.*, Am. Compl. ¶¶ 227, 231, 238–239, 241 (alleging criminal misconduct of various individuals). Thus, far from this being a case where Defendants must wait to accumulate evidence about the intervention of third parties to break the causal chain of any alleged harm, the State's own complaint *admits* the role of third parties on the face of the complaint. *Cf. Podpeskar v. Dannon Co.*, 2017 WL 6001845, at *3 (S.D.N.Y. Dec. 3, 2017). The

State's own allegations demonstrate that this case must be dismissed under the PLCAA.

This absence of proximate causation is particularly apparent in Counts Four and Five. By its terms, General Business Law § 898 does not include a proximate causation element, but instead permits the Attorney General to sue for an injunction, restitution, and damages "[w]henever there shall be a violation of this article." N.Y. GEN. BUS. LAW § 898-d. Because this statutory scheme permits the Attorney General to seek relief without proving harm proximately caused by the violation, the predicate exception does not provide a basis for the State's public nuisance claims. In the ongoing Second Circuit litigation over this statute, the State has sought to defend § 898 by arguing that it could be construed to "leave[ ] room for notions of proximate causation and reasonably foreseeable harms." Br. & Suppl. App. for Appellee at 35, *Nat'l Shooting Sports Found., Inc. v. James*, No. 22-1374 (2d Cir. Jan. 6, 2023). The State has attempted to save its statute in that litigation by arguing for a proximate cause standard it cannot meet (and has not adequately alleged) in this litigation.

2. The predicate exception's proximate cause requirement also bars many of the remedies the State seeks. In enacting the PLCAA, Congress explained that it was animated by, not just preventing the litigation of meritless claims that were "an abuse of the legal system," but also the prospect that such claims would result in "money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. §§ 7901(a)(3), (6). Consistent with its effort to take on both litigation and the liability that would result from litigation, Congress clarified that only when the knowing violation "was a *proximate cause* of the harm *for which relief is sought*" could a lawsuit proceed under the predicate exception. *Id.* § 7903(5)(A)(iii) (emphasis added). In other words, any relief sought in such an action must be limited to seeking a remedy for harm proximately caused by the Defendant.

The State's requests for relief for harm *not* proximately caused by Defendants' alleged statutory violations are barred by the PLCAA. The State cannot, for example, be awarded a generalized endowment to an abatement fund because that is not limited to relief for a specified harm proximately caused by an individual Defendant. Instead, it would allow for the imposition of relief for harms remote from anything related to an individual Defendant's conduct. *Cf. Beretta*, 940 A.2d at 172 ("Shoehorning, as it were, into the predicate exception a strict liability cause of action that, at bottom, simply shifts the cost of injuries resulting from the discharge of lawfully manufactured and distributed firearms would, in our view, 'frustrate Congress's clear intention.'" (quoting *Hubbard v. United States*, 514 U.S. 695, 703 (1995)); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1222 (D. Colo. 2015) (barring a claim under Colorado's similar firearms preemption statute because "Plaintiffs are not seeking 'damages'").

Nor can the State recover "civil penalties" that the State admits are to "deter future violations and to punish illegal conduct, not to compensate the injured." Am. Compl. at 96, Prayer for Relief ¶ 4. By definition, civil penalties are not relief for harm for which a statutory violation "*was* a proximate cause" but are forward-looking deterrents based on potential future harm that has not yet occurred. *State ex rel. Grupp v. DHL Express (USA), Inc.*, 19 N.Y.3d 278, 286 (2012) ("[R]ather than redressing the harm actually suffered, the statute's imposition of civil penalties and treble damages evinces a broader punitive goal of deterring fraudulent conduct against the State."); *see also New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 599 (2d Cir. 2019) (similar). For similar reasons, the PLCAA prohibits disgorgement as a remedy; disgorgement of profits would not remedy any injury the State sustained as a proximate result of Defendants' alleged statutory violations. *See, e.g.*, *People v. Ernst & Young LLP*, 980 N.Y.S.2d 456, 457 (App. Div. 1st Dep't 2014); *Diamond v. Oreamuno*, 24 N.Y.2d 494, 497–99 (1969).

## III.     The State's Claims Must Be Dismissed Under the Federal Constitution.

### A.     The State's Interpretation of the Federal Definition of "Firearm" and New York General Business Law § 898-b Would Render Both Statutes Void for Vagueness.

Both the federal statutory definition of "firearm" and New York General Business Law § 898-b would be unconstitutionally vague if interpreted and applied in the manner that the State proposes. The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. States "violate[ ] this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Here, interpreting "firearm" as the State urges would render the relevant federal statute vague, inviting the type of ad-hoc, arbitrary enforcement that is barred by the Constitution. In addition, New York's law holding "gun industry member[s]" liable "for creat[ing], maintain[ing] or contribut[ing] to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product," N.Y. GEN. BUS. LAW § 898-b(1), similarly runs afoul of the Constitution's command.

The Court's application of the void for vagueness doctrine in this case should be especially exacting. The fact that the federal definition of "firearm" ultimately stems from a criminal statute gives the Court reason to review New York's interpretation of that statute through a "stricter" lens. *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010); *accord Leocal v. Ashcroft*, 543 U.S. 1, 12 n.8 (2004) (noting obligation to "interpret [a] statute consistently" when "it has both criminal and noncriminal applications"). Furthermore, when evaluating laws for vagueness, "laws that might infringe constitutional rights," as New York's Second Amendment infringing laws do, are subject to this Court's "strictest" review. *VIP of Berlin, LLC*, 593 F.3d at 186.

