**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Case No. 22-cv-06124 (JMF) |
| Plaintiff, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| ARM OR ALLY, LLC; BLACKHAWK MANUFACTURING GROUP, INC., A/K/A 80 PERCENT ARMS, INC. OR 80 PERCENT ARMS; SALVO TECHNOLOGIES, INC., A/K/A 80P BUILDER OR 80P FREEDOM CO.; BROWNELLS, INC., A/K/A BROWNELLS OR BOB BROWNELL'S; GS PERFORMANCE, LLC, A/K/A GLOCKSTORE OR GSPC; INDIE GUNS, LLC; KM TACTICAL; PRIMARY ARMS, LLC; RAINIER ARMS, LLC; AND ROCK SLIDE USA, LLC, | |
| Defendants. | |

**DEFENDANT BROWNELLS, INC.'S MOTION TO DISMISS**
**PLAINTIFF'S SECOND AMENDED COMPLAINT**

David H. Thompson*
Brian W. Barnes*
**COOPER & KIRK PLLC**
1523 New Hampshire Ave., NW
Washington, DC 20036
Phone: (202) 220-9600
* Admitted *pro hac vice*

*Attorneys for Defendant Brownells,*
*Inc., a/k/a Brownells or Bob*
*Brownell's*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................2

I.    Regulatory History of Unfinished Frames and Receivers. ..................................2

II.   Allegations Specific to Brownells. ........................................................................5

III.  The State's Second Amended Complaint................................................................7

ARGUMENT ..................................................................................................................8

I.    The State's Allegations that Defendants Violated Federal Law Fail Because the
Products at Issue Are Not "Firearms" Under 18 U.S.C. § 921. ...........................8

      A.    The Unfinished Frames and Receivers that the State Alleges Defendants Sold
            Are Not "Firearms" Under the Plain Meaning of 18 U.S.C. § 921(a)(3). ...............9

      B.    The State's Litigating Position on the Meaning of "Firearm" Is Contrary to
            Longstanding ATF Guidance and Repeated Assurances by New York State
            Officials................................................................................................................14

      C.    Unfinished Frame or Receiver "Parts Kits" Are Not "Firearms" Under Federal
            Law.......................................................................................................................18

      D.    Because the Unfinished Frames and Receivers at Issue in this Case Are Not
            "Component Parts" of Firearms, the Court Must Dismiss the State's Public
            Nuisance Claim.....................................................................................................20

II.   The State's Claims Are Barred by the Federal Protection of Lawful Commerce in
Arms Act. ............................................................................................................22

      A.    The PLCAA Prohibits Lawsuits Such as this One................................................22

      B.    The PLCAA's Predicate Exception Does Not Apply to Any of the State's
            Claims. ................................................................................................................24

            1.    The State Fails to Allege Any Knowing Violations. ..................................25

            2.    The SAC Fails to Allege a Violation of a Valid Predicate Statute. ...........29

                  a.    The State's Illegal Acts and Misrepresentation Claims Are
                        Based Upon Statutes of General Applicability.............................29

i

        b.     The State's Public Nuisance Claims are Unmoored Common Law Claims that the PLCAA Was Enacted to Prohibit.................32

    C.     The SAC Fails to Satisfy the Predicate Exception's Proximate Causation Requirement....................................................................................33

III.    The State's Negligence Per Se and Negligent Entrustment Claims Fail as a Matter of Law...........................................................................................................37

    A.     Negligence Per Se. ................................................................................37

    B.     Negligent Entrustment. .........................................................................39

IV.    The State's Claims Must Be Dismissed Under the Federal Constitution. ........................42

    A.     The State's Interpretation of the Federal Definition of "Firearm" and New York General Business Law § 898-b Would Render Both Statutes Void for Vagueness.............................................................................................42

    B.     New York's Public Nuisance Statute Violates the Dormant Commerce Clause Because It Discriminates Against Interstate Commerce.......................................47

    C.     The State Seeks to Hold Defendants Liable for Non-Actionable Statements of Opinion that Are Protected by the First Amendment.............................................50

    D.     All the State's Claims Must Be Dismissed Under the Second Amendment..........53

V.    The SAC Fails to Adequately Allege a Basis for the Imposition of Joint and Several Liability.....................................................................................................57

VI.    The SAC Suffers from Additional Pleading Deficiencies that Require Dismissal............62

    A.     The SAC Fails to Allege Any Conduct By Defendants that Occurred Within New York City, and New York Administrative Code § 10-314 Does Not Apply Extraterritorially.................................................................................62

    B.     The State Fails to Allege the Specific Conduct that Purports to Support Its Misrepresentation Claims Against Brownells.........................................................64

    C.     The State Fails to Adequately Allege that Brownells Aided and Abetted Violations of Local, State, or Federal Law. ..........................................................64

CONCLUSION.........................................................................................................65

## **TABLE OF AUTHORITIES**

**Cases**             **Page**

*600 W. 115th St. Corp. v. 600 W. 115th St. Condo.*,
 580 N.Y.S.2d 307 (1st Dep't 1992) .......................................................51

*Alix v. McKinsey & Co., Inc.*,
 23 F.4th 196 (2d Cir. 2022) ...............................................................34

*Allison Engine Co. v. U.S. ex rel. Sanders*,
 553 U.S. 662 (2008).........................................................................13

*Am. Sugar-Ref. Co. v. United States*,
 99 F. 716 (2d Cir. 1900)....................................................................46

*Anza v. Ideal Steel Supply Corp.*,
 547 U.S. 451 (2006).........................................................................34

*Aponte v. N.Y.C. Hous. Auth.*,
 153 N.Y.S.3d 582 (2d Dep't 2021).......................................................39

*Ashmore v. CGI Grp., Inc.*,
 923 F.3d 260 (2d Cir. 2019) ...............................................................12

*AT&T Mobility LLC v. Concepcion*,
 563 U.S. 333 (2011).........................................................................33

*Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*,
 984 F. Supp. 768 (S.D.N.Y. 1997).......................................................50

*Bittner v. United States*,
 143 S. Ct. 713 (2023)........................................................................44

*Bouie v. City of Columbia*,
 378 U.S. 347 (1964)...............................................................43, 44, 45

*Boule v. Hutton*,
 328 F.3d 84 (2d Cir.2003).................................................................53

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
 476 U.S. 573 (1986).........................................................................48

*Butler v. City of New York*,
 559 F. Supp. 3d 253 (S.D.N.Y. 2021) .....................................................3

*California Rest. Ass'n v. City of Berkeley*,
 2023 WL 2962921 (9th Cir. Apr. 17, 2023) ...........................................31

*Cangemi v. United States*,
 13 F.4th 115 (2d Cir. 2021) ...............................................................3, 4

*Cargill v. Garland*,
 57 F.4th 447 (5th Cir. 2023) ...............................................................15

*Carolina Cas. Ins. Co. v. Capital Trucking, Inc.*,
 523 F. Supp. 3d 661 (S.D.N.Y. 2021)................................................50, 51

*Casey v. Odwalla,*
   338 F. Supp. 3d 284 (S.D.N.Y. 2018) ................................................................. 3

*Cayuga Indian Nation of N.Y. v. Pataki,*
   79 F. Supp. 2d 66 (N.D.N.Y. 1999) ............................................. 58, 59, 60, 61

*Chambers v. Time Warner, Inc.,*
   282 F.3d 147 (2d Cir. 2002) ........................................................................ 3, 5, 6

*Chipman v. Palmer,*
   77 N.Y. 51 (1879) .................................................................................................. 61

*City of Chicago v. Morales,*
   527 U.S. 41 (1999) ................................................................................................. 46

*City of New York v. Beretta U.S.A. Corp.,*
   524 F.3d 384 (2d Cir. 2008) ................................................ 22, 25, 29, 30, 31, 33

*City of New York v. Milhelm Attea & Bros., Inc.,*
   550 F. Supp. 2d 332 (E.D.N.Y. 2008) ................................................................. 63

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
   173 F.3d 725 (9th Cir. 1999) ......................................................................... 51, 52

*Cook v. Schapiro,*
   871 N.Y.S.2d 714 (2d Dep't 2009) ...................................................................... 41

*Cucchiaro v. Cucchiaro,*
   627 N.Y.S.2d 224 (N.Y. Sup. Ct. Orange Cnty. 1995) ..................................... 52

*Daggett v. Keshner,*
   134 N.Y.S.2d 524 (1st Dep't 1954) ..................................................................... 38

*Dance v. Town of Southampton,*
   467 N.Y.S.2d 203 (2d Dep't 1983) ...................................................................... 38

*Dep't of Revenue of Ky. v. Davis,*
   553 U.S. 328 (2008) .............................................................................................. 49

*Dial A Car, Inc. v. Transp., Inc.,*
   82 F.3d 484 (D.C. Cir. 1996) .................................................................... 51, 52, 53

*Diamond v. Oreamuno,*
   24 N.Y.2d 494 (1969) ........................................................................................... 37

*District of Columbia v. Beretta U.S.A. Corp.,*
   940 A.2d 163 (D.C. 2008) .......................................................................... 34, 35, 36

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ........................................................................................ 54, 55

*Doron Precision Sys., Inc. v. FAAC, Inc.,*
   423 F. Supp. 2d 173 (S.D.N.Y. 2006) ................................................................... 6

*Dubai Islamic Bank v. Citibank, N.A.,*
   126 F. Supp. 2d 659 (S.D.N.Y. 2000) ........................................................... 37, 38

*Duffy v. Drake Beam Morin*,
    1998 WL 252063 (S.D.N.Y. May 19, 1998) ...................................................63

*Elliott v. City of New York*,
    95 N.Y.2d 730 (2001) ...................................................................................39

*Empire Merchs., LLC v. Reliable Churchill LLLP*,
    902 F.3d 132 (2d Cir. 2018) ..........................................................................34

*Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*,
    391 F.3d 401 (2d Cir. 2004) ............................................................................3

*Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*,
    2022 WL 4597526 (D. Mass. Sept. 30, 2022) ...............................................34

*Exxon Co., U.S.A. v. Sofec, Inc.*,
    517 U.S. 830 (1996) .......................................................................................47

*Fagan v. AmerisourceBergen Corp.*,
    356 F. Supp. 2d 198 (E.D.N.Y. 2004) ...........................................................38

*Finn v. Barney*,
    471 F. App'x 30 (2d Cir. 2012) ........................................................................3

*Flores-Figueroa v. United States*,
    556 U.S. 646 (2009) .......................................................................................26

*Freeman v. Quicken Loans, Inc.*,
    566 U.S. 624 (2012) .........................................................................................9

*Gain v. E. Reinforcing Serv.*,
    603 N.Y.S.2d 189 (3d Dep't 1993) ................................................................37

*GeigTech E. Bay LLC v. Lutron Elecs. Co., Inc.*,
    2019 WL 1768965 (S.D.N.Y. Apr. 4, 2019) ...................................................50

*German ex rel. German v. Fed. Home Loan Mortg. Corp.*,
    896 F. Supp. 1385 (S.D.N.Y. 1995) ...............................................................37

*Goetz v. Greater Ga. Life Ins. Co.*,
    649 F. Supp. 2d 802 (E.D. Tenn. 2009) .........................................................46

*Granholm v. Heald*,
    544 U.S. 460 (2005) .......................................................................................48

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .......................................................................................45

*Groden v. Random House, Inc.*,
    61 F.3d 1045 (2d Cir. 1995) ..........................................................................50

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009) .......................................................................................21

*Hamilton v. Beretta U.S.A. Corp.*,
    96 N.Y.2d 222 (2001) ......................................................................39, 40, 47

*Healy v. Beer Inst., Inc.*,
  491 U.S. 324 (1989) ...................................................................................49

*Hecht v. City of New York*,
  60 N.Y.2d 57 (1983) ..................................................................................58

*Hill v. Colorado*,
  530 U.S. 703 (2000)..............................................................................43, 45

*Hilton v. S.C. Pub. Rys. Comm'n*,
  502 U.S. 197 (1991) ...................................................................................15

*Hubbard v. United States*,
  514 U.S. 695 (1995)...................................................................................37

*Hughes v. Farrey*,
  817 N.Y.S.2d 25 (1st Dep't 2006) .............................................................12

*Ileto v. Glock, Inc.*,
  565 F.3d 1126 (9th Cir. 2009) .......................................................24, 32, 33

*Ill. Ass'n of Firearm Retailers v. City of Chicago*,
  961 F. Supp. 2d 928 (N.D. Ill. 2014) .........................................................54

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*,
  447 F. Supp. 2d 289 (S.D.N.Y. 2006)...........................................58, 59, 60, 61, 62

*In re Moody's Corp. Securities Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) .......................................................

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
  140 S. Ct. 768 (2020)..................................................................................28

*Irvine v. Wood*,
  51 N.Y. 224 (1872) .....................................................................................59

*Jefferies v. District of Columbia*,
  916 F. Supp. 2d 42 (D.D.C. 2013) .............................................................22

*Johnson v. United States*,
  576 U.S. 591 (2015)...................................................................42, 44, 45, 47

*Kamiel v. Hai St. Kitchen & Co. LLC*,
  2023 WL 2473333 (S.D.N.Y. Mar. 13, 2023) ...........................................63

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021) .........................................................................3

*Kolender v. Lawson*,
  461 U.S. 352 (1983).....................................................................................45

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) ........................................................................................42

*Lewis v. Jamesway Corp.*,
  737 N.Y.S.2d 657 (2d Dep't 2002) .............................................................38

*Liparota v. United States*,
  471 U.S. 419 (1985)......................................................................................25, 26

*Luis v. United States*,
  578 U.S. 5 (2016).........................................................................................54, 55

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013).................................................................................59

*McBoyle v. United States*,
  283 U.S. 25 (1931)............................................................................................44

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)...........................................................................................55

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990)..............................................................................................53

*Morehouse Enters., LLC v. BATFE*,
  2022 WL 3597299 (D.N.D. Aug. 23, 2022)......................................................13, 14

*N.A.A.C.P. v. AcuSport, Inc.*,
  271 F. Supp. 2d 435 (E.D.N.Y. 2003) .............................................................58, 61

*N.Y. Pet Welfare Ass'n, Inc. v. City of New York*,
  850 F.3d 79 (2d Cir. 2017)...................................................................................49

*Nastasi & Assocs., Inc. v. Bloomberg, L.P.*,
  2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022)........................................................34

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005)...........................................................................................17

*Nat'l Conversion Corp. v. Cedar Bldg. Corp.*,
  23 N.Y.2d 621 (1969).........................................................................................52

*Nat'l Shooting Sports Found. v. Platkin*,
  2023 WL 1380388 (D.N.J. Jan. 31, 2023) ..............................................27, 28, 33

*Nelson v. Lilley*,
  2022 WL 2872648 (W.D.N.Y. July 21, 2022).........................................................65

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ...................................................................2, 54, 55, 57

*New York v. United Parcel Serv., Inc.*,
  942 F.3d 554 (2d Cir. 2019).................................................................................37

*O'Neill v. Mermaid Touring Inc.*,
  968 F. Supp. 2d 572 (S.D.N.Y. 2013).....................................................................63

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)...............................................................................51, 52, 53

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
  720 F.3d 490 (2d Cir. 2013).................................................................................53

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
   761 N.Y.S.2d 192 (1st Dep't 2003) ...................................................36, 61, 62

*People v. Ernst & Young LLP*,
   980 N.Y.S.2d 456 (1st Dep't 2014) ....................................................................37

*People v. Gen. Elec. Co.*,
   756 N.Y.S.2d 520 (1st Dep't 2003) ....................................................................57

*Phillips v. Lucky Gunner, LLC*,
   84 F. Supp. 3d 1216 (D. Colo. 2015) .................................................................37

*Podpeskar v. Dannon Co.*,
   2017 WL 6001845 (S.D.N.Y. Dec. 3, 2017) ......................................................35

*Prescott v. Slide Fire Sols., LP*,
   341 F. Supp. 3d 1175 (D. Nev. 2018) ...................................................20, 21, 34

*Prunier v. City of Watertown*,
   936 F.2d 677 (2d Cir. 1991) ...............................................................................46

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ............................................................................................10

*Ravo ex rel. Ravo v. Rogatnick*,
   70 N.Y.2d 305 (1987) ..............................................................................57, 58, 59

*Rehaif v. United States*,
   139 S. Ct. 2191 (2019) ...............................................................................25, 26

*Republic Ins. Co. v. Michel*,
   885 F. Supp. 426 (E.D.N.Y. 1995) .....................................................................41

*Rigby v. Jennings*,
   2022 WL 4448220 (D. Del. Sept. 23, 2022) .......................................................54

*Rios v. Smith*,
   95 N.Y.2d 647 (2001) ..........................................................................................40

*Ruan v. United States*,
   142 S. Ct. 2370 (2022) ...............................................................................25, 26

*S. Dakota v. Wayfair, Inc.*,
   138 S. Ct. 2080 (2018) .........................................................................................48

*Safeco Ins. Co. v. Burr*,
   551 U.S. 47 (2007) .......................................................................................26, 27

*Sambrano v. Savage Arms, Inc.*,
   338 P.3d 103 (N.M. Ct. App. 2014) ....................................................................22

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
   902 F.2d 222 (3d Cir. 1990) ...............................................................................51

*Schwebel v. Crandall*,
   967 F.3d 96 (2d Cir. 2020) ..................................................................................16

*Screws v. United States*,
    325 U.S. 91 (1945) ...........................................................................................................28

*Simmons v. Everson*,
    124 N.Y. 319 (1891) .........................................................................................................60

*Slater v. Mersereau*,
    64 N.Y. 138 (1876) ...........................................................................................................60

