**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

THE PEOPLE OF THE STATE OF NEW YORK,

        Plaintiff,

    v.

ARM OR ALLY, LLC, *et al.*

        Defendants.

22-cv-6124
(Furman, J.)

---

## MEMORANDUM OF LAW IN SUPPORT OF
## UNITED STATES OF AMERICA'S MOTION TO INTERVENE
## AND IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

DAMIAN WILLIAMS
United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2800
lucas.issacharoff@usdoj.gov
jeannette.vargas@usdoj.gov

LUCAS ISSACHAROFF
JEANNETTE VARGAS
Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND ................................................................................. 3
    I.      Statutory Background ................................................................. 3

    II.     Regulatory Background ............................................................. 4

    III.    Procedural Background ........................................................... 8

ARGUMENT ..................................................................................... 10
    I.      The Government Is Entitled to Intervene as of Right and Should Be Granted Permissive Intervention ............................................ 10

        A.    Applicable Legal Standards ................................................ 10

        B.    The United States Satisfies the Requirements for Intervention as of Right ....................................................................... 12

        C.    The United States Satisfies the Requirements for Permissive Intervention ...................................................................... 14

    II.     The Gun Control Act as Implemented by the Rule Does Not Offend the Second Amendment .......................................................... 15

        A.    Legal Standard—*Heller*, *McDonald*, and *Bruen* .............. 16

        B.    The Second Amendment's Plain Text Does Not Cover the Challenged Provisions of the Act and the Rule .................... 18

        C.    Section 922(a)(3) Fits Within This Nation's Historical Tradition of Firearms Regulation ......................................... 21

    III.    The Rule Comports with the Gun Control Act ........................... 26

        A.    The Rule's Amended Definition of "Firearm" Is Appropriate and in Accordance with the Statute ..................................... 27

        B.    ATF's Amendment of the Definition of "Frame or Receiver" Is Proper and in Accordance with the Statute ...................... 30

    IV.    The Gun Control Act and the Rule Are Not Void for Vagueness ............ 34

CONCLUSION .................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*,
    84 F.3d 602 (2d Cir. 1996) ................................................................ 36

*Aubin v. Columbia Cas. Co.*,
    No. 16 Civ. 290 (BAJ) (EWD), 2017 WL 1416814 (M.D. La. Apr. 19, 2017) ...................... 11

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)........................................................................ *passim*

*Heller v. Bedford Cent. Sch. Dist.*,
    665 F. App'x 49 (2d Cir. 2016) ............................................................ 16

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)........................................................................ 2, 16, 19

*Morehouse Enters., LLC v. ATF*,
    3:22-CV-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022)........................................ 8

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) .............................................................. 35, 36

*N.Y.C. Bd. of Elections*,
    246 F. Supp. 978 (S.D.N.Y. 1965) ........................................................ 11

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)..................................................................... *passim*

*New York v. Burger*,
    482 U.S. 691 (1987)........................................................................ 33

*Nuesse v. Camp*
    385 F.2d 694, 706 (D.C. Cir. 1967)........................................................ 14

*Roberts v. United States*,
    No. 2:04-cr-295-PMD, 2007 WL 9754483 (D.S.C. Oct. 30, 2007) .............................. 35

*Robertson v. Baldwin*,
    165 U.S. 275 (1897)........................................................................ 18

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017) .............................................................. 21, 22

*United States v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns*,
    443 F.2d 463 (2d Cir. 1971) .............................................................. 35

*United States v. Annis*,
    446 F.3d 852 (8th Cir. 2006) .............................................................. 7, 28

*United States v. Bogle*,
    717 F.3d 281 (2d Cir. 2013) .............................................................. 16

*United States v. Brown*,
    235 F. Supp. 2d 931 (S.D. Ind. 2002)...................................................... 12

*United States v. Catanzaro*,
    368 F. Supp. 450 (D. Conn. 1973).......................................................... 35

*United States v. Decastro*,
    682 F.3d 160 (2d Cir. 2012) .............................................................. 19, 24

*United States v. Dotson*,
   712 F.3d 369 (7th Cir. 2013) ............................................................. 29
*United States v. Flores*,
   No. H-20-427, 2023 WL 361868 (S.D. Tex. Jan. 23, 2023) ...................... 20
*United States v. Focia*,
   869 F.3d 1269 (11th Cir. 2017) .......................................................... 19
*United States v. Hardin*,
   889 F.3d 945 (8th Cir. 2018) .............................................................. 29
*United States v. Holton*,
   No. 3:21-cr-0482-B, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) ............ 25
*United States v. Kazmende*,
   No. 22 Cr. 236 (SDG)(CCB), 2023 WL 3872209 (N.D. Ga. May 17, 2023) ......... 20
*United States v. King*,
   No. 22 Cr. 215, 2022 WL 17668454 (E.D. Pa. Dec. 14, 2022) .................... 20
*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) ................................................................. 25
*United States v. Mobley*,
   956 F.2d 450 (3d Cir. 1992) ............................................................... 25
*United States v. Mullins*,
   446 F.3d 750 (8th Cir. 2006) .............................................................. 33
*United States v. Quiroz*,
   449 F.2d 583 (9th Cir. 1971) .............................................................. 35
*United States v. Rivera*,
   415 F.3d 284 (2d Cir. 2005) .......................................................... 29, 30
*United States v. Ryles*,
   988 F.2d 13 (5th Cir. 1993) ......................................................... *passim*
*United States v. Stewart*,
   451 F.3d 1071 (9th Cir. 2006) ......................................................... 7, 27
*United States v. Theodoropoulous*,
   866 F.2d 587 (3d Cir. 1989) ........................................................... 7, 28
*United States v. Tita*,
   No. RDB-21-0334, 2022 WL 17850250 (D. Md. Dec. 22, 2022) ................. 20
*United States v. TRW Rifle 7.62x51mm Caliber*,
   447 F.3d 686 (9th Cir. 2006) .............................................................. 33
*United States v. Vereen*,
   22 Cr. 644 (S.D.N.Y. June 12, 2023) ................................................... 20
*United States v. Wick*,
   697 F. App'x 507 (9th Cir. 2017) ..................................................... 7, 27
*United States v. Wick*,
   No. CR 15-30-M-DLC, 2016 WL 10612608 (D. Mont. Mar. 11, 2016) .......... 35
*United States v. Williams*,
   553 U.S. 285 (2008).......................................................................... 35
*United States v. Wojcikiewicz*,
   403 F. App'x 483 (11th Cir. 2010) ....................................................... 35
*United States v. Woods*,
   560 F.2d 660 (5th Cir. 1977) .............................................................. 33

*VanDerStok v. Garland*,
  625 F.Supp.3d 570 (N.D. Tex. 2022) ................................................................. 14
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) .......................................................................................... 36

## Statutes

15 U.S.C. § 7903 ................................................................................................... 14
18 U.S.C. § 921 .............................................................................................. *passim*
18 U.S.C. § 922 ...................................................................................... 3, 12, 13, 19
18 U.S.C. § 923 ............................................................................................ 3, 12, 13
18 U.S.C. § 926 ............................................................................................ 1, 12, 30
18 U.S.C. § 927 ...................................................................................................... 7
26 U.S.C. § 5845 ....................................................................................... 32, 33, 35
28 U.S.C. § 2403 ........................................................................................... *passim*
Gun Control Act of 1968, Pub. L. No. 90-351 ............................................... *passim*
2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822
  (1823) ............................................................................................................... 22
3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One
  Thousand Seven Hundred 240-44 ..................................................................... 22
6 Statutes at Large of Pennsylvania from 1682 to 1801 (1899) ................................. 22
15 The Public Records of the Colony of Connecticut 191 (1890) .............................. 23
1776-1777 N.J. Laws 6, An Act for theInspection of Gunpowder, ch. 6, § 1 .............. 23
Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890) .............. 23
Internal Revenue Code of 1986 ................................................................................. 7
Laws of the Commonwealth of Massachusetts from February 28, 1807 to February 28, 1814 at
  536-37 (1814) ................................................................................................... 24
Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at
  259 (1807) ................................................................................................... 23, 24
Laws of the State of Maine 546 (1830) ..................................................................... 24
Laws of the State of New Hampshire; with the Constitutions of the United States and of the State
  Prefixed 277 (1830) .......................................................................................... 22
New York Executive Law 63(12) ................................................................................ 8
New York General Business Law 898 .............................................................. 8, 9, 14
Records of the State of Rhode Island and Providence Plantations in New England 18 (1863) ... 23
The Charter and Ordinances of the City of Providence, with the General Assembly Relating to
  the City 37 (1835) ............................................................................................. 23

