UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,

                    Plaintiff,

            -against-                                                    Case No. 22-cv-06124 (JMF)

ARM OR ALLY, LLC; BLACKHAWK                          **ORAL ARGUMENT**
MANUFACTURING GROUP, INC., A/K/A 80                        **REQUESTED**
PERCENT ARMS, INC. OR 80 PERCENT ARMS;
SALVO TECHNOLOGIES, INC., A/K/A 80P
BUILDER OR 80P FREEDOM CO.; BROWNELLS,
INC., A/K/A BROWNELLS OR BOB BROWNELL'S;
GS PERFORMANCE, LLC, A/K/A GLOCKSTORE OR
GSPC; INDIE GUNS, LLC; KM TACTICAL;
PRIMARY ARMS, LLC; RAINIER ARMS, LLC; AND
ROCK SLIDE USA, LLC,

                    Defendants.

------------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

    A.   Laws Relating to the Specific Products at Issue ................................................. 3

    B.   The State's Causes Of Action ............................................................................ 5

STATEMENT OF FACTS ...................................................................................................... 7

    A.   Certain Defendants' Sales to Undercover Investigators .............................. 10

    B.   Certain Defendants' Sales to Prohibited Persons......................................... 10

    1.   Sales to Persons with Prior Convictions ................................................... 10

    2.   Sales to Persons Who are Legally Prohibited from Possessing a Weapon
        and to Unlicensed Persons ........................................................................ 11

    C.   Defendants' Harm to New York ...................................................................... 12

ARGUMENT .......................................................................................................................... 13

    I.   THIS CASE IS NOT BARRED BY PLCAA............................................................ 13

    A.   This Action Is Based on Defendants' Own Violations,
        Not "Unlawful Misuse" By Others. ................................................................. 14

    B.   Alternatively, PLCAA's Predicate Exception Applies Here. ..................... 15

    1.   The State Bases Its Claims on Violations of Statutes That
        Regulate The Firearms Industry................................................................ 15

        a.   The State's Deceptive Trade Practices Claims ................................. 17

        b.   The State's GBL § 898 Claim............................................................... 18

    2.   Defendants Knowingly Made Illegal Sales................................................ 19

    C.   Proximate Causation Is Satisfied. ................................................................. 20

    D.   Unfinished Frames And Receivers Are Also "Component Parts"
        Pursuant 15 U.S.C. § 7903(4). ....................................................................... 23

ii

II.   DEFENDANTS' PRODUCTS MEET THE FEDERAL
      DEFINITION OF A FIREARM. ................................................................. 23

   A.   Defendants Sold "Firearms" Under 18 U.S.C. § 921(a)(3). ....................... 24

   B.   Alternatively, Defendants Sold"Frame[s] or Receiver[s]" Under
        18 U.S.C. § 921(a)(3)(B). ...................................................... 28

   C.   ATF Has Long Viewed Defendants' Products As Firearms. ....................... 31

   D.   Defendants Selectively Cite ATF Regulatory Material Which
        Never Legalized Their Unfinished Frames And Receivers. ...................... 34

      1.   The ATF's 2015 Interpretive Ruling .......................................... 35

      2.   The ATF'S 2017 Letter ....................................................... 36

III.  THE SECOND AMENDMENT DOES NOT INSULATE DEFENDANTS
      FROM STATE AND FEDERAL LAWS REGULATING THE
      COMMERCIAL SALE OF WEAPONS. ............................................... 37

   A.   The Second Amendment Is An Individual Right Inapplicable to Corporations or
        LLCs, Including Defendants. .................................................... 37

   B.   The Prohibition on The Sale Of Unfinished Frames And Receivers
        Does Not Implicate the Second Amendment. ................................... 39

      1.   Laws Regulating the Commercial Sale of Arms Do Not Implicate
           the Second Amendment. ...................................................... 39

      2.   The Second Amendment Does Not Cover Ghost Guns. ....................... 41

   C.   Law and History Supports The Prohibition on the Sale of
        Ghost Gun Components. ....................................................... 42

IV.   THE STATE'S CLAIMS ARISING UNDER GBL § 898
      (CAUSE OF ACTION NO. 3) STAND AS A MATTER OF LAW. ................... 44

   A.   Defendants' Dormant Commerce Clause Arguments Fail. ....................... 45

      1.   § 898 Does Not Clearly Discriminate Against Interstate Commerce. ......... 45

      2.   § 898 Does Not Burden Interstate Commerce ................................. 47

      3.   § 898 Does Not Regulate Out-of-State Commerce. ........................... 48

B.     Defendants' Void for Vagueness Arguments Fail. ...................................... 49

    1.    GBL § 898-b(1) Was Crafted with Sufficient Clarity
         Regarding The Misconduct At Issue.......................................... 50

    2.    The Federal Definition of "Firearm" Is Not Vague. ................................. 52

V.     DEFENDANTS HAVE ENGAGED IN DECEPTIVE MARKETING. .......................... 54

   A.    Defendants' First Amendment Arguments Fail. ........................................ 54

    1.    The First Amendment Does Not Protect False or Misleading
         Commercial Speech. ................................................................ 54

    2.    The Central Hudson Test Permits the State's Claims ................................. 56

    3.    The Alleged Speech is Not Opinion. ........................................... 57

   B.    The State Adequately Alleges that Each Defendant Made Actionable
       Misrepresentations that Support Liability.................................. 59

VI.  THE COMPLAINT STATES A CLAIM FOR NEGLIGENT ENTRUSTMENT
     AND NEGLIGENCE *PER SE* ................................................................ 63

   A.    Negligent Entrustment. ................................................................ 63

   B.    Negligence *Per Se*. ................................................................ 68

VII.  DEFENDANTS AIDED AND ABETTED POSSESSION OF UNSERIALIZED
     FIREARMS AND POSSESSION BY PROHIBITED PERSONS. ............................. 70

   A.    Defendants Substantially Assisted Unlawful Possession. .......................... 70

   B.    Defendants' Marketing Demonstrates Actual Knowledge. ........................ 72

   C.    The Doctrine of Conscious Avoidance Applies.......................................... 73

   D.    Defendants' Illicit Sales Also Constitute Aiding And Abetting
       Under New York State Law................................................... 75

VIII. DEFENDANTS' SALES WERE REPEATED AND PERSISTENT. ........................... 76

IX.  DEFENDANTS' REMAINING FACT-SPECIFIC ARGUMENTS
     DO NOT WARRANT DISMISSAL OF ANY OF THE STATE'S
     CLAIMS OR ANY OTHER RELIEF. ...................................................... 77

A.    Defendants' Out-of-State Conduct Legally Gives Rise to City Law Violations. ....... 77

B.    Blackhawk's Fact-Specific Arguments Fail. ............................................... 80

C.    KM Tactical's Fact-Specific Arguments Fail. ........................................... 81

D.    Glockstore's Fact-Specific Arguments Fail. .............................................. 82

E.    Primary Arms' Fact-Specific Arguments Fail. .......................................... 83

X.    DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE.................................... 84

CONCLUSION........................................................................................... 88

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allied World Surplus Lines Ins. Co. v. Hoffman Int'l, Inc.*,
  2020 WL 4925618 (S.D.N.Y. Aug. 21, 2020) ..................................................................74, 78

*Altria Group, Inc. v. Good*,
  555 U.S. 70 (2008) ..................................................................................................................17

*Anderson v. Treadwell*,
  294 F.3d 453 (2d Cir. 2002) ....................................................................................................55

*Angus Partners LLC v. Walder*,
  52 F. Supp. 3d 546 (S.D.N.Y. 2014) .......................................................................................47

*Arriaga v. Mukasey*,
  521 F.3d 219 (2d Cir. 2008) ..............................................................................................49, 50

*Ashmore v. CGI Grp., Inc.*,
  923 F.3d 260 (2d Cir. 2019) ....................................................................................................24

*Avola v. Louisiana-Pac. Corp.*,
  991 F. Supp. 2d 381 (E.D.N.Y. 2013) .....................................................................................60

*Badilla v. Midwest Air Traffic Control Serv., Inc.*,
  8 F.4th 105 (2d Cir. 2021) .......................................................................................................22

*Beatie & Osborn LLP v. Patriot Sci. Corp.*,
  431 F. Supp. 2d 367 (S.D.N.Y. 2006) .....................................................................................81

*Boles v. United States*,
  3 F. Supp. 3d 491 (M.D.N.C. 2014) ........................................................................................69

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983) ..................................................................................................................55

*Breitkopf v. Gentile*,
  41 F. Supp. 3d 220 (E.D.N.Y. 2014) .......................................................................................22

*Bryan v. United States*,
  524 U.S. 184 (1998) ............................................................................................................19, 20

*Bullen v. CohnReznick, LLP*,
  194 A.D.3d 637 (1st Dep't 2021) ............................................................................................75

*Cabble v. Rollieson*,
  2006 WL 464078 (S.D.N.Y. Feb. 27, 2006) .................................................................80, 81

*California v. ATF*,
  2023 WL 1873087 (N.D. Cal. Feb. 9, 2023) ...........................................................................34

*Cayuga Indian Nation of New York v. Pataki*,
  79 F. Supp. 2d 66, 71-72 (N.D.N.Y. 1999). ...........................................................................87

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980) .............................................................................................................55, 56

*City of N.Y. v. Beretta U.S.A. Corp.*,
  401 F. Supp. 2d 244 (E.D.N.Y. 2005) .....................................................................................22

*City of New York v. A-1 Jewelry & Pawn, Inc.*,
  247 F.R.D. 296 (E.D.N.Y. 2007) .......................................................................................7, 85

*City of New York v. A-1 Jewelry & Pawn, Inc.*,
  501 F. Supp. 2d 369 (E.D.N.Y. 2007) .....................................................................................68

*City of New York v. Arm or Ally, LLC, et al.*,
  No. 22 Civ. 5525, ECF No. 79 (S.D.N.Y. Oct. 27, 2022) .....................................................20

*City of New York v. Beretta U.S.A. Corp.*,
  315 F. Supp. 2d 256 (E.D.N.Y. 2004) ......................................................................65, 67, 85

*City of New York v. Beretta U.S.A. Corp.*,
  524 F.3d 384 (2d Cir. 2008) ........................................................................................... passim

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999) ...................................................................................................59

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013) .....................................................................................................79

*Dark Storm Indus. LLC v. Cuomo*,
  471 F. Supp. 3d 482 (N.D.N.Y. 2020) .....................................................................................38

*Dep't of Revenue of Ky. v. Davis*,
  553 U.S. 328 (2008) ..................................................................................................................47

*Dial A Car, Inc. v. Transp., Inc.*,
  82 F.3d 484 (D.C. Cir. 1996) ...................................................................................................59

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ......................................................................................................38, 40, 42

*Division 80, LLC v. Garland,*
    2022 WL3648454 (S.D. Tex. Aug. 23, 2022) ........................................................34

*Dixon v. United States,*
    548 U.S. 1 (2006) ................................................................................................19

*Draper v. Healey,*
    98 F. Supp. 3d 77 (D. Mass. 2015) ......................................................................40

*Elliot v. City of New York,*
    95 N.Y.2d 730 (2001) ...................................................................................69, 70

*Freedom Holdings, Inc. v. Spitzer,*
    357 F.3d 205 (2d Cir. 2004) ...............................................................................48

*Gazzola v. Hochul,*
    2022 WL 17485810 (N.D.N.Y. Dec. 7, 2022) ....................................................38

*GeigTech E. Bay LLC v. Lutron Elecs. Co.,*
    2019 WL 1768965 (S.D.N.Y. Apr. 4, 2019) .......................................................58

*German by German v. Fed. Home Loan Mortg. Corp.,*
    896 F. Supp. 1385 (S.D.N.Y. 1995) ...................................................................68

*Goldberg v. Cablevision Sys. Corp.,*
    261 F.3d 318 (2d Cir. 2001) ...............................................................................56

*Gorran v. Atkins Nutritionals, Inc.,*
    464 F. Supp. 2d 315 (S.D.N.Y. 2006) ................................................................56

*Grand River Enters. Six Nations v. Boughton,*
    988 F.3d 114 (2d Cir. 2021) ...............................................................................45

*Hamilton v. Beretta U.S.A. Corp.,*
    96 N.Y.2d 222 (N.Y. 2001) ..........................................................................64, 65

*Heckler v. Cmty. Health Servs.,*
    467 U.S. 51 (1984) ..............................................................................................25

*Helms Realty Corp. v. City of New York,*
    397 F. Supp. 3d 379 (S.D.N.Y. 2019) ................................................................57

*Herdzik v. Chojnacki,*
    68 A.D.3d 1639 (4th Dep't 2009) .......................................................................68

*Hetherton v. Sears, Roebuck & Co.,*
    593 F.2d 526 (3d Cir. 1979) ...............................................................................68

*Huddleston v. United States*,
    415 U.S. 814 (1974)............................................................................................69

*Ileto v. Glock, Inc.*,
    565 F.3d 1126 (9th Cir. 2009) .........................................................................18

In *City of New York v. Milhelm Attea & Bros., Inc.*,
    550 F. Supp. 2d 332, 349 (E.D.N.Y. 2008) .....................................................78

*In re Antrobus*,
    519 F.3d 1123 (10th Cir. 2008) .......................................................................22

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig*,
    447 F. Supp. 2d 289, 303 (S.D.N.Y. 2006)................................................86, 87

*In re Opioid Litigation*,
    Index No. 400000/2017 NYSCEF No. 7351 (N.Y. Sup. Ct., Suffolk Cnty.
    Aug. 17, 2020) ...........................................................................................87, 88

*Johnson v. Bryco Arms*,
    304 F. Supp. 2d 383 (E.D.N.Y. 2004) ...................................................64, 65, 66

*Kamiel v. Hai St. Kitchen & Co. LLC*,
    2023 WL 2473333 (S.D.N.Y. Mar. 13, 2023) ..................................................77

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976)............................................................................80

*Lopes v. Dep't of Social Servs.*,
    696 F.3d 180 (2d Cir. 2012)............................................................................31

*MacNaughton v. Young Living Essential Oils, LC*,
    67 F.4th 89 (2d Cir. 2023) ..............................................................................79

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)...................................................................................40, 49

*Miller v. Astucci U.S. Ltd.*,
    2007 WL 102092 (S.D.N.Y. Jan. 16, 2007) .....................................................70

*Montana Shooting Sports Ass'n v. Holder*,
    No. CV-09-147, 2010 WL 3926029 (D. Mont. Aug. 31, 2010) ..........................40

*Morehouse Enterprises, LLC v. ATF*,
    2022 WL 3597299 (D.N.D. Aug. 23, 2022) ................................................30, 34

*N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*,
    850 F.3d 79 (2d Cir. 2017)...........................................................................13, 14

*Nat'l Ass'n of Tobacco Outlets, Inc. v. City of N.Y.*,
   27 F. Supp. 3d 415 (S.D.N.Y. 2014).................................................................57

*Nat'l Coalition on Black Civic Participation v. Wohl*,
   2023 WL 2403012 (S.D.N.Y. Mar. 8, 2023) ........................................................5

*Nat'l Shooting Sports Found., Inc. v. James*,
   604 F. Supp. 3d 48 (N.D.N.Y. 2022) ........................................................ passim

*National Pork Producers Council v. Ross*,
   143 S.Ct. 1142 (2023)...............................................................................45, 47, 48

*New York v. Actavis, PLC*,
   2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) ....................................................76

*New York v. Princess Prestige Co.*,
   42 N.Y.2d 104 (1977) .......................................................................................76

*NSSF v. Platkin*,
   2023 WL 1380388 (D.N.J. Jan. 31, 2023) ..........................................19, 49, 50

*NYSRPA v. Bruen*,
   142 S.Ct. 2111 (2022)...............................................................................37, 38, 40

*NYSRPA v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015)...............................................................................50

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
   720 F.3d 490 (2d Cir. 2013)...............................................................................58

*People of the State of New York v. Gift & Luggage Outlet, Inc.*,
   194 Misc.2d 582 (Sup. Ct. N.Y. Cnty. 2003) ...................................................17

*People of the State of New York v. Wal-Mart Stores, Inc.*,
   Index No. 401062/2003 (Sup. Ct. N.Y. Cnty. June 4, 2003)..............................17

*People v. Ivybrooke Equity Enters., LLC*,
   175 A.D.3d 1000 (4th Dep't 2019)......................................................................5

*People v. Kaplan*,
   76 N.Y.2d 140 (1990) .......................................................................................75

*People v. Loyola*,
   No. IND-71721-22/001 (Apr. 19, 2023)............................................................24

*People v. Wilco Energy Corp.*,
   284 A.D.2d 469 (2d Dep't 2001) ........................................................................76

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970)..............................................................................................47

*Republic Ins. Co. v. Michel*,
   885 F. Supp. 426 (E.D.N.Y. 1995) ....................................................................67

*Rich v. Miller*,
   2022 WL 7748176 (S.D.N.Y. Oct. 4, 2022) ......................................................80

*Rios v. Smith*,
   95 N.Y.2d 647 (N.Y. 2001) ...............................................................................67

*Rodick v. City of Schenectady*,
   1 F.3d 1341 (2d Cir. 1993)................................................................................85

*Roja-Reyes v. INS*,
   235 F.3d 115 (2d Cir. 2000)..............................................................................25

*Samir Muhamma Al-Salihi v. Gander Mt., Inc.*,
   2013 WL 5310214 (N.D.N.Y. Sept. 20, 2013) ............................................63, 67

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
   902 F.2d 222 (3d Cir. 1990)..............................................................................59

*Sanfo v. Avondale Care Grp., LLC*,
   2022 WL 3448100 (S.D.N.Y. Aug. 17, 2022) ...................................................81

*Sayles v. Ferone*,
   137 A.D.3d 486 (1st Dep't 2016) .....................................................................75

*Schwebel v. Crandall*,
   967 F.3d 96 (2d Cir. 2020)................................................................................25

*SEC v. Alpine Securities Corp.*,
   308 F. Supp. 3d 775 (S.D.N.Y. 2018)...............................................................30

*SEC v. Apuzzo*,
   689 F.3d 204 (2d Cir. 2012)........................................................................71, 72

*SEC v. China N.E. Petroleum Hldgs., Ltd.*,
   27 F. Supp. 3d 379 (S.D.N.Y. 2014).................................................................72

*Selevan v. New York Thruway Auth.*,
   584 F.3d 82 (2d Cir. 2009)................................................................................46

*Shalala v. Guernsey Mem'l Hosp.*,
   514 U.S. 87 (1995)............................................................................................35

*Smith & Wesson Corp. v. City of Gary*,
   875 N.E.2d 422 (Ind. Ct. App. 2007) ....................................................................15

*Smith v. Atlantic Gun & Tackle, Inc.*,
   376 F. Supp. 2d 291 (E.D.N.Y. 2005) ...................................................................64

*Soto v. Bushmaster Firearms International, LLC*,
   331 Conn. 54 (2019) .......................................................................................17, 18

*Splawnik v. Di Caprio*,
   146 A.D.2d 333 (3d Dep't 1989) .....................................................................66, 67

*State v. City of Yonkers*,
   2004 WL 5213504 (Sup. Ct. Westchester Cnty. 2004) ...................................85, 86

*State v. Cortelle Corp.*,
   38 N.Y.2d 83 (1975) ...............................................................................................5

*State v. Fermenta ASC Corp.*,
   160 Misc. 2d 187 (Sup. Ct. Suffolk Cnty. 1994) ...................................................85

*State v. Schenectady Chemicals, Inc.*,
   103 A.D.2d 33 (3d Dep't 1984) .......................................................................85, 86

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ........................................................................ passim

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
   648 F. App'x 609 (9th Cir. 2016) ..........................................................................59

*Timperio v. Bronx-Lebanon Hosp. Ctr.*,
   384 F. Supp. 3d 425 (S.D.N.Y. 2019) ....................................................................63

*Town of Southold v. Town of E. Hampton*,
   477 F.3d 38 (2d Cir. 2007) ..............................................................................45, 47

*Twitter, Inc. v. Taamneh*,
   143 S.Ct. 1206 (2023) ...........................................................................................71

*U.S. ex rel. Perler v. Papandon*,
   331 F.3d 52 (2d Cir. 2003) ....................................................................................84

*United States ex rel. Foreman v. AECOM*,
   19 F.4th 85 (2d Cir. 2021) .....................................................................................31

*United States v. 16,179 Molso Italian Convertible Starter Guns*,
   443 F.2d 463 (2d Cir. 1971) ..................................................................................20

*United States v. Allah*,
   130 F.3d 33 (2d Cir. 1997)................................................................19

*United States v. Avila*,
   2023 WL 3305934 (D.Colo. May 8, 2023)................................................42

*United States v. Bradley*,
   2023 WL 2621352 (S.D. W.Va. Mar. 23, 2023) ....................................41, 43, 44

*United States v. Canon*,
   993 F.2d 1439 (9th Cir. 1993) ............................................................72

*United States v. Colon-Quiles*,
   859 F. Supp. 2d 229 (D.P.R. 2012).......................................................42

*United States v. Cox*,
   235 F. Supp. 3d 1221 (D. Kan. 2017)....................................................40

*United States v. Cox*,
   591 F. App'x 181 (4th Cir. 2014) .........................................................72

*United States v. Decastro*,
   682 F.3d 160 (2d Cir. 2012)...........................................................38, 39

*United States v. Drasen*,
   845 F.2d 731 (7th Cir. 1988) ..............................................................26

*United States v. Elias*,
   619 F. Supp. 3d 296 (E.D.N.Y. 2022) ...................................................70

*United States v. Ferguson*,
   676 F.3d 260 (2d Cir. 2011)............................................................73, 74

*United States v. Flores*,
   2023 WL 361868 (S.D. Tex. Jan. 23, 2023) ............................................41

*United States v. Gardner*,
   488 F.3d 700 (6th Cir. 2007) ..............................................................72

*United States v. Hardin*,
   889 F.3d 945 (8th Cir. 2018) ..............................................................26

*United States v. Holton*,
   2022 WL 16701935 (N.D. Tex. Nov. 3, 2022)..........................................41

*United States v. Hosford*,
   843 F.3d 161 (4th Cir. 2016) ..............................................................40

*United States v. John*,
   2022 WL 1062998 (E.D.N.Y. Apr. 8, 2022) ............................................24, 28, 30

*United States v. Martinez*,
   964 F.3d 1329 (11th Cir. 2020) .....................................................................28

*United States v. McCray*,
   7 F.4th 40 (2021) .........................................................................................28

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ................................................................................31, 35

*United States v. Morales*,
   280 F. Supp. 2d 262 (S.D.N.Y. 2003) ...........................................................28

*United States v. Morgan*,
   2009 WL 3644213 (N.D.N.Y. Oct. 27, 2009) .................................................25

*United States v. Mullins*,
   446 F.3d 750 (8th Cir. 2006) ...................................................................27, 28

*United States v. Nektalov*,
   461 F.3d 309 (2d Cir. 2006) ..........................................................................73

*United States v. Pipola*,
   83 F.3d 556 (2d Cir. 1996) .............................................................................72

*United States v. Randolph*,
   2003 WL 1461610 (S.D.N.Y. Mar. 20, 2003) .............................................27, 28

*United States v. Reyna*,
   2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ......................................41, 42, 72

*United States v. Rivera*,
   415 F.3d 284 (2d Cir. 2005) ......................................................................24, 25, 26

*United States v. Serrano*,
   2023 WL 2297447 (S.D. Cal. Jan. 17, 2023) ......................................41, 42, 43, 44

*United States v. Simels*,
   654 F.3d 161 (2d Cir. 2011) ...........................................................................24

*United States v. Smith*,
   477 F.2d 399 (8th Cir. 1973) ..........................................................................32

*United States v. Smith*,
   985 F. Supp. 2d 547 (S.D.N.Y. 2014) .........................................................51, 53

*United States v. Stewart*,
  2001 WL 194917 (D. Az. Feb. 26, 2001) .............................................................27

*United States v. Tita*,
  2022 WL 17850250 (D. Md. Dec. 22, 2022)..........................................41, 42, 43, 44

