**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)<br>) |
| ARM OR ALLY, LLC; BLACKHAWK MANUFACTURING GROUP, INC., A/K/A 80 PERCENT ARMS, INC. OR 80 PERCENT ARMS; SALVO TECHNOLOGIES, INC., A/K/A 80P BUILDER OR 80P FREEDOM CO.; BROWNELLS, INC., A/K/A BROWNELLS OR BOB BROWNELL'S; GS PERFORMANCE, LLC, A/K/A GLOCKSTORE OR GSPC; INDIE GUNS, LLC; KM TACTICAL; PRIMARY ARMS, LLC; RAINIER ARMS, LLC; AND ROCK SLIDE USA, LLC, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Case No. 22-cv-06124 (JMF)

**ORAL ARGUMENT REQUESTED**

_____

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT BROWNELLS, INC.'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**

David H. Thompson*
Brian W. Barnes*
**COOPER & KIRK PLLC**
1523 New Hampshire Ave., NW
Washington, DC 20036
Phone: (202) 220-9600
* Admitted *pro hac vice*

*Attorneys for Defendant Brownells,
Inc., a/k/a Brownells or Bob
Brownell's*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES.................................................................................................. iii

INTRODUCTION ............................................................................................................1

ARGUMENT .................................................................................................................1

I.    The SAC Fails to Plausibly Allege that Defendants Violated Federal Law Because
the Products at Issue Are Not "Firearms" Under 18 U.S.C. § 921. ...................................1

    A.    The Unfinished Frames and Receivers that the State Alleges Defendants
Sold Are Not "Firearms" Under the Plain Meaning of 18 U.S.C. § 921(a)(3). .......2

        1.    Section 921(a)(3)(A)...............................................................................3

        2.    Section 921(a)(3)(B). ..............................................................................8

    B.    ATF's Prior Guidance and Repeated Assurances by New York State Officials
Contradict the State's Litigating Position on the Meaning of "Firearm."...............9

    C.    The Court Must Dismiss the State's Public Nuisance Claim Because the
Unfinished Frames and Receivers at Issue in this Case Are Not
"Component Parts" of Firearms Under Federal Law. ...........................................11

II.    The State's Claims Are Barred by the PLCAA.................................................................12

    A.    The PLCAA Applies to this Lawsuit. ..................................................................12

    B.    The Predicate Exception Does Not Apply to Any of the State's Claims. ..............13

        1.    The SAC Fails to Allege a Violation of a Valid Predicate Statute. .........13

        2.    The SAC Fails to Allege Any Knowing Violations. ...............................16

    C.    The SAC Fails to Satisfy the Predicate Exception's Proximate Cause
Requirement...................................................................................................18

III.    The SAC's Negligence Per Se Claim Fails as a Matter of Law..........................................21

IV.    The SAC's Negligent Entrustment Claim Fails as a Matter of Law. ................................23

V.    The Constitution Bars the State's Claims. .....................................................................26

    A.    Accepting the State's Interpretation of the Federal Definition of "Firearm"
and its Public Nuisance Statute Would Render Those Statutes
Unconstitutionally Vague...................................................................................26

i

B.    The Dormant Commerce Clause Further Bars the State's Claim Under the Public-Nuisance Statute. ....................................................................................28

C.    The State's Misrepresentation Claims Must be Dismissed Because Statements of Opinion About the Legal Status of Unfinished Frames and Receivers Are Not Actionable. ................................................................................30

D.    The Second Amendment Bars All the State's Claims. ...........................................32

VI.    The State Has Not Adequately Established Joint and Several Liability. ..........................36

A.    The State Has Not Alleged a Single or Indivisible Injury......................................36

B.    Equity Further Precludes Joint and Several Liability. ...........................................39

VII.    The SAC's Other Pleading Deficiencies Require Dismissal. ...........................................40

A.    The SAC Does Not Plausibly Allege Any Conduct by Defendants that Occurred Within New York City, and New York City Administrative Code § 10-314 Does Not Apply Extraterritorially. .........................................................................40

B.    The State Fails to Plausibly Allege Misrepresentations by Brownells. .................42

C.    The SAC Does Not Adequately Allege that Brownells Aided and Abetted Violations of Local, State, or Federal Law. ...........................................................43

CONCLUSION...................................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*,
   984 F. Supp. 768 (S.D.N.Y. 1997) ...................................................................30

*Bank of Am. Corp. v. City of Miami*,
   581 U.S. 189 (2017)...........................................................................................19, 20

*Breitkopf v. Gentile*,
   41 F. Supp. 3d 220 (E.D.N.Y. 2014) .................................................................19

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
   476 U.S. 573 (1986).............................................................................................28

*Bryan v. United States*,
   524 U.S. 184 (1998).............................................................................................17

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016).......................................................................................33, 34

*Carey v. Population Servs., Int'l*,
   431 U.S. 678 (1977).............................................................................................32

*Cayuga Indian Nation of N.Y. v. Pataki*,
   79 F. Supp. 2d 66 (N.D.N.Y. 1999).................................................................36

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) .............................................................................10

*Chipman v. Palmer*,
   77 N.Y. 51 (1879)................................................................................................36

*City of New York v. A-1 Jewelry & Pawn, Inc.*,
   501 F. Supp. 2d 369 (E.D.N.Y. 2007) .............................................................21

*City of New York v. Beretta U.S.A. Corp.*,
   315 F. Supp. 2d 256 (E.D.N.Y. 2004) .............................................................24

*City of New York v. Beretta U.S.A. Corp.*,
   524 F.3d 384 (2d Cir. 2008).............................................................13, 14, 15, 19

*City of New York v. Milhelm Attea & Bros.*,
   550 F. Supp. 2d 332 (E.D.N.Y. 2008) .............................................................42

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999) ............................................................................30

*Dial A Car, Inc. v. Transp., Inc.*,
   82 F.3d 484 (D.C. Cir. 1996).............................................................................30

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).............................................................................................35

*Dubai Islamic Bank v. Citibank, N.A.*,
   126 F. Supp. 2d 659 (S.D.N.Y. 2000) .............................................................22

*Duffy v. Drake Beam Morin*,
  1998 WL 252063 (S.D.N.Y. 1998) ...................................................................41

*Elliott v. City of New York*,
  95 N.Y.2d 730 (2001) ...........................................................................22, 23

*Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*,
  633 F. Supp. 3d 425 (D. Mass. 2022) ...............................................................22

*Fabiano v. Philip Morris Inc.*,
  54 A.D.3d 146 (1st Dep't 2008) .....................................................................8

*Fagan v. AmerisourceBergen Corp.*,
  356 F. Supp. 2d 198 (E.D.N.Y. 2004) ..............................................................21

*German ex rel. German v. Fed. Home Loan Mortg. Corp.*,
  896 F. Supp. 1385 (S.D.N.Y. 1995) ................................................................21

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*,
  859 F. Supp. 1521 (S.D.N.Y. 1994) ................................................................31

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ...............................................................................28

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ...............................................................................11

*Hecht v. City of New York*,
  60 N.Y.2d 57 (1983) ...............................................................................39

*Hilton v. S.C. Pub. Rys. Comm'n*,
  502 U.S. 197 (1991) ...............................................................................10

*Holmes v. Secs. Inv. Prot. Corp.*,
  503 U.S. 258 (1992) ...............................................................................20

*Ileto v. Glock, Inc.*,
  565 F.3d 1126 (9th Cir. 2009) ......................................................................15

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*,
  447 F. Supp. 2d 289 (S.D.N.Y. 2006) ....................................................36, 39, 40

*In re Opioid Litig.*, Index No. 400000/2017, NYSCEF No. 7351
  (N.Y. Sup. Ct. Suffolk Cnty. Aug. 17, 2020) .......................................................37

*Johnson v. Bryco Arms*,
  304 F. Supp. 2d 383 (E.D.N.Y. 2004) ..............................................................24

*Kamiel v. Hai St. Kitchen & Co.*,
  2023 WL 2473333 (S.D.N.Y. 2023) ................................................................41

*Lewis v. Jamesway Corp.*,
  737 N.Y.S.2d 657 (2d Dep't 2002) .................................................................22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ...............................................................................20

iv

*Liparota v. United States*,
    471 U.S. 419 (1985) ................................................................................................17

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990) ..................................................................................................30

*Miller v. Astucci U.S. Ltd.*,
    2007 WL 102092 (S.D.N.Y. Jan. 16, 2007) .........................................................23

*N.A.A.C.P. v. AcuSport, Inc.*,
    271 F. Supp. 2d 435 (E.D.N.Y. 2003) ................................................................39

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ...............................................................................26

*N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ........................................................................32, 34, 35, 36

*Nat'l Pork Producers Council v. Ross*,
    143 S. Ct. 1142 (2023) ........................................................................................29

*Nat'l Shooting Sports Found., Inc. v. James*,
    604 F. Supp. 3d 48 (N.D.N.Y. 2022) ...........................................16, 27, 28, 29, 30

*Nat'l Shooting Sports Found., Inc. v. James*,
    No. 22-1372 (2d Cir. June 24, 2022) ...................................................................16

*Nat'l Shooting Sports Found., Inc. v. Platkin*,
    2023 WL 1380388 (D.N.J. 2023) ........................................................................16

*Nat'l Shooting Sports Found., Inc. v. Platkin*,
    No. 23-1214 (3d Cir. Feb. 13, 2023) ...................................................................16

*Nelson v. Lilley*,
    2022 WL 2872648 (W.D.N.Y. 2022) ..............................................................43, 45

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
    309 A.D.2d 91 (1st Dep't 2003) ..........................................................................20

*People v. Kaplan*,
    76 N.Y.2d 140 (1990) ..........................................................................................45

*People v. Scott*,
    25 N.Y.3d 1107 (2015) ........................................................................................45

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ............................................................................................29

*Prescott v. Slide Fire Sols., LP*,
    341 F. Supp. 3d 1175 (D. Nev. 2018) .................................................................12

*Ravo ex rel. Ravo v. Rogatnick*,
    70 N.Y.2d 305 (1987) .....................................................................................36, 39

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019) ........................................................................................17

*Republic Ins. Co. v. Michel,*
   885 F. Supp. 426 (E.D.N.Y. 1995) ................................................................26

*Ruan v. United States,*
   142 S. Ct. 2370 (2022) ................................................................................17

*Safeco Ins. Co. of Am. v. Burr,*
   551 U.S. 47 (2007) ....................................................................................17

*Sambrano v. Savage Arms, Inc.,*
   338 P.3d 103 (N.M. Ct. App. 2014) ..............................................................12

*SEC v. China Northeast Petroleum Holdings Ltd.,*
   27 F. Supp. 3d 379 (S.D.N.Y. 2014) ..............................................................44

*Smith v. Atl. Gun & Tackle, Inc.,*
   376 F. Supp. 2d 291 (E.D.N.Y. 2005) ............................................................24

*Soto v. Bushmaster Firearms International, LLC,*
   202 A.3d 262 (Conn. 2019) ..........................................................................15

*Staples v. United States,*
   511 U.S. 600 (1994) ....................................................................................18

*State v. Schenectady Chemicals, Inc.,*
   103 A.D.2d 33 (3d Dep't 1984) ....................................................................37

*State v. Schenectady Chems., Inc.,*
   117 Misc. 2d 960 (Sup. Ct. Rensselaer Cty. 1983) ........................................38

*Teixeira v. County of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ........................................................................32

*Travieso v. Glock Inc.,*
   526 F. Supp. 3d 533 (D. Ariz. 2021) ......................................................12, 13

*Twitter, Inc. v. Taamneh,*
   143 S. Ct. 1206 (2023) ................................................................................44

*United States v. Aboumoussallem,*
   726 F.2d 906 (2d Cir. 1984) ..........................................................................8

*United States v. Annis,*
   446 F.3d 852 (8th Cir. 2006) ..........................................................................4

*United States v. Dotson,*
   712 F.3d 369 (7th Cir. 2013) ......................................................................3, 4

*United States v. Drasen,*
   845 F.2d 731 (7th Cir. 1988) ..........................................................................5

*United States v. George,*
   386 F.3d 383 (2d Cir. 2004) ....................................................................17, 18

