UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                               :

STATE OF NEW YORK,                     :

                               :

                  Plaintiff,       :        22-CV-6124 (JMF)

                               :

        -v-                     :

                               :        <u>OPINION AND ORDER</u>

ARM OR ALLY, LLC et al.,           :

                               :

                  Defendants.     :

                               :
---------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      The State of New York (the "State"), through its Attorney General, brings this case

against ten companies that allegedly manufacture and sell products used to make "ghost guns":

homemade guns that lack serial numbers and are thus untraceable.[1]  The State alleges that

Defendants' products are "designed to subvert" a host of "federal and state statutes that prevent

guns from falling into the hands of people who cannot and should not possess them," ECF No.

157 ("SAC"), ¶ 19, and that the sale of their products in New York has caused great harm to

New York's public health and safety, *see id.* ¶¶ 574-95.  It brings seven claims under New York

law, *id.* ¶¶ 596-634, and it seeks various forms of relief, ranging from restitution, disgorgement,

and damages to a permanent injunction barring Defendants from, among other things, "selling,

shipping, distributing, or otherwise supplying" their products to New Yorkers, *id.* Prayer for

Relief.

---

[1]      Defendants are: Arm or Ally, LLC; Blackhawk Manufacturing Group, Inc. ("80 Percent
Arms"); Salvo Technologies, Inc.; Brownells, Inc.; GS Performance, LLC ("Glockstore"); KM
Tactical; Primary Arms, LLC; Rainier Arms, LLC, Rock Slide USA, LLC; and Indie Guns, LLC.

Nine of the ten Defendants (the "Moving Defendants") now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the State's claims, arguing, among other things, that the laws at issue do not apply to them because their products do not qualify as "firearms" within the meaning of federal law; that they are immune from suit under a 2005 federal law; and that the State's claims run afoul of the Second Amendment to the U.S. Constitution. *See* ECF Nos. 174, 176, 178, 180, 181, 186, 188, 190, 191.[2]  Four of the Defendants also move for a severance. *See* ECF No. 184.  For the reasons that follow, the Court denies these motions, except in one narrow respect.

## BACKGROUND

The following facts are drawn from the State's Second Amended Complaint ("SAC") and assumed to be true for purposes of resolving the Moving Defendants' motions, *see, e.g.*, *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110-11 (2d Cir. 2010).

### A.  Federal Law Governing Firearms

The manufacture and sale of firearms are governed by a web of federal, state, and local laws.  As relevant here, federal law restricts who can sell and buy a "firearm," which is defined as "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" or "the frame or receiver of any such weapon," 18 U.S.C. § 921(a)(3), and ensures that all firearms are traceable.  For example, only federal firearms licensees ("FFLs") may "engage in the business of importing, manufacturing, or dealing in firearms."  18 U.S.C. § 923(a); *see also id.* § 922(a)(1).  FFLs, in turn, must subject each prospective customer to a background check to ensure that the customer does not belong to any

---

[2]      The one Defendant not moving to dismiss is Indie Guns, LLC, which is in default.  *See* ECF No. 192.  On February 5, 2024, the State filed a motion for entry of default judgment against Indie Guns.  *See* ECF Nos. 238-40.  That motion is pending.

category of people who are prohibited from purchasing firearms (e.g., people previously convicted of a felony). *Id.* § 922(t). And all firearms must bear a serial number "which may not be readily removed, obliterated, or altered." 26 U.S.C. § 5842(a). Furthermore, the National Firearms Act, which defines a "firearm" with some additional specifications about barrel length (among other things), prohibits an individual from "receiv[ing] or possess[ing]" any firearms "not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(c)-(d).

These statutes are implemented and enforced by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF"), a domestic law enforcement agency within the Department of Justice. *See* 18 U.S.C. § 926(a); 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A. In 1968, on the heels of Congress's enactment of the federal licensing scheme, ATF elaborated on Section 921(a)(3)'s definition of "firearm" by defining the statutory term "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward position to receive the barrel." 33 Fed. Reg. 18,555, 18,558. In 2021, the ATF observed that "some courts" had recently "treated [this] regulatory definition as inflexible when applied to the lower portion of the AR-15-type rifle," which "could mean that as many as 90 percent of all firearms . . . in the United States would not have any frame or receiver subject to regulation." 87 Fed. Reg. 24,652, 24,655. The ATF thus published a Notice of Proposed Rulemaking proposing updated definitions of both "firearm" and "frame or receiver." *See* 86 Fed. Reg. 27,720. In April 2022, the ATF promulgated a new Rule that (1) extended the regulatory definition of "firearm" to "include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive," 87 Fed. Reg. at 24,735; (2) defined the term "privately

made firearm" as "[a] firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number," *id.*; and (3) updated the terms "frame" and "receiver" to "include a partially complete, dissembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," *id.* at 24,739.  Additionally, the 2022 Rule defined "readily" as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state."  *Id.* at 24,735.  These changes were intended to "make[] explicit that manufacturers and sellers of [weapon parts] kits or aggregations of weapon parts are subject to the same regulatory requirements applicable to the manufacture or sale of fully completed and assembled firearms."  *Id.* at 24,662.

## B.  Ghost Guns

Defendants are in the business of selling "unfinished frames and receivers" — also known as "80% lowers" or "receiver blanks" — which are designed to evade these restrictions. SAC ¶¶ 20, 22, 40, 81.  A "frame" is the core part of a handgun or pistol, and a "receiver" is the core part of a rifle, shotgun, or other long gun.  *Id.* ¶ 21.  An "unfinished" frame or receiver requires an extra step to be rendered usable: usually the drilling of a few required holes or the filing of excess plastic.  *Id.* ¶¶ 20, 22, 37.  But that extra step of converting an "unfinished" frame or receiver into a finished firearm is, according to one of the Defendants, "ridiculously easy" and can be done by an amateur in under an hour with only basic tools.  *Id.* ¶ 31.  Some Defendants make it even easier by shipping their products in a "jig," a plastic setting that enables a customer to easily convert an unfinished frame or receiver into a firearm.  *Id.* ¶¶ 43-49.  As one Defendant put it to customers when linking to an instructional video: "There's no complicated

setup because the jig that came with your slide keeps everything properly aligned as you make simple cuts with the included drill bits.  Wait, it can't be that simple?  Yes, it is."  *Id*. ¶ 281.

The completed products are functionally and visually indistinguishable from frames or receivers one could buy at a gun store, *id.* ¶ 23, but they are effectively untraceable because manufacturers, distributers, and purchasers generally do not comply with the registration and serialization requirements applicable to "firearms," *id.* ¶¶ 27-28.  Thus the common name "ghost guns."  *Id.* ¶ 28; *see* N.Y. Penal Law § 265.00(32) (defining "ghost gun" as a "firearm, rifle or shotgun that does not comply with" the registration and serialization requirements of N.Y. Penal Law § 265.07).  Thanks to this "built-in evasion of federal and state laws," unfinished frames and receivers and the ghost guns made from them are "naturally attractive to (and naturally marketed to)" those who are ineligible to purchase a firearm under federal law.  SAC ¶ 29.  Taking note of such "loopholes" in state and federal law, *id.* ¶ 98, lawmakers in New York City and New York State banned the sale of unfinished frames and receivers in 2020 and 2022, respectively, *id.* ¶¶ 96, 104; *see* N.Y.C. Admin. Code § 10-314, N.Y. Penal Law §§ 265.63, 265.64.

## C.  Defendants' Sales and Marketing of Ghost Guns

From June 2016 to July 2022 (the "Relevant Time Period"), Defendants marketed and sold unfinished frames and receivers "directly to consumers without following any of the federal or state laws and regulations that apply to the sale of guns, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source if used in a crime."  *Id.* ¶¶ 19, 27; *id.* ¶ 128 (Arm or Ally); *id.* ¶¶ 181, 208, 251 (80 Percent Arms); *id.* ¶¶ 297-98, 369 (Brownells); *id.* ¶¶ 392, 398 (Glockstore); *id.* ¶ 431 (Indie Guns); *id.* ¶ 494 (KM Tactical); *id.* ¶¶ 498, 526 (Primary Arms);

*id.* ¶ 560 (Rainier Arms); *id.* ¶ 570 (Rock Slide).  During the Relevant Time Period, Defendants

made at least 100,000 shipments to consumers in New York not registered as FFLs, including

undercover agents employed by the State.  *Id.* ¶¶ 107-10.[3]  A significant number of these

shipments contained unfinished frames and receivers.  *Id.* ¶ 111.  As FFLs, Defendants Arm or

Ally, 80 Percent Arms, Salvo Technologies, Brownells, Glockstore, Primary Arms, and Rainier

Arms had access to, but did not use, the National Instant Criminal Background Check System

before selling unfinished frames and receivers to New York consumers.  *Id.* ¶ 75.  The remaining

Defendants — Indie Guns, KM Tactical, and Rock Slide — are not licensed to sell firearms at

all.  *Id.* ¶ 76.

Defendants used "common marketing strategies" to advertise their unfinished frames and

receivers, namely by "misle[ading] New York customers into believing that unfinished frames

and receivers are legal workarounds to New York's gun control laws, as well as federal law."  *Id.*

¶ 112.  During the Relevant Time Period, Defendants' websites claimed, among other things, that

unfinished frames and receivers could be sold and purchased with "No FFL Required," *id.* ¶ 119

(Arm or Ally); *id.* ¶ 162 (80 Percent Arms); *id.* ¶ 531 (Rainier Arms); *id.* ¶ 564 (Rock Slide);

could "be shipped straight to a customer's home without an FFL," *id.* ¶ 285 (Brownells); were

"not subject to the same regulations as any other complete firearm[s]," *id.* ¶ 161 (80 Percent

Arms); were "completely unregistered and legal," *id.* ¶ 171 (80 Percent Arms); allowed

---

[3]     The number of shipments into New York for which each Defendant was responsible ranged from dozens to thousands.  *See* SAC ¶¶ 130-32 (Arm or Ally); *id.* ¶¶ 174-76 (80 Percent Arms); *id.* ¶¶ 257-59 (Salvo Technologies); *id.* ¶¶ 272-275 (Brownells); *id.* ¶¶ 383-386 (Glockstore); *id.* ¶¶ 447-48 (Indie Guns); *id.* ¶¶ 469-72 (KM Tactical); *id.* ¶¶ 500-03 (Primary Arms); *id.* ¶¶ 544-47 (Rainier Arms); *id.* ¶¶ 565-67 (Rock Slide).  The State confirmed some of these shipments through undercover agents and ground-mail data.  *See id.* ¶¶ 107, 122-128, 261-63, 276-78, 434-36, 535-41, 566-69.  In addition, some Defendants were more forthcoming.  For example, Lawrence Destefano, the owner of Defendant Indie Guns, boasted on social media that he "sold thousands, tens of thousands to New York City and New York State."  *Id.* ¶ 447-48.

consumers to "build a completely legal handgun without any 'government oversight'" and to "legally own a firearm that does not have to be 'registered,'" *id.* ¶¶ 375, 377 (Glockstore); were "[a]pproved" by the ATF, *id.* ¶ 466 (KM Tactical); and were considered by the government to be mere "pieces of metal and/or plastic and not guns," *id.* ¶ 530 (Rainier Arms).  For its part, Defendant Indie Guns touted unfinished frames' and receivers' "blank serialization plate" as a major selling point.  *Id.* ¶¶ 432-33.  Since the Relevant Time Period, Indie Guns has removed the option to purchase these products directly from its website and now conducts all sales through "telephone, text, private/direct messages over social media, or using an encrypted messaging service."  *Id.* ¶ 439.  These marketing strategies "enable[ed] [Defendants] to not only maximize their individual market share but also to put the overall market for unfinished frames and receivers into overdrive in New York."  *Id.* ¶ 112-13.

