**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, <br><br><br> Plaintiff, <br><br> -against- <br><br> ARM OR ALLY, LLC; BLACKHAWK MANUFACTURING GROUP, INC., a/k/a 80 Percent Arms, Inc. or 80 Percent Arms; SALVO TECHNOLOGIES, INC., a/k/a 80P Builder or 80P Freedom Co.; BROWNELLS INC., a/k/a Brownells or Bob Brownell's; GS PERFORMANCE, LLC, a/k/a Glockstore or GSPC; INDIE GUNS, LLC; KM TACTICAL; PRIMARY ARMS, LLC; RAINIER ARMS, LLC; and ROCK SLIDE USA, LLC, <br><br> Defendants. | Case No. 22-cv-06124 (JMF) |

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................................... 1

ARGUMENT ............................................................................................................................... 4

    I.     UNDER *VANDERSTOK*, *ARM OR ALLY I*, AND ORDINARY MEANING, DEFENDANTS' PRODUCTS ARE "FIREARMS" AS ALLEGED ...................................... 4

        A.    *VanDerStok* Underscores that this Court's Opinion in *Arm or Ally I* Was Correct......... 4

        B.    The State Has More Than Carried Its Rule 8 Pleading Burden................................... 10

        C.    Defendants Were On Notice About Their Illegal Conduct and *VanDerStok* Does Not Require Formal Notice....................................................................................................11

    II.    PLCAA DOES NOT IMMUNIZE DEFENDANTS FROM THIS ACTION ................. 14

        A.    The State's Case is Not a Qualified Civil Liability Action Barred by PLCAA............ 14

        B.    *Smith & Wesson Brands* Has No Bearing on This Action ........................................... 15

        C.    Defendants' Other PLCAA Arguments are Improper and Meritless ........................... 19

           1.    The Second Amended Complaint Alleges Violations of "Statute[s] Applicable to the Sale or Marketing" of Firearms ...................................................................................... 19

           2.    The Second Amended Complaint Alleges that the Defendants' Illegal Conduct Proximately Caused the Harm for Which Relief is Sought ........................................... 21

CONCLUSION............................................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................................10

*Bondi v. VanDerStok*,
   604 U.S. 458 (2025).......................................................................................... *passim*

*Hain v. Jamison*,
   28 N.Y.3d 524 (N.Y. 2016) ...............................................................................................21

*Humphries v. Mitsubishi Chem. Am., Inc.*,
   No. 23 Civ. 6214, 2026 WL 1493504 (S.D.N.Y. May 28, 2026)............................................11

*Nat'l Shooting Sports Found'n v. James*,
   144 F.4th 98 (2d Cir. 2025) ........................................................................................15, 21

*New York ex rel. James v. Arm or Ally, LLC* (Arm or Ally III),
   No. 24-773, 2026 WL 537890 (2d Cir. Feb. 26, 2026) ..................................................... 3-4, 7

*New York v. Arm or Ally, LLC* (Arm or Ally I),
   718 F. Supp. 3d 310 (S.D.N.Y. 2024)........................................................................... *passim*

*New York v. Arm or Ally, LLC* (Arm or Ally II),
   No. 22 Civ. 6124, 2024 WL 2270351 (S.D.N.Y. May 20, 2024)............................................3

*Prescott v. Slide Fire Solutions, LP*,
   410 F. Supp.3d 1123 (D. Nev. 2019) ..................................................................................20

*Salter v. Meta Platforms, Inc.*,
   240 A.D.3d 1378 (4th Dept. 2025) .....................................................................................20

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
   605 U.S. 280 (2025)......................................................................................... *passim*

*Soto v. Bushmaster Firearms Int'l, LLC*,
   202 A.3d 262 (2019) .......................................................................................................20

**Federal Statutes**

15 U.S.C.
    § 7903(5).................................................................................................................14
    § 7903(5)(A)(iii) ...............................................................................................14, 20

18 U.S.C.
    § 921(a)(1)(B) ..........................................................................................................6
    § 921(a)(3) ........................................................................................................... 4-7
    § 922(g)................................................................................................................4, 20
    § 922(n).....................................................................................................................20
    § 923(a)(1) ...............................................................................................................10

**State Statutes**

General Business Law
    §§ 349, 350, and 898-c...........................................................................................18

N.Y. Executive Law
    § 63(12).............................................................................................4, 14-15, 18-19

N.Y. Penal Law
    §§ 265.00(8), 265.07(2), 265.64 ............................................................................3

New York General Business Law
    §§ 349 and 350..................................................................................... 14-15, 20
    § 898-a *et seq*. .......................................................................................................15
    § 898-c ...............................................................................................................15, 20

**Rules**

Rule 12(b)(6)...............................................................................................................3

Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the State of New York ("the State"), submits this Memorandum of Law in opposition to the renewed Motion to Dismiss filed by Defendants.

## PRELIMINARY STATEMENT

In 2024, this Court read the plain text of the Gun Control Act and the Protection of Lawful Commerce in Arms Act and concluded that neither provided a basis for dismissal. Nothing in the Supreme Court's recent decisions in *Bondi v. VanDerStok* or *Smith & Wesson Brands v. Estados Unidos Mexicanos* undermines any aspect of this Court's decision in 2024. Defendants' renewed motion to dismiss rehashes arguments that this Court previously rejected and points to no authority that requires this Court to revisit its 2024 decision. Defendants' renewed motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

Defendants are in the business of selling "unfinished frames and receivers," which are "the core part[s] of a handgun, rifle, or shotgun, but missing a few drill holes and containing a small amount of extra plastic." Second Amended Complaint, ECF No. 157 (the "SAC") ¶¶ 20, 22, 40, 81. A nominally "unfinished" frame or receiver is "easily convertible into the finished product, a deadly weapon," commonly known as a "ghost gun" because it lacks any serial number or any record of its manufacture. *Id.* ¶¶ 20, 28. Defendants' products are virtually identical to the completed, federally- and state-regulated frames and receivers for sale at a legitimate gun store, and in fact are designed to mimic popular weapons platforms such as the frames of Glock pistols or the receivers of AR-9, AR-15, or AK-47 rifles. *Id.* ¶ 23. "Unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose." *Id.* ¶ 32.