-41-

1. The State asks this Court to adopt an interpretation of "firearm" that is so capacious that it "violates the first essential of due process." *Johnson*, 576 U.S. at 595–96. After all, at the time of the sales by Defendants alleged in the complaint, that term had *never* before been understood to include the precursor products at issue in this case. *See United States v. Lanier*, 520 U.S. 259, 267 (1997) (holding "the touchstone" of the Court's due process analysis "is whether the statute, either standing alone or as construed, made it reasonably clear *at the relevant time* that the defendant's conduct was criminal" (emphasis added)). The State is thus seeking an "unforeseeable and *retroactive* judicial expansion of narrow and precise statutory language," which is a quintessential violation of due process. *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964) (emphasis added).[10] As discussed above, the Attorney General, the Governor, members of the New York Legislature, and ATF all understood and communicated to the public at large that these products were not "firearms." In other words, prior to this case, the term "firearm" was limited to cover what "people of ordinary intelligence" would have understood it to cover. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Now the State is asking this Court to endorse retroactive enforcement of the statute in a manner that wholly departs from the "common understanding and practices" that have underlain the statutory framework for years. *VIP of Berlin, LLC*, 593 F.3d at 187. To do so would be to

---

[10] As the Supreme Court explained in *Bouie*, "the objection of vagueness" based on "inadequate guidance to the individual whose conduct is regulated . . . could not be cured retrospectively by a ruling either of the trial court or the appellate court, though it might be cured *for the future* by an authoritative judicial gloss." 378 U.S. at 353 (emphasis added); *accord Lanier*, 520 U.S. at 266. There is thus a meaningful distinction between expanding the scope of prohibited conduct retroactively, as opposed to prospectively. Given that distinction, the Court can accept Defendants' void for vagueness argument in this case without deciding whether *prospective* application of ATF's new regulatory interpretation of "firearm" offends due process. *See* 87 Fed. Reg. 24652, 24674 (Apr. 26, 2022) (rejecting argument that new rule violates Ex Post Facto Clause because "penalties would result only from the future failure to mark" unfinished frames and receivers with serial numbers, and FFLs "have 60 days from the [August 2022] effective date of the rule to appropriately mark these" products).

interpret the statute in a manner that does not "convey[ ] sufficiently definite warning as to the proscribed conduct." *Id*. Rather, this Court would be empowering the State to leave the public in a guessing game as to which precursor parts meet its nebulous definition of "firearm" and then allow the State to seek "judicial enlargement" "retroactively." *Bouie*, 378 U.S. at 353.

Consider just one of the many guesses the public would need to make under the State's interpretation. The State provides no baseline as to the requisite level of effort (or lack thereof) required to say a precursor part is "readily" convertible. After all, the level of effort to mill or drill a precursor part will vary greatly between a novice, an amateur watching YouTube videos, or an experienced gunsmith. A precursor part which may be "readily" convertible for one individual with one set of skills may prove significantly cumbersome to convert for another. How should the public determine whether a precursor part has been made illegal or how much effort is required to keep a part on the right side of the law? The State does not say.

It is exactly this need to guess which products New York will retroactively penalize next that demonstrates why the State's interpretation would render the statute void for vagueness: "it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595. The Due Process Clause does not permit governments to subject Defendants to civil penalty when the meaning of its statutes is left up to an "ad hoc and subjective" resolution by "judges," "juries," and, in this case, attorneys general. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Not only would adopting the State's capacious and standardless interpretation create a "danger[ ] of arbitrary and discriminatory application," *id.*, it would "authorize[ ] *or even encourage*[ ]" it, *Hill*, 530 U.S. at 732 (emphasis added). After all, what else could result when the elected leaders of New York and the lead federal regulatory agency inform the public that certain products are not covered by existing law, "lull[ing] the potential defendant[s] into a false sense of security," *Bouie*, 378 U.S. at 352, but then the State

runs into court to allege that those products are covered and always have been? At bottom, to endorse the State's interpretation would permit it to penalize "a standardless sweep" of conduct and products based on the "personal predilections" of those empowered to pursue such actions in the name of the State. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). That is unconstitutional.

2. Separately, New York's fourth cause of action, seeking to hold Defendants liable for "endanger[ing] the safety or health of the public" under New York General Business Law § 898-b, is also unconstitutionally vague. In *Johnson*, the Supreme Court held a statute to be unconstitutionally vague when "two features" of the law, even if "tolerable in isolation," proved with "their sum" to "make[ ] a task . . . which at best could be only guesswork." *Johnson*, 576 U.S. at 597, 602. The same is true of New York's new "nuisance" law.

"In the first place," the law "leaves grave uncertainty about how to estimate" the requisite amount of danger to the "safety or health of the public" to be held liable. *Id.* at 597; N.Y. GEN. BUS. LAW § 898-b(1). "How does one go about deciding what kind of [danger]" needs to be involved—"[a] statistical analysis . . . ? A survey? Expert evidence? Google? Gut instinct?" *Johnson*, 576 U.S. at 597 (internal quotation omitted). The statute is silent. This suggests boundless discretion among prosecutors and the courts to decide when events have reached a heretofore unknown danger threshold. "The Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'" *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (quoting *United States v. Reese*, 92 U.S. 214, 221 (1876)).

New York's law then piles another uncertainty on top of that uncertainty with the statute posing further questions related to "how much . . . it takes to qualify" as "creat[ing], maintain[ing] or contribut[ing] to a condition" that leads to this unknown level of danger. *Johnson*, 576 U.S. at

598. It has long been held that the word "condition" "is broad enough to include *any* state or situation." *Am. Sugar-Ref. Co. v. United States*, 99 F. 716, 719 (2d Cir. 1900) (emphasis added). Thus, the statute might be applied to hold Defendants liable for any contribution to any state or situation that leads to an unknown threshold of danger. Does a sale of a product that is lawful in Ohio "contribute" to a "condition" in New York if that Ohio resident later brings it into New York? Or what if a member of the gun industry mistakenly sells only a handful of its products into the State? "Contribute" can mean something as broad as "to have a share in any act or effect." *Goetz v. Greater Ga. Life Ins. Co.*, 649 F. Supp. 2d 802, 823 (E.D. Tenn. 2009). To avoid such a capacious net to capture the unwary, New York negligence law limits liability to actions that, at the very least, are a "*substantial* contributing factor." *Prunier v. City of Watertown*, 936 F.2d 677, 679 (2d Cir. 1991) (emphasis added). Nevertheless, the State appears to reject any such limit here, leaving a "shapeless" provision making it not "so easy" to know the metes and bounds of what is and what is not unlawful. *Johnson*, 576 U.S. at 602.[11]