*Sorto v. Flores*,
    660 N.Y.S.2d 60 (2d Dep't 1997) ....................................................................................41

*Soto v. Bushmaster Firearms Int'l, LLC*,
    202 A.3d 262 (Conn. 2019) .......................................................................................31, 32

*SPGGC, LLC v. Blumenthal*,
    505 F.3d 183 (2d Cir. 2007) .............................................................................................49

*Splawnik v. Di Caprio*,
    540 N.Y.S.2d 615 (3d Dep't 1989) ..................................................................................40

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ...............................................................................................3

*State ex rel. Grupp v. DHL Express (USA), Inc.*,
    19 N.Y.3d 278 (2012) .......................................................................................................37

*State of N.Y. v. Shore Realty Corp.*,
    759 F.2d 1032 (2d Cir. 1985) ...........................................................................................59

*State v. City of Yonkers*,
    836 N.Y.S.2d 495 (N.Y. Sup. Ct. Westchester Cnty. 2004) .............................................60

*State v. Schenectady Chemicals, Inc.*,
    479 N.Y.S.2d 1010 (3d Dep't 1984) ................................................................................60

*Suria v. Shiffman*,
    67 N.Y.2d 87 (1986) .........................................................................................................57

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
    648 F. App'x 609 (9th Cir. 2016) .....................................................................................51

*Timperio v. Bronx-Lebanon Hosp. Ctr.*,
    384 F. Supp. 3d 425 (S.D.N.Y. 2019) .........................................................................39, 40

*Trs. of Amherst College v. Ritch*,
    151 N.Y. 282 (1897) .........................................................................................................52

*U.S. Dep't of Treasury v. Fabe*,
    508 U.S. 491 (1993) .........................................................................................................30

*United States v. Harris*,
    838 F.3d 98 (2d Cir. 2016) .................................................................................................9

*United States v. Imperial Irrigation Dist.*,
    799 F. Supp. 1052 (S.D. Cal. 1992) ...........................................................................60, 61

*United States v. Lanier*,
    520 U.S. 259 (1997)................................................................42, 43

*United States v. Lopez*,
    514 U.S. 549 (1995)....................................................................48

*United States v. Morales*,
    280 F. Supp. 2d 262 (S.D.N.Y. 2003)..........................................11

*United States v. Pipola*,
    83 F.3d 556 (2d Cir. 1996)......................................................64, 65

*United States v. Price*,
    2022 WL 6968457 (S.D. W. Va. Oct. 12, 2022) ..........................57

*United States v. Reese*,
    92 U.S. 214 (1876)......................................................................46

*United States v. Ryles*,
    988 F.2d 13 (5th Cir. 1993) ........................................................11

*United States v. Thompson/Center Arms Co.*,
    504 U.S. 505 (1992)....................................................................14

*Universal Health Servs., Inc. v. United States*,
    579 U.S. 176 (2016)....................................................................28

*VanDerStok v. Garland*,
    2022 WL 4009048 (N.D. Tex. Sept. 2, 2022)...........13, 14, 18, 19, 20

*VanDerStok v. Garland*,
    No. 22-11071 (5th Cir.)................................................................5

*VanDerStok v. Garland*,
    No. 4:22-cv-691 (N.D. Tex.)........................................................5

*VIP of Berlin, LLC v. Town of Berlin*,
    593 F.3d 179 (2d Cir. 2010)..................................................42, 43, 44

*VIZIO, Inc. v. Klee*,
    886 F.3d 249 (2d Cir. 2018)........................................................49

## Constitutions and Statutes

U.S. Const. amend. II ............................................................................53

U.S. Const. art. VI, cl. 2.......................................................................22

15 U.S.C.

    § 7901(a)(3) ...........................................................................33, 34, 36
    § 7901(a)(4) ...............................................................................22, 23
    § 7901(a)(5) ...............................................................................22, 23
    § 7901(a)(6) ...................................................................22, 23, 36, 56
    § 7901(a)(7) ...................................................................28, 30, 31, 32, 53
    § 7901(a)(8) ...............................................................................23, 30, 31

§ 7901(b)(1) ...................................................................................................22
§ 7901(b)(2)–(3). ............................................................................................53
§ 7902(a) .................................................................................................22, 23
§ 7903(4) ...........................................................................20, 21, 27, 47, 48
§ 7903(5)(A) .......................................................................................23, 24, 34
§ 7903(5)(A)(i) ..............................................................................................24
§ 7903(5)(A)(ii) .......................................................................................24, 39
§ 7903(5)(A)(iii) ...........................................................24, 25, 27, 31, 33, 36
§ 7903(5)(A)(iv) ......................................................................................24, 27
§ 7903(5)(A)(v) .............................................................................................24
§ 7903(5)(A)(vi) ............................................................................................24
§ 7903(5)(A)(vii) ...........................................................................................27
§ 7903(5)(B) ...................................................................................................40
§ 7903(5)(C) ...................................................................................................39

18 U.S.C.

§ 2. ...................................................................................................................64
§ 921(a)(3) ...........................................................................................2, 20, 21
§ 921(a)(3)(B) .....................................................................................11, 12, 13, 19

26 U.S.C.

§ 5845(a) .........................................................................................................14
§ 5845(e) .........................................................................................................14

N.Y. Exec. Law § 63(12) ..................................................................................29

N.Y. Penal Law § 20.00 ...................................................................................65

N.Y. Public Health Law § 1399–*ll*(1) ...........................................................63

N.Y.C. Admin Code

§ 2-201 ...........................................................................................................62
§ 10-301(8). ...................................................................................................63
§ 10-301(22). .................................................................................................12
§ 10-314 .........................................................................................................12
§ 10-314(a). ..............................................................................................12, 62

N.Y. Gen. Bus. Law

§ 349. .........................................................................................................8, 31
§ 350. .........................................................................................................8, 31
§ 898-a(2). ...............................................................................................28, 49
§ 898-a(6). ...............................................................................................20, 47
§ 898-b(1). ...............................................................................................2, 27, 45
§ 898-b(2). ................................................................................................2, 27
§ 898-d ...........................................................................................................35

## **Rules and Regulations**

Fed. R. Evid. 201(b) ..........................................................................................3

87 Fed. Reg. 24652 (Apr. 26, 2022) ...............................................................................43

27 C.F.R.

    § 478.11.............................................................................................................18, 20
    § 478.12...................................................................................................................20
    § 478.12(c)..............................................................................................................19
    § 478.12(c)..........................................................................................................5, 17

## Other Authorities

App'x in Support of Polymer80, Inc.'s Br. in Support of Its Mot. to Intervene, Ex. F,
    *VanDerStok*, No. 4:22-cv-691 (N.D. Tex. Jan. 9, 2023), ECF No. 159 ..................18

*Are "80%" or "unfinished" receivers illegal?*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS
    & EXPLOSIVES (Apr. 6, 2020), https://bit.ly/2nlfssN ..............................................3

ATF Ruling 2015-1, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES
    (Jan. 2, 2015), https://bit.ly/3PheBo4 ..................................................................3

*Attorney General James Stops Sales of "Ghost Guns" Into New York*, N.Y. ATT'Y GEN.
    (July 15, 2020), https://on.ny.gov/3e0pehk ...........................................................16

Br. & Suppl. App. for Appellee, *Nat'l Shooting Sports Found., Inc. v. James*,
    No. 22-1374 (2d Cir. Jan. 6, 2023) ......................................................................35

*Brownells Announce Exclusive Polymer80 Frames for Glock-Style Pistols*, AMMOLAND
    (Oct. 10, 2017), https://bit.ly/3nYfyZG .........................................................7, 64

*Brownells Announces Exclusive Polymer80 Frames*, THE OUTDOOR WIRE
    (Oct. 11, 2017), https://bit.ly/3W9xr3g .........................................................7, 64

*The Brownells Story*, BROWNELLS,
    https://bit.ly/3ZBWmQ3 (last visited Apr. 19, 2023) ........................................5, 6

*Component*, WEBSTER'S SECOND.........................................................................21

*Constituent*, WEBSTER'S SECOND........................................................................21

*Governor Hochul Signs Legislation Package to Fight Gun Violence Epidemic*, NEW YORK
    STATE (Oct. 28, 2021), https://on.ny.gov/3R41SWF.............................................16

JAMES B. WHISKER, THE GUNSMITH'S TRADE (1992) ...................................................56

Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*,
    54 ST. MARY'S L. J. 35 (2023) ................................................................................56

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical
    Period for Historical Analogues is when the Second Amendment was Ratified in 1791,
    and not 1868 (working draft)*, (Oct. 1, 2022), *available at* https://bit.ly/3CMSKjw...............55

Mem. of Law in Support of Defs.' Mot. for Summ. J. & in Opp'n to Pls.' Mot. for
    Summ. J., *City of Syracuse v. ATF*, No. 20-cv-6885 (S.D.N.Y. Jan. 29, 2021),
    ECF No. 98........................................................................................2, 3, 4, 13, 14

NATIONAL FIREARMS ACT HANDBOOK § 7.2.4.1, ATF (Apr. 2009),
    https://bit.ly/3L7iHj9 ...........................................................................................4

*Open Letter to All Federal Firearms Licensees*, BUREAU OF ALCOHOL, TOBACCO,
   FIREARMS & EXPLOSIVES (Dec. 27, 2022), https://bit.ly/3GsTZqK .........................................5

*Part*, WEBSTER'S SECOND ...........................................................................................................21

*Readily*, WEBSTER'S SECOND .....................................................................................................11

*Regular Session – February 10, 2021 Transcript*,
   N.Y. STATE SENATE, https://bit.ly/3TAlaF8 ..........................................................................16

*Regular Session – June 8, 2021 Transcript*,
   N.Y. STATE ASSEMBLY, https://bit.ly/3KAtG2A ...................................................................16

Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J.,
   *City of Syracuse v. ATF*, No. 20-cv-6885 (S.D.N.Y. Mar. 19, 2021), ECF No. 114..............13

RESTATEMENT (SECOND) OF TORTS

   § 433A, cmt. c................................................................................................................60
   § 840E, cmt. b................................................................................................................60
   § 840E, cmt. e................................................................................................................61

Stop Gun Violence: Ghost Guns, Hearing before the Subcomm. on the Constitution,
   Comm. on the Judiciary ("Stop Gun Violence"), 117th Cong. 4 (2021) (statement of
   Ashley Hlebinsky, Curator Emerita & Senior Firearms Scholar, Cody Firearms
   Museum, President, The Gun Code, LLC), https://bit.ly/3cS6LDp .................................56, 57

*Weapon*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1944)......................................10

## INTRODUCTION

The fulcrum on which most of this lawsuit turns is the State's contention that Defendants sold "firearms" in violation of federal law that were later misused by third parties. But the products at issue in this case are not "firearms" under the plain text of the relevant federal statute and longstanding ATF guidance. Before this lawsuit, numerous New York state officials, including the Attorney General's Office, agreed. Yet now, in an extraordinary bait-and-switch, the State claims that Defendants' actions were *always* unlawful and seeks to impose retroactive liability for conduct Defendants took in strict compliance with then-authoritative guidance from ATF. Indeed, ATF previously determined that the very unfinished frames that New York alleges Defendants sold are not "firearms" under federal law. The fact that the State, as a matter of policy, would prefer that the law had been different in the past is not a basis for changing it after the fact.

To the extent this Court nevertheless holds (or assumes) that Defendants' products are "firearms," this case is a textbook illustration of why Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA"). Before Congress enacted the statute in 2005, the gun industry faced a tidal wave of public nuisance lawsuits in which plaintiffs asked the courts to use their common lawmaking power to regulate the industry. Although those suits had gained traction in some jurisdictions, Congress considered them manifestly unfair because they threatened to impose massive retroactive liability on the industry under adventuresome legal theories that the industry could not have foreseen at the time of the challenged conduct. Congress's solution was to confer immunity for all suits against the industry for the criminal or unlawful misuse of its products, with a handful of narrowly drawn exceptions. None of the exceptions apply, so this suit must be dismissed in its entirety.

The State's claims also run afoul of multiple federal constitutional doctrines. Retroactively

holding Defendants liable for sales that ATF long said were lawful would render the federal definition of firearms void for vagueness as applied to this case. The void for vagueness doctrine also requires dismissal of Count Three, which seeks to hold Defendants liable under New York's hopelessly amorphous prohibition on "contribut[ing] to a condition . . . that endangers the safety or health of the public" and requirement to "establish and utilize reasonable controls and procedures to prevent [their] qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. GEN. BUS. LAW § 898-b(1)–(2). New York's public nuisance statute also violates the Commerce Clause because it purports to regulate products that have been shipped in interstate commerce without reaching otherwise identical products that have not moved in interstate commerce. The State's misrepresentation claims (certain subparts of Count One, Counts Two, Four, and Five) all seek to hold Defendants liable for expressing opinions about a contested legal issue—unactionable speech that falls within the heartland of the First Amendment. And all of the State's claims depend on firearms regulations that can no longer survive Second Amendment scrutiny after the Supreme Court's decision last term in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

## **BACKGROUND**

### I.      **Regulatory History of Unfinished Frames and Receivers.**

The Gun Control Act ("GCA") defines a "firearm" as, in relevant part, "(A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). In determining whether an object is a firearm, ATF historically "consistently focused on the degree of machining [it] has undergone," Mem. of Law in Support of Defs.' Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. at 7, *City of Syracuse v. ATF*, No. 20-cv-6885 (S.D.N.Y. Jan. 29, 2021), ECF

No. 98 ("ATF *Syracuse* Br."),[1] *not* whether the object may be "readily converted" into a firearm. ATF recognized that certain "castings or machined/molded or other manufactured bodies . . . have not yet reached a stage of manufacture in which they are classified as 'firearm frames or receivers' under the [GCA] and implementing regulations." ATF Ruling 2015-1, at 1, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Jan. 2, 2015), https://bit.ly/3PheBo4. Even if a product required only "minor drilling and machining activities" to convert it into a frame or receiver, it nevertheless could still be categorized as an unfinished frame or receiver. *Id.*

In accordance with this approach, for objects colloquially known as "unfinished frames and receivers," ATF long held that "items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the GCA." *See Are "80%" or "unfinished" receivers illegal?*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Apr. 6, 2020), https://bit.ly/2nlfssN. This approach was reiterated by ATF in a 2013 Technical Bulletin that stated "[i]n order to preclude classification as a firearm, this area of the receiver, in addition to being solid, must not contain any holes or dimples for the trigger, hammer, and selector," an approach that is consistent with the focus on "the degree of machining to the

---

[1] In considering Brownells' motion to dismiss, the Court may consider documents where the SAC "relies heavily upon [their] terms and effect," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks and citation omitted), and "matters of which a court may take judicial notice," *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021), namely, as relevant here, facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," FED. R. EVID. 201(b). This document, as well as the other sources external to the SAC cited throughout the brief, are the types of "public documents or matters of public record," *Casey v. Odwalla*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018), that courts have judicially noticed, *see, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008); *Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 410 n.8 (2d Cir. 2004); *Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021); *Butler v. City of New York*, 559 F. Supp. 3d 253 (S.D.N.Y. 2021); *Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012).

frame or receiver." ATF *Syracuse* Br. at 32.

ATF also previously determined that Polymer80 PF940 unfinished frames are "not suffi-ciently complete to be classified as the frame or receiver of a firearm and thus . . . not . . . 'fire-arm[s]' as defined in the GCA." *See* Letter from Michael R. Curtis, Chief, Firearms Tech. Indus. Serv. Branch, ATF, to Jason David, The Law Offices of Davis & Assocs., at 4 (Jan. 18, 2017) (attached as Exhibit A).[2] The *only* unfinished frames or receivers that the SAC specifically alleges Brownells sold are Polymer80 PF940 unfinished frames. *See* SAC ¶¶ 277, 293–295. At the time of the alleged sales, operative ATF guidance said that this specific product is not a "firearm" under federal law.

In sum, ATF's longstanding position was that "an unfinished frame or receiver is not a firearm until it has been sufficiently machined such that it has reached a critical stage of manufac-ture, and that line-drawing exercise is necessarily carried out on a device-by-device basis." ATF *Syracuse* Br. at 9. And "unfinished frames or receivers that have not yet reached a critical stage of manufacturing—devices that are not designed to expel a projectile and still require many steps, tools, and expertise to be converted into such a device—are *not firearms* within the meaning of the GCA." *Id.* at 1 (emphasis added). ATF applied that framework and determined that Polymer80 PF940 unfinished frames—the specific product the State accuses Brownells of selling—are **not** firearms. *See* Ex. A at 4. Brownells and the gun industry more generally have spent years assidu-ously following this guidance.

On August 24, 2022, a new ATF rule addressing unfinished frames and receivers took

---

[2] Per ATF's publicly available handbook posted on its website, ATF classification letters may be "relied upon by their recipients as the agency's *official position* concerning the status of the firearms under Federal firearms laws." NATIONAL FIREARMS ACT HANDBOOK § 7.2.4.1, ATF (Apr. 2009), https://bit.ly/3L7iHj9 (emphasis added). The Court may thus take judicial notice of this handbook and the classification letter. *See Cangemi*, 13 F.4th at 124 n.4.

effect. The new rule departs in some respects from the agency's prior longstanding position. Under the new regulations, the terms "frame" and "receiver" include "a partially complete . . . or non-functional frame or receiver . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). The provision exempts from regulation "a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.* On December 27, 2022, ATF issued an open letter to the firearms industry in which it determined that, under the new rule, "partially complete Polymer80 . . . and similar striker-fired semiautomatic pistol frames, including, but not limited to, those sold within parts kits, have reached a stage of manufacture where they '*may readily be completed, assembled, restored, or otherwise converted*' to a functional frame." *Open Letter to All Federal Firearms Licensees* at 1, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Dec. 27, 2022), https://bit.ly/3GsTZqK; SAC ¶¶ 92, 94. ATF's new rule and the open letter are currently being challenged in another federal court. *See VanDerStok v. Garland*, No. 4:22-cv-691 (N.D. Tex.); *VanDerStok v. Garland*, No. 22-11071 (5th Cir.).