## Rules

Fed. R. Civ. P. 5.1 ......................................................................................... *passim*
Fed. R. Civ. P. 24 .......................................................................................... *passim*

## Regulations

27 C.F.R. § 478.11 ......................................................................................... *passim*
27 C.F.R. § 478.58 ................................................................................................ 7
27 C.F.R. § 478.92 ................................................................................................ 4

27 C.F.R. § 479.11 ................................................................................................ 31
33 Fed. Reg. 18,555 (Dec. 14, 1968) ...................................................................... 4
87 Fed. Reg. 24652 (Aug. 24, 2022) .............................................................. *passim*

**Other Authorities**

7C Charles Alan Wright & Arthur C. Miller, Fed. Prac. & Proc. Civ. § 1912 (3d ed.) .............. 14
Lois Schoewer, *Gun Culture in Early Modern England* 4-25 (2016) ......................................... 24

The United States of America, by and through its attorney Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion to intervene in the above-captioned case pursuant to Federal Rules of Civil Procedure 5.1(c), 24(a)(1), and 24(b)(2)(B), and in opposition to Defendants' motions to dismiss the Amended Complaint to the extent Defendants challenge the constitutionality of the Gun Control Act of 1968, Pub. L. No. 90-351 (the "Gun Control Act" or the "GCA"); the constitutionality of the regulation enacted by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") defining the statutory terms "firearm" and "frame and receiver," Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87  Fed. Reg. 24652 (effective Aug. 24, 2022) (the "Rule"); or the Rule's consistency with the GCA.

## PRELIMINARY STATEMENT

The United States seeks to intervene in this action to defend the constitutionality of the Gun Control Act, in particular its definition of "firearm," codified at 18 U.S.C. § 921(a)(3), and the Rule enacted by ATF. The United States further seeks to intervene in this action to defend the validity of the Rule, *i.e.*, that it is a reasonable interpretation of the relevant statutory provisions. The United States has the authority and obligation to interpret and enforce the provisions of the Gun Control Act and to defend the Rule and has a substantial interest in this litigation as a result.

The United States may intervene as of right with respect to the constitutionality of the Gun Control Act. *See* Fed. R. Civ. P. 5.1(c), 24(a)(1); 28 U.S.C. § 2403(a). The United States should further be granted permissive intervention to defend the Rule, which implements the provisions of the Gun Control Act as provided for by 18 U.S.C. § 926(a). *See* Fed. R. Civ. P. 24(b)(2)(B). Such intervention is appropriate because the United States has a substantial interest in defending the validity of the Rule and because such intervention would not unduly delay or prejudice the adjudication of the original parties' rights.

1

Defendants' arguments as to the unconstitutionality of the Gun Control Act are without merit. The Gun Control Act creates commonsense limitations on the commercial sale of arms; as relevant here, it requires that individuals and entities engaged in the business of importing, manufacturing, or dealing in firearms obtain a federal firearms license; maintain records of firearm acquisition and transfer as prescribed by regulation; conduct background checks before transferring firearms to a non-licensee; and identify each firearm they import or manufacture by means of a unique serial number on the receiver or frame of the weapon. These restrictions are among the "laws imposing conditions and qualifications on the commercial sale of arms" that the Supreme Court has repeatedly approved. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *see also New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., joined by Roberts, C.J., concurring) (same); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) (same). These laws do not burden the rights of law-abiding citizens to obtain arms for self-defense, and further are consistent with this nation's historical tradition of firearms regulation.

In addition, ATF's Rule is consistent with the Gun Control Act, and neither the Rule nor the Act is unconstitutionally vague. The Rule implements a commonsense definition of "frame or receiver" that captures a "partially complete, disassembled, or nonfunctional frame or receiver" to take into account technological changes since the GCA was enacted and the previous regulatory definition was promulgated in 1968. In doing so, ATF relied upon principles articulated by federal courts and applied elsewhere in federal statutes for determining when a component or set of components may "readily" be converted to a firearm. Nor is the definition unconstitutionally vague; several courts, including the Second Circuit, have rejected the argument that provisions of the GCA and the parallel language of the National Firearms Act addressing products that may be "readily converted" or "readily restored" to function in a particular manner (or materially identical

language in state laws) are unconstitutionally vague. And even if there were some ambiguity, ATF has implemented an administrative process whereby sellers may submit samples of the product they intend to sell to obtain an opinion from ATF as to whether it constitutes a firearm.

For these reasons, the Court should grant the Government's motion to intervene and deny Defendants' motions to dismiss to the extent they cast doubt upon the constitutionality of the Gun Control Act or the Rule, or the Rule's consistency with the Act.

## **BACKGROUND**

### I.      **Statutory Background**

Congress enacted the GCA after finding that "existing Federal controls over [widespread traffic in firearms moving in interstate commerce] do not adequately enable the States to control this traffic within their own borders." Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. 197, 225 (1968). Congress specifically determined that "only through adequate Federal control . . . over *all* persons engaging in the businesses of importing, manufacturing, or dealing in [these weapons], can this grave problem be properly dealt with." *Id*. § 901(a)(3), 82 Stat. at 225 (emphasis added). Accordingly, Congress enacted requirements for persons engaging in the business of importing, manufacturing, or dealing in "firearms." *See generally* 18 U.S.C. §§ 922-23.

Among other things, Congress, through the GCA, required individuals and entities engaged in the business of importing, manufacturing, or dealing in firearms to obtain a federal firearms license, *id*. § 923(a), to maintain records of firearm acquisition and transfer as prescribed by regulation, *id*. § 923(g)(1)(A), and to conduct background checks before transferring firearms to a non-licensee, *id*. § 922(t). Congress also required licensed importers and manufacturers to identify

each firearm they import or manufacture by means of a unique serial number on the receiver or frame of the weapon and other markings as prescribed by Federal regulation.[1] *Id*. § 923(i).

Congress defined "firearm" to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon." *Id*. § 921(a)(3). A "frame" or "receiver" is a firearm's primary structural component to which fire control components are attached, but Congress did not define the terms "frame" or "receiver" by statute, *see id*. § 921, and instead vested ATF with the authority to promulgate regulations "necessary to carry out the provisions of" the GCA. *Id*. § 926(a).

## II.    Regulatory Background

Over fifty years ago, ATF defined the statutory term "frame or receiver"[2] as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Final Rule, Commerce in Firearms and Ammunition, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968), *formerly codified at* 27 C.F.R. § 478.11. This definition was meant to provide direction as to which portion of a weapon is the frame or receiver for purposes of licensing, serialization, and recordkeeping, thereby ensuring that a component necessary for the weapon's functioning could be traced if the weapon was used in a crime. Final Rule, 87 Fed. Reg. at 24,652.

---

[1] Federal regulations, for example, require that the frame or receiver must also be marked with either the name, and city and state where the licensee maintains their place of business; or their name and the serial number beginning with their abbreviated federal firearms license number. 27 C.F.R. § 478.92(a)(1)(i).

[2] Previously, ATF regulations included definitions for both "firearm frame or receiver" and "frame or receiver." 87 Fed. Reg. 24,652, 24,727.

Yet as firearms have evolved a strict application of this definition, as applied by some courts, would have resulted in upwards of 90 percent of commercially manufactured firearms not being subject to the definition because they no longer have a single frame or receiver housing all components specified by the former regulatory definition. *Id*. Technological advances have also enabled the proliferation of weapon parts kits and easy-to-complete partially complete frames or receivers, which were routinely distributed by licensed and unlicensed individuals and entities to consumers without maintaining any records or conducting background checks. *Id*. These kits and partially complete frames and receivers allow unlicensed persons to make firearms quickly and easily. *Id.* at 24,652. Because such privately made firearms typically lack serial numbers, it is extremely difficult for law enforcement to trace them when used in a crime. *Id*. at 24,652, 24,659.