*United States v. Wick*,
  697 F. App'x 507 (9th Cir. 2017) ...............................................................26, 28

*United States v. Williams*,
  553 U.S. 285 (2008).................................................................................55

*Universal Health Servs., Inc. v. United States*,
  579 U.S. 176 (2016).................................................................................20

*USA Recycling, Inc. v. Town of Babylon*,
  66 F.3d 1272 (2d Cir. 1995).........................................................................47

*VanDerStok v. Garland*,
  2022 WL 4009048 (N.D. Tex. Sept. 2, 2022).........................................................34

*Vaselli v. United States*,
  2014 WL 4961421 (E.D.N.Y. Oct. 3, 2014)............................................................7

*VIP of Berlin, LLC v. Town of Berlin*,
  593 F.3d 179, 185 (2d Cir. 2010)....................................................................51

*Vugo, Inc. v. City of New York*,
  931 F.3d 42 (2d Cir. 2019)..........................................................................56

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*,
  471 U.S. 626 (1985).............................................................................55, 83

## FEDERAL STATUTES

5 U.S.C. § 553 ........................................................................................35

15 U.S.C.
  § 7901(b) ..................................................................................... passim
  § 7903(4) .........................................................................................23, 46
  § 7903(5)(A), (B), (C)......................................................................... passim
  § 7903(6)(B)........................................................................................14
  § 7903(7)...........................................................................................16
  § 7903(9)........................................................................................14, 15

18 U.S.C.
    § 921(a)(3) ......................................................................................................... passim
    § 921(a)(11) ................................................................................................................14
    § 922(a)(1) ....................................................................................................................4
    § 922(b) ......................................................................................................................6, 16
    § 922(k) ........................................................................................................................4
    § 922(t) ..........................................................................................................4, 6, 7, 16
    § 923(a) ......................................................................................................................14
    § 926(a) ........................................................................................................................4

26 U.S.C.
    § 5641(c) ....................................................................................................................73
    § 5842(a) ......................................................................................................................4
    § 5842(b) ..........................................................................................................4, 6, 73
    § 5843 ..........................................................................................................................4
    § 7801(a)(2) ................................................................................................................4

28 U.S.C. § 599A ............................................................................................................4


**STATE STATUTES**

Cal. Civ. Code
    §§ 1714, 3479, 3480 ................................................................................................18

N.Y. Executive Law
    § 63(12) ............................................................................................................ passim

N.Y. General Business Law
    §§ 349 and 350 ................................................................................................. passim
    § 898 .................................................................................................................. passim

N.Y. Penal Law
    § 240.45 ....................................................................................................................50
    §§ 265.01(1), 265.07, and 265.20(3) ........................................................................6
    §§ 265.01(9), 265.60-61 ............................................................................................4
    §§ 265.63-64; ...........................................................................................3, 6, 7, 16

N.Y. Pub. Health Law
    § 1399-ll ............................................................................................................78, 79

N.Y. Public Health Law
    §§ 1300-b ..................................................................................................................50

New York Labor Law
    § 198(1–a) ................................................................................................................78

New York Penal Law
    § 265.10(5) .........................................................................................................68


**FEDERAL REGULATIORY MATERIALS**

27 C.F.R. § 478.12(c) ...................................................................................5, 30, 34

87 Fed. Reg. 24652 (Apr. 26, 2022) ....................................................................5, 34

ATF Ruling No. 2015-1 ...........................................................................................35


**STATE REGULATIONS**

12 NYCRR § 142–2.2................................................................................................78


**RULES**

Federal Rules of Civil Procedure
    Rule 8 .........................................................................................................82, 83
    Rule 12 ..................................................................................................1, 80, 81


**MISCELLANEOUS AUTHORITIES**

60A N.Y. Jur. 2d Fraud and Deceit § 49 ...........................................................60, 61

Erna Risch, *Supplying Washington's Army*
    (U.S. Army Ctr. of Military Hist. 1981) ..........................................................43

N.Y. City Admin. Code § 10-314 ................................................................... passim

N.Y. Executive Order 3.21 ......................................................................................69

Restatement (Second) of Torts § 390.................................................................22, 66

Restatement (Second) of Torts § 431.........................................................................22

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment
    Rights*, 80 Law & Contemp. Probs 55 (2017)..........................................................43

Plaintiff the People of the State of New York, by Letitia James, Attorney General of the State of New York ("the State"), respectfully submits this memorandum of law in opposition to the Motions to Dismiss the State's Second Amended Complaint, dated March 13, 2023, ECF No. 157 ("Complaint" or "SAC"), filed by Defendants Arm or Ally, LLC ("Arm or Ally"), ECF No. 190; Blackhawk Manufacturing Group, Inc., a/k/a 80 Percent Arms, Inc. or 80 Percent Arms ("Blackhawk" or "80 Percent Arms"), ECF No. 186; Salvo Technologies, Inc., a/k/a 80P Builder or 80P Freedom Co. ("80P Builder"), ECF No. 176; Brownells, Inc., a/k/a Brownells or Bob Brownell's ("Brownells"), ECF No. 174;[1] GS Performance, LLC, a/k/a Glockstore or GSPC ("Glockstore"), ECF No. 188; KM Tactical LLC ("KM Tactical"), ECF No. 181; Primary Arms, LLC ("Primary Arms"), ECF No. 178; Rainier Arms, LLC ("Rainier"), ECF No. 191; and Rock Slide USA, LLC ("Rock Slide") (collectively, "Defendants"), ECF No. 183, filed on April 19, 2023,[2] pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

For years, Defendants sold thousands of firearm frames and receivers directly to New York consumers, without any record, without a background check, and without the serial number required by federal and state law—harming the public with each violation. Through these products, Defendants created and powered an industry intended to circumvent the law, promising their customers that they could "Build Your Own Gun in 1 Hour 100[%] Legal," SAC ¶ 47, with "[n]o fuss, no muss, no registration, no records." *Id.* ¶ 375. Defendants deliberately marketed and sold their products to customers who could not legally possess a firearm, and enabled their customers

---

[1] Consistent with this Court's order, ECF No. 75, all moving Defendants joined in Brownells' omnibus memorandum of law in support of its motion to dismiss as to issues that pertain to all parties. *See generally* ECF No. 175 ("Defs. Br."); *see also, e.g.*, ECF No. 189.

[2] Arm or Ally and Rainier filed their motions on April 20, 2023. *See* ECF Nos. 190 and 191, respectively.

to assemble fully functional, untraceable "ghost guns," which are increasingly likely to be involved in violent crimes in New York. Under multiple theories, this conduct gives rise to liability under N.Y. Executive Law § 63(12), N.Y. General Business Law §§ 349, 350, and 898-c, and for negligence, warranting relief including restitution, damages, disgorgement, civil penalties, punitive damages, and meaningful injunctive relief which includes jointly and severally endowing an abatement fund. SAC at p.119-120. The instant motions do not defeat any of these claims in whole or in part at this stage.

Defendants do not seriously dispute that the Complaint adequately alleges the necessary facts, but instead provide one argument after another about why their conduct should be declared legal. First, Defendants claim immunity based on the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7901 *et seq.* ("PLCAA"), but that statute does not apply to them because their commerce in arms was not lawful: the statute covers only actions for harm "solely caused by the criminal or unlawful misuse of firearm products . . . by others," *id.* § 7901(b)(1). In any event, this action would fall into PLCAA's predicate exception, which allows suits based on violations of "statutes that expressly regulate firearms." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 404 (2d Cir. 2008). Second, Defendants argue that their products are not "firearms" under federal law, but their products are manifestly "designed to . . . expel a projectile," and "may readily be converted to expel a projectile," 18 U.S.C. § 921(a)(3), and their position is contradicted by over a half-century of caselaw from the Second Circuit and federal courts across the country, as well as the longstanding position of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").

Third, Defendants raise several constitutional arguments that fail for a variety of reasons. Defendants have no standing as corporations to raise a Second Amendment challenge, and no actual member of "the People" has had his or her right to bear arms infringed when virtually

identical weapons are available through lawful channels. Moreover, the Supreme Court has repeatedly reiterated that laws regulating the commercial sale of weapons are constitutional, and in any event, laws weapon serialization requirements are well-supported by American law and history. The Dormant Commerce Clause is not implicated here because there is no discrimination against interstate commerce or any in-state commerce that is being unlawfully protected, and Defendants cannot identify any such instances. Nor are any of the straightforward public safety laws that form the basis of this civil enforcement action so vague or complex that a person of ordinary intelligence could not understand them. Defendants' First Amendment arguments are likewise unavailing, as the Constitution gives no protection to false or misleading commercial speech (or speech proposing an illegal transaction), and Defendants' advertisements were not statements of opinion, but rather material misrepresentations directly contrary to controlling statutory and case law.

Fourth, Defendants' knowing sales of dangerous weapons to prohibited persons constitute negligent entrustment and their statutory violations constitute negligence *per se*, each of which constitutes a separate and sufficient bar to the applicability of PLCAA. *See* 15 U.S.C. § 7903(5)(A)(ii). Defendants' remaining, secondary arguments, like their contention that their conduct does not constitute aiding and abetting the possession of "finished" ghost guns, or that the State has not sufficiently pled persistent illegal or fraudulent misconduct or attributed misrepresentations to each Defendant, ignore much of the State's allegations. The motions to dismiss should be denied.

## LEGAL AND STATUTORY BACKGROUND

### A.    Laws Relating to the Specific Products at Issue

New York State prohibits the sale of unfinished frames and receivers: knowingly selling one is a class E felony, ten or more is a class D felony. *See* N.Y. Penal Law §§ 265.63-64 (effective

3

April 26, 2022). New York City law also prohibits the sale of these dangerous products into the five boroughs. N.Y. City Admin. Code § 10-314 (effective February 23, 2020). Federal law also prohibits these products, defining "firearm" in pertinent part as "any weapon…which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" or "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). Ghost guns, the unserialized, untraceable firearms made from nominally "unfinished" frames and receivers, *see* SAC ¶¶ 1-2, 28-29, are also illegal to sell or possess under state and federal law. *See* N.Y. Penal Law §§ 265.01(9), 265.60-61; 26 U.S.C. §§ 5842, 5861(i).

Federal law also limits "the business of…dealing in firearms, or in the course of such business[,] ship[ping], transport[ing] or receiv[ing] any firearm in interstate or foreign commerce," to Federal Firearms Licensees or "FFLs." 18 U.S.C § 922(a)(1). Prior to virtually any sale of a firearm, the licensed seller must (i) conduct a background check to ensure that the sale would not violate federal, state, local or tribal law*, see generally* 18 U.S.C. §§ 922(t), and (ii) maintain a record of "a serial number which may not be readily removed, obliterated, or altered" that every gun sold must bear, 26 U.S.C. § 5842(a); *see also* 26 U.S.C. § 5843, 18 U.S.C. § 922(k).

The implementation of federal firearms laws, including the promulgation of applicable regulations, is conducted by the Department of Justice, specifically ATF. *See* 18 U.S.C. § 926(a), 26 U.S.C. § 7801(a)(2), 28 U.S.C. § 599A. ATF has long viewed "unfinished" frames and receivers as meeting the federal definition of a firearm, declaring that "[i]t is our position that an unfinished firearm receiver which may be readily converted to functional condition is a firearm as defined." *See* 1978 ATF Letter, attached as Exhibit A to the Declaration of James M. Thompson ("Thompson Dec."). In April 2022, ATF promulgated a formal regulation on the subject, adopted through full notice-and-comment rulemaking. *See* Final Rule, Definition of "Frame or Receiver" and

Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022). Pursuant to that Rule, "[t]he terms 'frame' or 'receiver' [constituting a firearm] shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver…" 27 C.F.R. § 478.12(c).

### B.    The State's Causes Of Action

The State brings this civil enforcement action to halt the Defendants' illegal sales of ghost gun components into New York, and to obtain legal and equitable relief. The Second Amended Complaint states seven claims, each of which is a separate and sufficient basis for the relief sought.

The State's **first cause of action** is brought pursuant to **N.Y. Executive Law ("Exec. Law") § 63(12)**, which empowers the Attorney General to sue "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business." "Under [] Section 63(12), 'any conduct which violates state or federal law[3] is actionable.'" *Nat'l Coalition on Black Civic Participation v. Wohl*, 2023 WL 2403012, at *35 (S.D.N.Y. Mar. 8, 2023) (cleaned up) (quoting *FTC v. Shkreli*, 581 F. Supp. 3d 579, 627-28 (S.D.N.Y. 2022)). The statute is written broadly in order to serve the public interest: "persistent" means the "continuance or carrying on of any fraudulent or illegal act or conduct," Exec. Law § 63(12), while "repeated" means "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person." *Id.*

Exec. Law § 63(12) is a right of action for the Attorney General but does not in itself create specific obligations. Instead, an action under the illegality prong of the section is premised on a defendant's violation of one or more underlying statutes. *See State v. Cortelle Corp.*, 38 N.Y.2d

---

[3] The statute allows suit for violations of local law as well. *See, e.g., People v. Ivybrooke Equity Enters., LLC*, 175 A.D.3d 1000 (4th Dep't 2019).

83, 85 (1975) (statute "d[oes] not 'make' unlawful the alleged [illegal] practices, but only provide[s] standing in the Attorney-General to seek redress and additional remedies for recognized wrongs"). Here, the State has provided a list of Defendants' underlying violations, *see* SAC ¶ 599, which include violations of State and New York City prohibitions on shipping unfinished frames and receivers (*e.g.,* N.Y. Penal Law §§ 265.63-64, N.Y. City Admin. Code § 10-314), aiding and abetting the possession of unserialized firearms and possession of firearms by prohibited persons (in violation of federal statues such as 26 U.S.C. §§ 5842(b), 5861(c), and 5861(d) and state statutes such as N.Y. Penal Law §§ 265.01(1), 265.07, and 265.20(3)), sale of firearms to persons prohibited from possession by state law (in violation of 18 U.S.C. § 922(b)), and sale of firearms without a background check (in violation of 18 U.S.C. § 922(t)). It is these state, federal, and local laws that Defendants violated by selling unfinished frames and receivers to New York consumers, with Exec. Law § 63(12) as the source of the Attorney General's right to sue.

The State's **second, fourth, and fifth causes of action** are premised on Defendants' false statements to consumers regarding the legality of their products, under **Exec. Law § 63(12)**, **New York General Business Law ("GBL") § 349**, and **GBL § 350**, respectively. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state," and charges the Attorney General with investigating such practices and filing suit to stop them. Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

The State's **third cause of action** is brought under New York's firearms-specific public nuisance statute, **GBL §§ 898-a-d**. The statute has two prongs: (i) the law prohibits any "gun industry member" from "creat[ing], maintain[ing] or contribut[ing] to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing

or marketing of a qualified product," GBL § 898-b(1), and (ii) all "gun industry members" who sell into New York state must "establish and utilize reasonable controls and procedures to prevent [their] qualified products from being possessed, used, marketed or sold unlawfully in New York state." *Id.* § 898-b(2). A violation of either requirement that results in harm is declared a public nuisance, *see id.* § 898-c(1), and the State has alleged that the Defendants' business practices violate both prongs. SAC ¶¶ 612-17.

The State's **sixth cause of action** is brought pursuant to common-law **negligence *per se***. *See id.* ¶¶ 624-27; *cf.* 15 U.S.C. § 7903(5)(A)(ii). "In New York, the unexcused omission or violation of a duty imposed by statute for the benefit of a particular class *is* negligence itself." *Vaselli v. United States*, 2014 WL 4961421, at *5 (E.D.N.Y. Oct. 3, 2014) (quoting *Chen v. United States*, 854 F.2d 622, 627 (2d Cir. 1988) (quotation marks omitted)). Here, the State pled a non-inclusive list of statutes that establish a duty of care. SAC ¶ 625*; see, e.g.,* N.Y. Penal Law §§ 265.63-64; N.Y. City Admin. Code § 10-314; 18 U.S.C. § 922(b)(2); 18 U.S.C. § 922(t). Similarly, the **seventh cause of action** is brought under the doctrine of **negligent entrustment**, under which "the possessor of a dangerous instrument is under a duty to entrust it to a responsible person whose use will not create an unreasonable risk of harm to others." *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 345 (E.D.N.Y. 2007).

The State bases each of these claims on multiple theories of liability, and Defendants' Motions to Dismiss do not warrant dismissal of any claim.

## STATEMENT OF FACTS

Defendants sell unfinished frames and receivers, which are easily converted into "ghost guns." SAC ¶¶ 19-20, 34-53; *see also generally* ¶¶ 115-573. A "frame" generally refers to the core part of a pistol or handgun, and a "receiver" generally refers to the core part of a rifle, shotgun, or other long gun. *Id.* ¶ 21. "Unfinished" frames and receivers are nearly identical to "finished"

frames and receivers and only require completing a few steps to render them usable. *Id.* ¶ 37; *see also id.* ¶¶ 19-39. Converting an "unfinished" frame or receiver into a "finished" deadly weapon can easily be done by an amateur in less than an hour with basic hand tools.[4]

Defendants have helped customers convert their already-easy-to-convert products into working firearms by providing jigs, as well as equipment, instructions, guides, and technical support. *See id.* ¶¶ 41, 43-51, 82, 95, 120, 281-82, 289, 373, 376. A "jig" is a plastic setting or fitting for the frame or receiver that allows a novice to see and follow the necessary steps to convert the unfinished frame into its operable finished form, minimizing any possibility of mistakes. *Id.* ¶¶ 43-45. According to Brownells, "this is pretty simple to do…only the portions that stick up here are what you remove." *Id.* ¶ 46. 80 Percent Arms explains, "80 percent of the work is already done for you. You take this part, snap it into an easy jig, and drill into the areas the template guides you through." *Id.* ¶ 51. Defendants have otherwise offered detailed instructions on how to convert their products into working firearms. *See id.* ¶¶ 120, 281-82, 289, 373, 376. Brownells even offered a tech support line to assist customers in real time to finish frames. *Id.* ¶ 282.

Evident through common marketing strategies, Defendants have intended their unfinished frames and receivers to be workarounds for federal and state gun serialization, recordkeeping, and background check requirements. *See, e.g.*, SAC ¶¶ 83-84, 112-13, 117-19, 160-62, 170-71, 253, 269-70, 285, 374-78, 432-33, 466, 495, 530, 564, 568. As this Court noted, "[e]vading [federal law requirements] and other requirements is not an accidental byproduct of Defendants' business; it appears to be the point." ECF No. 58 at 4. Thus, by design, unfinished frames and receivers and the ghost guns made from them are attractive to (and marketed to) persons who would not be able

---

[4] 80 Percent Arms recognizes that the process is "ridiculously easy," and "[e]ven a caveman can do this." SAC ¶¶ 31, 163, 170; *see also id.* ¶ 282 (Brownells' marketing video reassuring that conversion is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete"), 374 (Glockstore blogging that its unfinished pistol frame was a "DIY project that's easily accomplished by anyone even moderately handy").

to purchase guns legally, or who want a gun that cannot be traced back to them. SAC ¶ 29; *see also id.* ¶¶ 75-77, 82, 118-119, 161-62, 285, 531, 568.

Defendants have expressly marketed their products as not requiring a license, thereby asserting that these products are a viable workaround to evade the firearms laws. *See, e.g.*, SAC ¶¶ 161-62; *see also* 82, 118-19, 285, 531, 564, 568. Indeed, Defendants have emphasized the lack of registration[5] and serialization[6] requirements, necessarily appealing to the illicit market. The lack of serialization means that there is no record of the gun's existence and no ability for law enforcement to trace its origin if it is recovered in connection with a crime – hence the term "ghost gun." SAC ¶ 28. This untraceability, combined with Defendants' practice of selling their products without conducting a background check or any other control, renders their products particularly attractive to people who could not obtain a gun through legal channels. *See infra* pp. 10-12.

Defendants have also engaged in deceptive marketing practices by representing, either directly or indirectly, that their products are legally sold and/or possessed in New York and that their products are exempt from the legal requirements applicable to gun sales. *See, e.g.*, SAC ¶¶ 118, 530, 466. For example, Glockstore maintains several blog posts in which it promotes and markets its unfinished frames and receivers as "legal" products. *See id.* ¶¶ 375-79. Glockstore goes to great lengths to discuss how easy it is to make an untraceable firearm, while misrepresenting that its products are "completely legal and acceptable based on Federal laws that have been on the record for many years..." *Id.* ¶ 378. Glockstore does not acknowledge any state laws, licensing requirements, or prohibitions against firearm possession by certain persons. *Id.* Similarly, in a marketing video, 80 Percent Arms advertises how easy it is to make an untraceable assault rifle

---

[5] *See, e.g.,* SAC ¶¶ 161, 170-71, 375, 377, 446, 457.

[6] *See, e.g.*, SAC ¶¶ 38, n.4, 86, 255.

out of its products and that, despite "no paperwork, no background checks, no registration and no database…it's 100 percent legal." *Id.* ¶ 170. 80 Percent Arms goes on to advertise in the same video that its DIY AR-15 is "completely unregistered and legal." *Id.* ¶ 171.

### C.   Certain Defendants' Sales to Undercover Investigators

Between May 3 and June 22, 2022, Arm or Ally, 80P Builder, Brownells, Rainier, and Rock Slide sold and shipped one or more unfinished frames or receivers to locations in New York City in fulfillment of online purchases made by undercover investigators. *See id.* ¶¶ 122-28, 261-63, 276-78, 535-41, 566-69. None of these Defendants performed a background check, verified whether the undercover purchaser had a license, or even asked the consumer about his or her legal ability to possess a gun. In the case of Arm or Ally, although its website said that "NY residents must send copy of valid state-issued Driver's License," Arm or Ally did not require the undercover purchasers to make that submission to complete the sale. *Id.* ¶ 128.

### D.   Certain Defendants' Sales to Prohibited Persons

Defendants have marketed, sold, and shipped their products to persons who are legally prohibited from possessing a firearm, including certain individuals who then went on to commit serious crimes with ghost guns. *Id.* ¶¶ 217-20, 239-43, 320-23, 335-37. No Defendant has established or utilized any reasonable controls to prevent the unlawful use of their products, as evidenced by the fact that Defendants sold their products to individuals with prior convictions, individuals without licenses to possess a firearm, and other persons prohibited from possessing a deadly weapon.

#### 1.   Sales to Persons with Prior Convictions

Publicly available reports and statements from government authorities demonstrate that Defendants have sold their products to people who are ineligible to legally possess a firearm because of a prior conviction. For example, Matthew Gerwitz, a Tonawanda, New York resident,

was barred from lawfully possessing a weapon because of a prior conviction. *See id.* ¶ 329, n.49. Nevertheless, Brownells, Glockstore, and KM Tactical sold and shipped products to Gerwitz, who later used a ghost gun to carry out a drive-by shooting, and when police came to investigate, he opened fire, striking a detective multiple times. *Id.* ¶¶ 327-32, 409, 484. The Erie County District Attorney described the weapon used in the drive-by as "a homemade, off-the-internet [nine-millimeter]," and noted that Gerwitz had a "little gun shop in his house." *Id.* ¶¶ 331-32.

The Complaint includes multiple instances where five Defendants sold and shipped packages directly to individuals with prior convictions in New York, who would have walked out of a legitimate gun shop empty-handed. *See id.* ¶¶ 206-10, 300-03, 361-65, 398, 411, 419, 486, 550.

2.    <u>Sales to Persons Who are Legally Prohibited from Possessing a Weapon and to Unlicensed Persons</u>

Publicly available reports and statements from government authorities also demonstrate that Defendants have marketed and sold their products to people who were not authorized to possess a weapon and to people who did not have a license to possess a firearm. For example, Edison Cruz, a Bronx, New York resident had a "lengthy rap sheet" and "was not legally permitted to possess a firearm." *See id.* ¶ 341. Between June 24, 2020, and May 4, 2022, Brownells, Glockstore, and Primary Arms satisfied orders and shipped packages directly to Cruz. *Id.* ¶¶ 339-44, 413, 510. On May 3, 2022, Cruz used a ghost gun to open fire into a store, killing one person and injuring two. *See id.* ¶¶ 341-43.