*United States v. Hardin,*
   889 F.3d 945 (8th Cir. 2018) ..........................................................................4

*United States v. John*,
  2022 WL 1062998 (E.D.N.Y. 2022) .................................................................4

*United States v. Martinez*,
  964 F.3d 1329 (11th Cir. 2020) ........................................................................7

*United States v. Morales*,
  280 F. Supp. 2d 262 (S.D.N.Y. 2003) ........................................................4, 5, 7

*United States v. Pipola*,
  83 F.3d 556 (2d Cir. 1996) .........................................................................43, 44

*United States v. Randolph*,
  2003 WL 1461610 (S.D.N.Y. 2003) ................................................................7

*United States v. Rivera*,
  415 F.3d 284 (2d Cir. 2005) .........................................................................4, 5

*United States v. Ryles*,
  988 F.2d 13 (5th Cir. 1993) ..........................................................................4, 5

*United States v. Stewart*,
  451 F.3d 1071 (9th Cir. 2006) .........................................................................5

*United States v. Theodoropoulos*,
  866 F.2d 587 (3d Cir. 1989) ............................................................................4

*United States v. Weintraub*,
  273 F.3d 139 (2d Cir. 2001) ...........................................................................17

*United States v. Wick*,
  697 F. App'x 507 (9th Cir. 2017) ..................................................................4, 7

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) .........................................................................................31

*Van Steenburgh v. Tobias*,
  17 Wend. 562 (N.Y. Sup. Ct. 1837) ...............................................................40

*VanDerStok v. Blackhawk Mfg. Grp. Inc.*,
  2023 WL 4539591 (N.D. Tex. 2023) ........................................2, 3, 5, 6, 7, 9

*VanDerStok v. Blackhawk Mfg. Grp. Inc.*,
  No. 23-10718 (5th Cir. July 13, 2023) .............................................................2

*VanDerStok v. Blackhawk Mfg. Grp. Inc.*,
  No. 23A82 (U.S. Aug. 8, 2023) .......................................................................2

*VIP of Berlin, LLC v. Town of Berlin*,
  593 F.3d 179 (2d Cir. 2010) ...........................................................................28

*Yenem Corp. v. 281 Broadway Holdings*,
  18 N.Y.3d 481 (2012) .....................................................................................23

## Statutes and Rules

15 U.S.C.
 § 7901(a)(7) ................................................................................14, 19
 § 7901(a)(8) ................................................................................14, 19
 § 7901(b)(1) .......................................................................................16
 § 7903(4) ...........................................................................11, 12, 28
 § 7903(5)(A) ......................................................................................13
 § 7903(5)(A)(ii) .............................................................................13, 14
 § 7903(5)(A)(iii) ...........................................................................15, 18

26 U.S.C. § 5845(c) ......................................................................................5

N.Y. Exec. Law § 63(12) ........................................................................13, 14

N.Y. Gen. Bus. Law
 § 349 ..........................................................................................13, 14, 31
 § 350 ..........................................................................................13, 14, 31
 § 871 ............................................................................................14, 15
 § 872 ............................................................................................14, 15
 § 898-a(6) ........................................................................................28
 § 898-b(2) ........................................................................................29

N.Y. Pub. Health Law § 1399-ll(1) ...............................................................42

N.Y.C. Admin. Code
 § 2-201 ..............................................................................................40
 § 10-301(8) ........................................................................................41
 § 10-314 ............................................................................................23
 § 10-314(a) ........................................................................................40

87 Fed. Reg. 24652 (Apr. 26, 2022) ...............................................................2

## Other Authorities

60A N.Y. Jur. 2d Fraud & Deceit § 49 ........................................................31

Br. of City of N.Y. as *Amicus Curiae*, *Bruen*, 142 S. Ct. 2111 (2022) (No. 20-843) ....................35

*People v. Loyola*, No. IND-71721-22/001 (N.Y. Crim. Ct. Apr. 19, 2023), ECF No. 175-2 ...........8

Order, *Garland v. VanDerStok*, No. 23A82 (U.S. Aug. 8, 2023) .........................................3

W. LaFave, 1 Substantive Criminal Law, § 5.6(e)(3) (3d ed. 2022) ................................16, 17

**INTRODUCTION**

When members of the firearms industry were uncertain about the regulatory status of Polymer80's unfinished frames, they asked ATF and were told in 2017 that these products are not "firearms." Later, a new Administration came to power and prospectively changed ATF's position in a rule that took effect in August 2022. Whether the new regulatory definition is consistent with the relevant federal statute is an issue on which federal judges have disagreed and that the Supreme Court may ultimately resolve. Irrespective of which side has the better of that dispute, however, it should not be up for debate whether Defendants were entitled to notice and a fair opportunity to bring their conduct into conformity with the law after the regulatory definition was changed. The regulation of firearms is not a game of "gotcha" in which state elected officials may lie in wait and hope to weaponize legal uncertainty to retroactively punish those they dislike.

Fortunately, numerous legal doctrines foreclose the State's extraordinary bait and switch. The unfinished frames and receivers Defendants stand accused of selling are not "firearms" under the plain meaning of 18 U.S.C. § 921(a)(3). The Protection of Lawful Commerce in Arms Act ("PLCAA") bars the State's lawsuit, as do a host of provisions of the federal Constitution—including the First, Second, and Fourteenth Amendments. And the Second Amended Complaint (Mar. 13, 2023), ECF No. 157 ("SAC"), suffers from numerous pleading deficiencies. Accordingly, the Court should dismiss this suit in its entirety.

**ARGUMENT**

**I.     The SAC Fails to Plausibly Allege that Defendants Violated Federal Law Because the Products at Issue Are Not "Firearms" Under 18 U.S.C. § 921.**

The State argues that 18 U.S.C. § 921(a)(3) must be interpreted to apply to the unfinished frames and receivers that Defendants sold, *i.e.*, that they are "firearms" under the statute. Opp'n to Defs.' MTDs at 23–37 (June 16, 2023), ECF No. 205 ("N.Y. Br."). The United States, although it

1

does not address the specific products that New York alleges Defendants sold in this case, similarly disagrees with Defendants' interpretation of the statute and defends ATF's newly revised interpretation as reflected in the recently promulgated rule, 87 Fed. Reg. 24652 (Apr. 26, 2022) ("New Rule"), as "appropriate and in accordance with the statute." USA's Opp'n to Defs.' MTDs at 26–34 (June 16, 2023), ECF No. 204 ("U.S. Br."). This Court should reject New York's and the United States' interpretation of 18 U.S.C. § 921(a)(3) because it is irreconcilable with the plain meaning of the statutory text. At an absolute minimum, even if ATF's New Rule is valid because it is supported by one permissible reading of the statute, ATF's current position is not the only permissible interpretation and was not the law before the New Rule took effect.

### A.    The Unfinished Frames and Receivers that the State Alleges Defendants Sold Are Not "Firearms" Under the Plain Meaning of 18 U.S.C. § 921(a)(3).

The Court should reject the State's interpretation of Section 921(a)(3) because it is contrary to the plain language and structure of the statute—it collapses two subsections into one inquiry, rendering Section 921(a)(3)(B) superfluous—and violates the clear congressional intent apparent from the statute to differentiate objects that qualify as firearms under each section. Although Congress specifically addressed frames and receivers in Section 921(a)(3)(B), the State's interpretation of Section 921(a)(3)(A) would cover a fully complete frame or receiver. Furthermore, the Court should not import the "designed to" and "may readily be converted" language from Section 921(a)(3)(A) into Section 921(a)(3)(B) because to do so would be to violate Congress's deliberate choice to use different language in each section. *See VanDerStok v. Blackhawk Mfg. Grp. Inc.*, 2023 WL 4539591, at *14 (N.D. Tex. 2023), *appeal docketed*, No. 23-10718 (5th Cir. July 13, 2023), *judgment stayed pending appeal and certiorari*, No. 23A82 (U.S. Aug. 8, 2023) (5–4 vote). The Court should instead adopt Defendants' straightforward interpretation of Section 921(a)(3)— an interpretation that a district court in the Northern District of Texas accepted in recently vacating

ATF's New Rule, including its interpretation of Section 921(a)(3) and its definitions of "frame or receiver." *See VanDerStok*, 2023 WL 4539591.[1] Under that interpretation, the unfinished frames and receivers at issue in this case are not firearms subject to the regulations attendant to that categorization. And contrary to the State's insistence that this point "is germane to only one of the State's causes of action, and only in part," N.Y. Br. 23, most of the sales at issue in this case predate New York's ban on unfinished frames and receivers, so the federal status of these products will determine whether the bulk of the State's lawsuit can go forward.

### 1.    Section 921(a)(3)(A).

To qualify as firearms under Section 921(a)(3)(A), Defendants' products must be (1) "weapon[s]" that (2) "will," are "designed to," or "may readily be converted to" "expel a projectile by the action of an explosive." The SAC's allegations make clear that Defendants' products satisfy neither requirement.

a. Section 921(a)(3)(A) applies only to "weapon[s]." But the unfinished frames identified in the SAC—essentially hunks of plastic or metal—are not "weapons" because they are neither an instrument of offensive combat nor something used or designed to be used in injuring an enemy. *Contra* N.Y. Br. at 25 n.14; *see United States v. Dotson*, 712 F.3d 369, 371 (7th Cir. 2013) (noting that "almost any solid object can be used as a club, yet we don't call all solid objects weapons"). The fact that these objects, through further machining and in combination with other parts, may be transformed into "weapons" does not make them weapons in themselves.

b. Regardless, weapons or not, unfinished frames will not, are not designed to, and cannot readily be converted to expel a projectile. The State does not argue that unfinished frames and

---

[1] On August 8, 2023, the Supreme Court granted the government's application to stay the vacatur pending appeal by a 5–4 vote. Order, *Garland v. VanDerStok*, No. 23A82 (U.S. Aug. 8, 2023). The Fifth Circuit has scheduled expedited oral argument for September 7, 2023.

receivers *will* expel a projectile and they clearly will not. Nor are they "designed to" expel a projectile by action of an explosive. *Contra* N.Y. Br. at 24–26. The purpose of an unfinished frame or receiver—after it has been completely finished—is to be incorporated into *something else* that is "designed" to expel a projectile. It is a completed firearm that is designed to expel a projectile—not its grip, hammer, or frame. The State's repeated (albeit wrong) refrain that unfinished frames are "a tiny effort away" from becoming functional firearms, *id.* at 27, does not change this fact. The State's argument is also contrary to the conclusion reached by other courts that a starter gun does *not* qualify as a firearm under the "designed to" prong of Section 921(a)(3)(A), even though a starter gun may be converted into a functioning firearm with relatively little effort. *See United States v. John*, 2022 WL 1062998, at *4 (E.D.N.Y. 2022). Indeed, the State is not able to muster any response to Defendants' straightforward point that construing unfinished frames to be "designed" to expel a projectile would have no limiting principle and would mean that *every part* of a firearm—including various screws and springs—would be "designed" to expel a projectile and, therefore, be deemed a "firearm" under Section 921(a)(3)(A) and need to be serialized under federal law. Such an interpretation cannot possibly be correct.

Unable to persuasively answer Defendants' arguments from statutory text, the State and the United States resort to cases about objects that started out as "firearms" but that were damaged to the point that they could not fire, *United States v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005); *Dotson*, 712 F.3d 369, were missing significant parts, *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006); *United States v. Hardin*, 889 F.3d 945 (8th Cir. 2018); *Dotson*, 712 F.3d 369, or were disassembled, *United States v. Wick*, 697 F. App'x 507 (9th Cir. 2017); *United States v. Theodoropoulos*, 866 F.2d 587, 595 & n.3 (3d Cir. 1989); *United States v. Ryles*, 988 F.2d 13, 16 (5th

Cir. 1993); *United States v. Morales*, 280 F. Supp. 2d 262, 272–73 (S.D.N.Y. 2003).[2] But in every one of those cases, the defendant possessed a *finished* frame or receiver, and it begs the question to simply assume that the same result would have obtained had the defendant instead possessed an unfinished frame or receiver. While an object that was "originally designed to fire a bullet" might still be a firearm when damaged or disassembled, *Rivera*, 415 F.3d at 286, that reveals nothing about the point in the manufacturing process at which an object is "designed to" expel a projectile in the first place.