**D.  Impact on Public Safety**

The State alleges that by "targeting and selling (and reselling) to the very same New York customers who should have never had access to firearms," *id.* ¶ 573, Defendants have placed ghost guns in the hands of New Yorkers who are ineligible to possess firearms, *see id.* ¶¶ 61, 630.  Some of those people committed crimes of violence using the very ghost guns they purchased from Defendants.  *See, e.g.*, *id.* ¶¶ 243, 336, 342.  For example, Defendants 80 Percent Arms, Glockstore, Primary Arms, and Rainier Arms all sent packages containing unfinished frames or receivers to an address where a man "would later be arrested after threatening to shoot his wife with a ghost gun while she held her child."  *Id.* ¶¶ 212-14, 401, 506, 554.

More broadly, the "influx" of Defendants' ghost guns into New York has posed "a significant threat to public health and safety."  *Id.* ¶ 574.  According to a recent study, between 2017 and 2021, there was "a 522% increase" in the likelihood that a firearm recovered by law

enforcement was a ghost gun. *Id.* ¶ 577. That observation accords with the State's own data: New York law enforcement recovered only 44 ghost guns in 2018; in 2022, that number climbed to 797. *Id.* ¶ 579. The study also indicates that ghost guns are approximately 51% more likely to be recovered at a violent crime scene than traditionally manufactured and serialized firearms, suggesting that they "may have become a 'weapon of choice' for violent gun criminals." *Id.* ¶ 586. All in all, Defendants have "affirmatively harm[ed] New Yorkers" by increasing the number of firearms likely to be used in a crime, unwinding the effect of targeted legal protections (e.g., for potential victims of domestic violence), and creating a new primary and secondary market for illicit guns in New York. *Id.* ¶ 574.

**E.  Procedural History**

Based on the above facts, the State brings seven civil-enforcement and tort claims under New York law. The State's first cause of action is brought under New York Executive Law Section 63(12), which empowers the Attorney General to sue "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business." N.Y. Exec. Law § 63(12). Pursuant to that law, the State alleges that Defendants' business practices violated various local, state, and federal laws regulating firearms and, on that basis, seeks to enjoin Defendants from making further sales of unfinished frames and receivers to New York consumers. SAC ¶¶ 596-600. The State's second, fourth, and fifth causes of action allege that Defendants misrepresented their ghost gun products as "legal" despite state and local laws prohibiting their sale and possession and federal requirements for serialization, sale licenses, and background checks. *Id.* ¶¶ 601-05, 618-23. These counts are brought both as a part of the State's Section 63(12) claim and as standalone claims under New York General Business Law Sections 349 and 350. In the

third cause of action, the State alleges that Defendants' activities as "gun industry members" constitute a public nuisance under New York General Business Law § 898 and, on that basis, asks that Defendants, jointly and severally, "endow[] an abatement fund that will allow the State to eliminate the public nuisance." *Id.* ¶¶ 4, 606-17.  Finally, the State's sixth and seventh causes of action are brought pursuant to common-law doctrines of negligence per se and negligent entrustment.  *Id.* ¶¶ 624-634.

The State initially brought these claims in the Supreme Court of the State of New York, County of New York, *see* ECF No. 1-1, and moved to remand the case back to that court after Defendants removed it to this Court, ECF No. 42.[4]  The Court denied the State's motion pursuant to the "substantial federal question" doctrine because most, if not all, of the State's claims depend on "whether the products at issue qualify as 'firearms' or 'component parts' thereof within the meaning of a federal law that is incorporated, in turn, into the relevant New York law."  *New York v. Arm or Ally, LLC*, 644 F. Supp. 3d 70, 73, 78-83 (S.D.N.Y. 2022).  In March 2023, the Court entered a consent order preliminarily enjoining Defendants from selling or delivering ghost guns into New York "unless and until" the applicable state laws "are repealed, held to be unconstitutional, held to be unenforceable, or amended," and "unfinished frames and receivers are adjudicated not to constitute 'firearms' within the meaning of 18 U.S.C. § 921(a)(3)."  ECF No. 156, at 3.  The State then filed the SAC, and the Moving Defendants timely filed the instant motions to dismiss.

---

[4]     Around the time the State filed this case in state court, the City of New York filed in this Court a similar case against Arm or Ally, Rainier Arms, Salvo Technologies, Rock Slide, and Indie Guns, bringing public nuisance claims under common law and New York General Business Law § 898.  *See City of New York v. Arm or Ally, LLC*, No. 22-CV-5525 (JMF).  That case has been resolved, against Indie Guns by way of default judgment and against the other defendants by way of settlements.  *See id.*, ECF Nos. 42, 49, 51, 68, 102-03.

Defendants Salvo Technologies, Brownells, Primary Arms, and Rock Slide also filed —

and served upon the U.S. Attorney General — a notice of constitutional challenge of a federal

statute in light of their argument that "interpreting 'firearm' as [the State] urges would render the

relevant federal statute unconstitutionally vague in violation of the Fifth Amendment and violate

the Second Amendment."  ECF No. 112.  That notice was consistent with Rule 5.1(b) of the

Federal Rules of Civil Procedure, which provides that the Court "must, under 28 U.S.C. § 2403,

certify to the appropriate attorney general that a statute has been questioned."  Section 2403(a),

in turn, states that "[i]n any action . . . wherein the constitutionality of any Act of Congress

affecting the public interest is drawn in question, the [C]ourt shall certify such fact to the

Attorney General, and shall permit the United States to intervene for presentation of evidence . . .

and for argument on the question of constitutionality."  The United States subsequently filed a

motion to intervene and a memorandum of law focused mostly on the legality of the ATF's April

2022 Rule.  *See* ECF Nos. 203-04.  The Court granted the Government's motion as unopposed.

*See* ECF No. 209.[5]

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to

determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a

---

[5]     Given that the United States has already intervened, there is arguably no need for the
Court to enter a formal certification under Section 2403.  Because the statute mandates
certification, however, the Court hereby certifies to the Attorney General of the United States
that this case involves a constitutional challenge to the Gun Control Act, 18 U.S.C. § 921(a)(3),
insofar as Defendants argue that the statute, if construed to encompass the products at issue,
violates the Second and Fifth Amendments of the Constitution.  *See* ECF No. 112.  Thus, "[t]he
United States shall, subject to the applicable provisions of law, have all the rights of a party and
be subject to all liabilities of a party as to court costs to the extent necessary for a proper
presentation of the facts and law relating to the question of constitutionality."  28 U.S.C.
§ 2403(a).

plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  When ruling on a Rule 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  A complaint that offers only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Further, if the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

## DISCUSSION

The Moving Defendants seek dismissal of all claims.  Most of their arguments for dismissal are set forth in Defendant Brownells's omnibus memorandum of law, *see* ECF No. 175 ("Brownells Mem."), although each individual Moving Defendant also filed its own memorandum of law, *see* ECF Nos. 177, 179, 182, 183, 187.  In addition, Defendants Brownells, Salvo Technologies, Primary Arms, and Rock Slide move, pursuant to Rules 20 and 21 of the Federal Rules of Civil Procedure, to sever any remaining claims against each of them.  ECF No. 184.  The Court will begin with the Moving Defendants' three catch-all arguments for dismissing all (or most) of the State's claims, and then turn to the Moving Defendants' arguments for dismissing the State's false advertising, negligent entrustment, and public nuisance claims in particular.  The Court will then turn to the motion to sever.

### A.  Ghost Guns as Firearms

First, the Moving Defendants make a variety of arguments, mostly based on the text of the relevant statutes, that unfinished frames and receivers were not "firearms" as defined in Section 921(a)(3) during the Relevant Time Period.  Brownells Mem. 8-14.  It follows, they contend, that they did not commit any of the federal law violations that underpin the State's claim under New York Executive Law Section 63(12).  *See* Brownells Mem. 8-9.  So too, their marketing of unfinished frames and receivers as "legal" under local, state, and federal laws did not violate New York General Business Law Sections 349 and 350.  Brownells Mem. 52-53. The Court is unpersuaded.

#### 1.  Ghost Guns "May Readily Be Converted" to Fire a Projectile

For starters, the Moving Defendants' arguments are answered by the allegations in the SAC, which the Court must treat as true.  As noted above, federal law defines "firearm" to mean, as relevant here, "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon."  18 U.S.C. § 921(a)(3).  The State plainly and sufficiently alleges — with help from Defendants' own marketing — that Defendants' unfinished frames and receivers are firearms under Section 921(a)(3) as they "may readily be converted" to fully functional guns.  As the Moving Defendants themselves submit, "readily" means "[w]ith promptness; quickly; at once; easily."  Brownells Mem. 25 (quoting *Readily*, Webster's Second New International Dictionary); *see also Readily*, Webster's Third New International Dictionary ("without much difficulty").  According to the State's pleadings, Defendants' unfinished frames and receivers meet this definition because they "can be converted into . . . working gun[s] in under thirty minutes" by someone with prior experience, and in under an hour by an amateur.

SAC ¶ 31.  As the State further alleges, Defendants themselves have advertised their unfinished frames and receivers as "ridiculously easy for a non-machinist to finish . . . in under 1 hour with no drill press required," *id.* ¶ 41, "[i]n the comfort and privacy of [one's] home," *id.* ¶ 124. Indeed, unfinished frames and receivers are commonly called "80% lowers" because "about 80 percent of the work is already done for you."  *Id.* ¶ 51.  As one Defendant stated in a marketing video: "Even a caveman can do this."  *Id.* ¶ 47.  From these allegations alone, one can "draw the reasonable inference" that unfinished frames and receivers "may readily be converted" into functional firearms and, thus, are firearms that should have been serialized and otherwise sold subject to the restrictions imposed by federal law.  *Iqbal*, 556 U.S. at 678.