1

The step of converting the nominally "unfinished" frame or receiver is, in the words of Defendants, "pretty simple" and "ridiculously easy," such that "even a caveman can do this." *Id.* ¶ 88. All in, the process takes under an hour for an amateur with basic hand tools, or less than thirty minutes for someone with prior experience or mechanical aptitude. *Id.* ¶ 31. Defendant Blackhawk/80 Percent Arms summarized the process in one of its marketing videos: "You start out with this blank that we call an '80 percent lower receiver,' because about 80 percent of the work is already done for you. You take this part, snap it into an easy jig, and drill into the areas the template guides you through. And in no time, you have a military grade AR-15 lower, that simply snaps together with the other parts contained in our AR-15 kit. You now have a fully functional, legal AR-15. . . . Best of all, it's completely unregistered and legal." *Id.* ¶ 171.

Unregistered, perhaps, but not legal. *See id.* ¶ 3. As alleged in the Second Amended Complaint, unfinished frames and receivers (and the ghost guns made from them) are naturally attractive to persons who would not be able to purchase guns legally, or who want a gun that cannot be traced back to them. *Id.* ¶ 29. Defendants served that market by making the ease of conversion central to their marketing, and by touting their products as a way to avoid federal and state laws. *Id.* ¶¶ 50, 52, 53. And they increased their sales by portraying their products as legal, when in fact the products as-sold and the "ghost guns" inevitably made from them were prohibited by New York and federal law. *See id.* ¶¶ 47, 50-53, 85, 87, 112, 171, 604, 620, 623.

Defendants sold "directly to consumers without following any of the federal or state laws and regulations that apply to the sale of guns, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be

traced back to its source if used in a crime."[1] *Id.* ¶¶ 3, 27 (citing allegations against each individual defendant). During the limitations period, Defendants made at least 100,000 shipments to consumers in New York, including several to undercover agents employed by the New York State and New York City, without conducting background checks, serializing the weapons, or taking steps to ensure that the recipients of their products could legally possess a firearm.[2] *See id.* ¶¶ 75-76, 107-111.

On April 19, 2023, Defendants moved to dismiss the Second Amended Complaint. *See* ECF Nos. 175, 177, 179, 182, 183, 187 & 189. On February 23, 2024, the Court issued a 50-page decision, finding that the State's claims satisfied Rule 12(b)(6) threshold, "except in one narrow respect" concerning a claim for negligence *per se*. *New York v. Arm or Ally, LLC* (Arm or Ally I), 718 F. Supp. 3d 310, 316, 344 (S.D.N.Y. 2024). This Court certified an interlocutory appeal. *New York v. Arm or Ally, LLC* (Arm or Ally II), No. 22 Civ. 6124, 2024 WL 2270351, at *1 (S.D.N.Y. May 20, 2024). On February 26, 2026, the Circuit issued an order noting that the Supreme Court had issued two significant decisions while the appeal was pending: *Bondi v. VanDerStok*, 604 U.S. 458 (2025), and *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025). *New York ex rel. James v. Arm or Ally, LLC* (Arm or Ally III), No. 24-773, 2026 WL 537890 (2d

---

[1] Defendants KM Tactical and Rock Slide USA, LLC do not hold federal firearms licenses and thus are not legally permitted to "engage in the business of . . . dealing in firearms." SAC ¶ 76.

[2] The "Factual Background" section of Defendants' memorandum of law largely avoids mentioning the Second Amended Complaint, citing to it only once. ECF No. 288 at 3 ("Unfinished frames and receivers are component parts that, when a gunsmith further machines and combines with other parts, can constitute a functioning frame or receiver, and eventually, a working firearm."). However, the State does not allege that unfinished frames and receivers are merely "component parts," *id.*, but rather that they are "the core part of a handgun, rifle, or shotgun, but missing a few drill holes and containing a small amount of extra plastic." SAC ¶ 20. Additionally, the State does not allege that it is a "gunsmith" (a term of art under New York law, and a person legally allowed to possess unfinished frames and receivers, *see* N.Y. Penal Law §§ 265.00(8), 265.07(2), 265.64) who finishes Defendants' products into functional weapons, but rather regular consumers, many of whom cannot legally possess a weapon. *Id.* ¶ 29.

3

Cir. Feb. 26, 2026). The panel noted that *VanDerStok* had indicated that it was possible "that at some point a product may be 'so incomplete or cumbersome to assemble' as to no longer constitute a weapon, or 'so far from a finished frame or receiver that they cannot fairly be described using those terms,'" and noted that "[b]ecause the district court issued the order that is the subject of these appeals prior to the decision in *VanDerStok*, it did not conduct that analysis as to the products at issue here." *Id.* at *2. The Circuit remanded the case back to this Court to apply that standard, and to consider the impact of *Smith & Wesson* on the Court's Protection of Lawful Commerce in Arms Act ("PLCAA") analysis, "if any." *Id.*