Moreover, this absence of any definite standard for what it takes to "contribute" and the law's apparent elimination of any established proximate causation requirement "would produce extreme results." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838 (1996). After all, "[i]n a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond." *Id.* Thus, the relevant law must establish the "point" when the "link" between events "has become too tenuous—that what is claimed to be consequence is only fortuity." *Id.* (internal quotation marks omitted). But the State has eschewed

---

[11] To the extent the Court construes the statute as requiring Brownells' actions to be a "*substantial* contributing factor," that (1) does not address the other vagueness issues with New York's law, *see supra*, and (2) New York has not even alleged any facts making such a claim about the substantiality of Brownells' actions plausible on its face, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

any line or providing any fair warning as to where the line may be. This is particularly problematic in an area where there are so many intervening actors that could be said to contribute to the State's claimed injuries. As the New York Court of Appeals has explained, the connection between firearms manufacturers, criminal wrongdoers, and those potentially injured by those wrongdoers is "remote, running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer [and] . . . often . . . numerous subsequent legal purchasers or even a thief." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 234 (2001). Such a standardless stretching of liability falls well short of the Due Process Clause's commands.

By combining indeterminacy about how to measure the level of danger to the public "with indeterminacy about how much" a defendant must contribute to that unknown level of danger, New York's law "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson*, 576 U.S. at 598.

### B. The State's Misrepresentation and False Advertising Claims Seek to Hold Defendants Liable for Expressions of Legal Opinion that Are Protected by the First Amendment.

The New York Attorney General's Office is known for taking controversial legal positions, and every person in this country is entitled to publicly disagree with the Attorney General's legal views without being sued for fraud or misrepresentation. Counts Six, Seven, Eight, Nine, and Ten all allege that Defendants are guilty of various forms of fraud or false advertising for publicly misrepresenting the legal requirements for purchasing unfinished frames and receivers. The only specific statement by Brownells identified in the complaint to support these claims is a comment on the Brownells website that unfinished frames and receivers are "still legal" under the recent

ATF regulation. Am. Compl. ¶ 50.[12] Accordingly, the State's misrepresentation claims rest on nothing more than a disagreement about whether Brownells is correct about the proper interpretation of federal law. However the Court resolves that dispute, Brownells' public expression of a legal opinion is entitled to the full protection of the First Amendment. Even when wrong, a layperson's good-faith expression of a legal opinion can never be actionable under the First Amendment.

"[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990). This protection for most statements of opinion ensures "uninhibited, robust, and wide-open" debate on "public issues" and adds "much to the discourse of our Nation," *id.*, especially on issues where "there is considerable disagreement," *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013). Thus, opinions about the law cannot "give rise to liability under state law for defamation, deceptive acts and practices, or unfair competition." *GeigTech E. Bay LLC v. Lutron Elecs. Co., Inc.*, 2019 WL 1768965, at *7 (S.D.N.Y. Apr. 4, 2019); *see also 600 W. 115th St. Corp. v. 600 W. 115th St. Condo.*, 580 N.Y.S.2d 307, 308 (App. Div. 1st Dep't 1992) (holding that statement about a legal "right to give or withhold requisite consent was in the nature of an opinion concerning a matter known to be in contention between the parties, and d[id] not constitute actionable fraud").

Courts have routinely held that opinions about legal issues are protected by the First Amendment and hence not actionable under federal or state law. Thus, a statement about whether a corporation was legally "licensed" to do business under California law was not actionable.

---

[12] The Amended Complaint also misattributes a third-party publication to Brownells. That publication says that unfinished frames "are not complete firearms" and so can be purchased without a Federal Firearms License. *See* Am. Comp. ¶ 211.

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). The same was true of representations about whether a taxi company was "authorized" under D.C. law to provide certain services, *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 488 (D.C. Cir. 1996), or whether ingredients in cough syrup were properly labeled "active" under an FDA regulation, *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 232 (3d Cir. 1990); *see also ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614 (9th Cir. 2016) (noting that statements indicating that products are "legal" or "DSHEA-compliant" are "generally inactionable opinion").

"Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Coastal Abstract Serv.*, 173 F.3d at 731. To hold otherwise, as the D.C. Circuit has explained, would be "unthinkable" because it would suggest that a company "can be held liable . . . for failing to anticipate the court's subsequent interpretation." *Dial A Car, Inc.*, 82 F.3d at 489. It would be particularly unthinkable here, where the alleged mischaracterization of federal law was consistent with then-authoritative ATF guidance and a district court recently preliminarily concluded that ATF's new definition of "frame or receiver" conflicts with 18 U.S.C. § 921(a)(3)'s plain meaning. *See VanDerStok*, 2022 WL 4009048, at *4.

The Supreme Court has drawn a similar line between potentially false statements of fact and inactionable statements of legal opinion in the securities fraud context. In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), the Court explained that the defendants' statements, "[t]o simplify their content only a bit," amounted to "we believe we are obeying the law," *id.* at 186. This was a "sincere statement of pure opinion" that was simply not actionable. *Id.* It did not matter that the plaintiffs claimed that the defendants'

"belief turned out to be wrong—that whatever the company thought, it was in fact violating anti-kickback laws." *Id*. When relief is limited to claims about "factual statements"—as the First Amendment requires in this case—a plaintiff cannot sue to hold a defendant liable merely by "second-guess[ing] inherently subjective and uncertain assessments." "In other words," causes of action for fraud or misrepresentation are not "an invitation to Monday morning quarterback" a defendant's legal views. *Id.*

The New York courts have adopted a similar view for over a century. "One who neither withholds nor misstates the facts cannot be adjudged guilty of fraud simply because the courts finally decide the law to be other than he claimed it to be." *Trs. of Amherst Coll. v. Ritch*, 151 N.Y. 282, 322 (1897); *accord Nat'l Conversion Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 627–28 (1969); *Cucchiaro v. Cucchiaro*, 627 N.Y.S.2d 224, 229 (N.Y. Sup. Ct. Orange Cnty. 1995) ("[L]iability cannot be founded upon an erroneous opinion of the status of the law"). To hold otherwise "would make nearly every unsuccessful litigant guilty of fraud." *Amherst Coll.*, 151 N.Y. at 322.