## II.   Allegations Specific to Brownells.

Brownells is an Iowa corporation with its headquarters in Grinnell, Iowa. SAC ¶ 12. The company was founded in 1939 by a devoted outdoorsman and shooter, Bob Brownells, who enjoyed repairing and customizing firearms. *See The Brownells Story*, BROWNELLS, https://bit.ly/3ZBWmQ3 (last visited Apr. 19, 2023).[3] For over 80 years, Brownells has diligently

---

[3] Because the SAC repeatedly relies on and references the Brownells website, *see* SAC ¶¶ 41–42, 46, 84–85, 113, 270, 280–282, the Court may consider the website when ruling on Brownells' motion to dismiss, *see Chambers*, 282 F.3d at 152–53. Furthermore, "[f]or purposes of

followed the law through numerous developments and has continued to provide quality gunsmithing tools and parts to the firearms industry. *Id.* Today, the company sells over 90,000 gun parts, tools, and supplies. *Id.* According to the SAC, Brownells is "a distributor of firearms and firearm parts who . . . repeatedly marketed and sold unfinished frames and receivers to New York residents." *Id.* ¶ 268.

The SAC alleges that Brownells "sent at least 43,213 packages into New York State between May 17, 2017 and June 28, 2022." *Id.* ¶ 272. "At least 2,480 of these shipments were sent into New York City after February 23, 2020," and "[a]t least 1,070 of these shipments were sent into New York State after April 26, 2022." *Id.* ¶¶ 273–274. The SAC alleges that "[a] significant portion of each group of [these] shipments . . . contained unfinished frames and receivers." *Id.* ¶ 275. The SAC also identifies a handful of particular shipments that Brownells allegedly sent into New York, which, "[o]n information and belief," contained "unfinished frames or receivers and the parts to make them into" firearms. *E.g.*, *id.* ¶¶ 316–317. The SAC further alleges the actual contents of a few shipments, which allegedly contained Polymer80 unfinished frames (individually or as part of a "kit"), "a part to build the gun," "sets of tools . . . to make unfinished frames into" firearms, or "accessories for the completed" firearms. *See id.* ¶¶ 277–278, 292–296, 306–309.

The SAC alleges that "Brownells regularly posted and maintained videos marketing unfinished frames or receivers and detailing how to build them on its YouTube account." *Id.* ¶ 289. Although the SAC cites two October 2017 press releases as examples of statements Brownells made related to unfinished frames or receivers, the press releases were authored and posted by

---

a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (internal quotation marks and citations omitted).

other entities. *Id.* ¶¶ 284–285. The only quoted statements *Brownells* made contained in each of the press releases are that (1) "The Polymer80 80 percent frames are perfect for dedicated enthusiasts who enjoy building it themselves"; and (2) "Those who might have built their own AR-15 rifle can now make their very own custom pistol with just a few simple tools." *Brownells Announces Exclusive Polymer80 Frames*, THE OUTDOOR WIRE (Oct. 11, 2017), https://bit.ly/3W9xr3g; *Brownells Announces Exclusive Polymer80 Frames for Glock-Style Pistols*, AMMOLAND (Oct. 10, 2017), https://bit.ly/3nYfyZG. The only other representations that the SAC alleges Brownells made concern factual descriptions of Polymer80 frames, *e.g.*, SAC ¶¶ 25, 84, and how to build a custom pistol using a Polymer80 frame, *id.* ¶¶ 41, 46, 280–282, 289.[4]

## III.    The State's Second Amended Complaint.

New York asserts seven claims against all Defendants, which fall into four groups: (1) illegal acts claims; (2) public nuisance claims; (3) misrepresentation claims; and (4) negligence claims. The SAC repeatedly lumps all Defendants together and makes general allegations about them collectively in an attempt to attribute the actions of one Defendant to all Defendants—though it does not allege any plausible connection between the Defendants. This makes it difficult to discern what allegations are intended to support which claims and which actions should be attributed to which Defendants.

First, the State asserts in Count One that Defendants have engaged in "repeated or persistent illegal conduct in the carrying on, conducting, or transaction of business" in violation of New York Executive Law § 63(12) by violating various local, State, and federal laws. SAC ¶¶ 596–600 (Defendants refer to each sequential bulleted paragraph in SAC ¶ 599 as Count One (a) through

---

[4] Many of the SAC's most important factual allegations are false, but Brownells assumes their accuracy for purposes of this motion.

Count One (m)). Second, the State alleges in Counts One, Two, Four, and Five that each Defendant engaged in fraudulent conduct, deceptive acts and practices, and false advertising. *Id.* ¶¶ 599, 604–605, 619–620, 622–623. Specifically, these Counts charge each Defendant with "[m]isrepresenting, directly or by implication, in their advertising and elsewhere" the legal status of unfinished frames and receivers in violation of Executive Law § 63(12), SAC ¶¶ 599, 601–605; General Business Law § 349, SAC ¶¶ 618–620; and General Business Law § 350, SAC ¶¶ 621–623. Third, the State alleges in Count Three that Defendants' alleged conduct violates New York General Business Law §§ 898-b(1) and 898-b(2), thereby constituting a public nuisance in New York under General Business Law § 898-c(1). SAC ¶¶ 606–617. Finally, the State brings two negligence claims: negligence per se (Count Six) and negligent entrustment (Count Seven). *Id.* ¶¶ 624–634.

## **ARGUMENT**

### I.     **The State's Allegations that Defendants Violated Federal Law Fail Because the Products at Issue Are Not "Firearms" Under 18 U.S.C. § 921.**

The SAC is replete with allegations that Defendants violated federal law by selling unfinished frames and receivers into New York State. Importantly, those allegations are not merely redundant with the State's claims that Defendants also violated New York State and City laws that purport to regulate unfinished frames and receivers. New York State's statutory prohibition on sales of these items only went into effect on April 26, 2022, SAC ¶¶ 96–97, and the effective date of the relevant New York City ordinance was February 23, 2020, *id.* ¶ 104. For alleged transactions that occurred prior to those dates, the State's main hook for claiming that Defendants violated the law is its theory that the unfinished frames and receivers that Defendants sold are "firearms" under 18 U.S.C. § 921(a)(3). That novel theory is irreconcilable with the plain meaning of the relevant statutory text, contradicts the longstanding position of ATF, and is contrary to many recent public statements by New York State officials—including the Attorney General's Office. Accordingly,

the Court should dismiss the State's claims to the extent that they are predicated on alleged violations of federal law.

### A. The Unfinished Frames and Receivers that the State Alleges Defendants Sold Are Not "Firearms" Under the Plain Meaning of 18 U.S.C. § 921(a)(3).

Under 18 U.S.C. § 921(a)(3), a "firearm" is: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" or "(B) the frame or receiver of any such weapon." Unfinished frames and receivers do not fit into either subpart of that definition.

1. The text of Section 921(a)(3)(A) says that a "firearm" includes three types of "weapons": (1) a weapon that "will . . . expel a projectile by the action of an explosive"; (2) a weapon that is "designed to . . . expel a projectile by the action of an explosive"; and (3) a weapon that "may readily be converted to expel a projectile by the action of an explosive." This portion of the statutory definition of "firearm" does not apply to the unfinished frames and receivers identified in the SAC for numerous reasons.

First, the Court should reject any argument that would categorize a frame or receiver of a weapon as a firearm under subsection (A) because such an interpretation would make subsection (B) wholly superfluous. *See United States v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016). Where parties offer two competing interpretations of a statute, the rule against superfluities "favors that interpretation which avoids surplusage" and redundancies. *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (emphasis omitted). Interpreting subsection (A) to encompass frames and receivers as well as their precursors would make the items covered by subsection (B) a mere subset of items already included in subsection (A). The Court should reject any interpretation of this statute that would make subsection (B) meaningless surplusage.

Second, interpreting subsection (A) to apply to unfinished frames and receivers would

9

violate the "commonplace of statutory construction that the specific governs the general." *RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). In subsection (B) of the

definition, Congress specifically spoke to the status of a "frame or receiver," and in resolving this

dispute the Court must therefore be guided by subsection (B) rather than the more general language

of subsection (A).

Third, subsection (A) does not apply to the unfinished frames identified in the SAC because

those unfinished frames are not themselves "weapon[s]." A "weapon" is "[a]n instrument of of-

fensive or defensive combat" or "anything used, or designed to be used, in destroying, defeating,

or injuring, an enemy, as a gun, a sword, a shield, etc." *Weapon*, WEBSTER'S NEW INTERNATIONAL

DICTIONARY (2d ed. 1944) [hereinafter WEBSTER'S SECOND]. An unfinished frame—essentially a

hunk of plastic or metal—does not satisfy this definition. It is neither an instrument of offensive

combat nor something used or designed to be used in injuring an enemy. And while it eventually

can become *part* of a weapon once it *is* finished, it is clear from context that subsection (A) does

not sweep so broadly, particularly given the *separate* identification of frames and receivers as

"firearms" in subsection (B).

Fourth, even if the Court disagrees with these initial points, the unfinished frames the State

identifies in the SAC still do not qualify as "firearm[s]" under subsection (A) because they "will"

not, are not "designed to," and may not "readily be converted to expel a projectile by the action of

an explosive." Unfinished frames are not in a state of completion that would allow the firing of a

projectile, so it plainly cannot be said that they "will" expel projectiles. Nor are unfinished frames

"designed to" expel projectiles because the purpose of an unfinished frame is not to expel a pro-

jectile. Instead, its purpose is to be incorporated into *something else* that is designed to expel a

projectile. The object that is designed to expel a projectile is the completed firearm—not its trigger,

its hammer, the grip, the front sight, or the frame. It is the combination of these objects into one that results in an item that is "designed to" expel a projectile. Interpreting the statute otherwise would have no limiting principle and would mean that *every part* of a gun—including the various screws and springs—is "designed" to expel a projectile and, therefore, would be deemed a "firearm" under subsection (A)—an absurd conclusion that cannot possibly be correct.

The State's own allegations demonstrate that the unfinished frames identified in the SAC cannot be "readily converted to expel a projectile." "Readily" means "[w]ith promptness; quickly; at once; easily." *Readily*, WEBSTER'S SECOND. As the SAC itself acknowledges, converting an unfinished frame into something that will expel a projectile requires additional parts, specialized tools to drill holes and mill parts, the knowledge of how to perform those precise actions, and time to complete the necessary steps. *See* SAC ¶¶ 38, 43–45, 48–50. This process is much more involved and fundamentally different from situations in which courts have determined that a firearm in a disassembled condition nevertheless remains a firearm under § 921(a)(3)(A) because the component parts could quickly and easily be put together into a complete firearm. *See, e.g.*, *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993) (determining that shotgun with the barrel removed from the stock that could have been assembled in thirty seconds or less was "readily converted" to an operable firearm and therefore was a firearm); *United States v. Morales*, 280 F. Supp. 2d 262, 272 (S.D.N.Y. 2003) (concluding that handgun parts that could be assembled into a working gun "in about five seconds" satisfied statutory definition of "firearm").

2. The unfinished frames at issue also do not qualify as "firearms" under 18 U.S.C. § 921(a)(3)(B), which covers "the frame or receiver of any such weapon." First, the State should be judicially estopped from arguing that unfinished frames are "the frame or receiver of any such weapon" under § 921(a)(3)(B) because the State has successfully prosecuted individuals by

proving that the unfinished frames they unlawfully possessed were *not* "the frame or receiver of a firearm." New York City Administrative Code § 10-314(a) prohibits "dispos[ing] of or possess[ing] an unfinished frame or receiver." Administrative Code § 10-301(22), in turn, defines an unfinished frame or receiver as, *inter alia*, "[a] piece of any material that *does not constitute the frame or receiver of a firearm.*" N.Y.C. ADMIN. CODE § 10-301(22) (emphasis added). Therefore, to successfully convict someone under this statute, the State must establish that the object at issue was *not* the frame or receiver of a firearm.

The State has done so at least once. In February 2023, Rene Loyola—who is discussed extensively in the SAC, *see, e.g.*, SAC ¶¶ 63, 134–142, 306–309—pleaded guilty to one count of violating N.Y. ADMIN. CODE § 10-314. *See* Certificate of Disposition, *People v. Loyola*, No. IND-71721-22/0001 (Apr. 19, 2023) (attached as Exhibit B). "A guilty plea is considered a valid final judgment where the factual elements of a transaction or incident are conclusively established." *Hughes v. Farrey*, 817 N.Y.S.2d 25, 28 (1st Dep't 2006). Because the State successfully prosecuted Loyola for possessing an unfinished frame under a law requiring the State to prove that an unfinished frame is *not* a frame, a position adopted by the court through the guilty plea, and is now arguing the exact opposite, namely, that an unfinished frame *is* a frame, the necessary factors for applying judicial estoppel are met. *See Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019). The Court should thus judicially estop the State from arguing that an unfinished frame is a frame under § 921(a)(3)(B).

Second, even if the Court does not judicially estop the State, unfinished frames do not fit under § 921(a)(3)(B) because they are not frames or receivers. As the SAC acknowledges, there are additional steps that need to be performed to convert an unfinished frame into a frame capable of being added into something that will expel a projectile by the action of an explosive. *See* SAC

¶¶ 38, 43–45, 48–50.

Nor can an unfinished frame satisfy Section 921(a)(3)(B) on the theory that it "may readily be converted" into "the frame or receiver of any such weapon." The phrase "may readily be converted" in Section 921(a)(3)(A) cannot be imported into subsection (B), where it does not appear. Congress had the power to insert the "readily converted" language into subsection (B) but chose not to do so. Accordingly, reading this language in one subpart of the definition into another would violate the principle that "[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008).

Indeed, this is the interpretation that ATF historically has adopted; it has asserted that the "readily be converted" language in subsection (A) has no application to subsection (B). ATF recently said in federal court filings that "ATF's position is that the 'readily be converted' language modifies only 'weapon' in Section 921(a)(3)(A) and not 'frame or receiver' in Section 921(a)(3)(B)." Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. at 6–7 & n.3, *City of Syracuse v. ATF*, No. 20-cv-6885 (S.D.N.Y. Mar. 19, 2021), ECF No. 114. ATF has also recognized that "the 'designed to' and 'readily be converted' language are only present in the *first clause* of the statutory definition [of firearm in Section 921(a)(3)]." ATF *Syracuse* Br. at 14.

A district court in the Northern District of Texas recently agreed with many of these arguments in determining, in preliminarily enjoining ATF from enforcing its new rule against a plaintiff in that case, that the newly promulgated definition of "frame or receiver" conflicts with 18 U.S.C. § 921(a)(3)'s plain meaning. *See VanDerStok v. Garland*, 2022 WL 4009048, at *4 (N.D. Tex.

13

Sept. 2, 2022), *appeal docketed*, No. 22-11071 (5th Cir. Nov. 3, 2022).[5] The court reasoned that "[t]hat which *may become* a receiver is not itself a receiver" and explained that "Congress could have included firearm parts that 'may readily be converted' to frames or receivers, as it did with 'weapons' that 'may readily be converted' to fire a projectile," but it did not. *Id.* "[I]t omitted that language when talking about frames and receivers." *Id.* The court thus concluded that Congress made the deliberate choice *not* to cover "parts that are 'designed' to be frames or receivers—that is, incomplete, nonfunctional frames or receivers." *Id.* This Court should conclude the same on the statutory interpretation question.[6]

### B. The State's Litigating Position on the Meaning of "Firearm" Is Contrary to Longstanding ATF Guidance and Repeated Assurances by New York State Officials.

1. Defendants' interpretation of the word "firearm" in § 921(a)(3) is consistent with the longstanding position of ATF. Again, the ATF historically focused on "the degree of machining a device has undergone" to determine whether the device is a firearm, ATF *Syracuse* Br. at 7, not whether the object may be "readily converted" into a firearm. And applying that framework, the ATF determined that Polymer80 PF940 unfinished frames—the specific product the State accuses Brownells of selling—as well as certain other unfinished frames and receivers that have not yet reached a critical stage of manufacturing are not firearms. *See* Ex. A at 4.

---

[5] *But see Morehouse Enters., LLC v. BATFE*, 2022 WL 3597299, at *5–9 (D.N.D. Aug. 23, 2022), *appeal argued*, No. 22-2854 (8th Cir. Mar. 14, 2023) (preliminarily concluding that ATF's new rule is not inconsistent with the statutory language of the GCA).

[6] While most of the State's claims allege violations of federal law that depend on the definition of "firearm" that appears in 18 U.S.C. § 921, Count One (f) alleges that Defendants aided and abetted violations of the National Firearms Act ("NFA"). *See* SAC ¶ 599. The NFA uses a different and much narrower definition of "firearm" that does not include ordinary semiautomatic handguns and rifles. *See* 26 U.S.C. § 5845(a), (e); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 507 (1992) (plurality). Because there is no allegation that Defendants sold "firearms" within the meaning of the NFA, Count One (f) must be dismissed to the extent it is based on violations of these federal laws.