To address technological developments and update its decades-old definition of "frame and receiver," ATF promulgated the Rule on April 26, 2022, 87 Fed. Reg. 24,652, which took effect on August 24, 2022. The Rule contains the following key provisions:

First, to reflect existing law, the Rule adds a sentence to ATF's regulatory definition of "firearm" providing that "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *See id*. at 24,662, 24,727, 24,735. The term "readily" is also defined by the rule as discussed herein.

Second, the Rule provides an updated definition of the term "frame or receiver." *See id*. at 24,652, 24,727. The Rule further defines "frame" for handguns and "receiver" for rifles, shotguns, and other weapons that expel a projectile. *See id*. at 24,727, 24,735. Unlike the 1968 definition, these updated definitions now describe only a *single* housing or structural component for a *specific* fire control component of a given weapon—including "variants thereof," a term that is also

defined.[3] *Id*. For handguns (or variants thereof), the frame is the housing or structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component before initiating the firing sequence. *Id*. For long guns (or variants thereof), the receiver is the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence. *Id*.

The definition of "frame or receiver" includes a frame or receiver that is partially complete, disassembled, or nonfunctional—including a frame or receiver parts kit—that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver. *Id*. at 24,739; *see also id*. at 24,663, 24,727-28.

Third, the Rule also defines "[r]eadily" to mean a process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. *Id*. at 24,735. The Rule includes factors relevant to determine whether a firearm may readily be completed, assembled, restored, or otherwise converted to function as a firearm or a frame or receiver.[4] ATF based this definition on case law

---

[3] The terms "variant" and "variants thereof" mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments. For example, an AK-type firearm with a short stock and a pistol grip is a pistol variant of an AK-type rifle, an AR-type firearm with a short stock and a pistol grip is a pistol variant of an AR-type rifle, and a revolving cylinder shotgun is a shotgun variant of a revolver. *Id*.

[4] "With respect to the classification of firearms, factors relevant in making this determination include the following: (1) Time, i.e., how long it takes to finish the process; (2) Ease, i.e., how difficult it is to do so; (3) Expertise, i.e., what knowledge and skills are required; (4) Equipment, i.e., what tools are required; (5) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained; (6) Expense, i.e., how much it costs; (7) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and (8) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction." *Id*.

interpreting the terms "may readily be converted to expel a projectile" in the GCA and "can be readily restored to shoot" in the National Firearms Act (NFA). 86 Fed. Reg. at 27,730.[5]

Fourth, to account for recent technological advances, the Rule clarifies that the GCA's definition of "firearm" includes a "privately made firearm." 87 Fed. Reg. at 24,735. A "privately made firearm" is a firearm (including a frame or receiver) that is assembled or otherwise produced by a person other than a licensed manufacturer, and that does not contain a serial number placed by a licensed manufacturer at the time of production. *Id*. The Rule does not restrict the private making of firearms by non-licensees who are not otherwise prohibited by law from possessing them and requires only that such firearms that are taken into inventory by licensees be serialized and recorded so that they may be traced by law enforcement if they are later involved in crime.[6] *Id*. at 24,653, 24,742, 24,744.

Importantly, the Rule reflects the long-held understanding that the GCA's definition of "firearm" encompasses something more than a completely assembled and functional weapon. Federal courts have repeatedly held that disassembled collections of weapon parts and parts kits that may readily be converted to expel a projective are "firearms" under 18 U.S.C. § 921(a)(3)(A). *See, e.g.*, *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006); *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993); *United States v. Theodoropoulous*, 866

---

[5] The NFA is part of the Internal Revenue Code of 1986. The Internal Revenue Code, with the exception of the NFA, is administered and enforced by the Secretary of the Treasury. When ATF was transferred to the Department of Justice under the Homeland Security Act of 2002, all its authorities, including the authority to administer and enforce the NFA, were transferred to the Attorney General.

[6] The GCA does not, with limited exceptions, supersede State or local law, which may be more restrictive than federal requirements. *See, e.g.*, 18 U.S.C. § 927 and 27 C.F.R. § 478.58.

F.2d 587, 595 n.3 (3d Cir. 1989). As recently as August of last year, a court examining the Rule

stated that "a non-operational weapon which can be made operational already qualifies as a firearm

under 18 U.S.C. § 921(a)(3)(A)." *Morehouse Enters., LLC v. ATF*, No. 3:22-CV-116, 2022 WL

3597299, at *11 (D.N.D. Aug. 23, 2022), *appeal docketed* (8th Cir. Aug. 31, 2022). Consequently,

"regulating a non-operational kit that can be readily turned into an operational firearm is not a

significant change [and] [f]urther, any adjustments to the way these kits, or the parts they contain,

are treated has been thoroughly explained." *Id.*

Accordingly, the Rule implements the longstanding interpretation of the GCA—by both

ATF and federal courts—that weapon parts kits that include all or most components necessary to

produce a functional firearm are weapons that may readily be converted to expel a projectile by

the action of an explosive. Such kits are, and always have been, classified as firearms under the

GCA. Further, the Rule clarifies when an item becomes a regulated frame or receiver by stating

that partially complete, disassembled, or nonfunctional firearm frames and receivers that are

designed to or may readily be completed, assembled, restored, or otherwise converted to function

as a frame or receiver are frames and receivers—and therefore firearms—under the GCA

## III.     Procedural Background

In this action the People of the State of New York ("New York") bring claims against ten

defendant companies under New York Executive Law 63(12), for shipping and selling partially

complete frames and receivers into New York in contravention of New York Penal Law, and under

New York General Business Law 898-b.

This case was originally filed in state court, but then removed by Defendants to federal

court. New York filed a motion seeking to remand the matter to state court. On December 8, 2022,

the Court denied the remand motion. Dkt. No. 58. In determining that the case raised a substantial

federal issue, the court relied heavily on the Rule and on the Statement of Interest submitted by

the United States in *City of New York v. Arm or Ally, LLC*, 22 Civ. 5525 (S.D.N.Y.). *See* Dkt. No. 58 at 11-12. Specifically, the Court reasoned that this action implicates the proper definition of the terms "firearm" and "component part" under the GCA. *Id.* The Court agreed with Defendants that the resolution of this question could "have sweeping consequences for the regulatory flexibility of the ATF, the enforcement powers of federal prosecutors, the scope of a state's authority to regulate these products, and the potential liability of thousands of individuals who have acquired these products." *Id.* at 12. To the extent there was any doubt of the substantial nature of the federal question presented, the Court found that it was "resolved" by the Government's filing of the Statement of Interest in the *City of New York* litigation, which stated that the court's resolution of these issues was of "acute interest" to the United States. *Id.*

Following the court's denial of the motion for remand, the court permitted New York to file an amended complaint. On January 16, 2023, Defendants filed motions to dismiss the amended complaint. The common defenses were primarily advanced in the memorandum of law submitted by Defendant Brownells, Inc. ("Brownells"). Specifically, Defendants argued that the amended complaint should be dismissed because, *inter alia*:

(1) The products at issue are not "firearms" under 18 U.S.C. § 921 according to the statutory text and ATF guidance (and to the extent the ATF's Rule defines the products as "firearms," it is inconsistent with the statutory text);

(2) New York's interpretation of 18 U.S.C. § 921 and New York GBL § 898-b would render both void for vagueness; and

(3) All of the state's claims must be dismissed under the Second Amendment.

Dkt. No. 91.

Based on the Second Amendment argument, as well as the void-for-vagueness argument under the Fifth Amendment, Brownells served the United States with a Rule 5.1 Notice on January

18, 2023. Dkt. No. 112. The Government acknowledged the Notice on January 23, 2023, informing the court that it was determining whether to intervene under Fed. R. Civ. P. 5.1 and/or Fed. R. Civ. P. 24(b)(2). Dkt. No. 115. The Court granted the United States until June 16, 2023, to determine whether to intervene. Dkt. No. 200.