Similarly, Paul Carey, a dentist who operated a practice out of his home in Massapequa, New York, had a lengthy arrest history and his pistol license was revoked in 2016. *Id.* ¶¶ 240-42. Between May 28, 2021, and February 14, 2022, 80 Percent Arms, Brownells, Primary Arms, and Rainier satisfied orders and shipped packages directly to Carey. *Id.* ¶¶ 238-49, 367, 524, 558. On

February 16, 2022, police received a call from Carey's secretary, advising that he was intoxicated and brandishing a gun. *Id.* ¶ 243. A search of Carey's home revealed multiple firearms, including 16 ghost gun assault weapons. *Id.* ¶ 245.

The Complaint includes several other instances where seven Defendants sold and shipped packages directly to individuals in New York who were ineligible to legally possess a weapon and would have walked out of a licensed gun shop empty-handed. *See id.* ¶¶ 143-48, 182-83, 231-36, 314-15, 318-26, 403, 425, 479-81, 508, 522, 552.

### E.    Defendants' Harm to New York

The influx of ghost guns into New York is a significant threat to public health and safety. Although New York's legislature has passed laws specifically to stop companies like Defendants from shipping the products at issue here, *see supra* p. 3, Defendants' business practices have increased the number of illegal operable firearms in New York and undermined public safety. A study published in 2022 concluded that ghost guns, as compared to traditionally manufactured and serialized firearms, are "51% more likely to be recovered in violent crime during the 2017 through 2021 study period." *Id.* ¶ 586. That study revealed that ghost guns may have become a "weapon of choice" for violent gun criminals, as they accounted for nearly 1 in 4 guns recovered by the local police department providing the data, even though ghost guns cannot plausibly account for that share of guns entering firearms commerce. *Id.*

By the conduct summarized above and further detailed in the Second Amended Complaint, Defendants exacerbate the challenges New York has in preventing illegal firearms from entering its communities. *Id.* ¶¶ 574-95. Comprehensive background checks are most effective in lowering firearm homicide and suicide rates when they are implemented in conjunction with handgun purchaser licensing laws. *Id.* ¶ 592, n.84. But Defendants are stripping New York's effective licensing and permit laws of their impact, and consequently the number and rate of homicides and

suicides will continue to rise. With every sale, Defendants have circumvented and undermined New York's firearms public safety measures and have created, maintained, or contributed to a dangerous condition.

## ARGUMENT

Defendants are liable under Exec. Law § 63(12) and GBL §§ 349, 350, and 898. These claims are not barred by PLCAA. Moreover, Defendants sold products that have been deemed "firearms" under federal law for over 50 years, and no part of this case runs afoul of the Second or First Amendments, or any other constitutional doctrine. Finally, each of the State's claims as to each Defendant are well-pled and viable as a matter of law.

## I.    THIS CASE IS NOT BARRED BY PLCAA.

PLCAA is not the blanket grant of immunity Defendants portray it as. The statute was designed to preempt claims against gun manufacturers that were "solely caused by the criminal misuse of firearm products or ammunition products *by others*." 15 U.S.C. §§ 7901(b)(1) & (6) (emphasis added). This case falls outside PLCAA's scope because the State is seeking to hold Defendants accountable for their own illegal conduct, not unlawful misuse by third parties. Removing all doubt about PLCAA's inapplicability here, Defendants' illegal sales fall comfortably into PLCAA's predicate exception, which provides no shelter against actions where a seller "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii).

The court's analysis, as in "every preemption case[,] starts with the presumption that Congress did not intend to displace state law," a presumption that is "especially strong in areas where states traditionally wield police powers," such as firearms regulation. *N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*, 850 F.3d 79, 86 (2d Cir. 2017) (citing *Wyeth v. Levine*, 55 U.S. 555,

565 (2009)). "Second, since preemption is ultimately a question of statutory construction," the court must "look to the intent of Congress," *id.* at 87, which declared in PLCAA its purpose to "protect . . . important principles of federalism, State sovereignty and comity between sister States." 15 U.S.C. § 7901(b)(6).[7] These guiding principles forbid a finding of preemption here.

Additionally, certain defendants cannot invoke PLCAA at all because the statute does not apply to any entity who is not an FFL. *See, e.g.*, SAC ¶ 7. To constitute a preempted "qualified civil liability action," a lawsuit must be brought "against a…seller." 15 U.S.C. § 7903(5)(A). The statutory definition of a "seller," 15 U.S.C. § 7903(6)(B), means "a dealer," as defined in 18 U.S.C. § 921(a)(11), that is "licensed to engage in business as such a dealer under Chapter 44 of Title 18," *i.e.* an FFL. Any Defendant without a federal firearms license is not legally permitted to "engage in the business of…dealing in firearms" in the first place, 18 U.S.C. § 923(a), *see* SAC ¶ 76, and cannot invoke PLCAA's preemption.

## A.  This Action Is Based on Defendants' Own Violations, Not "Unlawful Misuse" By Others.

PLCAA preemption applies only to "a civil action…brought by any person against a manufacturer or seller of a qualified product…for damages…or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." 15 U.S.C. § 7903(5)(A). The statute defines "unlawful misuse" as "conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product." 15 U.S.C. § 7903(9). That definition

---

[7] The State understands Defendants to be arguing express preemption. *See* Defs. Br. 22 (arguing that PLCAA "prohibit[s] the precise claims" the State has brought and that "the State's claims are predicated on [conduct] covered by the PLCAA"). To the extent that the Defendants could be viewed as arguing conflict preemption, as the Northern District of New York recognized, "there is no statutory indication in the PLCAA for [any] claim that Congress intended to preempt state statutes which expressly regulate firearms—much less establish the 'high threshold [that] must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.'" *Nat'l Shooting Sports Found., Inc. v. James*, 604 F. Supp. 3d 48,61 (N.D.N.Y. 2022) ("NSSF") (quoting *Chamber of Com. Of U.S. v. Whiting*, 563 U.S. 582, 607 (2011)). Any conflict preemption argument is further undermined by the fact that "the text of the [PLCAA] unambiguously envisions continuing state [firearms] regulation." *Pet Welfare*, 850 F.3d at 89.

underscores Congress' desire to immunize lawful dealers in firearms from liability "for the harm *solely* caused" by the illegal misuse of third parties. 15 U.S.C. § 7901(b)(1) (emphasis added). But here, the statutory violations giving rise to relief against Defendants are not based on "the use of a qualified product" by someone else, 15 U.S.C. § 7903(9), but Defendants' own direct conduct that violates specific state, federal, and local laws. *See* SAC ¶ 599; *cf. Smith & Wesson Corp. v. City of Gary*, 875 N.E.2d 422, 433 (Ind. Ct. App. 2007) (denying motion to dismiss based on PLCAA because "[b]ased on the [government]'s allegations, we cannot say that the [defendants] are engaged in the '*lawful* design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products,' or that the harm 'is solely caused by others.'"

### B.  Alternatively, PLCAA's Predicate Exception Applies Here.

Even if any of the State's claims are based on others' "unlawful misuse," Defendants' alleged misconduct squarely falls into PLCAA's predicate exception, 15 U.S.C. § 7903(5)(A)(iii), which exempts from preemption any "action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."

### 1.  The State Bases Its Claims on Violations of Statutes That Regulate The Firearms Industry.

By selling unfinished frames and receivers directly to consumers without following statutory requirements, such as serialization or background checks, Defendants "knowingly violated a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. § 7903(5)(A)(iii), and therefore fall into PLCAA's predicate exception. Under *Beretta*, this exception "encompass[es] statutes that expressly regulate firearms, or that courts have applied to the sale and marketing of firearms; and does encompass statutes that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." 524 F.3d at

404. In this action, the State indisputably alleges that Defendants violated statutes that specifically regulate the sale or marketing of firearms. SAC ¶¶ 599, 625; *see, e.g.,* N.Y. Penal Law §§ 265.63-64; 18 U.S.C. § 922(b)(2); 18 U.S.C. § 922(t).

Defendants instead try to conflate their statutory violations with Exec. Law § 63(12), which establishes the Attorney General's power to bring a civil enforcement action. *See* Defs. Br. 30 (asserting that violations of "underlying state and federal statutes…do not rescue these claims from PLCAA immunity because they are not the source of the cause of action"). But this deliberately misconstrues PLCAA's predicate exception, which says nothing about "the source of the cause of action." That requirement does not exist in 15 U.S.C. § 7903(5)(A)(iii), which plainly states that there shall be no preemption where a seller "knowingly violated a State or Federal statute."[8] *Beretta* likewise says nothing about preemption applying only to cases wherein the State or Federal statutes violated are themselves the "cause of action." 524 F.3d at 404. And in discussing the legislative history of the predicate exception, the Circuit noted "that comments by the bill's proponents consistently referred to firearms-specific statutes," not causes of action. *Beretta*, 524 F.3d at 403-04 ("[I]f in any way [defendants] violate State or Federal Law…they are in violation of law. This bill does not shield them[.]").

Defendants are asking the Court for a second layer of PLCAA preemption that does not exist. By Defendants' logic, PLCAA creates an exemption from preemption when there is a State or Federal law violation, but also eliminates that exact exemption in the context of the very enforcement mechanisms required to enforce those laws. Such a reading is not only unsupported by the statutory text or any other authority, it contravenes the respect for federalism and state

---

[8] The predicate exception applies to violations of local laws as well. *See* 15 U.S.C. § 7903(7) ("The term 'State' includes . . . any political subdivision.").

sovereignty that compel federal courts to construe preemption statutes narrowly. *See Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) ("[W]hen the text of a pre-emption clause is susceptible of more than one … reading," a federal court should "accept the reading that disfavors pre-emption." (internal quotations omitted)); *see also* 15 U.S.C. § 7901(b)(6).

Lastly, Exec. Law § 63(12) meets the Second Circuit's *Beretta* test in any event. The Circuit recognized that even where a statute does not "expressly regulate firearms," PLCAA's predicate exception will still apply so long as it is a statute "that courts have applied to the sale and marketing of firearms." *Beretta*, 524 F.3d at 404. Exec. Law § 63(12) is such a statute. Indeed, the New York Attorney General has brought several previous successful actions under Exec. Law § 63(12) based on a seller's violations of firearms laws. *See, e.g., People of the State of New York v. Gift & Luggage Outlet, Inc.*, 194 Misc.2d 582 (Sup. Ct. N.Y. Cnty. 2003); Consent Order and Judgment, *People of the State of New York v. Wal-Mart Stores, Inc.*, Index No. 401062/2003 (Sup. Ct. N.Y. Cnty. June 4, 2003), Thompson Dec. Ex. B.

### a. The State's Deceptive Trade Practices Claims

Defendants argue in a three-sentence aside that New York's claims under GBL §§ 349 and 350, which prohibit deceptive trade practices, are also preempted under PLCAA because they do not fit the predicate exception. Defs. Br. 31. But deceptive trade practice statutes such as these, were among the "state consumer protection laws" contemplated by Congress in enacting the predicate exception. *See Soto v. Bushmaster Firearms International, LLC*, 331 Conn. 54, 121-22 (2019) (recognizing that "at the time PLCAA was enacted, no federal statutes directly or specifically regulated the marketing of firearms," and "[i]t would have made little sense for the drafters of the legislation to carve out an exception for violations of laws applicable to the marketing of firearms if no such laws existed"). This approach is consistent with *Beretta*, which holds that the predicate exception "encompasses…laws…that 'clearly can be said to implicate the

17

purchase and sale of firearms,' as well as laws of general applicability that 'courts have applied to the sale and marketing of firearms,'" such as the FTC Act and state analogues like GBL§§ 349 and 350. *Soto*, 331 Conn. at 125-26.

### b. The State's GBL § 898 Claim

New York's firearm-specific nuisance law, GBL § 898-a-e, is a "statute[] that actually regulate[s] the firearms industry," *Beretta*, 524 F.3d at 404, and is therefore covered by PLCAA's predicate exception. The statute applies only to a "gun industry member," defined as any entity "engaged in the sale, manufacturing, distribution, importing or marketing of firearms, ammunition, ammunition magazines, and firearms accessories." GBL § 898-a(4). The statute has two prongs, one forbidding gun industry members from creating, maintaining or contributing to a condition that endangers public health or safety in New York, and another requiring all gun industry members to "establish and utilize reasonable controls and procedures" to prevent their products "from being possessed, used, marketed or sold unlawfully in New York state." *Id.* § 898-b.

Defendants characterize this firearm-specific statute as an "unmoored common law claim[]" to which the predicate exception does not apply, Defs. Br. 29, but this Court should reject Defendants' arguments for the same reasons the Northern District of New York recently rejected this precise argument in *National Shooting Sports Foundation, Inc. v. James*, 604 F. Supp. 3d 48 (N.D.N.Y. 2022), finding that "[n]o reasonable interpretation" of the predicate exception "can exclude a statute which imposes liability exclusively on gun manufacturers for the manner in which guns are manufactured, marketed, and sold."[9] *Id.* at 59. There is simply no credible reading

---

[9] *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009), is unavailing because the statutes at issue there were general tort statutes not specifically connected to firearms, *see* Cal. Civ. Code §§ 1714, 3479, 3480, while GBL §§ 898-a-e are "statutes [] that expressly regulate firearms." *Beretta*, 524 F.3d at 404.

of § 898 as anything other than a "statute[] that expressly regulate[s] firearms." *Beretta*, 524 F.3d at 404; *accord NSSF*, 604 F. Supp. 3d at 60.[10]

### 2. Defendants Knowingly Made Illegal Sales.

Defendants argue that the term "knowingly," as used in 15 U.S.C. § 7903(5)(A), requires "knowledge of illegality," including "knowledge of the relevant law." Defs. Br. 25, 27. Defendants' argument is contradicted by several Supreme Court cases rejecting the idea that a violation of the federal firearms laws requires specific intent.

In *Bryan v. United States*, 524 U.S. 184 (1998), the Court held that the government was not required to prove that a defendant had knowledge of the specific federal laws that he violated.[11] The Court ruled that "the term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law." *Bryan*, 524 U.S. at 192. Accordingly, it is "not [] necessary to prove that the defendant knew that his [act] was unlawful." *Id.* at 193 (citation omitted); *accord Dixon v. United States*, 548 U.S. 1, 5 (2006) ("As we have explained, 'unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense.'" (quoting *Bryan*, 524 U.S. at 193)).

---

[10] Ignoring the *NSSF* decision upholding the public nuisance statute at issue in this case, Defendants instead cite only to the District of New Jersey's ruling in *NSSF v. Platkin*, 2023 WL 1380388 (D.N.J. Jan. 31, 2023). The New Jersey case is readily distinguishable because it was based on that court's own textual analysis, *see id.* at *5 (the "analysis begins and ends with the text"), and cannot be squared with the Second Circuit's holding in *Beretta* that the predicate exception "does encompass statutes that expressly regulate firearms." 524 F.3d at 404; *accord NSSF v. James*, 604 F. Supp. 3d at 59 ("No reasonable interpretation of 'applicable to' can exclude a statute [GBL § 898-a-e] which imposes liability exclusively on gun manufacturers for the manner in which guns are manufactured, marketed, and sold."). Moreover, the circumstances of this case undermine aspects of the *Platkin* court's policy-oriented analysis: while the New Jersey district court was concerned with "Congress' intent" to preclude liability for "harm solely cause by the criminal or unlawful misuses of firearm products . . . by others," 2023 WL 1380388 at *7, in this case Defendants engaged in unlawful behavior of their own, and New York is seeking to hold them accountable for the consequences of their own actions. *Cf. Beretta*, 524 F.3d at 403 ("if in any way [gun industry members] violate State or Federal law . . , they are in violation of law. This bill does not shield them, as some would argue. Quite the contrary." (quoting 151 Cong. Rec. S9087-01 (statement of Sen. Craig))).

[11] Notably, the standard at issue in *Bryan* required the government to prove that a defendant acted "willfully," *see* 524 U.S. at 188-89, a higher standard of *mens rea* than "knowingly." *See United States v. Allah*, 130 F.3d 33, 39 (2d Cir. 1997)). The *Bryan* court found that even a "willfulness requirement…does not carve out an exception to the traditional rule that ignorance of the law is no excuse." 524 U.S. at 196.

This Court recently rejected a nearly identical argument in this action's companion case:

> It is well established that "the phrase 'knowingly violates' requires knowledge of the facts and the attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal." *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001). Moreover, for dangerous products, which certainly include the products at issue here "the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *United States v. International Minerals & Chemical Corporation*, 402 U.S. 558, 565 (1971). Thus, **the [government] need not prove that [the defendant] had knowledge that its conduct violated the law, let alone any specific law, to satisfy the requirements of Section 898-b**.

*City of New York v. Arm or Ally, LLC, et al.*, No. 22 Civ. 5525, ECF No. 79 at 13:1-14 (S.D.N.Y. Oct. 27, 2022) (emphasis added). That reasoning and conclusion applies to the State in this case.

There is no basis for Defendants' wishful reading of the term "knowingly" as used in PLCAA. *See also Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 187 (2016) ("[I]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses."); *United States v. 16,179 Molso Italian Convertible Starter Guns*, 443 F.2d 463, 466 (2d Cir. 1971) ("As the proper purpose of the statute is to keep such potentially dangerous weapons out of the hands of unlicensed [persons], we can see no reason for requiring scienter or for reading into the statute what is not there."). Because the State alleges their "knowledge of the facts that constitute the offense," *Bryan*, 524 U.S. at 193, Defendants' PLCAA *mens rea* argument fails.

### C.    Proximate Causation Is Satisfied.

PLCAA explicitly contemplates suits such as this one because Defendants' illegal sales were harmful in and of themselves, and because Defendants could reasonably foresee intentional or criminal acts carried out by customers who they knew bought their products to evade the firearms laws.

The analysis can begin and end with the text of PLCAA. The predicate exception, 15 U.S.C. § 7903(5)(A)(iii,) includes two nonexclusive examples of fact patterns that satisfy the statute, both of which are analogous to the Defendants' alleged conduct. First is "any case in which the…seller knowingly…failed to make appropriate entry in[] any record required to be kept under Federal or State law with respect to the qualified product." Here, Defendants' sales of "unfinished" frames and receivers were made without complying with federal and state recordkeeping requirements, without querying the National Instant Criminal Background Check System, and without recording a serial number for the firearm. *See, e.g.*, SAC ¶¶ 26-27, 72-74, 375. Indeed, that was Defendants' marketing strategy.

Second, the statute's requirements are satisfied in "any case in which the…seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition." 15 U.S.C. § 7903(5)(A)(iii)(II). The State alleges precisely that. *See supra* pp. 10-12. Indeed, Defendants specifically market their products as a way to circumvent the public safety protections that would keep prohibited persons from getting guns. *Id.* Thus, PLCAA explicitly states that the elements of the predicate exception are satisfied in the context of a seller's failure to keep required records or sales to prohibited persons; because the Second Amended Complaint alleges both, the proximate cause analysis need go no further.

This proximate cause analysis also differs because this is a civil enforcement action brought by the government to remedy harms to the State, rather than an action by a private party. This is not the kind of case PLCAA targets, seeking damages "for the harm solely caused by the criminal or unlawful misuse of firearm products…by others." 15 U.S.C. § 7901(b)(1). Instead, Defendants'

sales were *illegal in themselves* and caused harm to New York directly. *See* SAC ¶¶ 65-68, 574-95. The State can and must enforce its laws to prevent that harm. *See City of N.Y. v. Beretta U.S.A. Corp.*, 401 F. Supp. 2d 244, 271 (E.D.N.Y. 2005) (ruling that where statute "is violated by the same conduct" that causes harm, the government's pleading "sufficiently alleges the proximate cause requirement"), *aff'd in part, rev'd in part on other grounds*, 524 F.3d 384 (2d Cir. 2008).

Moreover, a defendant proximately causes harm "if his conduct is a substantial factor in bringing about the harm." Restatement (Second) of Torts § 431. There can be proximate cause when an "intervening cause was foreseeable." *In re Antrobus*, 519 F.3d 1123, 1127 (10th Cir. 2008) (Tymkovich, J., concurring); *see* Restatement (Second) of Torts § 390; *accord Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 135 (2d Cir. 2021) ("liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's [action]" (quotation omitted)).

Here, Defendants are wrong that "alleged criminal misconduct of third parties [] break[s] any causal chain of any kind" as to their conduct. Defs. Br. 35. "[T]hat 'doctrine has no application when the intentional or criminal intervention of a third party or parties is reasonably foreseeable.'" *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 274 (E.D.N.Y. 2014) (quoting *Kush v. City of Buffalo*, 59 N.Y.2d 26, 33 (N.Y. 1983)). The "normal and foreseeable consequence[s]" of Defendants' unlawful marketing and sales is an influx of harmful ghost guns at large, leading to an avoidable increase in shootings, suicides, and other violent crimes in the aggregate. *See, e.g.,* SAC ¶¶ 27-29, 106-14, 585-95. That harm was certainly foreseeable by Defendants, given that their marketing materials deliberately targeted individuals ineligible to legally purchase a firearm, opening a direct avenue to illicitly purchase a virtually untraceable weapon. *See, e.g., id.* ¶¶ 171, 375.

### D.     Unfinished Frames And Receivers Are Also "Component Parts" Pursuant 15 U.S.C. § 7903(4).

Defendants argue alternatively that their unfinished frames and receivers are not "a component part of a firearm or ammunition" under PLCAA, *see* 15 U.S.C. § 7903(4), and under GBL § 898-a(6), which incorporates PLCAA's definition. *See* Defs. Br. 20-22. However, an unfinished frame or receiver "is the core part of a handgun, rifle, or shotgun, but missing a few drill holes and containing a small amount of extra plastic." SAC ¶¶ 20-21. Defendants' argument is contradicted by their public statements, in which they repeatedly describe their unfinished frames and receivers as "parts" or "components." *See, e.g.*, SAC ¶¶ 162, 171, 377, 530 n.69. And as discussed in the following section, Defendants' products were not merely "component parts," but met the federal definition of a "firearm."

In sum, Defendants find no cover from this lawsuit under PLCAA, and the motions to dismiss should be denied.

## II.     DEFENDANTS' PRODUCTS MEET THE FEDERAL DEFINITION OF A FIREARM.

Defendants strenuously contend that "unfinished" frames and receivers are not "firearms" under the governing federal statute. This is an issue that is germane to only one of the State's causes of action, and only in part. The State's first cause of action, brought to combat Defendants' persistent illegality pursuant to Exec. Law § 63(12), is predicated on Defendants' violations of a host of federal, state, and local laws, with only a subset of those laws being ones where the federal definition of "firearm" is relevant. *See* SAC ¶ 599. Even in that limited context, Defendants' interpretation of the definition of a "firearm" is simply wrong, contradicted by over half a century of federal case law and the longstanding position of ATF.

A.    <u>**Defendants Sold "Firearms" Under 18 U.S.C. § 921(a)(3).**</u>

Defendants have marketed their products as "unfinished" or "80 percent," but the fact that they do not come out of the box ready to fire a bullet does not change the fact that they are "firearms" under the governing federal statute. 18 U.S.C. § 921(a)(3) provides, in relevant part, that "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon[.]" This definition is not limited to a gun that "will" fire a bullet, but also covers products that can be made to do so. *See United States v. Simels*, 654 F.3d 161, 171 (2d Cir. 2011) (explaining that Congress was "concerned with the dangers that might arise from any gun that is 'designed' to expel projectiles"); *United States v. John*, 2022 WL 1062998, at *3 (E.D.N.Y. Apr. 8, 2022) ("[F]ederal courts have broadly interpreted the meaning of a firearm under § 921(a)(3)[.]"). Also, "[t]he statute was clearly written in the disjunctive. The government need only show that the weapon[] was either 'designed to' or 'may readily be converted.' It need not demonstrate both." *United States v. Rivera*, 415 F.3d 284, 287 (2d Cir. 2005).