Neither can unfinished frames "readily be converted to expel a projectile by the action of an explosive." *Contra* N.Y. Br. at 24–25, 27–28. The SAC belies the State's arguments by acknowledging that converting an unfinished frame into something that will expel a projectile requires additional parts, specialized tools to drill holes and mill parts, the knowledge of how to perform those precise actions, and time to complete the necessary steps. *See* SAC ¶¶ 38, 43–45, 48–50. The cases cited by the State and the United States are not to the contrary, for they all involved *finished* frames and receivers along with other parts needed to assemble a working firearm—not unfinished frames and receivers standing alone.

c. Aside from individual unfinished frames and receivers, the State alleges that Brownells sold and shipped a "Polymer80 PF940CV1 Glock-compatible pistol frame, along with a part to build the gun." SAC ¶ 294. To the extent that this allegation is meant to allege that Brownells sold an unfinished frame or receiver "parts kit"—an uncertain point that the State does not clarify in its opposition, *see* N.Y. Br. at 28 n.16—the "parts kit" that the State alleges in the SAC does not

---

[2] The State also cites *United States v. Drasen*, 845 F.2d 731 (7th Cir. 1988). But *Drasen* involved a different statute, 26 U.S.C. § 5845(c), which defined a "rifle," and did not interpret the meaning of "designed to" in that statute whatsoever. Similarly, *United States v. Stewart*, 451 F.3d 1071, 1072 (9th Cir. 2006), cited by the United States, was a case about probable cause and did not reach any firm conclusion about whether an unfinished frame qualifies as a "firearm."

qualify as a "firearm" under federal law. *See VanDerStok*, 2023 WL 4539591, at *16–18.

First, Brownells' "parts kit" is not "any weapon . . . designed to or [that] may readily be converted to expel a projectile by the action of an explosive" because it is not itself a weapon. *See id.* at *16–17. An unfinished frame and one other "part to build the gun," SAC ¶ 294, might be capable of being turned into a finished frame, but it is not plausibly capable of being turned into a completed firearm. The United States' argument that "a parts kit is merely a weapon in an unfinished or unassembled form or configuration" does not undermine this point. At most, the "parts kits" at issue here could perhaps be completed and assembled to form a frame or receiver, but not an entire firearm. *Contra* U.S. Br. at 28. And if a frame was a "weapon" under Section 921(a)(3)(A) by itself, then there would have been no need for Congress to delineate frames as a separate category in Section 921(a)(3)(B). *VanDerStok*, 2023 WL 4539591, at *16 ("To read § 921(a)(3)(A) as authorizing ATF to regulate any aggregation of weapon parts that may readily be converted into a weapon would render § 921(a)(3)(B)'s carveout for 'frame[s] or receiver[s]' superfluous.").

Second, Brownells' "parts kit" is neither "designed to" nor "may readily be converted to" "expel a projectile by the action of an explosive." At most, the kit might be designed to or readily be converted into a finished frame or receiver, but that is *not* the same as readily being converted into a weapon that will expel a projectile by the action of an explosive. This argument does not mean that "a partially disassembled handgun that is missing one minor part (for example, a screw or a firing pin) cannot and should not be considered a 'firearm' under the [Gun Control Act ("GCA")]." *Contra* U.S. Br. at 29. What Defendants argue here is that the products they are alleged to have sold are not "designed to," and may not "readily be converted to," expel a projectile, and are not "frames or receivers," so they do not fit the definitions under Section 921(a)(3). The United States' example of a partially disassembled handgun missing one minor part may indeed be readily

converted, depending on the steps needed to make it fire, but Defendants' products are *not* readily converted, for the reasons explained above.

Third, Brownells' "parts kit" is not "the frame or receiver of any such weapon." As explained in the next section, the unfinished frames and receivers at issue in this case—and, logically, the parts kits that include them—do not fit this definition because they are not frames or receivers.

Fourth, in enacting the GCA to supersede the Federal Firearms Act, which more broadly defined "firearm" to include "any weapon . . . designed to expel a projectile or projectiles by the action of an explosive . . . or any part of such weapon," *VanDerStok*, 2023 WL 4539591, at *2, Congress deliberately revised the definition to drop the "or any part of such weapon" language in favor of "the frame or receiver" language in Section 921(a)(3)(B). Consequently, this change must be given "real and substantial effect," and therefore, "Congress's definition does not cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile." *Id.* at *16.

The State does not directly address any of these arguments but instead cites cases that have found certain configurations of parts to constitute a firearm under Section 921(a)(3)(A). But specifics matter, and the "parts kit" that the State alleges Brownells sold is not analogous to the disassembled guns in those cases, all of which included *finished* frames or receivers. *See Morales*, 280 F. Supp. 2d at 272–73 (complete gun in a state of disassembly); *Wick*, 697 F. App'x 507 (same); *United States v. Randolph*, 2003 WL 1461610, at *2 (S.D.N.Y. 2003) ("gun" at issue consisted of "disassembled parts" and "a broken firing pin"); *United States v. Martinez*, 964 F.3d 1329, 1332, 1340 (11th Cir. 2020) (shotgun consisting of detached barrel and handle stock); *see also VanDerStok*, 2023 WL 4539591, at *17 (distinguishing many of these cases). Consequently, the Court should determine that the "parts kits" identified in the SAC are not "firearms."

### 2.    Section 921(a)(3)(B).

The State also argues that Defendants' products qualify as firearms under 18 U.S.C. § 921(a)(3)(B), which covers "the frame or receiver of any such weapon." N.Y. Br. at 28–31. By definition, however, the *unfinished* frames and receivers at issue in this case are not themselves *finished* frames and receivers. The State's contrary arguments are unpersuasive.

As an initial matter, the Court should reject the State's argument against judicially estopping it from asserting that unfinished frames are "firearms" under Section 921(a)(3)(B) based on the successful prosecution of Rene Loyola. Both the Loyola prosecution and this lawsuit were brought by "the People of the State of New York." *Compare People v. Loyola*, No. IND-71721-22/001 (N.Y. Crim. Ct. Apr. 19, 2023), ECF No. 175-2, *with* SAC at 1. Such suits are binding on all of New York's citizens. *See Fabiano v. Philip Morris Inc.*, 54 A.D.3d 146 (1st Dep't 2008). The State is bound by the outcome of the Loyola prosecution for double jeopardy purposes, *see United States v. Aboumoussallem*, 726 F.2d 906, 910 n.2 (2d Cir. 1984), and it should be bound for present purposes as well.

In any event, the State's arguments about Section 921(a)(3)(B) fail on the merits. The State first highlights that "frame or receiver" is not defined in the statute, and that dictionary definitions of "frame" and "receive" apply to Defendants' products, so they are thus the "frame" or "receiver" of "any such weapon." N.Y. Br. at 28–29. The State's logical leaps in making this argument should be rejected. While unfinished frames and receivers *may become* the frame or receiver of a firearm through additional steps, in their original state they have not yet reached that stage of completion. Even if the dictionary definitions of "frame" or "receive" apply to the actual frames or receivers of firearms, they *do not* cover Defendants' products because those products are not "the underlying constructional system or structure that gives shape or strength" to a firearm or "the receptacle or

container for" a firearm.

The State insists that the supposedly "trivial differences between an unfinished frame or receiver and a finished version" do not change the conclusion that Defendants' products "meet the statutory definition" under Section 921(a)(3)(B). *Id.* at 29–30. But even small differences can have large categorical consequences, and in this case, the lack of certain holes and the additional material on unfinished frames and receivers render them incapable of acting as functional frames or receivers. New York cannot simply waive away these meaningful differences as "negligible" and lump them together—especially when the differences were dispositive under controlling ATF guidance at the time of the sales at issue in this case.

As a final resort, the State abandons Section 921(a)(3)(B)'s text altogether and resorts to the definition of a "frame or receiver" set forth in the ATF's New Rule, *id.* at 30–31, but that maneuver fares no better. As Brownells argued in its opening brief—an argument the State fails to address—all of the conduct that the State alleges Defendants engaged in occurred prior to the August 24, 2022 effective date of ATF's New Rule, so Defendants cannot be held liable under regulatory definitions that were not in effect at the time. Moreover, a district court recently and correctly concluded that ATF's new definition of "frame or receiver" conflicts with 18 U.S.C. § 921(a)(3)'s plain meaning. *See VanDerStok*, 2023 WL 4539591.

### B.  ATF's Prior Guidance and Repeated Assurances by New York State Officials Contradict the State's Litigating Position on the Meaning of "Firearm."

Section 921(a)(3)'s text is clear, and this Court need examine no other materials to conclude that Defendants' products are not firearms under that law. Nevertheless, although in no way essential to Defendants' argument, both ATF's prior interpretation of the word "firearm" in Section 921(a)(3) and repeated assurances by New York State officials support Defendants' position.

ATF previously determined that Polymer80 PF940 unfinished frames—the specific

product the State accuses Brownells of selling—are not firearms under Section 921(a)(3).[3] ATF reached that determination by focusing on the degree of machining the product had undergone, an approach that ATF itself previously described as its historical approach, Brownells' MTD at 14 (Apr. 19, 2023), ECF No. 175 ("Op. Br."); *see* U.S. Br. at 30, not whether the object may be "readily converted" into a firearm. Brownells and the firearms industry have built up significant reliance interests based on ATF's determinations in this area, and the Court should thus give great weight to ATF's prior position. *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202 (1991). Indeed, Defendants have adhered to ATF's guidance, and the products at issue in this case reflect the balance that Congress struck—and ATF previously recognized—between regulating the commercial firearms market and preserving the ability of law-abiding citizens to construct their own firearms.

While the State focuses on obscure administrative materials from the 1970s and 1980s to argue that Defendants are wrong about ATF's prior position, the United States itself has intervened in this case and does not resort to those same materials. Indeed, the United States tellingly does *not* argue that the products at issue in this case have always been firearms under the GCA and implementing regulations, but instead, simply that ATF's New Rule is "consistent with the statute and is reasonable." U.S. Br. at 27. Far from supporting the State's characterization of past ATF guidance, the United States concedes that "a rigid application" of the regulatory definition of firearms that applied prior to the New Rule "would not cover the frame or receiver of the vast majority of firearms currently in circulation" and never suggests that Defendants were wrong to rely on ATF guidance concerning the legal status of Polymer80 unfinished frames while that guidance was

---

[3] The State urges the Court not to consider the materials external to the SAC upon which Defendants rely to make this argument. But the Court may consider the documents because the SAC "relies heavily upon [their] terms and effect," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), and they are capable of judicial notice. *See* Op. Br. at 3 n.1.

in effect. *Id.* at 31–32.[4]

Furthermore, until recently, New York State officials, including the Attorney General, apparently agreed with Defendants that the meaning of "firearm" under federal law does not reach unfinished frames or receivers like the ones at issue in this case. As the AG previously explained, "[a]side from a fully assembled firearm, the lower receiver is the only piece that is independently considered a firearm and is thus subject to federal regulation. However, an incomplete lower receiver—lacking certain holes, slots, or cavities—is not considered a firearm." Op. Br. at 16. The State's only response is that the Court should not estop it from arguing that Defendants' products *are* "firearms" under federal law "based on an out-of-context sentence" in a press release. But the State's attempt to dismiss the AG's statement is utterly unpersuasive. Even if the Court does not go as far as to estop the State from making this argument, State officials' and the AG's statements contrary to the State's current theory should factor into the Court's analysis because they are more in keeping with the plain language of the statute than the State's current position.

### C. The Court Must Dismiss the State's Public Nuisance Claim Because the Unfinished Frames and Receivers at Issue in this Case Are Not "Component Parts" of Firearms Under Federal Law.[5]

Because the State cannot establish that Defendants' products are "component part[s]" of a firearm, the Court must dismiss Count Three. Congress did not define "component part" in 15 U.S.C. § 7903(4), so the Court must interpret that language according to its ordinary meaning. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76 (2009). Unfinished frames and receivers do

---

[4] The *only* unfinished frames or receivers the SAC specifically alleges Brownells sold are Polymer80 PF940 unfinished frames. *See* SAC ¶¶ 277, 293–295. The State quibbles with the applicability of ATF's 2017 letter to Defendants' products, since the letter specifically addressed a Polymer80 PF940C. But the State never explains why ATF's rationale for concluding that the PF940C is not a "firearm" is not equally applicable to other versions of the PF940.