In light of that conclusion, the Court need not actually reach the Moving Defendants' argument that unfinished frames and receivers, absent "combination" with other parts, "will" not, and are not "designed to," fire projectiles.  Brownells Mem. 10-11.  That is, it is enough for now to determine that the State plausibly alleges that unfinished frames and receivers are "firearms" because they "may readily be converted" to fire a projectile.  *See United States v. Rivera*, 415 F.3d 284, 287 (2d Cir. 2005) ("The Government need only show that the weapon[] was either 'designed to' or 'may readily be converted.'  It need not demonstrate both." (citation omitted)). In any case, the Moving Defendants' argument fails because it is not faithful to the statutory text, which does not require that the object "will" or be "designed to" fire projectiles in and of itself. The State plausibly alleges that Defendants' unfinished frames and receivers "will" and are "designed to" fire projectiles when, for example, as instructed in one of Defendant 80 Percent Arms' marketing videos, the user "snap[s] it into an easy jig, and drill[s] into the areas the template guides you through" so that the part "simply snaps together with the other parts contained in our AR-15 kit."  SAC ¶ 51.  In other words, Defendants' ghost gun products are

literally the templates for a working gun, with "no other function or purpose." *Id.* ¶ 32; *see also id.* ¶ 89.

### 2. Ghost Guns Are "Weapons"

The Moving Defendants seek to counter the effect of the State's fulsome factual allegations by arguing that an unfinished frame or receiver is not a "weapon" in the first instance and, thus, cannot be "firearm" under 18 U.S.C. § 921(a)(3)(A).  Instead, the Moving Defendants argue, an unfinished frame is "essentially a hunk of plastic or metal."  Brownells Mem. 10.  The Court is unpersuaded.  A "weapon" is "an instrument of offensive or defensive combat; something to fight with; [or] something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy."  *Weapon*, Webster's Third New International Dictionary.[6]  An object that is able to "expel a projectile by the action of an explosive," or "may readily be converted" to do just that, fits this definition comfortably; that is, the definition of "weapon" does not exclude objects that require preparation or some modification.

On top of that, the Moving Defendants' argument is foreclosed by longstanding precedent interpreting the meaning of "firearm" in Section 921(a)(3) to include an "inoperable weapon" — an oxymoron by the Moving Defendants' logic.  Indeed, the Second Circuit and "every other circuit to consider" the issue have held that "an inoperable weapon falls within § 921(a)(3)'s definition of a 'firearm.'"  *Rivera*, 415 F.3d at 286 (collecting cases); *see also United States v. Hardin*, 889 F.3d 945, 948 (8th Cir. 2018) (holding that "broken pieces and missing parts" do not prevent a gun from "qualify[ing] under the federal definition"); *United*

---

[6]     Notably, according to the Webster's edition cited by the Moving Defendants, a "weapon" is also "anything used, or *designed to be used*, in destroying, defeating, or injuring, an enemy." Brownells Mem. 10 (quoting *Weapon*, Webster's Second New International Dictionary).  As discussed above, unfinished frames and receivers are "designed" to do precisely those things by firing a projectile.

*States v. Dotson*, 712 F.3d 369, 370 (7th Cir. 2013) (holding that a pistol was a firearm under Section 921(a)(3) despite "significant damage, missing/broken parts, and extension corrosion"); *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017) (concluding that "kits contain[ing] all the necessary components to assemble a fully functioning firearm with relative ease" were firearms under Section 921(a)(3)).

### 3.   Ghost Guns Qualify as "Firearms" Under Both Subsections (A) and (B)

The Moving Defendants argue that, even if all the foregoing were true, interpreting Section 921(a)(3)(A) to apply to unfinished frames and receivers would violate the "rule against superfluities" and the "commonplace [rule] of statutory construction that the specific governs the general" because Congress "specifically spoke to the status of a 'frame or receiver'" in Section 921(a)(3)(B).  Brownells Mem. 9-10 (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).  But that argument presumes that unfinished frames and receivers would qualify as firearms under subsection (B) of the statute, which would be enough to defeat the Moving Defendants' broader arguments.  More importantly, the Court disagrees with the Moving Defendants as a matter of statutory interpretation.  Disjunctive clauses separated by "or" are normally read to be inclusive, not mutually exclusive.  *See United States v. Harris*, 838 F.3d 98, 105-06 (2d Cir. 2016); *see also* Off. of the Legis. Couns., U.S. Senate, *Legislative Drafting Manual* § 302 (1997) (instructing drafters to "use 'or' . . . to indicate that thing is included in the class if it meets *1 or more* of the criteria" (emphasis added)).  Subsection (B)'s internal reference to "any such weapon" described in subsection (A) does not make the two subsections mutually exclusive.  *Cf. Loughrin v. United States*, 573 U.S. 351, 359 (2014) (noting that the "legislative structure" of "placing the clauses visually on an equal footing and indicating that they have separate meanings . . . reinforces the usual . . . understanding of the word 'or' as

meaning . . . well, 'or' — rather than . . . 'including'").  Indeed, it is not hard to imagine objects that satisfy two or more of the four subsections in § 921(a)(3).  For example, any weapon that qualifies as a firearm under subsection (D) because it "will, or . . . may be readily converted to" fire a projectile with a barrel "with a bore of more than one-half inch diameter," 18 U.S.C. § 921(a)(4)(B), will, by definition, also satisfy the more general conditions under subsection (A).  And as Judge Oldham recently explained in his concurrence in *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023), "Section 921(a)(3) does not contemplate a weapon covered by (A) that does *not* have a frame or receiver covered by (B)."  *Id.* at 210.  In short, an object can qualify as a firearm under *both* subsections (A) and (B) of Section 921(a)(3).

And here, the State plausibly alleges that Defendants' unfinished frames and receivers are firearms under subsection (B) too.  Relying primarily on the majority opinion in *VanDerStok*, the Moving Defendants argue that subsection (B) does not cover unfinished frames and receivers because "Congress explicitly declined to use" the phrase "designed to or may readily be converted" in that subsection.  86 F.4th at 189; *see* ECF No. 226, at 2-3.  But this aspect of the Fifth Circuit's opinion is "neither binding nor persuasive."  ECF No. 227, at 1; *see also* ECF No. 228, at 1.  As Judge Oldham explained his concurrence, "[w]ith its placement immediately following (A), we can easily understand (B)'s 'any such weapon' language to incorporate the definition of 'weapon' in (A)," which includes the phrase, "designed to or may readily be converted."  *VanDerStok*, 86 F.4th at 210 (Oldham, J., concurring).  Indeed, it is hard to imagine that Congress intended to omit the aspect of subsection (A) that covers weapons that are "designed to or may readily be converted to" fire projectiles when it inserted a broad reference to "any such weapon" in subsection (B).  Furthermore, as the State argues, such a reading "would appear to contradict the plain language of the [statute], which clearly defined 'firearms' more

broadly than a fully operational weapon." *Morehouse Enters., LLC v. ATF*, No. 22-CV-116 (PDW), 2022 WL 3597299, at *6 (D.N.D. Aug. 23, 2022); *see United States v. John*, No. 20-CR-341 (NGG), 2022 WL 1062998, at *4 (E.D.N.Y. Apr. 8, 2022) ("[F]ederal courts have broadly interpreted the meaning of a firearm under § 921(a)(3)."); *cf. United States v. Simels*, 654 F.3d 161, 171 (2d Cir. 2011) ("Apparently concerned with the dangers that might arise from any gun that is 'designed' to expel projectiles, Congress included such a gun in the statutory definition in addition to a gun that 'will' do so.").  The Court therefore concludes that subsection (B) covers the frames and receivers of those weapons that "may readily be converted to" fire projectiles, including ones whose frames and receivers are among the parts requiring ready conversion.

Here, the State alleges that unfinished frames are "virtually identical" to finished frames, and offers the following visual comparison:



*See* SAC ¶ 35.  More significantly, the State alleges that the unfinished frames that Defendants shipped into New York are compatible with — and "designed to mimic" the frames for — guns like the Glock Third Generation G19 or G23, or AR-9, AR-15, or AK-47 rifles.  SAC ¶ 23-24; *see also id.* ¶ 25 (alleging that "Defendants Brownells and Indie Guns . . . touted the Glock-compatibility of their products when selling to undercover investigators").  The Moving

Defendants do not dispute that the frames for Glock pistols are "firearms" under Section 921(a)(3).  The State therefore plausibly alleges that Defendants' unfinished frames and receivers are "frame[s] and receiver[s] of [] such weapon[s]" described in subsection (A) and, thus, are "firearms" subject to federal restrictions.

### 4. Prior State and Federal Positions Do Not Defeat the State's Claims

Finally, in arguing that their products were not "firearms" during the Relevant Time Period, the Moving Defendants point to prior positions of state and federal authorities.  Most conclusively, they contend that the State is estopped from arguing that unfinished frames and receivers constitute "frames and receivers" under Section 921(a)(3) based of positions it — or its subdivisions — took in the past.  *See* Brownells Mem. 11-12.  First, the Moving Defendants point to the fact that the Manhattan District Attorney allowed a defendant who possessed an unfinished frame to plead guilty to a violation of New York City Administrative Code Section 10-314 when that law defined unfinished frames and receivers as devices that are *not* "the frame or receiver of a firearm."  *See id.* at 12.  But putting aside the question of whether the State can be estopped by a position taken by a local District Attorney, the State's position here is not "clearly inconsistent" with the Manhattan District Attorney's position in that unrelated criminal proceeding, which involved application of local law, not Section 921(a)(3).  *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014).  Thus, the Court's "acceptance" of the State's interpretation of Section 921(a)(3)(B) in this litigation would not "create the perception that either the [state court or this Court] was misled."  *Id.*  Additionally, judicial estoppel is a doctrine that is "primarily concerned with protecting the judicial process," and thus "relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain."  *Id.* (citation omitted).  The Court has no such concern here.

Second, the Moving Defendants point to a July 2020 press release from the New York Attorney General's office stating that "an incomplete lower receiver — lacking certain holes, slots, or cavities — is not considered a firearm."  Brownells Mem. 16, 16 n.7; *see* Press Release, N.Y. Att'y Gen., Attorney General James Stops Sales of "Ghost Guns" Into New York (July 15, 2020), *available at* https://ag.ny.gov/press-release/2020/attorney-general-james-stops-sales-ghost-guns-new-york.  A careful reading of the press release, however, reveals that the statement is not, in fact, inconsistent with the State's litigating position in this case.  Indeed, the press release explicitly states that companies like Defendants "often specifically advertise their products in a way to evade law enforcement" and "have specifically been marketing their lower receivers as '80%' complete[] in order to *evade federal regulations*."  *Id.* (emphasis added).  These statements are consistent with the State's position here that Defendants' products are "firearms" under federal law that must be regulated accordingly.  In any case, the "doctrine of equitable estoppel is not available against the government 'except in the most serious of circumstances,'" namely where there is a showing of "affirmative misconduct" by the government, and courts are to apply it "with the utmost caution and restraint."  *Rojas-Reyes v. INS.*, 235 F.3d 115, 126 (2d Cir. 2000) (citations omitted).  Here, the Moving Defendants do not even make an attempt to show that the State committed affirmative misconduct.  In short, the State is not estopped — judicially or equitably — from arguing that Defendants' products are "firearms" within the meaning of Section 921(a)(3).