## ARGUMENT

I. **UNDER *VANDERSTOK*, *ARM OR ALLY I*, AND ORDINARY MEANING, DEFENDANTS' PRODUCTS ARE "FIREARMS" AS ALLEGED**

A. ***VanDerStok* Underscores that this Court's Opinion in *Arm or Ally I* Was Correct**

Nothing in the Supreme Court's *VanDerStok* decision casts doubt on this Court's prior conclusion that "assuming the truth of the allegations in the [Second Amended Complaint] . . . the State plausibly alleges that Defendants' products were 'firearms'" under federal law.[3] *Arm or Ally*

---

[3] None of the State's claims rise or fall on the question of whether their products are "firearms" under 18 U.S.C. § 921(a)(3). While the question is relevant to a portion of the State's first cause of action for repeated and persistent illegality under N.Y. Executive Law § 63(12), that claim alleges violations of multiple predicate statutes, including state law violations and violations of New York City law. *See* SAC ¶ 599; *Arm or Ally I*, 718 F. Supp. 3d at 320 ("[T]he State alleges that Defendants' business practices violated various local, state, and federal laws regulating firearms."). Moreover, even if unfinished frames and receivers did not meet the definition of a "firearm"—and *VanDerStok* reaches the opposite holding—the "finished" versions indisputably do. *See* SAC ¶ 23. The Second Amended Complaint also alleges that through their business practices, Defendants aided and abetted possession and acquisition of these "finished" weapons in ways that violate federal law, such as possession by persons prohibited from having a weapon under 18 U.S.C. § 922(g) and acquisition of weapons without the required background checks, serialization, and recordkeeping. SAC ¶ 599; *cf. VanDerStok*, 604 U.S. at 462 (discussing how these aspects of the Gun Control Act "keep guns out of the hands of criminals" and "assist law enforcement authorities in investigating serious crimes" (citation omitted)). Therefore, even if Defendants' definitional argument had merit, it would not actually warrant dismissal of any of the State's claims.

*I,* 718 F. Supp. 3d at 328 (citing 18 U.S.C. § 921(a)(3)). Defendants in this case had relied heavily on the Fifth Circuit's majority opinion in *VanDerStok*, which the Supreme Court has since reversed; 604 U.S. at 484, this Court, like the Supreme Court, found that opinion to be "neither binding nor persuasive." *Id.* at 324-25 (citation omitted). Far from undermining this Court's analysis, the Supreme Court's *VanDerStok* opinion echoes it on virtually every pertinent issue.

The plaintiffs in *VanDerStok*, like Defendants here, "argued that [18 U.S.C. § 921(a)(3)] cannot be fairly read to reach weapon parts kits or unfinished frames or receivers." 604 U.S. at 466; *cf., e.g.,* SAC ¶¶ 2, 24, 50, 51 (describing defendants' sale of kits in addition to unfinished frames or receivers alone). The Court accordingly conducted a close textual analysis of the statute, which covers "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," explaining that it lays out "two requirements. First, a 'weapon' must be present. Second, that 'weapon' must meet one of three criteria: It must be able to expel a projectile by the action of an explosive, designed to do so, or susceptible of ready conversion to operate that way." *Id.* at 468.

The *VanDerStok* Court looked to the same dictionary definition that this Court had cited a year earlier, finding that the term "weapon," means "an instrument of combat," and that the finished version of these products "[p]lainly" qualify. *Id.* at 470; *accord Arm or Ally I,* 718 F. Supp. 3d at 323. And as the Supreme Court explained, even where a kit as sold "requires some assembly," it nonetheless already "qualifies as a 'weapon.'" *VanDerStok,* 604 U.S. at 470; *accord Arm or Ally I,* 718 F. Supp. 3d at 323 ("the definition of 'weapon' does not exclude objects that require preparation or some modification."). That is because "[t]he term 'weapon' is an artifact noun," which is "characterized by an intended function." *VanDerStok,* 604 U.S. at 470 (citation omitted). Justice Gorsuch's majority opinion includes examples of other nouns that work this way: "[a]n

5

author might invite your opinion on her latest *novel*, even if she sends you an unfinished manuscript," or "[a] friend might speak of the *table* he just bought at IKEA, even though hours of assembly remain ahead of him." *Id.* at 470-71 (emphasis in original). And so a complete parts kit of the sort sold by the Defendants in this case is a weapon because "its intended function is clear. . . . Yes, perhaps a half hour of work is required before anyone can fire a shot. But even as sold, the kit comes with all the necessary components, and its intended function as [an] instrument of combat is obvious."[4] *Id.* at 471.

So too with unfinished frames and receivers, even when sold outside of a kit. The *VanDerStok* Court found that "[t]he answer here turns on subsection (B) of § 921(a)(3)," which establishes that the definition of "firearm" includes "the 'frame or receiver of any such weapon.'" *Id.* at 477. "[L]ike the word 'weapon' in subsection (A), the terms 'frame' and 'receiver' in subsection (B) are artifact nouns," the Supreme Court held. *Id.* at 479. "And, as artifact nouns, they may sometimes describe not-yet-complete objects." *Id.* As a practical matter, the unfinished frames and receivers discussed in *VanDerStok*, like the ones sold by Defendants, were "capable of ready conversion into a working firearm." *Id.* at 480; *cf. e.g.,* SAC ¶ 31. And the Supreme Court, like this Court in *Arm or Ally I*, recognized that by referring to "any such weapon" in 18 U.S.C. § 921(a)(1)(B)'s discussion of frames and receivers, Congress "expressly incorporates" the prior subsection's inclusion of instruments that were "designed to or may readily be converted" into weapons. *VanDerStok* 604 U.S. at 482-83; *accord Arm or Ally I, 718 F. Supp. 3d at 325* ("[w]ith its placement immediately following (A), we can easily understand (B)'s 'any such weapon'

---

[4] The statutory meaning of "weapon" covering unfinished versions was further supported by the fact that the term explicitly includes "a starter gun," which does not fire projectiles but can be modified to in under an hour, and because the term includes weapons that are "designed" to fire a projectile or "capable of being 'readily . . . converted'" to do so. *VanDerStok, 604 U.S. at 471-72.*

language to incorporate the definition of 'weapon' in (A), which includes the phrase, 'designed to or may readily be converted.'" (citation omitted).