In the Amended Complaint, the State does not identify a single alleged misrepresentation by Brownells apart from the company's articulation of its opinions about the legality of its products. *See* Am. Compl. ¶ 50. Such "statements by laypersons," which reflect their interpretation of "the meaning of a statute or regulation are opinion statements." *Coastal Abstract Serv.*, 173 F.3d at 731. Or, as the Supreme Court put it in *Omnicare*, they are simply statements that amount to "we believe we are obeying the law." 575 U.S. at 186. As courts around the country have held, these evaluations are entitled to the full protection of the First Amendment and cannot be the basis for a cause of action. *See Coastal Abstract Serv., Inc.*, 173 F.3d at 731; *Dial A Car, Inc.*, 82 F.3d at 488; *Sandoz Pharms. Corp.*, 902 F.2d at 232.

Furthermore, even if this Court were to issue a ruling *today* that disagreed with Defendants' position on the substantive law and regulations that are disputed in this case, that would *still* be insufficient to hold Defendants liable for any statements of opinion about the law made in the past. Such a decision by this Court "would still not show that the law was clear at the time [Defendants] made the alleged misstatements. In other words, [New York] cannot pursue this lawsuit with a simple assertion that *current* . . . law is seen to be clear and unambiguous . . . based on an interpretation . . . that was issued *subsequent* to [Defendants'] statements." *Dial A Car, Inc.*, 82 F.3d at 489 (emphasis added); *see also Omnicare*, 575 U.S. at 186 (explaining that opinions of legality remain unactionable opinions "regardless whether [a plaintiff] can ultimately prove the belief wrong").

### C.     All the State's Claims Must be Dismissed Under the Second Amendment.

New York seeks to hold Defendants liable for selling unfinished frames and receivers and representing that the sale and possession of such unfinished frames and receivers is legal. But these claims founder because the laws purporting to prohibit the sale and possession of these precursor parts violate the Second Amendment. The Second Amendment, as the Supreme Court reaffirmed, "has always been widely understood" to have "codified a *pre-existing* right." *Bruen*, 142 S. Ct. at 2127 (cleaned up) (emphasis in original). As relevant to this case, that pre-existing right necessarily must encompass the making and repair of firearms by private individuals for personal use. The restriction on Defendants selling precursor parts to consumers in New York and consumers possessing those precursor parts burdens this practice and is without historical precedent. Accordingly, New York's restrictions are unconstitutional.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S.

CONST. amend. II. In *Bruen*, the Supreme Court articulated a framework for determining if firearms regulations are constitutional. That framework requires the Court to begin with the Second Amendment's text. If the plaintiffs' proposed course of conduct falls within that text, then that conduct is presumptively protected. *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all the key terms in *Heller* and *Bruen*. "The people" presumptively means "all Americans," "Arms" presumptively includes "all instruments that constitute bearable arms," and to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "When the Second Amendment's plain text covers an individual's conduct, the Constitution *presumptively protects* that conduct." *Bruen*, 142 S. Ct. at 2126 (emphasis added). Thus, after this prima facie textual showing has been made, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961) (emphasis added)).

The unfinished frames and receivers at issue in this case fall within the Second Amendment's text. While these parts themselves are not firearms, they are used in making firearms; they are thus necessary incidents to "Arms" under the Second Amendment. "Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The Second Amendment right to possess firearms thus must necessarily include the right to *acquire* firearms, whether by purchasing them or making them. *See Rigby v. Jennings*, 2022 WL 4448220, at *8 (D. Del. Sept. 23, 2022) ("[T]he right to keep and bear arms implies a corresponding right to manufacture arms."); *Ill. Ass'n of Firearm Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930

(N.D. Ill. 2014) (explaining that the Second Amendment "right must also include the right to *acquire* a firearm"). And the right to make a firearm must extend to the right to materials necessary to do so. The protection for "Arms" "would be toothless" if its protection did not extend to cover the making of those Arms and the precursor parts needed to create them. *Luis*, 578 U.S. at 27 (Thomas, J., concurring in judgment).

Since "Arms" necessarily covers the parts necessary to construct firearms for personal use, the burden falls on the State to "affirmatively prove" its ban on unserialized precursor parts for personal use "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. The State may do so by identifying analogous restrictions from history, but these restrictions must arise from the relevant historical time period. Because the scope of the Second Amendment was set in 1791, the Founding era is the only appropriate period for this Court's historical analysis. *See generally* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868 (working draft)*, (Oct. 1, 2022), *available at* https://bit.ly/3CMSKjw. That is because this Court is bound by two lines of Supreme Court precedent. The first mandates that the scope of the Second Amendment with respect to the Federal Government is based on the public understanding in 1791. *See, e.g.*, *Heller*, 554 U.S. at 634–35. The second establishes that incorporated Bill of Rights provisions mean the same thing when applied to the States and the Federal Government. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765–66 (2010). *Bruen* itself was another entry in a long tradition of these precedents because it too—notwithstanding dicta about an "ongoing scholarly debate"—treated evidence surrounding the Founding as generally dispositive of the contours of the incorporated Second Amendment. 142 S. Ct. at 2137–38 (noting Reconstruction era evidence has only been used as

"confirmation" of what "had already been established" by Founding era evidence); *see also Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. And the Founding is paramount.[13]

In this case, the history is one-sided. During the Revolution and the Founding, many Americans built and repaired arms themselves. In fact, "[w]hen the colonies faced major arms shortages throughout the war, domestic arms manufacturing filled the void," with documented instances of militia members building their *own* arms to serve in the War. Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. __, at *16 (Apr. 11, 2022), https://bit.ly/3APYZSx ("*American Tradition of Self-Made Arms*"). In the decades that followed, people employed in as diverse trades as blacksmiths, whitesmiths, tinsmiths, locksmiths, silversmiths, farmers, clock and watchmakers, carpenters, mechanics, cutlers, stonemasons, and merchants undertook the making of arms "as an additional occupation or hobby." *Id.* at *29–30. As one historian of the time has explained, "[g]un crafting was one of several ways Americans expressed their unrestrained democratic impulses at the time of the adoption of the Bill of Rights." *Id.* at *24 (quoting James B. Whisker, The Gunsmith's Trade 92 (1992)).

---

[13] Even if this Court also considers evidence from the Reconstruction era, it is immaterial in this case because New York will be unable to identify a tradition of firearms regulation analogous to its restrictions during any relevant time period.