The Court should give great weight to ATF's longstanding refusal to interpret the statute in the manner the State advocates in view of the significant reliance interests that built up around ATF's interpretation. *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202 (1991). Brownells and the gun industry more generally have spent years assiduously following ATF's guidance on this issue. Gun industry members should be encouraged to comply with ATF's guidance, not retroactively punished for doing so. ATF's longstanding interpretation also deserves additional weight because the federal statute at issue here can trigger not only civil but also criminal liability. *Cf. Cargill v. Garland*, 57 F.4th 447, 470–71 (5th Cir. 2023) (en banc) (applying the rule of lenity to federal definition of "machinegun").

Defendants' adherence to ATF's guidance regarding unfinished frames and receivers should be lauded, not derided through misleading comparisons between finished and unfinished frames and receivers. In its SAC, the State juxtaposes an unfinished pistol frame with a finished pistol frame and comments that they "are virtually identical." *See* SAC ¶¶ 35–36. On the contrary, the drilled holes and removed plastic are not a mere technicality but are essential to ATF's prior focus on the degree of machining a device has undergone to determine if the device is a firearm. The differences between the two objects in the State's picture reflect the balance that ATF struck between enforcing the federal regulatory regime applicable to firearms and preserving the ability of hobbyists to construct their own firearms. Indeed, in a January 18, 2017 classification determination letter, in which ATF concluded that Polymer80 PF940 unfinished frames are "not sufficiently complete to be classified as the frame or receiver of a firearm and thus . . . not a 'firearm' as defined in the GCA," the agency included a picture of the unfinished frame that is virtually indistinguishable from the unfinished frame picture the State uses in its SAC. *See* Ex. A at 4–5. The State's comparison at most evinces that the gun industry has been attentive to complying with

the directives of ATF and meeting the law's requirements with exacting precision.

2. Until recently, New York State officials, including the Attorney General, agreed with Defendants and ATF that the meaning of "firearm" under federal law does not reach unfinished frames or receivers like the ones at issue in this case. In a July 15, 2020 press release about cease-and-desist letters that the Attorney General sent to websites selling unfinished lower receivers, the Office wrote that "[a]side from a fully assembled firearm, the lower receiver is the only piece that is independently considered a firearm and is thus subject to federal regulation. However, an incomplete lower receiver—lacking certain holes, slots, or cavities—is not considered a firearm." *Attorney General James Stops Sales of "Ghost Guns" Into New York*, N.Y. ATT'Y GEN. (July 15, 2020), https://on.ny.gov/3e0pehk.[7] In debating the Webster Act, legislators stated that unfinished frames and receivers "aren't considered to be firearms," *Regular Session – February 10, 2021 Transcript* at 673, N.Y. STATE SENATE, https://bit.ly/3TAlaF8 (statement of sponsor Sen. Hoylman), and that one can "legally have a ghost gun in New York State under current law," *Regular Session – June 8, 2021 Transcript* at 126, N.Y. STATE ASSEMBLY, https://bit.ly/3KAtG2A (statement of sponsor Rep. Rosenthal); *see also id.* at 164–65 (sponsor Rep. Lavine stating that the ATF "does not view these . . . ghost gun kits as being illegal, and they're not illegal in New York State"). During the signing ceremony for the laws, Governor Hochul asserted that the bills she was signing "make it a crime to sell the unfinished frames or receivers" and that "[r]ight now, that has not been illegal." *Governor Hochul Signs Legislation Package to Fight Gun Violence Epidemic*, NEW YORK STATE (Oct. 28, 2021), https://on.ny.gov/3R41SWF.

---

[7] The Court should equitably estop the State from arguing that Defendants' products are "firearms" under federal law based on this statement. *See Schwebel v. Crandall*, 967 F.3d 96 (2d Cir. 2020). The Attorney General—the State's chief legal officer—publicly stated that unfinished receivers are not firearms under federal law. New York cannot now change its view and retroactively punish Defendants for their past conduct.

Accordingly, it appears to have been the view of the very New York officials who are bringing this case that until certain laws became effective in New York in April 2022, Defendants' products *were not* illegal. Indeed, the combination of passing new legislation designed to prohibit certain unfinished frames or receivers with the various officials' statements strongly supports the conclusion that Defendants' alleged sales of the products at issue in this case were not prohibited at the time those sales occurred.

3. ATF recently promulgated a new rule addressing unfinished frames and receivers that in some respects differs from the agency's prior longstanding position. Under the new regulations, the terms "frame" and "receiver" include "a partially complete . . . or nonfunctional frame or receiver . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c).

ATF's new rule does not undermine the argument that Defendants' products are not firearms for three reasons. First, all of the conduct that the State alleges Defendants engaged in occurred prior to the August 24, 2022 effective date of ATF's new rule. Defendants cannot be held liable under regulatory definitions that were not in effect at the time. The Court can hold that Defendants' products were not firearms prior to ATF's new rule taking effect without determining the products' status after the rule took effect. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005). But second, even under the new rule's definitions, Defendants' products are not "readily . . . converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). The regulations define "readily" as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state," and lists eight factors "relevant in making this determination," including how long it takes to finish the process, how difficult it is to do so, what knowledge and

skills are required, what tools are required, whether additional parts are required, and how easily those parts can be obtained. *Id.* § 478.11. As the SAC acknowledges, however, converting an unfinished frame into something that will expel a projectile requires additional parts, specialized tools to drill holes and mill parts, the knowledge of how to perform those precise actions, and time to complete the necessary steps. SAC ¶¶ 38, 43–45, 48–50. Defendants' products are thus not "readily . . . converted" under ATF's definition.[8] Third, as explained above, a district court recently preliminarily concluded that ATF's new definition of "frame or receiver" conflicts with 18 U.S.C. § 921(a)(3)'s plain meaning. *See VanDerStok*, 2022 WL 4009048, at *4. This Court should reject ATF's rule for similar reasons.

### C.   Unfinished Frame or Receiver "Parts Kits" Are Not "Firearms" Under Federal Law.

1. The SAC is nebulous in alleging what products aside from unfinished frames or receivers Brownells purportedly sold into New York. The State alleges that Brownells sold and shipped a "Polymer80 PF940CV1 Glock-compatible pistol frame, along with a part to build the gun." SAC ¶ 294. The State does not explain in detail, however, precisely what items were included with these products. But as described in the SAC, an unfinished frame parts kit seems to include an unfinished frame or receiver, some "part" that would be required to convert that unfinished frame or receiver into a frame, and perhaps a "lower parts kit," imprecisely defined as "containing the parts necessary to make [an unfinished frame] the fully-functional lower part of a handgun." *Id.* ¶ 255. Such

---

[8] For the reasons explained in the text, the ATF's determination in its December 27, 2022 open letter to the firearms industry that Polymer80 unfinished frames and similar products *are* "readily . . . converted" under ATF's definition is wrong. Additionally, the lawfulness of the letter is currently being litigated in federal court. *See* App'x in Support of Polymer80, Inc.'s Br. in Support of Its Mot. to Intervene, Ex. F, *VanDerStok*, No. 4:22-cv-691 (N.D. Tex. Jan. 9, 2023), ECF No. 159.

an unfinished frame parts kit is not a "firearm" under federal law.[9]

First, an unfinished frame parts kit is not "any weapon . . . designed to or [that] may readily be converted to expel a projectile by the action of an explosive" because such a kit is not itself a weapon. *See VanDerStok*, 2022 WL 4009048, at *6. Section 921(a)(3)(A) is clear: it is a *weapon* that can be readily converted to expel a projectile that is a firearm, not the objects that can eventually be assembled into a weapon that can readily be converted to expel a projectile. Indeed, if the unassembled parts of a "weapon" were firearms under Section 921(a)(3)(A), then there would have been no need for the statute separately to include "the frame or receiver" of a weapon within the definition of a firearm under Section 921(a)(3)(B). "The statutory context repeatedly confirms that Congress intentionally chose not to regulate 'weapon' parts generally." *Id.*

Second, an unfinished frame parts kit is not a weapon that may "readily be converted to expel a projectile by the action of an explosive." None of the "kits" that the SAC describes include all the parts necessary to manufacture an operable firearm. At most, the "kit" might readily be converted into a frame, but that is *not* the same as readily being converted into a weapon that will expel a projectile by the action of an explosive, *i.e.*, an operable firearm.

Third, an unfinished frame parts kit is not "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3)(B). As explained above, the unfinished frames at issue in this case—and, logically, the parts kits that include them—do *not* fit this definition because they are not frames or receivers. There are additional steps that need to be performed to convert the unfinished frame contained in the parts kit into a frame capable of being added into something that will expel a projectile by the action of an explosive. And the Court should reject any argument that attempts to

---

[9] To the extent the State alleges that other Defendants sold unfinished frame parts kits as well, none of those "parts kits" are firearms under federal law either, for the same reasons explained elsewhere in this brief.

import the "may readily be converted" language from Section 921(a)(3)(A) into (B) because, as also explained above, it would defy bedrock canons of statutory interpretation.

2. To be sure, ATF's recently promulgated rule adopts a different view of unfinished frame parts kits. Under 27 C.F.R. § 478.12(c), the terms "frame" and "receiver" include "a frame or receiver parts kit . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." As a consequence, because Section 921(a)(3)(B) defines a firearm as "the frame or receiver of any such weapon," an unfinished frame parts kit *is itself* a firearm according to the new regulation.

Nevertheless, the plain meaning of Section 921(a)(3) mandates a different interpretation, and this Court should therefore reject ATF's position to the contrary. There are strong reasons why ATF's rule is invalid as a matter of law, and indeed, in recently preliminarily enjoining ATF from enforcing certain provisions of 27 C.F.R. §§ 478.11 and 478.12 against a plaintiff, another district court concluded that the plaintiff was likely to succeed on the merits of its claims that including "weapon parts kits" in its definition of "firearm" exceeded ATF's authority. *See VanDerStok*, 2022 WL 4009048, at *6–7. But even if this Court disagrees, again, all the conduct that the State alleges Defendants engaged in occurred prior to the effective date of ATF's new rule. Defendants cannot be held liable under a regulatory interpretation that was not in place at the time.

**D.  Because the Unfinished Frames and Receivers at Issue in this Case Are Not "Component Parts" of Firearms, the Court Must Dismiss the State's Public Nuisance Claim.**

Count Three of the SAC alleges that Defendants violated New York General Business Law § 898-b, thereby resulting in a public nuisance under § 898-c, through sales of "[q]ualified product[s]"—a term that has "the same meaning as defined in 15 U.S.C. section 7903(4)." N.Y. GEN. BUS. LAW § 898-a(6). The cross-referenced federal statute, in turn, defines "qualified product" as "a firearm" under 18 U.S.C. § 921(a)(3) or "a component part of a firearm or ammunition." 15

U.S.C. § 7903(4). As the discussion above demonstrates, unfinished frames are not "firearms" under federal law. To the extent the Court concludes that unfinished frames are also not "component part[s]" of a firearm, the Court must therefore dismiss Count Three of the SAC.

The Court should hold that the unfinished frames and receivers at issue in this case are not "component part[s]" under 15 U.S.C. § 7903(4).[10] The statute does not define "component part," so the Court "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76 (2009). And according to that ordinary meaning, because unfinished frames and receivers do not serve to "form, compose, or make up" firearms, nor are they "one of the portions" into which firearms may be divided, they are not "component parts" of firearms. *See Component*, *Constituent*, *Part*, WEBSTER'S SECOND.

This argument from plain meaning finds support in the overarching statutory structure. The federal definition of "firearm" includes "the frame or receiver of any" "weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). If, as ATF long maintained, the products at issue in this case are not far enough along in the manufacturing process to qualify as "frame[s] or receiver[s]" under that definition, it is difficult to see how these same products could qualify as "component part[s]" of "firearm[s]." 15 U.S.C. § 7903(4).

Case law also supports this interpretation. When determining whether other products qualify as "component part[s]" of firearms covered by 15 U.S.C. § 7903(4), courts have asked whether the item in question is necessary for a firearm to function. *Prescott v. Slide Fire Sols., LP*, 341 F.

---

[10] As permitted by Federal Rule of Civil Procedure 8(d)(3), this argument is presented in the alternative to the PLCAA defense presented later in this brief.

Supp. 3d 1175, 1188–89 (D. Nev. 2018); *Sambrano v. Savage Arms, Inc.*, 338 P.3d 103, 105 (N.M. Ct. App. 2014). Every firearm requires a *finished* frame or receiver to fire; firearms cannot function using unfinished frames.

## II. The State's Claims Are Barred by the Federal Protection of Lawful Commerce in Arms Act.

To the extent the Court concludes that unfinished frames and receivers are "firearms" or "component part[s]" of firearms, all of the State's claims must be dismissed under the PLCAA. 15 U.S.C. § 7902(a). In 2005, Congress enacted the PLCAA in response to a cascade of lawsuits in New York and other states against firearms manufacturers. Congress explained its express "purpose" was "[t]o prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products . . . for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." *Id.* § 7901(b)(1). In other words, to prohibit the precise claims that the State now wrongfully attempts to pursue in this case. Because the State's claims are predicated on alleged criminal, unlawful misuse or possession of products covered by the PLCAA, this case is a prohibited "qualifying civil action" under the PLCAA. *See, e.g.*, SAC ¶¶ 1, 54, 109, 292–369 (describing criminal and unlawful use of Defendants' products). The claims for which the PLCAA confers immunity must be dismissed with prejudice. U.S. CONST. art. VI, cl. 2; *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 404 (2d Cir. 2008) (instructing district court to "enter judgment dismissing the case as barred by the PLCAA"); *Jefferies v. District of Columbia*, 916 F. Supp. 2d 42, 46–47 (D.D.C. 2013).

### A. The PLCAA Prohibits Lawsuits Such as this One.

As explicitly stated in the PLCAA, Congress found that the firearms industry is "heavily regulated," "that imposing liability on an entire industry for harm that is solely caused by others is

an *abuse of the legal system*," and that,

> businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition . . . *are not*, and *should not*, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

15 U.S.C. § 7901(a)(4), (5), (6) (emphasis added). Too often, Congress found, such lawsuits were designed to impermissibly circumvent Congress to "regulate interstate and foreign commerce through judgments and judicial decrees." *Id.* § 7901(a)(8).

To that end, Congress provided in the PLCAA that "[a] qualified civil liability action *may not be brought in any Federal or State court*." *Id.* § 7902(a) (emphasis added). By forbidding "qualified civil liability action[s]," Congress generally prohibited any,

> civil action . . . brought by any person against a manufacturer or seller of a qualified product . . . for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party.

*Id.* § 7903(5)(A). Only if such an action falls within one of the PLCAA's narrowly drawn exceptions may such a cause of action proceed.

It is evident from the face of the SAC that the State's claims are prohibited "qualified civil liability action[s]" under the PLCAA. *See id.* First, the State itself claims that the products sold by Defendants are "qualified product[s]" under the PLCAA (they are not, *see supra*). *See* Mem. of Law in Support of the N.Y. State Att'y Gen.'s Mot. for Remand at 2, 13–14 (Aug. 17, 2022), ECF No. 43. Second, the State's claims are predicated upon the underlying alleged wrongdoing of the *purchasers* of the products—*i.e.*, by impermissible possession or use of the products. Indeed, the SAC expressly recounts in detail facts concerning the individual purchasers, including facts about the purchasers who were "indicted" and "pled guilty" to crimes. *See, e.g.*, SAC ¶¶ 140, 196, 230 299. Accordingly, the SAC seeks damages and other remedies from Defendants "resulting from

the criminal or unlawful misuse" of their products. *See* 15 U.S.C. § 7903(5)(A).

Moreover, the qualified civil liability action at bar is exactly what the PLCAA sought to prevent. The State is transparent in the SAC to broadcast its intent to use this lawsuit to achieve impermissible legislative goals, which is precisely what the PLCAA was intended to prevent. The SAC asserts that the underlying animating goal of this lawsuit is to "fix" an "avoidable crisis." *See* SAC ¶¶ 56–69. This verbiage makes plain that the lawsuit is little more than an invitation by the State asking this Court to assist the State in achieving the Attorney General's political and public policy aims. Congress foresaw this precise maneuver and expressly prohibited it.

**B.    The PLCAA's Predicate Exception Does Not Apply to Any of the State's Claims.**

The PLCAA provides six limited exceptions from its express prohibition on qualified civil liability actions. *See* 15 U.S.C. §§ 7903(5)(A)(i)–(vi). Among these are certain actions brought by the Attorney General of the United States, *id.* § 7903(5)(A)(vi); product liability actions based on defects in design or manufacturing, *id.* § 7903(5)(A)(v); actions by a person "directly harmed" by an illegal transfer under 18 U.S.C. § 924(h); actions for "breach of contract or warranty," 15 U.S.C. § 7903(5)(A)(iv); actions for "negligent entrustment or negligence per se," *id.* § 7903(5)(A)(ii);[11] and actions in which the defendant "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought," *id.* § 7903(5)(A)(iii). These exceptions are narrowly drawn and demonstrate that "Congress clearly intended to preempt common-law claims, such as general tort theories of liability." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135 (9th Cir. 2009).

None of the PLCAA's exceptions could plausibly be argued to apply to this case except

---

[11] The State's negligence per se and negligent entrustment claims fail for the independent reasons discussed in Part III.

what is known as the "predicate exception." The predicate exception only exempts from PLCAA immunity "an action in which a . . . seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii); *see Beretta*, 524 F.3d at 390. The text of the predicate exception thus establishes three requirements before it can exempt a claim: (1) the Defendants must have "knowingly violated," (2) a predicate State or Federal statute applicable to the sale or marketing of a qualified product, and (3) that violation must be a "proximate cause of the harm for which relief is sought." None of those three requirements is satisfied, so the SAC must be dismissed in its entirety under the PLCAA.