With leave of court, New York filed a Second Amended Complaint on March 13, 2023. Dkt. No. 157. In response to this Second Amended Complaint, Defendants once again filed motions to dismiss, advancing largely the same common arguments regarding the constitutionality of the GCA and the Rule and the consistency of the Rule with the GCA. Dkt. No. 175.

## ARGUMENT

### I.   The Government Is Entitled to Intervene as of Right and Should Be Granted Permissive Intervention

#### A.  Applicable Legal Standards

##### 1.        Intervention Pursuant to Fed. R. Civ. P. 5.1(c)

Federal Rule of Civil Procedure 5.1(a) provides that a "party that files a . . . written motion . . . drawing into question the constitutionality of a federal . . . statute must promptly: (1) file a notice of constitutional question stating the question and identifying the paper that raises it, if: (A) a federal statute is questioned and the parties do not include the United States, one of its agencies, or once of its officers or employees in an official capacity" and (2) serve such notice on the Attorney General.

Pursuant to Rule 5.1(a), Brownells filed a Rule 5.1 Notice of its constitutional challenge to the Gun Control Act, Dkt. No. 112, and served it upon the United States. Rule 5.1(b) requires that the Court certify to the Attorney General that the statute has been questioned pursuant to 28 U.S.C.

§ 2403.[7] Rule 5.1(c) states that, "[u]nless the Court sets a later time, the attorney general may intervene within 60 days after the notice is filed or after the court certifies the challenge, whichever is earlier." The Rule is intended to "ensure that the attorney general is notified of constitutional challenges and has an opportunity to exercise the statutory right to intervene at the earliest possible point in the litigation."

### 2.    Intervention Pursuant to Fed. R. Civ. P. 24(a)(1)

Federal Rule of Civil Procedure 24(a)(1) states that, "[o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by federal statute." 28 U.S.C. § 2403(a) provides:

> In any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The United States shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

Based upon the unambiguous statutory language, courts have characterized 28 U.S.C. § 2403 as providing the "unconditional right to intervene" required by Rule 24(a)(2). *N.Y.C. Bd. of Elections*, 246 F. Supp. 978, 980 (S.D.N.Y. 1965); *cf. Aubin v. Columbia Cas. Co.*, No. 16 Civ. 290 (BAJ) (EWD), 2017 WL 1416814, at *4 (M.D. La. Apr. 19, 2017) (noting the State of Louisiana's "unconditional right to intervene" under the parallel provision of 28 U.S.C. § 2403(b)).

---

[7] Although the United States' right to intervene is not conditional upon the Court's certification, *see infra*, for the avoidance of doubt the United States further requests that the Court certify the challenge pursuant to Fed. R. Civ. P. 5.1(b) and 28 U.S.C. § 2403(a). *See* Fed. R. Civ. P. 5.1, 2006 Advisory Committee Notes ("The Court's certification obligation remains" notwithstanding party's notice.).

### 3.    Intervention Pursuant to Fed. R. Civ. P. 24(b)(2)

In addition to the intervention as of right provided for by Rules 5.1 and 24(a), Federal Rule of Civil Procedure 24(b)(2)(B) provides that, "[o]n timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on (A) a statute . . . administered by the officer or agency; or . . . any regulation . . . issued or made under the statute . . . ."

As noted *supra*, Defendants challenge the validity of the Rule, a regulation issued pursuant to the authority delegated to the Attorney General by 18 U.S.C. § 926.

### B.  The United States Satisfies the Requirements for Intervention as of Right

28 U.S.C. § 2403(a) provides the United States an unconditional right to intervene in any action "wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question." That requirement is easily met here.

First, the Gun Control Act is an Act of Congress affecting the public interest. Congress enacted the GCA after finding that "existing Federal controls over [widespread traffic in firearms moving in interstate commerce] do not adequately enable the States to control this traffic within their own borders." Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. 197, 225 (1968). Congress specifically determined that "only through adequate Federal control . . . over all persons engaging in the businesses of importing, manufacturing, or dealing in [these weapons], can this grave problem be properly dealt with." *Id.* § 901(a)(3), 82 Stat. at 225 (emphasis added). Accordingly, Congress enacted requirements for persons engaging in the business of importing, manufacturing, or dealing in "firearms." *See generally* 18 U.S.C. §§ 922-23. Courts have described the GCA as the "centerpiece of federal firearms regulation," *United States v. Brown*, 235 F. Supp. 2d 931, 932 (S.D. Ind. 2002), and this Court itself has recognized the potentially "sweeping consequences" of the statutory questions at issue, Dkt. No. 58 at 12.

Second, the constitutionality of the GCA has been drawn into question. Defendants assert that "[l]aws purporting to prohibit the sale and possession of these precursor parts violate the Second Amendment." Dkt. No. 175 at 53. Although Defendants do not specify precisely *which* laws these are, the GCA creates a number of restrictions that turn upon the definition of "firearm," potentially including the precursor parts at issue in this litigation. Among other things, Congress, through the GCA, required individuals and entities engaged in the business of importing, manufacturing, or dealing in firearms to obtain a federal firearms license, *id.* § 923(a), to maintain records of firearm acquisition and transfer as prescribed by regulation, *id.* § 923(g)(1)(A), and to conduct background checks before transferring firearms to a non-licensee, *id.* § 922(t). Congress also required licensed importers and manufacturers to identify each firearm they import or manufacture by means of a unique serial number on the receiver or frame of the weapon and other markings as prescribed by Federal regulation. *Id.* § 923(i).

Defendants further argue that "the federal statutory definition of 'firearm' . . . would be unconstitutionally vague if interpreted and applied in the manner that the State proposes." Dkt. No. 175 at 42. Although Defendants suggest that the Court need not reach the question of the statute's prospective validity as interpreted by the Rule, *id.* at 43, Defendants nevertheless again call its constitutionality into question.

As discussed *infra*, Defendants are incorrect in their assertions that the GCA and the implementing Rule burden any conduct protected by the Second Amendment, and that the statute and Rule are unconstitutionally vague. But Defendants' motions to dismiss clearly draw the constitutionality of the Gun Control Act into question.

Accordingly, the Court should certify pursuant to Fed. R. Civ. P. 5.1(c) and 28 U.S.C. § 2403(a) that a constitutional challenge to a federal statute has been lodged and grant the Government's motion for intervention as of right.

13

### C.  The United States Satisfies the Requirements for Permissive Intervention

The Court should additionally permit the United States to intervene pursuant to Fed. R. Civ. P. 24(b)(2) because New York's claims rely in part on the Rule recently promulgated by ATF under the Gun Control Act and because Defendants' motions to dismiss call the Rule into question.

In its Second Amended Complaint, New York relies in part upon the Rule's clarification of the definitions of "firearm" and "frame or receiver." Dkt. No. 157 at ¶¶ 90-91. New York's third cause of action is brought under N.Y. Gen. Bus. L. § 898. Dkt. No. 157 at ¶ 609. Section 898-a incorporate the federal definition of "qualified product" at 15 U.S.C. § 7903(4), which in turn incorporates the definition of "firearm" at 18 U.S.C. § 921(a)(3), *i.e.*, the Gun Control Act as interpreted by the Rule. New York further relies upon the Gun Control Act and the Rule by bringing a claim under N.Y. Exec. L. 63(12) in part based on conduct that violates federal law or regulation. *See* Dkt. No. 157 at ¶¶ 596-600. Accordingly, two of New York's claims are based upon a statute administered by ATF and the Department of Justice and/or a regulation issued under that statute.

Additionally, in their motions to dismiss Defendants argue that the products at issue are not firearms under the GCA as interpreted by the Rule, but, to the extent they are, the court should reject the Rule as contrary to the statutory text. *See* Dkt. No. 175 at 13-14 (citing *VanDerStok v. Garland*, 625 F.Supp.3d 570 (N.D. Tex. 2022)). Accordingly, Defendants raise a challenge based upon the validity of a regulation issued under the Gun Control Act.

These challenges implicate the interests of the public and the United States. "[T]he whole thrust of the amendment [to Rule 24] is in the direction of allowing intervention liberally to governmental agencies and officers seeking to speak for the public interest . . . ." 7C Charles Alan Wright & Arthur C. Miller, Fed. Prac. & Proc. Civ. § 1912 (3d ed.) (footnote omitted) (collecting cases); *see also Nuesse v. Camp*, 385 F.2d 694, 706 (D.C. Cir. 1967) ("While a public official may

14

not intrude in a purely private controversy, permissive intervention is available when sought because an aspect of the public interest with which he is officially concerned is involved in the litigation.").