Instead of the large body of federal case law (including binding precedent from the Second Circuit) that has interpreted the term since it was codified in 1968, Defendants put before this Court citations to dictionaries, generalized arguments about statutory interpretation, and their own factual assertions untethered to any allegations in the Complaint. *See, e.g.,* Defs. Br. 10.[12] Federal courts have been interpreting the definition of a "firearm" for a long time, and case law solidly

---

[12] Defendants argue that the State should be estopped from arguing that an unfinished frame is a frame under § 921(a)(3)(b) because the Manhattan District Attorney obtained a guilty plea from Rene Loyola for violating N.Y.C. Admin. Code § 10-314(a) in *People v. Loyola*, No. IND-71721-22/001 (Apr. 19, 2023). *See* Defs. Br. 12. It is well-settled that judicial estoppel is "properly invoked where: (1) a party's later position is clearly inconsistent with its earlier position, and (2) the party's former position has been adopted in some way by the court in an earlier proceeding." *Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019). Here, judicially estopping the State would be wholly inappropriate because it was not a party to *People v. Loyola*.

establishes that products like Defendants' that are designed to ultimately fire a bullet are "firearms" even if additional parts and construction are necessary, and that the minimal amount of time, parts, and effort needed to convert Defendants' products into working ghost guns places them well within the definition of a weapon that "may readily be converted" to fire.[13]

In the governing case *United States v. Rivera*, 415 F.3d 284 (2d Cir. 2005), the Second Circuit joined "every other circuit" in "conclud[ing] that an inoperable weapon falls within § 921(a)(3)'s definition of a 'firearm.'" *Id.* at 286 (collecting cases). Under *Rivera*, the standard is a common-sense one: a weapon is a firearm whenever it "was originally designed to fire a bullet," whether or not it is currently in a condition to do so. *Id.*; *accord United States v. Morgan*, 2009 WL 3644213, at *4 (N.D.N.Y. Oct. 27, 2009) (definition satisfied if weapon "was designed to fire a bullet and there was no proof that the design had been altered").

A weapon is a "firearm" if it was designed to expel a projectile by action of an explosive,[14] and the dispositive quality is the design, not operability, completeness, or necessity of additional machining. *See Rivera*, 415 F.3d at 286 (holding that even if a weapon is "incapable of effecting its purpose" absent additional effort, "it continues to be 'designed' to fire a projectile"). This is the

---

[13] Defendants argue that the State should be equitably estopped from asserting that their products are firearms under federal law based on an out-of-context sentence contained in a 2020 press release from the Attorney General's Office. *See* Defs. Br. 16. In context, however, the New York Attorney General never took a position contrary to that of this case. That same press release states: "These companies often specifically advertise their products **in a way to evade law enforcement**…The companies operating these websites have specifically been marketing their lower receivers as "80%" complete, **in order to evade federal regulations**." *Attorney General James Stops Sales of "Ghost Guns" Into New York*, *available at* https://ag.ny.gov/press-release/2020/attorney-general-james-stops-sales-ghost-guns-new-york (last visited June 14, 2023) (emphasis added). Moreover, "[t]he elements of estoppel are a material representation, reasonable reliance, and provable damages," *Schwebel v. Crandall*, 967 F.3d 96, 102 (2d Cir. 2020) (citations omitted), and "it is well settled that the Government may not be estopped on the same terms as any other litigant" because estopping the Government would frustrate its ability to enforce the law. *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984) (citations omitted); *see also Roja-Reyes v. INS*, 235 F.3d 115, 126 (2d Cir. 2000) (holding equitable estoppel "will only be applied upon a showing of affirmative misconduct by the government"). Here, Defendants do not meet a single of these elements.

[14] Defendants cite a 1944 dictionary in support of their contention that their products are not "weapons." Defs. Br. 10. But even that source undermines their assertion: a weapon is "anything used, *or designed to be used*, in destroying, defeating, or injuring…" *Id.* (quoting Webster's New International Dictionary (2d ed. 1944)) (emphasis added).

case even if a gun is so significantly damaged that it cannot fire. *See id.* ("That the firing pin and firing-pin channel were damaged did not fundamentally alter the gun's design."). It is the case even if significant parts are missing, such that it could never be made to fire without additional parts being purchased and installed. *See United States v. Hardin*, 889 F.3d 945, 948 (8th Cir. 2018) (pistol that "did not function due to a broken trigger and numerous missing internal parts" nonetheless met statutory definition because "broken pieces and missing parts are not enough to constitute a fundamental alteration in design"). The statutory definition is met even if the firearm is completely disassembled, or a "mere collection of parts." *United States v. Drasen*, 845 F.2d 731, 736 (7th Cir. 1988); *accord United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *see also infra* Section II.C. The design factor is determinative, even if making the gun function would take effort far beyond what is necessary to complete a ghost gun from Defendants' products. *See Dotson*, 712 F.3d 369, 370 (7th Cir. 2013) (statutory definition met even if conversion "would take an hour or two for an expert in gun repair" and "would take a novice longer—if he could do it at all").[15]

Defendants' "unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose." SAC ¶ 32. Defendants do not dispute that their products are designed to shoot bullets, and instead try to split hairs, arguing that they are not "'designed to' expel projectiles because the purpose of an unfinished frame is…to be incorporated into *something else* that is designed to expel a projectile." Defs. Br. 10. In this way, Defendants cannot avoid conceding that their products are designed to expel a projectile with the addition of other parts and

---

[15] Conversely, to fall outside the definition of a "firearm," a weapon that was designed to fire a projectile must have been "damaged in a way that fundamentally altered its original design." *Hardin*, 889 F.3d at 949; *see also, e.g.*, *Rivera*, 415 F.3d at 286-87 (describing such an example as "a gun with a barrel filled with lead, maybe for use as a theatrical prop"); *Dotson*, 712 F.3d at 371-72 (describing a "gun…so damaged that it can't be restored…no longer useful for any purpose, even intimidation" or a gun "redesigned to be a cigarette lighter").

finishing work, just like the weapons found to be "firearms" based on design, despite needing additional parts and labor, in cases such as *Rivera*, *Hardin*, *Dotson*, and *Morales*. Indeed, the fact that Defendants' products were "designed to...expel a projectile by the action of an explosive" is demonstrated by their many representations to consumers, which tout their products as a tiny effort away from being functional ghost guns. *See, e.g.,* SAC ¶¶ 171, 376. The people buying Defendants' products certainly understood them as "designed to...expel a projectile," as one Brownells' customer explained, "[G]uess what [*sic*] they all go bang when I pull their trigger." *Id.* ¶ 42.

Of course, Defendants' products also constitute "firearms" because they "may readily be converted to expel a projectile by action of an explosive." 18 U.S.C. § 921(a)(3)(A). As with the design element, federal case law establishes that the minimal amount of work necessary to convert Defendants' products into working ghost guns falls well below the threshold for ready convertibility under the statute. *See, e.g., United States v. Mullins*, 446 F.3d 750, 755 (8th Cir. 2006) (starter gun could readily be converted "by cutting off the barrel with a hack saw and opening up the cylinder holes with a Dremel tool," which takes "easily less than an hour...without any specialized knowledge"); *United States v. Stewart*, 2001 WL 194917, at *1-2 (D. Az. Feb. 26, 2001) ("75% complete" parts kit could readily be converted even if consumer had to "mill out the receiver"); *United States v. Randolph*, 2003 WL 1461610, at *2 (S.D.N.Y. Mar. 20, 2003) (gun could be readily converted even though it "consists of disassembled parts with no ammunition, no magazine, and a broken firing pin, making it incapable of being fired without replacement or repair").

Here, Defendants' products can be converted into ghost guns capable of firing a bullet "by an amateur in under an hour with basic hand tools," and "[i]n the hands of someone with prior

experience or mechanical aptitude, an unfinished frame or receiver can be converted into a working gun in under thirty minutes." SAC ¶ 31; *cf. Mullins*, 446 F.3d at 755; *John*, 2022 WL 1062998 at *4-5 (gun could "readily be converted" if trained ATF agent "was able to expel a projectile in twenty to thirty minutes"). Defendants' marketing consistently emphasizes the quickness with which their products can be made to fire. *See, e.g.*, SAC ¶¶ 41, 282, 284. Nor does the process take any specialized skill, with Defendants describing the ease of conversion as "ridiculously easy," *id.* ¶ 41, "pretty simple to do," *id.* ¶ 46, and "[e]ven a caveman can do this."[16] *Id.* ¶ 47.

Given the extensive federal case law, Defendants' many admissions about the ease with which their products can be made to fire, "and the liberal interpretation that has been afforded to inoperable guns in this circuit under § 921(a)(3)," *John*, 2022 WL 1062998 at *5, the products Defendants shipped to New York consumers constitute firearms under federal law.

### B.   Alternatively, Defendants Sold "Frame[s] or Receiver[s]" Under 18 U.S.C. § 921(a)(3)(B).

The federal definition of a "firearm" includes "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). Defendants' products comfortably meet this federal definition as well.

The term "frame or receiver" is not defined in the statute, but its common meaning is consistent with its application to Defendants' products. Where Congress has not defined a term, a federal court will "employ the word's ordinary meaning when interpreting the statute." *United*

---

[16] Defendants also sold parts kits, which are independently considered firearms under federal law because assembly is not what determines "firearm" status—design and ready compatibility do. *See United States v. Morales*, 280 F. Supp. 2d 262, 272 (S.D.N.Y. 2003) ("Whether in pieces or whole, it is clear to this court that [disassembled Tec-9 pistol] was clearly 'designed to' and could 'readily be converted to' expel a projectile."); *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017) (Evidence "was sufficient to convict" where "Wick was selling complete Uzi parts kits that could 'readily be converted to expel a projectile by the action of an explosive,' thus meeting the statute's definition of a firearm."). This is congruent with extensive federal case law holding that disassembled guns likewise constitute "firearms" under 18 U.S.C. § 921(a)(3). *United States v. Martinez*, 964 F.3d 1329, 1340 (11th Cir. 2020) ("A disassembled [firearm] is just as much of a firearm as an assembled one."); *Morales*, 280 F. Supp. 2d at 262-63; *Randolph*, 2003 WL 1461610, at *2 (ruling that a gun "consist[ing] of disassembled parts with no ammunition, no magazine, and a broken firing pin…incapable of being fired without replacement or repair…meet[s] the federal definition of a firearm.").

*States v. McCray*, 7 F.4th 40, 46 (2021). Here, the dictionary definition of "frame" includes "the underlying constructional system or structure that gives shape or strength" or "an open case or structure made for admitting, enclosing, or supporting something. *Frame*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/frame. "Receive," meanwhile, means "to act as a receptacle or container for" or "to support the weight or pressure of." *Receive*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/receive. These definitions are in harmony with the Complaint, which explains that a "frame" is "the core part of a pistol or handgun" while a receiver is "the core part of a rifle, shotgun, or other long gun." SAC ¶ 21.

That is what Defendants' products are. Defendants' "unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose." *Id.* ¶ 32. The difference between an "unfinished" frame and the "finished" version "is negligible, as is the effort to convert the former into the latter." *Id.* ¶ 34. The two are "virtually identical," *id.* ¶ 36: in the case of a typical pistol frame, the finishing "amounts to having to drill three small holes and milling down a small amount of plastic at the top of the frame. *Id.* ¶ 37. And "[t]he differences are just as minuscule in the context of an unfinished lower receiver for a rifle," *id.* ¶ 38, meaning that "it takes very little time, effort, or skill to convert an unfinished frame[] or receiver into a working ghost gun." *Id.* ¶ 39. Defendants' marketing admits as much, explaining that "an 80% frame can be finished into a firearm in just minutes," *id.* ¶ 284, because "what is complete is far more than what is left for [the consumer] to do." *Id.* ¶ 38.

The "trivial differences" between an "unfinished" frame or receiver and a "finished" version do nothing to change the conclusion that Defendants' products meet the statutory definition. *Id.* ¶ 37. There is nothing in the statute that supports the conclusion that the three tiny holes involved in "finishing" Defendant's products are outcome-determinative, or that the tiny bit

of plastic to be removed at the top of the frame has dispositive legal significance. *Cf.* SAC ¶¶ 22, 34-39. To the contrary, the phrase "frame or receiver of any such weapon" in 18 U.S.C. § 921(a)(3)(B) recognizes that principles of design or convertibility apply, as the "such weapon" language refers back to 18 U.S.C. § 921(a)(3)(A), designating that "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" meets the definition of a "firearm." *See Morehouse Enterprises, LLC v. ATF*, 2022 WL 3597299, at *6 (D.N.D. Aug. 23, 2022) (finding it proper to use the term "readily...converted" in terms of an unfinished frame or receiver because the statute "clearly defined 'firearms' more broadly than a fully operational weapon"). That interpretation is also consistent with the broad interpretation of the term "firearm" by courts in this circuit, which focus on design, intent, and convertibility rather than instant operability. *See John*, 2022 WL 1062998, at *3-5 (summarizing Second Circuit caselaw and reaching decision based on "the liberal interpretation that has been afforded to inoperable guns in this circuit").

Defendants' products are also "frame[s] or receiver[s]" under ATF's authoritative definition of the statutory term. *See* 27 C.F.R. § 478.12(c) ("The terms 'frame' or 'receiver' [constituting a firearm] shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver[.]").[17] ATF's agency interpretation is entitled to judicial deference.[18] *See SEC v. Alpine Securities Corp.*, 308 F. Supp.

---

[17] The newly promulgated Rule is consistent with ATF's longstanding interpretation of 18 U.S.C. § 921(a)(3)(B), as the agency has long held that a product meets the statutory definition if "it *may readily be converted to function as the frame or receiver* of a firearm." July 14, 1994 ATF Classification Letter, Thompson Dec. Ex. G at 1 (emphasis added).

[18] *Chevron* deference is the appropriate analytical framework for ATF's interpretation. *See SEC v. Alpine Securities Corp.*, 308 F. Supp. 3d 775, 788 (S.D.N.Y. 2018) ("If an agency promulgates a regulation and complies with the notice and comment procedures defined in the Administrative Procedure Act, a court reviews the regulation under the two-part framework established in *Chevron*"). But even if the Court were to decline to apply *Chevron*, or if the analysis

3d 775, 788 (S.D.N.Y. 2018). Defendants attempt to distinguish ATF's regulation on the basis that their products require some parts, tools, knowledge, and time to complete the necessary steps, Defs. Br. 18, but none of those things contradict the conclusion that their products meet ATF's definition of "readily…converted," which requires only that the process be "reasonably efficient, quick and easy." *Id.* at 17 (quoting 27 C.F.R. § 478.11). Defendants' own marketing confirms that their products more than meet the standard. *See* SAC ¶¶ 41, 46-47.

### C.  ATF Has Long Viewed Defendants' Products As Firearms.

Defendants repeatedly mischaracterize ATF's longstanding position on their unfinished frames and receivers. Defs. Br. 14. As an initial matter, Defendants' argument is improper at this stage, and the Court should not consider the extraneous materials that Defendants introduce in order to make it. *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107 (2d Cir. 2021) ("A district court therefore errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss." (quotation omitted)). Nonetheless, contrary to Defendants' selective recitation, historical ATF regulatory materials demonstrate that Defendants are incorrect.

The federal definition of a "firearm" was adopted as part of the Gun Control Act of 1968, and it did not take long before manufacturers began trying to use "unfinished" frames to skirt the definition's plain scope. *See, e.g.,* June 1987 ATF Letter to Congressman Esteban Torres, Thompson Dec. Ex. C at 1-2 ("We are extremely concerned that the availability of unfinished

---

were to change given the Supreme Court's recent grant of certiorari in *Loper Bright Enterprises v. Raimondo*, ATF's interpretation would be entitled to great weight, particularly given the Bureau's deep subject-matter expertise and the extensive process it undertook to reach its conclusion. *See United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) ("[A]n agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency and given the value of uniformity in its administrative and judicial understandings of what a national law requires."); *accord Lopes v. Dep't of Social Servs.*, 696 F.3d 180, 187 (2d Cir. 2012) ("The interpretive guidance of an administrative agency…constitutes a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (quotation omitted)).

frames and receivers would provide an avenue whereby prohibited persons may be able to acquire mail order firearms in kit form bearing no serial number or marks of identification."). In line with that concern, ATF took the position that unfinished frames were covered by the federal definition, as they could be "readily converted" to fire a bullet or other projectile.

An October 4, 1976 ATF memorandum analyzed "the classification of unfinished frames," concluding that "[i]f the castings may be 'readily converted,' it is our view that they are firearms, and the manufacturers of these firearms must comply with the licensing, identification, and recordkeeping requirements of the [Gun Control] Act." *See* 1976 ATF Memorandum, Thompson Dec. Ex. D at 2. In doing so, ATF relied on foundational cases, such as the Second Circuit's holding in *16,179 Starter Guns* and the Eighth Circuit's holding in *United States v. Smith*, 477 F.2d 399 (8th Cir. 1973), *see supra* at Section I.B, I.2; *id.* at 3. ATF reiterated this interpretation in an August 2, 1978 letter, explaining that "[i]t is our position that an unfinished firearm receiver which may be readily converted to functional condition is a firearm as defined." *See* 1978 ATF Letter, Thompson Dec. Ex. A. A March 22, 1979 letter reached the same conclusion: "[t]he frame or receiver of a firearm is considered to be subject to the provisions of the Gun Control Act of 1968 at such time that it has reached a stage in it[s] manufacture where the frame can be readily converted to fire." *See* 1979 ATF Letter, Thompson Dec. Ex. E. As such, ATF's historical position on products that may be "readily converted" certainly encompasses the products at issue in this case. *See* SAC ¶ 31; *see also* June 11, 1980 ATF Letter, Thompson Dec. Ex. F. ("Certainly, if an unfinished receiver could be converted to functional condition within a few hours time using common hand tools, or simple grinding, cutting, drilling, or welding operations, it would likely qualify as a firearm.").

Over the decades that followed, ATF continued to adhere to the position that unfinished frames and receivers were "firearms" if they could be readily converted to fire in a relatively short period of time. In June of 1987, ATF's Director wrote to Congressman Esteban Torres of California that an "unfinished frame casting[]" produced by a company in the Congressman's district "could be readily converted to function and…was a firearm as defined." *See* June 1986 ATF Letter to Congressman Esteban Torres, Thompson Dec. Ex. C at 1-2. In July 1994, ATF considered "an unfinished, sample AR-15 type receiver," concluding that it met the statutory definition because "it is identifiable as the frame or receiver of an AR-15 type firearm and it may readily be converted to function as the frame or receiver of a firearm." July 14, 1994 ATF Letter, Thompson Dec. Ex. G at 1.[19] And in December 2002, ATF opined that several unfinished AR-15 receivers, each "represent[ing] a separate stage in the manufacturing process," all constituted "firearm[s]," noting that even the least-finished among them was similar to a previously-examined sample that could be "finished in approximately 75 minutes time using a 5/8 inch drill and a rotary file." *See* Dec. 27, 2002 ATF Letter, Thompson Dec. Ex. H at 1-2.

Contrary to Defendants' assertions, the State's position is consistent with both ATF's longstanding position and the statutory definition of a "firearm." An unfinished frame or receiver is a firearm if it "may readily be converted to expel a projectile," 18 U.S.C. § 922(a)(3); *accord* July 1994 ATF letter, Thompson Dec. Ex. G at 1 (unfinished AR-15 receiver was a firearm because "it may readily be converted to function as the frame or receiver of a firearm."). And as the State

---

[19] Notably, the simple steps required to complete the receiver discussed in the 1994 letter mirror almost exactly the ones necessary to complete Defendants' products. *Compare id.* at 1 ("The submitted sample is basically complete, except for a block of metal which is located in the area of the front pivot pin and two (2) holes which must be drilled through the receiver walls") *with* SAC ¶ 37 ("The trivial differences amount to having to drill three small holes and milling down a small amount of plastic at the top of the frame.").

repeatedly alleges, Defendants' products can be converted *very* easily. *See, e.g.,* SAC ¶¶ 20, 31, 36, 39, 40-53.

On April 26, 2022, ATF issued a Final Rule conclusively establishing that unfinished frames and receivers, such as Defendants' products at issue here, are firearms. *See* Final Rule, Definition of 'Frame or Receiver' and Identification of Firearms, 87 Fed. Reg. 24652 (Apr. 26, 2022). The text of the new Rule embraced ATF's longstanding focus on ready convertibility and consistency with 18 U.S.C. § 921(a)(3) as the touchstone for determining that unfinished frames or receivers constitute firearms. *See* ATF Definition of Frame or Receiver 27 C.F.R. § 478.12(c) (explaining that "[t]he terms 'frame' or 'receiver' [constituting a firearm] shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver…").[20] This was always the proper test, in keeping with both the text of the governing statute and ATF's prior course of conduct over many decades.

### D.   Defendants Selectively Cite ATF Regulatory Material Which Never Legalized Their Unfinished Frames And Receivers.

Defendants cite and append to their omnibus brief materials from the mid-2010's which are not controlling and did not legalize Defendants' products, particularly when shipped directly to consumers as Defendants have done.

---

[20] ATF's new Rule is the subject of extensive ongoing Administrative Procedure Act litigation, with Judge Reed O'Connor in the Northern District of Texas having granted a motion for preliminary injunction, and two other federal courts in the Southern District of Texas and District of North Dakota having denied them. *Compare VanDerStok v. Garland*, 2022 WL 4009048 (N.D. Tex. Sept. 2, 2022), *clarified* by 2022 WL 6081194 (N.D. Tex. Sept. 26, 2022), *further clarified by* 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022), *with Division 80, LLC v. Garland*, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022), *and Morehouse Enterprises, LLC v. ATF*, 2022 WL 3597299 (D.N.D. Aug. 23, 2022). Meanwhile, the State of California is pursuing a lawsuit arguing that ATF's Rule does not go far enough, which recently survived a motion to dismiss. *See California v. ATF*, 2023 WL 1873087 (N.D. Cal. Feb. 9, 2023).

1.    The ATF's 2015 Interpretive Ruling

The most significant ATF regulatory material Defendants cite is a January 2015 interpretive ruling, ATF Ruling No. 2015-1. An interpretive rule is something far less than an actual regulation issued by an administrative agency, requiring no hearings, no promulgation in the Federal Register, and no opportunity for public input. *See* 5 U.S.C. § 553. Consequently, interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995); *see also United States v. Mead Corp.*, 533 U.S. 218, 232 (2001) (recognizing interpretive rules "enjoy no *Chevron* status as a class"). Moreover, the substance of this particular interpretive rule does nothing to legalize Defendants' products or their conduct in selling them directly to consumers.

Defendants selectively quote from the interpretative ruling to feign support for their predetermined conclusion that products similar to those at issue "have not yet reached a stage of manufacture in which they are classified as 'firearm frames or receivers.'" Defs. Br. 3 (quoting ATF Ruling 2015-1 at 1). But the next two sentences of the interpretative ruling emphasize that such a frame or receiver "may be sufficiently complete to be classified and regulated as a 'firearm'" even if it "requires substantial additional machining before it can accommodate fire control components such as a trigger, hammer, or sear and be used to expel projectiles." ATF Ruling 2015-1 at 1-2. Since Defendants' products do not require "substantial additional machining," and can be finished in less than an hour by an amateur, this interpretative rule supports the conclusion that they are "firearms." *See, e.g.*, SAC ¶ 31.

The 2015 interpretive rule also makes very clear that its conclusion applies only when the machining is intended to be done only by a licensed gunsmith (who would serialize the finished weapon) and not by consumers themselves. ATF wrote that the proponents of the ruling "propose to take either a blank, or a frame or receiver (not marked with a serial number or any other marks

of identification) to a licensed dealer-gunsmith or machine shop for further machining and finishing so that it can be assembled into a complete or functional firearm as designed." ATF Ruling 2015-1 at 2. "The FFLs…would then use their own equipment…to finish the blank or frame or receiver into one that can be used to assemble a weapon capable of firing projectiles." *Id.* ATF emphasized that although a consumer might be able to do some preparatory work on a frame or receiver, "any of the steps that allow the frame or receiver to function when assembled into a complete weapon…are explicitly required to be done on behalf of a licensed manufacturer or importer who are required…to mark and serialize the frame or receiver…This will ensure that the frames or receivers can be traced by ATF[.]" *Id.* at 4.