[5] As permitted by Federal Rule of Civil Procedure 8(d)(3), this argument is presented in the alternative to the PLCAA defense presented later in this brief.

not "form, compose, or make up" firearms, nor are they "one of the portions" into which a firearm may be divided, so they are not "component parts" of firearms. *See* Op. Br. at 21. Additionally, because unfinished frames and receivers are *not* frames or receivers under Section 921(a)(3)(B), it is difficult to see how the same products could be a "component part" of a firearm. Finally, case law has focused on whether an object is necessary for a firearm to function in determining whether that object is a "component part" of a firearm covered by 15 U.S.C. § 7903(4), *Prescott v. Slide Fire Sols., LP*, 341 F. Supp. 3d 1175, 1188–89 (D. Nev. 2018); *Sambrano v. Savage Arms, Inc.*, 338 P.3d 103, 105 (N.M. Ct. App. 2014), but a firearm cannot function using an unfinished frame.

The State ignores Defendants' straightforward legal analysis, arguing instead that the SAC's characterization of an unfinished frame or receiver as "the core part of a handgun, rifle, or shotgun, but missing a few drill holes and containing a small amount of extra plastic" renders the products "component parts" of a firearm. N.Y. Br. at 23. The State cannot just gloss over these critical differences in this manner. While a firearm can be broken down into individual "component parts," such as a barrel or a hammer, those parts do not include an *unfinished* frame or receiver.

## II.    The State's Claims Are Barred by the PLCAA.

### A.    The PLCAA Applies to this Lawsuit.

The State insists that "the statutory violations giving rise to relief against Defendants" are based on "Defendants' own direct conduct that violates specific state, federal, and local laws," and therefore, that "this case falls outside PLCAA's scope." N.Y. Br. at 13–15. The State's argument, however, would render the predicate exception completely superfluous. If the PLCAA did not apply to cases alleging any wrongful conduct by a manufacturer or seller in the first place, then the predicate exception allowing actions for a seller's knowing violation of certain state or federal gun laws would be unnecessary. *See Travieso v. Glock Inc.*, 526 F. Supp. 3d 533, 543 (D. Ariz. 2021).

Moreover, despite the State's argument to the contrary, the SAC's claims *are* predicated upon the underlying alleged wrongdoing of the *purchasers* of the products, *e.g.*, unlawful possession or use of the products, and the State seeks relief premised on those third parties' actions. The SAC recounts in great detail facts concerning individual purchasers' purported unlawful use, including facts about purchasers who "pled guilty" to crimes. *See, e.g.*, SAC ¶¶ 140, 196, 230, 299. Accordingly, the SAC clearly seeks damages and other remedies from Defendants "resulting from the criminal or unlawful misuse" of their products. *See* 15 U.S.C. § 7903(5)(A).

**B.    The Predicate Exception Does Not Apply to Any of the State's Claims.**

**1.    The SAC Fails to Allege a Violation of a Valid Predicate Statute.**

The State contends that it "indisputably alleges that Defendants violated statutes that specifically regulate the sale or marketing of firearms." N.Y. Br. at 16. The State is wrong because its illegal acts and misrepresentation claims (Counts One, Two, Four, and Five) are based on statutes of general applicability and its nuisance claims under Count Three are unmoored common law claims the PLCAA prohibits.

First, the State brings Counts One and Two under New York Executive Law § 63(12), which applies to "*any person*" that engages in "repeated *fraudulent or illegal acts* or otherwise demonstrate[s] persistent fraud or illegality." N.Y. EXEC. LAW § 63(12). The statute's express application to "any person" plainly renders this statute one of "general applicability," not one directed toward firearms manufacturers or sellers. Counts Four and Five are brought under New York General Business Law §§ 349 and 350, which prohibit *any* deceptive acts or practices in the conduct of *any* business, *id.* § 349, and *any* false advertising in the conduct of *any* business, *id.* § 350. Again, the statutes' plain terms demonstrate that they are generally applicable to all persons conducting any business, not specifically to "the sale or marketing" of qualified products as

contemplated in the PLCAA. *See* 15 U.S.C. § 7903(5)(A)(ii); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 400–04 (2d Cir. 2008).

In response, the State argues that the PLCAA does not require the state or federal laws that specifically regulate the sale or marketing of firearms to be the cause of action themselves, only that the case somehow involve an alleged violation of such statutes. N.Y. Br. at 16–17. The State is advocating for the exact expansion of civil liability that Congress found the PLCAA was necessary to prevent. In enacting the PLCAA, Congress found that the statute was necessary, in part, because "liability actions commenced or contemplated by . . . States" were an "attempt to use the judicial branch to circumvent the Legislative branch of government" and to "expand civil liability in a manner never contemplated . . . by the legislatures of the several States." 15 U.S.C. §§ 7901(a)(7), (8). As the Second Circuit has held, consistent with Congress's findings, the predicate exception, which must be read "narrowly," does not permit the State to pursue causes of action unless the state legislature has expressly permitted such a cause of action through "statutes that actually regulate the firearms industry." *Beretta*, 524 F.3d at 403–04. The New York State Legislature has not done so here in Executive Law § 63(12) or General Business Law §§ 349 and 350, which apply generally to any actor engaged in certain deceptive acts or practices. And the State cannot rely on its nested allegations of violations of *other* federal, state, and local laws, *see* SAC ¶ 599, because it does not (and indeed, cannot) bring any charge or cause of action under, or seek any relief provided by, these provisions.

The State's argument that Executive Law § 63(12) satisfies the *Beretta* test because courts have supposedly "applied [it] to the sale and marketing of firearms" fares no better. N.Y. Br. at 17. Both of the trial court cases (or, in reality, the one trial court order and the one consent order and judgment) that New York cites involved violations of statutes specifically prohibiting the sale of

"imitation weapons" as defined in General Business Law §§ 871 and 872. Neither case addressed Executive Law § 63(12) at length, and it is unclear whether either case found that the defendants had violated that statute. Read properly, *Beretta* applies only to statutes that courts had "applied to the sale or marketing of firearms" prior to the PLCAA's enactment. *See Beretta*, 524 F.3d at 399, 404. Furthermore, even ignoring all these other deficiencies, this Court should not determine that courts have applied Executive Law § 63(12) to the sale and marketing of firearms on the basis of one trial court case and one consent judgment.

Second, the State's claim under General Business Law §§ 898-a–e is an unmoored common law claim for public nuisance that the PLCAA prohibits because it is premised on "general tort theories of liability that traditionally have been embodied in the common law." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135 (9th Cir. 2009); *see* Op. Br. at 32–33. New York resists this conclusion, arguing that §§ 898-a–e is instead a statute that expressly regulates firearms. N.Y. Br. at 18–19. Section 898-a–e, however, is not the kind of statute that falls within the PLCAA's predicate exception.

The Second Circuit has already rejected the proposition that the predicate exception can be read to cover every conceivable "State or Federal statute applicable to the sale or marketing of" firearms. 15 U.S.C. § 7903(5)(A)(iii); *see Beretta*, 524 F.3d at 400–03.[6] The meaning of that phrase instead "must be determined here by reading [it] in the context of the surrounding language and of the statute as a whole." *Id.* at 400. And reading it to sweep in any and all laws that apply to the firearms industry, even if they just codify the same vague tort-law duties of care the PLCAA was

---

[6] This suffices to defeat New York's reliance on *Soto v. Bushmaster Firearms International, LLC*, 202 A.3d 262 (Conn. 2019), to argue that General Business Law §§ 349 and 350 fit the predicate exception. *See* N.Y. Br. at 17–18. *Soto* concluded that the predicate exception is applicable to actions under a generally applicable state statute, which is precisely the argument that *Berretta* rejected, 524 F.3d at 400–03, as did *Ileto*, 565 F.3d at 1132. *Soto* thus cannot be reconciled with the binding law of the Second Circuit.

15

enacted to eliminate, "would allow the predicate exception to swallow the statute." *Id.* at 403. The PLCAA says on its face that its "purpose[ ]" is "[t]o prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." 15 U.S.C. § 7901(b)(1). Whether those "causes of action" are legislatively authorized does not matter. Any reading of the predicate exception that would resuscitate such suits is therefore invalid. And that is exactly what New York is attempting to do with §§ 898-a–e: codify a general tort theory of liability into a statute and attempt to use that statute to hold the firearms industry liable.[7]

### 2.    The SAC Fails to Allege Any Knowing Violations.

Defendants could not have "knowingly violated" federal and state prohibitions on selling unserialized firearms when acting on the objectively reasonable understanding, grounded in ATF guidance, that unfinished frames are not "firearms." Op. Br. at 25–28. Even if the Court concludes that Defendants' understanding was wrong, Defendants did not "knowingly violate[ ]" the law by conducting their businesses in this manner. As a leading treatise explains, if a defendant "reasonably relies upon an erroneous official statement of the law contained in an administrative order . . . by the public officer or body responsible for interpretation, administration, or enforcement of the law defining the offense, then his belief that the conduct was not criminal is a defense." W.

---

[7] Defendants acknowledge that two district courts have reached differing conclusions in this area. A district court in the Northern District of New York recently concluded that §§ 898-a–e met the PLCAA's predicate exception. *See Nat'l Shooting Sports Found., Inc. v. James*, 604 F. Supp. 3d 48 (N.D.N.Y. 2022) ("*NSSF*"), *appeal docketed*, No. 22-1372 (2d Cir. June 24, 2022). By contrast, a district court in the District of New Jersey recently preliminarily enjoined a substantially similar provision of New Jersey law for essentially the reasons Defendants have articulated in this case. *See Nat'l Shooting Sports Found., Inc. v. Platkin*, 2023 WL 1380388 (D.N.J. 2023), *appeal docketed*, No. 23-1214 (3d Cir. Feb. 13, 2023). Defendants urge the Court to adopt *Platkin*'s reasoning.

LaFave, 1 Substantive Criminal Law, § 5.6(e)(3) (3d ed. 2022). Put another way, one who acts on an erroneous but "objectively reasonable" understanding of the law based on agency guidance is not "a knowing or reckless violator." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007).

The State says that this argument is "contradicted by several Supreme Court cases," N.Y. Br. at 19, but it does not even attempt to distinguish the Supreme Court cases cited in Brownells' opening brief. The Supreme Court has repeatedly interpreted statutory terms such as "knowingly violated" to require knowledge of the law when doing so is necessary to "separate those who understand the wrongful nature of their act from those who do not." *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019); *see also Ruan v. United States*, 142 S. Ct. 2370, 2382 (2022); *Liparota v. United States*, 471 U.S. 419, 425 (1985). The Second Circuit's decision in *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001), is to similar effect. The Court in that case interpreted the phrase "knowingly violates" to require "knowledge of enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent." *Id.* Here, to the extent that the Court concludes that the products at issue are firearms, Defendants did not know that they should be categorized this way based on their reliance on contrary ATF guidance, and there can be no knowing violation absent "knowledge of facts *and attendant circumstances* that comprise a violation of the statute." *Id.* (emphasis added).

*Bryan v. United States*, 524 U.S. 184, 189 (1998), is not to the contrary. The defendant in that case "knew that his conduct was unlawful" but challenged his conviction on the theory that he was not *specifically* aware of the federal law that prohibits dealing in firearms without a license. That is a far cry from a case such as this one, where regulatory guidance gave Defendants an objectively reasonable basis for believing their conduct was innocent. *Bryan*, moreover, is an "atypical" case, and "general awareness of the unlawfulness [of a defendant's] conduct" is often

"necessary to establish the boundary between protected and unlawful conduct." *United States v. George*, 386 F.3d 383, 393 (2d Cir. 2004) (Sotomayor, J.).