As noted, the Moving Defendants also point to the positions of federal law enforcement in support of their textual arguments.[7]  Specifically, they argue that their interpretation of the

---

[7]    Relatedly, they cite the positions of federal law enforcement in support of their contention that "the federal statutory definition of 'firearm' . . . would be unconstitutionally vague if interpreted" to encompass unfinished frames and receivers.  Brownells Mem. 42.

word "firearm" in Section 921(a)(3) is "consistent with the longstanding position of [the] ATF."
Brownells Mem. 14.  To be clear, the validity of the ATF's recent rule, which expands the
regulatory definition of "firearm" to cover "a weapon parts kit that is designed to or may readily
be completed, assembled, restored, or otherwise converted to expel a projectile by the action of
an explosive," 87 Fed. Reg. at 24,727, is not at issue in this case.  Instead, the relevant question is
whether unfinished frames and receivers were "firearms" under Section 921(a)(3) during the
Relevant Time Period, which predates the promulgation of the new rule on April 26, 2022.  The
Moving Defendants argue that a 2015 interpretive ruling, a 2017 letter, and a 2020 website
posting from the ATF show that the ATF has traditionally distinguished unfinished frames and
receivers from firearms.  *See* Brownells Mem. 3-4.  The State counters that the "ATF has long
viewed 'unfinished' frames and receivers as meeting the federal definition of a firearm," relying
on its own coterie of ATF documents that predate the 2022 rule.  ECF No. 205 ("State Opp'n"),
at 4-5.

Taking judicial notice of the documents cited by the parties, which are publicly available,
*see Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), the Court concludes that it is
not clear at this stage whether the ATF took the position that Defendants' products did not
qualify as "firearms" prior to 2022.  As the Moving Defendants point out, ATF's 2015
interpretive ruling states that "castings or machined/molded or other manufactured bodies
(sometimes referred to as 'blanks,' or '80% receivers') . . . have not yet reached a stage of
manufacture in which they are classified as 'firearm frames or receivers.'"  Ruling 2015-1,
Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just. (Jan. 2, 2015),
*available at* https://www.atf.gov/file/11711/download.  But it appears that the product that ATF
was referring to "generally requires substantial additional machining before it can accommodate

fire control components" and that "[u]nlicensed individuals propose to take either a blank, or a frame or receiver . . . to a licensed dealer-gunsmith or machine shop for further machining and finishing so that it can be assembled into a complete or functional firearm" and engraved or stamped with a serial number. *Id.* at 1-2. Defendants' products here are at a much higher "stage of manufacture" than that. In fact, the State's motivating concern is that Defendants' unfinished frames and receivers can be (and regularly are) finished into unserialized but fully functional guns by unlicensed amateurs in under an hour with nothing more than home tools. If anything, based on the State's allegations, Defendants' products appear to be closest to the "third receiver" discussed in the ATF's 2020 website posting (also offered by the Moving Defendants), which "has a partially machined fire-control cavity and *does* meet the GCA definition of a firearm." *Are "80%" or "Unfinished" Receivers Illegal?*, Bureau of Alcohol, Tobacco, Firearms & Explosives (last reviewed Apr. 6, 2020), *available at* https://www.atf.gov/firearms/qa/are-"80"-or-"unfinished"-receivers-illegal.

The Moving Defendants also point to a 2017 letter in which the ATF stated that a particular model of a particular kind of unfinished frame was "not sufficiently complete to be classified as the frame or receiver of a firearm and thus [was] not a 'firearm' as defined" in Section 921(a)(3). *See* ECF No. 175-1, at 4. But unless and until further discovery shows that the ATF's 2017 letter applies to this case's "particular facts, designs, characteristics or scenarios presented," *id.*, it cannot and should not be read to provide "*carte blanche* to market and sell any Polymer80 product as a non-firearm," State Opp'n 37. Moreover, the documents to which the State points are enough to defeat the Moving Defendants' argument at this stage. Most significantly, the State points to a 1978 letter in which the ATF took the "position that an unfinished firearm receiver which may be readily converted to functional condition is a firearm

as defined." ECF No. 206-1. Based on the allegations in the SAC, Defendants' products are closer to those described in this 1978 letter than to the products described in the documents to which the Moving Defendants point. The Court thus rejects the Moving Defendants' argument that their products could not have been "firearms" prior to 2022 based on ATF's guidance, albeit without prejudice to its renewal after discovery.

In conclusion, assuming the truth of the allegations in the SAC, the Court concludes that the State plausibly alleges that Defendants' products were "firearms" within the meaning of Section 921(a)(3) during the Relevant Time Period.[8]

## B. The Protection of Lawful Commerce in Arms Act

Next, the Moving Defendants argue that, if the products at issue qualify as "firearms" within the meaning of Section 921(a)(3), the vast majority of the State's claims are preempted by the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. § 7901 *et seq.* Enacted in 2005, the PLCAA was intended by Congress "[t]o prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and

---

[8]     Briefly, the Moving Defendants also argue that the State's claim under New York Executive Law Section 63(12) must be dismissed insofar as it rests on Defendants' alleged violation of the National Firearms Act ("NFA") because that statute "uses a different and much narrower definition of 'firearm' that does not include ordinary semiautomatic handguns and rifles." Brownells Mem. 14 n.6. This argument can be swiftly rejected. The NFA does have specifications, such as those regarding barrel lengths, that Section 921(a)(3) does not, *see* 26 U.S.C. § 5845(a)-(f), but those specifications do not necessarily place Defendants' products outside the NFA's purview. The State alleges, for example, that some of Defendants' products were "modified to fire fully automatically," SAC ¶ 423, and that at least some people finished Defendants' products into potentially NFA-qualifying weapons such as "assault shotgun[s]," *id.* ¶ 221, and "high-powered rifle[s]," *id.* ¶ 330. As in the Section 921(a)(3) context, guns in a "dissembled state" qualify as firearms under the NFA. *United States v. Drasen*, 845 F.2d 731, 732-34 (7th Cir. 1988).

intended." 15 U.S.C. § 7901(b)(1). To that end, the statute bars any "qualified civil liability action," *id.* § 7902(a), defined to include "a civil action . . . brought by any person against a manufacturer or seller of a qualified product . . . for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." *Id.* § 7903(5)(A).

Significantly, however, that PLCAA expressly provides that "the term 'qualified civil liability action'" shall *not* include certain actions. As relevant here, the statute excludes from coverage — and thus does not bar — "an action brought against a seller for negligent entrustment or negligence per se." *Id.* § 7903(5)(A)(ii). "Negligent entrustment" is defined, in turn, as "the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." *Id.* § 7903(5)(B). The statute also excludes from coverage "an action in which a manufacturer or seller of a qualified product" — that is, "a firearm . . . as defined in Section 921(a)(3)(A) or (B) — "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* § 7903(4), (5)(A)(iii). That category includes "any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law." *Id.* § 7903(5)(A)(iii)(I).

In light of the exclusions, the Moving Defendants wisely make no argument that the PLCAA preempts the State's negligence per se claim.  But they argue that it preempts all of the State's other claims.[9]  The Court will therefore address each claim in turn.

### 1.  Claims Under New York Executive Law Section 63(12) and New York General Business Law Sections 349 and 350

To begin, the Moving Defendants' argument is easily rejected as to the State's claims under New York Executive Law Section 63(12) and New York General Business Law Sections 349 and 350.  These claims are premised on the States' allegations of Defendants' *own* "repeated or persistent illegal conduct," such as selling and transporting unregistered firearms without any background checks in violation of federal and state laws and falsely advertising these products as "legal" in violation of state laws.  SAC ¶ 599; *see also id.* 604, 620, 623.  They therefore are not "resulting from the criminal or unlawful misuse of [firearms] . . . by . . . a third party" and are not "qualified civil liability action[s]" preempted by the PLCAA.  15 U.S.C. § 7903(5)(A); *see also id.* § 7901(b)(1) (providing that the PLCAA was intended to "[t]o prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products . . . for the harm *solely* caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended" (emphasis added)).

---

[9]     As the State correctly argues, some of the Moving Defendants "cannot invoke [the] PLCAA at all because the statute does not apply to any entity who is not an FFL."  State Opp'n 14.  A "qualified civil liability action" under the statute must be brought "against a . . . seller." 15 U.S.C. § 7903(5)(A).  As relevant here, a seller is a "dealer . . . as defined in section 921(a)(11) of title 18 . . . *who is licensed to engage in business as such a dealer* under chapter 44 of title 18."  *Id.* § 7903(6)(B) (emphasis added).  Thus, the PLCAA does not bar any claims brought against Defendants KM Tactical and Rock Slide USA.  *See* SAC ¶ 76.

That is enough to reject the Moving Defendants' PLCAA arguments as to the State's claims under Executive Law Section 63(12) and General Business Law Sections 349 and 350. But, as to the State's claim under Executive Law Section 63(12), those arguments fail for another reason: The claim falls within the "predicate exception" set forth in Section 7903(5)(A)(iii), which applies to any "action in which a manufacturer or seller of a qualified product [] knowingly violated a State or Federal statute applicable to the sale or marketing of the product." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 390 (2d Cir. 2008).  The Moving Defendants offer three reasons why the predicate exception should not apply to the State's claim under Executive Law Section 63(12).  At this stage of the litigation, however, the Court is unpersuaded.

First, the Moving Defendants argue that the State's claim under Executive Law Section 63(12) does not concern violations of "a State or Federal statute applicable to the sale or marketing" of firearms.  As the Second Circuit has held, statutes "applicable to the sale or marketing" of firearms include laws (1) "that expressly regulate firearms," (2) "that courts have applied to the sale and marketing of firearms," or (3) "that clearly can be said to implicate the purchase and sale of firearms."  *Beretta*, 524 F.3d at 402, 404.  It is true that Executive Law Section 63(12) itself does not fall comfortably within any of these buckets.  But Executive Law Section 63(12) is not the relevant law for purposes of the predicate exception, as it merely provides the vehicle by which the State alleges violations of state or federal laws regulating firearms.  Neither the language of the PLCAA nor *Beretta* require the violated statute to also provide the cause of action.  Indeed, the predicate exception only requires only that the action be one "in which a manufacturer or seller . . . knowingly violated a [qualifying] State or Federal statute."  15 U.S.C. 7903(5)(A)(iii).  Here, the State's claim under Executive Law Section 63(12)

is based on Defendants' alleged violations of at least twenty-five state and federal laws that
"expressly regulate firearms." *Beretta*, 524 F.3d at 404; SAC ¶ 599 (listing statutes).  It follows
that the claims can qualify for the predicate exception.[10]