To be sure, both *VanDerStok* and the Second Circuit's remand order indicated that some products could be so far from their intended function as a weapon that they fall outside the scope of 18 U.S.C. § 921(a)(3). The Supreme Court emphasized that the statute does not "reach[] every piece or part that can be used to produce a firearm," nor to "any combination of parts susceptible of conversion into a frame or receiver with sufficient time, tools, and expertise." *Id.* at 474, 481. But the Court drew the line very far from the weapons and allegations in this case, explaining that to fall outside the statute, a product would need to be "so far from a finished frame or receiver that they cannot fairly be described using those terms." *Id.* at 481. The Second Circuit likewise considered in its remand order that to fall outside the definition of a "firearm," Defendants' product would need to be "'so incomplete or cumbersome to assemble' as to no longer constitute a weapon, or 'so far from a finished frame or receiver that they cannot fairly be described using those terms,' thus bringing them outside the scope of [Section 921(a)(3)]." *Arm or Ally III*, 2026 WL 537890 at *2 (quoting *VanDerStok*, 604 U.S. at 473, 481).

The allegations of the Second Amended Complaint are more than sufficient to place Defendants' products within the scope of Section 921(a)(3), particularly after *VanDerStok*'s recognition that the definition is "broad[]," "generous," and "a capacious one indeed." 604 U.S. at 462, 463, 477. The State alleges that Defendants' products "try to avoid [this] definition of a 'firearm' simply by leaving a few key holes undrilled or plastic unfiled," SAC ¶ 22, but the products are "easily convertible into the finished product, a deadly weapon," *id.* ¶ 20. The State alleges that the process is simple, and "can be carried out by an amateur in under an hour with basic hand tools." *Id.* ¶ 31; *cf. VanDerStok*, 604 U.S. at 472 (a starter gun is a "firearm" when "a

7

person without any specialized knowledge can convert [it] into a working firearm using everyday tools in less than an hour."). And "[i]n the hands of someone with prior experience or mechanical aptitude, an unfinished frame or receiver can be converted into a working gun in under thirty minutes." SAC ¶ 31. Defendants, as alleged, take steps to make the process even simpler "by shipping the products in a 'jig,' a plastic setting for the frame or receiver that makes it easy for even an amateur to see and follow the steps necessary to convert the unfinished frame into finished form." Id. ¶ 43; see also id. ¶ 45 ("The jig makes sure that an untrained consumer will easily be able to remover the small plastic rails with precision."). Some of the Defendants provide further assistance by uploading videos demonstrating how to "transform this 'not a firearm' into a fully functioning 9mm handgun." Id. ¶ 376; see also id. ¶¶ 41, 43, 289. One Defendant offered "a step-by-step guide to convert the 'unfinished' receiver into the core of an AR-15 rifle." Id. ¶ 120. Another offered a "telephone 'tech line' where 'we'll be glad to help you out'" with finishing the weapon. Id. ¶ 282. And the building process arrives at one—and only one—result, as "[t]hese unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose." Id. ¶ 32; cf. VanDerStok, 604 U.S. at 471 (definition satisfied when "the intended function of the unfinished object is obvious to speaker and listener alike.").

The status of Defendants' products as "firearms," and the ease of conversion, are best demonstrated by Defendants' own marketing statements. Blackhawk/80 Percent Arms, for instance, put up a video entitled "Build Your Own Gun in 1 Hour 100 Legal" promising that the process is "super simple," and "[e]ven a caveman can do this." SAC ¶ 170; see also id. ¶ 163 (conversion process is "ridiculously easy"); id. ¶ 171 ("about 80 percent of the work is already done for you"); id. ¶ 532 (describing Rainier Arms's products as "almost-completed pieces of machined metal or plastics"). Brownells said in one of its instructional videos that the process is

"'pretty simple to do' and 'usually takes about 45 minutes to an hour to complete.'" *Id.* ¶ 282; *see also id.* ¶ 280 (process requires only "some basic mechanical aptitude and a few simple tools found in many home workshops"); *id.* ¶ 281 ("Wait, it can't be that simple? Yes, it is. Watch this video."). Arm or Ally promised consumers that "[i]n the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools." SAC ¶ 124. Glockstore described it as "a DIY product that's easily accomplished by anyone even moderately handy." *Id.* ¶ 374.

Even beyond the allegations in the Second Amended Complaint, and beyond the admissions in Defendants' marketing, the application of *VanDerStok*'s holding to Defendants' products is best shown with a straightforward eye test. Justice Gorsuch's opinion included a visual comparison between a complete frame and a nominally "unfinished" frame, substantially identical to the comparison at Paragraph 35 of the Second Amended Complaint. *VanDerStok*, 604 U.S. at 478. And a glance at the two was enough for the Supreme Court to conclude that the product was a frame, and therefore a firearm: "Just look again at the second photo. What else would you call it?" *Id.* at 479.



9

### B.  The State Has More Than Carried Its Rule 8 Pleading Burden

Defendants' memorandum of law, for its part, addresses none of this—in fact, the portion of the brief discussing the definition of a firearm cites neither the Second Amended Complaint nor the Court's opinion in *Arm or Ally I*. *See* ECF No. 288 at 8-9 ("MTD"). Instead, Defendants' brief argues, without support, that *VanDerStok* requires a "product-by-product" framework and that the Complaint simply "lumps all Defendants together and makes general allegations about them collectively."[5] *Id.* at 9. This disregards Section III of the Second Amended Complaint, which spends 467 paragraphs discussing each defendant, including the products it sold, representations it made, shipments to persons charged with crimes involving ghost guns, and the specifics of sales to undercover officers. *See* SAC ¶¶ 106-573; *contra* MTD at 9 (complaining that it is "not the Defendants' burden to rebut unknown allegations").