Despite the longstanding practice of self-built arms, "[r]egulations on self-built arms are not longstanding. In fact, there were *no restrictions* on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. All such restrictions have been enacted within the last decade." *American Tradition of Self-Made Arms* at *40 (emphasis added). This absence is remarkable because "[p]rivately made firearms have been in existence since the first ignition system was developed close to 500 years ago, in the 1400s." Stop Gun Violence: Ghost Guns, Hearing before the Subcomm. on the Constitution, Comm. on the Judiciary ("Stop Gun Violence"), 117th Cong. 4 (2021) (statement of Ashley Hlebinsky, Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, President, The Gun Code, LLC), https://bit.ly/3cS6LDp (last visited Jan. 16, 2023). Thus, it is not as though the private manufacture of firearms for personal use is a new issue. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. Since the "Founders themselves could have adopted" restrictions similar to New York's "to confront" the perceived problem of privately made arms—but did not do so—that is dispositive evidence that the restrictions the State seeks to impose in this case are unconstitutional. *Id.*; *see also United States v. Price*, 2022 WL 6968457 at *5–*6 (S.D. W. Va. Oct. 12, 2022) (discussing lack of historical tradition of banning personal possession of firearms without serialization).[14]

---

[14] The Second Amendment provides a fully sufficient basis for dismissing not only the State's claims that defendants unlawfully sold unfinished frames but also the State's misrepresentation claims. For the misrepresentation claims to succeed, the State must establish that defendants made misleading statements about the legal regime that applies to unfinished frames—a burden the State cannot carry if the Second Amendment makes sale and possession of these products lawful. *See, e.g.*, *People v. Gen. Elec. Co.*, 756 N.Y.S.2d 520, 522–24 (App. Div. 1st Dep't 2003).

## IV.    The Amended Complaint Fails To Adequately Allege a Basis for the Imposition of Joint and Several Liability.

In the Amended Complaint's prayer for relief, the State seeks an order "direct[ing] Defendants, *jointly and severally*, to endow an abatement fund with sufficient capital to eliminate the public nuisance." The State thus asks the Court to hold each defendant responsible for alleged unlawful conduct by its codefendants. This is not only inequitable, but contrary to New York law.

The general rule of liability in New York is simple: an alleged wrongdoer is only "liable for all the proximate results of his own tortious act." *Suria v. Shiffman*, 67 N.Y.2d 87, 98 (1986). Even if there are allegations of "multiple tortfeasors," when the defendants "neither act in concert nor contribute concurrently to the same wrong," then the wrongs for which they are liable are considered "independent and successive"—they are not "joint tortfeasors." *Ravo ex rel. Ravo v. Rogatnick*, 70 N.Y.2d 305, 310 (1987).

Joint and several liability is an exception to this general rule that only applies in limited circumstances. Traditionally, plaintiffs must first demonstrate that "two or more tort-feasors act[ed] concurrently or in concert to produce a *single* injury." *Ravo*, 70 N.Y.2d at 309. (emphasis added). Failing that, plaintiffs must otherwise demonstrate that the separate actions of the alleged tortfeasors resulted in injuries, which, "because of their nature, are incapable of any reasonable or practicable division or allocation among multiple tort-feasors." *Id*. at 310. Even then, joint and several liability is only appropriate after plaintiffs have shown "that it would not violate traditional notions of fairness and justice to hold all defendants jointly and severally liable for the injury." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 447 F. Supp. 2d 289, 299 (S.D.N.Y. 2006).

Equitable considerations are particularly salient because the imposition of joint and several liability can have significant and disproportionate consequences when "each party is individually

liable to plaintiff for the *whole of the damage*." *Hecht v. City of New York*, 60 N.Y.2d 57, 62 (1983) (emphasis added). Such liability is thus only proper where it would be "logically inconsistent for one to be held liable while the other is not." *Cayuga Indian Nation of N.Y. v. Pataki*, 79 F. Supp. 2d 66, 71 (N.D.N.Y. 1999) (internal quotation mark omitted); *see also Ravo*, 70 N.Y.2d at 309 ("[I]n legal contemplation, there is a joint enterprise and a mutual agency, such that the act of one is the act of all and liability for all that is done is visited upon each."). Even when the injury associated with a public nuisance is indivisible, joint and several liability is still unavailable "where the injury imposed by each contributing actor individually does not constitute a *substantial* interference with a public right." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 493 (E.D.N.Y. 2003) (emphasis added).

In sum, joint and several liability may only be imposed if there (1) has been joint or concurrent conduct resulting in a single injury or separate conduct resulting in an indivisible injury and (2) the liability accords with equitable principles.

The State has not made adequate allegations that joint and several liability is appropriate. To begin with, the State has not demonstrated that the alleged harms from the various products Defendants sold at various times to various residents in various corners of the State has resulted in a "single" or "indivisible injury." *Ravo*, 70 N.Y.2d at 312. The State "simply assumes the existence of a single, indivisible injury." *Cayuga Indian Nation*, 79 F. Supp. at 72. Such assumptions are untenable because they leave Defendants without fair notice about the nature of the claims against them and resulting liability. For instance, the State "has been less than clear about whether the alleged injury is one injury to all of" New York or "whether each [locality]" in which these products have been sold "is individually (and indivisibly) injured." *MTBE*, 447 F.Supp.2d at 302 (holding plaintiffs could not pursue claim on injury to Suffolk County generally but could only

proceed on a "well-by-well basis").