### 1.     The State Fails to Allege Any Knowing Violations.

Like all scienter requirements, the predicate exception's "knowingly violate" standard serves to "separate those who understand the wrongful nature of their act from those who do not." *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019). In Congress's estimation, only those entities that knew they were violating a specific legal obligation or prohibition are sufficiently culpable that the PLCAA's bar should not apply. But the SAC fails as a matter of law to plead the requisite scienter.

The meaning of the scienter requirement is made plain in the statutory text. Here, "knowingly . . . modifies the verb 'violate[d]' and its direct object, which in this case is" the applicable underlying statute. *Id.* When a statute uses "knowingly" in this manner, the text requires knowledge of illegality. *Id.* at 2198. The reason being that knowledge of the relevant law "separate[s] wrongful from innocent acts," *id.* at 2197, or, to put it another way, required knowledge of the *unlawfulness* of an action separates what Congress sought to proscribe from a "broad range" of conduct that it did not, *Liparota v. United States*, 471 U.S. 419, 426 (1985); *see also Ruan v.*

*United States*, 142 S. Ct. 2370, 2377 (2022). This is particularly so when such a reading complies with "ordinary English grammar." *Rehaif*, 139 S. Ct. at 2196 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009)). Accordingly, the Supreme Court has interpreted "knowingly" to require knowledge by a person who acquires or possesses food stamps that, as a matter of law, "his conduct [was] unauthorized by statute or regulations." *Liparota*, 471 U.S. at 425. "Knowingly" requires knowledge by a possessor of a firearm that he is, as a matter of law, in the United States "illegally." *Rehaif*, 139 S. Ct. at 2198. And "knowingly" requires that a doctor's dispensation of drugs not merely be unauthorized as a matter of "fact," but also that the doctor "knew or intended" that his dispensation was not authorized by statute or regulation. *Ruan*, 142 S. Ct. at 2382.

The State has failed to allege any knowledge by the Defendants of the unlawfulness of their conduct. The State has failed to allege that Defendants *knew* their products were "firearms" (they are not, see *supra*), and thus the State has failed to allege Defendants *knew* their sales violated *any* of the statutes proscribing conduct related to "firearms." And the State cannot do so. Defendants cannot have knowingly violated applicable definitions when they acted consistent with an objectively reasonable interpretation of the federal definition of "firearm" and authoritative guidance from ATF. As explained above, the products at issue in this case are not "firearms" under the governing federal statutes and ATF guidance in force at the time of the alleged sales. But at an absolute minimum, it was objectively reasonable for Defendants not to treat these products as "firearms" when ATF said they were not firearms.

> Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a *knowing* or reckless violator. Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts, whatever their subjective intent may have been.

*Safeco Ins. Co. v. Burr*, 551 U.S. 47, 70 n.20 (2007) (emphasis added).

As Congress found, the firearms industry is "heavily regulated." 15 U.S.C. § 7901(a)(4), (7). In providing a narrow exception to the bar on liability, Congress required allegations of a "knowing[ ]" violation of the applicable law. *Id.* § 7903(5)(A)(iii). In this instance, such a "knowing[ ]" violation cannot be found when the "heavy" regulators themselves—ATF and the State—contemporaneously advanced the very same interpretation that the State now asserts Defendants *knew* was wrong.

The State has also failed to allege any Defendant "knowingly violated" any of the vague provisions of General Business Law § 898-b. These provisions again depend on a definition of "qualified product" under 15 U.S.C. § 7903(4), which Defendants did not knowingly violate by relying on objectively reasonable interpretations. But even putting that aside, Defendants cannot have "knowingly violated" obligations that are so amorphous. As the district court for the District of New Jersey recently held, "[t]he knowingly requirement of the predicate exception necessitates the actor to have a sufficiently concrete duty to have knowingly violated a relevant statute." *Nat'l Shooting Sports Found. v. Platkin*, 2023 WL 1380388, at \*6 (D.N.J. Jan. 31, 2023). Yet under § 898-b(1), the State claims to prohibit conduct that is "unreasonable under all the circumstances," which "create[s], maintain[s] or contribute to a condition in New York State that endangers the safety or health of the public." Under § 898(b)(2), the State mandates the establishment of "reasonable controls and procedures." Both statutory directives turn on as yet undefined standards of reasonableness. Regardless of whether those standards are sufficiently defined as a matter of constitutional due process (they are not, *see infra*), these are not concrete legal obligations capable of being knowingly violated. Section 898(b)(1)'s disjunctive phrasing—"unlawful *or* unreasonable"—makes clear that regulated entities can follow *all legal requirements* under the Federal law,

New York state law, or the laws of any other jurisdiction on the planet and *still* New York may find its activities "unreasonable under all the circumstances." "[T]o have 'actual knowledge' of a piece of information," such as the illegality of one's conduct, "one must in fact be aware of it." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020). But the State has made no entity aware of what counts as "unreasonable under all the circumstances." The same is true for what counts as "reasonable controls and procedures," save underinclusive directions to "institut[e] screening, security, inventory[,] and other business practices." N.Y. GEN. BUS. L. § 898-a(2). It would be a different case were there any allegations that Defendants acted in "open defiance . . . of a [legal] requirement which has been made specific and definite." *Screws v. United States*, 325 U.S. 91, 105 (1945) (plurality op.). But the SAC lacks any such allegations. Even "willful conduct cannot make definite that which is undefined." *Id*. The predicate exception does not permit causes of action alleging unknown violations of indefinite obligations. *See NSSF*, 2023 WL 1380388, at *6 ("It is contrary to the PLCAA to hold an industry member liable who complies with all laws but did not know that it failed to employ reasonable procedures, safeguards, and business practices . . . ." (internal quotation marks omitted)).

In enacting the PLCAA, Congress sought to limit lawsuits leading to an unanticipated "expansion of liability" with no "foundation in hundreds of years of the common law and jurisprudence of the United States," in part because such lawsuits "invite[d] the disassembly and destabilization" of the entire gun industry. 15 U.S.C. § 7901(a)(7). When Congress has specifically addressed concerns regarding "fair notice and open-ended liability" through "rigorous" scienter requirements before a defendant can be held liable, courts must give those requirements "strict enforcement." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016). The PLCAA's "knowingly violated" standard is no exception. And because the State has failed to

adequately allege *any* knowing violation, its claims do not meet the predicate exception.

### 2.    The SAC Fails to Allege a Violation of a Valid Predicate Statute.

The State's claims fail to meet the predicate exception for another reason: the State's illegal acts and misrepresentation claims are based on statutes of general applicability and its nuisance claims are the exact kind of unmoored common-law claim the PLCAA was enacted to prohibit.

### a.    The State's Illegal Acts and Misrepresentation Claims Are Based Upon Statutes of General Applicability.

Start with the State's illegal acts claims and fraud claims. In *City of New York v. Beretta U.S.A. Corp.*, the Second Circuit held that the predicate exception applies *only* to state or federal statutes (1) that "expressly regulate firearms"; (2) that "courts have applied to the sale and marketing of firearms"; or (3) that "clearly can be said to implicate the purchase and sale of firearms." 524 F.3d at 404. Put another way, "a statute of general applicability that does not encompass the conduct of firearms manufacturers" is *not* a predicate statute. *Id.* at 400. It is not enough that a statute is so general that it could be read to encompass firearms manufacturers or sellers *along with the general public*; a predicate statute must be legislatively directed toward the purchase and sale of firearms. *See id.* at 400–04.

Counts One and Two are brought under New York Executive Law § 63(12), which provides the exclusive basis and vehicle for the State's requested relief on those counts. *See* SAC ¶¶ 597–600, 602–05 & Prayer for Relief at 119–120, ¶¶ 1–2. Executive Law § 63(12) provides, "Whenever *any person* shall engage in repeated *fraudulent or illegal acts* or otherwise demonstrate persistent fraud or illegality . . . the attorney general may apply . . . for an order enjoining the continuance of such . . . fraudulent or illegal acts [and] directing restitution and damages." N.Y. Exec. Law § 63(12) (emphases added). The express application to "any person" categorically renders this statute one of "general applicability," not one directed toward firearms manufacturers or

sellers.

The State's citation to underlying state and federal statutes that inform its Executive Law claims do not rescue these claims from PLCAA immunity because they are not the source of the cause of action or the State's demanded relief. When enacting the PLCAA, Congress found that this statute was necessary, in part, because "liability actions commenced or contemplated by . . . States" were an "attempt to use the judicial branch to circumvent the Legislative branch of government" and to "expand civil liability in a manner never contemplated . . . by the legislatures of the several States." 15 U.S.C. § 7901(a)(7), (8). Consistent with Congress's findings, the predicate exception, which must be read "narrowly," does not permit the State to pursue causes of action *unless* the state legislature has expressly permitted such a cause of action through "statutes that actually regulate the firearms industry." *Beretta*, 524 F.3d at 403–04. In this way, the predicate exception is akin to a "clear-statement rule," only lifting the bar on causes of action when the State legislature has actually sought to regulate the firearms industry and expressly permitted particular causes of action to proceed. *Cf. U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993) (describing McCarran-Ferguson Act's preemption provision as a "clear-statement rule"). But here, the New York State Legislature has not done so. Instead, the State is attempting to shoehorn its claims under a statute of general applicability, Executive Law § 63(12), in an end-run around the PLCAA.

Count One is not saved by the fact that it relies on nested allegations of the violations of *other* federal, state, and municipal laws. *See* SAC ¶ 599. The State does not (and cannot) bring any charge or cause of action under, or seek any relief provided by, these provisions. It only seeks relief under Executive Law § 63(12). *See id.* ¶ 600. By exclusively relying on Executive Law § 63(12) as its cause of action and exclusively seeking relief provided by that section, Count One represents

a claim under a statute of general applicability that is not a predicate statute exempted from PLCAA immunity. To hold otherwise would be to allow the State to skirt the strictures of the PLCAA, which Congress designed explicitly to ensure courts were not used to "circumvent the Legislative branch" or impose liability in a manner not expressly set out by the "legislatures of the several States." 15 U.S.C. § 7901(a)(7)–(8); *cf. Cal. Rest. Ass'n v. City of Berkeley*, 2023 WL 2962921, at *9 (9th Cir. Apr. 17, 2023) ("States and localities can't skirt the text of broad preemption provisions by doing indirectly what Congress says they can't do directly."). That the New York State Legislature has not expressly granted the Attorney General authority to pursue such causes of action requires dismissal of Count One.

The analysis is no different for Counts Four and Five, which are brought by reference to New York General Business Law §§ 349 and 350. As to § 349, that provision is a law of general applicability, which provides that *any* "[d]eceptive acts or practices in the conduct of *any* business, trade or commerce . . . are hereby declared unlawful." N.Y. GEN. BUS. LAW § 349 (emphasis added). Likewise, General Business Law § 350 provides that *any* "[f]alse advertising in the conduct of *any* business, trade or commerce . . . is hereby declared unlawful." N.Y. GEN. BUS. LAW § 350 (emphasis added). By the plain terms of these statutory provisions, they are generally applicable to all actors, not specifically "applicable to the sale or marketing" of qualified products as contemplated in the PLCAA. *See* 15 U.S.C. § 7903(5)(A)(iii); *Beretta*, 524 F.3d at 400–04.[12]

_____

[12] The Connecticut Supreme Court erred in its interpretation of the predicate exception in *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262 (Conn. 2019). But, in any event, *Soto* provides no support for the State here. In that decision, the Connecticut Supreme Court allowed what it described as a "narrow legal theory" to proceed, *id.* at 272, but emphasized this would not lead to "crippling [the] PLCAA," *id.* at 312. The court made two points relevant here. First, the court agreed that, "as a general matter, the predicate exception cannot be so expansive as to fully encompass laws such as public nuisance statutes insofar as those laws reasonably might be implicated in any civil action arising from gun violence." *Id.* at 311. Second, the *Soto* court's merits discussion expressly distinguished that case (brought by direct victims of gun violence) from a case brought

**b.      The State's Public Nuisance Claims are Unmoored Common Law Claims that the PLCAA Was Enacted to Prohibit.**

The State's nuisance claims under Count Three also fail to satisfy the predicate exception. Those claims allege that the Defendants' activities "constitute a public nuisance." *See* SAC ¶¶ 495, 500. They are brought under New York General Business Law § 898-b. But these claims are prohibited by the PLCAA because, to the extent Defendants are given any fair notice of the standard of liability in these claims, they are premised on "general tort theories of liability that traditionally have been embodied in the common law." *Ileto*, 565 F.3d at 1135.

In enacting the PLCAA, "Congress clearly intended to preempt common-law claims, such as general tort theories of liability." *Id.* After all, Congress enacted the PLCAA in the wake of such lawsuits two decades ago. That New York has now codified the very theories—"without foundation in hundreds of years of the common law and jurisprudence of the United States," 15 U.S.C. § 7901(a)(7)—that Congress rejected, does not enable the State to pursue them under the predicate exception. The Ninth Circuit explained as much in *Ileto*. In *Ileto*, plaintiffs attempted to pursue tort theories against firearms manufacturers and argued that these were permissible because California had codified its tort law in a civil code. The court ruled that a suit brought under a statute that merely codifies a tort claim cannot be a predicate statute under the PLCAA. *Ileto*, 565 F.3d at 1136–38. The court's reasoning was three-fold. First, though California had codified its common law of nuisance into its statute—just as New York did with section 898-b—those codified statutes remained subject to "judicial evolution," *i.e.*, future development under common law principles as

---

by municipal plaintiffs seeking to "recoup various municipal costs associated with gun violence." *Id.* at 290–91. Further distinguishing this case from *Soto*, the SAC contains no allegations that Brownells marketed its products to anyone other than gun smiths and hobbyists (there is no allegation that Brownells or any Defendant marketed its products to individuals seeking to commit crimes).

with standard tort claims. *Id.* at 1136. This is antithetical to Congress's intent. *Id.* Second, the court concluded that Congress intended the predicate exception to cover "statutes that regulate manufacturing, importing, selling, marketing, and using firearms or that regulate the firearms industry—rather than general tort theories that happened to have been codified by a given jurisdiction." *Id.* Third, it would create incongruity between the states if those with a codified common law of torts fell within the PLCAA's predicate exception while those with the same common law torts that were not codified did not. *Id.* For those reasons, the *Ileto* court ruled that a nuisance statute is barred by the PLCAA.

The statute at issue in this case—General Business Law § 898-b—calls for the same analysis and conclusion. That is why the district court for the District of New Jersey preliminarily enjoined a substantially similar provision of New Jersey law. *See NSSF*, 2023 WL 1380388, at *7 ("To read [New Jersey's public nuisance statute] as fitting within the predicate exception would run afoul of the goals of the PLCAA and would, in fact, gut the PLCAA." (internal quotation marks omitted)). To hold otherwise, would be to "allow[ ] the predicate exception to swallow the statute." *Beretta*, 524 F.3d at 403. An "act cannot be held to destroy itself." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 343 (2011).

### C. The SAC Fails to Satisfy the Predicate Exception's Proximate Causation Requirement.

Congress was explicit that "an action" under the predicate exception must be based on a violation that "was a *proximate cause* of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). (emphasis added). This clause of the predicate exception compels dismissal of both the State's claims and many of the forms of relief it seeks.

1. In enacting the PLCAA, Congress was particularly concerned about firearms manufacturers having to litigate claims where "the harm caused" was "the misuse of firearms by third

parties, including criminals." *Id.* § 7901(a)(3). That is why it defined "qualified civil liability action," in part, by reference to an action where there has been "criminal or unlawful misuse of a qualified product by the person [bringing the suit] or a third party." *Id.* § 7903(5)(A). In light of this context, the predicate exception's specific proximate cause requirement has real teeth. *Prescott*, 341 F. Supp. 3d at 1191 (dismissing case because plaintiffs "cannot show that Slide Fire's misrepresentation proximately caused the injuries that are the subject of this case").

At a minimum, "proximate cause" requires that the claimed harm have "some direct relation between the injury asserted and the injurious conduct alleged." *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018) (cleaned up). "Put differently, 'a link that is too remote, purely contingent, or indirect is insufficient.'" *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2022 WL 4448621, at *13 (S.D.N.Y. Sept. 23, 2022) (quoting *Empire Merchants*, 902 F.3d at 141)); *see also Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 2022 WL 4597526, at *15 n.9 & *20 (D. Mass. Sept. 30, 2022), *appeal docketed*, No. 22-1823 (1st Cir. Dec. 5, 2022) (noting government plaintiff's harm was too causally remote for statutory standing, thus it was "doubtful" PLCAA "proximate-cause requirement could be satisfied"). In the proximate cause analysis—as is made clear by the PLCAA's repeated references to barring liability claims based on the actions of third parties—a central consideration must be whether "potential intervening events . . . broke the chain of causation between" the claimed violation and the State's "alleged injury." *See Alix v. McKinsey & Co., Inc.*, 23 F.4th 196, 205 (2d Cir. 2022); *cf. Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). Under the PLCAA, Congress highlighted the most likely intervening actions that would break the causal chain and would bar a liability action—namely, third parties and the

criminal or unlawful misuse of qualified products. *See District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 171 (D.C. 2008) (noting the government needed "proof" of "proximate cause" "*despite* the misuse of the firearm by a third person"; it is "implausible" Congress would permit an action based on a mere "causal link" (emphasis added)).

The State has made no effort to allege proximate causation on *any* count. In fact, the SAC *repeatedly* highlights the alleged criminal misconduct of third parties to break any causal chain of any kind *See, e.g.*, SAC ¶¶ 1, 54, 109, 292–369 (alleging criminal misconduct of various individuals). Thus, far from this being a case where Defendants must wait to accumulate evidence about the intervention of third parties to break the causal chain of any alleged harm, the State's SAC *admits* the role of third parties. *Cf. Podpeskar v. Dannon Co.*, 2017 WL 6001845, at *3 (S.D.N.Y. Dec. 3, 2017). The State's own allegations demonstrate that this case must be dismissed under the PLCAA.