Finally, because the United States is already provided an unconditional right to intervene to defend the constitutionality of the Gun Control Act, and because this intervention is occurring in line with the existing briefing schedule on the motions to dismiss New York's Second Amended Complaint, *see* Dkt. No. 200, no party's rights are prejudiced by intervention. The Court should therefore grant the Government permission to intervene to fully defend its interests with respect to the Gun Control Act and its implementing regulations.

## II.   The Gun Control Act as Implemented by the Rule Does Not Offend the Second Amendment

The regulatory regime challenged by Defendants is among the "laws imposing conditions and qualifications on the commercial sale of arms" that the Supreme Court has repeatedly made clear do not run afoul of the Second Amendment. *Heller*, 554 U.S. at 626-27. Despite this clear guidance, Defendants assert that the Supreme Court's test for adjudicating Second Amendment challenges set forth in *Bruen* overturns decades of decisions upholding the Gun Control Act and renders ATF unable to enforce it as against the sellers of unserialized weapon parts or partially complete frames or receivers that may be readily converted to functioning firearms. Defendants are incorrect. First, because the challenged provisions of the Rule and the Gun Control Act do not materially burden law-abiding citizens' right to acquire arms for valid purposes, they do not implicate the text of the Second Amendment. And second, to the extent the challenged provisions do implicate the Second Amendment, they are consistent with this nation's historical tradition of regulating the manufacture and sale of firearms.

15

A.      **Legal Standard—*Heller*, *McDonald*, and *Bruen***

In *Heller*, the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. At the same time, the Court emphasized that "nothing in our opinion should be taken to cast doubt on," *inter alia*, "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. As the Court noted, it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26. Two years later, the Court "repeat[ed] th[e] assurances" that it had "made . . . clear in *Heller*." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).

As courts applied *Heller* and *McDonald*, different methodological approaches emerged. In some cases, courts rejected Second Amendment claims based on the Supreme Court's reassurances in *Heller* and *McDonald* regarding the lawfulness of certain regulations. *See, e.g.*, *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (rejecting challenge to 18 U.S.C. § 922(g)(1)); *Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 54 (2d Cir. 2016) (rejecting challenge to 18 U.S.C. § 922(g)(4)). In other cases, courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," *i.e.*, whether "the regulation promotes an important [governmental] interest." *Bruen*, 142 S. Ct. at 2125-26.

In *Bruen*, the Supreme Court considered a New York State law that provided for a discretionary "proper cause" licensing regime to carry a firearm outside the home, which the Second Circuit upheld using the means-end framework. 142 S. Ct. at 2122-23, 2125. The Supreme Court reversed, rejecting the means-end test, *id.* at 2126-27, and reaffirming "*Heller*'s methodology centered on constitutional text and history," *id.* at 2128-29. Thus, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government

16

must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.

In assessing whether the Second Amendment's text covers an individual's conduct, a court must consider the "textual elements" of the Second Amendment's "operative clause," *i.e.*, "the right of the people to keep and bear Arms, shall not be infringed." *Id.* at 2134. In referring to "the right," the Second Amendment "codif[ied] a *pre-existing* right," *id.* at 2130, one that "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626. The individual must be "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. And the weapons at issue must be "[a]rms" within the meaning of the Second Amendment—"weapons 'in common use' today for self-defense." *Id.* (quoting *Heller*, 554 U.S. at 627). The individual's "proposed course of conduct" must be something "the plain text of the Second Amendment protects," *i.e.*, the conduct must constitute "keep[ing]" or "bear[ing]" arms. *Id.* at 2134-35.

If the Second Amendment's text covers an individual's conduct, "[t]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. This historical inquiry "will often involve reasoning by analogy." *Id.* at 2132. In determining whether a modern regulation and a historical regulation are "relevantly similar," courts should consider "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense," *i.e.*, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33. Such "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. The inquiry "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original). Thus, "even if a modern-day regulation

17

is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

## B.     The Second Amendment's Plain Text Does Not Cover the Challenged Provisions of the Act and the Rule

Under *Bruen*, the first question when considering the constitutionality of a firearms regulation is whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the Supreme Court "explained in *Heller*, the 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592). Because nothing in the Act or the Rule infringes on law-abiding citizens' ability to possess and carry weapons in self-defense, the Second Amendment's text does not cover Defendants' conduct.

"[T]he Second Amendment . . . codified a *pre-existing* right." *Heller*, 554 U.S. at 592. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (alteration in original) (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," did not protect an unlimited right. *Id.* at 593. Instead, it provided that Protestants "may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Thus, *Heller* explained, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

18

*Heller* outlined several of the limitations inherent in the Second Amendment's text. It indicated that "prohibitions on carrying concealed weapons" were lawful under the Amendment. *Id*. It said the Court was not calling into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or"—as relevant here—"laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.

Interpreting the text of the Second Amendment as the Supreme Court has instructed, neither the Gun Control Act nor the Rule "infringes" upon the central right protected by the Second Amendment: the right to armed self-defense. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Heller* "held that individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599). The right to lawful armed self-defense is not implicated by a requirement that readily completed firearms be serialized and subject to licensing and background check requirements.

Courts have repeatedly held that similar provisions of the Gun Control Act—requiring that firearms be sold through licensed dealers in one's home state—do not offend the Second Amendment. *See, e.g.*, *United States v. Decastro*, 682 F.3d 160, 163-64 (2d Cir. 2012) (finding that 18 U.S.C. § 922(a)(3)'s prohibition on purchases from out of state through unlicensed channels does not offend the Second Amendment because it "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything," and "does not bar purchases from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in the purchaser's home state"; the statute thus "only minimally affects the ability to acquire a firearm"). Similarly, courts have rejected challenges to Section 922(a)(5), which "prohibits only the transfer of a firearm by an unlicensed person to any other unlicensed

19

person who resides in a different state than the state in which the transferor resides" and thus "does not operate to completely prohibit [the defendant] or anyone else, for that matter, from selling or buying firearms." *United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017).

As with these provisions, the Gun Control Act and the Rule do not prohibit anyone legally entitled to bear arms from purchasing a firearm, or even from purchasing weapon parts kits or partially complete frames and receivers and assembling the firearms themselves; they must simply buy serialized parts from a licensed dealer after undergoing the same background check as any other firearms purchaser. Such a limited condition on the manner in which a firearm may be acquired does not infringe upon the right of armed self-defense, even after *Bruen*. *See United States v. Vereen*, 22 Cr. 644, Dkt. No. 49 (S.D.N.Y. June 12, 2023) (denying motion to dismiss indictment under Section 922(a)(3) with opinion to follow); *United States v. Kazmende*, No 22 Cr. 236, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023) (finding the "Second Amendment…. simply does not extend to the commercial sale of firearms."); *United States v. Flores*, No. H-20-427, 2023 WL 361868, at *5 (S.D. Tex. Jan. 23, 2023) (holding that "a *de minimis* burden on downstream possession rights" fails to "trigger *Bruen* scrutiny" in a Section 922(a)(1)(A) case; *see also, e.g.*, *United States v. Tita*, No. RDB-21-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) (rejecting an argument that export controls on firearms implicated the Second Amendment in a Section 922(k) case); *United States v. King*, No. 22 Cr. 215, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022) (rejecting an argument that commercially "buying and selling firearms . . . is protected by the Second Amendment'" in a Section 922(a)(1)(A) case).

And this burden is far less than that imposed by other regulations that *Bruen* indicated do not infringe upon an individual's Second Amendment right. *Bruen* made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the "shall-issue" firearm-carry licensing schemes that existed in 43 states. 142 S. Ct. at 2138 n.9. The Court explained that "these

shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by Chief Justice Roberts) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible then the Gun Control Act and the Rule's regulation of certain sellers of weapon parts kits and partially complete frames and receivers similarly falls outside of the Second Amendment's text because it does not "deny ordinary citizens their right to public carry." *Id.* at 2138 n.9 (majority opinion).