Defendants' products do not follow the process contemplated in their cited ATF interpretive ruling. Instead, Defendants intend that the consumers who buy their products will "finish" the job themselves, and even provide them with assistance to do so. *See* SAC ¶¶ 41-51. Indeed, Defendants specifically market their products as a way to avoid engaging an FFL, who would serialize the finished product. *See, e.g.*, SAC ¶ 38 n.4. Thus, ATF Ruling 2015-1 did not undo the history described above relating to ATF's general position on unfinished frames and receivers and cannot support dismissal of any part of the State's case.

## 2. The ATF's 2017 Letter

Defendants also introduce a January 18, 2017 letter from ATF to a lawyer representing Polymer80, which Defendants portray as "determin[ing] that Polymer80 unfinished frames are '<u>not</u> sufficiently complete to be classified as the frame or receiver of a firearm and thus…not…'firearm[s]' as defined in the GCA." Defs. Br. 4.

But that is not what the letter says. Instead, ATF only assessed and reached a limited conclusion on a single model, "the submitted 'PF940C'," Defs. Br., Ex. A at 3, and repeatedly emphasized that its narrow finding is "dependent upon the particular facts, designs, characteristics

or scenarios presented…[and that] this correspondence pertains to a particular issue or item." *Id.* The ATF expressly "caution[ed] applying this guidance…to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same." *Id.* Thus, far from providing *carte blanche* to market and sell any Polymer80 product as a non-firearm, let alone any of the wide variety of unfinished frames and receivers Defendants are alleged to have sold into New York, ATF's letter is limited to a single set of circumstances which do not apply here.

The finding of the 2017 letter was also limited to a situation contrary to Defendants' business practices. ATF noted that the PF940C that was the subject of the 2017 letter was "void of any indicators that designate or provide guidance in the completion of the firearm," Defs. Br., Ex. A at 1, but Defendants took it on themselves to provide exactly that guidance. Each Defendant shipped its products in a "jig" designed to give the consumer directions on how to "finish" the frame or receiver, and to guide the consumer's handiwork to eliminate mistakes. SAC ¶¶ 43-51. And others, like Brownells, went further, providing detailed instructions via YouTube and a telephone help line to walk consumers through finishing their ghost guns. *See id.* ¶¶ 41-42, 46.

Accordingly, federal law and regulations have long established that Defendants' unfinished frames and receivers are "firearms," and Defendants do not state a basis on this ground for the dismissal of any State claim.

### III.   **THE SECOND AMENDMENT DOES NOT INSULATE DEFENDANTS FROM STATE AND FEDERAL LAWS REGULATING THE COMMERCIAL SALE OF WEAPONS.**

#### A.   **The Second Amendment Is An Individual Right Inapplicable to Corporations or LLCs, Including Defendants.**

The Second Amendment is "an individual right to keep and bear arms for self-defense," *NYSRPA v. Bruen*, 142 S.Ct. 2111, 2125 (2022), and Defendants are corporate entities that fall

outside "the People" to whom the right applies. *See District of Columbia v. Heller*, 554 U.S. 570, 580-81 (2008) ("Nowhere else in the Constitution does a 'right' attributed 'the people' refer to anything other than an individual right."). The Supreme Court's Second Amendment jurisprudence makes clear that this "individual right" belongs to individuals only. *See, e.g., Heller*, 554 U.S. at 593 (the right is "secured to them [citizens] as individuals"); *Bruen*, 142 S.Ct. at 2122 (right belongs to "ordinary, law-abiding citizens").[21] The Northern District of New York recently rejected, post-*Bruen*, the proposition that corporations have Second Amendment rights. *Gazzola v. Hochul*, 2022 WL 17485810, at *14 (N.D.N.Y. Dec. 7, 2022) ("Plaintiffs [gun retailers] fail to present any support for their contention that the individual right secured by the Second Amendment applies to corporations or any other business organizations. It does not.").

To the extent Defendants attempt to make an argument that is derivative of their customers' Second Amendment rights, that argument fails because no person has had their access to firearms meaningfully impaired. In the few cases where courts have permitted firearms retailers to derivatively raise their customers' rights, courts have recognized that there is no Second Amendment right to buy from any particular retailer, "as long as [the buyer's] access is not meaningfully constrained." *Teixeira v. County of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017); *see United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (holding that a "law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense"); *see, e.g., Dark Storm Indus. LLC v. Cuomo*, 471 F. Supp. 3d 482, 497-98 (N.D.N.Y. 2020) (finding no Second

---

[21] Indeed, every one of the *Bruen* opinions emphasizes the individual nature of the Second Amendment right. *See* 142 S.Ct. at 2122 (majority op.) ("We…now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."); *id.* at 2157 (Alito, J., concurring) ("law-abiding residents"); *id.* at 2161 (Kavanaugh J., joined by Roberts, C.J., concurring) ("ordinary, law abiding citizens" engaged in "individual self-defense"); *id.* at 2163 (Barrett, J., concurring) (analyzing "individual rights"); *id.* at 2190 (Breyer, J., dissenting) ("an individual right to possess a firearm for self-defense").

Amendment infringement because adequate "alternatives remained for [gun buyers] and others like them in New York to acquire firearms for self-defense.").

New York's prohibitions on unfinished frames and receivers do not impact any citizen's right to own a gun because firearms that are substantively identical to Defendants' products are widely available for purchase at legitimate gun stores throughout New York State. *See, e.g.*, SAC ¶ 23. Indeed, Defendants emphasize their products' compatibility as a key feature. *See id.* ¶ 24. The actual "products that Defendants' 'unfinished' frames and receivers are designed to imitate are available for purchase at legitimate New York gun stores," *id.* ¶ 26, and are regularly purchased by New Yorkers in legitimate transactions.[22] However, these lawful analogues require a handgun or rifle license, involve a background check for criminality or other disqualifying behavior, and result in the sale of a serialized weapon that is traceable if it is recovered in connection with a crime—key public safety protections that Defendants profit from subverting. *See id*. Thus, because the public's "access [to firearms] is not meaningfully constrained," *Teixeira*, 873 F.3d at 680, and because a multitude of "adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense," *Decastro*, 682 F.3d at 168, Defendants cannot derivatively raise other people's Second Amendment rights.

> **B.**   **The Prohibition on The Sale Of Unfinished Frames And Receivers Does Not Implicate the Second Amendment.**
>
> 1.   Laws Regulating the Commercial Sale of Arms Do Not Implicate the Second Amendment.

The Supreme Court has made clear that restrictions on the commercial sale of weapons do not infringe the Second Amendment, reiterating that "nothing in our opinion[s] should be taken to

---

[22] Sources subject to judicial notice demonstrate that the lawful firearms market in New York is in robust health. The FBI recorded 447,567 background checks in connection with the sale of a firearm in New York in 2022, and 166,573 in the first five months of 2023 alone. *See* FBI, *NICS Firearm Background Checks: Month/Year by State* at 1-2, *available at* https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year_by_state.pdf.

cast doubt on…laws imposing conditions and qualifications on the commercial sale of arms," and that such commercial regulations are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & 627 n.26; *McDonald v. City of Chicago*, 561 U.S. at 786 (quoting the same passage and declaring that "[w]e repeat those assurances here"); *see Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting the passage in full to demonstrate that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."). Accordingly, federal courts have treated laws that merely regulate the trade in guns, rather than regulating their possession or use by individuals, as being outside the scope of the Second Amendment. *See, e.g., United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016) (prohibition on selling firearms was facially constitutional because it "covers only the commercial sale of firearms"); *Teixeira*, 873 F. 3d at 686-87 ("In short, no historical authority suggests that the Second Amendment protects an individual's right to *sell* a firearm unconnected to the rights of citizens to 'keep and bear' arms." (emphasis in the original)).[23]

There is no authority that expands the scope of the Second Amendment to cover commercial regulations, including any implicit ruling within *Bruen*, particularly when Justice Kavanaugh and Chief Justice Roberts reiterated that such measures are "presumptively lawful," *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring), and where Justice Alito separately wrote to emphasize that "[o]ur holding decides nothing about…the requirements that must be met to buy a gun." *Id.* at 2157 (Alito, J., concurring). Rather, courts applying the

---

[23] *See, e.g., Draper v. Healey*, 98 F. Supp. 3d 77, 85 (D. Mass. 2015) (challenged law "fits comfortably among the categories of regulation that *Heller* suggested would be 'presumptively lawful' because it 'imposes conditions and qualifications on the commercial sale of arms.'"); *United States v. Cox*, 235 F. Supp. 3d 1221, 1227-28 (D. Kan. 2017) (conviction for unregistered dealing "is clearly one of the federal 'laws imposing conditions and qualifications on the commercial sale of arms' that *Heller* said were permissible under the Second Amendment."); *Montana Shooting Sports Ass'n v. Holder*, No. CV-09-147, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010) ("*Heller* said nothing about extending Second Amendment protection to firearm manufacturers or dealers. If anything, *Heller* recognized that firearms manufacturers and dealers are properly subject to regulation[.]"), *R&R adopted*, 2010 WL 3909431 (D. Mont. Sept. 29, 2010), *aff'd*, 727 F.3d 975 (9th Cir. 2013).

*Bruen* test have broadly recognized that laws regulating the sale of weapons do not implicate the Second Amendment at all. *See, e.g., United States v. Flores*, , 2023 WL 361868, at *4 (S.D. Tex. Jan. 23, 2023) (historical evidence does not support "an unwritten right to commercially sell arms" or a "logical necessity [to] a right to commercially deal in firearms"); *see also United States v. Holton*, , 2022 WL 16701935, at *2 (N.D. Tex. Nov. 3, 2022) (laws regulating commercial sale of arms "did not infringe on the rights guaranteed under the Second Amendment.").

Accordingly, the commercial misconduct that is the subject of the State's case does not implicate the Second Amendment at all.

2.  The Second Amendment Does Not Cover Ghost Guns.

Defendants' Second Amendment argument also fails because there is no Second Amendment right to possess the "finished" version of the products they sell. *Cf.* SAC ¶ 32. As many post-*Bruen* federal courts have found, "[a] law requiring that firearms have serial numbers simply does not infringe a law-abiding citizen's right to keep and bear arms for self-defense and other lawful purposes." *United States v. Serrano*, 2023 WL 2297447, at *11 (S.D. Cal. Jan. 17, 2023); *accord United States v. Reyna*, 2022 WL 17714376, at *1 (N.D. Ind. Dec. 15, 2022) ("[T]he plain text of the Second Amendment doesn't reach a handgun without a serial number."); *United States v. Bradley*, 2023 WL 2621352, at *3 (S.D. W.Va. Mar. 23, 2023) (serialization requirements are "outside the scope or text of the Second Amendment"); *Holton*, 2022 WL 16701935 at *4; *United States v. Tita*, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022).

This broad consensus stems from a recognition that "firearms of similar make and model are essentially fungible, and the presence of a serial number does not impair the use or functioning of a weapon in any way[.] … [A] person is just as capable of defending himself with a marked firearm as an unmarked firearm.'" *Holton*, 2022 WL 16701935 at *4. Prohibitions on unserialized firearms, such as the unfinished frames and receivers sold by Defendants, simply do not implicate

the right to bear arms because "the [] prohibition applies to a class of guns defined solely by a nonfunctional characteristic: the serial number." *Reyna*, 2022 WL 17714376 at *5.

Moreover, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *cf. id.* at 627 (discussing "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'"). Federal courts applying *Heller* and *Bruen* have accordingly found that unserialized firearms fall outside the Second Amendment's scope based on their rarity and their attractiveness to persons seeking untraceable weapons for the purpose of criminal activity. *See, e.g., Reyna*, 2022 WL 17714376, at *5 ("A law-abiding citizen who uses a gun for self-defense has no reason to prefer a deserialized gun to a gun with serial number intact."); *United States v. Colon-Quiles*, 859 F. Supp. 2d 229, 234 (D.P.R. 2012) ("[T]his court cannot identify any lawful purpose that would be served" by having unserialized weapons and "sees no need to categorically protect" them). Accordingly, firearms without a serial number "are dangerous and unusual weapons and, therefore, not within the scope of the Second Amendment's guarantee." *United States v. Avila*, 2023 WL 3305934, at *5 (D.Colo. May 8, 2023); *accord Serrano*, 2023 WL 2297447 at *12.

**C.**   **Law and History Supports The Prohibition on the Sale of Ghost Gun Components.**

Even if the Court were to look into history, the prohibition on ghost gun component sales "is historically justified" based on "our Nation's history in regulating the transfer and sale of firearms." *Tita*, 2022 WL 17850250 at *8.

The requirement that all firearms be serialized falls into the tradition of regulating firearms sales, a tradition that is older than America itself. Neither the State nor the Court must conduct an extensive historical analysis, as several federal courts have already done so, most prominently the Ninth Circuit in *Teixeira*, which conducted an extensive historical analysis to "confirm[] that the

right to sell firearms was not within the historical understanding of the scope of the Second Amendment right." *Teixeira*, 873 F.3d at 683 (quotation omitted); *see Bradley*, 2023 WL 2621352 at *4-5 (looking to *Teixeira*'s analysis to conclude that "[e]arly legislatures and Founders did not shy away from regulating the trade and movement of firearms"); *see also* Eric M. Ruben & Darrell A.H. Miller *Gun Law History in the United States and the Second Amendment Rights*, 80 Law & Contemp. Probs 55, 76-77 (Robert J. Spitzer, ed., 2017).

Gun serialization falls comfortably into a long tradition of registering, cataloging, and stamping firearms for the purpose of tracing their ownership, as several federal courts have found after extensive historical analyses. *See, e.g., Bradley*, 2023 WL 2621352 at *4-5; *Serrano*, 2023 WL 2297447 at *12-13; *Tita*, 2022 WL 17850250 at *7-8. Since the seventeenth century, states have fought gun trafficking by requiring registration or taxation of individual firearms, dating all the way back to a 1631 Virginia law requiring the recording "of arms and munitions" brought into the colony, and extending through a multitude of gun taxation laws enacted across the country in the 1800s. *See* Ruben & Miller*, supra*, pp. 76-77. Militia laws required regular mandatory musters several times a year conducted "so that militia officers could record which men in the community owned guns." *Bradley*, 2023 WL 2621352 at *5. In 1777, both Congress and General Washington ordered guns to be stamped in order to prevent theft and misuse. *See* Erna Risch, *Supplying Washington's Army* 355-56 (U.S. Army Ctr. of Military Hist. 1981). Early colonies also had laws that "authorized door-to-door firearms censuses." *Bradley*, 2023 WL 2621352 at *5. And in the Reconstruction Era, states began implementing recordkeeping requirements, such as the ones that Defendants' products are designed to subvert. *Cf.* SAC ¶¶ 26-28. "That there were no serial numbers during the Founding Era is a distinction without a difference." *Tita*, 2022 WL 17850250 at *7.

43

Accordingly, even through a historical analysis, this Court should join other post-*Bruen* federal courts in concluding that serialization laws are "'consistent with the Second Amendment's text and historical understanding' and [] therefore constitutional," and ghost guns that violate those laws are properly prohibited. *Bradley*, 2023 WL 2621352 at *5 (quoting *Bruen*, 142 S.Ct. at 2127); *accord Serrano*, 2023 WL 2297447 at *12-13; *Tita*, 2022 WL 17850250 at *7-8.

## IV.    THE STATE'S CLAIMS ARISING UNDER GBL § 898 (CAUSE OF ACTION NO. 3) STAND AS A MATTER OF LAW.

Under New York law, it is a public nuisance for a member of the gun industry to "knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of" certain firearms products. GBL § 898-b. It is the duty of the Attorney General to halt such nuisances and secure remedies for them. The harm that Defendants have caused, maintained, or contributed to is a paradigmatic example of the exact sort of public nuisance that GBL § 898 was created to address; Defendants have each sold, manufactured, and marketed unfinished frames and receivers, knowing and fully intending that they would be converted into illegal and untraceable deadly weapons, and that they would find their way into the hands of those who could not legally obtain firearms. Defendants failed to take even the most basic steps to institute reasonable controls and procedures to prevent these harms, rather fully *intending* them. Defendants' irresponsible behavior poses a significant threat to the safety and health of New Yorkers, and Defendants' creation, maintenance, and contribution to this devastating public nuisance is a direct violation of GBL § 898-b.

Unable to deny the harm that they have done and continue to do to the State by flooding our communities with untraceable weapons and providing deadly guns to those who are not legally

permitted to possess them, Defendants instead raise a set of scattershot arguments against the constitutionality of GBL § 898. None of them succeed.

### A.   Defendants' Dormant Commerce Clause Arguments Fail.

Defendants argue that the State's application of GBL § 898-b to their illegal behavior violates the Dormant Commerce Clause. Def. Br. 47-49. The crux of Defendants' argument is that because GBL § 898 specifically applies to products "shipped or transported in interstate or foreign commerce," it impermissibly discriminates against and extraterritorially regulates interstate commerce. This exact argument has already been considered and soundly rejected by this Court's sister district. *See NSSF*, 604 F. Supp. 3d 48. Also, the Supreme Court's decision issued just weeks ago in *National Pork Producers Council v. Ross*, 143 S.Ct. 1142 (2023), further reinforces that § 898 withstands Dormant Commerce Clause scrutiny. A state statute violates the Dormant Commerce Clause if it: (1) "clearly discriminates against interstate commerce in favor of intrastate commerce;" (2) "imposes a burden on interstate commerce incommensurate with the local benefits secured;" or (3) "has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." *Grand River Enters. Six Nations v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021) (cleaned up). Defendants' arguments fail on each of these prongs.

### 1.   § 898 Does Not Clearly Discriminate Against Interstate Commerce.

The first question to be determined is whether a law "clearly discriminates against interstate commerce in favor of intrastate commerce, or whether it regulates evenhandedly with only incidental effects on interstate commerce." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007). As the Supreme Court recently reinforced, the intent of this test is to detect unfair economic protectionism. *National Pork Producers Council*, 143 S.Ct. at 1144 ("[T]he Commerce Clause prohibits the enforcement of state laws driven by economic protectionism—

that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.") (cleaned up). There is no such favoritism here because any sales of unfinished frames or receivers by a New York-only industry member would also be illegal and subject to a similar civil enforcement action.

As an initial matter, Defendants misstate the supposedly discriminatory language of § 898. They claim that, by its incorporation of the definition of "qualified product" found in 15 U.S.C. § 7903(4), § 898 impermissibly targets products "shipped or transported in interstate or foreign commerce." But Defendants have omitted part of that sentence. The incorporated definition of "qualified product" actually includes not just complete firearms, but "*a component part of a firearm or ammunition*, that has been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4) (emphasis added). As such, even if a firearm was manufactured and shipped fully within New York, it would still be subject to § 898 "if any component part of that firearm originated out-of-state." *NSSF*, 604 F. Supp. 3d at 63. Thus, Defendants are mistaken in presuming that in-state industry participants are not governed by § 898. *See id.* ("The firearms industry is interstate—indeed, international—in nature. Plaintiffs have not alleged, nor could they, that a New York State gun industry member that is exempt from § 898 exists.") (cleaned up).

Moreover, to allege that a law is discriminatory against interstate commerce, a litigant must "'identify an[ ] in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors.'" *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009) (quotation omitted). Defendants have not pointed to any in-state ghost gun retailers who the State is favoring through its application of § 898, for obvious reasons: the point of this lawsuit is to *halt* the flow of ghost guns in New York, not to favor New York retailers of

them, and Defendants have not argued otherwise.[24] Failure to identify advantaged in-state

commerce is fatal to a Dormant Commerce Clause claim. *See Angus Partners LLC v. Walder*, 52

F. Supp. 3d 546, 562 (S.D.N.Y. 2014). Even if Defendants could identify in-state ghost gun sellers

who the State has not (yet) taken legal action against, Defendants still could not credibly argue

that § 898 has as its purpose economic protectionism, which the Supreme Court has emphasized

is the core concern of the Dormant Commerce Clause. *National Pork Producers Council*, 143 S.Ct.

at 1153.

2.    <u>§ 898 Does Not Burden Interstate Commerce.</u>

A law that does not clearly discriminate against interstate commerce is considered under

the permissive balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), and will be

upheld unless it "places a burden on interstate commerce that is clearly excessive in relation to the

putative local benefits." *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1282 (2d Cir.

1995). The Supreme Court has noted that "[s]tate laws frequently survive this *Pike* scrutiny." *Dep't

of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008) (collecting cases); *see also Nat'l Pork

Producers Council*, 143 S.Ct. at 1159 (the *Pike* test is best interpreted as "another way to test for

purposeful discrimination against out-of-state economic interests").

Here, the *Pike* test very clearly favors the validity of § 898. As discussed above, § 898 is

not a "protectionist measure," but is directed at "legitimate local concerns," namely, the flow of

unregistered and untraceable firearms into New York, where they are used in a disproportionate

---

[24] Even a "clearly discriminatory" law will survive if it is "demonstrably justified by a valid factor unrelated to economic protectionism." *Town of Southold*, 477 F.3d at 47, quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992). The challenged application of § 898 is obviously intended not for economic protectionism, but rather to stem the flow of unregistered firearms into New York, a factor that would manifestly justify the State's policy even if it was "clearly discriminatory."

number of violent crimes. To the extent there is any effect at all on interstate commerce, it is merely incidental to the State's efforts to protect its people from gun violence.

Moreover, under the *Pike* test, a challenger must still "identify any in-state commercial interest that is favored, directly or indirectly." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 218 (2d Cir. 2004). As discussed above, Defendants have not attempted to, nor could they, identify an in-state commercial interest that benefits from § 898, or credibly argue that § 898 constitutes "purposeful discrimination against out-of-state economic interests." *Nat'l Pork Producers Council*, 143 S.Ct. at 1159.

3.     § 898 Does Not Regulate Out-of-State Commerce.

Finally, Defendants argue that § 898 impermissibly regulates conduct outside New York's borders. But "[c]ourts, however, have consistently recognized that the mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." *NSSF*, 604 F. Supp. 3d at 64 (citing *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 67 (2d Cir. 2010)). As such, courts have found statutes to violate the Commerce Clause only when they purport to directly control out-of-state commercial conduct to the benefit of the legislating state. *See Freedom Holdings, Inc. v. Spitzer*, 357 F.3d at 221. In contrast, "merely influenc[ing] national pricing decisions, rather than directly control[ling] out-of-state commerce" does not violate the Commerce Clause. *VIZIO*, 886 F.3d at 255. The Supreme Court recently strongly emphasized this principle, recognizing that "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior," but are nevertheless valid and constitutional, and explicitly rejected the argument that laws with an extraterritorial effect are "almost *per se*" invalid. *Nat'l Pork Producers Council*, 143 S. Ct. at 1153-57.

48

Here, the State's application of § 898 does not purport to directly control the behavior of Defendants in the sense implicated by the Constitution. As the *NSSF* court held, "§ 898 is a regulation targeted at the manufacturing, marketing, and sale of firearms in New York State. Regulations that touch upon safety are those that the Court has been most reluctant to invalidate." *NSSF*, 604 F. Supp. 3d at 65 (citing *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 670 (1981)). "Section 898 in no way differs from the extraterritorial effect of the myriad of safety state laws and regulations with which every industry must comply." *Id*. Thus, the dormant commerce clause provides no basis to dismiss the State's GBL § 898 claim in whole or part.

### B.        Defendants' Void for Vagueness Arguments Fail.

Defendants void for vagueness arguments fail in two ways: (i) GBL § 898-b survives a substantive vagueness analysis, and (ii) Defendants improperly analyze a federal definition unmoored from any specific statute, its history and plain language, and the facts of this case. Defs. Br. 42-47. As a threshold matter, the State's causes of action expose Defendants only to civil consequences, such that "a relaxed vagueness test" applies, *Berlin, LLC*, 593 F.3d at 186, and the State brings this case to regulate harmful commercial conduct, not the possession of firearms by any Defendant. *See McDonald*, 561 U.S. at 786 (2010) (Second Amendment precedents do not "cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms"); *NSSF*, 604 F. Supp. 3d at 67 (applying relaxed standard to void for vagueness analysis of GBL § 898-b and recognizing at best "an attenuated impact on Second Amendment rights, if any"); *see also Arriaga v. Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008) ("Laws with civil consequences receive less exacting vagueness scrutiny.").