The reasoning supporting this Court's preliminary injunction order in *City of New York v. Arm or Ally*, No. 22-cv-5525 (S.D.N.Y. 2022), ECF No. 79, is likewise distinguishable. While Indie Guns' ignorance of the fact that the New York Legislature had enacted General Business Law §§ 898-a–e might not have been an excuse, a very different case would have been presented had Indie Guns taken care to follow state guidance on how to comply with that law only to be sued after the fact on the theory that the state's guidance was mistaken. Furthermore, gun parts do not qualify as "highly dangerous devices that should alert their owners to the probability of regulation," for there is "a long tradition of widespread lawful gun ownership by private individuals in this country." *Staples v. United States*, 511 U.S. 600, 609–10 (1994).

### C.    The SAC Fails to Satisfy the Predicate Exception's Proximate Cause Requirement.[8]

To qualify under the predicate exception, the PLCAA requires that "an action" must be based on a violation that "was a *proximate cause* of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii) (emphasis added). Because the SAC does not allege proximate causation on any count, the Court must dismiss the State's claims and many of the forms of relief that it seeks. Indeed, not only does the SAC repeatedly highlight the alleged criminal misconduct of third parties that breaks any causal chain to Defendants, *see, e.g.*, SAC ¶¶ 1, 54, 109, 292–369, but General Business Law §§ 898-a–e, upon which Count Three is based, does not include a proximate causation element at all.

The State first argues that it has sufficiently pleaded proximate causation because the

---

[8] New York entirely fails to respond to Defendants' arguments that the SAC fails to allege the necessary proximate causation to support many of the remedies the State seeks, including a generalized endowment to an abatement fund, civil penalties, and disgorgement. Op. Br. at 36–37.

conduct it alleges Defendants engaged in is "analogous" to the "two nonexclusive examples of fact patterns that satisfy" the predicate exception included in the PLCAA. N.Y. Br. at 21. But the assumption that the two examples automatically "satisfy the statute" is unwarranted, and the State cites no precedent in support of that proposition. There is no indication in the PLCAA that the examples, in and of themselves and without the need for any further showing by the plaintiff, satisfy the proximate causation requirement. Neither of the examples even describes the harm that the manufacturer or seller would have proximately caused. Instead, the included examples are meant to illustrate the types of laws that Congress intended the predicate exception to apply to, *i.e.*, "statutes that clearly can be said to regulate the firearms industry." *See Beretta*, 524 F.3d at 402–03. Even if the conduct the State alleges Defendants engaged in is similar to the conduct in the two PLCAA examples, it must *still* satisfy the proximate causation requirement.

The State next contends, without any citation, that the proximate causation analysis in this case is not normal "because this is a civil enforcement action brought by the government to remedy harms to the State," and that somehow "[t]his is not the kind of case PLCAA targets." N.Y. Br. at 21–22. New York grossly misconstrues the PLCAA's aim. Congress passed the PLCAA to prevent *exactly* the type of case that New York brings here: "liability actions commenced or contemplated by . . . States" that are an "attempt to use the judicial branch to circumvent the Legislative branch of government" and to "expand civil liability in a manner never contemplated . . . by the legislatures of the several States." 15 U.S.C. §§ 7901(a)(7), (8).

Finally, the State maintains that Defendants are wrong that the alleged misconduct of third parties in this case breaks the causal chain because that misconduct was purportedly "reasonably foreseeable." N.Y. Br. at 22. The "reasonably foreseeable" exception, however, arises from New York state law, *see Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 273–74 (E.D.N.Y. 2014), not the

PLCAA, which is subject to *federal* proximate causation law. And under federal law, "foreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017), and there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). A proper "[p]roximate-cause analysis" therefore entails asking "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). The SAC's allegations do not sufficiently plead proximate causation under this standard: the State's central contention is that Defendants sold "firearms" that were later misused by third parties, and the SAC repeatedly highlights the alleged criminal conduct of third parties. *See, e.g.*, SAC ¶¶ 1, 54, 109, 292–369. The State has failed to plead that the harm for which it seeks redress has a sufficiently close connection to the allegedly violative conduct.

Even assuming that "reasonably foreseeable" misconduct by third parties does not break the causal chain—an unwarranted assumption—the SAC does not sufficiently allege that it was reasonably foreseeable that the sale of Defendants' products at issue in this case would lead to an "increase in shootings, suicides, and other violent crimes in the aggregate." N.Y. Br. at 22. New York courts have already concluded that proximate-cause principles would not permit a firearms manufacturer or seller to be held liable for a third party's misuse of a lawfully manufactured and sold firearm. *See People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 103–04 (1st Dep't 2003). And here, although the State insists that Defendants' marketing "deliberately targeted individuals ineligible to legally purchase a firearm," N.Y. Br. at 22, the most that the State's allegations support is that *some* marketing by *some* Defendants discussed the fact that the products at issue in this case were unserialized and did not require a background check prior to purchase because they are not legally considered to be firearms.

### III.    The SAC's Negligence Per Se Claim Fails as a Matter of Law.

In Count Six, the State alleges that Brownells was negligent per se by violating various New York City, New York State, and federal statutes. SAC ¶¶ 624–627. Under New York common law, negligence per se can only be established if "a statute is designed to protect a class of persons, in which the plaintiff is included, from the type of harm which in fact occurred as a result of its violation." *German ex rel. German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995). Because the State fails to satisfy these requirements, this Court should dismiss the negligence per se claim.

First, the State seems to argue that, because courts have found that violations of some statutes regulating firearms amounted to negligence per se, it has adequately pleaded negligence per se here because the statutes at issue regulate firearms, and the SAC pleads that Defendants violated those statutes. *See* N.Y. Br. at 68–69. But those are not the elements of negligence per se, which again, requires that a statute be designed to protect a *specific class of persons*, in which *the plaintiff is included*, from the *specific type of harm* that in fact occurred as a result of defendant's violation. *See Fagan v. AmerisourceBergen Corp.*, 356 F. Supp. 2d 198, 214 (E.D.N.Y. 2004). Furthermore, the cases New York cites as support for its contention are inapposite. The State attempts to plead negligence per se on the basis of statutes that were not intended to protect any specific class of persons (but rather "the public" at large, in New York's own pleadings, *see* SAC ¶ 626), where even if the statutes do protect a particular class of persons, the State cannot show that it is a "member" of that class, and where Defendants have not violated any of the statutes. By contrast, all of the cases that *City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 416 (E.D.N.Y. 2007), cited as support for its blanket statement that "[v]iolations of federal and state gun control laws causing injury amount to negligence *per se*" involved either statutes prohibiting the sale, etc.

21

of firearms to minors—*i.e.*, they protected a particular class of individuals—or involved plaintiffs within the class of individuals the legislature intended to protect through the statute. And, contrary to *City of New York*'s statement, courts have dismissed claims for negligence per se premised on alleged violations of federal and state gun control laws. *See, e.g.*, *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 633 F. Supp. 3d 425 (D. Mass. 2022).

Second, New York argues that the GCA was enacted "to curb crime" and "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." N.Y. Br. at 69. Even if that were correct, however—and Defendants do not concede that it is—the fact that the State can use the GCA to criminally prosecute individuals who violate its provisions does not mean that the statute supports the tort of negligence per se. Indeed, an important inquiry in determining whether a statute supports negligence per se is "whether a private cause of action exists under a statute," *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 668 (S.D.N.Y. 2000) (cleaned up), and New York courts have determined that the GCA does not provide a private cause of action for its violation, *see Lewis v. Jamesway Corp.*, 737 N.Y.S.2d 657, 659 (2d Dep't 2002). The same reasoning through which the New York courts came to this conclusion applies equally to the state and city laws at issue here as well.

Third, the State insists that it is a "'victim' of gun violence" attributable generally to "Defendants," and that it is "indisputable that gun violence in New York is a public health crisis and has been declared a disaster emergency." N.Y. Br. at 69. But this argument fails to demonstrate that the State is a victim of any "gun violence" that resulted from Defendants' alleged conduct because, as the State pleads in the SAC, the laws were designed to protect individuals from firearms-related harm, SAC ¶¶ 626–627, *not* to protect the State's fisc.

Fourth, the State argues that despite the general principle that "violation of a municipal

ordinance constitutes only evidence of negligence," not negligence per se, *Elliott v. City of New York*, 95 N.Y.2d 730, 734 (2001), N.Y.C. Admin. Code § 10-314 "should receive statutory treatment because the New York Legislature has approved the content of this provision with the passage of the Jose Webster Act, which also prohibits the sale of unfinished frames and receivers." N.Y. Br. at 70. The State cites *Miller v. Astucci U.S. Ltd.*, 2007 WL 102092, *5 (S.D.N.Y. Jan. 16, 2007), for the proposition that if the legislature "approve[s] or adopt[s]" a municipal ordinance, violation of that ordinance may give rise to a negligence per se claim, and *Miller* in turn ultimately relied on *Elliott* for that principal. But *Elliott* says nothing of the sort: nowhere in the opinion did the Court of Appeals explicitly or implicitly reason that a local ordinance that is "approved or adopted" by the legislature would transform a violation of the local ordinance into negligence per se. *See Yenem Corp. v. 281 Broadway Holdings*, 18 N.Y.3d 481, 489–91 (2012). And regardless, the New York Legislature did not "approve or adopt" N.Y.C. Admin. Code § 10-314 by passing the Jose Webster Act; it merely passed its own state statute that addressed a similar topic. A principle that any local ordinance (passed first) that addressed a similar topic to a state statute (passed second) could form the basis of a negligence per se claim would result in the very mischief *Elliott* explicitly warned against. *See Elliott*, 95 N.Y.2d at 736 & n.3.

## IV. The SAC's Negligent Entrustment Claim Fails as a Matter of Law.

The State alleges in Count Seven that Brownells committed negligent entrustment by selling its products to "individuals who were likely to create an unreasonable risk of harm to others." SAC ¶ 631. Under both the PLCAA's definition of "negligent entrustment" and New York common law, the State has failed to adequately plead negligent entrustment because the State does not allege that Defendants knew, or reasonably should have known, that certain of their customers would use Defendants' products in a manner involving unreasonable risk of physical injury to themselves or

others, and because Defendants' products are not "dangerous instruments."[9]

The State disagrees, and in setting forth its affirmative argument for why Defendants are liable for negligent entrustment, focuses entirely on whether Defendants were in the best position to prevent harm from their products. N.Y. Br. at 64–66. The State entirely ignores, however, the other requisite elements of negligent entrustment, namely, knowledge and whether Defendants' products qualify as "dangerous instruments." The State cannot simply argue that Defendants directly sold the products at issue to customers, so they are therefore liable for negligent entrustment, without satisfying the other elements, a showing the State cannot make. Even the cases upon which the State relies analyzed the other elements of the claim.[10]

The State next contends that its allegations that "Defendants intentionally marketed to individuals who are ineligible to legally possess a firearm, and turned a blind eye when those individuals purchased their products," satisfy the requirements that Defendants had *specific* knowledge that any individual customer to whom the products were sold was likely to use them in a manner involving unreasonable risk of injury and that Defendants knew or should have known that certain of their customers allegedly had the propensity to use the products at issue in an improper or dangerous manner. N.Y. Br. at 66. Not so. The SAC contains only conclusory allegations that Brownells "knowingly sold" the products at issue to "customers intending to use them in the commission of a crime" or to individuals "who were likely to create an unreasonable risk of harm to others." SAC ¶¶ 631, 633. The State's insistence that Brownells sold its products to individuals

---

[9] New York maintains that the PLCAA and New York standards for negligent entrustment are "functionally identical." N.Y. Br. at 64 n.36. The Court should not accept this argument. As just one difference, New York common law requires a plaintiff to prove that defendant's product was a "dangerous instrument," a requirement that the PLCAA does not include.

[10] *See Smith v. Atl. Gun & Tackle, Inc.*, 376 F. Supp. 2d 291, 293 (E.D.N.Y. 2005); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 280 (E.D.N.Y. 2004); *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 399 (E.D.N.Y. 2004).

with prior convictions, to persons who are legally prohibited from possessing a weapon, or to unlicensed persons, does not equate to *specific knowledge* that Brownells knew of those customers' status or that they were likely to use them in a manner involving unreasonable risk of injury.