Next, the Moving Defendants argue that the predicate exception does not apply to the
State's claim under Executive Law Section 63(12) because the State fails to allege that
Defendants "knowingly" violated the underlying statutes.  *See* Brownells Mem. 25-28.  It is well
established, however, that "the phrase 'knowingly violates' requires knowledge of facts and
attendant circumstances that comprise a violation of the statute, *not* specific knowledge that
one's conduct is illegal."  *United States v. Weintrab*, 273 F.3d 139, 147 (2d Cir. 2001) (emphasis
added); *see also Dixon v. United States*, 548 U.S. 1, 5 (2006).  Here, the Moving Defendants
wisely do not dispute that the State's allegations of knowledge meet that standard, as the State
alleges, for example, that Defendants' ghost gun products were unserialized and untraceable and
that they were selling and shipping their ghost gun products to New York and to people who had
not proven their eligibility to own a firearm, *see* SAC ¶ 27, 128, 181, 208, 251, 297-98, 369,
392-98, 431, 494, 498, 526, 560, 570.  Instead, relying on *Rehaif v. United States*, 139 S. Ct.
2191 (2019), the Moving Defendants argue that the State's allegations fall short because they did
not know that their actions were unlawful.  *See* Brownells Mem. 25-26.  But that argument relies
on a misreading of *Rehaif*, which merely held that, in prosecutions under 18 U.S.C. § 924(g), the
Government must prove that "the defendant knew he possessed a firearm and also that he knew

---

[10]     By contrast, it is doubtful that the State's claims under General Business Law Sections
349 and 350, which are general consumer-protection laws that prohibit deceptive acts and false
advertising, could qualify under the predicate exception, as those statutes would appear to be
statutes "of general applicability," not laws "applicable to the sale and marketing" of firearms.
*Beretta*, 524 F.3d. at 400, 403.  Notably, the State does not cite (and the Court has not been able
to identify) a single case in which a court "applied [General Business Law Sections 349 and 350]
to the sale and marketing of firearms."  *Beretta*, 524 F.3d at 402.

he had the relevant status when he possessed it."  139 S. Ct. at 2194; *see also id.* at 2198.  It did not hold that the Government has to prove that a defendant knew it was illegal for him to possess a firearm, let alone tacitly upend decades of law regarding the meaning of "knowingly."[11]

Finally, the Moving Defendants argue that the State fails to allege that any alleged violation was a "proximate cause of the harm for which relief is sought."  *See* Brownells Mem. at 33-37.  This argument is belied by the allegations in the SAC.  The State does not merely allege that Defendants flooded the market with lawful firearms that third parties then independently proceeded to misuse; it alleges, instead, that Defendants made firearms accessible to ineligible buyers by selling unlawful (i.e., unserialized) firearms in an unlawful way (i.e., without background checks), including, in some cases, by "targeting and selling (and reselling) to the very same New York customers who should have never had access to firearms."  SAC ¶ 573.  These allegations are a logical match for the harms alleged by the State: that Defendants' actions have increased the number of firearms in bad actors' hands, undermined targeted legal protections (e.g., for potential victims of domestic violence), and created new primary and secondary markets for illicit guns in New York, causing the State to invest more resources in

---

[11]     The Moving Defendants' reliance on *Ruan v. United States*, 597 U.S. 450 (2022), is also misplaced because that case dealt with an entirely different statutory construction in the Controlled Substances Act, 21 U.S.C. § 841.  Instead of subjecting a person who "knowingly violates" the law to a specified punishment, Section 841 makes it unlawful, "[e]xcept as authorized . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance."  *Ruan*, 597 U.S. at 457.  In other words, like in the food-stamps statute that the Court had considered in *Liparota v. United States*, 471 U.S. 419, 426 (1985), the word "knowingly" applies more directly to the "unauthorized" nature of the action at issue (the distribution of a controlled substance) — necessarily requiring, indeed, "specific knowledge that one's conduct is illegal," *Weintrab*, 273 F.3d at 147.  The Court held that because "§ 841's 'knowingly or intentionally' *mens rea* applies to the [statute's] 'except as authorized' clause," the Government must "prove knowledge of a lack of authorization" in § 841 prosecutions.  *Ruan*, 597 U.S. at 467-68.  *Ruan* is irrelevant to the Court's analysis of Executive Law Section 63(12) because its statutory language is entirely distinct from Section 841.

tackling the ghost gun "crisis."  *See* SAC ¶ 574-75; *accord Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 534-37 (1st Cir. 2024) ("When faced with an epidemic of unlawful gun trafficking . . . a government will foreseeably — indeed inexorably — incur costs of its own . . . to mitigate the flow of illegal weapons."); *Prescott v. Slide Fire Sols., LP*, 410 F. Supp. 3d 1123, 1139-40 (D. Neb. 2019) ("[W]hen viewing the facts alleged in the light most favorable to [p]laintiffs, the [complaint] plausibly alleges that designating the bump stock as 'ATF approved' proximately caused [p]laintiffs' harm" — i.e., the mass shooting of fifty-eight concertgoers at a Las Vegas music festival — "as required by 15 U.S.C. § 7903(5)(A)(iii).").

The Moving Defendants argue that the link between the alleged violations and the alleged harms is "too remote" and that the "intervening actions" of "third parties and [their] criminal or unlawful misuse of qualified products" serve to "break the causal chain."  Brownells Mem. 34-35.  But "the fact that one can fashion a multi-step description of the causal chain does not mean that the injurious conduct and the injury alleged are insufficiently connected."  *Estados Unidos Mexicanos*, 91 F.4th at 534.  Instead, the relevant question is whether the harm was a "foreseeable and direct consequence" of the alleged violations and, here, the SAC "plausibly alleges that . . . the illegal sale of a large volume of [ghost guns]" into New York "foreseeably caused [the State] to shore-up its defenses," *id.* at 534-35, including by "invest[ing] in ghost gun-specific law enforcement," "expend[ing] increasing amounts of resources on . . . investigative efforts to solve specific crimes involving assembled ghost guns," and "research[ing] and implement[ing] other measures to quell the crisis," SAC ¶ 575; *see also id.* ¶ 586 (alleging that ghost guns are approximately 51% more likely to be recovered at a violent crime scene than traditionally manufactured and serialized firearms, and that they "have become a 'weapon of choice' for violent gun criminals").  Finally, any intervening actions by third parties fail to

warrant dismissal at this stage of the litigation.  Indeed, "[i]f a third party's unlawful act always

undercuts proximate case, the predicate exception would be meaningless." *Estados Unidos*

*Mexicanos*, 91 F.4th at 535; *see also* 15 U.S.C. § 7901(b)(1) (defining the PLCAA's purpose as

prohibiting "causes of action . . . for the harm *solely caused* by criminal or unlawful misuse of

firearm products" (emphasis added)).  Assuming the truth of the State's allegations, as the Court

must on this motion to dismiss, a reasonable jury could conclude at least "that [Defendants]

should have known there was a high likelihood that the firearms would end [up] with

wrongdoers who were highly likely to injure others," *Minnesota v. Fleet Farm LLC*, No. 22-CV-

2694 (JRT) (JFD), 2023 WL 4203088, at *12 (D. Minn. June 27, 2023), and at most that

Defendants "actually intended to bring about" the alleged harm by targeting individuals who

were not supposed to possess firearms, *Estados Unidos Mexicanos*, 91 F.4th at 535; *accord*

*Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 135 (2d Cir. 2021) ("[L]iability

turns upon whether the intervening act is a normal or foreseeable consequence of the situation

created by the defendant's action."); *cf.* Restatement (Second) of Torts § 431 ("The actor's

negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in

bringing about the harm.").  In short, the State plausibly alleges "violation[s] w[ere] a proximate

cause of the harm for which relief is sought."  *Id.* § 7903(5)(A)(iii).

In conclusion, the PLCAA does not preempt the State's claims under Executive Law

Section 63(12) and General Business Law Sections 349 and 350 because they are not "qualified

civil liability action[s]" under the statute.  15 U.S.C. § 7903(5)(A).

## 2. The Public Nuisance Claim

Neither is the State's public nuisance claim pursuant to New York General Business Law

Section 898 a "qualified civil liability action."  That is true even though the State's theory as to

that claim involves "the criminal or unlawful misuse" of firearms by third parties.  *See* SAC

¶¶ 612, 617.  To begin, as noted, the PLCAA is intended to immunize lawful dealers of firearms

from liability "for the harm *solely* caused" by the illegal misuse of third parties.  *Id.* § 7902(b)(1)

(emphasis added).  The State's public nuisance claim is also based on Defendants' own conduct

— namely, violations of their duties to "establish and utilize reasonable controls and procedures

to prevent [firearms] from being possessed, used, marketed or sold unlawfully," N.Y. Gen. Bus.

Law § 898-b(2) — which, in turn, allegedly led ineligible owners of firearms to misuse them.

  In any case, the predicate exception also applies to the State's public nuisance claim.  The

Moving Defendants do not dispute that General Business Law Section 898-c is a state statute

"that expressly regulate[s] firearms," *Beretta*, 524 F.3d at 402, and is therefore a qualifying

predicate.  *See Nat'l Shooting Sports Found., Inc. v. James*, 604 F. Supp. 3d 48, 59-60 (N.D.N.Y.

2022) ("*NSSF*") ("Because § 898 establishes liability exclusively on gun industry members for

certain actions[,] such as the failure to institute 'screening, security, inventory and other business

practices to prevent thefts of qualified products as well as sales of qualified products to straw

purchasers, traffickers, persons prohibited form possessing firearms under state or federal law, or

persons at risk of injuring themselves or others,' — the Court holds that § 898 expressly

regulates firearms.").[12]  That is a wise choice given, among other things, that the State's claim

under Section 898 fits squarely into one of the PLCAA's two explicit examples of cases that

would qualify for the predicate exception, as a "case in which the seller knowingly . . . failed to

---

[12] Notably, the Moving Defendants' challenges to the State's public nuisance law here
mirror those made by the plaintiffs in *NSSF*.  *See* 604 F. Supp. 3d at 57-60 (PLCAA
preemption); *id.* at 61-65 (Dormant Commerce Clause); *id.* at 65-69 (void for vagueness).  An
appeal from the district court's decision in *NSSF* is now pending before the Second Circuit.  *See
Nat'l Shooting Sports Found. v. James*, No. 22-1374 (2d Cir. filed June 24, 2022; argued Nov. 3,
2023).

make appropriate entry in[] any record required to be kept under Federal or State law with respect to" firearms.  *Id.* § 7903(5)(A)(iii)(I).  The Moving Defendants' arguments as to the other prongs of the predicate exception fall short for the reasons discussed above.  Accordingly, the PLCAA does not bar the State's public nuisance claim either.