Defendants appear to contend that *VanDerStok* imposed a higher pleading standard in ghost guns cases, and that the State has failed to plead with the required particularity. MTD at 9. But nothing in *VanDerStok* indicates that a higher pleading standard is required and Defendants cite no law for the assertion; instead, a complaint need only "contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009)

---

[5] Defendants also contend that "the [Second Amended] Complaint is devoid of any allegations of a connection between the Defendants." MTD at 9. The assertion again is belied by the Second Amended Complaint. *See* SAC ¶ 53 ("Defendants have shared a common business model"); *id.* ¶ 112 ("Defendants' common marketing strategies have misled New York customers into believing that unfinished frames and receivers are legal workarounds to New York's gun control laws, as well as federal law."); *id.* ¶ 573 ("Defendants have jointly and severally caused, contributed to, or maintained the same crisis . . . ."); *see also Arm or Ally I*, 718 F. Supp. 3d at 344 (discussing common allegations and explaining that "the Court is skeptical of the Moving Defendants' bald assertion that there will be 'very little overlapping evidence' among Defendants." (citation omitted)). In any event, Defendants fail to explain why a lack of common allegations would be fatal to an argument that their products are "firearms" under 18 U.S.C. § 923(a)(1), let alone cite to any authority with such a holding.

(quoting Fed. R. Civ. P 8(a)(2)). The Second Amended Complaint more than satisfies this standard. Nor is there anything insufficient with making allegations about the Defendants as a group, given that they engaged in the same illegal business practice, namely selling unfinished frames and receivers into the New York market. "[T]he Second Circuit has also made clear that Plaintiffs do not always need to 'separate out claims against individual defendants' as long as those defendants have 'notice of the substance of plaintiff's claims' against them. In particular, if a plaintiff alleges that multiple defendants engaged in the same conduct, the plaintiff may properly make 'allegations against "Defendants" collectively.'" *Humphries v. Mitsubishi Chem. Am., Inc.*, No. 23 Civ. 6214, 2026 WL 1493504, at *6 (S.D.N.Y. May 28, 2026) (citation omitted).

### C. Defendants Were On Notice About Their Illegal Conduct and *VanDerStok* Does Not Require Formal Notice

Defendants, relying on Justice Kavanaugh's concurrence in *VanDerStok,* which addressed "*mens rea* issues with respect to ATF's 2022 rule," argue that the State will be unable to demonstrate that Defendants' conduct falls within PLCAA's predicate exception, which requires a "knowing" violation of a predicate statute. Additionally, Defendants argue that at most, any liability should be limited to conduct that occurred after the implementation of the 2022 ATF rule. Defendants' argument, which mischaracterizes the nature of both the State's lawsuit and Justice Kavanaugh's concurrence, fails for several reasons.

As a threshold matter, only Justice Kavanaugh's concurrence, which is not the majority opinion and therefore not binding law, addresses fair notice. In his concurrence, Justice Kavanaugh wrote that the Gun Control Act penalizes background-check violations that were committed "knowingly" and that establishing this *mens rea* "requires 'proof of knowledge of the facts that constitute the offense.'" VanDerStok, 604 U.S. at 487 (citation omitted). Thus, according to Justice Kavanaugh, this lesser "*mens rea* requirement could therefore create concerns about fair notice, at

11

least in certain cases." [6] The concurrence emphasized that criminal prosecution of some violations of the ATF's rule could be unfair, because "the line is not entirely clear" between illegal ghost gun kits and lawful sales of component parts, and because the penalties for violations are criminal "fines and imprisonment." *Id.* at 486. These concerns are not implicated here, where this lawsuit does seek criminal penalties. Moreover, while Defendants claim that "the lack of fair notice goes directly to the predicate exception's requirement that Defendants 'knowingly' violated a predicate statute," MTD at 19, the Second Amended Complaint is replete with allegations that the Defendants knew that they were selling unserialized guns illegally, in violation of state, federal, and local laws, and specifically for the purpose of evading those laws.[7]

Defendants argue that the State is seeking "to impose backward-looking liability following a change in the federal regulatory landscape" and that Justice Kavanaugh's fair notice concerns about future criminal prosecutions should also apply to fair notice concerns looking backward. MTD at 19. Defendants mischaracterize the nature and scope of the State's lawsuit, which is not seeking to hold Defendants retroactively liable following the promulgation of the 2022 rule. The State's lawsuit seeks to hold Defendants liable for violating a myriad of state, federal, and local laws, nearly all of which were in effect prior to 2022. *See* SAC ¶ 599. Moreover, to the extent that

---

[6] Justice Kavanaugh also raised concerns about violations of the licensing, recordkeeping, and serialization requirements of the Gun Control Act, but notes that the *mens rea* is "willfully." Justice Kavanaugh opines that "with respect to ATF's rule, the 'willfulness' requirement should help prevent the Government from unfairly penalizing an individual who is not aware that his conduct violates the law." *VanDerStok*, 604 U.S. at 487.

[7] This Court has already rejected Defendants' argument that the predicate exception does not apply to the State's claim because the State failed to allege that Defendants "knowingly" violated the underlying statutes. *Arm or Ally*, 718 F. Supp. 3d at 330. This Court explained that "[i]t is well established, however, that 'the phrase 'knowingly violates' requires knowledge of facts and attendant circumstances that comprise a violation of the statute, *not* specific knowledge that one's conduct is illegal,'" and found that the "State's allegations of knowledge meet that standard." *Id.* (citation omitted).