To be sure, public nuisance liability is sometimes joint and several. But that is only when—in striking contrast to the Amended Complaint's studied vagueness—the alleged nuisance is readily understood to be a single injury or indivisible by its nature. *Ravo*, 70 N.Y.2d at 310. This is apparent, for instance, in nuisances found from hazardous waste stored on a single plot of land, *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1037 (2d Cir. 1985), the unauthorized excavation of a single street, *Irvine v. Wood*, 51 N.Y. 224, 230 (1872), the collapse of a single brick wall with portions standing on multiple landowners' lots, *Simmons v. Everson*, 124 N.Y. 319, 324 (1891), or the creation of an indivisible injury by dumping hazardous materials into water that becomes commingled in surface or ground water, *see e.g., State v. Schenectady Chems., Inc.*, 479 N.Y.S.2d 1010, 1012 (App. Div. 3d Dep't 1984); *State v. City of Yonkers*, 836 N.Y.S.2d 495 (N.Y. Sup. Ct. Westchester Cnty. 2004); *MTBE*, 447 F.Supp.2d at 302. This latter injury is indivisible because "the water with which each of the parties were instrumental in injuring . . . was one mass and inseparable, and *no distinction* can be made between the different sources from whence it flowed, so that it can be claimed that each caused a separate and distinct injury for which each one is separately responsible." *Slater v. Mersereau*, 64 N.Y. 138, 147 (1876) (emphasis added); *accord MTBE*, 447 F.Supp.2d at 302.

Even if the State had pleaded its injury with sufficient definiteness to determine the scope of the alleged basis for joint and several liability, unlike many other public nuisance claims, any potential injury traceable to Defendants is readily divisible. The injuries the State claims are "capable of division" based on the number of alleged shipments by each Defendant that are held to contribute to the public nuisance. *Cayuga Indian Nation*, 79 F. Supp. 2d at 72; *see also* RESTATEMENT (SECOND) OF TORTS § 840E, cmt. b ("[M]any nuisances are capable of

apportionment among two or more persons who contribute to them, because a reasonable basis can be found for dividing the harm done on the basis of the extent of the contribution of each party.").

The State's injuries are also "readily divisible" because they are "conveniently separable in point of time." *Cayuga Indian Nation*, 79 F. Supp. 2d at 72 (quoting RESTATEMENT (SECOND) TORTS § 433A, cmt. c). Every alleged sale of unfinished frames by the Defendants occurred at a different time. And the injuries are geographically divisible. The alleged shipments of qualified products by the Defendants occurred at separate addresses in separate communities that may be separately situated with respect to the injuries the State claims. *Cf. id.* (citing *United States v. Imperial Irrigation Dist.*, 799 F. Supp. 1052, 1069–70 (S.D. Cal. 1992) (apportioning liability amongst water districts for separate contributions to flood of tribal land); *cf.* RESTATEMENT (SECOND) OF TORTS § 840E, cmt. e (noting "character of the locality" in particular with respect to activities of "third persons"). As the New York Appellate Division has explained, these considerations of "temporal proximity" and "spatial proximity" are inseparable from the public nuisance inquiry. *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 197 (App. Div. 1st Dep't 2003). They also provide a ready manner to divide any injuries the State alleges.

Even if the State had alleged an indivisible injury, equity prohibits joint and several liability. First, when a plaintiff seeks to hold "multiple actors" liable "for the creation of a public nuisance . . . and where the injury imposed by each contributing actor individually does not constitute a substantial interference with a public right," joint and several liability may not be imposed. *AcuSport*, 271 F. Supp. 2d at 493 (citing *Chipman v. Palmer*, 77 N.Y. 51, 56 (1879)). That is the case here because the contribution of each of the Defendants is minimal. Indeed, the State has alleged only a tiny number of actual shipments by any of the Defendants, such that the individual responsibility of any Defendant is "very small." *MTBE*, 447 F.Supp.2d at 303. In these

circumstances, the *only* remedy available to the State is an injunction to restrain Defendants from further sales. *N.A.A.C.P.*, 271 F.Supp.2d at 493 (citing *Chipman*, 77 N.Y. at 56).

Second, application of joint and several liability would be at odds with traditional notions of fundamental fairness. Essentially, the State "wants the benefit of dispensing with product identification" of any individual qualified product sold by a Defendant and to simply bundle all manufacturers together to pay for alleged injuries that may or may not be traceable to any of their products. *MTBE*, 447 F.Supp.2d at 303. Joint and several liability may not be imposed simply as a matter of convenience or because dividing injuries "will not be an easy task." *Cayuga Indian Nation*, 79 F.Supp.2d at 72. It must be "impossible." *Id*. At the very least there must be "no good reason why each should not be liable for the whole." *MTBE*, 447 F.Supp.2d at 303. And, the individual nature of each Defendant's business shows why it should not be applied. Each of the Defendants has its own processes, sales policies and practices, and customers.

At bottom, to group the Defendants together would "summarily ignore" such concepts as "remoteness" of any individual Defendant from any particular injury, "proximate cause[,] and the significance of indisputable intervention of unlawful and frequently violent acts of criminals— over whom defendants have absolutely no control—who actually, directly, and most often intentionally, cause the cited harm." *Sturm, Ruger & Co.*, 761 N.Y.S.2d at 198–99; Am. Compl. ¶¶ 431–40 (citing exclusively criminal conduct by individuals). "Under these circumstances, it would be fundamentally unfair to hold these defendants jointly and severally liable." *MTBE*, 447 F.Supp.2d at 303.

## V. The First Amended Complaint Suffers from Additional Pleading Deficiencies That Require Dismissal.

### A. The State Fails to Allege the Specific Conduct That Purports to Support Its Misrepresentation Claims Against Brownells.

Counts Six, Seven, Eight, Nine, and Ten should be dismissed for failure to state a claim.

The State alleges in these Counts that each Defendant engaged in fraudulent conduct, deceptive acts and practices, and false advertising. Am. Compl. ¶¶ 504, 507, 512, 519, 525. Specifically, these Counts charge each Defendant with (1) "[m]isrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York," *id.* ¶¶ 504, 508, 526; (2) "[m]isrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York," *id.* ¶¶ 504, 508, 514, 526; (3) "[m]isrepresenting, directly by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods and that the guns sold need not be serialized or recorded," *id.* ¶¶ 504, 508, 516, 526; and (4) "[m]isrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell or possess ghost guns in the State of New York and/or City of New York," *id.* ¶ 515. But there are no allegations in the complaint that support these claims as to Brownells.