This absence of proximate causation is particularly apparent in Count Three. By its terms, General Business Law § 898 does not include a proximate causation element, but instead permits the Attorney General to sue for an injunction, restitution, and damages "[w]henever there shall be a violation of this article." N.Y. GEN. BUS. LAW § 898-d. Because this statutory scheme permits the Attorney General to seek relief without proving harm proximately caused by the violation, the predicate exception does not provide a basis for the State's public nuisance claims. In the ongoing Second Circuit litigation over this statute, the State has sought to defend § 898 by arguing that it could be construed to "leave[ ] room for notions of proximate causation and reasonably foreseeable harms." Br. & Suppl. App. for Appellee at 35, *Nat'l Shooting Sports Found., Inc. v. James*, No. 22-1374 (2d Cir. Jan. 6, 2023). The State has attempted to save its statute in that litigation by arguing for a proximate cause standard it cannot meet (and has not adequately alleged) in this

35

litigation.[13]

2. The predicate exception's proximate cause requirement also bars many of the remedies the State seeks. In enacting the PLCAA, Congress explained that it was animated by, not just preventing the litigation of meritless claims that were "an abuse of the legal system," but also the prospect that such claims would result in "money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. §§ 7901(a)(3), (6). Consistent with its effort to take on both litigation and the liability that would result from litigation, Congress clarified that only when the knowing violation "was a *proximate cause* of the harm *for which relief is sought*" could a lawsuit proceed under the predicate exception. *Id*. § 7903(5)(A)(iii) (emphasis added). In other words, any relief sought in such an action must be limited to seeking a remedy for harm proximately caused by the Defendant.

The State's requests for relief for harm *not* proximately caused by Defendants' alleged statutory violations are barred by the PLCAA. The State cannot, for example, be awarded a generalized endowment to an abatement fund because that is not limited to relief for a specified harm proximately caused by an individual Defendant. Instead, it would allow for the imposition of relief for harms remote from anything related to an individual Defendant's conduct. *Cf. Beretta*, 940 A.2d at 172 ("Shoehorning, as it were, into the predicate exception a strict liability cause of action that, at bottom, simply shifts the cost of injuries resulting from the discharge of lawfully manufactured and distributed firearms would, in our view, 'frustrate Congress's clear intention.'" (quoting

---

[13] Moreover, to the extent General Business Law § 898 includes a "proximate cause" standard, the statute would appear to be a nullity. New York courts have already determined that firearms manufacturers' "lawful commercial activity" is "too remote" and "having been followed by harm to person and property caused directly and principally by the criminal activity of intervening third parties, may not be considered a proximate cause of such harm." *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 761 N.Y.S.2d 192, 201 (1st Dep't 2003).

*Hubbard v. United States*, 514 U.S. 695, 703 (1995)); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1222 (D. Colo. 2015) (barring a claim under similar Colorado statute because "Plaintiffs are not seeking 'damages'").

Nor can the State recover "civil penalties." By definition, civil penalties are not relief for harm for which a statutory violation *was* a proximate cause but are deterrents based on potential future harm that has not yet occurred. *See State ex rel. Grupp v. DHL Express (USA), Inc.*, 19 N.Y.3d 278, 286 (2012); *see also New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 599 (2d Cir. 2019) (similar). For similar reasons, the PLCAA prohibits disgorgement as a remedy; disgorgement of profits would not remedy any injury the State sustained as a proximate result of Defendants' alleged statutory violations. *See, e.g.*, *People v. Ernst & Young LLP*, 980 N.Y.S.2d 456, 457 (1st Dep't 2014); *Diamond v. Oreamuno*, 24 N.Y.2d 494, 497–99 (1969).

## III. The State's Negligence Per Se and Negligent Entrustment Claims Fail as a Matter of Law.

### A. Negligence Per Se.

Under New York common law, negligence per se can only be established if "a statute is designed to protect a class of persons, in which the plaintiff is included, from the type of harm which in fact occurred as a result of its violation." *German ex rel. German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995). To warrant a finding of negligence per se, the statute must also evidence "an intention, express or implied, that from disregard of [its] command a liability for resultant damages shall arise which would not exist but for the statute." *Id.* at 1397 (quoting *Gain v. E. Reinforcing Serv.*, 603 N.Y.S.2d 189, 191 (3d Dep't 1993)). That inquiry "is closely related to the question of whether a private cause of action exists under a statute." *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 668 (S.D.N.Y. 2000) (cleaned up). The State's negligence per se claim fails to satisfy these requirements.

First, as the State concedes, the laws it says Defendants violated "are designed to protect *the public* from gun violence." SAC ¶ 626. Because these criminal laws were not enacted for the "particular benefit" of a specific "class of people," they cannot provide a basis for negligence per se under New York law. *Fagan v. AmerisourceBergen Corp.*, 356 F. Supp. 2d 198, 214 (E.D.N.Y. 2004). Laws requiring serialization and licensure of firearms are akin to vehicular licensing statutes, which "[a]lmost universally . . . are not regarded as creating a duty to individual highway travelers or pedestrians." *Dance v. Town of Southampton*, 467 N.Y.S.2d 203, 207 (2d Dep't 1983). Furthermore, none of the laws provide a private cause of action for their violation. *See Lewis v. Jamesway Corp.*, 737 N.Y.S.2d 657, 659 (2d Dep't 2002) (explaining that the federal Gun Control Act "was designed to keep firearms out of the possession of those persons not legally entitled to possess them because of age, criminal background, or incompetency," and holding that "[t]he Act neither created a private cause of action for victims injured by firearms obtained in violation of § 922, nor created a duty of care of a reasonable person"). Although no court has addressed whether the specific state and city laws at issue here create a private cause of action, the same reasoning through which the New York courts determined that the Gun Control Act does not create a private right of action applies equally here. And "[r]arely is there a private right of action under a criminal statute." *Dubai Islamic Bank*, 126 F. Supp. 2d at 668.

Second, even if the laws that the State says Defendants violated had been enacted to protect a particular class of persons, the State cannot show that it "is a member" of that class. *See Daggett v. Keshner*, 134 N.Y.S.2d 524, 527–28 (1st Dep't 1954). The State argues that Defendants' alleged sales of unfinished frames and receivers into New York violated laws that "are designed to protect the public from gun violence." SAC ¶¶ 626–627. But the State is not a victim of any "gun violence" that resulted from Defendants' alleged conduct. As the State admits in its SAC, the laws were

designed to protect individuals from firearms-related harm, *id.*, not to protect the State's fisc.

Third, negligence per se requires a statutory violation. Defendants did not violate any statute for reasons explained elsewhere in this brief.

Fourth, with respect to the New York City Administrative Code provision, the Court of Appeals has long distinguished "between State statutes on the one hand, and local ordinances or administrative rules and regulations on the other, for purposes of establishing negligence." *Elliott v. City of New York*, 95 N.Y.2d 730, 734 (2001). Whereas violation of a state statute that meets the requirements outlined above constitutes negligence per se, "violation of a municipal ordinance constitutes only evidence of negligence." *Id.* Consequently, as a municipal ordinance, N.Y.C. Admin. Code § 10-314 cannot form the basis of a negligence per se claim. *See Timperio v. Bronx-Lebanon Hosp. Ctr.*, 384 F. Supp. 3d 425, 435 (S.D.N.Y. 2019) (because New York City Administrative Code "sets forth municipal rules" rather than state statutory requirements, sale of firearm in violation of Administrative Code does not constitute negligence per se); *see also Aponte v. N.Y.C. Hous. Auth.*, 153 N.Y.S.3d 582, 584 (2d Dep't 2021).

### B.   Negligent Entrustment.

Although the PLCAA provides a limited exception from immunity for negligent entrustment claims, *see* 15 U.S.C. § 7903(5)(A)(ii), it does not create a cause of action, *see id.* § 7903(5)(C). Consequently, the exception applies only if the State's claim meets both the PLCAA definition of negligent entrustment and satisfies the elements of a common law negligent entrustment claim under New York law. The State's claim fails in both respects.

In New York, "[t]he owner or possessor of a dangerous instrument is under a duty to entrust it to a responsible person whose use does not create an unreasonable risk of harm to others." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 237 (2001). The tort of negligent entrustment, in turn,

"is based on the degree of knowledge the supplier of chattel has or should have concerning the entrustee's propensity to use the chattel in an improper or dangerous fashion," *id.*, and requires a plaintiff to prove "some special knowledge on the part of the defendant concerning a characteristic or condition peculiar to [the user] which renders the [user]'s use of the chattel unreasonably dangerous," *Timperio*, 384 F. Supp. 3d at 434 (internal quotation marks and citation omitted). "Most of the case law invoking this doctrine relates to the entrustment of guns or motor vehicles to children, incompetents or intoxicated persons." *Splawnik v. Di Caprio*, 540 N.Y.S.2d 615, 617 (3d Dep't 1989).

First, the PLCAA's definition of "negligent entrustment" requires that a seller "know[ ], or reasonably should know, the person to whom [a qualified] product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C. § 7903(5)(B). The State's claim does not satisfy this definition because the State does not allege that Defendants knew or reasonably should have known that certain of their customers would use Defendants' products in a manner involving unreasonable risk of physical injury to themselves or others. The State does not allege that Defendants had any knowledge of the intended use of their products, let alone *specific* knowledge that any individual customer to whom the products were sold was likely to use them in a manner involving unreasonable risk of physical injury. Accordingly, the State's negligent entrustment claim does not satisfy the PLCAA's definition and is thus barred by the PLCAA.

For the same reason, the State does not allege the required elements of a common law negligent entrustment claim. The State does not allege that Defendants knew or should have known that certain of their customers allegedly had the "propensity to use [the products at issue] in an improper or dangerous fashion." *Hamilton*, 96 N.Y.2d at 237.

Furthermore, even if the State's allegations could be read to allege that Defendants knew or should have known that certain of their customers had the propensity to use the products at issue in an improper or dangerous fashion, the State's theory of why that is hinges entirely on those products being qualified products and Defendants thereby being required under federal and state laws to perform background checks and ensure that its customers possessed the necessary licenses. *See, e.g.*, SAC ¶¶ 26–27. But the products at issue are not qualified products, so Defendants were under no more obligation to investigate the fitness of their customers than any other seller of goods. *See Cook v. Schapiro*, 871 N.Y.S.2d 714, 715–16 (2d Dep't 2009). Consequently, there is no legally cognizable reason why Defendants should have known of certain of their customers' alleged propensities.

Second, common law negligent entrustment requires the object at issue to be a "dangerous instrument." The State cannot establish that an unfinished frame or receiver is a dangerous instrument as a matter of law. "Whether a particular object qualifies as a dangerous instrument depends on the nature of the instrument and the facts pertaining to its use," *Rios v. Smith*, 95 N.Y.2d 647, 653 (2001), a determination that may be made as a matter of law, *see Sorto v. Flores*, 660 N.Y.S.2d 60, 61 (2d Dep't 1997). The types of instruments that New York courts have found to be dangerous in certain circumstances include cars, motorcycles, motorboats, guns, and BB guns. *Republic Ins. Co. v. Michel*, 885 F. Supp. 426, 431 (E.D.N.Y. 1995). Conversely, New York courts have determined that in certain circumstances bicycles, toys, a skateboard, a waterslide, and pizza are not dangerous instruments. *Id.* An unfinished frame or receiver—essentially a hunk of plastic or metal—is not a dangerous instrument. Without significant transformation requiring the use of specialized tools, additional parts, and expert knowledge, an unfinished frame or receiver cannot fire a projectile or be used as a firearm. And like a bicycle or a skateboard—which, despite the fact

that they could be dangerous in the hands of certain individuals, New York courts have determined *not* to be dangerous instrumentalities—the fact that an unfinished frame or receiver could by itself be used to cause injury is not enough to cross the dangerous instrumentality threshold.

**IV.    The State's Claims Must Be Dismissed Under the Federal Constitution.**

> **A.    The State's Interpretation of the Federal Definition of "Firearm" and New York General Business Law § 898-b Would Render Both Statutes Void for Vagueness.**

Both the federal statutory definition of "firearm" and New York General Business Law § 898-b would be unconstitutionally vague if interpreted and applied in the manner that the State proposes. The Court's application of the void for vagueness doctrine in this case should be especially exacting. The fact that the federal definition of "firearm" ultimately stems from a criminal statute gives the Court reason to review New York's interpretation of that statute through a "stricter" lens. *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010); *accord Leocal v. Ashcroft*, 543 U.S. 1, 12 n.8 (2004) (noting obligation to "interpret [a] statute consistently" when "it has both criminal and noncriminal applications"). Furthermore, when evaluating laws for vagueness, "laws that might infringe constitutional rights," as New York's Second Amendment infringing laws do, are subject to this Court's "strictest" review. *VIP of Berlin*, 593 F.3d at 186.

1. The State asks this Court to adopt an interpretation of "firearm" that is so capacious that it "violates the first essential of due process": fair notice. *Johnson v. United States*, 576 U.S. 591, 595–96 (2015). After all, at the time of the sales by Defendants alleged in the SAC, that term had *never* before been understood to include the precursor products at issue in this case. *See United States v. Lanier*, 520 U.S. 259, 267 (1997) (holding "the touchstone" of the Court's due process analysis "is whether the statute, either standing alone or as construed, made it reasonably clear *at the relevant time* that the defendant's conduct was criminal" (emphasis added)). The State is thus

seeking an "unforeseeable and *retroactive* judicial expansion of narrow and precise statutory lan-guage," which is a quintessential violation of the government's obligation to ensure citizens have fair notice. *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964) (emphasis added). As discussed above, the Attorney General, the Governor, members of the New York Legislature, and ATF all understood and communicated to the public at large that these products were not "firearms." This contemporary guidance and understanding—even if displaced by more recent authoritative inter-pretations—is critical because "fair notice" concerns the ambit of regulated conduct *at the time* of the alleged violation. As the Supreme Court explained in *Bouie*, "the objection of vagueness" based on "inadequate guidance to the individual whose conduct is regulated . . . could not be cured retrospectively by a ruling either of the trial court or the appellate court, though it might be cured *for the future* by an authoritative judicial gloss." 378 U.S. at 353 (emphasis added); *accord Lanier*, 520 U.S. at 266. In other words, there is a difference between expanding the scope of prohibited conduct retroactively, as opposed to prospectively. Given that difference, the Court can accept Defendants' void for vagueness argument in this case without deciding whether *prospective* appli-cation of ATF's new regulatory interpretation of "firearm" offends due process. *See* 87 Fed. Reg. 24652, 24674 (Apr. 26, 2022) (rejecting argument that new rule violates Ex Post Facto Clause because "penalties would result only from the future failure to mark" unfinished frames and re-ceivers with serial numbers, and FFLs "have 60 days from the [August 2022] effective date of the rule to appropriately mark these" products).

Before this case, the term "firearm" was limited to what "people of ordinary intelligence" would have understood it to cover. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Now the State is asking this Court to endorse retroactive enforcement of the statute in a manner that wholly departs from the "common understanding and practices" that have underlain the statutory framework for

years. *VIP of Berlin*, 593 F.3d at 187; *cf. Bittner v. United States*, 143 S. Ct. 713, 722 n.5 (2023) ("[W]hen the government (or any litigant) speaks out of both sides of its mouth, no one should be surprised if its latest utterance isn't the most convincing one."). To do so would be to interpret the statute in a manner that does not "convey[ ] sufficiently definite warning as to the proscribed conduct." *VIP of Berlin*, 593 F. 3d at 187. Rather, this Court would be empowering the State to leave the public in a guessing game as to which precursor parts meet its nebulous definition of "firearm" and then allow the State to seek "judicial enlargement" "retroactively." *Bouie*, 378 U.S. at 353. That "poses a serious fair-notice problem." *Bittner*, 143 S. Ct. at 725 (opinion of Gorsuch, J.).

Consider just one of the many guesses the public would need to make under the State's interpretation. The State provides no baseline as to the requisite level of effort (or lack thereof) required to say a precursor part is "readily" convertible. After all, the level of effort to mill or drill a precursor part will vary greatly between a novice, an amateur watching YouTube videos, or an experienced gunsmith. A precursor part which may be "readily" convertible for one individual with one set of skills may prove significantly cumbersome to convert for another. How should the public determine whether a precursor part has been made illegal or how much effort is required to keep a part on the right side of the law? The State does not say. But the Due Process Clause demands that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27 (1931). The State instead proposes a line that it can move wherever it wants *whenever* it wants—even back in time.

It is exactly this need to guess which products the New York Attorney General will retroactively penalize next that demonstrates why the State's interpretation would render the statute void for vagueness: "it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595. The Due Process

Clause does not permit governments to subject Defendants to civil penalty when the meaning of its statutes is left up to an "ad hoc and subjective" resolution by "judges," "juries," and, in this case, attorneys general. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Not only would adopting the State's capacious and standardless interpretation create a "danger[ ] of arbitrary and discriminatory application," *id.*, it would "authorize[ ] *or even encourage*[ ]" it, *Hill*, 530 U.S. at 732 (emphasis added). After all, what else could result when the elected leaders of New York and the lead federal regulatory agency inform the public that certain products are permissible under existing law, "lull[ing] the potential defendant[s] into a false sense of security," *Bouie*, 378 U.S. at 352, but then the State runs into court to allege that those products are prohibited and always have been? At bottom, to endorse the State's interpretation would permit it to penalize "a stand-ardless sweep" of conduct and products based on the "personal predilections" of those empowered to pursue such actions in the name of the State. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). That is unconstitutional.