The Second Amendment protects the right to keep and bear arms; it does not protect a right to sell them or to acquire them without restriction. The Gun Control Act and the Rule's prohibition on the sale of unserialized readily assembled firearms does not meaningfully affect, let alone infringe upon, the right to armed self-defense by law-abiding citizens. Accordingly, Defendants' conduct does not implicate the Second Amendment and their constitutional challenge should be denied without further historical inquiry.

### C. Section 922(a)(3) Fits Within This Nation's Historical Tradition of Firearms Regulation

To the extent the Act or the Rule burdens the Second Amendment right of non-prohibited persons to acquire unserialized firearms, under the test articulated by *Bruen* they are consistent with this Nation's historical tradition of firearms regulation.

The Act and the Rule are consistent with a variety of historical laws regulating firearms and gunpowder. Well before serial numbers became common, colonial and state legislatures

21

regulated firearms and the firearms trade. *See Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc) ("[C]olonial governments substantially controlled the firearms trade."). For example, Connecticut banned residents from selling firearms outside the colony. *Id.* Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." *Id.* at 685 n.18 (emphasis added; quotation marks omitted).

Additionally, at least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 Statutes at Large of Pennsylvania from 1682 to 1801 (1899) at 319-320 (1763 law); Laws and Ordinances of New Netherland, 1638-1674 (1868) at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). Although not an exact analogy to the Rule, these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the perceived wrong hands.

Furthermore, several states had laws relating to the inspection and marking of gunpowder, which "was essential to the operation of firearms at that time," meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal. 2022) (Dkt. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf. Bruen*, 142 S. Ct. at 2149 (citing article by Cornell). In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810). In 1809, Massachusetts required the inspection of all gunpowder manufactured in the commonwealth or stored in a public magazine, with the inspector marking each cask as either "Massachusetts Inspected Proof" or "Condemned" and adding his name and

the year. 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823). The law imposed a fine of between $200 and $500 on any person who sold any condemned powder or "fraudulently alter[ed], or deface[d] any mark, or marks, placed by any inspector upon any cask or casks containing gunpowder." *Id.* New Hampshire adopted a very similar law in 1820. Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830); *see also* Records of the State of Rhode Island and Providence Plantations in New England 18 (1863) (1776 Rhode Island statute requiring gunpowder casks to be marked and inspected); 1776-1777 N.J. Laws 6, An Act for the Inspection of Gunpowder, ch. 6, § 1 (similar 1776 New Jersey statute).

Colonial and early state governments likewise prohibited the manufacture and transportation of gunpowder without a license. *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gunpowder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"); The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City 37 (1835) (1821 law) (prohibiting selling gunpowder within the town of Providence "without having a license therefor").

Most importantly, at least two states in the early republic required gun barrels to be proved and marked and prohibited the obliteration of the proof marks. *See Heller*, 554 U.S. at 605 (observing that examining the "public understanding of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation" (emphasis omitted)). In 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee. Laws of the Commonwealth

23

of Massachusetts from November 28, 1780 to February 28, 1807, at 259 (1807). The law was adopted to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." *Id.*

Under the Massachusetts law, the prover was required to "stamp" the barrel "within one and an half inches of the breech" with the prover's initials, the letters "P." and "M.," and the year—all in "letters and figures . . . so deeply impressed . . . as that the same cannot be erased or disfigured." Laws of the Commonwealth of Massachusetts, *supra*, at 260. The act imposed a ten-dollar fine on any person who manufactured within the Commonwealth "any musket or pistol, without having the barrels proved and stamped as aforesaid." *Id.* at 260. It also imposed a $10 fine for selling, delivering, or purchasing any unmarked musket or pistol manufactured in the Commonwealth. *Id.* at 260-61. And it imposed a fine of between $20 and $50 for any person who "shall falsely forge or alter the stamp of any prover of fire-arms . . . impressed on any musket or pistol barrel." *Id.* at 261. Massachusetts slightly amended this act in 1814 but kept the provision prohibiting alteration of the prover's stamp. Laws of the Commonwealth of Massachusetts from February 28, 1807 to February 28, 1814 at 536-37 (1814).

Similarly, Maine in 1821 passed a law requiring the appointment of "suitable persons, to be provers of the barrels of all new, or unused firearms." Laws of the State of Maine 546 (1830). Each prover was required (in exchange for compensation) to "prove and try the strength of the barrels of all firearms which shall be offered to him for that purpose, in such manner as to satisfy himself of the strength of the same," to "in a permanent manner, mark and number every barrel by him so proved," and to provide a certificate attesting to the proof. *Id.* The statute imposed a $10 fine on any person who "shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified." *Id.* Additionally, it imposed a fine of "not more than one hundred dollars, nor less than twenty dollars," for any

person who "shall falsely alter the stamp or mark or the certificate of any prover of firearms." *Id.* These laws were similar to England's 1638 Gunmaker's Law and subsequent legislation, which required all firearms manufactured domestically or imported to be inspected and approved by licensed entities of the state. *See* Lois Schoewer, *Gun Culture in Early Modern England* 4-25 (2016).

Although these statutes are not identical to the Act and the Rule's serialization and background check requirements, they are "relevantly similar." *Bruen*, 142 S. Ct. at 2132. *Bruen* made clear that the government need only identify a "historical analogue, not a historical twin." *Id.* at 2133. The ultimate question is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. As explained above, the Act and the Rule impose a minimal burden on the right of armed self-defense by law-abiding citizens because access to serialized firearms is ubiquitous and such firearms are just as effective for self-defense as unmarked firearms. That burden is no greater than the burdens imposed by historical laws relating to the sale and marking of firearms and gunpowder. And neither the historical laws nor the modern regulatory regime deprives citizens of the use of firearms for self-defense. *Cf. United States v. Holton*, No. 3:21-cr-0482-B, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022) (observing that "[n]ot removing the serial number from a firearm" is a "negligible burden" compared to historical restrictions on firearm possession).

The challenged provisions are also "comparably justified." The historical regulations of commerce in firearms were designed to keep firearms out of the hands of those who might be dangerous, such as (in the view of legislators at the time) Native Americans. And the laws requiring marking of gun barrels and gunpowder were designed to protect citizens from explosions and to allow unsafe barrels or powder to be traced to the inspector who first affixed the markings. The

25

Act serves similar purposes, as it is "designed to increase public safety by, among other things, preventing prohibited persons from acquiring firearms and allowing law enforcement to trace firearms involved in crime." *Cf. United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) (describing purposes of related provisions of 18 U.S.C. § 922); *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) (same). And the Rule updates the Act's definitions to account for technological developments that otherwise would undermine these legislative purposes.

Accordingly, although the Act and the Rule do not reflect precisely the same legislative priorities as these historical regulations, they nevertheless impose a "comparable burden" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133. Defendants attempt to sidestep this lengthy history of regulation by arguing that the Act and the Rule regulate privately made firearms, and that there is no historical tradition of regulating such firearms. Dkt. No. 175 at 56-57. But Defendants' attempt to recast the Rule as regulating the private manufacture of firearms is a red herring. As ATF explained, the statutory licensing, recordkeeping, and background check requirements implicated by the Rule are commercial restrictions on *sellers*; they "do not prohibit individuals from assembling or otherwise making their own firearms." 87 Fed. Reg. at 24,676. The

Therefore, to the extent that these provisions implicates the Second Amendment at all— which they do not—they fall within the historical tradition of regulation of the commercial manufacture and sale of firearms.

## III.   The Rule Comports with the Gun Control Act

Defendants argue that the Court should conclude that ATF's Rule conflicts with the plain meaning of 18 U.S.C. § 921(a)(3). Dkt. No. 175 at 20. That argument is incorrect; the Rule's definition of firearm implements the long-held understanding of ATF and federal courts that weapon parts kits can constitute firearms, and the amendment of the definition of "frame or

receiver" to encompass "partially complete, disassembled, or inoperable" frames or receivers is consistent with the statute and is reasonable.

### A.    The Rule's Amended Definition of "Firearm" Is Appropriate and in Accordance with the Statute

The term "firearm" has long been understood to encompass disassembled collections of parts that may be combined to form a working firearm, and the amended language to the definition of "firearm" is consistent with the statutory definition, purpose, and legislative history.