"The void for vagueness doctrine requires first that 'laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and second that 'laws contain 'minimal guidelines to govern law enforcement.'" *NSSF*, 604 F.

Supp. 3d at 65 (quoting *Thibodeau v. Portuondo*, 486 F.3d 61, 65–66 (2d Cir. 2007) (other quotations omitted)). As set forth below, the State's claims survive a void for vagueness analysis, under any standard. *See NYSRPA v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015).

1.   GBL § 898-b(1) Was Crafted with Sufficient Clarity
     Regarding The Misconduct At Issue.

Defendants claim that GBL § 898-b is impermissibly vague because of the purported combination of confusion around (i) "the requisite amount of danger to the 'safety or health of the public' to be held liable," and (ii) "how much" conduct rises to the level of endangering the safety or health of the public. Defs. Br. 45-46; GBL § 898-b(1). But Defendants conspicuously ignore that the Northern District recently rejected a nearly identical vagueness challenge to GBL § 898-b, holding that "there are clear 'common understanding and practices' of what type of conduct § 898-b(1) prohibits."[25] *NSSF*, 604 F. Supp. 3d at 67-68. The Court found the law to be sufficiently clear in part because it "closely tracks the language of New York's current general public nuisance law, N.Y. Penal Law § 240.45, which has been good law since 1965. Not only has N.Y. Penal Law § 240.45 never been held to be void-for-vagueness itself, but its over fifty years of existence elucidates and narrows the application § 898-b(1)." *Id.*; *see also* N.Y. Penal Law §§ 240.45 (general nuisance statute), 400.05 (nuisance in relation to certain weapons); N.Y. Public Health Law §§ 1300-b (nuisance in industrial waste), 1320 (nuisance in growing noxious plants)*; Arriaga*, 521 F.3d at 224 (holding that a statute that incorporates well-worn legal concepts therefore accords with "common understanding and practices."). Defendants' arguments likewise fail here because there is nothing vague about decades of well-settled nuisance law in New York.

---

[25] The *NSSF* Court also upheld GBL § 898-b(2), which Defendants do not challenge here, because "[i]t expressly applies to certain business practices, [and] 'intelligibly forbids a definite course of conduct.'" *Id.* at 69 (quoting *United States v. Powell*, 423 U.S. 87, 93 (1975)).

Likewise, long-existing New York precedents govern the meaning of the term "contribute" in the context of a public nuisance statute, including authorities that limit liability where the relationship between the complained-of conduct and the nuisance is too remote. *See United States v. Smith*, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) ("Importantly, it is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well."); *Copart Indus., Inc.*, 41 N.Y.2d at 569-70 (assessing whether disputed conduct was "origin" of a nuisance).

A case Defendants heavily rely on illustrates the State's position. In *VIP of Berlin, LLC v. Town of Berlin*, the Second Circuit reversed a District Court's finding that a statute was vague. 593 F.3d 179, 185 (2d Cir. 2010). The Circuit looked to the plain language meaning of the subject statute, analyzed statutes of similar construction, and avoided hypothetical applications. *Id.* at 188-89. The Second Circuit recognized that "a court's analysis should be confined to the litigant's actual conduct, and a court should not analyze whether a reasonable person would understand that certain hypothetical conduct or situations violate the statute." *Id.* at 189; *see also Smith*, 985 F. Supp. 2d at 593, *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 ("[T]he Court's overarching inquiry is not into whether the term…is sufficiently clear in *every* application; its inquiry is into whether the term…is clear in *this* application.").

Applying that analysis here, there is no ambiguity as to the application of GBL § 898-b(1) to the Defendants' illegal sales to New York consumers. The State alleges that each of the ten Defendants engaged in "conduct either unlawful in itself or unreasonable under all the circumstances" by marketing and selling unserialized, readily-convertible frames and receivers, including to individuals who should not have access to working firearms, which "knowingly or recklessly create[d], maintain[ed] or contribute[d] to a condition in New York state that

endanger[ed] the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." GBL § 898-b(1); SAC ¶¶ 106-573. The State also alleges that Defendants' actions "endanger[] the safety and health of the public." *See* SAC ¶ 612; *see also* ¶¶ 585-87.[26] Defendants' hypotheticals and rhetorical questions do not detract from this simple and constitutionally sound application of GBL § 898-b(1)—one that is grounded in the plain language meaning of the statute, statutes of similar construction, long-established precedents, and the facts of this case. For these reasons, Defendants' vagueness challenge to GBL § 898-b fails.

### 2.   The Federal Definition of "Firearm" Is Not Vague.

Defendants urge this Court to apply the void for vagueness doctrine as to the federal definition of "firearm," but do not want to analyze whether "prospective application of ATF's new regulatory interpretation of 'firearm' offends due process." Defs. Br. 43. In this way, Defendants in essence concede that this void for vagueness argument is only viable to the extent that the State seeks to retroactively change the operative definition of "firearm," which it does not.

Within the confines of this as-applied vagueness challenge, *see Berlin, LLC*, 593 F.3d at 189, Defendants' challenge rests on a fundamentally inaccurate premise: that during the relevant time period, unfinished frames and receivers were not encompassed within the federal definition of a firearm. *See* Defs. Br. 42. However, as discussed above, the pertinent historical precedent— both federal law and ATF's agency interpretation—supported the conclusion that unfinished frames and/or receivers were "firearms" under federal law all along. *See supra* p. 31. Thus,

---

[26] Unlike in *Sturm, Ruger & Co.*, the State alleges that each Defendant engaged in illegal conduct in itself, *see* SAC ¶¶ 106-573, and each ghost gun they have sold into our communities is harmful because of the proven and significant increase in its likelihood of being used in a violent crime or suicide, *see* SAC ¶¶ 592-95; *cf.* 309 A.D.2d at 104. Moreover, unlike in *Sturm, Ruger*, where the defendants were "simply too far removed from the nuisance to be held responsible for it," 309 A.D.2d at 104, here the Defendants directly caused the nuisance, selling their products to prohibited persons with no intervening steps in the chain.

Defendants misstate the law at the time of the sales at issue, and the State is not seeking to retroactively change the rules—eliminating the need for any void for vagueness analysis at all.[27]

In support of their position, however, Defendants offer hypotheticals relating to frames or receivers in various stages of manufacture, and whether the varying crafting abilities of members of the public can render some products "readily convertible" in some hands but not in others. Defs. Br. [44]. But these arguments are non-sequiturs. *See VIP of Berlin, LLC*, 593 F.3d at 189 (confining the analysis to "the litigant's actual conduct" and not hypotheticals); *see also Smith*, 985 F. Supp. 2d at 593 (limiting the court's inquiry of a term as to whether it "is clear in *this* application"). The products at issue and Defendants' own characterization of whether they are "readily convertible" are clear, such that there is no legitimate reading around the federal definition of a "firearm." *See supra* p. 24. As noted above and detailed in the Complaint, each Defendant marketed and sold unfinished frame and/or receiver products on the basis that the customer was just a few easy moments away from holding a fully functioning, unserialized ghost gun. *See supra* pp. 6-8. Accordingly, the State's case is premised on Defendants' marketing and selling of products which by design (and by their own statements) constituted a product that satisfied the federal definition of a "firearm" at the time of their sales into New York. The State's claims do not require this Court to retroactively and unconstitutionally expand the federal definition of a "firearm," nor is any segment of the State's case thereby rendered void for vagueness.

Ultimately, Defendants do not state a basis to dismiss any of the State's claims based on arguments against the constitutionality of GBL § 898.

---

[27] Because the State is not seeking to retroactively apply a different federal definition of the term "firearm," this Court need not address Defendants' arguments that the State's claims "invite[] arbitrary enforcement." Defs. Br. 44.

## V.   DEFENDANTS HAVE ENGAGED IN DECEPTIVE MARKETING.

Defendants' marketing is a key component in their endeavor to flood New York with illegal and untraceable weapons for their profit. Each Defendant has marketed their products in ways designed to convey to customers why they should finish ghost guns rather than purchase legitimate firearms through an FFL, emphasizing among other supposed advantages that ghost guns are not subject to registration requirements, background checks, and other forms of oversight, yet remain legal and purchasable by all. Unfortunately for Defendants, these are lies. New York law prohibits such misleading marketing. In response, Defendants argue that the First Amendment permits them to sell their products via misrepresentations about their legal status, and relatedly that such statements constitute nothing more than "opinion" (despite having been presented to their customers as clear fact). Both arguments fail.

### A.   Defendants' First Amendment Arguments Fail.

Defendants argue that the State's claims brought pursuant to GBL §§ 349 and 350 for misrepresentation and false advertising are barred by the First Amendment. To the contrary, the State has every right to seek to put a halt to Defendants' untrue statements to their customers regarding the legality of their products.

#### 1.   The First Amendment Does Not Protect False or Misleading Commercial Speech.

Defendants claim that their marketing constitutes statements of legal opinion that are protected by the First Amendment, but Defendants entirely ignore that their marketing is *commercial* speech, subject to significantly less protection than non-commercial speech. Under the applicable standard for commercial speech, speech concerning unlawful activity, which is precisely what is in contest here, may plainly be restricted.

Defendants' First Amendment argument is premised on framing their speech as "expressions of legal opinion." But this argument skips a step: Defendants have not merely stated (incorrectly) that their products are legal, but they have used this speech to *sell their products*, indeed using that supposed legality as a key selling point. *See, e.g.*, SAC ¶¶ 169-71, 284-85.

The Supreme Court has defined commercial speech as, "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980); *see Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) ("Even a communication combining commercial and noncommercial elements, if it is an advertisement, makes reference to a specific product, and the speaker has an economic motivation for the communication, is properly characterized as commercial speech."). Here, there can be no reasonable dispute that Defendants' speech at issue is commercial. The State's allegations all relate to Defendants' marketing materials or advertisements—speech used for the specific purpose of inducing customers to purchase products from them. Nor does speech "cease to be commercial merely because it alludes to a matter of public debate." *Connecticut Bar Ass'n*, 620 F.3d at 94 (requirement that debt relief agencies provide written disclosure about bankruptcy process to consumer debtors implicated only commercial speech); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67-68 (1983) (advertisements for contraceptives are commercial speech "notwithstanding the fact that they contain[ed] discussions of important public issues").

While commercial speech is entitled to some protection under the First Amendment, it is much less than the protection afforded to other forms of expression. *United States v. Williams*, 553 U.S. 285 (2008); *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626 (1985). False and misleading commercial speech, as is alleged here, is afforded *no* protection under the First Amendment. *Bolger*, 463 U.S. at 69 ("The State may deal effectively with false,

deceptive, or misleading sales techniques" without running afoul of the First Amendment); *Goldberg v. Cablevision Sys. Corp.*, 261 F.3d 318, 327 (2d Cir. 2001) (false or misleading commercial speech "is amenable to regulation or prohibition outside of First Amendment restraints"); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326 (S.D.N.Y. 2006), aff'd, 279 F. App'x 40 (2d Cir. 2008) ("Commercial speech that is false or misleading is afforded no First Amendment protection at all.").

Here, the State's GBL §§ 349 and 350 claims are based on the premise that Defendants' challenged advertising is false and misleading. SAC ¶¶ 618-623. Defendants' attempt to defeat these claims on First Amendment grounds is therefore circular; if the State has successfully pled a claim of false advertising and/or deceptive acts and practices, it has also successfully alleged that Defendants' statements have no constitutional protection.

### 2.   The *Central Hudson* Test Permits the State's Claims.

Even if Defendants' advertisements were not alleged to be false and misleading, the State's enforcement efforts are directed at illegal activity and are therefore allowed under the First Amendment as a permissible restriction on commercial speech. Whether a restriction on commercial speech is permissible is evaluated using a four-factor test set forth by the Supreme Court in *Central Hudson*, 447 U.S. at 566. The test considers "whether: (1) the speech restriction concerns lawful activity; (2) the [government's] asserted interest is substantial; (3) the prohibition "directly advances" that interest; and (4) the prohibition is no more extensive than necessary to serve that interest." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 51 (2d Cir. 2019), *citing Cent. Hudson*, 447 U.S. at 566.

Here, all four factors weigh in favor of permitting the State to proceed with its GBL §§ 349 and 350 claims. *First*, and most significantly, by their very nature the State's allegations are entirely aimed at halting *illegal* activity. Pursuing legal action to halt commercial speech

constituting or promoting unlawful activity is not barred by the First Amendment. *See, e.g.*, *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of N.Y.*, 27 F. Supp. 3d 415, 423–24 (S.D.N.Y. 2014) ("[T]he Supreme Court has made clear that the 'government may ban commercial speech related to illegal activity."), *citing Central Hudson*, 447 U.S. at 563–564; *Helms Realty Corp. v. City of New York*, 397 F. Supp. 3d 379, 387 (S.D.N.Y. 2019), vacated on other grounds, 820 F. App'x 79 (2d Cir. 2020) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that . . . proposes an illegal transaction.").

The remaining *Central Hudson* factors all weigh in the State's favor. Defendants have not argued that the State lacks a substantial interest in stemming the tide of ghost guns flowing from Defendants' businesses into New York and in remediating the harms created by these illegal sales. The State's chosen enforcement mechanism—a civil suit seeking to permanently enjoin future sales of violative products into New York and to recover, among other things, damages for the harms that Defendants have already caused—directly advances that interest. Finally, Defendants do not argue that the State is seeking to halt any more advertising than is necessary to serve this interest. To the contrary, the State's suit *only* targets advertising claiming that Defendants' illegal products are legal, or that firearms made from them need not be registered and serialized. The State is not seeking to halt or obtain damages for any other form of advertisement or any other communications by Defendants to prospective customers. Under the *Central Hudson* test, the State's GBL §§ 349 and 350 claims are manifestly constitutional.

### 3.   The Alleged Speech is Not Opinion.

Even if this Court were to consider this issue through Defendants' preferred (but incorrect) lens of whether their advertisements are mere statements of opinion, they are still not entitled to dismissal of the State's GBL §§ 349 and 350 claims. It is true that "[g]enerally, statements of pure opinion—that is, statements incapable of being proven false—are protected under the First

Amendment." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013). But "the line between fact and opinion is not always a clear one," and the Supreme Court has "declined to carve out an absolute privilege for statements of opinion and reaffirmed that the test for whether a statement is actionable does not simply boil down to whether a statement is falsifiable." *Id.*, citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990). In deciding whether a statement is one of opinion, courts must consider "(i) the common usage or meaning of the specific language used in the challenged statements; (ii) whether the statement is objectively capable of proof or disproof; (iii) the context in which the statement was made, including its broader social context and whether the nature of the writing will signal to readers or listeners what is being read or heard likely to be opinion, not fact." *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2019 WL 1768965, at *8 (S.D.N.Y. Apr. 4, 2019) (cleaned up).

Defendants flatly assert that their advertising that their products are legal constitutes statements of opinion. But merely asserting as much does not make it so. Defendants' blanket, unqualified statements were intended to falsely convey to their customers *as a factual matter* that their products were legal.[28] These are not statements of opinion within the meaning of the First Amendment. *See, e.g.*, *ONY*, 720 F.3d at 498 (considering whether statements in a scientific journal could underlie a false advertising claim, and holding such claims as non-actionable "to the extent a speaker or author draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement"); *GeigTech*, 2019 WL 1768965, at *8-9 (holding a statement to be a legally actionable assertion of fact where it was "unambiguous and

---

[28] *E.g.* SAC ¶ 119 ("No FFL Required!"); ¶ 161 ("[A]n unfinished receiver is not subject to the same regulations as any other firearm."); ¶ 285 ("Because they are not complete firearms, [unfinished frames] can be shipped straight to a customer's home without an FFL."); ¶ 378 ("This is completely legal and acceptable."); ¶ 466 ("ATF Approved"); ¶ 531 ("This item can ship straight to your door, with no Federal Firearms License required.").

explicit, [and] was not subject to competing interpretations."). Defendants here did not explain to their customers why they believe their products are legal, or make clear that there were competing interpretations and that customers should consider the issue for themselves when purchasing products; they simply *told* their customers that their products are legal in New York, unambiguously and explicitly. Put simply, the fact that Defendants' advertising spoke about the legality of its products does not, alone, render this speech "opinion." In the circumstances raised here, the State has adequately pled that these constituted false statements of fact that are susceptible to New York law regarding false and misleading advertising.[29]

In sum, Defendants' First Amendment argument suffers from numerous fatal defects. It falls flat from the start because their advertising constituted false or misleading speech, and proposed an illegal transaction, which the First Amendment does not protect. Moreover, the challenged advertising is fundamentally commercial speech, subject to a lower level of protection that the State's claims easily satisfy. And finally, Defendants' advertising is simply *not* mere opinion, but pitched to its customers as *facts* regarding the legality of their products and how they may be used. For each of these reasons, Defendants' First Amendment argument fails.

> **B.**   **The State Adequately Alleges that Each Defendant Made Actionable Misrepresentations that Support Liability.**

Certain individual Defendants (each addressed below) argue that the State failed to adequately allege misrepresentations sufficient to state a claim under GBL §§ 349 and 350, which respectively prohibit deceptive acts and practices in the conduct of any business, trade, or

---

[29] Defendants argue that the First Amendment protects opinions and statements about legal matters and are therefore not actionable. They cite four cases for this proposition: *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999); *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 488 (D.C. Cir. 1996); *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 232 (3d Cir. 1990); and *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614 (9th Cir. 2016). This is a perplexing string of citations, as **not a single one** mentions the First Amendment. Rather, each of these cases found that the claims failed under the Lanham Act.

commerce in the State of New York; and false advertising in the conduct of any business, trade, or commerce in the State of New York. With respect to both claims and as to each Defendant, the State's allegations are based on Defendants' misrepresentations that (1) it is legal to sell and possess the firearms sold by Defendants in the State and City of New York; (2) it is legal to sell or possess unfinished frames, receivers, and/or ghost guns in the State and City of New York; and (3) the state and federal legal requirements applicable to gun sales are not applicable to Defendants' sales of their products. SAC ¶¶ 618-23.

Defendants' arguments generally fall into two categories: (1) the State did not allege any misleading statements; and (2) certain claims were statements of opinion. With respect to this second category, the Court should evaluate whether the statements are "materially misleading," versus non-actionable "puffery."[30] Considerations for the Court to evaluate regarding the subject statements include "(i) vagueness; (ii) subjectivity; and (iii) inability to influence the buyers' expectations." *See Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 392 (E.D.N.Y. 2013).

Defendants further attempt to immunize their misrepresentations by emphasizing that they relate to assertions of their products' legality and arguing that "misstatements of law" are nonactionable, but they overstate the applicability of this doctrine. It would be absurd to argue that any statement that touches on the legality of a product can inherently *never* be the subject of a misrepresentation claim, and the law does not support this argument. To the contrary, a long-standing principle under New York law is that a "mixed statement of fact as to what the law is or whether it is applicable" is actionable as fraud. 60A N.Y. Jur. 2d Fraud and Deceit § 49. As detailed below, Defendants' supposed opinion statements are in the nature of "our products are legal" or

---

[30] The First Amendment considerations relating to "opinion" speech, as distinguished from whether the State has stated a claim under GBL §§ 349 and 350, are discussed separately elsewhere in this section.

"our products do not have to be serialized." Under the "modern, more flexible rule allowing an action for fraud to be based on a statement of law where the statement is not intended to be merely one of opinion," *id.* (collecting cases), Defendants' statements are not pure opinions. They are presented as factual statements that are a part of a commercial transaction by a seller that purports to possess superior, definitive knowledge as to what the law is and how it applies to their products. These are not the sorts of statements that, under New York law, are nonactionable as statements of legal opinion.[31]

The State has adequately stated a claim against each Defendant that has moved on this ground.[32] Statements by **80 Percent Arms** include "an unfinished receiver is not subject to the same regulations as any other complete firearm. This means no RED TAPE including: NO Registering an 80% Lower, NO Transfer fees like a typical firearm, NO FFL Required, Ships right to your door." SAC ¶ 161; *see also* SAC ¶ 171 ("[b]est of all, it's completely unregistered and legal"). As to **80P Builder**, the Complaint cites 80P's "confusing and inaccurate messaging" designed to induce customers to purchase products without the full knowledge of their legal status. For example, the Complaint points to 80P's website noting the "Blank Serialization Plate" as a key feature, and that a "Complete Finishing Jig and Drill bits" are included. Complaint ¶ 255 emphasizes the ease with which the product can be converted in a complete and intentionally obfuscating the fact that the weapon must be serialized and recorded. The Complaint alleges multiple misrepresentations made by **Brownells** that are not immunized as statements of opinion, for instance that 80% frames "are still legal" and "will still be legal after the [ATF Rule] but there

---

[31] Notably, none of Defendants' cited cases making this argument relate to GBL §§ 349 and 350 claims. Rather, they are in inapposite contexts, such as common law fraud and federal securities claims.

[32] Arm or Ally and Rainier did not file separate memoranda in support of their motions to dismiss and do not argue that the State failed to allege GBL §§ 349 and 350 claims specifically against them.

will be new restrictions and hoops to jump through." SAC ¶ 85. Brownells also issued a press release that appeared in multiple outlets advertising that "[b]ecause [80% frames] are not complete firearms, [unfinished frames] can be shipped straight to a customer's home without an FFL." SAC ¶ 285. This is presented as a factual statement, not a vague or subjective one with no ability to influence consumers.[33] **Glockstore**, meanwhile, told its customers they "can build a completely legal handgun with out any 'government oversight,' aka interference," and that such products are subject to "no registration, no records." SAC ¶ 375. The State alleges that this is materially incorrect, that these products *are* subject to government oversight, and that they *do* have to be registered. *See also* SAC ¶ 377 (customers can "legally own a firearm that does not have to be registered"). These are not presented to customers as vague, subjective statements or puffery, but as facts regarding Glockstore's products. **KM Tactical** told consumers that their products are "ATF Approved," SAC ¶ 466, an assertion that remains on KM Tactical's website to this day[34] and is still intended to mislead customers into thinking that these products are fully legal as-is and need not be serialized and registered even upon being completed into working guns.[35] And, as with the other defendants, KM Tactical's flat statement that their products are "ATF Approved" is presented to customers as fact. It is not couched on the product page as "legal opinion," customers are simply *told* unambiguously by a seller that purports to have expertise on the matter that the products are "ATF approved." **Primary Arms** deceived its customers by marketing and selling

---

[33] Brownells speciously argues that the State "misattributes a third-party publication to Brownells." Defs. Br. 50, n.14. That is incorrect. The State cites to multiple instances of a Brownells *press release*, published in "third party publications" but representing Brownells' *own words*. SAC ¶ 285 n.46; *see also* https://www.prweb.com/releases/2017/10/prweb14773457.htm (containing identical language as the other two cited instances). Brownells' insistence that these are not its own statements is disingenuous and not to be credited at this posture of the State's case.

[34] *See, e.g.*, https://kmtactical.net/product-category/default-category/accessories/80-lowers/ar-platform/ (last visited June 16, 2023).

[35] To the extent that "ATF Approved" was ever arguably ever not a misstatement, it certainly is now. *See* Section II(C), above (explaining how ATF's traditional and current explicit position is contrary to KM Tactical's assertion).

products without any indication that the products they were selling were required to be serialized or registered. *See* SAC ¶ 498. And **Rock Slide** argues that the statement "No license required" for its products, SAC ¶ 564, is legally protected opinion, but as with the similar arguments made by other defendants, Rock Slide did not *opine* to its customers that no license is needed for its products, it *told* them so unambiguously and as a matter of *fact*. This is not nonactionable puffery, but a specific, disprovable statement that is a cognizable basis for a misrepresentation claim.