In its moving brief, Brownells argued that the State's theory for why Defendants knew or should have known that certain of their customers had the propensity to use the products at issue in an improper or dangerous fashion hinges entirely on those products being qualified products. *See* Op. Br. at 41. Specifically, the State's theory goes, if Defendants' products are qualified products, Defendants are thereby required under federal and state laws to perform background checks and ensure that their customers possess the necessary licenses, so they should have known that certain of their customers could not pass those background checks and did not possess the necessary licenses. The State now insists that the status of Defendants' products as firearms under federal or state law is beside the point because the duty of care under a theory of negligent entrustment "applies to anyone who entrusts a 'dangerous instrument,'" and Defendants' products are dangerous instruments. N.Y. Br. at 66–67. Brownells adheres to its position that, to the extent the State relies on the fact that Defendants' products are firearms to establish the duty of care under a negligent entrustment theory, because Defendants' products are *not* firearms, that reasoning fails. But even under New York's pivoted argument the SAC's allegations fail to sufficiently plead that Defendants' products are "dangerous instruments."

The State cannot establish that an unfinished frame or receiver is a dangerous instrument as a matter of law. Unfinished frames or receivers are essentially hunks of plastic or metal that require significant transformation through specialized tools, additional parts, and technical instruction to become a frame or receiver. Like a bicycle or a skateboard, which can be dangerous in the hands of certain individuals, but which New York courts have determined not to be dangerous

instruments in and of themselves, unfinished frames or receivers are not dangerous instruments simply because they could by themselves be used to cause injury (*e.g.*, through bludgeoning). *See Republic Ins. Co. v. Michel*, 885 F. Supp. 426, 431 (E.D.N.Y. 1995). And contrary to New York's contention that Defendants would be "hard-pressed to distinguish" this case from other cases holding that "cars, motorcycles, motorboats, guns, and BB guns" are dangerous instruments, N.Y. Br. at 67, Defendants can easily distinguish those items: each one can be dangerous in its original state without transformation, whereas an unfinished frame or receiver is just a hunk of metal or plastic in its original state.

**V.     The Constitution Bars the State's Claims.**

> **A.     Accepting the State's Interpretation of the Federal Definition of "Firearm" and its Public Nuisance Statute Would Render Those Statutes Unconstitutionally Vague.**

Neither the State nor the United States contends with the exacting level of clarity that a law—especially one with application in both civil and criminal contexts—must meet when the State seeks to apply it retroactively against constitutionally protected conduct. But even under a less-than-exacting standard, both the federal definition of "firearm" and New York's public-nuisance statute would be unconstitutionally vague if applied in the manner the State proposes.

As to the GCA's definition of "firearm," the State's argument is equal parts circular and conclusory: the definition properly applies to the products at issue because, purportedly, it "clear[ly]" applies and has long been understood to apply. N.Y. Br. at 52–53. Both contentions are wrong for the reasons explained elsewhere in this brief. The United States adds that courts have rejected other vagueness challenges to the definition's application to "products that may be 'readily converted' to function in a particular manner." U.S. Br. at 35. Whether the definition has "given rise to confusion" in other contexts, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 266 (2d Cir. 2015), is irrelevant in this one. Before this case, as the United States does not dispute,

neither the GCA's definition of "firearm" nor ATF's prior construction of that Act had ever been applied to the types of unfinished frames and receivers at issue in this case. If it had been, ATF would have had no need to promulgate its New Rule.

The United States separately argues that its New Rule is not void for vagueness because it provides "context and guidance" for its new definition and an "administrative process" for determining whether a given product is a firearm under the new definition. U.S. Br. at 36. Perhaps. But whatever "context and guidance" the New Rule provides was unavailable at the time of the alleged conduct at issue in this case. Nothing in the Act's definition of "firearm" gives notice to a person of ordinary intelligence that an unfinished frame or receiver could be considered a firearm, and the ATF guidance that actually existed during the relevant time period affirmatively assured Defendants that these products are *not* firearms. Holding Defendants retroactively liable for failing to anticipate ATF's change in position would violate the Due Process Clause.

As for the public-nuisance statute, the State again emphasizes that the Northern District recently upheld the statute against a vagueness challenge. But again, that challenge was not "nearly identical" to this one. N.Y. Br. at 50. That case concerned a facial vagueness challenge, which, the Northern District observed, "are generally disfavored." *NSSF*, 604 F. Supp. 3d at 65 (quotation marks omitted). Defendants' as-applied defense raises no similar concern of "formulat[ing] a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* at 65–66 (quotation marks omitted). The problem here is that the public-nuisance statute *cannot* be applied to the present facts with the clarity needed when constitutional rights are implicated.

Indeed, the State has no response to the fact—which the Northern District also did not discuss—that applying the statute to Defendants' alleged conduct would involve three layers of uncertainty: over what kind of public danger the statute prohibits, how much danger creates a

27

violation, and how much a Defendant must have contributed to the danger to be liable. These are no mere "hypothetical[s]." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010). Every one of those questions must be answered for the Court to find any Defendant liable in this case. Yet the State fails to offer any standards for these inquiries. The best the State manages is to repeat its allegation that Defendants "created, maintained, or contributed to" a public danger through conduct that was "either unlawful in itself or unreasonable under all the circumstances"— which simply quotes the statute and thus begs all the above questions (as well as the question whether the conduct violated other laws). N.Y. Br. at 51–52 (cleaned up). In short, the State's claims call for inherently "arbitrary and discriminatory application" of the statute in violation of the Due Process Clause. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

### B. The Dormant Commerce Clause Further Bars the State's Claim Under the Public-Nuisance Statute.

New York's public-nuisance statute undisputedly applies only to products "that ha[ve] been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4); *see* N.Y. GEN. BUS. LAW § 898-a(6). It follows that the State's attempt to apply that statute to Defendants' qualifying products is an attempt to "directly regulat[e] . . . interstate commerce." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578 (1986). The statute's application here would thus violate the Dormant Commerce Clause, not only by discriminating against interstate commerce but also by regulating fully extraterritorial conduct.

The State responds that the statute does not discriminate against interstate commerce because it also applies to firearms "manufactured and shipped fully within New York" if "any component part of that firearm originated out-of-state." N.Y. Br. at 46. But that is no response at all; New York has chosen to regulate parts that have moved in interstate commerce but not identical parts that remain entirely within its boundaries. Despite the *NSSF* court's conclusion to the

contrary, *NSSF*, 604 F. Supp. 3d at 62, it makes no difference whether a purely intrastate market for these parts currently exists in New York. A state seeking to attract a new in-state industry, and thereby keep all the benefits of that industry for itself, does not have carte blanche to try to do so by imposing special penalties on those who sell their products in interstate commerce.

Given that the public-nuisance statute explicitly discriminates against interstate commerce, the Court need not resort to the *Pike* balancing test, which serves to identify "practical effects [that] may also disclose the presence of a discriminatory purpose." *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1157 (2023). But the statute fails the *Pike* test, too, because "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). There is no greater burden on interstate commerce than halting it, as the State seeks to do. Meanwhile, the statute does not halt the sale of unfinished frames or receivers from New York manufacturers, including manufacturers that the statute might incentivize to establish in-state operations, vitiating the State's purported safety rationale.

The State also disputes that its public-nuisance claim calls for extraterritorial regulation. Absent from this discussion, however, is any mention of the extraterritorial acts listed in the SAC, including, for example, sales into Pennsylvania from outside New York. *E.g.*, SAC ¶¶ 62–63. The State thus tacitly admits that it cannot regulate any such acts. The State also does not contest that the public-nuisance statute mandates conduct that in this case would occur entirely outside New York, namely the implementation of "reasonable controls and procedures" at Defendants' facilities. N.Y. Gen. Bus. Law § 898-b(2).

Throughout, the State emphasizes that *NSSF* rejected a facial pre-enforcement challenge to the public-nuisance statute under the Dormant Commerce Clause. That holding has little relevance to an as-applied defense where, as here, the State seeks to enforce the statute against

extraterritorial acts, such as an alleged lack of "reasonable controls and procedures" at out-of-state facilities. In any event, that court's analysis is not binding. And to the extent it has any relevance to Defendants' as-applied defense, it is, respectfully, not persuasive. The court's discrimination analysis relied on the same erroneous comparison between in-state manufacturers of completed firearms and out-of-state retailers of component parts as the State does. *See NSSF*, 604 F. Supp. 3d at 63.

### C.   The State's Misrepresentation Claims Must be Dismissed Because Statements of Opinion About the Legal Status of Unfinished Frames and Receivers Are Not Actionable.

Defendants do not argue that "any statement that touches on the legality of a product" is "never" actionable. N.Y. Br. at 60. Rather, statements of opinion are generally not actionable and, "[a]bsent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). These conditions are undisputedly met: the State seeks to impose liability for Defendants' statements about the legality of their products, and not even the State argues that any "clear and unambiguous ruling" had adopted its preferred contrary interpretation of relevant federal law at the time of the alleged statements. It makes no difference whether these statements were made in a commercial context. Commercial speech can still be a statement of opinion. *See id*. at 731; *see also, e.g.*, *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 488 (D.C. Cir. 1996). The State's only response to these cases is to note that they applied the Lanham Act. But the relevant New York laws incorporate "substantially the same" standards. *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 800 (S.D.N.Y. 1997). And these laws' protection of opinions follows from the First Amendment. *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990).

The State's reliance on the *Central Hudson* test is therefore misplaced. For one thing, the

speech at issue, such as Brownells' statement that unfinished frames and receivers are "still legal," does not in fact meet the definition of "commercial speech," *i.e.*, speech that "does no more than propose a commercial transaction." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 776 (1976) (quotation marks omitted). Regardless, statutes like the Lanham Act (and accordingly like N.Y. GEN. BUS. LAW §§ 349, 350) apply to speech "encompassed within the commercial speech doctrine," and yet, as seen, maintain the constitutional protection of opinion statements. *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994) (quotation marks omitted). And if intermediate scrutiny under *Central Hudson* did apply, Defendants' statements concerned lawful activity, which the State itself considers the "most significan[t]" consideration. N.Y. Br. at 56. Those statements were consistent with then-operative ATF guidance, and the State can identify no interest in punishing such speech.

Finally, the State argues that Defendants' expressions of legal opinion were not statements of opinion but "mixed" statements of opinion and fact. *Id*. at 60. Per the State's own treatise, however, "statements concerning the law are *not* regarded as representations of fact." 60A N.Y. JUR. 2D FRAUD & DECEIT § 49 (emphasis added). The State itself illustrates why. As the State notes, opinion statements are characterized in part by "whether the statement is objectively capable or proof or disproof" and whether, in "its broader social context," the statement is likely to be "read or heard" as one of opinion. N.Y. Br. at 58. And as the State's collection of Defendants' statements shows, that is exactly what these were. *See id*. at 61–63. Defendants did not rely on (or misconstrue) any factual premise, nor did they speak as "a fiduciary" or a party "possessing superior knowledge." 60A N.Y. JUR. 2D FRAUD & DECEIT § 49. Their statements were their positions on a contested legal issue that the courts will ultimately reject or vindicate. Defendants had the same First Amendment right as anyone else to express those opinions. Suffering liability for those

statements would infringe on that right.

**D.    The Second Amendment Bars All the State's Claims.**

The State seeks to prevent the sale and possession of certain firearm precursors—indeed, that is "the point of this lawsuit." N.Y. Br. at 46. But, the State says, its claims do not implicate the Second Amendment because firearms distributors and retailers are not among "the people" whom the amendment protects. The United States does not join this assertion, and for good reason. Neither party contests that the individual right to keep and bear arms includes the right to acquire firearms, *see, e.g.*, *Teixeira v. County of Alameda*, 873 F.3d 670, 677, 682 (9th Cir. 2017); *see also* Op. Br. at 54–55, and individuals can acquire firearms either by purchasing or making them. Here, Defendants' customers seek to make their own firearms with the use of Defendant's products. And it is "settled" that a corporate entity "has standing not only in its own right but also on behalf of its potential customers." *Carey v. Population Servs., Int'l*, 431 U.S. 678, 683 (1977); *accord Teixeira*, 873 F.3d at 679.