### 3.  The Negligent Entrustment Claim

Finally, the State's negligent entrustment claim falls within the PLCAA's express statutory exemption for such claims.  *See* 15 U.S.C. § 7903(5)(A)(ii).  As relevant here, "negligent entrustment" for purposes of the PLCAA means "the supplying of a [firearm] by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the [firearm] is supplied is likely to, and does, use the [firearm] in a manner involving unreasonable risk of physical injury to the person or others."  *Id.* § 7903(5)(B).[13]  Here, the State alleges that Defendants used "common marketing strategies" to entice customers who are ineligible to buy traditionally manufactured and registered firearms, SAC ¶ 112, including by "targeting and selling (and reselling) to the very same New York customers who should have never had access to firearms," *id.* ¶ 573.  Moreover, Defendants touted the untraceable and "unregistered" nature of ghost guns as a major selling point.  *See, e.g.*, *id.* ¶ 171, 255.  And they failed to conduct any background checks to ensure that their buyers were eligible to purchase and possess a firearm.  *See, e.g., id.* ¶¶ 122-28, 261-63, 276-78, 434-36, 535-41 (sales and shipments of unfinished frames or receivers to undercover investigators without conducting background check); *see also id.* ¶¶ 143-48, 182-83, 198-204, 206-10, 218-24, 226-30, 238-49, 300-03, 314-

---

[13]     Whether the State's claim falls within the PLCAA's exemption for negligent entrustment claims turns on whether it fits the express federal definition.  The question of whether the claim satisfies the requirements of state law — an argument also pressed by the Moving Defendants, *see* Brownells Mem. 39-42 — is analytically distinct and thus addressed separately below.

15, 316, 318-26, 327-32, 339-43, 361-65, 367, 398, 403, 405-07, 409, 411, 413, 419, 479-81, 484, 486, 508, 510, 514-17, 524, 548, 550, 552, 556, 558 (sales of unfinished frames or receivers to people who either had no license or were disqualified from owning a firearm).  At this stage in the litigation, these allegations, taken together, are enough to support an inference that Defendants knew their customers would use their products "in a manner involving unreasonable risk of physical injury."  15 U.S.C. § 7903(5)(B).

*    *    *    *

In conclusion, none of the State's claims are preempted by the PLCAA.

## C.  The Second Amendment

The Moving Defendants' final catch-all defense rests on the Second Amendment.  Under the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), a court must first consider whether "the Second Amendment's plain text covers an individual's conduct."  *Id.* at 2117, 2129.  If it does, "the Constitution presumptively protects that conduct" and the government "must then justify" the challenged "regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.  "Stated differently, 'the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'"  *Antonyuk v. Chiumento*, 89 F.4th 271, 298 (2d Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 1217)).  Relying on *Bruen*, the Moving Defendants argue that "the restrictions the State seeks to impose in this case are unconstitutional" because "there were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries."  Brownells Mem. 56-57 (internal quotation marks omitted).  They urge the Court to dismiss all of the State's claims on this ground but focus the brunt of their analysis on

32

the State's public nuisance law, which they argue has no historical analogue. *See id.* The Moving Defendants' argument fails to persuade the Court for several reasons.[14]

First, the State's claims do not even "infringe" on the right to bear arms and, thus, do not trigger Second Amendment scrutiny. As the Supreme Court has emphasized, "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Instead, "the Second Amendment . . . codified a pre-existing right," traceable to the English Bill of Rights, which provided that Protestants "may have Arms for their Defence suitable to their Condition, and *as allowed by Law*." *Heller*, 554 U.S. at 592, 608 (emphasis added). Here, none of the local, state, or federal laws at issue prohibit people legally entitled to bear arms from purchasing a firearm or, for that matter, from buying unfinished frames and receivers and then making them into fully functional firearms; they "must simply buy serialized parts from a licensed dealer after undergoing the same background check as any other firearms purchaser." *See* ECF No. 204 ("Gov't Mem."), at 20 (emphasis added). The State's claims — all of which focus on unregistered firearms being sold to ineligible purchasers — thus fall outside the text of the Second Amendment, along with, for example, the very regulations that dictate who is and is not legally entitled to bear arms. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (emphasizing that the Second Amendment does not foreclose regulations that require license applicants to "undergo fingerprinting, a background

---

[14] The State contends that the Moving Defendants may not even raise arguments under the Second Amendment because it guarantees only an individual right to keep and bear arms that is "inapplicable to" entities such as Defendants. State Opp'n 37-39. The Second Circuit recently held, however, that firearm vendors and "those in like positions . . . have derivative standing to pursue Second Amendment claims on behalf of their customer base." *Gazzola v. Hochul*, 88 F.4th 186, 194-95 (2d Cir. 2023) (internal quotation marks omitted).

check, a mental health records check, and training in firearms handling and in laws regarding the use of force"); *cf. United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (holding that a "law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for *law-abiding citizens* to acquire a firearm for self-defense" (emphasis added)).

Second, and in any event, the laws at issue (including the State's public nuisance law) do not run afoul of the Second Amendment because they merely impose conditions and qualifications on the commercial sale of firearms. In its landmark cases prior to *Bruen*, the Supreme Court observed that there is a "longstanding" tradition of such laws and that they are "presumptively lawful" under the Second Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626-27). And the Second Circuit recently held that "[n]othing in the Court's more recent decision in . . . *Bruen* casts doubt on that understanding of the Second Amendment's scope." *Gazzola*, 88 F.4th at 195. The Moving Defendants do not even attempt to rebut the presumption of lawfulness that attaches on this understanding. Nor could they given the fact that, as discussed above, all of the State's claims are based on or otherwise consistent with longstanding firearm regulations (that, among other things, require firearms to be registered and purchasers to be eligible), and the Supreme Court's admonition that the Second Amendment does not even protect "those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

Finally, the laws at issue — which, broadly speaking, require licensed vendors to sell registered firearms to eligible purchasers — fit comfortably within "the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30. Because "[a]rms were considered an important means of protecting [] colonial settlements," colonial governments "substantially

34

controlled the firearms trade" by "provid[ing] and stor[ing] guns, control[ing] the conditions of trade, and financially support[ing] private firearms manufacturers."  *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 684-85 (9th Cir. 2017) (citing Solomon K. Smith, *Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*, 49TH PARALLEL, Autumn 2014, at 18-19).  For example, a 1652 New York law "outlaw[ed] illegal trading of guns, gun powder, and lead by private individuals"; around the same time, laws in Massachusetts, Connecticut, Maryland, and Virginia made it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians.  Robert J. Spitzer, *Gun Law History in the United States and the Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 57, 76-77 (2017); *see Teixeira*, 873 F.3d at 685.  In invoking history, the Moving Defendants improperly frame the question as regulations on the "manufacture of arms for personal use."  Brownells Mem. 56 (quoting Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 51-52 (2023)).  But the State brought this action based on Defendants' alleged violations of federal and state laws governing the manufacturing and sale of firearms, not laws governing whether one can manufacture arms at home for personal use.  And in any case, there is ample historical precedent for restrictions on the manufacturing and possession of arms for personal use, including a long tradition of gun serialization and enforcing serialization on a person-to-person level.  *See* State Opp'n 43 (discussing the history); *see, e.g.*, *United States v. Bradley*, No. 22-CR-98, 2023 WL 2621352, at *4-5 (S.D.W. Va. Mar. 23, 2023) (noting that early colonies had laws that "authorized door-to-door firearm censuses" for the purpose of recording "which men in the community ow[n]ed guns"); *United States v. Serrano*, No 21-CR-1590, 2023 WL 2297447, at *12 (S.D. Cal. Jan. 17, 2023) (discussing a 1631 Virginia law that required the recording of "arms and munitions"); *United States v. Tita*, No. 21-CR-334, 2022 WL 17850250,

at *7-8 (D. Md. Dec. 22, 2022) (explaining that various 17th century laws that "regulated trading and selling [of] firearms outside of each respective colony . . . are historical analogues to the current serial number requirement").

In short, the Moving Defendants' argument that the State's claim runs afoul of the Second Amendment right to keep and bear arms must be and is rejected.

## D. Defendants' Claim-Specific Arguments

Having rejected the Moving Defendants' broader arguments for dismissal of all or most of the State's claims, the Court will turn to their arguments for dismissal of particular claims for failure to state a claim, namely (1) the claims under New York General Business Law Sections 349 and 350 for false advertising and deceptive acts and practices; (2) the negligence *per se* claim; (3) the negligent entrustment claim; and (4) the public nuisance claim. The Court will address each in turn.

### 1. False Advertising and Deceptive Acts and Practices

First, the Moving Defendants contend that the State's claims under New York General Business Law Sections 349 and 350 fail because Defendants' marketing of unfinished frames and receivers as "legal" is protected by the First Amendment. Brownells Mem. 50-53. That contention is without merit.

For starters, Defendants' marketing of unfinished frames and receivers as "legal" constitutes commercial speech. According to the SAC, some Defendants proclaimed "NO FFL Required!" in "large bold green letters," SAC ¶ 119 (Arm or Ally), and in the midst of other advertising language, such as "Various colors available," *id.* ¶ 564 (Rock Slide), and "no RED TAPE . . . NO Registering . . . No Transfer fees . . . Ships right to your door," *id.* ¶ 161 (80 Percent Arms). Other Defendants labeled unfinished frames and receivers as "ATF Approved"

on their sales websites, *id.* ¶ 466 (KM Tactical), and prominently proclaimed "Ban Reversed on All of Our Products!" next to pictures of unfinished frames and receivers, *id.* ¶ 164 (screenshot). These allegations make plain that Defendants' statements were advertisements that "propose[d] a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760 (1976) (internal quotation marks omitted).

It follows that Defendants' statements at issue are entitled to less protection under the First Amendment. To determine whether a restriction of commercial speech passes constitutional muster, a court "must examine whether: (i) the regulated expression is false or misleading; (ii) the government interest is substantial; (iii) [the restriction] directly and materially advances the governmental interest asserted; and (iv) [the restriction] is no more extensive than necessary to serve that interest." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 264 (2d Cir. 2014) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980)). Here, the parties disagree only as to whether the State sufficiently alleges the first prong, which asks whether the speech at issue "is tainted by lies, misleading statements, or an illegal purpose." *Id.*; *see* Brownells Mem. 50-53; State Opp'n 54-57. The State has the better of the argument. For starters, the State alleges that Defendants continued to market unfinished frames and receivers as "legal" to New York consumers even after the State and New York City banned the sale or possession of ghost guns. *See* N.Y.C. Admin. Code § 10-314, N.Y. Penal Law §§ 265.63, 265.64. Furthermore, it can be plausibly inferred from the State's allegations that at least some Defendants knowingly evaded federal and state laws. For example, on Halloween Day in 2022, Defendant 80 Percent Arms posted a facetious photo of one of its products dressed as a "ghost gun," showing that it understood that "its unfinished frame and receiver products have only one use — to make untraceable ghost guns." SAC ¶ 172. And

various other Defendants touted the "untraceable" and "unregistered" nature of ghost guns as a major selling point.  *See, e.g.*, *id.* ¶¶ 171, 255.  In light of these allegations, Plaintiffs plausibly allege that Defendants' marketing served an "illegal purpose" and therefore constituted "false and misleading" speech.