Defendants' argument is that ATF's pre-2022 practices led Defendants to believe that their products were lawful, this Court has already rejected Defendants' argument "that their products could not have been 'firearms' prior to 2022 based on ATF's guidance, albeit without prejudice to its renewal after discovery" and found that at this stage, the State has plausibly alleged that the Defendants' products were "firearms" during the Relevant Time Period, which predates the 2022 rule. *Arm or Ally I*, 718 F. Supp. 3d at 328.

Second, Defendants' assertion that they were "complying with administrative guidance that was operative and valid at the relevant time," MTD at 19, is belied by the regulatory record adduced by the State in the briefing of the prior motion to dismiss, and by the Court's prior opinion. ECF No. 206 Exs. A, C-H. As the Court recognized, even the ATF's 2015 administrative ruling indicating that some receiver blanks may not be firearms was referring to a product that "'generally requires substantial additional machining before it can accommodate fire control components' and that '[u]nlicensed individuals propose to take either a blank, or a frame or receiver . . . to a licensed dealer-gunsmith or machine shop for further machining and finishing so that it can be assembled into a complete or functional firearm' and engraved or stamped with a serial number." *Arm or Ally I*, 718 F. Supp. 3d at 327 (quoting ATF Ruling 2015-1 at 1-2.) "Defendants' products here are at a much higher 'stage of manufacture' than that." *Id.* Defendants' argument rings particularly hollow because ATF has a procedure where Defendants (or any distributor or manufacturer) can seek clarification from ATF about whether a product would be considered a firearm. *See VanDerStok, 604 U.S. at 485–86 (Sotomayor, J., concurring)*. That Defendants chose not to avail themselves of that procedure should not be grounds for evading liability.

13

## II.    PLCAA DOES NOT IMMUNIZE DEFENDANTS FROM THIS ACTION

Defendants' renewed motion to dismiss fails to raise any colorable argument that this Court erred in its previous decision denying Defendants' PLCAA arguments. They argue that "PLCAA's broad grant of immunity applies to several defendants here." [8] MTD at 10. But neither the text of PLCAA nor its purpose counsel in favor of dismissal. And nothing in the U.S. Supreme Court's decision in *Smith & Wesson Brands v. Estados Unidos Mexicanos* undermines any aspect of this Court's prior decision denying the Defendants' motion to dismiss on PLCAA grounds.

### A.    The State's Case is Not a Qualified Civil Liability Action Barred by PLCAA

PLCAA prohibits bringing a Qualified Civil Liability Action, which is defined, in relevant part, as a "civil action . . . brought . . . against . . . a seller of a qualified product. . . for damages . . . or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." 15 U.S.C. § 7903(5). PLCAA exempts from this prohibition any Qualified Civil Liability Action that satisfies the predicate exception, which includes, in relevant part, any action alleging that: "a . . . seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. 7903(5)(A)(iii).

This Court previously found that the State's claims under New York Executive Law § 63(12) and New York General Business Law §§ 349 and 350 are not Qualified Civil Liability Actions, because they "are premised on the State's allegations of the Defendants' *own* 'repeated

---

[8] The State notes that, though Defendants have filed a notice of motion on behalf of all nine remaining Defendants seeking dismissal "under the Protection of Lawful Commerce in Arms Act," *see* ECF No. 287 (Notice of Motion to Dismiss on behalf of all Defendants), this Court has already found that defendants KM Tactical and Rock Slide USA cannot raise that defense, as they do not possess federal firearms licenses. *See Arm or Ally I*, 718 F. Supp. 3d at 329, n. 9 ("PLCAA does not bar any claims brought against Defendants KM Tactical and Rock Slide USA").

or persistent illegal conduct,' such as selling and transporting unregistered firearms without any background check in violation of federal and state laws and falsely advertising these products as 'legal' in violation of state laws." *Arm or Ally I*, 718 F.Supp.3d at 239 (emphasis in original). Additionally, this Court concluded that, to the extent that the State's claims under New York Executive Law § 63(12), New York General Business Law §§ 349 and 350, and New York General Business Law § 898-c, were Qualified Civil Liability Actions, they nevertheless all fell within the predicate exception, insomuch as the Second Amended Complaint alleged knowing violations of statutes applicable to the sale of firearms, namely Section 898-c of the General Business Law and the "at least twenty-five state and federal laws that 'expressly regulate firearms.'" 718 F. Supp. 3d at 330-333; *see also Nat'l Shooting Sports Found'n v. James*, 144 F.4th 98, 111 (2d Cir. 2025) (upholding constitutionality of New York General Business Law § 898-a *et seq*., and concluding that "Section 898 falls within the bounds of PLCAA's predicate exception as written"). This holding rested upon the straightforward application of the plain text of PLCAA to the Second Amended Complaint.