The complaint includes few allegations about statements or representations made by Brownells and fails to plausibly plead that Brownells violated the statutes cited in Counts Six through Ten. Although the complaint cites to an October 2017 press release and attempts to attribute the entire content of that press release to Brownells, the press release cited was authored and posted by another entity, "The Outdoor Wire." *See* Am. Compl. ¶¶ 210–211. Within the press release, only two quotations are attributed to Brownells: (1) "The Polymer80 80% frames are perfect for dedicated enthusiasts who enjoy building it themselves"; and (2) "Those who might have built their own AR-15 rifle can now make their very own custom pistol with just a few simple

tools." *Brownells Announces Exclusive Polymer80 Frames*, THE OUTDOOR WIRE (Oct. 11, 2017), https://bit.ly/3W9xr3g. The only other Brownells' statements or representations alleged in the complaint concern how to build a custom pistol using a Polymer80 frame. Am. Compl. ¶¶ 212–214. There are no statements, representations, or implications alleged that concern the legality of selling and possessing Brownells' firearms, ghost guns, or unfished frames and receivers in New York. Nor are there statements, representations, or implications alleged about FFLs, background checks, or the need to serialize and record sales. The State has failed to allege any Brownells' conduct to support Counts Six, Seven, Eight, Nine, and Ten and, as a result, the Court should dismiss those claims.

### B. The State's Claims Raised on "Information and Belief" Fail to Allege or Cite Sufficient Facts to Make Them Plausible.

This Court should dismiss Counts One, Two, Three, and Eleven for failure to state a claim. The State alleges in these claims that each Defendant violated Executive Law § 63(12) by engaging in the repeated and persistent illegal conduct of selling and shipping unfinished frames or receivers to New York consumers. Am. Compl. ¶¶ 468, 475, 483, 533. But these allegations are made "on information and belief" and the State fails to include facts that make these allegations plausible.

With respect to Brownells' conduct, the State's allegations made on "information and belief" appear to be based on a single paragraph in the complaint which alleges that the Attorney General obtained shipping data indicating that "from March 2020 to the present, Brownells sent approximately 1,300 packages to non-FFL addresses in New York State each month, with approximately 328 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in an undercover purchase." Am. Compl. ¶ 216. Despite this assertion, which demonstrates that about 75% of the packages Brownells sends to non-FFL addresses in New York are *not* believed to be unfinished frames based on their weight and dimensions, the complaint

goes on allege that Brownells sent "packages" and "shipments" to individuals in New York that "on information and belief" must have contained unfinished frames. *E.g.*, *id.* ¶¶ 228, 232; 250-51.

These allegations made "on information and belief" fall short of plausibly pleading that Brownells sold and shipped unfinished frames and receivers to the individuals cited in the complaint. The State fails to allege that any of the shipments or packages sold to these individuals were among those that roughly matched the weight and dimensions of known shipments of unfinished frames. Moreover, the State alleges that law enforcement executed search warrants on several residences to which Brownells allegedly mailed unfinished frames, yet there are no allegations that any items found within these homes were believed to be from Brownells. *E.g.*, *id.* ¶¶ 235-37, 244-45. Additionally, the complaint indicates that the State had access to Brownells' records, *id.* ¶ 226, making it implausible to merely allege illegal conduct "on information and belief." As a result, Counts One, Two, Three, and Eleven should be dismissed.

### C. The State Fails to Adequately Allege That Brownells Aided and Abetted Violations of State or Federal Law.

Counts Two, Three, and Eleven charge that Brownells aided and abetted the possession of a firearm by convicted persons, the possession of firearms by unlicensed persons, and the possession of unserialized firearms, respectively. The aiding and abetting alleged in Counts Two and Eleven purportedly violates both state and federal law, while the aiding and abetting alleged in Count Three violates only violates state law. Am. Compl. ¶¶ 473–474, 482, 529–530, 532. The State has failed to state a claim for aiding and abetting violations of these state and federal laws because it has not alleged the necessary *mens rea* requirements.

The allegations in Counts Two and Eleven fall short of stating a claim for aiding and abetting under federal law. The federal aiding and abetting standard includes a substantial *mens rea* requirement. *See United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996), *cert. denied*, 117 S.

Ct. 183 (1996); 18 U.S.C. § 2. To be culpable for aiding and abetting a violation of the federal laws cited in Counts Two and Eleven, Brownells "must have taken some *conscious action* that furthered the commission of the underlying crime" and must have "either acted or failed to act with the *specific intent* of advancing the commission of the underlying crime." *Pipola*, 83 F.3d at 562 (emphases added).

The State has not alleged a conscious action Brownells undertook to further the commission of aiding and abetting the possession of unserialized firearms or the possession of firearms by convicted persons, nor does the State allege that Brownells acted with specific intent to advance the commission of these crimes. While the complaint alleges that one individual to whom Brownells sent "packages" "was not legally permitted to possess a firearm," Am. Compl. ¶¶ 267, 269, the State fails to allege that Brownells consciously acted or acted with the specific intent to assist a felon in possessing a firearm. The State also fails to allege that this individual was not legally permitted to possess a firearm at the time that Brownells mailed him packages. *See id.* ¶ 269. Similarly, there are no allegations in the complaint that Brownells consciously acted or acted with specific intent to assist others in the possession of unserialized firearms.

As for the claims of aiding and abetting violations of State law, the State has also failed to adequately allege the appropriate *mens rea* requirements in Counts Two, Three, and Eleven. New York's standard for aiding and abetting requires the "mental culpability required for the commission" of the underlying offense. *See* N.Y. PENAL LAW § 20.00. "[A]n accomplice must have a shared intent, or 'community of purpose' with the principal." *Nelson v. Lilley*, 2022 WL 2872648, at *5 (W.D.N.Y. July 21, 2022) (quoting *People v. Carpenter*, 30 N.Y.S.3d 299, 301 (App. Div. 2d Dep't 2016)). The complaint fails to allege that Brownells had a shared intent or community of purpose with the individuals who unlawfully possessed guns.

This Court should dismiss Counts Two, Three, and Eleven for failure to state a claim because the State has failed to allege that Brownells acted with the requisite *mens rea* to aid and abet possession of firearms by convicted persons, possession of firearms by unlicensed persons, or possession of unserialized firearms.