2. For similar reasons, the Court should also dismiss Count Three, which seeks to hold Defendants liable for "endanger[ing] the safety or health of the public" under New York General Business Law § 898-b. In *Johnson*, the Supreme Court held a statute to be unconstitutionally vague when "two features" of the law, even if "tolerable in isolation," proved with "their sum" to "make[ ] a task . . . which at best could be only guesswork." *Johnson*, 576 U.S. at 597, 602. The same is true of New York's new "nuisance" law.

"In the first place," the law "leaves grave uncertainty about how to estimate" the requisite amount of danger to the "safety or health of the public" to be held liable. *Id.* at 597; N.Y. GEN. BUS. LAW § 898-b(1). "How does one go about deciding what kind of [danger]" needs to be in-volved—"[a] statistical analysis . . . ? A survey? Expert evidence? Google? Gut instinct?" *Johnson*,

576 U.S. at 597 (internal quotation omitted). The statute is silent. This suggests boundless discretion among prosecutors and the courts to decide when events have reached a heretofore unknown danger threshold. "The Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'" *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (quoting *United States v. Reese*, 92 U.S. 214, 221 (1876)).

New York's law then piles another uncertainty on top of that uncertainty with the statute posing further questions related to "how much . . . it takes to qualify" as "creat[ing], maintain[ing] or contribut[ing] to a condition" that leads to this unknown level of danger. *Johnson*, 576 U.S. at 598. It has long been held that the word "condition" "is broad enough to include *any* state or situation." *Am. Sugar-Ref. Co. v. United States*, 99 F. 716, 719 (2d Cir. 1900) (emphasis added). Thus, the statute might be applied to hold Defendants liable for any contribution to any state or situation that leads to an unknown threshold of danger. Does a sale of a product that is lawful in Ohio "contribute" to a "condition" in New York if that Ohio resident later brings it into New York? Or what if a member of the gun industry mistakenly sells only a handful of its products into the State? "Contribute" can mean something as broad as "to have a share in any act or effect." *Goetz v. Greater Ga. Life Ins. Co.*, 649 F. Supp. 2d 802, 823 (E.D. Tenn. 2009). To avoid such a capacious net to capture the unwary, New York negligence law limits liability to actions that, at the very least, are a "*substantial* contributing factor." *Prunier v. City of Watertown*, 936 F.2d 677, 679 (2d Cir. 1991) (emphasis added). Nevertheless, the State appears to reject any such limit here, leaving a "shapeless" provision making it not "so easy" to know the metes and bounds of what is and what is not unlawful. *Johnson*, 576 U.S. at 602.

Moreover, this absence of any definite standard for what it takes to "contribute" and the

law's apparent elimination of any established proximate causation requirement "would produce extreme results." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838 (1996). After all, "[i]n a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond." *Id.* Thus, the relevant law must establish the "point" when the "link" between events "has become too tenuous—that what is claimed to be consequence is only fortuity." *Id.* (internal quotation marks omitted). But the State has eschewed drawing any line or providing any fair warning as to where the line may be. This is particularly problematic in an area where there are so many intervening actors that could be said to contribute to the State's claimed injuries. As the New York Court of Appeals has explained, the connection between firearms manufacturers, criminal wrongdoers, and those potentially injured by those wrongdoers is "remote, running through several links in a chain consisting of at least the manu-facturer, the federally licensed distributor or wholesaler, and the first retailer [and] . . . often . . . numerous subsequent legal purchasers or even a thief." *Hamilton*, 96 N.Y.2d at 234. Such a stand-ardless stretching of liability falls well short of the Due Process Clause's commands.

By combining indeterminacy about how to measure the level of danger to the public "with indeterminacy about how much" a defendant must contribute to that unknown level of danger, New York's law "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson*, 576 U.S. at 598.

**B.    New York's Public Nuisance Statute Violates the Dormant Commerce Clause Because It Discriminates Against Interstate Commerce.**

Application of General Business Law § 898-b to this case violates the Dormant Commerce Clause for at least two reasons. First, § 898-b impermissibly regulates *only* Defendants' products that have been "shipped or transported in *interstate* or foreign commerce." N.Y. GEN. BUS. LAW § 898-a(6); 15 U.S.C. § 7903(4). Second, § 898-b impermissibly regulates extraterritorially.

1. In our constitutional system, only the federal government may specifically target, regulate, and burden interstate commerce. By contrast, "[s]tate laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity.'" *S. Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018) (quoting *Granholm v. Heald*, 544 U.S. 460, 476 (2005)). Accordingly, "[w]hen a state statute directly regulates or discriminates against interstate commerce," the Supreme Court has "generally struck down the statute without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). Since General Business Law § 898-b *exclusively* regulates interstate commerce, it is unconstitutional.

The text of General Business Law § 898-b makes plain that New York has only sought to regulate interstate commerce. As much of the above briefing on the federal definition of "firearms" makes implicit, General Business Law § 898-b is *only* regulating products that Congress has purportedly sought to regulate. This is fatal under the Commerce Clause because Congress, needing a jurisdictional hook, *see United States v. Lopez*, 514 U.S. 549, 561 (1995), has defined "qualified product" to mean a firearm "that has been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4). New York has adopted the exact same definition for purposes of New York General Business Law § 898-b. *See* N.Y. GEN. BUS. LAW § 898-a(6) ("'Qualified product' shall have the same meaning as defined in 15 U.S.C. section 7903(4)."). This means that New York is only regulating *interstate* products. But interstate products are exactly the kinds of products that New York *may not* regulate exclusively. By limiting itself to *only* Defendants' products shipped in interstate commerce, the State has explicitly left open and free from potential liability any intrastate products that contribute to the same alleged harm. That sort of out-of-state discrimination is unconstitutional because the State cannot demonstrate that whatever interest it has in targeting unfinished frames that have been shipped or transported in interstate or foreign commerce

"cannot be adequately served by reasonable nondiscriminatory alternatives." *N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 90 (2d Cir. 2017) (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008)).

2. General Business Law § 898-b and its application here violates the Commerce Clause for another reason: a State may not regulate "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). This forecloses any application of General Business Law § 898-b to sales of Defendants' products outside of the State of New York. The SAC makes repeated references to sales of products *outside of* New York, for instance, to customers in Pennsylvania. *See e.g.*, SAC ¶ 63. Even though those sales allegedly have affected New York, the State of New York simply cannot regulate that commerce in a manner consistent with the Commerce Clause. To do so would "require[e]" Defendants' sales in Pennsylvania and other states to be impermissibly "conducted at [New York's] direction" under whatever definition of "reasonable" that New York settles upon. *VIZIO, Inc. v. Klee*, 886 F.3d 249, 255 (2d Cir. 2018) (quoting *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 193 (2d Cir. 2007)).

Further, a state law cannot be applied when the "practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336. But that is what General Business Law § 898-b does by purporting to impose New York's definition of "reasonable controls and procedures." Defendants are out-of-state businesses. This means that all "screening, security, inventory and other business practices" occur outside the territorial jurisdiction of New York. N.Y. GEN. BUS. LAW § 898-a(2). This "effectively require[es]" all Defendants to "seek the approval of the New York State" Attorney General or court system before producing and selling their products elsewhere. *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 193 (2d Cir. 2007). That

violates the Commerce Clause.

**C.    The State Seeks to Hold Defendants Liable for Non-Actionable Statements of Opinion that Are Protected by the First Amendment.**

The New York Attorney General's Office is known for taking controversial legal positions, and every person in this country is entitled to publicly disagree with the Attorney General's legal views without being sued for fraud or misrepresentation. Counts One, Two, Four, and Five all allege that Defendants are guilty of various forms of misrepresentation or false advertising for publicly misrepresenting the legal requirements for purchasing unfinished frames and receivers. The only specific statement by Brownells identified in the SAC to support these claims is a comment on the Brownells website that unfinished frames and receivers are "still legal" under the recent ATF regulation. SAC ¶ 85.[14] Thus, the State's misrepresentation claims rest on nothing more than a disagreement about whether Brownells has a correct legal opinion.

It is a bedrock tenet of the law governing misrepresentation that statements of opinion are generally not actionable. *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995). This is true whether the claim is brought under federal law, or as here, under state laws governing false advertising and unfair competition. *Id.* (§ 43(a) of the Lanham Act); *see also Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 800 (S.D.N.Y. 1997) (Sotomayor, J.) ("The standards for bringing a claim under § 43(a) of the Lanham Act are substantially the same as those applied to claims brought under the New York common law for unfair competition and §§ 349 and 350 of the New York General Business Law."); *GeigTech E. Bay LLC v. Lutron Elecs. Co., Inc.*, 2019 WL 1768965, at *7 (S.D.N.Y. Apr. 4, 2019). "Statements, and even misrepresentations, of law are generally regarded as opinions which cannot be relied upon absent special circumstances," thus

---

[14] The SAC also misattributes a third-party publication to Brownells. *See* SAC ¶ 285.

"[i]t is well settled that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law." *Carolina Cas. Ins. Co. v. Capital Trucking, Inc.*, 523 F. Supp. 3d 661, 680 (S.D.N.Y. 2021) (internal quotation marks omitted); *see also 600 W. 115th St. Corp. v. 600 W. 115th St. Condo.*, 580 N.Y.S.2d 307, 308 (1st Dep't 1992).

"Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Coastal Abstract Serv. Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). For example, a statement about whether a corporation was legally "licensed" to do business under California law was not actionable. *Id*. The same was true of representations about whether a taxi company was "authorized" under D.C. law to provide certain services, *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 488 (D.C. Cir. 1996), or whether ingredients in cough syrup were properly labeled "active" under an FDA regulation, *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 232 (3d Cir. 1990); *see also ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614 (9th Cir. 2016). To hold otherwise would be "unthinkable" because it would suggest that a company "can be held liable . . . for failing to anticipate the court's subsequent interpretation." *Dial A Car, Inc.*, 82 F.3d at 489. It would be particularly unthinkable here, where the alleged mischaracterization of federal law was consistent with then-authoritative ATF guidance.

The Supreme Court has drawn a similar line in the securities fraud context. In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), the Court explained that the defendants' statements, "[t]o simplify their content only a bit," amounted to "we believe we are obeying the law," *id.* at 186. This was a "sincere statement of pure opinion" that was simply not actionable. *Id.* It did not matter that the plaintiffs claimed that the defendants'

51

"belief turned out to be wrong—that whatever the company thought, it was in fact violating anti-kickback laws." *Id*. When relief is limited to claims about "factual statements," a plaintiff cannot sue to hold a defendant liable merely by "second-guess[ing] inherently subjective and uncertain assessments." "In other words," causes of action for fraud or misrepresentation are not "an invitation to Monday morning quarterback" a defendant's legal views. *Id.*

New York courts have long adopted a similar view. "One who neither withholds nor misstates the facts cannot be adjudged guilty of fraud simply because the courts finally decide the law to be other than he claimed it to be." *Trs. of Amherst College v. Ritch*, 151 N.Y. 282, 322 (1897); *see Nat'l Conversion Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 627–28 (1969); *Cucchiaro v. Cucchiaro*, 627 N.Y.S.2d 224, 229 (N.Y. Sup. Ct. Orange Cnty. 1995). To hold otherwise "would make nearly every unsuccessful litigant guilty of fraud." *Amherst College*, 151 N.Y. at 322.

The State does not identify a single alleged misrepresentation by Brownells apart from the company's articulation of its opinions about the legality of its products. *See* SAC ¶ 85. Such "statements by laypersons," which reflect their interpretation of "the meaning of a statute or regulation are opinion statements" and hence, not actionable. *Coastal Abstract Serv.*, 173 F.3d at 731. In addition, at the time of Brownells' alleged misrepresentations, ATF and even the New York Attorney General agreed that the meaning of "firearm" under federal law did not reach unfinished frames or receivers, so any alleged representation by Brownells was in accordance with authoritative guidance. Even if this Court were to rule *today* that Defendants' position on the substantive law is incorrect, that would *still* be insufficient to hold Defendants liable for any statements of opinion about the law made in the past. This Court's ruling "would still not show that the law was clear at the time [Defendants] made the alleged misstatements. In other words, [New York] cannot pursue this lawsuit with a simple assertion that current … law is seen to be clear and unambiguous

… based on an interpretation … that was issued subsequent to [Defendants'] statements." *Dial A Car, Inc.*, 82 F.3d at 489; *see also Omnicare*, 575 U.S. at 186.

A contrary conclusion would violate the First Amendment, which protects "statement[s] of opinion relating to matters of public concern." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990). This protection ensures "uninhibited, robust, and wide-open" debate on "public issues" and adds "much to the discourse of our Nation," *id.*, especially on issues where "there is considerable disagreement," *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013). This Court must be "careful not to permit overextension of" state law liability "to intrude on First Amendment values." *Boule v. Hutton*, 328 F.3d 84, 91 (2d Cir. 2003). Holding Defendants liable for an objectively reasonable legal interpretation of contested governing law, especially on an issue of significant public concern, would be a serious intrusion on protected speech.

**D.    All the State's Claims Must Be Dismissed Under the Second Amendment.**

New York seeks to hold Defendants liable for conduct protected by the Second Amendment. Laws purporting to prohibit the sale and possession of these precursor parts violate the Second Amendment. Additionally, the imposition of novel public nuisance claims against manufacturers "without foundation in hundreds of years of the common law"—as Congress recognized in the PLCAA—violates the Second Amendment. *See* 15 U.S.C. § 7901(a)(7), (b)(2)–(3). Accordingly, all of the State's claims must be dismissed.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Bruen*, the Supreme Court articulated a framework for determining if firearms regulations are constitutional. The Court must begin with the Second Amendment's text. If Defendants' proposed course of conduct falls within that text, then that conduct is presumptively

protected. *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all the key terms in *Heller* and *Bruen*. "The people" presumptively means "all Americans," "Arms" presumptively includes "all instruments that constitute bearable arms," and to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "When the Second Amendment's plain text covers an individual's conduct, the Constitution *presumptively protects* that conduct." *Bruen*, 142 S. Ct. at 2126 (emphasis added). Thus, after this prima facie textual showing has been made, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

The products at issue in this case fall within the Second Amendment's text. If the Court concludes they are "firearms," then they necessarily are "Arms" as a textual matter. If the unfinished frames and receivers are properly understood not to be firearms, they still are covered by the text because they are used in making firearms; they are thus necessary incidents to "Arms." "Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The Second Amendment right to possess firearms thus must necessarily include the right to *acquire* firearms, whether by purchasing them or making them. *See Rigby v. Jennings*, 2022 WL 4448220, at *8 (D. Del. Sept. 23, 2022) ("[T]he right to keep and bear arms implies a corresponding right to manufacture arms."); *Ill. Ass'n of Firearm Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014). And the right to make a firearm must extend to the right to materials necessary to do so. The protection for "Arms" "would be toothless" if its protection did not extend to cover the making of those Arms and the precursor parts needed to create them. *Luis*, 578 U.S. at 27 (Thomas, J.,

concurring in judgment).

Since "Arms" necessarily covers the products at issue here, the burden falls on the State to "affirmatively prove" its restrictions are "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. The State may do so by identifying analogous restrictions from history, but these restrictions must arise from the relevant historical time period. Because the scope of the Second Amendment was set in 1791, the Founding era is the only appropriate period for this Court's historical analysis. *See generally* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868 (working draft)*, (Oct. 1, 2022), *available at* https://bit.ly/3CMSKjw. This Court is bound by two lines of Supreme Court precedent. The first mandates that the scope of the Second Amendment with respect to the Federal Government is based on the public understanding in 1791. *See, e.g.*, *Heller*, 554 U.S. at 634–35. The second establishes that incorporated Bill of Rights provisions mean the same thing when applied to the States and the Federal Government. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765–66 (2010) (collecting cases). *Bruen* itself was another entry in a long tradition of these precedents because it too—notwithstanding dicta about an "ongoing scholarly debate"— treated evidence surrounding the Founding as generally dispositive of the contours of the incorporated Second Amendment. 142 S. Ct. at 2137–38 (noting Reconstruction era evidence has only been used as "confirmation" of what "had already been established" by Founding era evidence). "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. And the Founding is paramount.[15]

---

[15] Even if this Court also considers evidence from the Reconstruction Era, it is immaterial in this case because the State will be unable to identify a tradition of firearms regulation analogous to its restrictions during any relevant time period.

In this case, the history is one-sided. For the public nuisance claims, it is undisputed that no such laws existed anywhere in the nation until last year. *Cf.* 15 U.S.C. § 7901(a)(6). With respect to laws restricting precursor parts of arms for personal use, the State will fail to demonstrate an analogous history of regulation. During the Revolution and the Founding, many Americans built and repaired arms themselves. In fact, "[w]hen the colonies faced major arms shortages throughout the war, domestic arms manufacturing filled the void," with documented instances of militia members building their *own* arms to serve in the War. Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L. J. 35, 51–52 (2023). In the decades that followed, people employed in as diverse trades undertook the making of arms "as an additional occupation or hobby." *Id.* at 66–67. As one historian explained, "[g]un crafting was one of several ways Americans expressed their unrestrained democratic impulses at the time of the adoption of the Bill of Rights." *Id.* at 62 (quoting JAMES B. WHISKER, THE GUNSMITH'S TRADE 92 (1992)).