The GCA defines the term "firearm" as follows:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. 921(a)(3). The 1968 regulatory definition of the term "firearm" states:

> Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics.

27 C.F.R. § 478.11. The Rule adds the following language to the end of the regulatory definition in 478.11:

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive. The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition of "frame or receiver."

87 Fed. Reg. at 24,735.

As an initial matter, the idea that the GCA definition of "firearm" encompasses something other than a completely assembled and functional weapon is not a novel idea set forth for the first time in the Rule, but rather a longstanding and widely held interpretation of the statute. Federal courts that have addressed the issue have uniformly held that disassembled collections of weapon

27

parts and parts kits that may readily be converted to expel a projective are "firearms" under 18 U.S.C. § 921(a)(3)(A). *See, e.g.*, *United States v. Wick*, 697 F. App'x at 508; *United States v. Stewart*, 451 F.3d at 1073 n.2; *United States v. Annis*, 446 F.3d at 857; *United States v. Ryles*, 988 F.2d at 16; *United States v. Theodoropoulous*, 866 F.2d at 595 n.3.

Defendants' contention that the word "weapon" in the statutory definition of "firearm" somehow precludes the amendment to the definition in the Rule is unavailing. Defendants seems to argue that because a "parts kit" is not a "weapon," it therefore cannot be a "firearm" under the statutory definition. Dkt. 175 at 18-19. However, a parts kit is merely a weapon in an unfinished or unassembled form or configuration. To the extent that Defendants are positing that only something currently assembled and functional as a weapon can be considered a "weapon" (and, consequently, a "firearm") under the GCA, that argument is entirely circular and would contradict the "may readily be converted" language of the statute. So long as the collection of parts is identifiable as a collection that may be completed or assembled as an instrument to expel live ammunition, that is sufficient to constitute a "weapon," and therefore a "firearm," within the meaning of the GCA.

The legislative history also demonstrates that in passing the GCA, Congress intended that the definition of "firearm" would encompass devices that could not immediately expel a projectile but could readily be converted to do so. This is most apparent by the inclusion of the example of the "starter gun" (*i.e.*, a gun designed for use with "blank" ammunition) in the statutory definition. 18 U.S.C. § 921(a)(3). Although a "starter gun" may not currently be able to expel a projectile, Congress was clearly concerned at the ease with which such a device could be converted to do so, and cited in the GCA's legislative history the case of an individual who made bulk purchases of starter guns out of state and "would then, at his residence, disassemble them, and . . . bore out the plugged barrel and enlarge the cylinder chambers to accommodate .22-caliber cartridges." *See* S.

Rep. No. 88-1340, at 14 (1967). There is no meaningful legal distinction between a starter pistol that could be modified and converted to expel a projectile, and disassembled firearms and weapon parts kits, which could similarly be converted. *See* S. Rep. No. 89-1866, at 73 (1966) ("firearm" includes starter pistols because they "may be converted to fire a projectile by boring a hole through an obstruction in the barrel, substitution of a barrel which will permit the firing of a projectile, or otherwise converted to fire a projectile"). Because Congress intended such collection of components to be considered a "firearm" under the GCA, ATF properly included language explicitly acknowledging as much in the Rule.

Nothing in the statute requires that a set of functional parts must be fully complete to qualify as a "firearm" under the GCA. Several courts of appeals interpreting the existing statutory and regulatory language have held that even if a weapon is missing one or more essential pieces such that it cannot expel a projectile in its present form, it can be considered a "firearm" for the purposes of the GCA. *See, e.g.*, *United States v. Hardin*, 889 F.3d 945, 946-47, 949 (8th Cir. 2018) (holding that a pistol with a broken trigger and some missing internal component parts was still a "firearm"); *United States v. Dotson*, 712 F.3d 369, 370-71 (7th Cir. 2013) (holding that a pistol that was inoperable due to multiple corroded, missing, and broken parts was still a "firearm"); *United States v. Rivera*, 415 F.3d 284, 285-87 (2d Cir. 2005) (holding that a pistol with a broken firing pin and flattened firing-pin channel was a "firearm").

Under Defendants' interpretation, a partially disassembled handgun that is missing one minor part (for example, a screw or a firing pin) cannot and should not be considered a "firearm" under the GCA and therefore may freely be sold commercially with none of the licensure, background-check, marking, or record-keeping requirements that would attach to the repetitive sale of "firearms." Nothing in the statute would require such an absurd result.

As ATF acknowledges in the Rule, if "certain essential parts are removed from the kit," this could very well "make it difficult to determine whether such a kit or aggregation of parts may readily be converted to fire." 87 Fed. Reg. at 24,692. However, the Rule is clear that in order to be "readily" convertible to expel a projectile, the conversion of a kit or collection of components "must be fairly or reasonably efficient, quick, and easy . . . after examining the enumerated factors" in the definition of "readily." *Id.* That is consistent with the plain language of the statute and the interpretation of the statutory definition by numerous federal courts of appeals. It is therefore an appropriate interpretation of the regulatory definition.

Accordingly, the Rule's amendment of the term "firearm" is consistent with the statutory definition of that term and the purpose and intent of the GCA.

**B.      ATF's Amendment of the Definition of "Frame or Receiver" Is Proper and in Accordance with the Statute**

In the Gun Control Act, Congress defined "firearm" to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). A "frame" or "receiver" is a firearm's primary structural component to which fire control components are attached, but Congress did not define the terms "frame" or "receiver" by statute, *see id*. § 921, and instead vested ATF with the authority to promulgate regulations "necessary to carry out the provisions of" the GCA. *Id*. § 926(a).

The crucial question is at what point a mere component or foundation of a component, such as a piece of metal or plastic—which is unregulated under federal firearms law—becomes a "frame or receiver" that is so regulated. For many years, ATF has determined that a component becomes a "frame or receiver" when it reaches a "critical stage of manufacture," which is the point at which it is "brought to a stage of completeness that will allow it to accept the firearm components [that]

it is designed for, using basic tools in a reasonable amount of time." As explained above, under the former regulatory definitions, "frame or receiver" was defined as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11 (defining "firearm frame or receiver"); 27 C.F.R. § 479.11 (defining "frame or receiver").

The Rule contains an amended definition for "frame or receiver" that includes definitions for the terms "frame," "receiver," and "variant," 87 Fed. Reg. at 24,735, and provides ten nonexclusive examples (with photo illustrations) of "frames or receivers" under the regulatory definitions of those terms, *id.* at 24,735-38. The Rule's definition of "frame or receiver" also includes the following subparagraph, specifically at issue in this case:

> (c) *Partially complete, disassembled, or nonfunctional frame or receiver*. The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distribution of the item or kit to the purchaser or recipient of the item or kit.

*Id.* at 24,739. The Rule then provides five non-exclusive examples of what does, and does not, constitute a "frame or receiver" under subparagraph (c). *Id.*

When ATF promulgated the prior regulatory definitions in 1968, single-frame firearms such as revolvers and break-open shotguns were far more prevalent for civilian use than split-receiver weapons. Most firearms now in circulation use a split or multi-part receiver in which the

31

relevant fire control components are housed by more than just a single part of the weapon. Consequently, due to changes in firearms technology, a rigid application of the 1968 definition would lead to the absurd result that "frame or receiver" would not cover the frame or receiver of the vast majority of firearms currently in circulation in the United States. Moreover, the prior definitions were never intended or understood to be exhaustive, and ATF has long applied a multi-factor test in analyzing which component was intended to be the "frame or receiver" even in situations in which no single component of a weapon would satisfy a restrictive reading of the regulatory definition. See 86 Fed. Reg. at 27,721-22.

The clear congressional intent, as reflected in the GCA's plain language and the statutory scheme, was to regulate—as a "firearm"—the frame or receiver of a firearm. By updating the regulatory definition of "frame or receiver" to take account of technological changes that Congress did not contemplate in 1968, ATF has acted to ensure that the statutory term will cover more than just a small fraction of the firearms currently in circulation—a result Congress would not have intended.