## VI.   THE COMPLAINT STATES A CLAIM FOR NEGLIGENT ENTRUSTMENT AND NEGLIGENCE *PER SE*

As set forth above, *see supra* pp. 13-14, PLCAA prohibits the filing of "qualified civil liability actions" against gun industry members for harms "resulting from the criminal or unlawful misuse of a qualified product." 15 U.S.C. § 7903(5)(a). PLCAA, however, excepts from the definition of a "qualified civil liability action," among other things, "an action brought against a seller for negligent entrustment or negligence *per se*." *Id.* § 7903(5)(A)(ii).

### A.   Negligent Entrustment

PLCAA defines "negligent entrustment" as the "supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." *Id.* § 7903(5)(B). Because PLCAA does not "create a public or private cause of action or remedy," *id.* § 7903(5)(C), a plaintiff must also satisfy the requirements for a negligent entrustment claim pursuant to state law. *See Timperio v. Bronx-Lebanon Hosp. Ctr.*, 384 F. Supp. 3d 425, 434 (S.D.N.Y. 2019). PLCAA's definition of negligent entrustment "mirrors the standard for the tort of negligent entrustment under New York law which is based on the degree of knowledge the supplier of a chattel has or should have concerning the entrustee's propensity to use the chattel in an improper or dangerous fashion." *Samir Muhamma*

*Al-Salihi v. Gander Mt., Inc.*, 2013 WL 5310214 at *12 (N.D.N.Y. Sept. 20, 2013) (citing *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 237 (N.Y. 2001)).[36] "Under the negligent entrustment doctrine, '[t]he possessor of a dangerous instrument is under a duty to entrust it to a responsible person whose use will not create an unreasonable risk of harm to others. The duty may extend through successive, reasonably anticipated entrustees.'" *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 395 (E.D.N.Y. 2004) (quoting *Hamilton*, 96 N.Y.2d at 236-37).

In *Hamilton*, the New York Court of Appeals declined to impose liability for negligent entrustment on certain gun manufacturers, finding that such liability should not be imposed "without a more tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries, and that defendants were realistically in a position to prevent the wrongs." *Hamilton*, 96 N.Y.2d at 234. The Court of Appeals explained that "the connection between [defendant manufacturers], the criminal wrongdoers and plaintiffs is remote, running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer." *Id.* The "key" consideration in the negligent entrustment analysis "is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Id.* at 233.

Here, the chain has only one link; Defendants sold ghost gun components to individuals who were ineligible, unable, or otherwise unwilling to secure a firearm through the legal FFL process and were likely to create an unreasonable risk of harm to others.[37] *See Smith v. Atlantic Gun & Tackle, Inc.*, 376 F. Supp. 2d 291, 293 (E.D.N.Y. 2005) (denying summary judgment as to

---

[36] Although Defendants argue that the State failed to state a claim for negligent entrustment under PLCAA and New York common law, *see* Defs. Br. 39, the standards are functionally identical. Thus, the Court does not need to conduct two separate evaluations as to whether the State has stated a claim for negligent entrustment under PLCAA and New York common law.

[37] *See, e.g.,* SAC ¶¶ 143-48, 182-83, 339-43, 413, 486, 510, 552.

claim of negligence against gun retailer but explaining that a "retailer is much closer to the illegal use than the manufacturer…[and] *Hamilton* does not bar this claim"); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 280 (E.D.N.Y. 2004) (finding that there were sufficient allegations to demonstrate that defendant manufacturers, importers, and distributors were a "direct link in the causal chain that results in harm to the City and the public occasioned by illegal gun use and that [they] are in the best position to substantially reduce such harm"); *Johnson,* 304 F. Supp. 2d at 399 (finding that it would be "premature to dismiss [plaintiff's] negligence claim" against defendants, including firearms distributors, who "were a direct link in the causal chain" and "were in the best position to prevent the foreseeable harm").

Therefore, as alleged in the Second Amended Complaint, "[e]ach Defendant was in the best position to protect against the risk of harm. They—and only they—had the ability to know who they were shipping their 'unfinished' products to—and who would be turning them into ghost guns." SAC ¶ 634. However, Defendants took absolutely no steps to ensure that their products would not fall into the wrong hands and, in fact, advertised their unwillingness to do so. In recognition of this important role, the *Hamilton* Court declined to impose common-law liability on gun manufacturers, finding that "[f]ederal law already has implemented a statutory and regulatory scheme to ensure *seller* responsibility through licensing requirements and buyer responsibility through background checks." *Hamilton*, 96 N.Y.2d at 239 (internal quotations omitted and emphasis added).

Defendants in this case were sellers, but they intentionally subverted these very protections. They either had no federal firearms license, *see* SAC ¶ 76, or failed to sell their products in accordance with the requirements of their license. *Id.* ¶¶ 75, 122-28, 276-78, 535-41. And they failed to conduct any background check to ensure that their buyers were licensed and not

disqualified from owning a firearm. *See, e.g., id.* ¶¶ 122-28, 261-63, 276-78, 434-36, 535-41 (sales and shipments of unfinished frames or receivers to undercover investigators without conducting background check); *see also id.* ¶¶ 143-48, 182-83, 198-204, 206-10, 218-24, 226-30, 238-49, 300-03, 314-15, 316, 318-26, 327-32, 339-43, 361-65, 367, 398, 403, 405-07, 409, 411, 413, 419, 479-81, 484, 486, 508, 510, 514-17, 524, 548, 550, 552, 556, 558 (sales of unfinished frames or receivers to individuals who either had no license or were disqualified from owning a firearm).

Defendants' arguments in support of their motions to dismiss this claim are unavailing. First, Defendants argue that the State failed to allege that the Defendants knew or should have known that "certain of their customers allegedly had the 'propensity to use [the products at issue] in an improper or dangerous fashion.'" Defs. Br. 40 (quoting *Hamilton*, 96 N.Y.2d at 237). In contrast, the State alleges at length that Defendants intentionally marketed to individuals who are ineligible to legally possess a firearm, and turned a blind eye when those individuals purchased their products. *See supra* pp. 10-**Error! Bookmark not defined.**.

Defendants next argue that even if they knew or should have known that their customers would use their products "in an improper or dangerous fashion," *see* Defs. Br. 41, this Court should still decline to find them liable for negligently entrusting these products because they were under no obligation to "investigate the fitness of their customers." *Id.* Defendants' argument rests on the fiction that their products are not firearms and therefore, they were not required to perform background checks or verify that their customers had the appropriate licenses. But there is nothing in the law of negligent entrustment that limits the duty of care only to completed firearms. Instead, the obligation applies to anyone who entrusts a "dangerous instrument." *Johnson*, 304 F. Supp. 2d at 395; *accord Splawnik v. Di Caprio*, 146 A.D.2d 333, 335-36 (3d Dep't 1989) (any "dangerous instrumentality"); *see also* Restatement (Second) of Torts § 390 (any "chattel . . . involving

unreasonable risk of physical harm"). By the very nature of Defendants' unfinished frames and receivers, and their ready convertibility into ghost guns, Defendants were uniquely aware of the many ways their products could be used in an improper or dangerous fashion and owed "a duty to foreseeable parties to withhold" those products regardless of the federal definition of a firearm. *See Muhamma Al-Salihi*, 2013 WL 5310214, at *12 (finding that there was no evidence to show that defendant seller knew or should have known that weapon would be used improperly where purchaser had a valid firearms license and successfully passed the background check); *accord Splawnik*, 540 N.Y.S.2d at 617 (allowing negligent entrustment claim to proceed because defendant had reason to know that buyer should not possess a dangerous instrument).

Finally, Defendants argue that their products are not "dangerous instruments" because they are just "a hunk of plastic or metal" and will not become dangerous without "significant transformation requiring the use of specialized tools, additional parts, and expert knowledge." Defs. Br. 41. This unsupported factual assertion contradicts the well-pled allegations of the Second Amended Complaint, as well as Defendants' own statements that the process is "ridiculously easy" and can be "easily accomplished by anyone even moderately handy," *see supra* p. 8 n.4.

In any event, as Defendants point out, "[w]hether a particular object qualifies as a dangerous instrument depends on the nature of the instrument and the facts pertaining to its use," *Rios v. Smith*, 95 N.Y.2d 647, 653 (N.Y. 2001), and they would be hard-pressed to distinguish the facts at bar from the much authority supporting the State's case, including holdings that "cars, motorcycles, motorboats, guns, and BB guns" can become dangerous in the wrong hands. *Republic Ins. Co. v. Michel*, 885 F. Supp. 426, 431 (E.D.N.Y. 1995); *see also City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 280 (E.D.N.Y. 2004) (stating that firearm sales which "facilitat[ed] the flow of illegally possessed guns into New York City" resulted in a harm that

supports a finding of negligent entrustment). For these reasons, the State's negligent entrustment claim must proceed.

### B.     Negligence *Per Se*

Under New York law, violation of a statute may constitute negligence *per se* if "[1] a statute is designed to protect a class of persons, [2] in which the plaintiff is included, [3] from the type of harm which in fact occurred as a result of its violation." *German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995). If these criteria are satisfied, "the issues of the defendant's duty of care to the plaintiff and the defendant's breach of that duty are conclusively established upon proof that the statute was violated." *Id.* "In order to warrant a finding of negligence *per se* for a statutory violation, the statute must evidence an intention, express or implied, that from disregard of [its] command a liability for resultant damages shall arise which would not exist but for the statute." *Id.* at 1397 (internal quotations and citation omitted).

> Three factors are of central importance in this inquiry: (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted, (2) whether a finding of negligence *per se* for violation of the statute would promote the legislative purpose, and (3) whether creation of such liability would be consistent with the legislative scheme.

*Id.* at 1397 (internal quotations and citations omitted).

Courts have found that "[v]iolations of federal and state gun control laws causing injury amount to negligence *per se*." *City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 416 (E.D.N.Y. 2007) (collecting cases); *see, e.g.*, *Herdzik v. Chojnacki*, 68 A.D.3d 1639, 1642 (4th Dep't 2009) (finding that purchasing and providing a paintball gun to a minor violated New York Penal Law § 265.10(5), which prohibits providing weapons to a person under the age of sixteen, constituted negligence *per se*), *Hetherton v. Sears, Roebuck & Co.*, 593 F.2d 526, 529 (3d Cir. 1979) (sustaining claim based on state law regulating sale and possession of deadly weapons, because "[i]f a statute was enacted for the safety of others, its violation is negligence [p]er se").

Here, the State has alleged that each Defendant has violated federal, state, and local laws that were enacted to protect the public,[38] *see* SAC ¶¶ 625-26, and as is centrally relevant here, the Gun Control Act was enacted to "curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Huddleston v. United States,* 415 U.S. 814, 824 (1974). Congress intended for the Gun Control Act to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." Gun Control Act of 1968, Pub. L. No. 90-618, §101 (1968); *see also Boles v. United States,* 3 F. Supp. 3d 491, 509, n.13 (M.D.N.C. 2014) (noting cases that "characterize[d] [the Gun Control Act] as a public safety statute designed to prevent shooting deaths).

While Defendants summarily argue that the State is not a "victim" of gun violence attributable to Defendants, *see* Defs. Br. 38, that assertion is again contrary to even a cursory reading of the Complaint. Among other harms, it is indisputable that gun violence in New York is a public health crisis and has been declared a disaster emergency. *See* SAC ¶¶ 54, 68; N.Y. Executive Order 3.21.

Finally, Defendants argue that any violation of N.Y. City Admin. Code § 10-314, which prohibits the sale of unfinished frames and receivers within New York City, cannot constitute negligence *per se* because generally, a "violation of a municipal ordinance constitutes only evidence of negligence." *Elliot v. City of New York*, 95 N.Y.2d 730, 734 (2001). However, this principle is not absolute. Sections of the New York City Administrative Code may be entitled to statutory treatment and accordingly, violations of those sections may give rise to a negligence *per*

---

[38] To the extent that Defendants argue that the State is alleging only violations of statutes requiring serialization and licensure of firearms, which Defendants assert cannot form the basis of a negligence *per se* claim because these are "akin to vehicular licensing statutes," *see* Defs. Br. 38, Defendants mischaracterize the State's case. The State is alleging that Defendants have violated a variety of federal, state, and local laws that were enacted to protect the public. *See supra* pp. 4-5.

*se* claim if those sections have their "origin in State law," *id.* at 736, or have been "approved or adopted by the State Legislature" *Miller v. Astucci U.S. Ltd.*, 2007 WL 102092, *5 (S.D.N.Y. Jan. 16, 2007) (internal quotations and citations omitted). Here, N.Y. City Admin. Code § 10-314 should receive statutory treatment because the New York Legislature has approved the content of this provision with the passage of the Jose Webster Act, which also prohibits the sale of unfinished frames and receivers.  For these reasons, the State's negligence *per se* claim must proceed.

### VII.  DEFENDANTS AIDED AND ABETTED POSSESSION OF UNSERIALIZED FIREARMS AND POSSESSION BY PROHIBITED PERSONS.

Defendants aided and abetted violations of federal, state, and local firearms laws, and cannot hide behind their refusal to know their customer, or to inquire into their customers' legal ability to possess a gun. "To be liable…for aiding and abetting a crime, a defendant must '(1) take an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission.'" *United States v. Elias*, 619 F. Supp. 3d 296, 303 (E.D.N.Y. 2022) (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)) (brackets omitted). The State has alleged three avenues of aiding and abetting liability: (1) aiding and abetting the possession of firearms by convicted persons; (2) aiding and abetting the possession of firearms by persons without a license; and (3) aiding and abetting the possession of unserialized firearms. *See* SAC ¶ 599. For all three avenues, the State has alleged both the necessary culpable act and the requisite unlawful intent.

### A.  Defendants Substantially Assisted Unlawful Possession.

Defendants largely do not dispute the culpable act element, *see, e.g.,* Defs. Br. 65 (acknowledging "certain individuals to whom Brownells allegedly sent packages" who "were not legally permitted to possess firearms"), but the scale and directness of that assistance is highly relevant because "less substantial assistance require[s] more scienter before a court c[an] infer conscious and culpable assistance. And, vice versa, if the assistance were direct and extraordinary,

then a court might more readily infer conscious participation in the underlying [act]."[39] *Twitter, Inc. v. Taamneh*, 143 S.Ct. 1206, 1222 (2023) (citation omitted)*; see also SEC v. Apuzzo*, 689 F.3d 204, 214 (2d Cir. 2012) ("components of the aiding and abetting test cannot be considered in isolation from one another" (quotation omitted)).

Here, Defendants' assistance could not be more direct: they sold unserialized frames and receivers directly to prohibited consumers, without any other links in the chain.[40] SAC ¶ 27; *see, e.g., id.* ¶¶ 134-57, 179-250, 292-368. At the very least, Defendants' products by their own labels put their customers "80 percent" of the way to firearms possession. *See, e.g.*, SAC ¶¶ 47, 51, 284, 530 n.69. But Defendants also went above and beyond to help their customers get to 100 percent, providing them with kits containing all the necessary parts to finish their firearm, *see, e.g.*, SAC ¶¶ 50-51, 119-27, 255, 262, 277-78, written instructions on how to complete the product, *see id.* ¶¶ 82, 120, YouTube videos demonstrating all the necessary steps, *id.* ¶¶ 42, 289, 376, "jigs" that make the simple finishing steps crystal clear and prevent mistakes, *id.* ¶¶ 41-51, 127, 163, 281, and in the case of Brownells even a telephone "tech line," where "we'll be glad to help you out," SAC ¶ 282. This assistance was extraordinary. As alleged, Defendants directly sold products that would inevitably become finished, unserialized firearms possessed by the people who bought them, and did everything in their power to help make the conversion happen. Accordingly, the scale and scope of that assistance reduces the level of knowledge necessary to state an aiding and

---

[39] Although *Twitter* dealt with aiding and abetting in the tort context, the law of aiding and abetting is "roughly similar" between the two contexts, as they share the same common-law roots. *Twitter*, 143 S.Ct. at 1223.

[40] The *Twitter* Court found that the elements of aiding and abetting were unsatisfied in the context of plaintiffs' claims that social media companies who allowed ISIS to use their platforms for general recruitment or fundraising had aided and abetted a specific attack in Istanbul, Turkey. *Twitter*, 143 S.Ct. at.1214, 1227. Here, however, Defendants interacted with and sold their products directly to customers whose possession of firearms was illegal, and provided them with products, tools, and know-how to finish them into working ghost guns. *Cf. id.* at 1230 ("When there is a direct nexus between the defendant's acts and the [violation], courts more easily infer such culpable assistance.").

abetting claim. *See Apuzzo*, 689 F.3d at 215 ("[A] high degree of substantial assistance may lessen the [government]'s burden in proving *scienter*.").

## B.  Defendants' Marketing Demonstrates Actual Knowledge.

To incur liability for an illegal act, a defendant need not have precise knowledge of all relevant facts; instead, "a 'defendant's general awareness of its overall role in the primary violator's illegal scheme is sufficient knowledge for aiding and abetting liability.'"[41] *SEC v. China N.E. Petroleum Hldgs., Ltd.*, 27 F. Supp. 3d 379, 395 (S.D.N.Y. 2014) (quoting *SEC v. Espuelas*, 905 F. Supp. 2d 507, 518 (S.D.N.Y. 2012)). Here, even leaving aside specific instances where Defendants, such as Brownells, were placed on notice that a specific customer sought their products as a means of evading recordkeeping and serialization laws,[42] Defendants' marketing demonstrates that "general awareness." Defendants are well-aware that their "unfinished" frames and receivers are particularly attractive to persons who could not legally purchase a firearm, *see, e.g.*, SAC ¶¶ 29, 32, and they specifically market their products as a way around the federal, state, and local laws that would prevent those persons from obtaining a deadly weapon. *See, e.g.,* SAC ¶¶ 47, 82, 119, 375. Defendants' explicit marketing of their products as a vehicle for circumventing firearms laws demonstrates their knowledge that prohibited persons are a key clientele, *see Reyna*,

---

[41] Indeed, with respect to aiding and abetting firearms possession by a felon or unlicensed person, knowledge of the customer's prohibited status may not even be an element of the offense. The Second Circuit has not ruled on whether a person who aids and abets another's unlawful possession of a firearm must be aware of the person's prohibited status, and other federal circuits have divided on the subject. *Compare United States v. Gardner*, 488 F.3d 700, 716 (6th Cir. 2007) (requiring the government to establish the defendant "knew or had cause to know of" the principal's status as a felon) *with United States v. Canon*, 993 F.2d 1439, 1442 (9th Cir. 1993) ("No greater knowledge requirement applies"); *see generally United States v. Cox*, 591 F. App'x 181, 186 (4th Cir. 2014). But even those circuits that require knowledge have nonetheless rejected the specific intent standard that Defendants proffer. *Compare* Defs. Br. 65 (demanding a "specific intent" standard) *with Gardner*, 488 F.3d at 714, 716 (proof of aiding and abetting satisfied if defendant "knew or had cause to know" of prohibited status). The case Defendants cite for their "specific intent" standard, *United States v. Pipola*, 83 F.3d 556 (2d Cir. 1996) concerned armed robbery rather than unlawful firearms possession, and said nothing about an abettor's knowledge of a prohibited status.

[42] *See, e.g.*, SAC ¶ 84.

2022 WL 17714376, at *5, and their affirmative refusal to inquire into their customers' backgrounds demonstrates their conscious avoidance of the fact.

In addition, the State has alleged that Defendants aided and abetted the possession of unserialized firearms, which is separately prohibited by statutes including 26 U.S.C. § 5842(b), 26 U.S.C. § 5641(c), and N.Y. Penal Law § 265.01(9). The State alleges that Defendants provided direct and substantial assistance to persons who would complete unserialized firearms, in that Defendants "sold [their products] directly to consumers without following any of the federal or state laws and regulations that apply to the sale of guns, and in particular without…placing a serial number on the gun." SAC ¶ 27; *see also, e.g., id.* ¶ 36. Defendants' knowledge that their products would become fully-functioning unserialized firearms can be seen in their marketing, their active support in converting their products into finished ghost guns, and in the simple fact that there is no other reason to purchase an unfinished frame. *See, e.g.*, SAC ¶¶ 38 n.4, 84, 86, 255, 375. Defendants provided unserialized frames and receivers directly to New York consumers knowing and intending that they would inevitably be converted into working, unserialized illegal guns. *See, e.g., id.* ¶ 127. In doing so, they aided and abetted the possession of those illegal weapons.

### C.  The Doctrine of Conscious Avoidance Applies.

Even if the Court were to find that the State's allegations do not support Defendants' direct knowledge, the well-established doctrine of conscious avoidance[43] prevents Defendants' attempts to hide behind their willful refusal to know their customers. Under the conscious avoidance doctrine, "when knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist." *United States v. Nektalov*, 461 F.3d 309, 314 (2d Cir. 2006)

---

[43] Also known as "willful blindness." *See United States v. Ferguson*, 676 F.3d 260, 278 n.16 (2d Cir 2011) (describing the two terms as interchangeable).

(quoting *Leary v. United States*, 395 U.S. 6, 46 n.93 (1969)); *see also United States v. Ferguson*, 676 F.3d 260, 277-79 (2d Cir. 2011) (conscious avoidance instruction proper in aiding and abetting case). Here, liability is proper if "there [is] evidence that 'the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" *Lange*, 834 F.3d at 78 (quoting *Nektalov*, 461 F.3d at 314). That is precisely the State's case.

The State has more than adequately alleged Defendants' conscious avoidance of their customers' legal status, particularly at this early stage. *See Allied World Surplus Lines Ins. Co. v. Hoffman Int'l, Inc.*, 2020 WL 4925618, *3 (S.D.N.Y. Aug. 21, 2020). In addition to the marketing allegations discussed in Section B, above, which demonstrate that Defendants encouraged their customers' desire to circumvent the firearms laws, New York has pled deliberate choices Defendants made to shield themselves from knowledge of their customers' prohibited status. Each Defendant had ready access to tools, such as the FBI's National Instant Criminal Background Check System or New York's public criminal history records search service, which they could have used to verify whether their customers would have been legally permitted to possess the guns that they would inevitably build, but each Defendant chose not to utilize those tools. *See* SAC ¶¶ 75, 77. And Defendants did not even take the simple step of *asking* their customers whether they could legally possess the firearms that Defendants helped them build. *See, e.g.*, SAC ¶¶ 122-28, 181, 262-64, 297-98, 392, 398, 435-37.

Defendants cannot avoid any of the State's claims by hiding behind their unilateral and unreasonable decision not to know their customer. Instead, "[r]ed flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." *Ferguson*, 676 F.3d at 278.

74

### D.   Defendants' Illicit Sales Also Constitute Aiding And Abetting Under New York State Law.

The aiding and abetting analysis is virtually identical under New York law. While Defendants argue that New York courts require a showing of "community of purpose" for aiding and abetting liability, *see* Defs. Br. 65 (citing *Nelson v. Lilley*, 2022 WL 22872648, at \*5 (W.D.N.Y. July 21, 2022)), the New York Court of Appeals has ruled that this language does not create a specific intent requirement of the sort Defendants ask the Court to apply. *See People v. Kaplan*, 76 N.Y.2d 140, 145 (1990) (this language "cannot be read for the proposition, advanced by defendant, that a specific wish to commit the principal's crime is required in all circumstances"). Instead, "the 'shared intent or purpose' test set forth in the case law merely establishes that acts undertaken in relative innocence and without a conscious design to advance the principal's crime will not support…accomplice liability." *Id.* New York law, like federal law, recognizes that aiding and abetting liability is proper on a conscious avoidance or willful blindness theory. *See Bullen v. CohnReznick, LLP*, 194 A.D.3d 637, 638 (1st Dep't 2021) (affirming denial of motion to dismiss aiding and abetting claim where complaint's allegations "allow for the inference that defendant 'willingly turned a blind eye" to illegality); *see also Sayles v. Ferone*, 137 A.D.3d 486, 528 (1st Dep't 2016) (aiding and abetting liability proper if "the defendant actually knew of the underlying harm or was willfully blind to it, and rendered substantial assistance").

Thus, under a federal or state rubric, none of the State's claims premised on aiding and abetting should be dismissed.