The State's further assertion that no potential customer "has had their access to firearms *meaningfully* impaired," N.Y. Br. at 38 (emphasis added), simply invokes the sort of means-ends scrutiny that the Supreme Court has rejected. *See N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111, 2129 (2022). If the State targets conduct covered by the Second Amendment's plain text, the question is not whether the threatened burden on that conduct would be acceptable in light of any purported benefits. The question is whether the burden would be "consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126.

Neither the State nor the United States can coherently dispute that the State seeks to impose liability on the basis of conduct protected by the Second Amendment: If, as they argue, the products at issue are properly understood as "firearms," then the State seeks to impose liability based

on acquisition of firearms; if they are not, then the State seeks to impose liability based on the process of making firearms for private use. Nevertheless, the State argues that this lawsuit burdens no conduct protected by the Second Amendment because the Supreme Court has not "cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms" and some lower courts have upheld regulations of "trade in guns." N.Y. Br. at 40. The Supreme Court has not upheld any conditions on firearm sales; the vague statement from *Heller* was dicta (and was not repeated by the majority in *Bruen*). The United States likewise cites no controlling authority for the assertion that the GCA does not even implicate the Second Amendment as long as they can describe its provisions as imposing a condition on the sale of a firearm. U.S. Br. at 19. In any event, the State is not just seeking to impose such conditions on firearm sales. The State is seeking to punish and thereby prevent the sale of pieces of plastic or metal on the ground that they can be finished and used as part of completed firearms. Acquiring such precursors is no less a predicate to the textual right to keep and bear arms than is acquiring completed firearms. This prohibition thus implicates not just firearm trade, but the fundamental right to possess firearms. The State's assertion that the Second Amendment has no role to play finds no support even in the Supreme Court's prior dicta.

The State also suggests that the Second Amendment does not apply because "the 'finished' version of [Defendants'] products," *i.e.*, firearms built from unfinished frames or receivers, are "dangerous and unusual." N.Y. Br. at 41–42. Such firearms function the same as firearms sold in completed form, and the State itself alleges in the SAC that such firearms are in common use. In any event, the items at issue are the unfinished precursors, and there is nothing uniquely dangerous about a piece of plastic or metal without the capacity to expel a projectile by the action of an explosive. *See Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the

judgment) ("A weapon may not be banned unless it is *both* dangerous *and* unusual.").

Because the State's claims implicate the Second Amendment, it is the State's burden to prove with "well-established," "representative," and "relevantly similar" historical analogues that the liability it seeks to impose is consistent with a national tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2132–33. Yet the State does not deny that its public-nuisance statute would have been wholly unknown at the Founding. The State also does not dispute that the Founding is the relevant period; neither does the United States. And yet the State makes no effort to refute the Founding-era tradition of self-built arms, a tradition directly contrary to the State's claims here. *See* Op. Br. at 56–57. According to the State, "extensive historical analysis" is unnecessary because other courts, "most prominently the Ninth Circuit" in a case decided before *Bruen*, have concluded that the Second Amendment does not protect "the right to sell firearms." N.Y. Br. at 42–43 (quotation marks omitted). Even if those holdings remained valid under *Bruen*'s text-and-history framework, they again provide no support for the burden that the State seeks to impose on the individual right to possess firearms—which, as the Ninth Circuit recognized in the same case, entities like Defendants may assert.

The State cites few historical laws to justify that burden, all purportedly relating to firearm "serialization." N.Y. Br. at 43. Even accepting that characterization, requiring a serial number (or other identifier) on a completed firearm is not "relevantly similar" to preventing the acquisition of materials that can become part of a completed firearm. *Bruen*, 142 S. Ct. at 2132. That much is evident in the State's chosen examples. Laws "requiring the recording of arms and munitions," or mandating regular musters so that militias could inventory available weapons, or authorizing "door-to-door firearms censuses"—none of these types of laws prevented people from acquiring precursor firearm materials. N.Y. Br. at 43 (quotation marks omitted). To the contrary, they

34

presumed that people would possess firearms and, thus, any precursor materials; otherwise, there would have been nothing to record. These laws' "purpose of tracing [firearm] ownership" was also not akin to the public-safety purpose that the State asserts here. *Id*. The State does not seek to get a count of firearms available for militia purposes. It seeks "to *halt* the flow" of certain parts into the State. *Id*. at 46. That effort is not similar to any of the State's historical examples in either "how" or "why" it burdens the right to armed self-defense. *Bruen*, 142 S. Ct. at 2133.

The United States' handful of additional examples in support of its reading of the federal definition of "firearm" do not help the State carry its burden, either. Like the purported serial-number analogues, the two 19th-century laws requiring "proof marks" on firearms are no analogy for total prohibitions on certain precursor materials. U.S. Br. at 23. Regardless, as the United States notes, the point of these laws was not to take particular firearms out of circulation (or even to trace their ownership), but to ensure the safe construction of those in circulation. Likewise irrelevant are laws regarding "inspection," "marking," "manufacture," and "transportation" of gunpowder, *id*., which were generally aimed at the explosion and fire risks of gunpower storage. *See, e.g.*, Br. of City of N.Y. as *Amicus Curiae* at 10, *Bruen*, 142 S. Ct. 2111 (2022) (No. 20-843). And again, such laws did not prohibit particular parts, regardless of their condition, as the State now seeks to do. Last are regulations (several from the early colonial era) criminalizing the transfer of firearms to Native Americans. The United States understates things in acknowledging that these laws are "not an exact analogy." U.S. Br. at 22. Laws abridging the civil rights of people who were considered outside the "political community," *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008), cannot support restrictions on "the people" whom the Second Amendment protects.

To the extent any analogies proffered here could be considered similar to the specific prohibitions at issue, they certainly did not cover enough of the national population to suggest a

national tradition. *See Bruen*, 142 S. Ct. at 2154–55. But no proffered analogy is in fact analogous. The State's claims must be dismissed under the Second Amendment.

## VI.    The State Has Not Adequately Established Joint and Several Liability.

### A.    The State Has Not Alleged a Single or Indivisible Injury.

It is well established under New York law that liability generally cannot be imposed on a defendant for the acts of others. *See Ravo ex rel. Ravo v. Rogatnick*, 70 N.Y.2d 305, 310 (1987); *Chipman v. Palmer*, 77 N.Y. 51, 53 (1879). Joint and several liability is a narrow exception to this principle and may only be imposed if a stringent test is satisfied. Joint and several liability may not be imposed simply as a matter of convenience or because dividing injuries "will not be an easy task." *Cayuga Indian Nation of N.Y. v. Pataki*, 79 F. Supp. 2d 66, 72 (N.D.N.Y. 1999).

To satisfy this test, the State must first demonstrate that "two or more tort-feasors act[ed] concurrently or in concert to produce a *single* injury." *Ravo*, 70 N.Y.2d at 309 (emphasis added). Failing that, the State must demonstrate that the separate actions of the alleged tortfeasors resulted in injuries, which, "because of their nature, are incapable of any reasonable or practicable division or allocation among multiple tort-feasors." *Id*. at 310. Even then, joint and several liability is only appropriate if equitable principles establish "that it would not violate traditional notions of fairness and justice to hold all defendants jointly and severally liable for the injury." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 447 F. Supp. 2d 289, 299 (S.D.N.Y. 2006); *see Ravo*, 70 N.Y.2d at 309–10. The State has failed to satisfy this test.

The State concedes that Defendants have not colluded with one another to cause a single injury. *See* Opp'n to Certain Defs.' Mot. to Sever at 3 (June 16, 2023), ECF No. 207 ("[T]he State is not alleging that the various defendants actively colluded with each other . . . ."). The State is thus forced to characterize its alleged harm as somehow indivisible. According to the State, the

injury here relates to the "the generalized increase in gun violence caused by the ghost gun industry." *See* N.Y. Br. at 86. In other words, the State attempts an end-run around traditional tort liability limitations by conflating individual instances of the alleged unlawful use of a firearm—with different alleged harms, by different Defendants, and implicating different degrees of causation—under the broad umbrella of the "generalized increase in gun violence." *Id.*

The State paints with an improperly broad brush and utterly fails to establish that the individual injuries from gun violence are indivisible between Defendants. Indeed, the State ignores the multiple bases for dividing liability here, including the different numbers of alleged shipments, the different times of sale for unfinished frames, the different geographic locations for individual shipments, the different alleged injuries, and the different chains of causation for each sale allegedly linking each Defendant to the ultimate harm. Instead, the State admits that "while the number of illegal firearms injected into New York by each defendant may be calculable following discovery," N.Y. Br. at 86, "the generalized increase in gun violence caused by the ghost gun industry as a whole is not readily apportionable," *id*. The State here again simply avoids the relevant test by framing its injury at the broadest possible level of generality.

The State's argument is not supported by *State v. Schenectady Chemicals, Inc.*, 103 A.D.2d 33 (3d Dep't 1984).[11] There, hazardous discharge stemming from a single site became "inextricably mixed" and polluted various water sources over the course of 30 years. *Id.* at 34. But

_____

[11] The State also invokes a public nuisance enforcement action against a group of opioid manufacturers, distributors, and providers. *See In re Opioid Litig.*, Index No. 400000/2017, NYSCEF No. 7351 (N.Y. Sup. Ct. Suffolk Cnty. Aug. 17, 2020). But, as the State eventually admits, *see* N.Y. Br. at 88, the court there "held that it could not determine as a matter of law pretrial that the defendants were not jointly and severally liable, reserving the issue for trial." The Court did not substantively engage with the question of joint and several liability. In one sentence, the court simply deferred the question to a later date. Accordingly, the opioid litigation provides no support for the State's novel theory here.

*Schenectady* is easily distinguishable. First, the State only sought to hold the defendant liable for the percentage of waste discharged *by the defendant*. *State v. Schenectady Chems., Inc.*, 117 Misc. 2d 960, 963 (Sup. Ct. Rensselaer Cnty. 1983). Here, by contrast, the State seeks to hold each single Defendant liable for the entirety of the "generalized" harm. Further, *Schenectady* involved illegal dumping at a *single* site; it did not hold that liability can be imposed for distinct and unrelated injuries throughout the entire state in vastly different contexts. And unlike in the context of the "inextricably mixed" hazardous waste in *Schenectady*, injuries from firearms *can* be traced to specific defendants. *Schenectady* does not hold what the State would need to support its novel theory: that a party who contributes to a nuisance by polluting in a certain way at a certain site at a certain time can be held broadly liable for all the injuries caused by pollution in the State of New York in different ways, by different parties, at different times.

To permit the State to make an end-run around the requirements of joint and several liability through its high level of abstraction would sanction joint and several liability in virtually every case involving multiple defendants. For instance, when hazardous waste is dumped into the environment it surely contributes to a "generalized increase" in pollution. But this hardly means that an individual who drops a piece of litter in a lake can be held jointly and severally liable with a factory that dumps toxic waste in a river, and every other polluter in the State of New York—for *all* the pollution in the State of New York. No doubt, these acts all contribute to a "generalized increase [in pollution]." But that is simply not how tort liability works. If plaintiffs were permitted to establish joint and several liability by defining their injuries at such a high level, injuries would *never* be divisible. That individual injuries *can* be grouped under some high level of abstraction does not mean that every potential defendant must be held jointly and severally liable for the aggregated alleged harm.

38

Even assuming the injuries the State alleges *were* indivisible, joint and several liability would still be improper "where the injury imposed by each contributing actor individually does not constitute a *substantial* interference with a public right." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 493 (E.D.N.Y. 2003) (emphasis added). Critically, the State ignores this additional requirement. Little wonder why—the State has only alleged with specificity a minuscule number of actual shipments by any of the Defendants, such that the individual responsibility of any Defendant is "very small." *MTBE*, 447 F. Supp. 2d at 303. Under these circumstances, the only available remedy is an injunction to restrain Defendants from further sales—which this Court has already entered through a consent order, ECF No. 156—not sweeping joint and several liability.

## B.    Equity Further Precludes Joint and Several Liability.

Even if the State could establish that the alleged injuries were indivisible, equitable principles preclude joint and several liability. The State largely dismisses the equitable component of the test for joint and several liability as Defendants' "plea that it would be 'unfair'" to hold them jointly and severally liable for the broad harms alleged. N.Y. Br. at 86. But equitable considerations have long been critical to joint and several liability—for good reason. Joint and several liability can have significant and disproportionate consequences, making each party "liable to plaintiff for the *whole of the damage*." *Hecht v. City of New York*, 60 N.Y.2d 57, 63 (1983) (emphasis added). After all, under joint and several liability, "the act of one is the act of all and liability for all that is done is visited upon each." *Ravo*, 70 N.Y.2d at 309–10.