The Moving Defendants' primary argument to the contrary — that their statements were merely "expressions of legal opinion," ECF No. 214 ("Brownells Reply"), at 31; *see* Brownells Mem. 50 — is unpersuasive.[15]  The argument focuses almost exclusively on whether the law was clear to Defendants, but what matters in determining whether a statement constitutes false and misleading commercial speech is whether the *customer* "understood [the statement] merely as an expression of opinion."  *Nat'l Conversion Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 628 (1969).  Notably, to be actionable under New York General Business Law Sections 349 and 350, the alleged deceptive act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Warren v. Stop & Shop Supermarket, LLC*, 592 F. Supp. 3d 268, 277 (S.D.N.Y. 2022) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995)).  "In determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial."  *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013).  In *National Conversion Corporation*, for example, the New York Court of Appeals found it significant that the "tenant's lawyer was persuaded not to verify" the truth of the landlords' statements about the law on account of the landlords' authority and the certainty with which they spoke.  23 N.Y.2d at 628; *see also Lukowsky v. Shalit*, 110 A.D.2d 563, 567-68

---

[15]    The Moving Defendants also argue that their statements could not have been false or misleading because they were "in accordance with authoritative guidance" at the time. Brownells Mem. 52.  That argument falls short at this stage of the litigation for the reasons discussed above.

(1st Dep't 1985) ("[A] misrepresentation of law is actionable if the representation is made by an individual possessing superior knowledge."). Here, every Defendant marketed their unfinished frames and receivers as "completely" legal, *see, e.g.*, SAC ¶ 171, 375, 378, on sales websites visited by thousands or millions of customers per month, *see* SAC ¶ 372, 463, 497, 529, 563. Furthermore, they did so from a position of superior knowledge as established merchants in the gun industry. Thus, the Moving Defendants' attempt to play down their advertisements as mere "opinions" fails to persuade.[16]

### 2. Negligence *Per Se*

By contrast, the State's claim for negligence *per se* must be and is dismissed, substantially for the reasons discussed in Brownells's memorandum of law in support of its motion to dismiss. *See* Brownells Mem. 37-39. Under New York law, violation of a statute may constitute negligence *per se* if "[1] a statute is designed to protect a class of persons, [2] in which the plaintiff is included, [3] from the type of harm which in fact occurred as a result of its violation." *German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995). Here, the State alleges that Defendants breached the relevant duty of care by violating two state and six federal laws governing the sale and manufacturing of firearms. SAC ¶ 625. The State, however, fails to specify — beyond the level of "the public," *id.* ¶ 626 — what "class of persons" each law is designed to protect. In fact, each of the six laws appears to impose restrictions on the activities of gun sellers and manufacturers without specifying that it is meant to protect a particular class of people, let alone the State. Courts routinely dismiss negligence

---

[16]     In arguing that their statements were mere "opinions," the Moving Defendants rely almost exclusively on the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). That case is distinguishable from this case for many reasons, but most clearly because Defendants here did not merely state that they "*believe*[*d*] [they were] obeying the law." *Id.* at 186.

*per se* claims based on alleged violations of such laws.  *See, e.g.*, *Hicksville Water Dist. v. Philips Elecs. N. Am. Corp.*, No. 21-CV-4442 (ADS), 2018 WL 1542670, at *10 (E.D.N.Y. Mar. 29, 2018); *Bd. of Cnty. Comm'rs of Cnty. of La Plata, Colo. v. Brown Grp. Retail, Inc.*, 598 F. Supp. 2d 1185, 1194-95 (D. Colo. 2009); *Reg'l Airport Auth. of Louisville and Jefferson Cnty. v. LFG, LLC*, 255 F. Supp. 2d 688, 693-94 (W.D. Ky. 2003); *cf. Antauga Cnty. Emergency Mgmt. Commc'n Dist. v. Bellsouth Commc'ns, LLC*, No. 15-CV-765 (SGC), 2016 WL 5848854, at *6 (N.D. Ala. Oct. 6, 2016) (allowing the plaintiff communication district to bring a negligence *per se* claim based on the defendants' alleged violation of statutory "sections . . . meant to fund emergency communications districts" (citing *Madison Cnty. Commc'ns Dist. v. MagicJack Vocaltec, Ltd*, No. 12-J-1922-NE (IPJ), 2012 WL 12925761, at *3-4)).

To the Court's knowledge, the decision in *Fleet Farm*, by the United States District Court for the District of Minnesota, is the only decision to allow a state government to allege negligence *per se* on behalf of "the public" at large.  *See* 2023 WL 4203088, at *14-15.[17]  There, the district court upheld Minnesota's negligence *per se* claim based on Fleet Farm's alleged violations of the federal Gun Control Act and its Minnesota counterpart, reasoning that these laws "are specifically designed to protect Minnesotans from gun violence, rather than just to promote the general welfare of the state."  *Id.*  The Court respectfully disagrees with this analysis.  That the laws are "designed to protect Minnesotans from gun violence" speaks more to the laws' subject matter than to the "class of persons" they are meant to protect.  Here, the State comes closest to alleging its membership in any relevant "class" when it points out that Congress

---

[17]     The district court's opinion in *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296 (E.D.N.Y. 2007), also contains some discussion of a claim of negligence *per se* brought by the City of New York, *see id.* at 330-31, but it was in service of a larger point about whether the complaint's allegations were sufficient to satisfy the "tortious act" requirement for personal jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(3).

intended the federal Gun Control Act to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence."  State Opp'n 69 (quoting Pub. L. No. 90-618, § 101 (1968)).  But this argument, too, falls short, because "provid[ing] support" to a class is not the same thing as protecting it.  And in any case, the SAC itself states only that the six laws at issue "are designed to protect the public from gun violence."  SAC ¶ 626.

In short, the State has failed to establish the elements of negligence *per se*, and the Moving Defendants' motions to dismiss that claim must be and are granted.

### 3.  Negligent Entrustment

Next, the Moving Defendants contend that the State fails to state a claim for negligent entrustment under New York law.[18]  Under New York's negligent entrustment doctrine, the "owner or possessor of a dangerous instrument is under a duty to entrust it to a responsible person whose use does not create an unreasonable risk of harm to others."  *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 236 (2001), *answering certified question*, 264 F.3d 21 (2d Cir. 2001).  A duty arises "where . . . the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm," *id.* at 233, and where "the degree of knowledge the supplier of a chattel has or should have concerning the entrustee's propensity to use the chattel in an improper or dangerous fashion," *id.* at 236-37.  To begin, unfinished frames and receivers are "dangerous instruments."  The Moving Defendants' assertions to the contrary belie the State's well-pleaded allegations that amateurs can easily convert unfinished frames and receivers into fully functional firearms in under an hour.  SAC ¶¶ 31, 41, 124, 281.  According to the SAC, Defendants certainly knew that unfinished frames

---

[18]     As noted, this argument is legally and logically distinct from whether the State's claim meets the definition of "negligent entrustment" for purposes of the PLCAA discussed above.

and receivers would not remain unfinished for long — indeed, they placed heavy emphasis on the ease of conversion in their marketing of these products. *Id.* Furthermore, Defendants, as the manufacturers and sellers of these dangerous instruments, were in the "best position to protect against the risk of harm." *Hamilton*, 96 N.Y.2d at 233; *see City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 280 (E.D.N.Y. 2004) (concluding that gun manufacturers and dealers are "in a position to substantially reduce" harm "occasioned by illegal gun use"); *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 399 (E.D.N.Y. 2004) (concluding that it would be "premature to dismiss [the plaintiff's] negligence claim" against defendants, including firearms distributors, who "were a direct link in the causal chain" and "were in the best position to prevent the foreseeable harm"). Accordingly, the State's negligent entrustment claim satisfies the common-law elements under New York law and thus cannot be dismissed.

**E. Public Nuisance**

The Moving Defendants final claim-specific contention is that the State's public nuisance law claim must be dismissed because the relevant law, New York General Business Law Section 898-b, is void for vagueness and violates the dormant Commerce Clause. Neither argument has merit.

**1. Vagueness**

Whether a law is void for vagueness turns on whether it provides "sufficient notice and . . . limits on the discretion of law enforcement authorities." *Arriaga v. Mukasey*, 521 F.3d 219, 224-25 (2d Cir. 2008) (citing *Kolender v. Lawson,* 461 U.S. 352, 357 (1983)); *see also Thibodeau v. Portuondo,* 486 F.3d 61, 65-66 (2d Cir.2007). The relevant inquiry asks "whether the statute, as written, provides notice sufficient to alert ordinary people as to what conduct is prohibited," mindful that statutes "need not achieve meticulous specificity, which would come at

the cost of flexibility and reasonable breadth." *Id.* (cleaned up). An as-applied challenge —

which is what the Moving Defendants bring here — is cabined by the facts of the case; a court

should focus on "the litigant's actual conduct, and . . . should not analyze whether a reasonable

person would understand that certain hypothetical conduct or situations violate the statute." *VIP*

*of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010).

Significantly, a "relaxed vagueness test" applies here because Section 898-b regulates

(allegedly) harmful commercial conduct, *VIP of Berlin*, 593 F.3d at 186, and subjects Defendants

to civil, not criminal, penalties, *see Arriaga*, 521 F.3d at 223; *see NSSF*, 604 F. Supp. 3d at 67.[19]

Applying this relaxed standard to the facts of the case, the Court concludes that the State's

application of Section 898-b to Defendant's alleged conduct is not void for vagueness. The State

alleges that Defendants engaged in "conduct either unlawful in itself and unreasonable under all

the circumstances" by marketing and selling ghost guns to people who are ineligible to purchase

traditionally manufactured and registered firearms. N.Y. Gen. Bus. Law § 898-b(1); SAC

¶¶ 106-573. Those factual allegations also support the State's claim that Defendants failed to

"establish and utilize reasonable controls and procedures to prevent its qualified products from

being possessed, used, marketed, or sold unlawfully in New York state" as required by New

York General Business Law Section 898-b(2). SAC ¶¶ 574, 591, 614-15. Finally, the State

alleges that these actions predictably "endanger[ed] the safety and health of the public" by

causing a statewide influx of ghost guns, which are statistically more likely to be used in violent

crimes and recovered in the possession of those who are ineligible to own firearms. N.Y. Gen.

---

[19] The Moving Defendants argue that the Court must apply a stricter vagueness test
because the State's application of the public nuisance law runs counter to the Second
Amendment. Brownells Mem. 42. That argument is without merit given the Court's analysis
and conclusions above.

Bus. Law § 898-b(1); SAC ¶¶ 585-87, 612.  Given how closely the State's allegations track the language of the statute, Defendants had more than sufficient notice of the restrictions that Section 898-b imposed on their activities.  *Cf. NSSF*, 604 F. Supp. 3d at 69 (rejecting a facial vagueness challenge to Section 898-b because "[i]t expressly applies to certain business practices, [and] 'intelligibly forbids a definite course of conduct'" (quoting *United States v. Powell*, 423 U.S. 87, 93 (1975)).  Finally, because the State's application of Section 898-b is intricately tied to Defendants' violations of other federal and state laws, the State's public nuisance claim provides ample "limits on the discretion of law enforcement authorities." *Arriaga*, 521 F.3d at 224.  In sum, the Moving Defendants' vagueness challenge falls short.