## B.  *Smith & Wesson Brands* Has No Bearing on This Action

*Smith & Wesson Brands* involved a broad set of claims "mostly sounding in negligence," brought by the government of Mexico against seven gun manufacturers. Mexico's complaint "alleges that the manufacturers' firearms violations were ones of aiding and abetting, rather than of independent commission." 605 U.S. at 288. The Court and the parties agreed that Mexico's lawsuit was a Qualified Civil Liability Action, because it sought to hold the manufacturers "liable for the 'criminal or unlawful misuse' of guns by third parties. *Id*. at 287, 288. The issue before the Supreme Court was whether the government of Mexico had "plausibly alleged" that the gun manufacturers—who did not directly sell their products to consumers—had consciously and

15

culpably aided and abetted the sales made by "bad apple" gun stores to straw purchasers. *Id*. at 291. The Supreme Court emphasized that "Mexico's complaint sets for itself a high bar," because its complaint did "not pinpoint, as most aiding-and-abetting claims do, any specific criminal transactions that the defendants (allegedly) assisted." *Id*. at 294. Additionally, the complaint did not "confront[] that the manufacturers do not directly supply any dealers," and the complaint did not allege that the manufacturers even knew who the "bad apple" gun dealers were. *Id*. at 295-96. Ultimately, the Supreme Court held that "Mexico [had] not adequately pleaded what it needs to: that the manufacturers 'participate in' those sales 'as in something that [they] wish[ ] to bring about,' and 'seek by [their] action to make' succeed." *Id*. at 294. The most they had alleged was "'passive nonfeasance'—a 'failure to stop' independent retailers downstream from making unlawful sales," which did not suffice. *Id*. at 297. Because *Smith & Wesson* concluded that the complaint did not meet the pleading standards for aiding and abetting liability, it did not address proximate causation. *Id*. at 291.

The Second Amended Complaint alleges illegal acts "of independent commission" and bears no resemblance to the complaint filed by the Mexican government. *Id*. at 288. First, the State has alleged that the Defendants in this case *directly* violated a host of state and federal laws by: (1) shipping and selling unfinished frames and receivers in violation of State and City law; (2) engaging in deceptive business practices and false advertising (including by representing that it was legal to sell or possess ghost guns); (3) transporting unfinished frames or receivers to unlicensed persons in New York state from out of state; (4) directly selling unfinished frames or receivers to persons prohibited from possessing guns; and (5) selling and delivering unfinished frames or receivers without conducting a background check. SAC ¶ 599. And while the Second Amended Complaint includes allegations that Defendants aided and abetted the possession of

firearms by convicted and otherwise prohibited persons, it does what Mexico did not do—namely, it alleges direct sales to prohibited persons and points to dozens of "specific criminal transactions that the defendants (allegedly) assisted." *Smith & Wesson Brands*, 605 U.S at 294. As just one example of the allegations establishing aiding and abetting liability, the Second Amended Complaint describes a series of shipments that Defendants Arm or Ally, 80 Percent Arms, Brownells, and KM Tactical made to a man named Jonathan Santos, who was subsequently indicted for over 252 different violations of state firearms laws. SAC ¶¶ 143-149, 182-183, 314-315, 479-481.[9] The Second Amended Complaint also alleges specific conduct on the part of each Defendant that encouraged prohibited persons to violate the law by buying unfinished frames or receivers. As just one example, Defendant 80 Percent Arms advertised that it required "no background checks, no registration and no database"—something sure to appeal to those who know they could not pass a background check—and went so far as to post a picture of their product "dressed as a 'ghost gun.'" SAC ¶¶ 170, 172. In sum: the Second Amended Complaint looks nothing like the complaint filed by Mexico.

Defendants raise a series of arguments that misconstrue the Supreme Court's holding and analysis in *Smith & Wesson Brands*:

First, Defendants argue that *Smith & Wesson Brands* should be read as holding that PLCAA is a "broad grant of immunity" to gun dealers and that Congress was concerned about lawsuits "imposing liability on an entire industry for harm that is solely caused by others." MTD at 10, 11.

---

[9] Defendants also argue that the allegations about specific criminal misconduct by purchasers means that these claims are all Qualified Civil Liability Actions. MTD at 12. The State has alleged that it is the Defendants' misuse of firearms that is harming the State; these allegations about the Defendants' aiding and abetting the crimes of others do not change the focus of this lawsuit: Defendants' illegal trafficking of unserialized firearms into New York State in violation of local, state and federal law.

The Supreme Court explained only that PLCAA "bars *certain* lawsuits against manufacturers and sellers of firearms" and said nothing about a "broad grant of immunity." *Smith & Wesson Brands, 605 U.S. at 285 (emphasis added))*.

Second, Defendants contend that "the Supreme Court strongly reaffirmed that the PLCAA bars suits for downstream harm from the firearms industry's products." MTD at 12. To be sure, the Supreme Court was concerned that the "downstream harms" that Mexico sought to remedy were many steps removed from any affirmative acts carried out by the gun manufacturers. 605 U.S. at 288-89. But nothing in *Smith & Wesson* suggests that a lawsuit, such as this, against companies that *directly* sold hundreds of guns directly to prohibited persons in violation of local, state and federal laws is prohibited by PLCAA.[10]  *See* 605 U.S. at 286 ("If a plaintiff can show . . . that, say, a [distributor] committed a gun-sale violation proximately causing the harm at issue—then a suit can proceed, even though it arises from a third party's later misuse of a gun.").

Third, Defendants suggest that *Smith & Wesson Brands* analyzed what it means for a statute to be "applicable to the sale or marketing of firearms," MTD at 12, notwithstanding the fact that the Court's opinion did not address that question. As discussed below, this Court was correct to conclude that Executive Law § 63(12) and General Business Law §§ 349, 350, and 898-c are "applicable to" the sale or marketing of firearms.[11]

---

[10] In support of their argument that the Second Amended Complaint's allegations cannot survive PLCAA, Defendants repeatedly cite to a non-operative pleading, the First Amended Complaint. *See, e.g.*, MTD at 12. The First Amended Complaint's allegations are not relevant here.

[11] Defendants also argue that Congress intended that "the *only* permissible claims predicated on negligence are for 'negligent entrustment or negligence per se." MTD at 11 (emphasis in original). However, the Second Amended Complaint does not include claims for general negligence. In any event, nothing in *Smith & Wesson Brands* suggests that Mexico's negligence claims were categorically excluded from the predicate exception; rather, the opinion plainly contemplates that a different pleading, premised on direct violations of federal gun laws, could meet the exception.