### D. The State Fails to Allege Persistent Conduct in Its Executive Law § 63(12) Claims.

Insofar as Counts One and Eleven are rooted in violations of New York Penal Law §§ 265.60, 265.61, and 265.07, they fail to allege persistent conduct. As pleaded, the Executive Law § 63(12) claims brought in Counts One and Eleven are rooted in violations of New York law.[15] Count One alleges repeated and persistent violations of New York Penal Law §§ 265.60 and 265.61; and Count Eleven alleges repeated and persistent violations of Penal Law § 265.07. These statutory provisions did not become effective until April 26, 2022 and the bulk of the State's allegations as to Brownells predate April 26, 2022.

Executive Law § 63(12) applies to "repeated fraudulent or illegal acts" or "persistent fraud or illegality" in conducting business. The statute defines "repeated" as "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person," and persistent fraud or illegality "shall include continuance or carrying on of any fraudulent or illegal act or conduct." N.Y. EXEC. LAW § 63(12). The State fails to allege illegal acts or conduct that was continued or carried on over a stretch of time; instead, the complaint merely alleges individual incidents after April 26, 2022.

To plausibly plead an Executive Law § 63(12) violation in Counts One and Eleven the State must allege that Brownells repeatedly and persistently (a) sold or shipped unfinished frames

---

[15] Although the complaint also cites federal laws that allegedly serve as a basis for these claims, the State's Motion to Remand argues that "[t]he State can and will establish the affirmative elements of each of its eleven claims based on violations of New York law." Remand Mot. at 11.

or receivers into New York, and (b) aided and abetted the possession of unserialized firearms *after* April 26, 2022. But the complaint falls short. Few allegations concern Brownells' conduct *after* these laws went into effect on April 26, 2022: the Attorney General's Office investigators made an undercover purchase of an unfinished frame kit on May 27, 2022, Am. Compl. ¶ 218; and between June 24, 2020 and May 4, 2022—a window of time in which only nine days overlapped with the laws going into effect—Brownells sent "at least seven packages" to an individual at an address in the Bronx, *id.* ¶ 267. These two paragraphs of the complaint are insufficient to state a claim that Brownells engaged in repeated and persistent conduct in violation of state law by selling or shipping unfinished frames or receivers into New York, or aiding and abetting possession of unserialized firearms. This Court should dismiss Counts One and Eleven insofar as they are predicated on violations of New York law.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Amended Complaint in its entirety.

Dated: January 16, 2023

Respectfully Submitted,

/s/ David H. Thompson
**COOPER & KIRK PLLC**
David H. Thompson*
Brian W. Barnes*
1523 New Hampshire Ave., NW
Washington, DC 20036
Phone: (202) 220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
* Admitted *pro hac vice*

*Attorneys for Defendant Brownells, Inc., a/k/a Brownells or Bob Brownell's*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, <br><br> Plaintiff, <br><br> v. <br><br> ARM OR ALLY, LLC; BLACKHAWK MANUFACTURING GROUP, INC., A/K/A 80 PERCENT ARMS, INC. OR 80 PERCENT ARMS; SALVO TECHNOLOGIES, INC., A/K/A 80P BUILDER OR 80P FREEDOM CO.; BROWNELLS, INC., A/K/A BROWNELLS OR BOB BROWNELL'S; GS PERFORMANCE, LLC, A/K/A GLOCKSTORE OR GSPC; INDIE GUNS, LLC; KM TACTICAL; PRIMARY ARMS, LLC; RAINIER ARMS, LLC; AND ROCK SLIDE USA, LLC, <br><br> Defendants. | Case No. 22-cv-06124 (JMF) |

## RULE 5.1 NOTICE OF CONSTITUTIONAL CHALLENGE OF A FEDERAL STATUTE

Pursuant to Rule 5.1(a) of the Federal Rules of Civil Procedure, Defendants Salvo Technologies, Inc., a/k/a 80P Builder or 80P Freedom Co.; Brownells, Inc., a/k/a Brownells or Bob Brownell's; Primary Arms, LLC; and Rock Slide USA, LLC (collectively, "Defendants"), respectfully file this Rule 5.1 Notice of Constitutional Challenge of a Federal Statute with the Court. In Brownells' Motion to Dismiss Plaintiff's Amended Complaint filed with this Court on January 16, 2023 (ECF Nos. 89, 91), and as incorporated and fully adopted by Salvo, Primary Arms, and Rock Slide in their respective Motions to Dismiss (ECF Nos. 93–98), Defendants

challenge the constitutionality of the federal statutory definition of "firearm," arguing that interpreting "firearm" as Plaintiff urges would render the relevant federal statute unconstitutionally vague in violation of the Fifth Amendment and violate the Second Amendment (*see* ECF No. 91 at 41–44, 50–54).

In compliance with Rule 5.1(a)(2) of the Federal Rules of Civil Procedure, Defendants will serve the United States Attorney General with a copy of this Notice and the pleading questioning the federal statute's constitutionality via certified mail. A true and accurate copy of that notice is attached hereto as Exhibit A.

Dated: January 18, 2023          Respectfully Submitted,
       New York, New York

                              /s/ David H. Thompson
                              **COOPER & KIRK PLLC**
                              David H. Thompson*
                              Brian W. Barnes*
                              1523 New Hampshire Ave., NW
                              Washington, DC 20036
                              Phone: (202) 220-9600
                              dthompson@cooperkirk.com
                              bbarnes@cooperkirk.com
                              * Admitted *pro hac vice*

                              *Attorneys for Defendant Salvo Technologies, Inc.,*
                              *a/k/a 80P Builder or 80P Freedom Co., Brownells,*
                              *Inc., a/k/a Brownells or Bob Brownell's, Primary*
                              *Arms, LLC and Rock Slide USA, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that the foregoing was served upon all counsel of record using the CM/ECF system.

I further certify that the foregoing was served upon the United States Attorney General by mailing a copy thereof via Certified Mail to the United States Attorney General at the following address:

>    The Honorable Merrick B. Garland
>    United States Attorney General
>    U.S. Department of Justice
>    950 Pennsylvania Avenue, NW
>    Washington, DC 20530-0001

<u>/s/ David H. Thompson</u>
David H. Thompson*

* Admitted *pro hac vice*

*Attorney for Defendant Salvo Technologies, Inc., a/k/a 80P Builder or 80P Freedom Co., Brownells, Inc., a/k/a Brownells or Bob Brownell's, Primary Arms, LLC and Rock Slide USA, LLC*