Despite the longstanding practice of self-built arms, "[r]egulations on self-built arms are not longstanding. In fact, there were *no restrictions* on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. All such restrictions have been enacted within the last decade." *Id.* at 78 (emphasis added). This means Brownells itself, a company founded in 1939 by Bob Brownells because of his love of repairing and customizing firearms, has a longer history than these restrictions. Moreover, the absence of analogous restrictions in the historical record is even more remarkable considering that "[p]rivately made firearms have been in existence since the first ignition system was developed close to 500 years ago." Stop Gun Violence: Ghost Guns, Hearing before the Subcomm. on the Constitution, Comm. on the Judiciary ("Stop Gun Violence"), 117th Cong. 4 (2021) (statement of Ashley Hlebinsky, Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, President, The Gun Code,

LLC), https://bit.ly/3cS6LDp. Thus, it is not as though the private manufacture of firearms for personal use is a new issue. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. Since the "Founders themselves could have adopted" restrictions similar to New York's "to confront" the perceived problem of privately made arms—but did not do so—that is dispositive evidence that the restrictions the State seeks to impose in this case are unconstitutional. *Id.*; *see also United States v. Price*, 2022 WL 6968457 at *5–*6 (S.D. W. Va. Oct. 12, 2022) (discussing lack of historical tradition of banning personal possession of firearms without serialization).[16]

## V.   The SAC Fails to Adequately Allege a Basis for the Imposition of Joint and Several Liability.

The general rule of liability in New York is simple: an alleged wrongdoer is only "liable for all the proximate results of his own tortious act." *Suria v. Shiffman*, 67 N.Y.2d 87, 98 (1986). Even if there are allegations of "multiple tortfeasors," when the defendants "neither act in concert nor contribute concurrently to the same wrong," then the wrongs for which they are liable are considered "independent and successive"—they are not "joint tortfeasors." *Ravo ex rel. Ravo v. Rogatnick*, 70 N.Y.2d 305, 310 (1987).

Joint and several liability is an exception to this general rule that only applies in limited circumstances. Traditionally, plaintiffs must first demonstrate that "two or more tort-feasors

---

[16] The Second Amendment provides a fully sufficient basis for dismissing not only the State's claims that Defendants unlawfully sold unfinished frames but also the State's misrepresentation claims. For the misrepresentation claims to succeed, the State must establish that Defendants made misleading statements about the legal regime that applies to unfinished frames—a burden the State cannot carry if the Second Amendment makes sale and possession of these products lawful. *See, e.g.*, *People v. Gen. Elec. Co.*, 756 N.Y.S.2d 520, 522–24 (1st Dep't 2003).

act[ed] concurrently or in concert to produce a *single* injury." *Id.* at 309 (emphasis added). Failing that, plaintiffs must demonstrate that the separate actions of the alleged tortfeasors resulted in injuries, which, "because of their nature, are incapable of any reasonable or practicable division or allocation among multiple tort-feasors." *Id.* at 310. Even then, joint and several liability is only appropriate after plaintiffs have shown "that it would not violate traditional notions of fairness and justice to hold all defendants jointly and severally liable for the injury." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 447 F. Supp. 2d 289, 299 (S.D.N.Y. 2006).

Equitable considerations are particularly salient because the imposition of joint and several liability can have significant and disproportionate consequences, making each party "liable to plaintiff for the *whole of the damage*." *Hecht v. City of New York*, 60 N.Y.2d 57, 62 (1983) (emphasis added). Such liability is thus only proper where it would be "logically inconsistent for one to be held liable while the other is not." *Cayuga Indian Nation of N.Y. v. Pataki*, 79 F. Supp. 2d 66, 71 (N.D.N.Y. 1999) (internal quotation mark omitted); *see also Ravo*, 70 N.Y.2d at 309 ("[I]n legal contemplation, there is a joint enterprise and a mutual agency, such that the act of one is the act of all and liability for all that is done is visited upon each."). Even when the injury associated with a public nuisance is indivisible, joint and several liability is still unavailable "where the injury imposed by each contributing actor *individually* does not constitute a *substantial* interference with a public right." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 493 (E.D.N.Y. 2003) (emphasis added).

In sum, joint and several liability may only be imposed if there (1) has been joint or concurrent conduct resulting in a single injury or separate conduct resulting in an indivisible injury and (2) the liability accords with equitable principles. This suit fails to satisfy either requirement.

1. The State has not alleged that Defendants acted jointly or that their actions led to a single

indivisible injury. To begin with, the State has not alleged Defendants acted in concert—all the State musters is a bald allegation that Defendants have a "common business model" and have "common marketing strategies." SAC ¶¶ 53, 112–13. But, at most, those are allegations that Defendants acted separately and individually to violate the law in similar ways. That is insufficient to allege concerted action. *Cf. Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) (holding in the antitrust context that "a bare allegation of parallel conduct is not enough to survive a motion to dismiss").

Moreover, the State's spare allegations do not plausibly allege that the harms from the various products Defendants sold at various times to various residents in various corners of the State has resulted in a "single" or "indivisible injury." *Ravo*, 70 N.Y.2d at 312. The State "simply assumes the existence of a single, indivisible injury." *Cayuga Indian Nation*, 79 F. Supp. at 72. Such assumptions are untenable because they leave Defendants without fair notice about the nature of the claims against them and resulting liability. For instance, the State "has been less than clear about whether the alleged injury is one injury to all of" New York or "whether each [locality]" in which these products have been sold "is individually (and indivisibly) injured." *MTBE*, 447 F.Supp.2d at 302 (holding plaintiffs could not pursue claim on injury to Suffolk County generally but could only proceed on a "well-by-well basis").

To be sure, public nuisance liability is sometimes joint and several. But that is only when—in striking contrast to the SAC's studied vagueness—the alleged nuisance is readily understood to be a single injury or indivisible by its nature. *Ravo*, 70 N.Y.2d at 310. This is apparent, for instance, in nuisances found from hazardous waste stored on a single plot of land, *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1037 (2d Cir. 1985), the unauthorized excavation of a single street, *Irvine v. Wood*, 51 N.Y. 224, 230 (1872), the collapse of a single brick wall with portions standing

on multiple landowners' lots, *Simmons v. Everson*, 124 N.Y. 319, 324 (1891), or the creation of

an indivisible injury by dumping hazardous materials into water that becomes commingled in sur-

face or ground water, *see e.g., State v. Schenectady Chemicals, Inc.*, 479 N.Y.S.2d 1010, 1012 (3d

Dep't 1984); *State v. City of Yonkers*, 836 N.Y.S.2d 495 (N.Y. Sup. Ct. Westchester Cnty. 2004);

*MTBE*, 447 F.Supp.2d at 302. This latter injury is indivisible because "the water with which each

of the parties were instrumental in injuring . . . was one mass and inseparable, and *no distinction*

can be made between the different sources from whence it flowed, so that it can be claimed that

each caused a separate and distinct injury for which each one is separately responsible." *Slater v.*

*Mersereau*, 64 N.Y. 138, 147 (1876) (emphasis added).

Even if the State had pleaded its injury with sufficient definiteness to determine the scope

of the alleged basis for joint and several liability, unlike many other public nuisance claims, any

potential injury traceable to Defendants is readily divisible. Any alleged injuries are "capable of

division" based on the number of shipments by each Defendant that are held to contribute to the

public nuisance. *Cayuga Indian Nation*, 79 F. Supp. 2d at 72; *see also* RESTATEMENT (SECOND)

OF TORTS § 840E, cmt. b (observing that "many nuisances are capable of apportionment among

two or more persons who contribute to them").

The State's injuries are also "readily divisible" because they are "conveniently separable

in point of time." *Id*. (quoting RESTATEMENT (SECOND) TORTS § 433A, cmt. c). Every alleged sale

of unfinished frames by the Defendants occurred at a different time. And the injuries are geograph-

ically divisible. The alleged shipments of qualified products by the Defendants occurred at separate

addresses in separate communities that may be separately situated with respect to the injuries the

State claims. *See Cayuga Indian Nation*, 79 F.Supp.2d at 72 (citing *United States v. Imperial Irri-*

*gation Dist.*, 799 F. Supp. 1052, 1069–70 (S.D. Cal. 1992) (apportioning liability amongst water

60

districts for separate contributions to flood of tribal land); *see also* RESTATEMENT (SECOND) OF TORTS § 840E, cmt. e. As the New York Appellate Division has explained, these considerations of "temporal proximity" and "spatial proximity" are inseparable from the public nuisance inquiry. *Sturm, Ruger & Co.*, 761 N.Y.S.2d at 197. They also provide a ready manner to divide any injuries the State alleges.

2. Even if the State had alleged an indivisible injury, equity prohibits joint and several liability. First, when a plaintiff seeks to hold "multiple actors" liable "for the creation of a public nuisance . . . and where the injury imposed by each contributing actor individually does not constitute a substantial interference with a public right," joint and several liability may not be imposed. *AcuSport*, 271 F. Supp. 2d at 493 (citing *Chipman v. Palmer*, 77 N.Y. 51, 56 (1879)). That is the case here because the contribution of each of the Defendants is minimal. Indeed, the State has alleged with specificity only a tiny number of actual shipments by any of the Defendants, such that the individual responsibility of any Defendant is "very small." *MTBE*, 447 F.Supp.2d at 303. In these circumstances, the *only* remedy available to the State is an injunction to restrain Defendants from further sales. *AcuSport*, 271 F.Supp.2d at 493 (citing *Chipman*, 77 N.Y. at 56).

Second, application of joint and several liability would be at odds with traditional notions of fundamental fairness. Essentially, the State "wants the benefit of dispensing with product identification" of any individual qualified product sold by a Defendant and to simply bundle all manufacturers together to pay for alleged injuries that may or may not be traceable to any of their products. *MTBE*, 447 F.Supp.2d at 303. Joint and several liability may not be imposed simply as a matter of convenience or because dividing injuries "will not be an easy task." *Cayuga Indian Nation*, 79 F.Supp.2d at 72. It must be "impossible." *Id*. At the very least there must be "no good reason why each should not be liable for the whole." *MTBE*, 447 F.Supp.2d at 303. And, the

individual nature of each Defendant's business shows why it should not be applied. Each of the Defendants has its own processes, sales policies and practices, and customers.

At bottom, to group the Defendants together would "summarily ignore" such concepts as "remoteness" of any individual Defendant from any particular injury, "proximate cause[,] and the significance of indisputable intervention of unlawful and frequently violent acts of criminals— over whom defendants have absolutely no control—who actually, directly, and most often intentionally, cause the cited harm." *Sturm, Ruger & Co.*, 761 N.Y.S.2d at 198–99; *see, e.g.*, SAC ¶¶ 1, 54, 109, 292–369 (citing exclusively criminal conduct by individuals). "Under these circumstances, it would be fundamentally unfair to hold these defendants jointly and severally liable." *MTBE*, 447 F.Supp.2d at 303.

## VI.   The SAC Suffers from Additional Pleading Deficiencies that Require Dismissal.

### A.   The SAC Fails to Allege Any Conduct By Defendants that Occurred Within New York City, and New York Administrative Code § 10-314 Does Not Apply Extraterritorially.

Counts One, Six, and Seven rely, in part, on a nested claim that Defendants violated New York City Administrative Code § 10-314(a). That code section provides: "Notwithstanding any other provision of this chapter, no person shall dispose of or possess an unfinished frame or receiver." N.Y.C. ADMIN. CODE § 10-314(a). The text of the provision establishes no basis to apply New York's municipal regulation to the conduct of someone outside the territorial jurisdiction of New York City who ships an unfinished frame to a New York City address.

To begin with, New York City itself does not purport to regulate beyond its territorial limits. The New York Administrative Code is crystal clear: "the boundaries, jurisdictions and powers of the city are for all purposes of local administration and government hereby declared to be co-extensive with the territory" of the five boroughs. N.Y. ADMIN. CODE § 2-201. This territorial limitation on the municipal regulation has been repeatedly referenced to foreclose causes of actions

based on allegations of conduct occurring elsewhere. *See, e.g.*, *Kamiel v. Hai St. Kitchen & Co. LLC*, 2023 WL 2473333, at *6 (S.D.N.Y. Mar. 13, 2023); *Duffy v. Drake Beam Morin*, 1998 WL 252063, at *11 (S.D.N.Y. May 19, 1998) ("[I]n order to state a claim under the City Human Rights Law, a plaintiff must allege that he was discriminated against by the defendant *within* New York City." (emphasis added)).

Further, the territorial limitation on New York municipal law is fully consonant with the general presumption under New York law that its statutes do not apply to conduct outside of the state. "New York recognizes the settled rule of statutory interpretation [ ] that unless expressly stated otherwise, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state . . . enacting it." *O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572, 578 (S.D.N.Y. 2013) (cleaned up). To rebut this presumption, a legislative body must make a "clear statement" that it intends to reach out-of-jurisdiction conduct. For example, the New York State Legislature has sought to regulate the "remote sale" of cigarettes by out-of-state retailers over the internet into New York State. *See, e.g.*, *City of New York v. Milhelm Attea & Bros., Inc.*, 550 F. Supp. 2d 332, 349 (E.D.N.Y. 2008). To do so, the Legislature made it "unlawful" "to ship or cause to be shipped any cigarettes to any person in this state" who does not meet certain requirements. N.Y. PUBLIC HEALTH LAW § 1399–*ll*(1).

New York City Administrative Code § 10-314(a) lacks any such language targeting "remote sales." For example, the codified definition of "dispose of" provides that it means "give away, give, lease, loan, keep for sale, offer, offer for sale, sell, transfer[, or] otherwise dispose of." N.Y.C. ADMIN. CODE § 10-301(8). Yet for every one of the Defendants, they "keep for sale, offer, offer for sale, sell, transfer, or otherwise dispose of" their products in places *outside* of New York. The SAC fails to allege that Defendants process their sales, pack their shipments, or effect their

shipments within the five boroughs.

**B.    The State Fails to Allege the Specific Conduct that Purports to Support Its Misrepresentation Claims Against Brownells.**

The State's misrepresentation claims should be dismissed because the SAC fails to identify any allegedly misleading statements by Brownells. Although the SAC cites to two October 2017 press releases and attempts to attribute the entire contents of the press releases to Brownells, the press releases cited were authored and posted by other entities, "The Outdoor Wire" and "Ammo-land." *See* SAC ¶¶ 284–285. Within the press releases, only two quotations are attributed to Brownells: (1) "The Polymer80 80 percent frames are perfect for dedicated enthusiasts who enjoy building it themselves"; and (2) "Those who might have built their own AR-15 rifle can now make their very own custom pistol with just a few simple tools." *Brownells Announces Exclusive Polymer80 Frames*, THE OUTDOOR WIRE (Oct. 11, 2017), https://bit.ly/3W9xr3g; *Brownells Announce Exclusive Polymer80 Frames for Glock-Style Pistols*, AMMOLAND (Oct. 10, 2017), https://bit.ly/3nYfyZG. The only other Brownells statements identified in the SAC concern factual descriptions of the Polymer80 frames, *e.g.*, SAC ¶¶ 25, 84, and how to build a custom pistol using a Polymer80 frame. SAC ¶¶ 41, 46, 280–282, 289. There are no statements alleged that concern the legality of selling and possessing Brownells' firearms, supposed ghost guns, or unfinished frames and receivers in New York. Because the SAC fails to allege any Brownells conduct to support its misrepresentation claims, those claims should be dismissed.

**C.    The State Fails to Adequately Allege that Brownells Aided and Abetted Violations of Local, State, or Federal Law.**

Count One charges that Brownells aided and abetted various violations of state and federal law. These claims fail because the SAC does not allege the necessary *mens rea*.

The federal aiding and abetting standard includes a substantial *mens rea* requirement. *See United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996); 18 U.S.C. § 2. To be culpable for aiding

and abetting a violation of the federal laws cited in the relevant portions of Count One, Brownells "must have taken some *conscious action* that furthered the commission of the underlying crime" and must have "either acted or failed to act with the *specific intent* of advancing the commission of the underlying crime." *Pipola*, 83 F.3d at 562 (emphases added). The State has not alleged a conscious action Brownells undertook to further the commission of aiding and abetting the possession of unserialized firearms or the possession of firearms by convicted persons, nor does the State allege that Brownells acted with specific intent to advance the commission of these crimes. While the SAC alleges that certain individuals to whom Brownells allegedly sent packages were not legally permitted to possess firearms, *see* SAC ¶¶ 319, 323, 327, 331, 339, 341, 361, 363, the State fails to allege that Brownells consciously acted or acted with the specific intent to assist a felon in possessing a firearm. Similarly, there are no allegations that Brownells acted with specific intent to assist others in the possession of unserialized firearms.

As for the allegations concerning aiding and abetting violations of state law, the State has also failed to adequately allege the necessary *mens rea*. New York's standard for aiding and abetting requires the "mental culpability required for the commission" of the underlying offense. *See* N.Y. Penal Law § 20.00. "[A]n accomplice must have a shared intent, or community of purpose with the principal." *Nelson v. Lilley*, 2022 WL 2872648, at *5 (W.D.N.Y. July 21, 2022) (cleaned up). The SAC fails to allege that Brownells had a shared intent or community of purpose with the individuals who unlawfully possessed guns.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC in its entirety.

65

Dated: April 19, 2023                    Respectfully Submitted,

                                         /s/ David H. Thompson
                                         **COOPER & KIRK PLLC**
                                         David H. Thompson*
                                         Brian W. Barnes*
                                         1523 New Hampshire Ave., NW
                                         Washington, DC 20036
                                         Phone: (202) 220-9600
                                         dthompson@cooperkirk.com
                                         bbarnes@cooperkirk.com
                                         * Admitted *pro hac vice*

                                         *Attorneys for Defendant Brownells, Inc., a/k/a*
                                         *Brownells or Bob Brownell's*