Defendants argue that unfinished frames and receivers cannot fit into the statutory definition of "frame and receiver" because they can only "readily be converted" into a frame or receiver, not the weapon itself. Dkt. No. 175 at 9, 19. They are incorrect. "[F]rame or receiver" is not defined in the GCA and the statute does not mandate that only a complete, assembled frame or receiver be considered a "frame or receiver."

The portion of the definition regulating so-called "unfinished" frames or receivers is a reasonable approach that incorporates well known and oft-interpreted concepts such as the "may readily be completed, assembled, restored, or otherwise converted" language into the definition. ATF's use of the term "readily" simply incorporates a term that Congress used repeatedly in federal firearms laws—not only the GCA, but also elsewhere, see, e.g., 26 U.S.C. § 5845(b)

(defining "machinegun" as "any weapon that shoots, is designed to shoot, or can readily be restored to shoot, automatically . . .")—so that the regulatory definition of "frame or receiver" actually accomplishes what Congress intended it to do. Any other approach would result in persons being able to easily circumvent the requirements of the GCA and NFA by producing or purchasing almost-complete frames or receivers that could quickly and easily be altered to produce a functional frame or receiver of a weapon. This would thwart Congress's purpose in enacting the GCA and NFA. *See New York v. Burger*, 482 U.S. 691, 713 (1987) ("[T]he regulatory goals of the Gun Control Act . . . ensure[] that weapons [are] distributed through regular channels and in a traceable manner," thus making "possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms." (internal punctuation omitted)).

ATF has acted consistent with its statutory authority by adopting a term and concept used elsewhere in federal firearms laws. *See, e.g.*, *United States v. TRW Rifle 7.62x51mm Caliber*, 447 F.3d 686, 692 (9th Cir. 2006) (holding that an inoperable rifle that could be rendered functional with ordinary tools and roughly two hours of welding fit within the meaning of "readily restored" for purposes of 26 U.S.C. § 5845); *United States v. Mullins*, 446 F.3d 750, 756 (8th Cir. 2006) (holding that a starter gun that could be modified in less than an hour by an ordinary person to fire a projectile would be considered "readily convertible" under the GCA); *United States v. Woods*, 560 F.2d 660, 664 (5th Cir. 1977) (holding that a weapon qualified as a shotgun within the meaning of 26 U.S.C. § 5845(d) even though the weapon was in two pieces when it was found because an ordinary person could have quickly reassembled it).

That is particularly true here, where ATF has not only explicitly incorporated these well-established concepts into the definition of "frame or receiver," but has done so by adopting a regulatory definition of the term "readily" that comports with the plain meaning and summarizes and relies upon the principles used by federal courts in interpreting the term "readily" in the context

of federal firearms laws. The Rule incorporates the following definition of "readily" into 27 C.F.R.

§ 478.11:

> *Readily*. A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. With respect to the classification of firearms, factors relevant in making this determination include the following:
>
>> (1) Time, i.e., how long it takes to finish the process;
>>
>> (2) Ease, i.e., how difficult it is to do so;
>>
>> (3) Expertise, i.e., what knowledge and skills are required;
>>
>> (4) Equipment, i.e., what tools are required;
>>
>> (5) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;
>>
>> (6) Expense, i.e., how much it costs;
>>
>> (7) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and
>>
>> (8) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction.

87 Fed. Reg. at 24,735. The Rule provides five specific, non-exclusive examples of how collections of components may be determined to be a "frame or receiver" or not depending upon all the circumstances. *Id.* at 24,739. These principles are consistent with the statutory scheme and decades of federal court interpretations.

## IV.    The Gun Control Act and the Rule Are Not Void for Vagueness

Although Defendants do not directly challenge whether the Rule's prospective application would be, or would render 18 U.S.C. § 921(a)(3), void for vagueness, *see* Dkt. No. 175 at 43, they do argue that New York's retrospective application of the Rule is void for vagueness. The United States takes no position on the parties' dispute over conduct that predates the effective date of the

Rule, but writes briefly to establish that the Act, as implemented by the Rule, is decidedly *not* void for vagueness.

Under the Fifth Amendment's Due Process Clause, a criminal or quasi-criminal law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

Defendants cannot make such a showing here. They argue that the amended regulatory definition of "frame or receiver" to include "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" is unconstitutionally vague. 87 Fed. Reg. at 24,739. As noted *supra*, the phrase "may readily be . . . converted" derives from federal statutes. *See* 18 U.S.C. § 921(a)(3) (GCA); 26 U.S.C. § 5845 (employing similar language in various definitions in the NFA). Several courts, including the Second Circuit, have rejected the argument that provisions of the GCA and the NFA addressing products that may be "readily converted" or "readily restored" to function in a particular manner (or materially identical language in state laws) are unconstitutionally vague. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 266 (2d Cir. 2015); *United States v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns*, 443 F.2d 463, 464 (2d Cir. 1971); *United States v. Quiroz*, 449 F.2d 583, 585 (9th Cir. 1971); *United States v. Wick*, No. CR 15-30-M-DLC, 2016 WL 10612608, at *3-4 (D. Mont. Mar. 11, 2016); *United States v. Catanzaro*, 368 F. Supp. 450, 454 (D. Conn. 1973); *cf. United States v. Wojcikiewicz*, 403 F. App'x 483, 486 (11th Cir. 2010) (holding that plaintiff could not "establish that the district court plainly erred in failing to determine that the term 'readily restored' was unconstitutionally vague as applied" to his case); *Roberts v. United States*, No. 2:04-cr-295-PMD, 2007 WL 9754483, at *7 (D.S.C. Oct. 30, 2007)

(on an ineffective assistance of counsel claim, holding that the plaintiff had "made no showing whatsoever that 26 U.S.C. § 5845 is unconstitutionally vague"). As the Second Circuit reasoned in *New York State Rifle & Pistol Ass'n*, "[t]his statutory language dates at least to the 1994 federal assault-weapons ban," and "there [was] no record evidence that it [had] given rise to confusion at any time" in the decades since. 804 F.3d at 266.

Moreover, as discussed *supra*, the Rule provides extensive context and guidance for the term "readily" in the form of specific illustrative examples and the Rule's definition itself. This is particularly true given that the Rule's definition explicitly provides that a "frame or receiver" "shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material)." 87 Fed. Reg. at 24,739. This language did not appear in the Notice of Proposed Rulemaking's proposed definition, *see* 86 Fed. Reg. at 27,746, but was included in the Rule specifically in response to comments to address concerns that there could be some confusion over whether raw materials could be considered a "frame or receiver," *see* 87 Fed. Reg. at 24,698.

Finally, any void-for-vagueness challenge to the Rule would fail for an additional reason: the Rule provides for an administrative process through which regulated entities may obtain clarification as to whether their particular products fall within the Rule's scope. The Supreme Court and the Second Circuit have held that such "commercial regulation[s]" generally survive void-for-vagueness challenges in part because "'the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.'" *Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 614 (2d Cir. 1996) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)). Here, the Rule provides just such an opportunity, by inviting requests for voluntary classifications as to whether

a particular item, such as a partially complete frame or receiver, is a "firearm" within the meaning

of the GCA and its regulations. *See* 87 Fed. Reg. at 24,743. Defendants therefore cannot be heard

to complain that they have no means of ascertaining whether any product that they sell falls within

that definition.

<u>**CONCLUSION**</u>

For the reasons set forth herein, the Court should certify the constitutional challenge

pursuant to Fed. R. Civ. P. 5.1(b) and 28 U.S.C. § 2403(a); grant the Government's motion to

intervene pursuant to Fed. R. Civ. P. 5.1(c), 24(a)(1), and 24(b)(2); and deny Defendants' motions

to dismiss insofar as they challenge the constitutionality of the Gun Control Act and the Rule or

challenge the Rule's consistency with the Act.

Dated: June 16, 2023
      New York, New York

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:    /s/ *Lucas Issacharoff*
      LUCAS ISSACHAROFF
      JEANNETTE VARGAS
      Assistant United States Attorneys
      86 Chambers Street, 3rd Floor
      New York, New York 10007
      Tel.: (212) 637-2800
      lucas.issacharoff@usdoj.gov
      jeannette.vargas@usdoj.gov