## VIII.   DEFENDANTS' SALES WERE REPEATED AND PERSISTENT.

Only Rock Slide disputes that the State has alleged that its conduct was "repeated" or "persistent" within the meaning of Exec. Law § 63(12),[44] *see* ECF No. 183 at 6-7, but the requirements for alleging persistence or repeated behavior are minimal, and the Complaint comfortably meets them. The terms "persistent" and "repeated" in Exec. Law § 63(12) are disjunctive and have separate statutorily-defined meanings. "Persistent" means the "continuance or carrying on of any fraudulent or illegal act or conduct." Exec. Law § 63(12). "Repeated" means "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person." *Id.* Accordingly, under New York law, "the Attorney General can show repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person to satisfy the 'repetition' requirement under the law." *New York v. Actavis, PLC*, 2014 WL 7015198, at *43 (S.D.N.Y. Dec. 11, 2014) (citing *People v. Wilco Energy Corp.,* 284 A.D.2d 469, 471 (2d Dep't 2001)).

There is no basis to read the Complaint, with all allegations accepted as true and all inferences taken in favor of the State, as alleging that any Defendant made only one shipment into New York, or that their conduct affected only one person. Rock Slide was caught red-handed, selling and shipping an unfinished pistol frame into Manhattan in response to an undercover purchase by the New York City Sheriff's Office. SAC ¶¶ 566-69. But the Complaint cannot be

---

[44] KM Tactical argues in passing that the Complaint "does not plausibly support the conclusion that any of [KM Tactical's] shipments contained any particular product" and "provides no basis for concluding that a 'significant portion' of these alleged shipments contained unfinished frames or receivers." ECF No. 182 at 6. But the State "is not required to establish a large percentage of violations," *New York v. Princess Prestige Co.*, 42 N.Y.2d 104, 107 (1977), only that a defendant's conduct "affected more than one person," Exec. Law § 63(12), or even a single person more than one time. *See People v. Wilco Energy Corp.*, 284 A.D.2d 469, 471 (2d Dep't 2001). Here, the State alleges that (i) KM Tactical marketed unfinished frames and sent over 8,500 packages into New York, a significant portion of which contained the very products they focused on selling, namely unfinished frames and receivers, SAC ¶¶ 469-72, (ii) KM Tactical made shipments to known individuals who committed ghost gun-related crimes, *see, e.g.*, SAC ¶¶ 473-77, 479-93, and (iii) in one instance, the package sent by KM Tactical into New York is known to have contained an unfinished pistol frame. SAC ¶ 478.

read to allege that this was Rock Slide's only sale into the State. Rather, the State alleges that this

was "just one instance of many prohibited sales of unfinished frames into New York." *Id.* ¶ 570;

*see also, e.g., id.* ¶¶ 565, 572, 599 (additional allegations of multiple shipments).

### IX.   **DEFENDANTS' REMAINING FACT-SPECIFIC ARGUMENTS DO NOT WARRANT DISMISSAL OF ANY OF THE STATE'S CLAIMS OR ANY OTHER RELIEF.**

#### A.   **Defendants' Out-of-State Conduct Legally Gives Rise to City Law Violations.**

Defendants argue[45] that, at best, partial dismissal of the State's first (repeated and persistent

illegality in violation of Exec. Law § 63(12)), sixth (negligence *per se*), and seventh (negligent

entrustment) claims is appropriate because N.Y. City Admin. Code § 10-314 purportedly does not

reach the online sale and subsequent shipment of an unfinished frame or receiver to a New York

City address from out of state. This argument is based on a generous factual presumption in their

own favor and thin legal support that is wholly inapposite. Rather, the alleged facts and applicable

law support the State's case.

Primarily, Defendants seek to apply the territorial limits recognized in two employment

cases litigating the New York City Human Rights Law where there is no application. Def. Br. 62-

63 (citing *Duffy v. Drake Beam Morin*, 1998 WL 252063, at *11 (S.D.N.Y. May 19, 1998) (holding

a City Human Rights Law claim could not belong to plaintiffs who did not live or work in New

York City); *Kamiel v. Hai St. Kitchen & Co. LLC*, 2023 WL 2473333, at *6 (S.D.N.Y. Mar. 13,

2023) (parties agreed that the City's Human Rights Law did not apply because the plaintiff was

employed in Westchester)). Since these cases do not come close to establishing the territorial

---

[45] Certain Defendants' fact-specific arguments are discussed elsewhere in this brief. For example, those Defendants that made individual arguments related to misrepresentation claims are discussed *supra*, Part V. Consequently, only those Defendants with remaining fact-specific arguments not discussed elsewhere are addressed here.

limitation on N.Y. City Admin. Code § 10-314 that Defendants wish applied, Defendants take two unjustified leaps—one factual and one legal.

Factually, Defendants presume that their online sales and shipments of unfinished frames and receivers to New York City customers constitute "conduct outside the state." *Id.* (citing *O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572, 579 (S.D.N.Y. 2013) (rejecting application of 12 NYCRR § 142–2.2 and New York Labor Law § 198(1–a) based on *plaintiff's* residence or domicile)). This presumption is in direct contrast to the State's allegations in the Complaint, setting forth the many ways Defendants reached into the State to engage in culpable conduct and omissions, including their marketing efforts and their thousands of completed sales and shipments into New York City. *See, e.g.*, SAC ¶¶ 106-14. Defendants do nothing more than take the conclusory position that "they 'keep for sale, offer, offer for sale, sell, transfer, or otherwise dispose of' their products in places *outside* of New York," Def. Br. 63, an unsupported assertion which cannot be credited for purposes of this motion.[46] *See Allied World Surplus Lines Ins. Co.*, 2020 WL 4925618, at *3.

Legally, Defendants rely on a red herring. Rather than engage in a genuine analysis of N.Y. City Admin. Code § 10-314's intent and reach, Defendants simply compare some text of N.Y. City Admin. Code § 10-314 to some text of N.Y. Pub. Health Law § 1399–*ll*(1) and argue that the former omits comparable explicit language "targeting 'remote sales.'"[47] Def. Br. 63. But it is clear

---

[46] Defendants argue that the State "fails to allege that Defendants process their sales, pack their shipments, or effect their shipments within the five boroughs," but do not explain how or why these specific activities are necessary for N.Y. City Admin. Code § 10-314 to apply.

[47] Defendants do not cite any applicable law regarding N.Y. City Admin. Code § 10-314, instead citing only one case interpreting N.Y. Pub. Health Law § 1399-ll, which actually undermines their position. *See* Defs. Br. 63. In *City of New York v. Milhelm Attea & Bros., Inc.* the court *upheld* the City's public nuisance claim on the grounds that the named defendants' conduct enabled third party online-sellers of cigarettes that harmed and endangered City residents' health. 550 F. Supp. 2d 332, 349 (E.D.N.Y. 2008) (citing *Copart Indus., Inc.*, 41 N.Y.2d at 568 (1977); *New York Trap Rock Corp.*, 299 N.Y. 77, 83 (1949); *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 482 (E.D.N.Y.2003)).

that N.Y. City Admin. Code § 10-314, and its corresponding definitions, bar *any* sales (or transfers, etc.) of unfinished frames or receivers, whereas N.Y. Pub. Health Law § 1399–*ll*(1) is intended to delineate certain permissible shipments from certain others that are not. *Compare* N.Y. Pub. Health Law § 1399-ll ("It shall be unlawful for any person engaged in the business of selling cigarettes to ship or cause to be shipped any cigarettes to any person in this state *who is not:* (a) a person licensed as a cigarette tax agent or wholesale dealer…(emphasis added)) *with* N.Y. City Admin. Code § 10-314 ("Notwithstanding any other provision of this chapter, *no person* shall dispose of or possess an unfinished frame or receiver." (emphasis added)).[48] The legislative history of N.Y. City Admin. Code § 10-314 confirms that New York City intended to ban internet sales like those made by Defendants. *See Prohibiting unfinished frames or receivers: Hearing on Int. 1553-2019 Before the City Couns. of N.Y. Comm. on Pub. Safety*, 5 (N.Y. City 2019) (statement of Rep. Donovan Richards, Chairperson, Comm. on Pub. Safety) (legislation designed to "prohibit[] unfinished frames or receivers, *which are items that can be purchased on the Internet and easily converted into untraceable firearms*." (emphasis added)). Case law also contradicts Defendants' position. *See, e.g., MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89 (2d Cir. 2023) (recognizing that a plaintiff who was a New York State citizen sufficiently plead territoriality when he "purchased the products online, thus satisfying the requirement that 'the transaction in which the consumer is deceived must occur in New York'); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2d Cir. 2013) (interpreting "the appropriate test in this case is to focus on the location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction, rather than 'on the residency of the parties'").

---

[48] *See also* New York City, N.Y., Code § 10-301(8) ("'Dispose of.' To dispose of, give away, give, lease, loan, keep for sale, offer, offer for sale, sell, transfer and otherwise dispose of.").

**B.**     **Blackhawk's Fact-Specific Arguments Fail.**

Blackhawk moves to strike SAC ¶ 172, pursuant to FRCP 12(f).[49] ECF No. 187 at 3 (citing *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000) (substantively reviewing a variety of rulings, post-trial, but none made pursuant to FRCP 12)); *Cabble v. Rollieson*, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006)). That disputed paragraph is as follows in its entirety:

> 172. 80 Percent Arms not only persists in its sales and marketing of these dangerous products, but it also makes light of the harm its products have caused and continue to cause. For example, on Halloween 2022, 80 Percent Arms acknowledged that its unfinished frame and receiver products have only one use—to make untraceable ghost guns—by posting a photo of one of their products dressed as a "ghost gun."

"[C]ourts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (partially granting motion under Rule 12(f) and striking allegations in a complaint that pertained to a consent judgment between a federal agency and a private corporation which were not true adjudications). Indeed, "Courts disfavor motions to strike." *Rich v. Miller*, 2022 WL 7748176, at *3 (S.D.N.Y. Oct. 4, 2022).

Evident by the very authority it cites, Blackhawk fails to meet its burden to strike ¶ 172. *See Cabble*, 2006 WL 464078, at *10 ("To meet this standard, the movant must show that no evidence in support of the allegation would be admissible, that the allegations have no bearing on the issues in the case, and that to permit the allegations to stand would result in prejudice to the movant…Since this requires a detailed inquiry into the facts, generally only as a trial unfolds can a determination of relevance be properly made." (internal quotations and citations omitted)); *accord Sanfo v. Avondale Care Grp., LLC*, 2022 WL 3448100, at *6 (S.D.N.Y. Aug. 17, 2022)

---

[49] Blackhawk also moves to dismiss the State's first (Exec. Law § 63(12) illegality), second (Exec. Law § 63(12) fraud), fourth (GBL § 349), and fifth (GBL § 350) causes of action on the grounds that the statements attributed to Blackhawk are protected opinions. *See* ECF No. 187 at 2. The State has addressed these arguments elsewhere in this brief. *See supra* pp. 54-62. Likewise, Blackhawk repeats arguments concerning the State's aiding and abetting claims, to which the State has replied elsewhere herein. *See* ECF No. 187 at 2; *supra* pp. 70-75.

(denying motion under Rule 12(f) because the defendants fails to show that "(i) no evidence in support of these allegations would be admissible, (ii) these allegations have no bearing on the issues in this case, or (iii) permitting these allegations to stand would result in prejudice to Defendant"); *see also, e.g., Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 399 (S.D.N.Y. 2006) (denying motion because movants failed to show that any evidence in support of the claim would be admissible at trial).

Blackhawk fails to demonstrate that there is absolutely no evidence in support of the State's broad allegations in ¶ 172, and the paragraph clearly relates to central issues in the case, such as Blackhawk's ongoing illicit conduct, its affirmative knowledge that its unfinished frames have only one purpose—to build dangerous and untraceable ghost guns—and illustrates its disregard of the harm it is causing by pushing ghost guns into our communities. Moreover, nothing in ¶ 172 can be said to be scandalous because "[a] scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *Cabble*, 2006 WL 464078, at *11. There can be no legitimate argument that one recent posting from Blackhawk's Instagram account, used for purposes of marketing the very products at issue in this case, can somehow reflect unnecessarily on its moral character or prejudice Blackhawk, nor is there any repulsive language that detracts from the dignity of the Court.

Accordingly, Blackhawk is not entitled to any relief.

### C.    KM Tactical' s Fact-Specific Arguments Fail.

KM Tactical argues that it must be dismissed on three grounds: (1) that the State has not plausibly pled that it shipped unfinished frames or receivers to New York recipients; (2) that the SAC does not identify any alleged misstatements made by KM and/or that their statements are First Amendment-protected opinion; and (3) that the SAC does not adequately allege that KM

aided and abetted violation of local, state, or federal law. *See* ECF No. 182. The latter two arguments are discussed respectively in Parts V and VII of this opposition.

With respect to its argument that the State has not plausibly pled that it shipped unfinished frames or receivers into New York, KM Tactical ignores the *multiple* plausible allegations to the contrary. The State alleges that KM Tactical sent *thousands* of packages to New York addresses between December 22, 2017, and June 28, 2022. SAC ¶ 469. The State further points to no fewer than nine New York residents known to have received packages from KM Tactical and who were subsequently found to be in possession of illegal frames and receivers. *Id.* ¶¶ 473-94. At this stage, the State must simply put forth "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and the State has done so, pointing to the fact that KM Tactical sent nearly ten thousand packages to New York addresses, and that multiple KM Tactical customers were found to have illegal products at the center of KM Tactical's catalog. Far from being merely "conclusory," these facts establish that it is not merely "plausible," but overwhelmingly likely that KM Tactical sold illegal products to New York addresses. It would be utterly implausible if none of these packages sold by KM Tactical, a prolific seller of ghost guns, contained prohibited products. Moreover, the State alleges a shipment specifically known to have contained an un unfinished pistol frame, which was sent by KM Tactical into "the East Village neighborhood of Manhattan." SAC ¶ 478. At this time, these facts are sufficient to defeat KM Tactical's motion.

### D.       Glockstore's Fact-Specific Arguments Fail.

Glockstore's culpable conduct is well-pled in the Complaint, *see* SAC ¶¶ 370-427, but the company nonetheless alleges that the State's allegations against it are insufficiently plausible. *See* ECF No. 189. Although Glockstore argues that "there are no allegations establishing that GS Performance shipped any unfinished frames," *id.* at 1-2, the State alleges Glockstore's conduct in

great detail, including alleging over 14,000 shipments into New York, many of which contained unfinished frames and receivers, including shipments after the effective date of all applicable laws. *See* SAC ¶¶ 383-86. The State also alleges multiple instances in which the contents of Glockstore's packages is specified, including fourteen instances where Glockstore is known to have sent unfinished handgun frames to customers located in Manhattan. *See id.* ¶¶ 387-98. The State also alleges shipments by Glockstore to no fewer than twelve persons who went on to commit crimes with ghost guns. *See id.* ¶¶ 399-427. These allegations go far beyond the State's pleading burden. *See* Fed. R. Civ. P. 8(a)(2).

To the extent that Glockstore argues that its marketing of its products as vehicles for circumventing the law "are merely expressions of legal opinion and not statements of fact," ECF No. 189 at 5, the assertion is incorrect for the reasons stated in Section V, above. Glockstore promised that its products are "completely legal and acceptable based on Federal laws," SAC ¶ 378, and that its sales required "[n]o fuss, no muss, no registration, no records . . . what's not to like?" *Id.* ¶ 375. There is nothing unknowable about the truth of these statements, and the First Amendment does not protect "commercial speech that is false, deceptive, or misleading, or that proposes an illegal transaction." *Zauderer*, 471 U.S. at 638.

### E.    Primary Arms' Fact-Specific Arguments Fail.

Primary Arms argues that: (1) the State did not plausibly plead that Primary Arms shipped any unfinished frames or receivers into New York after April 26, 2022; (2) the SAC does not identify any alleged misstatements made by Primary Arms; and (3) the SAC does not adequately allege that Primary Arms aided and abetted violation of local, state, or federal law. The latter two arguments are discussed respectively in Parts V and VII of this opposition.

Primary Arms' argument that the State has not plausibly pled that it shipped unfinished frames or receivers into New York misses the point in several ways. The State has alleged that

Primary Arms sent nearly 1,000 packages to New York State between April 26, 2022, and March 13, 2023 (the date the SAC was filed), and that "[a] significant portion" of those shipments "contained unfinished frames and receivers." SAC ¶¶ 502-03. There is nothing implausible about the allegation, particularly given Primary Arms' extensive history of shipping unfinished frames and receivers to New York addresses. *See, e.g.*, SAC ¶¶ 504-26 (discussing specifically identified incidents of Primary Arms shipping unfinished frames and receivers to New York recipients). The fact that unfinished frames and receivers were prohibited under New York State law as of April 26, 2022, does not suggest that Primary Arms began to *obey* the law on this date; to the contrary, Primary Arms does not dispute that they continued to ship unfinished frames and receivers to New York City addresses following February 23, 2020, the date on which they became illegal in New York City. *See, e.g.*, SAC ¶¶ 504-11 (discussing known or suspected shipments of illegal products from Primary Arms to New York City addresses after the date on which they became illegal).

Primary Arms' only real contention is that at this early stage the State does not have the information to point to *specific* violative shipments after this cut-off date,[50] but the State has alleged that the company's practice of illegal shipments continued after the law went into effect. *See id.* ¶¶ 502-03. That is sufficient at this phase.

### X.    DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE.

Defendants argue they are not jointly and severally liable for the public nuisance that they have caused. Defs. Br. 57-62. The law is clear that they are.

As an initial matter, the applicability of joint and several liability is to be determined under New York State law. *See, e.g.*, *U.S. ex rel. Perler v. Papandon*, 331 F.3d 52, 55 (2d Cir. 2003)

---

[50] Moreover, Primary Arms ignores that post-April 26, 2022 sales are not the only ones relevant to this matter. While these sales are evidence of *particularly* egregious violations of New York State law, the State contends that *all* sales of unfinished frames and receivers are grounds for relief. Even if Primary Arms were correct that the State has not plausibly alleged post-April 26, 2022 sales, that would not provide grounds for dismissing Primary Arms.

(applying state law on joint and several liability for a partnership dispute); *Rodick v. City of Schenectady*, 1 F.3d 1341, 1348 (2d Cir. 1993) (applying state law on joint and several liability for a tort claim). Joint and several liability is the historical default for all tort actions under New York law: "The rule of 'joint and several' liability has long been the rule in tort cases, meaning that each tortfeasor is responsible not only for the share of [plaintiff]'s damages that she herself caused ('several' liability), but also for the shares attributable to the other culpable tortfeasors ('joint' liability)." Siegel, N.Y. Prac. § 168A.

As Defendants acknowledge, under New York law, the joint and several liability rule is at its very strongest when the government is asserting a public nuisance claim, as here. *See State v. Schenectady Chemicals, Inc.*, 103 A.D.2d 33, 38 (3d Dep't 1984) ("[N]uisance liability is joint and several."); *State v. Fermenta ASC Corp.*, 160 Misc. 2d 187, 195 (Sup. Ct. Suffolk Cnty. 1994) ("[E]veryone who creates a nuisance or participates in the creation or maintenance…of a nuisance are liable jointly and severally for the wrong and injury done thereby[.]") (citations and internal quotation marks omitted); *State v. City of Yonkers*, 2004 WL 5213504, at *12 (Sup. Ct. Westchester Cnty. 2004) ("A party is liable in nuisance even if other contributors to the nuisance are not joined for 'nuisance liability is joint and several[.]'") (citation omitted); *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 347 (E.D.N.Y. 2007) ("Persons who join or participate in the creation or maintenance of a public nuisance are liable jointly and severally for the wrong and resulting injury."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 282 (E.D.N.Y. 2004) (same, denying motion to dismiss by firearms manufacturers, importers, and distributors, and holding that the defendants may be subject to joint and several liability for creation or maintenance of a public nuisance).

Defendants' arguments to the contrary are unavailing. Their claim that the harm they have collectively caused is readily "divisible" is belied by several cases they cite. For example, Defendants attempt to distinguish the case at bar with *Schenectady Chemicals*, 103 A.D.2d 33, and *City of Yonkers*, 2004 WL 5213504, which are public nuisance cases wherein the defendants dumped hazardous materials into water that became comingled and are examples of "indivisible" injury subject to joint and several liability. These cases support the State's position. In both cases, the quantity of chemicals dumped by each tortfeasor could have been apportioned and used as the basis for liability, but because the *result* of the tortfeasors' behavior was a generalized indivisible injury, joint and several liability applied. So too here; while the number of illegal firearms injected into New York by each defendant may be calculable following discovery (just as the volume of chemicals dumped into a water source can be), the generalized increase in gun violence caused by the ghost gun industry as a whole is not readily apportionable.

Even less convincing is Defendants' plea that it would be "unfair" to hold them jointly and severally liable. Defendants point to several cases where courts held that, in certain circumstances, it would have been inequitable to impose joint and several liability because of the possibility that a defendant whose contribution to the nuisance was "very small" might be solely responsible for an enormously larger liability. But the cases cited by Defendants are substantially different from the instant matter.

In *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, a multi-district litigation consolidated in the Southern District of New York, the plaintiffs named "almost fifty defendants who participated in the national gasoline market during a twenty-five year period," including different *types* of participants in the industry: "manufacturers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE." 447 F. Supp. 2d

289, 303 (S.D.N.Y. 2006). In view of the number of defendants, the difference in how different defendants participated in the industry, and that it was "likely that each defendant's contribution to the total volume of MTBE-containing gasoline in any particular well was very small…[u]nder these circumstances, it would be fundamentally unfair to hold these defendants jointly and severally liable." *Id.* And in *Cayuga Indian Nation of New York v. Pataki*, the court was concerned about "the potential for a truly devastating result in that any one of the approximately 7,000 individual landowners could be held liable for the entire amount of damages sustained by the Cayugas for the past 200 years or so." 79 F. Supp. 2d 66, 71-72 (N.D.N.Y. 1999).

Neither of those cases resembles this one; here, there are ten defendants, all of whom occupy nearly identical roles in the ghost gun industry, as major distributors of unfinished frames and receivers. Defendants cannot credibly claim that each of them had no more than a "very small" responsibility for the harm that their industry has caused the State; to the contrary, the State pleads that these Defendants are among the largest players in this industry—indeed the trailblazers who helped create the industry itself. And even if other actors could also properly be held jointly and severally liable, Defendants may seek contribution when and as appropriate. The limited equitable exception from joint and several liability in public nuisance matters does not remotely apply here.

In contrast, the State's recent public nuisance enforcement action against a group of opioids manufacturers and distributors provides an instructive and analogous example. In that matter, the State alleged that numerous manufacturers and distributors of opioid products caused, maintained, or contributed to a public nuisance. *In re Opioid Litigation*, Index No. 400000/2017, NYSCEF No. 7351 (N.Y. Sup. Ct., Suffolk Cnty. Aug. 17, 2020). The court was presented with the question of whether the defendants, as here multiple separate entities who independently engaged in similar behavior that together caused a public nuisance, could be subject to joint and several liability. The

court observed that under New York law these independent companies could potentially be found to be jointly and severally liable, and held that it could not determine as a matter of law pre-trial that the defendants were not jointly and severally liable, reserving the issue for trial. *Id.*

Here, as in *In re Opioid Litigation*, the State has asserted that Defendants may be jointly and severally liable for the public nuisance that they each caused, contributed to, or maintained. While Defendants will undoubtedly continue to contest this assertion in future stages of this action, at the motion to dismiss stage, the State has at minimum sufficiently pled joint and several liability, and this Court cannot properly decide at this stage that Defendants are not so liable.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in its entirety.

Dated: New York, New York
      June 16, 2023

Respectfully submitted,

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Plaintiff*

By: _____

    James M. Thompson
    Monica Hanna
    *Special Counsel*
    Abigail Katowitz
    Matthew Conrad
    *Assistant Attorneys General*
    28 Liberty Street
    New York, New York 10005
    (212) 416-8660
    james.thompson@ag.ny.gov
    monica.hanna@ag.ny.gov
    abigail.katowitz@ag.ny.gov
    matthew.conrad@ag.ny.gov