The State fails to meaningfully respond to Defendants' arguments that imposing joint and several liability violates equitable principles. The State merely asserts that Defendants can seek contribution at a later date. But this is a non-answer to the inequity of barring Defendants from defending themselves individually. After all, the Defendants in *MTBE* could have likewise sought

contribution, yet the court there nonetheless found that "it would be fundamentally unfair" to impose joint and several liability. 447 F. Supp. 2d at 303.

The State also ignores the critical causation issues lurking in their novel joint and several liability theory. Intervening illegal acts committed by third parties—not Defendants—caused the State's alleged injuries. So the State's theory would hold Defendants liable not only for all acts committed by other Defendants, but also for intervening illegal acts committed by other *non-parties* to this case—non-parties that have nothing whatsoever to do with Defendants. On these facts, it would be "repugnant to the plainest principles of justice" to hold Defendants responsible for the entirety of the harm caused by others. *Van Steenburgh v. Tobias*, 17 Wend. 562, 563 (N.Y. Sup. Ct. 1837). The State's novel theory of joint and several liability cannot stand.

## VII.  The SAC's Other Pleading Deficiencies Require Dismissal.

### A.   The SAC Does Not Plausibly Allege Any Conduct by Defendants that Occurred Within New York City, and New York City Administrative Code § 10-314 Does Not Apply Extraterritorially.

Counts One, Six, and Seven rely in part on allegations that Defendants violated New York City Administrative Code § 10-314(a), which provides that "[n]o person shall dispose of or possess an unfinished frame or receiver." N.Y.C. ADMIN. CODE § 10-314(a). Because the text of this provision establishes no basis to apply the prohibition to the conduct of someone outside the territorial jurisdiction of New York City who ships an unfinished frame or receiver to a New York City address, and because every Defendant "dispose[s] of" their products in places *outside* of New York, the SAC fails to allege any conduct by Defendants that violates N.Y.C. Admin. Code § 10-314(a). Indeed, the New York Administrative Code could not be clearer: "the boundaries, jurisdictions and powers of the city are for all purposes of local administration and government hereby declared to be co-extensive with the territory" of the five boroughs. N.Y.C. ADMIN. CODE § 2-201.

In response, the State first argues that the cases upon which Defendants rely for the

territorial limitation of New York municipal regulations are irrelevant because they concerned only the New York City Human Rights Law ("NYCHRL"). N.Y. Br. at 77. The State is incorrect. Both cases that Defendants cited determined that the NYCHRL did not apply to conduct that occurred outside of the five boroughs *because of* the limitations imposed by N.Y.C. Admin Code § 2-201, which by its terms is not limited to the NYCHRL. *See Kamiel v. Hai St. Kitchen & Co.*, 2023 WL 2473333, at *6 n.5 (S.D.N.Y. 2023); *Duffy v. Drake Beam Morin*, 1998 WL 252063, at *11 (S.D.N.Y. 1998). The State's attempt to limit the non-extraterritoriality principle of the New York City Administrative Code to just the NYCHRL thus falls flat.

The State next argues that Defendants make two "unjustified leaps—one factual and one legal." N.Y. Br. at 78. For the purported factual leap, the State contends that Defendants simply "presume that their online sales and shipments of unfinished frames and receivers to New York City customers constitute 'conduct outside the state.'" *Id.* To the contrary, the SAC fails to plausibly plead that any Defendant "dispose[d] of" or "possess[ed]" an unfinished frame or receiver in New York City, where "dispose of" is defined as "give away, give, lease, loan, keep for sale, offer, offer for sale, sell, transfer[, or] otherwise dispose of." N.Y.C. ADMIN. CODE § 10-301(8). As the SAC's description of Defendants demonstrates, they are all out-of-state businesses with their primary places of business in states other than New York. *See* SAC ¶¶ 9–18. The State itself has not pleaded any factual allegations—as opposed to simply conclusory assertions that Defendants have violated Section 10-314—to establish that Defendants "dispose[d] of" unfinished frames or receivers in New York City. For example, the State does not allege that Defendants process their sales, pack their shipments, or effect their shipments within the five boroughs.

For the purported legal leap, the State insists that Section 10-314 is "intended to ban internet sales like those made by Defendants," relying on one statement in the legislative history of the

provision. N.Y. Br. at 78–79. But the State cannot ignore the plain language of the provision, which clearly lacks any indication that the prohibition applies extraterritorially, let alone a *clear statement* indicating such application was intended. The State also attempts to distinguish N.Y. Pub. Health Law § 1399-ll(1), which a court has found to regulate remote sales, from Section 10-314, which Defendants argue should not be so interpreted, on the basis that the Public Health Law provision permits some shipments but not others. But the State's argument overlooks the key statutory language; while § 1399-ll(1) prohibits "any person . . . to ship or cause to be shipped . . . to any person in this state," thus targeting remote sales, *City of New York v. Milhelm Attea & Bros.*, 550 F. Supp. 2d 332, 349 (E.D.N.Y. 2008), Section 10-314 lacks any similar language. The actions that Section 10-314 prohibits through the statutory definition of "dispose of"—including giving away, leasing, offering, and selling—do not evince any intent for an extraterritorial reach. The cases the State cites are unavailing, as they involved analysis of whether a transaction in which a consumer was deceived occurred in New York, where the purportedly deceived individual was a New York State citizen who engaged in the transaction online while within New York or the deceiving entity engaged in the transaction while within New York. *See* N.Y. Br. at 79.

## B.    The State Fails to Plausibly Allege Misrepresentations by Brownells.

The Court must dismiss the State's misrepresentation claims against Brownells because the SAC fails to identify any allegedly misleading statements by Brownells. In response, the State first points to a comment on the Brownells website that unfinished frames and receivers are "still legal" under the recent ATF regulation. SAC ¶ 85. But as Brownells explained above, this statement is the company's articulation of its opinion about the legality of its products and is non-actionable.

Second, the State insists that Brownells issued a press release where Brownells stated that "[b]ecause [80% frames] are not complete firearms, [unfinished frames] can be shipped straight to a customer's home without an FFL," N.Y. Br. at 62 (alterations in original), but Brownells is not

the author of that statement, *contra* N.Y. Br. at 62 n.33. In the SAC (as opposed to citations to new sources in the State's opposing brief, which should be disregarded), the two October 2017 press releases the State cited were authored and posted by other entities, "The Outdoor Wire" and "Ammo-land," *not* Brownells. *See* SAC ¶¶ 284–285. Again, the only two quotations in the press releases specifically attributed to Brownells are: (1) "The Polymer80 80 percent frames are perfect for dedicated enthusiasts who enjoy building it themselves"; and (2) "Those who might have built their own AR-15 rifle can now make their very own custom pistol with just a few simple tools." Neither of these statements concerns the legality of selling and possessing Brownells' firearms, supposed ghost guns, or unfinished frames and receivers in New York. And the only other *actual statements* by Brownells the SAC alleges merely concern factual descriptions of the Polymer80 frames, *e.g.*, *id.* ¶¶ 25, 84, and how to build a custom pistol using a Polymer80 frame, *id.* ¶¶ 41, 46, 280–282, 289. None of these statements are misrepresentations whatsoever, let alone misrepresentations that constitute fraudulent conduct, deceptive acts and practices, and false advertising. They are simply statements describing the features of the product Brownells was selling.

### C.   The SAC Does Not Adequately Allege that Brownells Aided and Abetted Violations of Local, State, or Federal Law.

The State has failed to state a claim for aiding and abetting because it has not alleged, as required by federal law, that Brownells took "some *conscious action* that furthered the commission of the underlying crime" and that Brownells "acted or failed to act with the *specific intent* of advancing the commission of the underlying crime." *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996) (emphases added). Nor does the SAC allege the intent required by New York law for aiding and abetting liability: "a shared intent, or 'community of purpose' with the principal," *Nelson v. Lilley*, 2022 WL 2872648, at *5 (W.D.N.Y. 2022).

The State first argues that because Defendants allegedly provided "extraordinary"

assistance to the alleged unlawful possession, the "level of knowledge necessary to state an aiding and abetting claim" is lessened. N.Y. Br. at 70–72. The State's allegations of "extraordinary" assistance amount to alleging that Brownells sold products to consumers, provided instructions and customer support for those products, and certain of those customers may have eventually used those products in a prohibited manner. But aiding-and-abetting liability does not ordinarily reach merchants for the misuse of their goods or services, *see Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1221 (2023), especially where the *mens rea* element is not proven.

The State next argues that Brownells is mistaken about the requisite *mens rea* standard for aiding and abetting liability under 18 U.S.C. § 2(a). N.Y. Br. at 72–73. In the State's view, the State need only prove that Brownells had a "general awareness of its overall role in the primary violator's illegal scheme" to meet its *mens rea* requirement. *Id.* at 72. But the case upon which the State relies is entirely inapposite: *SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014), involved aiding and abetting liability under Section 20(e) of the Securities Exchange Act of 1934, which is a very different statute than 18 U.S.C. § 2(a), with a distinct body of law interpreting its requirements. By contrast, *Pipola*, which involved 18 U.S.C. § 2(a), is directly on point, and the State does not contest *Pipola*'s explanation of the *mens rea* requirement, it just tries to distinguish the case. But the State's attempt to distinguish *Pipola* based on the fact that it was a case about "armed robbery" is not only factually wrong—the aiding and abetting at issue in *Pipola* was "aiding and abetting the use or carrying of a firearm during a crime of violence in violation of 18 U.S.C. [§] 2(a)," *Pipola*, 83 F.3d at 559—it is also based on an irrelevant distinction. *Pipola* interpreted aiding and abetting liability under 18 U.S.C. § 2(a) and explained that proving liability under that statute required "specific intent of advancing the commission of the underlying crime." *Id.* at 562. Like *Pipola*, this case involves 18 U.S.C. § 2(a).

44

The State's allegations fail to satisfy the *mens rea* requirement that Brownells had the "specific intent of advancing the commission of the underlying crime." The SAC does not allege that Brownells acted with the specific intent to assist others in the unlawful possession of firearms. While the SAC does allege that individuals to whom Brownells sent packages were not legally permitted to possess firearms, *see, e.g.*, SAC ¶¶ 319, 323, 327, the State does not allege that Brownells acted with the specific intent to assist a felon in possessing a firearm. Importantly, the products in the packages Brownells shipped were not "firearms" for the reasons explained earlier in this brief. The State also argues that Defendants made "deliberate choices . . . to shield themselves from knowledge of their customers' prohibited status" by not "verify[ing] whether their customers would have been legally permitted to possess the guns that they would inevitably build." N.Y. Br. at 74. But federal law as construed by the relevant agency at the time of the conduct at issue did *not* require Brownells to scrutinize its customers any more than it did. Following the guidance of an agency charged with enforcing federal law does not evince specific intent to arm criminals.

Finally, the State is wrong that federal aiding and abetting law and New York aiding and abetting law are "virtually identical." *Id.* at 75. New York law additionally requires the accomplice to have "a shared intent, or 'community of purpose' with the principal." *Nelson*, 2022 WL 2872648, at *5; *see also People v. Scott*, 25 N.Y.3d 1107, 1109–10 (2015). In other words, the accomplice must have "intentionally aided the principal in bringing forth a result." *People v. Kaplan*, 76 N.Y.2d 140, 146 (1990). For the same reasons as explained above, the State does not adequately plead that Brownells "intentionally aided" anyone in unlawfully possessing firearms.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the SAC in its entirety.

Dated:  August 11, 2023

Respectfully Submitted,

<u>/s/ David H. Thompson</u>
**COOPER & KIRK PLLC**
David H. Thompson*
Brian W. Barnes*
1523 New Hampshire Ave., NW
Washington, DC 20036
Phone: (202) 220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
* Admitted *pro hac vice*

*Attorneys for Defendant Brownells, Inc., a/k/a*
*Brownells or Bob Brownell's*