## 2.  The Dormant Commerce Clause

The State's public nuisance law adopts the PLCAA's definition of a firearm.  N.Y. Gen. Bus. Law § 898-a(6).  The PLCAA, in turn, applies to a firearm as defined in 18 U.S.C. § 921(a)(3) (or a component of a firearm or ammunition) "that has been shipped or transported in interstate or foreign commerce."  15 U.S.C. § 7903(4).  Focusing on the last clause, the Moving Defendants argue that Section 898-b violates the Dormant Commerce Clause because the law "impermissibly regulates *only* Defendants' products that have been shipped or transported in interstate or foreign commerce," and "regulates extraterritorially."  Brownells Mem. 47.  A state statute violates the Dormant Commerce Clause if it: (1) "clearly discriminates against interstate commerce in favor of intrastate commerce"; (2) "imposes a burden on interstate commerce incommensurate with the local benefits secured"; or (3) "has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question."  *Grand River Enters. Six Nations v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021) (cleaned up).  Section 898-b does none of these things.

First, contrary to the Moving Defendants' argument, Section 898-b does not discriminate against interstate commerce in favor of intrastate commerce, including by regulating "only" interstate commerce.  To begin, the PLCAA's definition does not foreclose Section 898-b's application to firearms that are manufactured within New York with "component parts" that have been "shipped or transported in interstate or foreign commerce."  Furthermore, the Moving Defendants fail to "identify an[] in-state commercial interest that is favored, directly or indirectly, by the challenged statute[] at the expense of out-of-state competitors."  *Selevan v. New York Thruway Auth*., 584 F.3d 82, 95 (2d Cir. 2009) (internal quotation marks omitted).  Indeed, as the State persuasively argues, "the point of this lawsuit is to *halt* the flow of ghost guns in New York, not to favor New York retailers of them, and Defendants have not argued otherwise."  State Opp'n 46-47; *see also NSSF*, 604 F. Supp. 3d at 63 (rejecting the plaintiffs' argument that Section 898-b violates the Dormant Commerce Clause, in part because the plaintiffs "do not allege that § 898 does not apply to [New York's] 3,827 federal firearms licensees").

Second, Section 898-b does not burden interstate commerce in a way that is "clearly excessive in relation to the putative local benefits."  *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1282 (2d Cir. 1995); *see also Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970).  This so-called *Pike* test is permissive, and "[s]tate laws frequently survive" it.  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008) (collecting cases).  Here, it is clear from the face of the statute that Section 898-b is directed at "legitimate local concerns" about firearms "being possessed, used, marketed or sold unlawfully" by and to ineligible New Yorkers.  N.Y. Gen. Bus. Law § 898-b(2); *see* State Opp'n 47.  Any incidental effect that Section 898-b may have on interstate commerce is not incommensurate with this important local benefit.

Finally, the State's public nuisance law does not have the practical effect of extraterritorial control. "In our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior," but are nevertheless valid and constitutional. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023). Therefore, laws with an extraterritorial effect are not automatically invalid. *Id.*; *see Nat'l Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1130-31 (7th Cir. 1995) (Easterbrook, J.) ("[A]lmost every state and local law — indeed, almost every private transaction — affects interstate commerce."). Section 898-b may have some unavoidable "repercussions beyond state lines," *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 67 (2010), but it does not purport to directly control out-of-state commerce by, for example, "making specific reference to the terms of [] pricing . . . and attaching in-state consequences where the pricing terms violated the statutes," *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 221 (2d Cir. 2004); *see also VIZIO, Inc. v. Klee*, 886 F.3d 249, 255 (2d Cir. 2018); *NSSF*, 605 F. Supp. 3d at 64-65.

In conclusion, Section 898-b does not violate the Dormant Commerce Clause either.

## F.  Joint and Several Liability

Finally, the Moving Defendants argue that the State fails to adequately allege a basis for joint and several liability because any potential injury traceable to Defendants is "readily divisible," Brownells Mem. 60, and because equity prohibits joint and several liability where, as here, "the contribution of each of the Defendants is minimal," *id.* at 61. Under New York law, "[w]hen two or more tort-feasors act concurrently or in concert to produce a single injury, they may be held jointly and severally liable" because "there is a joint enterprise and a mutual agency, such that the act of one is the act of all and liability for all that is done is visited upon each." *Ravo by Ravo v. Rogatnick*, 70 N.Y.2d 305, 309-10 (1987). Accordingly, "[p]ersons who by

their several acts or omissions maintain a public or common nuisance, are jointly and severally liable for such damages as are the direct, immediate and probable consequence of it." *Simmons v. Everson*, 124 N.Y. 319, 323-24 (1891); *see also A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. at 347 (same); *Beretta U.S.A. Corp.*, 315 F. Supp. 2d at 282 (same, and holding that firearm-dealer defendants may be subject to joint and several liability for creation or maintenance of a public nuisance). Where the alleged tort-feasors acted neither in concert nor concurrently, they may "nevertheless be considered jointly and severally liable . . . in the instance of certain injuries which, because of their nature, are incapable of any reasonable or practicable division or allocation among multiple tort-feasors." *Ravo by Ravo*, 70 N.Y.2d at 310. Where "one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor." *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 447 F. Supp. 2d 289, 297 (S.D.N.Y. 2006) (citing Restatement (Second) of Torts § 433B(2)).

Given the large variation in both the sizes of the Moving Defendant companies and the number of unfinished frames and receivers each Defendant sold in New York, the Moving Defendants' equity-based concerns are understandable. *See id.* at 299 ("[T]o utilize a theory of concurrent wrongdoing, plaintiffs must show that . . . it would not violate traditional notions of fairness and justice to hold all defendants jointly and severally liable for the injury."). But these concerns do not justify dismissal of the State's theory of joint and several liability at this stage of the litigation. As discussed previously, the State alleges that Defendants concurrently sold unfinished frames and receivers to New York consumers during the Relevant Time Period, used "common marketing strategies" to attract ineligible buyers for their unserialized firearms, and contributed to the endangerment of public safety by causing an influx of ghost guns — which

are, among other things, more likely to be used in violent crimes — into the State.  SAC ¶¶ 91,
112-14, 574; *see also* ECF No. 207 ("State Severance Opp'n"), at 3 ("[T]he State [] allege[] that
each defendant's actions purposefully expanded the market for their own and each other's ghost
gun products in New York and beyond, and that their actions collectively and inseparably
exacerbated the crisis of gun violence afflicting the State and beyond.").  These allegations are
sufficient for present purposes.  Moreover, because the State adequately pleads a public nuisance
claim under Section 898-b, and sufficiently alleges that Defendants acted concurrently, it is not
necessary here to consider whether the alleged injuries are capable of "any reasonable or
practicable division" among Defendants.  *Ravo by Ravo*, 70 N.Y.2d at 310; *see State v.
Schenectady Chems., Inc.*, 103 A.D.2d 33, 38 (3d Dep't 1984) (imposing joint and several
liability on the defendant without regard to the ascertainable quantity of chemical waste by-
products it disposed into the surface water).  In any event, the Moving Defendants do not offer
any theory or argument as to how the alleged injury in this case should be apportioned among
them.  *MTBE Prod. Liab. Litig.*, 447 F. Supp. 2d at 297.  The Moving Defendants may, of
course, challenge joint and several liability later if discovery produces a different picture of
whether and to what extent they acted concurrently or in concert with each other.  But there is no
basis at this juncture to dismiss the State's theory.

## G.  Motions to Sever

For similar reasons, the motion to sever filed by Defendants Brownells, Salvo
Technologies, Primary Arms, and Rock Slide can be swiftly denied.  Rule 21 of the Federal
Rules of Civil Procedures provides courts with "broad discretion to sever parties or claims from
the action" upon a determination that they were misjoined under Rule 20.  *Agnesini v. Doctor's
Assocs., Inc*., 275 F.R.D. 456, 458 (S.D.N.Y. 2011) (cleaned up).  But severance under Rule 21

is to be employed "only in exceptional circumstances," *id.*, and "[t]he requirements of [Rule 20] are to be interpreted liberally to enable . . . court[s] to promote judicial economy," *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 160 (S.D.N.Y. 2009).  Given the allegations in the SAC, this case does not present "exceptional circumstances" justifying severance.  As discussed above, the State alleges that Defendants are jointly and severally liable for the public nuisance arising "out of the same transaction, occurrence, or series of transactions and occurrences."  Fed. R. Civ. P. 20(a)(2)(A).  And the Moving Defendants seeking severance do not (and cannot) deny that this case contains at least some "question[s] of law or fact common to all defendants."  Fed. R. Civ. P. 20(a)(2)(B).  (Among other things, every Moving Defendant relies almost exclusively on Brownells's omnibus brief in support of its motion to dismiss.)  Nor are there other overriding considerations in favor of severing now.  At this stage, the Court is skeptical of the Moving Defendants' bald assertion that there will be "very little overlapping evidence" among Defendants.  ECF No. 185 ("Defs.' Severance Mem.'), at 6.  As discussed above, the State sufficiently alleges that Defendants engaged in "common marketing strategies" and jointly contributed to the creation and maintenance of a public nuisance.  These claims will require some common — or at least related — proof of liability and/or damages across all Defendants.  Thus, severance will not protect Defendants from any unreasonable risk of "guilt by association" or "spillover," *id.* at 8, and leaving the State's joinder in place will therefore "serve the interest of judicial economy by preventing likely duplication of effort."  *Skyline Steel, LLC v. Pilepro, LLC*, No. 13-CV-8171 (JMF), 2015 WL 999981, at *5 (S.D.N.Y. Mar. 5, 2015).

**CONCLUSION**

The Court has considered the Moving Defendants' remaining arguments and, at least at this stage of the litigation, finds them to be without merit.[20]  Accordingly, and for the reasons discussed above, Defendants' motions to dismiss are DENIED, except as to the State's negligence *per se* claims, which must be and are dismissed.  The motion to sever filed by Defendants Brownells, Salvo Technologies, Primary Arms, and Rock Slide is also DENIED.

Unless and until the Court orders otherwise, the Moving Defendants shall file an answer with respect to Plaintiffs' remaining claims **within three weeks of this Order**.  By separate Order, the Court will schedule an initial pretrial conference for some time thereafter.

The Clerk of Court is directed to terminate ECF Nos. 174, 176, 178, 180, 181, 184, 186, 188, 190, and 191.

SO ORDERED.

Dated: February 23, 2024
New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[20]     For example, Defendants' miscellaneous arguments for dismissing the State's claims — i.e., Defendants' argument that the State's claim pursuant to New York Executive Law Section 63(12) should be dismissed to the extent it relies on Defendants' alleged violation of New York City Administrative Code Section 10-314; Defendant Blackhawk's argument that SAC ¶ 172 should be stricken as unsubstantiated; the arguments of Defendants KM Tactical, Glockstore, and Primary Arm that the State fails to sufficiently allege their individual liabilities as to some of its claims — are rejected substantially for the reasons stated above and in the State's memorandum of law in opposition to Defendants' motions to dismiss.  *See* State Opp'n 77-84.