18

And finally, Defendants argue that "*Smith & Wesson* forecloses this Court's earlier reasoning that PLCAA immunity applies only where a plaintiff seeks to hold parties covered by the PLCAA liable for conduct committed 'solely' by third parties and not where any conduct by the Defendants is alleged." MTD at 13. But the Supreme Court took pains to emphasize that Mexico's central theory—"that the defendants failed to exercise 'reasonable care' to prevent trafficking of their guns into Mexico, and so are responsible for the harms arising there from the weapons' misuse"—brought it within the definition of a Qualified Civil Liability Action. *Smith & Wesson Brands,* 605 U.S. at 287. By contrast, the Second Amended Complaint alleges direct misconduct (in the Supreme Court's terminology, "independent commission," *Id*. at 288, rather than a failure to act). Thus, contrary to Defendants' assertions, *Smith & Wesson Brands* does not "foreclose" any aspect of this Court's earlier opinion.

## C. Defendants' Other PLCAA Arguments are Improper and Meritless

Defendants' motion to dismiss disregards this Court's instruction to limit their arguments to whether *VanDerStok* or *Smith & Wesson Brands* impact this case and to not "relitigate issues decided by the Court that are not affected by those decisions." ECF No. 286. While they should be denied for that reason alone, they also fail on their own merits.

### 1. The Second Amended Complaint Alleges Violations of "Statute[s] Applicable to the Sale or Marketing" of Firearms

Defendants argue that Executive Law § 63(12) is not a proper predicate statute under PLCAA. MTD at 15-17. "But Executive Law Section 63(12) is not the relevant law for purposes of the predicate exception, as it merely provides the vehicle by which the State alleges violations of state or federal laws regulating firearms." *Arm or Ally I,* 718 F. Supp. 3d at 330. There is nothing in PLCAA that requires that the predicate statute be the source of the cause of action, as this Court recognized. This is consistent with the text of the predicate exception, which references only "an

action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing" of firearms. 15 U.S.C. § 7903(5)(A)(iii). The predicate exception lists examples of statutory provisions that can serve as predicates, and notably, they are not statutes that create causes of action. *Id*. (listing 18 U.S.C. § 922(g), (n) as sample predicate statutes). Thus, in enacting PLCAA, Congress understood and intended that a statute could serve as a predicate even where (as here) it did not provide the cause of action. Nothing in *Smith & Wesson Brands* in any way supports the Defendants' argument to the contrary.

Defendants also argue that General Business Law §§ 349 and 350 cannot serve as predicate statutes, because they are generally applicable. This argument is also without merit. Sections 349 and 350 prohibit deceptive business practices and false advertising, and like other state analogues to the FTC Act, they have been applied to the sale or marketing of firearms. *See, e.g., Salter v. Meta Platforms, Inc.*, 240 A.D.3d 1378, 1384 (4th Dept. 2025) (allowing §§ 349 and 350 claims to proceed against firearm accessory seller); *see also Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 325 (2019) (holding that Connecticut Unfair Trade Practices Act "qualifies as a predicate statute"); *Prescott v. Slide Fire Solutions, LP*, 410 F. Supp.3d 1123, 1138-39 (D. Nev. 2019) (allowing Nevada Deceptive Trade Practices Act to serve as predicate statute, and noting that "PLCAA's language, purpose, and legislative history [do not] foreclose the [Nevada Deceptive Trade Practices Act] from serving as a predicate statutory violation").

Finally, Defendants argue that the State's claim under § 898-c of the General Business Law is "prohibited by the PLCAA because [it is] premised on 'general tort theories of liability that traditionally have been embodied in the common law.'" MTD at 17 (citing *Ileto v. Glock*, 565 F.3d 1126, 1135 (9th Cir. 2009). This argument is foreclosed by

20

*v. James,* which held that "Section 898 falls within the bounds of PLCAA's predicate exception as written." 144 F.4th 98, 111 (2d Cir. 2025).

**2. The Second Amended Complaint Alleges that the Defendants' Illegal Conduct Proximately Caused the Harm for Which Relief is Sought**

As to proximate causation, Defendants acknowledge that "the Supreme Court in *Smith & Wesson* did not reach the question of proximate cause," yet argue that in passing PLCAA, "Congress has already identified the intervening actions that break the causal chain and bar a liability action—the criminal or unlawful misuse of qualified products by third parties." MTD at 18. But *Smith & Wesson Brands* explains otherwise: "the predicate violation opens a path to making a gun manufacturer civilly liable for the way a third party has used the weapon it made." 605 U.S. at 286. This is supported by the plain text of PLCAA, which expressly contemplates that the predicate exception applies where there has been third party misuse of a weapon (*i.e.* an intervening action). And it is consistent with common law principles of proximate causation, in which a third party's acts do not cut off the chain of causation where (as here) they were foreseeable. *See, e.g. Hain v. Jamison*, 28 N.Y.3d 524, 529 (N.Y. 2016).

## CONCLUSION

For the foregoing reasons, the State respectfully requests that the Defendants' renewed Motion to Dismiss be denied in its entirety.

Dated: June 4, 2026                    Respectfully Submitted,

                                       LETITIA JAMES
                                       Attorney General of the State of New York

                                       By: _____
                                       Molly Thomas-Jensen
                                       Matthew Conrad

21

Abigail Katowitz-Liu
James M. Thompson
28 Liberty Street
New York, New York 10005
(212) 416-8679
molly.thomas-jensen@ag.ny.gov
matthew.conrad@ag.ny.gov
abigail.katowitz-liu@ag.ny.gov
james.thompson@ag.ny.gov

22